**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE SWEETWATER, A WILDERNESS LODGE, L.L.C., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-1795C |
| | ) | (Judge Merow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S UNOPPOSED MOTION FOR LEAVE OF COURT TO FILE OUT OF TIME ITS MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Plaintiff The Sweetwater, A Wilderness Lodge LLC respectfully requests leave of court to file out of time its pretrial Memorandum of Contentions of Fact and Law. Plaintiff's memorandum was due July 11, 2005 but plaintiff was unable to electronically file it due to problems in converting it from Word format to Adobe Acrobat. However, plaintiff did email a copy of the memorandum to defendant's counsel on July 11, 2005 in Word format, and is filing the same version of the document with the Court in Adobe Acrobat. Plaintiff's Memorandum of Contentions of Fact and Law is attached as an exhibit hereto. Plaintiff's counsel has been informed by defendant's counsel that defendant does not oppose this motion.

For the foregoing reasons, plaintiff respectfully requests that the Court grant its motion for leave of court to file its memorandum out of time.

Respectfully submitted,

/s/

Kevin R. Garden
The Garden Law Firm P.C.
901 N. Pitt Street, Suite 325
Alexandria, VA 22314

Counsel for Plaintiff

Dated: June 12, 2005

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-1795C (Judge Merow) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Kevin R. Garden
THE GARDEN LAW FIRM P.C.
Suite 325
901 North Pitt Street
Alexandria, VA 22314
(703) 535-5565

Date: July 12, 2005

# TABLE OF CONTENTS

STATEMENT OF THE CASE TO BE PROVEN AT TRIAL .......... 1

STATEMENT OF THE PRIMARY RELEVANT FACTS TO BE PROVEN AT TRIAL RELATED TO LIABILITY .......... 3

Facts Related to The Sweetwater's Claim .......... 3

Facts Related to the Forest Service's Affirmative Defense .......... 17

STATEMENT OF THE PRIMARY RELEVANT FACTS RELATED TO DAMAGES .......... 20

*Breach of contract* .......... 20

*Out of pocket expenses* .......... 20

*Lost profits* .......... 21

*Value of Lodge Facilities* .......... 22

*Fifth Amendment Taking* .......... 25

STATEMENT OF THE ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT .......... 26

*Issues related to liability* .......... 26

*Issues related to the quantum of damages* .......... 27

DISCUSSION OF THE APPLICABLE LEGAL PRINCIPLES .......... 28

*Duty to cooperate and not to hinder* .......... 28

*Breach of contract by failing to invoke Clause 15* .......... 31

*Tortious breach of contract* .......... 34

*Applicability of CDA* .......... 37

*Fifth Amendment Taking* .......... 38

PLAINTIFF'S WITNESS LIST .......... 40

## TABLE OF AUTHORITIES

**CASES** **PAGE**

*Alpine Camping Services*, B-238625.2, 90-1 CPD ¶ 580 .......... 38

*C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539 (1993) .......... 30

*Cedar Lumber, Inc. v. United States*, 27
5 Cl. Ct. 539 (1984) .......... 28

*CEMS, Inc. v. United States*,
2003 WL 22533158 (Fed. Cl. 2003) .......... 29

*Commerce International Co. v. United States*,
338 F.2d 81 (Ct. Cl. 1964) .......... 1, 30
*Davidson Industries, Inc.*,
AGBCA No. 95-166-1, 96-2 BCA ¶ 28,299 (1996) .......... 33, 34

*Detroit Housing Corp. v. United States*,
55 Fed. Cl. 410 (2003) .......... 35

*Essex Electro Engineers, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2001) .......... 29, 30

*George A. Fuller Co. v. United States*,
69 F. Supp. 409 (Ct. Cl. 1947) .......... 28

*Kehm Corp. v. United States*,
93 F. Supp. 620 (Ct. Cl. 1950) .......... 28, 29

*Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1 (1984) .......... 37, 38

*L.L. Hall Construction Company v. United States*,
379 F.2d 559 (Ct. Cl. 1966) .......... 28

*Lewis-Nicholson, Inc. v. United States*,
550 F.2d 26 (Ct. Cl. 1977) .......... 28, 29

*Meyers Cos., Inc. v. United States*,
41 Fed. Cl. 303 (1998) .......... 35

*Peter Kiewet Sons' Co. v. United States*, 138 Ct. Cl. 668, 674 (1954) .......... 2, 30

*Pine & Timber, Inc. v. United States*,
50 Fed. Cl. 35 (2001) .......... 28, 29

*Ryco Constr., Inc. v. United States*,
55 Fed. Cl. 184 (2002) .......... 29

*S.A. Healey Company v. United States*,
576 F. 2d 299 (Ct. Cl. 1978) .......... 31

*Sacramento Nav. Co. v. Salz*,
273 U.S. 326 (1927) .......... 28

*Steve Rados, Inc.*,
AGBCA No. 77-130-4, 82-1 BCA ¶ 15,624 .......... 28

*Sun Oil v. United States*, 215 Ct. Cl. 716 (1978) .......... 30

*Tecom, Inc. v. United States*, No. 00-475C (Fed. Cl. June 27, 2005) .......... 1, 2, 30

*Walter Dawgie Ski Corporation v. United States*,
30 Fed. Cl. 115 (1993) .......... 28, 30

*Wetsel-Oviatt Lumber Co. Inc. v. United States*,
38 Fed. Cl. 563 (1997) .......... 33, 34

**STATUTES AND REGULATIONS**

28 U.S.C. § 2680(a) .......... 36

Contract Disputes Act,
41 U.S.C. § 602 .......... 37

36 C.F.R. § 251 .......... 37

**MISCELLANEOUS**

John Cibinic, Jr. & Ralph C. Nash, Jr., ADMINISTRATION OF GOVERNMENT CONTRACTS
297 (3d Ed. 1995) .......... 29

RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) .......... 1

Pursuant to the Court's Scheduling Order dated March 29, 2005, plaintiff The Sweetwater, A Wilderness Lodge LLC ("The Sweetwater") hereby submits its Memorandum of Contentions of Fact and Law and its Witness List.[1]

**STATEMENT OF THE CASE TO BE PROVEN AT TRIAL**

At issue in this matter is whether or not the government, acting through the Forest Service, breached its contractual obligation to The Sweetwater to cooperate and not to hinder performance under the Term Special Use Permit ("Term SUP") which it entered into with The Sweetwater. This Court has recently held in explaining the duties to cooperate and not to hinder, which are part of the over-arching duty of good faith and fair dealing:

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor *believes his conduct to be justified*. But the obligation goes further; bad faith may be overt or may consist of inaction, and fair dealing may *require more than honesty*. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: . . . [evasion of the spirit of the bargain] . . . lack of diligence and slacking off . . . and interference with or failure to cooperate in the other party's performance.
>
> . . . .
>
> Breach of the duty to cooperate is assessed under a reasonableness standard, and depends upon "the particular context, and its surrounding circumstances." *Commerce Int'l Co. v. United States*, 167 Ct. Cl. 529, 36 (1964).
>
> . . . .
>
> Similarly, under the implied duty not to hinder performance, Government actions that are unreasonable under the circumstances constitute a breach.

*Tecom, Inc. v. United States*, No. 00-475C (June 27, 2005) at 42, *quoting* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)(emphasis in original); *see also Tecom*, at 38, 42 (noting that a breach

[1] The Sweetwater has endeavored to succinctly state in the following document its position related to the issues to be addressed in the impending trial, but also points out to the Court that it previously set forth a detailed description of the relevant facts and law in Plaintiff's Memorandum In Support Of Its Cross-Motion For Summary Judgment As To Liability On Counts I and II

of the duty to cooperate and not to hinder can be caused by gross negligence or gross error in decision making as well as subterfuges, evasiveness and inaction). In addition, this duty has been expressed as the obligation "not to *willfully or negligently* interfere with the contractor in the performance of his contract." *Peter Kiewet Sons' Co. v. United States*, 138 Ct. Cl. 668, 674 (1954)(emphasis added).

The overall evidence will demonstrate that the Forest Service, whether through a deliberate agenda, gross negligence or a combination of the two, repeatedly engaged in actions consisting of deceit, evasiveness and gross error which brought about the cessation of lodge activities and impending removal, at no cost to the Forest Service, of the lodge facilities and operations which it had authorized The Sweetwater to conduct pursuant to the Term SUP. Notwithstanding the Forest Service's attempts to place a spin on its actions relevant to The Sweetwater, what stands out very clearly is that *all of the Forest Service's actions in this matter* are strikingly consistent with the goals outlined in the following candid deposition statement made by the Forest Service District Ranger who was primarily responsible for administering The Sweetwater's permit.

> [W]e would be better off trying to secure the [Sweetwater] lodge through a conservation buyer [which would tear down the lodge rather] than continuing on with the permit up there; or, **you know, do away with the permit and not have to deal with the road issues and the bridge issues** . . . .

The law is clear that the defendant is to be treated in contract matters before this Court as any other private party would be. Therefore, it is appropriate to view the Forest Services' actions in this matter as if it were a large private landowner which entered into a contract with a business for the purpose of operating a lodge on its property. Were a private landowner to engage in the following conduct, that landowner would clearly have failed to meet its duty to cooperate and not

---

(February 6, 2004).

hinder performance of the contract for lodge operations: (1) withholding critical information from the business related to a finding that access to the lodge structures was deficient when the business was considering the purchase of the lodge facilities; (2) then, after the business purchased the lodge, disclose that same information to a potential new buyer of the lodge causing the sales contract to be broken; (3) then tell the existing lodge owner that the landowner would attempt to obtain funds to fix the impaired access, but instead secretly reject such funds when they became available because it was hoping to bring about a sale of the lodge to a party which would tear it down so that the costs to the landowner of maintaining access to the lodge could be eliminated; (4) then tell the lodge owner that the impaired access could only be fixed by investing over $500,000 when in fact the bridge access could be fixed for $85,000; (5) and then, when the lodge owner still insisted on performing its contract, demand that the lodge owner operate the lodge *without bridge access* or tear down its lodge, when it knew such operations without bridge access were an impossibility. As will be demonstrated at trial, that scenario is exactly what occurred in this matter.

## STATEMENT OF THE PRIMARY RELEVANT FACTS TO BE PROVEN AT TRIAL RELATED TO LIABILITY

### Facts Related to The Sweetwater's Claim

The lodge improvements related to this case, such as the buildings and other structures, are owned by, and the property of, The Sweetwater. The land upon which operations occur is owned by the United States and administered by the Forest Service. The Term SUP was entered into for the purpose of operating the lodge as a public resort. As will be demonstrated in this case, if there is no vehicular access to the lodge over the bridges at issue, there can be no lodge operations. If

there are no lodge operations, the permit authorizing the continued existence of the lodge facilities on federal land will be terminated. If the permit is terminated, the lodge operations are worthless given their location on federal land because the permit is the only authorization by which the lodge owner can conduct operations on federal land using the lodge facilities. In addition, if there are no lodge operations and the permit is terminated, the lodge owner has to tear down its lodge structures and restore the area to its natural condition pursuant to the terms of the permit and federal regulations. Therefore, vehicular access to the lodge is critical to both performance of the Term SUP as well as the value of the lodge facilities.

The facts to be presented at trial will show, in the course of an analysis it had made of the area where the lodge facilities are located, the Forest Service singled out the lodge facilities as unique because the facilities are the only ones located 3 ½ miles off the highway and set well back into the depths of the Forest in an otherwise pristine area. In addition, the lodge facilities are surrounded on three sides by federally designated Wilderness Area and are located in an area which the Forest Service believes is prime wildlife habitat, with which the lodge interferes. Finally, the lodge facilities had been a source of concern by the Forest Service over the years given its obligation related to maintaining the Forest Service road and bridges which provided the only vehicular access to the lodge facilities.

The Forest Service first started its pattern of deceit, evasiveness and gross error in this matter when The Sweetwater was involved in discussions with the Forest Service related to the purchase of the lodge facilities in June of 1995. When The Sweetwater contacted the Forest Service in 1995 regarding its plans to purchase the lodge from the then-current owner and operate it pursuant to a Term SUP, the parties specifically discussed the condition of the two bridges located on a Forest Service road which provided the only vehicular access to the lodge. However,

notwithstanding its purported position that "The Sweetwater should be fully appraised of the current status of the bridges," the Forest Service never disclosed to The Sweetwater that in 1992 Forest Service bridge inspectors, who had specifically been brought in from another National Forest because of their expertise, had physically inspected the two bridges and had, in the Forest Service's own words, "basically condemned" the bridges. The Sweetwater was unaware that any documentation existed as to the bridges, much less that experienced Forest Service experts had come to this conclusion.

While the Forest Service made general comments about the age and condition of the bridges in that June 1995 meeting, the Forest Service also held those bridges out to be safe and passable. In addition, the Forest Service admits that it made statements to The Sweetwater in the 1995 meeting assuring it of the Forest Service's intent to maintain access over those bridges. Those statements included representations by the Acting Forest Supervisor at the time that "[t]he Forest Plan of the Shoshone National Forest allocates that area up there to a public lodge facility; therefore, there is a commitment on the part of the Forest to provide for that use to the extent it can. All Forest Plan implementation is subject to dollars available, but I think it's probably – no, it's not probably, it's standard practice and intent when one has allocated a use on the Forest *to do your best* to implement that." The Forest Service also admits that it stated to the representatives of The Sweetwater at the 1995 meeting that "it [is] our intent to keep the [Sweetwater] road open to the best of our ability." The Forest Service further stated in the 1995 meeting that "it [is] our intent to support, to the degree that we [can], access to the lodge facility." While the Forest Service officials qualified their representations on events outside of their control, they clearly and unequivocally expressed their commitment to providing access through measures within their

control.[2]

Notwithstanding that the Forest Service officials admit making the above statements to The Sweetwater in the June 1995 meeting, they assert that they also clearly impressed upon The Sweetwater that the Forest Service had a "very low" priority on devoting funds to the maintenance of the road and bridges as well as a "low priority" on restoring bridge access if those bridges *actually became impassable*. To support its position, the Forest Service refers to an internal email from the Acting Forest Supervisor which he states was written shortly after the 1995 meeting. However, this internal email was never shared with representatives of The Sweetwater until many years later, at which time they vehemently denied its characterization of the meeting. Moreover, the Acting Forest Supervisor's current interpretation of his email is also inherently inconsistent with the statements that he and the other Forest Service officials admit making at the June 1995 meeting, as noted above. Furthermore, the Forest Service's characterization of the meeting is also inconsistent with the Forest Service's subsequent actions once bridge access was lost, such as sending a letter to The Sweetwater in 1997 stating that the Forest Service would place replacement of the bridges into their budgetary funding request (which was a "short list" of the Forest's highest priority projects).

The Sweetwater representatives who attended the June 1995 meeting agree that the Forest Service stated that its desire to replace the bridges was a "low priority" as long as the bridges were able to provide access to the lodge. However, the discussion at the June 1995 meeting included

[2] The Forest Service has attempted to defend itself in this matter by repeatedly asserting that it never "guaranteed" access to the lodge. However, The Sweetwater has *never* argued that this case involved a guarantee that access would exist, which is a straw man argument that has been asserted by the Forest Service. Rather, this case involves the issue of whether the Forest Service met its duty to cooperate and not to hinder performance of the Term SUP.

explicit representations by the Forest Service that, if the bridges' ability to provide access was lost, such as by a flood (the Forest Service had not revealed the 1992 inspection results at this point), the Forest Service would make its "best efforts" to attempt to reinstate access to the lodge via the bridges. In addition, fords through the creek were discussed as a temporary solution while awaiting funding for bridge repair should bridge access be lost.[3]

An understanding of the June 1995 meeting which is consistent with the majority of evidence in this case (except certain *post facto* oral statements by certain Forest Service officials) is that the Forest Service officials informed The Sweetwater that the bridges were not in superior condition in 1995 and that maintaining the road or repairing the bridges to improve *their current condition* was a low priority. However, if the bridges became impassable, the Forest Service would "do their best" to ensure bridge access was maintained so that lodge operations could occur even though they could not actually guarantee funds would be obtained because of factors outside of their control in the budget process. This interpretation is exactly what a Forest Service official, who attended the meeting, testified to, with which the Forest Service agrees:

> I think what was stated is if [the bridges] washed out, we would re-look at it, and that we had previously put in for [funding] and if they washed out, that would probably give it a higher priority for looking at than it had previously, but we could not make any commitment on how the outcome would be of that, other than we can make the recommendations, which we have done previously by putting it in [as a budget request].

---

[3] While the Forest Service has tried to argue that The Sweetwater agreed to the use of fords across the Sweetwater Creek as a *permanent* means by which to operate the lodge in the event the bridge access was lost, even its own officials who attended the June 1995 meeting now admit that this was not the agreement at the 1995 meeting (in addition to the fact that such operations are simply not feasible). As will be shown at trial, the issue of fords was raised at the meeting to discuss the method by which The Sweetwater would *temporarily* access the lodge for maintenance purposes until bridge access could be restored.

Defendant's Proposed Findings of Uncontroverted Facts ¶ 56 (testimony of Monte Barker). In addition, this interpretation is consistent with both the wording of the June 1995 email referenced by the Forest Service, the statements which the other Forest Service officials admit they made at the June 1995 meeting and the Forest Service's actual actions in 1997 when bridge access was lost, *i.e.*, they sought and actually received funding to restore access.

Finally, assuming *arguendo* that the Forest Service's current characterization of the meeting is correct (which it certainly is not), in the Forest Service's view The Sweetwater was informed that, because of the agency's "low priority" on providing access over the bridges, The Sweetwater was taking a "high risk" that funding would not be obtained pursuant to the agency's budget process to repair the bridges if they became impassable, but nonetheless (as the Forest Service does admit) the Forest would "do its best" to obtain this funding to provide for access. As the Forest Service states, The Sweetwater took this risk when it bought the lodge. However, notwithstanding the purported "high risk" which was taken by The Sweetwater, the funding was in fact obtained! In other words, even under the Forest Service's version of events, The Sweetwater took a "high risk" and it paid off. However, the funding was then sent back. It is now abundantly clear, as demonstrated by the facts discussed below, that the Forest Service has no intention whatsoever of funding access to the lodge. This is simply not the bargain which the parties entered into in 1995.

The Forest Service has also argued that the parties' agreement not to enter into an explicit memorandum of understanding ("MOU") as to the issue of road or bridge maintenance or replacement supports its view that it has no liability for its conduct related to the bridges. However, the evidence will show that the parties' discussion of this issue did not eliminate or restrict the Forest Service's core duty to cooperate and not hinder as it related to a fundamental

aspect of contract performance- vehicular access over the bridges. In fact, the evidence will demonstrate that the Forest Service's conduct pursuant to the MOU issue, which was to remove any references in the contract to The Sweetwater's having a maintenance obligation as to the road and bridges, further supports The Sweetwater's position in this case.

After The Sweetwater purchased the lodge facilities and entered into a Term SUP with the Forest Service to operate the lodge facilities, in 1997 The Sweetwater received an offer to purchase the lodge from Mr. and Mrs. Sutherland for $595,000. However, when the Sutherlands discussed their purchase of the lodge facilities with the Forest Service, as had The Sweetwater in 1995, the Forest Service *created* a document which explicitly stated that in 1992 the Forest Service had "basically condemned" the bridges providing the only vehicular access to the lodge facilities (this document was a candid description of the 1992 bridge inspection by the outside specialized bridge experts). The newly created document also noted that, specifically because of this determination, *the Forest Service had not even inspected the bridges since that 1992 inspection*. The Sutherlands then withdrew from their contract to buy the lodge because of this information, foregoing their $5,000 down payment.[4]

The Sweetwater then was forced to stop operations in 1997 because its knowledge of the 1992 inspection details not only made it impossible to operate safely, it also greatly enhanced its liability. The Forest Service agreed with and allowed this cessation. The Sweetwater then

[4]The Forest Service stated after this information was disclosed to the Sutherlands that it had not "formally" condemned the bridges. However, the Forest Service does not deny that the bridge inspectors, in all substantive respects, "basically condemned" the bridges based on their physical condition in 1992, nor does it deny that it never disclosed this information to The Sweetwater in discussions it held with The Sweetwater in 1995 related to the condition of the bridges.

complained to the Forest Service about this matter, and the Forest Service stated to The Sweetwater orally and in writing that the Forest Service would seek funding pursuant to its budget process to repair or replace the bridges. It will be shown at trial that The Sweetwater repeatedly inquired over the years into the status of these efforts to acquire funding, and was repeatedly told by the Forest Service that these efforts were ongoing but simply had not been successful. Based on these repeated written and oral representations by the Forest Service, The Sweetwater did not undertake efforts to replace the bridges itself.

However, it was later revealed (pursuant to discovery in this case) that in 1999 the Forest Service *had in fact obtained funding* for the bridge repair project.[5] When asked in depositions what happened to these funds, the Forest Service official in charge of handling the funds candidly admitted that he sent them back and that they were not used for any other projects on the particular Forest at issue. ***This action was kept secret and not disclosed to The Sweetwater***, which continued for years afterward to believe that good faith efforts to obtain funding were ongoing based on continuing representations made by the Forest Service. The Forest Service official also admitted that, but for this action (or, as he put it, "those manipulations"), <u>the bridges would be in place today</u>.[6]

When asked in his deposition why the funds were sent back in 1999, the Forest Service official who sent them back stated that he believed that the Forest Service had a "conservation

[5] The Forest Service has now admitted that "during Fiscal Year 2000, funds became available from the Forest Service's regional office to replace the Sweetwater bridges." Defendant's Corrected Proposed Findings of Uncontroverted Fact ¶ 92.

[6] Given these admissions, if the Court concludes that the Forest Service action in sending the funds back constituted a breach of its duty to cooperate and not to hinder performance, it is clear that, *but for this breach*, The Sweetwater would currently have vehicular access over the

buyer" lined up which would purchase the lodge and then tear it down so the area could be restored to its natural condition. As that official stated in his deposition:

> It was pretty much between [the District Ranger] and myself of- of let's – you know – let's pull the bridges from the program until we know for sure what's going to happen with these [conservation buyer] proposals.

He then further recounted what he stated to the Regional Office as to why the bridge funds were being rejected:

> Hey, you know, our decision is we're not going to build this bridge this year because of the conservation – because of what appeared at the time as a really good possibility that the conservation organizations would – you know, were going to be able to buy the lodge.

As will be shown at trial, among other reasons, the Forest Service was interested in pursuing this strategy so that it could eliminate its own costs in maintaining access to the lodge. However, as was also revealed for the first time in discovery in this matter, *no conservation buyer had in fact been located by the Forest Service, nor was there even any likely prospect at the time*. Thus, even if this action which precluded the reinstatement of bridge access was not motivated by an express desire to eliminate the lodge, it was based on grossly erroneous assumptions.

The Forest Supervisor, Ms. Rebecca Aus, provided testimony in her deposition related to this case which conflicts with the established record and the testimony of her staff. Ms. Aus has testified that, when the money had been received for the bridges in 1999, she purportedly directed that the money not be applied to the bridges leading to the Sweetwater lodge because she had determined that a particular project on her Forest had a higher priority. She claims no knowledge of the strategy to block the funds to pursue a conservation buyer. As will be shown at trial, this oral, after-the-fact assertion by Ms. Aus is contradicted by the testimony of her staff, the overall

---

bridges.

evidence in this case and is also simply illogical.

Moreover, *even if* Ms. Aus's assertion is determined to be credible, her decision to return the money was based on grossly erroneous information which would still make such a decision a basis for a breach of the duty to cooperate and not to hinder performance. Her decision was based on her understanding that (1) permitting safe access required an investment of over $500,000 (as the Forest Service stated to the public) and (2) The Sweetwater could perform its contract without vehicular access over the bridges. In fact, replacing the bridges to allow vehicular access over them would only have cost $85,000, not over $500,000, and the Forest Service's own experts have agreed that operating the lodge without vehicular access over the bridges was not possible. Had Ms. Aus merely bothered to make reasonable inquiries as to this issue of the ability to operate the lodge (she admitted that, while she felt that "somehow" the lodge could be operated without bridges, she had no experience herself with this issue), she would have learned that her views were wrong. (The Sweetwater was unable to provide input at this point because this process was deliberately kept secret from it.) Thus, if one assumes *arguendo* that Ms. Aus's testimony is credible, she is admitting that she never bothered to make an inquiry which would have informed her that her actions would terminate lodge operations, and she took that action entirely (and recklessly) unaware of its direct and severe consequence.

Finally, Ms. Aus's testimony as to her views toward the level of effort the Forest Service was obligated to put forth towards assisting in providing access to the lodge stand in stunning contrast to the assertions made to The Sweetwater by the Acting Forest Supervisor and other Forest Service personnel in the 1995 meeting referred to above when the Term SUP was being

executed.[7]

When the Forest Service realized that its plan to obtain a conservation buyer to tear the

---

[7] In addition to the comments made by the Forest Service at that 1995 meeting discussed above, another Forest Service official who attended that meeting, Mr. Monte Barker, testified in great length during his deposition as to the intent of the Forest Service at the time it entered into the Term SUP:

> Whether today or then, I feel that based on -- based on the idea that concessionaire permittees are part of the Forest Service who are permitted to provide a service that we want provided, it's not for convenience of the permittee, it's to meet a responsibility providing public service to the public, and so we allow the numbers and the locations in order to provide what we feel to meet the public need, okay.
>
> With that said, then whether or not -- I guess that there is that implied responsibility, then, that you provide adequate ancillary facilities, access, opportunities to that concessionaire to fulfill the obligation that we require.
>
> In order to fulfill that, then I would assume that you would have at least the essential facilities available to you to meet that obligation of the Forest for public service, public safety, and in the public interest.
>
> So that I guess my thinking at that time is if we can't get the road where it's at least usable to meet the intent of bringing people up there, then we have a responsibility to, under the terms to the permit -- in other words, I believe there is something there about for a higher and better interest. If we can't provide the interest that we had foreseen with issuance of that permit, then probably we would compensate that permittee and get out of there.
>
> It's a compensable permit, because if we can't do what it was intended to do, then I think we have a responsibility and obligation to meet our standard one way or the other, either fix the road, purchase that term permit, that portion of it back, or allow the -- give it to the permittee. That was the options I looked at I told you.
>
> I mean, any of the one of the options is valid. If we either -- if it's a public road, keep it up. If it's a private road, they keep it up. Or if we do away with the road and do what's necessary as far as the compensation on the permit that can't be successfully operated.

This testimony will be presented at the trial, along with evidence that demonstrates that the Forest

lodge down was not going to work, the Forest Service then took additional actions which (deliberately or not) ensured that no lodge operations would occur. When The Sweetwater made inquiries in 2000 as to it potentially remedying the bridge access problem itself, the Forest Service required The Sweetwater to have a private engineer "load rate" the bridges before it would allow any such efforts to take place. However, and as will be shown at the trial, no such load rating had been obtained previously by the Forest Service and the Forest Service engineer in charge of this matter was aware that any effort to obtain such a load rating would likely result in the bridges being formally closed. As the Forest Service anticipated (or should have been aware), the bridges could not be load rated by the private engineer and the Forest Service then used this fact to justify formally closing the bridges in 2001. The Forest Service then placed a padlocked gate at the very beginning of the only road providing access to the lodge.

In explaining its decision to formally close the road and bridges providing the only access to the lodge, the Forest Service stated that it would require an investment of *more than $500,000* to provide safe access over the bridges and it could not justify expending such significant sums. This figure, along with the Forest Service's position that the bridges must be kept open to public vehicular travel, also dissuaded The Sweetwater from any further efforts to inquire into possibly replacing the bridges itself. (As will be shown at trial, the Forest Service has now admitted that it actually would only have cost approximately *$85,000* to fix the access issue over the bridges in 2000, contrary to what it stated to The Sweetwater and the public would be necessary to restore safe access. This misrepresentation is another example of either a deliberately misleading statement or a gross error on the part of the Forest Service which was, once again, consistent with

---

Service consistently asserted that the road had to be kept open for public vehicular use.

the goal of ensuring no lodge operations occurred.)

When The Sweetwater subsequently persisted in trying to resume operations and began pressing the Forest Service on its purported efforts to obtain funding to replace the bridges, the Forest Service sent The Sweetwater a letter in 2001. The letter, entitled a Notice of Noncompliance and signed by Forest Supervisor Rebecca Aus, demanded that The Sweetwater somehow operate the lodge *without use of the bridges which provided access to the lodge* or the Forest Service would terminate its permit. However, as will be shown at trial, the Forest Service knew or certainly should have known that the lodge could <u>*not*</u> be operated as an ongoing business entity without this bridge access. Thus, this letter demanding that operations occur was, at worst, a ruse, and, at best, a demand for the impossible because the Forest Service knew or should have known that the operations which it called for could not occur, and thus termination of the permit was the likely outcome. The Forest Service was well aware of this fact, as succinctly stated by the District Ranger in his deposition:

> [Questions] What is your understanding of those ramifications [of the noncompliance letter]?
>
> [Mr. Larson] If [The Sweetwater] did not comply, he was going to lose his permit.
>
> [Question] And what would happen then?
>
> [Mr. Larson] We would ask him to remove his improvements.
>
> [Question] Anything else?
>
> [Mr. Larson] We probably, you know, I don't know that we got any further, but my assumption would be if the improvements are no longer there, then we would not need the road; we would not reconstruct the bridges. *It would go away.*

Thus, the ultimate result would be exactly the same as that admitted to by the Forest Service District Ranger (and quoted on page 2 above) as being the goal he had shared with the Forest

Supervisor-- remove the lodge at no cost to the Forest Service, eliminate the ongoing demand on the Forest Service's budget caused by the lodge's presence and restore the area to its natural condition.[8]

After receipt of this demand letter from the Forest Service, The Sweetwater then filed an administrative CDA claim in this matter, which was denied by Rebecca Aus, the Forest Supervisor. The basis for Ms. Aus' denial was that her agency did not have, and therefore did not owe, any contractual obligations to The Sweetwater whatsoever and therefore The Sweetwater had no recourse for damages arising from any of the Forest Service's conduct in this matter. The Sweetwater then filed its Complaint in this Court.

Since then, as the Forest Service engineer will testify at trial and based on internal Forest Service emails, the Forest Service determined that, once this litigation was resolved, it was going to tear out the bridges.

**Facts Related to the Forest Service's Affirmative Defenses**

In an effort to eliminate The Sweetwater's claim, the Forest Service has raised for the first time in this case the argument that The Sweetwater materially breached the terms of its Term SUP in 1996 and therefore has no legal basis to assert its breach of contract claim. However, as will be shown at trial, this assertion is without supportable basis and is directly contradicted by the

[8] Ironically, as will be shown at trial, the District Ranger's plan was that, if a conservation buyer was not found, the Forest Service would step in and buy the lodge. In fact, when no conservation buyer could be found, the Forest Service did initiate an appraisal process to assess the value of the lodge, but, as the Forest Service official who was involved will testify, this process was stopped when the Forest Service became concerned that it had no way to finance the purchase. The District Ranger has described the Forest Service's subsequent demand that The Sweetwater operate without bridge access or remove its lodge to be a "radical change of direction" by the

evidence in this case.

The Forest Service argues that The Sweetwater did not operate a "public" lodge in 1996, in contravention of the terms of its Term SUP, based on a purported but unseen "exclusive use" arrangement it had with Carl Bixby. However, the Forest Service has no supportable evidence that any member of the public was ever excluded from the lodge and apparently bases its argument on its interpretation of a single comment made by Mr. Jeff Mummery, the General Manager of The Sweetwater, in response to an improperly vague question asked in his deposition in this matter (to which plaintiff's counsel objected at the time). As Mr. Mummery has clarified (but which the defendant chooses to ignore), while Mr. Bixby had exclusive use of *his* lodge cabin when he paid his money for it, no one was ever excluded from an unoccupied room at the lodge, nor in fact was anyone ever turned away. This fact will be conclusively demonstrated at trial.

In addition, the Forest Service's interpretation of Mr. Mummery's comment is entirely rebutted by another fact it has conveniently chosen to ignore. In a legal pleading *cited by Forest Service itself* which was filed by Mr. Bixby in another legal matter, Mr. Bixby accused The Sweetwater of not putting forth sufficient effort in 1996 to obtain other guests at the lodge in contravention of the agreement between himself and The Sweetwater. As The Sweetwater has noted, Mr. Bixby and his family members were the only guests which stayed at the lodge in the summer of 1996 (which was the lodge's first season of operations after extensive cleanup efforts in 1995) because The Sweetwater's efforts to obtain additional guests did not meet with any success. (Admittedly, these marketing efforts in The Sweetwater's first season were not extensive because Mr. Bixby had agreed to fund up front the cost of lodge operations during the 1996 season

Forest Service.

to ensure that the lodge stayed open and The Sweetwater had agreed to reduce his funding commitment by revenue it received from other lodge guests.) Obviously, if Mr. Bixby accused The Sweetwater of violating the agreement between himself and The Sweetwater by failing to obtain additional guests for the lodge, the agreement with Mr. Bixby *clearly was not for Mr. Bixby's exclusive use of the entire lodge*.

Additionally, given that Mr. Bixby's statements demonstrate that The Sweetwater was not financially or otherwise rewarded pursuant to its arrangement with Mr. Bixby for any exclusive use of the lodge, there is absolutely no logical reason why The Sweetwater would have excluded paying guests (as the Forest Service illogically asserts in its affirmative defense). Thus, not only does the Forest Service have no evidence that any member of the public was excluded, it cannot even show a motive for excluding any person. As will be shown at the trial and through additional evidence, the Forest Service is grasping at straws in making this argument.[9]

Moreover, the overall facts in this case demonstrate that the Forest Service cannot validly assert that The Sweetwater's operations in 1996 constituted a material breach of contract which would absolve the Forest Service of responsibility for its own conduct. The Sweetwater was reasonable in its understanding that the way it operated in 1996 was consistent with the terms of the Term SUP, which merely requires operation of a "public" lodge with no further explanation.[10] Prior to 1996, representatives of The Sweetwater and Mr. Bixby were unacquainted. In addition, the arrangement which was entered into with Mr. Bixby in 1996 was an arms-length agreement

---

[10] The Forest Service has referred to further detailed explanations of what it meant by the term "public." However, these descriptions were set forth in the Forest Service internal policy manual, which is not binding as law, and more importantly they were never disclosed to or discussed with The Sweetwater.

with a member of the public which provided for operation of the lodge and in no way can be construed as The Sweetwater attempting to operate the lodge as a private resort for its own family or for private use. The arrangement with Mr. Bixby in fact was intended to potentially facilitate the future sale of The Sweetwater's stock to Mr. Bixby and was entered into with the intent that other guests for the lodge would be located from the computer software industry in general, where Mr. Bixby had substantial contacts. However, the stock sale never occurred.[11]

The Forest Service has also asserted that The Sweetwater was required to submit an operating plan from1996 to 2002 and that this failure is another basis for concluding that it materially breached the Term SUP. However, the evidence will show that (1) The Sweetwater did submit an operating plan for 1996, and (2) the Forest Service officials which were responsible for administering the Term SUP explicitly allowed The Sweetwater not to submit such a plan once the bridge issue arose in 1997. Thus, there was no material breach by The Sweetwater which would allow the Forest Service to avoid responsibility for its actions in this matter.

## STATEMENT OF THE PRIMARY RELEVANT FACTS RELATED TO DAMAGES

***Breach of contract***

The Sweetwater's breach of contract damages arise under three general categories: (1) out-of-pocket expenses to date related to its maintaining the lodge facilities; (2) lost profits

---

[11] The Forest Service has also tried to assert that this stock purchase agreement was in contravention of the terms of the Term SUP and thus also constituted a material breach of the contract allowing the Forest Service to avoid responsibility for its own actions. However, the Forest Service has apparently abandoned this argument given the language in the Term SUP which does not require notification of such a stock transfer until 15 days after it occurs. As previously stated, the stock transfer never occurred, so no notice was ever required.

associated with those years in the current contract term within which The Sweetwater otherwise had a right to operate but has been prevented from doing so by the Forest Service's breach; and (3) the value of the lodge facilities, which are now worthless as a direct result of the Forest Service's actions.

***Out of pocket expenses***

The Sweetwater is seeking its actual out-of-pocket expsnses related to its ongoing ownership and maintenance of the lodge facilities exclusive of the fees and expenses generated by these legal proceedings. The Forest Service breach which has prevented lodge operations for the period 1997 through 2004 has created out-of-pocket expenses totaling $459,201, with the addition of estimated expenses to mid-September 2005 of approximately $40,000. The Sweetwater is claiming total out-of-pocket expenses of at least $500,000.

***Lost profits***

The Sweetwater is also seeking its lost profits directly caused by the government's breach of contract. In its claim letter dated May 28, 2002, The Sweetwater sought lost profits based on its actual profits from its 1996 operations. These profits totaled $34,995 for that single year and were based on The Sweetwater's expectation that it would be selling its stock to Mr. Carl Bixby in late 1996. However, that sale did not go through for reasons unrelated to the lodge or its operations. Therefore, the claims letter calculation for estimated lost profits through December 2002 totals $312,256. The current total of lost profits up to mid-September of 2005 would be at least $492,500.

Had The Sweetwater not been able to sell the lodge for $595,000 in 1997, as the Forest

Service now apparently asserts was not possible,[12] The Sweetwater would have continued operations in accordance with a long-term business plan. Pursuant to The Sweetwater's projection of what its business plan would have been in such a circumstance, along with its projected profits and current funds value, those profits total $830,518 for the period 1997-2005. The annual average for operating 7 units plus proceeds from the restaurant is $14,832 (which includes restaurant revenue averaged in with the seven units). This average is consistent with the profits actually achieved by other comparable lodges in the area, such as the UXU Ranch and Rimrock Ranch.

The Sweetwater recognizes that lost profits and opportunity costs are difficult to estimate and subject to many variables. Based on the Forest Service breach and estimating lost profits through mid-September 2005, The Sweetwater calculates its lost profits to be, depending on which methodology one uses, between $490,000 and $830,000. The Sweetwater is entitled to the full value of its lost profits under the current term of the Term SUP, which extends until 2014. But for the government's breach, The Sweetwater would have been able to operate through this full term and receive the full benefit of its bargain. The full benefit of The Sweetwater's bargain, inclusive of the projections stated above, and discounted through 2014, would total, depending on which methodology is used, *i.e.*, the claims letter, business plan or some combination of both, between $960,000 and $1,667,000.

---

[12] In early 1997, The Sweetwater entered an agreement to sell the lodge assets to Mr. and Mrs. Sutherland. In the event the Court determines that The Sweetwater would have sold the lodge but for the Forest Service's breach prior to 2014, The Sweetwater is entitled to its lost profits up until that sale date, including its lost opportunity costs by not having those proceeds. However, that sale did not go through because of the issue of the bridge access which arose in 1997. Had the sale been completed with the Sutherlands, The Sweetwater asserts that the current value of the sale would be in excess of $920,000. Therefore, by subtracting the value of the 1997 sale of $595,000,

***Value of Lodge Facilities***

Pursuant to the terms of the Term SUP (which were drafted by the Forest Service and thus subject to the principles of *contra proferentum* in their interpretation), The Sweetwater is entitled to "equitable consideration" for its lodge facilities in the event that the Forest Service terminates its permit in the public interest. It is The Sweetwater's position that, where the Forest Service has complete control over the use or operation of The Sweetwater's structures and such structures cannot be physically moved should the Forest Service terminate The Sweetwater's ability to use those structures, The Sweetwater is entitled to the reconstruction cost, less physical depreciation, of those structures. In other words, since The Sweetwater cannot move its lodge facilities to another location, it is entitled to be compensated for the cost of rebuilding those facilities (less current physical depreciation) in another location.

The Sweetwater set forth in its 2002 claim letter a detailed assessment of that cost as totaling $1,930,179. However, since this litigation was begun, The Sweetwater has hired a national expert in the area of reconstruction costs of structures on federal lands, Mr. John Pucetas. Mr. Pucetas has extensive experience in assessing the reconstruction cost of lodges located on National Parks, including resort structures in Yellowstone National Park which located within 30 miles of The Sweetwater lodge. Mr. Pucetas conducted an assessment of The Sweetwater lodge in a manner consistent with how the National Park Service assesses the value of lodge structures operated by private entities in National Parks. Pursuant to his assessment and as thoroughly set forth in his written report, Mr. Pucetas has concluded that the reconstruction cost, less physical depreciation, of The Sweetwater's lodge facilities is $1,475,600. The Sweetwater agrees that Mr.

---

The Sweetwater has lost profits and opportunity costs on the sale proceeds of at least $325,000.

Pucetas' analysis, which is more thorough and based on extensive experience in this area, is the more appropriate calculation to use for assessing this value. The Sweetwater believes this method of valuation is appropriate because of its unique location which is not comparable to any other lodge in the Shoshone National Forest.

In the event the Court does not agree that reconstruction cost, less physical depreciation, is the appropriate method by which to assess The Sweetwater's entitlement under the contract term of "equitable consideration" or otherwise as appropriate damages related to its inability to move its the lodge facilities to another location, The Sweetwater hired an expert appraiser, Que Mangus, to appraise the market value of the lodge facilities. Rather than being someone located well out of the area who obtained their experience in the local market from their involvement in this particular case (which describes the Forest Service's appraisal expert), Mr. Mangus is located in Cody, Wyoming and has significant experience in the Cody area. In addition, Mr. Mangus has appraised many of the lodges located on the Shoshone National Forest, the most recent of which he appraised within the last 12 months. As he will testify, Mr. Mangus has a demonstrated track record of his appraisal's being extremely close to the actual subsequent sales price of the lodges for which prepared the appraisal.

Mr. Mangus appraised The Sweetwater's lodge facilities and prepared an extensive written report, in which he concluded that The Sweetwater's lodge facilities have a market value of $900,000 as of 2005. Therefore, if the Court does not conclude that The Sweetwater is entitled to the reconstruction cost, less physical depreciation, of the lodge facilities as "equitable consideration," in the alternative The Sweetwater asserts that it is entitled to $900,000 as the 2005 market value of the lodge which is no longer a viable business due directly to the Forest Service's breach of the Term SUP.

The Sweetwater has submitted both a claims letter and a draft financial business plan. Utilizing the same methodology as the claims letter, The Sweetwater's projected earnings for the 2005 season are at least $60,000. Utilizing the business plan methodology, The Sweetwater's projected earnings are at least $104,000. The average of these two methodologies is $82,000. Utilizing this average income approach, The Sweetwater estimates income valuation for The Sweetwater to be in excess of $1,230,000.

The Sweetwater therefore values its lodge facilities in three different methods:

| | |
|---|---|
| 1) by an expert appraiser using a sales comparison approach: | $900,000 |
| 2) by an expert in reconstruction less physical depreciation: | $1,475,000 |
| 3) by average of The Sweetwater's income projections | $1,230,000 |

The Sweetwater therefore contends that the lodge facilities are worth at least $1,200,000.

***Fifth Amendment Taking***

Regarding The Sweetwater's claim that the Forest Service has effected a Fifth Amendment taking of The Sweetwater's contract rights as well as physical property, which The Sweetwater has pled as an alternative claim to its breach of contract claim, the Forest Service's own expert has acknowledged that the lodge facilities cannot be operated as an on-going business without vehicular access over the bridges. Therefore, because the lodge cannot continue to exist on federal land unless it can be operated, the lodge has been made worthless by the Forest Service's conduct in this matter and a complete taking has occurred.

In the event that the Court does not conclude that the Forest Service has breached the contract or is otherwise liable to The Sweetwater for the value of the lodge, The Sweetwater asserts that the Forest Service's actions constitute a taking of its property without just compensation as required under the Fifth Amendment, and The Sweetwater is entitled to the full

fair market value of the lodge as of 2005, which has been determined to be between $900,000 and up to $1,475,000 using Mr. Mangus' appraisal , The Sweetwater's income approach and Mr. Pucetas' reconstruction less depreciation approach. In addition, The Sweetwater is also entitled to the value of its contract rights. Under the current term of the Term SUP, the appropriate method to measure the value of those contract rights would be the net profits which The Sweetwater would have received from 1997-2014. These total between $960,000 and $1,667,000, taking into account appropriate interest and a discount on future profits, and depending whether one uses the values expressed in the claims letter, business plan or a combination of both.

In addition, if the Court were to determine that a taking occurred at some point prior to 2005, The Sweetwater asserts that it is entitled to compound interest on the value of its lodge since the date of the taking. The Sweetwater is entitled to compound interest because, if the Forest Service had compensated The Sweetwater for its lodge facilities at the time of the taking, The Sweetwater would have had the opportunity to invest those sums and earn income from them, and in turn this earned income would also have earned additional income. For these reasons, simple interest would not put The Sweetwater in as good a position pecuniarily as it would have been if the Forest Service had paid it at the time of the taking.

## STATEMENT OF THE ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT

*Issues related to liability*

1. Whether the Forest Service breached its duty to cooperate and not to hinder based on is actions in this matter, including but not limited to its preventing funds from being used to replace the Sweetwater bridges which were critical to lodge operations when it had informed The

Sweetwater that such funds were being sought and otherwise hindering the reinstatement of access to The Sweetwater's lodge?

2. Whether the Forest Service breached the contract by failing to compensate The Sweetwater as required under the contract's terms when it took actions to terminate lodge operations in the public interest?

3. Whether the Forest Service committed a tortious breach of contract by failing to disclose, prior to executing the Term SUP, that it had previously determined that the Sweetwater bridges were unsafe for vehicular use?

4. Whether the Term SUP qualifies as a contract for purposes of the Contract Disputes Act?

5. Whether the defendant has taken The Sweetwater's property without payment of just compensation in violation of the Fifth Amendment?

*Issues related to the quantum of damages*

6. What is the appropriate quantum of damages arising from the Forest Service's breach of contract regarding out of pocket expenses, lost profits and the value of the lodge facilities?

7. What is the appropriate quantum of damages arising from the government's taking of The Sweetwater's lodge facilities and contract?

## DISCUSSION OF THE APPLICABLE LEGAL PRINCIPLES

*Duty to cooperate and not to hinder*

It is well-established that there is an "implied provision of every contract, whether it be one between individuals or between an individual and the Government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance." *Lewis-Nicholson*, 550 F.2d 26, 32 (Ct. Cl. 1977), *quoting George A. Fuller*, 69 F. Supp. at 411 (Ct. Cl. 1947); *L.L. Hall Construction Company v. United States*, 379 F.2d 559, 563 (Ct. Cl. 1966); *Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 58-59 (2001); *Walter Dawgie Ski Corporation v. United States*, 30 Fed. Cl. 115, 130 (1993); *Cedar Lumber, Inc. v. United States*, 5 Cl. Ct. 539, 549 (1984); *Steve Rados, Inc*., AGBCA No. 77-130-4, 82-1 BCA ¶ 15,624 (citing *Sacramento Nav. Co. v. Salz*, 273 U.S. 326, 329 (1927)).[13] This obligation is binding on the parties as if it were expressly written out in the contract. *Kehm Corp. v. United States*, 93 F. Supp. 620, 623 (Ct. Cl. 1950); *Precision Pine*, 50 Fed. Cl. at 54.[14]

The Court of Claims further held that:

> Indeed, not only must the Government refrain from hindering the contractor's performance, *it must do whatever is necessary to enable the contractor to perform*.

---

[13]This Court's decision in *Precision Pine* states that the duty to cooperate and the duty not to interfere are separate, but related duties. *Precision Pine*, 50 Fed. Cl. at 59, n.31. However, in a more recent decision, *Tecom, Inc. v. United States*, No. 00-475C (June 27, 2005)(at 42, n.38), this Court held that these "two duties may well be two different ways of expressing the same obligation." Nonetheless, as the facts in this case demonstrate, the government has breached both of these duties.

[14]This Court has recently held, in a thorough and extensive analysis of the history of the implied covenant of good faith and fair dealing, that "claims of a breach of the implied covenant of good faith and fair dealing--- including claims that the duties to cooperate and not hinder performance of a contract have been breached—are to be treated like any other claim for breach of contract." *Tecom*, No. 00-475C (Opinion and Order June 27, 2005) at 43.

*Lewis-Nicholson*, 550 F.2d at 32 (emphasis added), *citing Kehm Corp*., 93 F. Supp. at 623 (Ct. Cl. 1950). This same point was reiterated more recently in *Essex Electro Engineers, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2001), where the Federal Circuit held:

> Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation that "neither party will do anything that will hinder or delay the other party in performance of the contract."[[15]]

This point was again reiterated in *Precision Pine* where Chief Judge Damich held:

> When the Government fails to take essential action, or when the Government's conduct during contract performance is unreasonable *such as failing to help in a solution of a problem that has arisen in contract performance*, it will be said to have breached its implied duty to cooperate with the performance of the contract.

*Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 59 (2001)(emphasis added).

Furthermore:

> [W]hen some government action is essential for the contractor to perform and the government wrongfully fails or refuses to take that action, then the government has breached its implied duty to cooperate.

*CEMS, Inc. v. United States*, 2003 WL 22533158 (Fed. Cl. 2003), *quoting Ryco Constr., Inc. v. United States*, 55 Fed. Cl. 184, 192 (2002) (*citing* John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 297 (3d ed. 1995)).

As this Court has recently held, "under the implied duty not to hinder performance, Government actions that are unreasonable under the circumstances constitute a breach." *Tecom*, (June 27, 2005) at 42, *citing C. Sanchez and Son, Inc.*, 6 F.3d at 1542; *Essex Electro*, 224 F.3d at

---

[15] The Federal Circuit further pointed out that the determination of whether the government met its duty in resolving a problem which arose with contract performance is to be viewed in light of whether the government's actions caused the problem to arise. *Essex Electro*, 224 F.3d at 1291. The Forest Service's actions in this matter, namely its failure to disclose the details of the 1992 inspection until 1997, did cause the problem at issue to arise, thus further

1291; *Sun Oil v. United States*, 215 Ct. Cl. 716, 741 (1978). In addition, "[t]his duty has been expressed as the obligation 'not to willfully *or negligently* interfere with the contractor in the performance of his contract.'" *Tecom*, (June 27, 2005) at 43 (emphasis in original), *quoting Peter Kiewit Sons' Co. v. United States*, 138 Ct. Cl. 668, 674 (1957).

In addition, the specific nature and scope of the government's duty to cooperate and not to hinder is dependent on the particular facts and circumstances of the case at hand. *Commerce International Co. v. United States*, 338 F.2d 81, 86 (Ct. Cl. 1964) ("the nature and scope of [the duty to cooperate] is to be gathered from the particular contract, its context, and its surrounding circumstances"); *Walter Dawgie*, 30 Fed. Cl. 115, 130 (1993)("the nature and scope of this duty depends on the facts and circumstances of the case").[16]

Among other facts, the Forest Service's admitted statements to representatives of The Sweetwater in the 1995 meeting between the two parties are directly relevant to the scope of this implied duty. As the Forest Service officials repeatedly reiterated, the Forest Service intended to "do [its] best" as to events within its control to ensure that the lodge had sufficient access for operations. Moreover and independent of this 1995 meeting, once the problem regarding the bridges was revealed in 1997, the Forest Service then stated in a letter to The Sweetwater in 1997 that it would seek funding to resolve this problem which hindered contract performance. *See S.A.*

---

raising their duty to assist in its resolution.

[16] As the Forest Service itself has previously pointed out, the Court in *Walter Dawgie* noted that, while the Forest Service had not provided assurances to the holder of the Term SUP at issue that it would have uninterrupted or unlimited access to its permit area for operations, "the duty not to hinder performance <u>assuredly incorporates certain assurances of access to the permit area</u>." 30 Fed. Cl. at 34 (emphasis added); Defendant's Motion to Dismiss (Dec. 15, 2003) at 34. In the present case, The Sweetwater was left with no access to its permit area that would allow operations.

*Healey Company v. United States*, 576 F.2d 299, 306-307 (Ct. Cl. 1978) (once government informs a contractor that it intends to seek funds to assist contract performance, it has an obligation to follow through on those efforts under its duty to cooperate and not interfere even though it otherwise may not have been contractually required to seek funds).

The facts in this case repeatedly demonstrate that, again and again, the Forest Service not only failed to do its best to make efforts towards providing access to the lodge to allow performance, but actually took actions that prevented such access and directly contradicted its written and oral representations to The Sweetwater. This included, but is not limited to, withholding the truth from The Sweetwater as to the success of the Forest Service's funding efforts, blocking such funding from being applied to the bridges when it actually had been obtained, and misleading The Sweetwater as to the cost of replacing the bridges. Whether these actions are viewed as deliberate or grossly negligent, they still constitute a basis for having breached the Forest Service's contractual obligation to The Sweetwater.

*Breach of contract by failing to invoke Clause 15*

The Sweetwater's contract contains Clause 15 which obligates the Forest Service to compensate The Sweetwater when the Forest Service terminates lodge operations under the permit for the public interest as opposed to the permit holder's fault. While the Forest Service did in fact deliberately terminate lodge operations through its actions for a greater public benefit, it has refused to compensate The Sweetwater under its contract as it is required to do. This failure constitutes a breach of The Sweetwater's contract and makes the Forest Service liable for compensation as otherwise calculated under the applicable contract clause.

Clause 15 of the contract states:

> If during the term of this permit or any extension thereof, the Secretary of Agriculture *or any official of the Forest Service acting by or under his authority shall determine that the public interest requires termination of this permit*, this permit shall terminate upon thirty days' written notice to the permittee of such determination, and the United States shall have the right thereupon to purchase the permittee's improvements, to remove them, or to require the permittee to remove them, at the option of the United States, *and the United States shall be obligated to pay an equitable consideration* for the improvements or for removal of the improvements and damages to the improvements resulting from their removal.

As will be demonstrated at trial, the Forest Supervisor had delegated to the District Ranger, as she was authorized to do under Forest Service policy, the authority that had been delegated to her to administer the terms of The Sweetwater Term SUP, which included clause 15. In exercising this duty, the Forest Service District Ranger decided that the lodge operations were not the best use of the land. He shared his goals and strategy for accomplishing them with the Forest Supervisor and others in the Forest Service, thereby attaining such approval to the extent it was necessary. To accomplish his goal, he attempted to locate a private conservation buyer who would tear the lodge down. As a direct part of his strategy and as he informed the Forest Supervisor, the District Ranger blocked the repair of the Sweetwater bridges because that repair was not consistent with, and in fact would interfere with his goal of terminating lodge operations. Preventing the repair of The Sweetwater bridges prevented continued lodge operations, essentially terminating them.

The District Ranger's actions were motivated in part by the desire, which was shared by local environmental groups, to put the land area where the lodge operations occurred to a better public use. This use included removing the lodge to improve the habitat for sensitive or endangered wildlife species such as the grizzly bear, big horn sheep and elk. It also included eliminating an on-going harm to Sweetwater Creek due to the sedimentation that occurred from run-off coming from the road leading to the lodge. This action was also driven by the motive of

eliminating an on-going Forest Service financial output caused by its continuing upkeep of the road and bridges leading to the lodge. In other words, the actions were taken to save the Forest Service money. When the District Ranger was informed that funding which had been previously sought for the specific purpose of replacing the bridges had arrived at the Forest Service from Congress, he took the affirmative step of ensuring that funding was not used for that purpose. This action completed the goal of terminating lodge operations.

In a similar situation involving a Forest Service timber sale contract, the Forest Service attempted to escape the obligations it had contractually agreed would apply when it took certain actions by not formally invoking the contract clause that contained the obligation. *Wetsel-Oviatt Lumber Co. Inc. v. United States*, 38 Fed. Cl. 563, 569-570 (1997). The Court rejected this effort. In *Wetsel-Oviatt*, the contract obligated the Forest Service to compensate the purchaser when the government terminated a portion of the contract. *Id.* at 569-570. While the government admitted that it had effectively terminated the contract, it claimed that because it had not formally invoked the contract clause providing compensation for such terminations, it had no obligation to compensate the purchaser. *Id.* at 570. The Court relied on a similar conclusion reached by the AGBCA in resolving another case where the Forest Service tried the same tactic. In that case, *Davidson Industries, Inc.*, AGBCA No. 95-166-1, 96-2 BCA ¶ 28,299 (1996), the Forest Service suspended a contract for environmental reasons and the contract contained three clauses obligating the Forest Service to compensate the purchaser in such an event. *Id.* at 141,302-03. In that case, the Forest Service argued that a particular clause providing for compensation in the situation that existed was not applicable because it required a formal decision by the Chief of the Forest Service. *Id.* at 141,303-304. As summarized by the Court of Federal Claims:

In *Davidson*, the government attempted to escape compensating a contractor for

> timber the government deleted from a timber contract by taking refuge behind procedures required for modification and termination of the contract, even though the government had, in substance, already canceled portions of the contract. So too in the instant case.

*Wetsel-Oviatt*, 38 Fed. Cl. at 569-570.

The Court in *Wetsel-Oviatt* also concluded, as had the *Davidson* board panel, that:

> Although clause C8.2 vests the Chief of the Forest Service with authority to terminate, the Forest Service cannot seek to avoid determination that a termination has effectively taken place—particularly where the government has conceded that a termination has taken place—because documentation does not indicate the Chief of the Forest Service's formal approval. *See Davidson Indus. Inc.*, 96-2 BCA ¶ 28,299 at 141,303-304.

In the present case, the Forest Service clearly took direct and deliberate affirmative actions to terminate lodge operations. Whether or not it complied with each particular formal procedural requirement under clause 15 of the contract is irrelevant where an effective termination has occurred. In such an instance, the Forest Service is contractually liable under clause 15 of the permit to compensate The Sweetwater for its actions.

*Tortious breach of contract*

In the alternative to the breach of contract identified above, the government has committed a tortious breach of the contract if the plaintiff can show that: (1) the government made a representation; (2) the misrepresentation was either fraudulent or material; (3) the misrepresentation induced plaintiff to enter into the contract; and (4) plaintiff was justified in relying on the misrepresentation. *Detroit Housing Corp. v. United States*, 55 Fed. Cl. 410 (2003). Each of these elements is present in this case.

The critical representation in this case was that the Forest Service bridges leading to the lodge were in a safe condition and could be used by a lodge operator to perform its contract with

the Forest Service. This representation was made by the Forest Service when it kept the road and bridges open for public use with no warning signs or other indicia of the fact that qualified Forest Service bridge inspectors had reviewed the bridges in 1992 and had concluded that they "need[ed] to close those bridges immediately" because of the safety risk they posed. The Shoshone employees argued in 1992 that they could not close the bridges because of the ramifications due to the lodge needing the bridges for operations.[17] Solely because of this argument, the bridges were kept open.

Misrepresentation occurs when the government misleads a contractor by a negligently untrue representation of fact, or fails to disclose information that it has a duty to disclose. *Meyers Cos., Inc. v. United States*, 41 Fed. Cl. 303 (1998). The misrepresentation about the status of the lodge was material because the safe status of the bridges was critical to lodge operations. The status of the bridges is important not only for ensuring the public's physical safety, but also for not causing legal liability should an accident occur. While the government may be able to take the risk of leaving a defective bridge open because it enjoys sovereign immunity where the decision to leave the bridge open is discretionary,[18] a private business has no such protection. Therefore, by being aware that qualified Forest Service bridge inspectors concluded in 1992 that the bridges were in poor enough shape to be "basically condemned" and that no work had been done to repair

[17]This fact further demonstrates that the Forest Service was aware as early as 1992 that lodge operations *required* vehicular access. If such access was not necessary and the lodge could be operated by means of alternative means, the Shoshone would not have kept otherwise dangerous bridges open for public use after 1992. Further, it is consistent both with the Forest Service written determination that "[s]hould the bridges fail and this access be lost, . . . the service to the public [will be] lost" as well as the prior lodge owners' notification to the Forest Service of this same fact.

[18]*See* 28 U.S.C. § 2680(a).

the bridges since this time, the lodge operator would take on an unreasonable liability risk if it were to invite paying guests to its lodge knowing they had to cross these unsafe bridges.

Had the Forest Service disclosed to The Sweetwater that, at the time it was purchasing the lodge, the bridges had been inspected by the Forest Service and the inspectors' concluded that the bridges "should be closed immediately," The Sweetwater would not have purchased the lodge prior to the bridges being repaired. As The Sweetwater's actual conduct in 1997 shows, as soon as The Sweetwater learned of this information, it shut down its operations. Obviously, had The Sweetwater known of this information in 1995, it never would have purchased a lodge it would be unable to operate. In addition, the Forest Service knew that safe vehicular access over the bridges was critical to any lodge owner being able to operate a business. Therefore, it is clear that the Forest Service's representations by keeping the road publicly open with no warning signs induced The Sweetwater to purchase the lodge assets and enter into a contract with the Forest Service to operate those assets as an on-going lodge business.

Finally, The Sweetwater was justified in relying on the Forest Service's representations. First, the Forest Service was involved in the purchase of the lodge assets and clearly understood that the value of the lodge assets was totally dependent on them being operated as an on-going business. In order for the lodge owners to operate an on-going business, the Forest Service required any lodge owner to have a permit which specifically obligated it to provide a recreational business to members of the public. 36 C.F.R. § 251.50(a). Without a permit, the assets would have to be removed. 36 C.F.R. § 251.60(h)(2)(i). In addition, by not placing any warning signs on its own bridges which it knew were the only way vehicles could access the lodge, the Forest Service was aware that its actions indicated that it had determined the bridges to be safe and usable by the lodge for its business. Therefore, given the Forest Service's awareness of the significance

of its bridges to lodge operations and that its keeping the bridges open to the public indicated their adequacy for lodge operations, The Sweetwater had every reason to rely on the Forest Service's representations and conduct.

*Applicability of CDA*

The Contract Dispute Act ("CDA") states:

> Unless otherwise specifically provided herein, this chapter applies to any express or implied contract (including those of the nonappropriated fund activities described in sections 1346 and 1491 of title 28) entered into by an executive agency for—
>
> (1) the procurement of property, other than real property in being;
>
> (2) **the procurement of services**;
>
> (3) the procurement of construction, alteration, repair or maintenance of real property; or,
>
> (4) the disposal of personal property.

41 U.S.C. § 602(a)(emphasis added).

As to whether or not a Term SUP is entered into in order for the Forest Service to obtain services, the Forest Service officials involved in administering these contracts have stated it best. As the Forest Service Recreation, Wilderness and Land Staff Officer stated in his deposition:

> [Term SUPs] are, by regulation and by purpose, [] a delivery system to provide public services. With the exception of summer homes, which are pretty well focused on individuals, most of our Special Use Permits are—have some basis in public service and doing public good through the Special Use Permit system and in cooperation with private enterprises to provide public services. So, with that philosophy, you know, I kind of agreed that that's why we're here, and that's why we have Special Use Permits.

Another Forest Service official who was a member of the Shoshone National Forest special use permit team reiterated the same statement:

> [C]oncessionaire permittees are part of the Forest Service who are permitted to provide a service that we want provided, it's not for convenience of the permittee, it's to meet a responsibility providing public service to the public, and so we allow the numbers and the locations in order to provide what we feel to meet the public need, okay.

Thus, in the words of the individuals who have the most knowledge as to what Term SUPs are and the purposes which they achieve, a Term SUP is clearly the type of contract which is covered by the Contract Disputes Act. *See Alpine Camping Services*, B-238625, B-238625.2, 90-1 CPD ¶ 580.

*Fifth Amendment Taking*

When the government takes property for public use, it is obliged under the Fifth Amendment to provide "just compensation" which the U.S. Supreme Court has held to mean in most cases "the fair market value of the property on the date it was appropriated." *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 10 (1984). "Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking." *Id.* In the present case, the Term SUP contains clause 15, which addresses situations where the Forest Service terminates the Term SUP in the public interest. In the event that the Court determines that the Forest Service has terminated the Term SUP, but clause 15 does not apply, The Sweetwater asserts that the Forest Service has taken its property (both the lodge facilities and contract) without just compensation, as required under the Fifth Amendment. Because the Forest Service's actions in accomplishing this taking have occurred over time, The Sweetwater asserts

that the best measure of the date of taking is the date of trial. *See Kirby Forest Industries*, 467 U.S. at 16-17 ("courts and commissions understandably have adopted the convention of using the date of the commencement of the trial as the date of the valuation").

**Plaintiff's Witness List**[19]

Jeff Mummery- expected to provide testimony related to the purchase of The Sweetwater lodge, defendant's administration of the contract, business operations related to the lodge and damages incurred pursuant to the defendant's breach. (8 hours)

Monte Jackson- expected to testify as to matters related to lodge operations. (1 hour)

William Simpson- expected to testify as to the terms of the permit and the circumstances at the time the permit was entered into. (30 minutes)

Brent Larson- expected to testify as to the terms of the permit, the circumstances at the time the permit was entered into, Forest Service administration of the permit as well as prior permits, and lodge operations. (4 hours)

James Fischer- expected to testify as to the terms of the permit, the circumstances at the time the permit was entered into, Forest Service administration of the permit as well as prior permits, and lodge operations. (2 hours)

Monte Barker- expected to testify as to the terms of the permit, the circumstances at the time the permit was entered into, Forest Service administration of the permit as well as prior permits, and

[19] Counsel for plaintiff and defendant have discussed the issue of the exhibit lists to be submitted in this matter and have agreed to provide a consolidated list as to exhibits both intend to submit. Plaintiff will provide its exhibit list to defendant for purposes of preparing a consolidated

lodge operations. (2 hours)

Robert Rossman- expected to testify as to the terms of the permit, the circumstances at the time the permit was entered into, Forest Service administration of the permit, and lodge operations. (2 hours)

Mike Bree- expected to testify as to the terms of the permit, the circumstances at the time the permit was entered into, Forest Service administration of the permit as well as prior permits, and lodge operations. (2 hour)

Jennifer Watson- expected to testify as to the terms of the permit, the circumstances at the time the permit was entered into, Forest Service administration of the permit as well as prior permits, and lodge operations. (1 hour)

Rebecca Aus- expected to testify as to the terms of the permit, Forest Service administration of the permit and lodge operations. (3 hours)

Gary Reynolds- expected to testify as to the Forest Service's efforts related to appraising the lodge facilities. (30 minutes)

George Barrus- expected to testify as to the Forest Service administration of the permit preceding

list that then also includes and notes exhibits which the parties have not agreed upon.

the permit entered into by The Sweetwater and defendant, the condition of the bridges over Sweetwater Creek as well as the Forest Service's administration of The Sweetwater's permit. (30 minutes)

Tom Koenig- expected to testify as to matters related to the bridges used to access the lodge and the Forest Service's administration of the permit. (1 hour)

Ralph Wilkerson- expected to testify as to selling prices for area lodges located on Forest Service land and the sale by the Brannon's of the lodge facilities. (30 minutes)

Hamilton Bryan- expected to testify as to historic lodge rates and revenues in the area of The Sweetwater's lodge operations and historic and projected visitor demand. (1 hour)

Phil Lamb- expected to testify as to historic lodge rates and revenues in the area of The Sweetwater's lodge operations and historic and projected visitor demand. (1 hour)

John Parsons- expected to testify as to historic lodge rates and revenues in the area of The Sweetwater's lodge operations and historic and projected visitor demand. (30 minutes)

Scott Bates- expected to testify as to historic lodge rates and revenues in the area of The Sweetwater's lodge operations and historic and projected visitor demand. (30 minutes)

Seven Mazone- expected to testify as to historic lodge rates and revenues in the area of The

Sweetwater's lodge operations and historic and projected visitor demand. (30 minutes)

Que Mangus- expected to testify as an expert witness regarding the appraised value of The Sweetwater lodge. (2 hours)

John Pucetas – expected to testify as an expert witness regarding the replacement cost of The Sweetwater lodge. (1 ½ hours)

Furthermore, plaintiff reserves the right to call any and all witnesses listed by the government in defendant's Witness List and the right to include additional witnesses to the extent it does not result in prejudice to defendant.

Respectfully submitted,

/s/

Kevin R. Garden
THE GARDEN LAW FIRM P.C.
Suite 325
901 North Pitt Street
Alexandria, VA 22314
(703) 535-5565

Dated: July 12, 2005