IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC, | |
| Plaintiff, | |
| v. | No. 02-1795C (Senior Judge Merow) |
| THE UNITED STATES, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**


PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
1100 L St. N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
E-mail: john.williamson@usdoj.gov

OF COUNSEL:

KENNETH S. CAPPS
Attorney-Advisor
Office of the General Counsel
Mountain Region
U.S. Department of Agriculture
P.O. Box 25005
Denver, CO 80225-0005


August 12, 2005

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

CONTENTIONS OF FACT

I. History Of Sweetwater Lodge And Bridges . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Location . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. The Lodge Permittee Immediately Preceding The Sweetwater Entered A Cooperative Road Maintenance Agreement With The Forest Service . . . . . . . . . . 2

II. The Sweetwater Buys The Lodge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. Negotiations Between The Brannons And Jeff Mummery . . . . . . . . . 4

B. During A June 12, 1995 Meeting To Discuss The Terms Of The Permit, The Sweetwater Declined To Enter Any Agreement About The Bridges . . . . . . . . . . . . . . . . . . . 5

C. The Sweetwater Completes Its Purchase Of The Lodge, And The Forest Service Issued A Permit On August 21, 1995 . . . . . . . . . . 8

III. The Forest Service Has Shown Good Faith In Its Decisions About Whether To Fund The Replacement Of The Sweetwater Bridges . . . . . . . . 10

IV. The Sweetwater Has Never Operated The Lodge As A Public Resort . . . . . 12

ISSUES OF FACT AND LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CONTENTIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I. The Permit Issued To The Sweetwater Is A License, Not A Contract For Services . . . . . . . . . . . . . . . . . . . . . . . . . 16

II. The Permit Is Not A Contract Covered By The Contract Disputes Act . . . . 17

III. The Forest Service Does Not Owe, And Did Not Violate, Any Implied Contractual Duties That Plaintiff Asserts In Count I . . . . . . . . 19

A. The Terms Of The Permit Do Not Require The Forest Service To Replace The Bridges . . . . . . . . . . . . . . . . . . . 19

B. The Parties' Discussions Before The Permit Issued Preclude Any Implied Duty To Ensure Access By Car To The Lodge . . . . . 24

C. The Alleged Actions Of The Forest Service After The Permit Issued Did Not Breach Any Implied Duties To Cooperate And Not Hinder . . . . . . . . . . . . . 30

IV. The Forest Service Has Not Violated Clause 15 Of The Permit, As Asserted In Count II . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

V. Plaintiff's Failure To Operate The Lodge As A Public Resort Was A Material Breach Of Contract That Excused Any Alleged Non-Performance By The Forest Service . . . . . . . . . . . . . . . . 43

VI. The Forest Service Has Not Committed Any Tortious Breach Of The Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

VII. Plaintiff Is Unable To State A Claim For A Fifth Amendment Taking . . . . . 51

VIII. Plaintiff Is Not Entitled To Recover Any Breach Of Contract Damages . . . 56

A. Plaintiff Could Have Covered Its Out-Of-Pocket Expenses By Operating . . . . . . . . . . . . . . . . . . . . . . . 57

B. Plaintiff Cannot Meet Any Of The Three Requirements To Recover Lost Profits . . . . . . . . . . . . . . . . . . . . . 58

C. Plaintiff Is Not Entitled To Recover The Market Value Or Replacement Cost Of Its Lodge As Damages For Breach Of Contract . . . . . . . . . . . . . . . . 62

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

## TABLE OF AUTHORITIES

### CASES

Allied-General Nuclear Servs. v. United States,
839 F.2d 1572 (Fed. Cir.),
cert. denied, 488 U.S. 819 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Alpine Camping Services,
B-238 90-1 CPD ¶ 580 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Alves v. United States,
133 F.3d 1454 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

American Pelagic Fishing Co., L.P. v. United States,
379 F.3d 1363 (Fed. Cir. 2004),
cert. denied, ___ U.S. ____, 125 S. Ct. 2963 (2005) . . . . . . . . . . . . . . . . . . . . 53, 54, 55

Anderson v. United States,
344 F.3d 1343 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Andrus v. Allard,
444 U.S. 51 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

B-West Imports, Inc. v. United States,
75 F.3d 633 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Bonneville Assocs. v. United States,
43 F.3d 648 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Bradley v. Chiron Corp.,
136 F.3d 1317 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 31

Caldwell & Santmyer, Inc. v. Glickman,
55 F.3d 1578 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 60, 61, 62

Casa de Cambio Comdiv S.A., de C.V. v. United States,
291 F.3d 1356 (Fed. Cir. 2002),
cert. denied, 538 U.S. 921 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Castle v. United States,
301 F.3d 1328 (Fed. Cir. 2002),
cert. denied, 539 U.S. 925 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Cedar Lumber v. United States,
5 Cl. Ct. 539, (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

Chancellor Manor v. United States,
331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Commerce Int'l Co. v. United States,
338 F.2d 81 (Ct. Cl. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Contel of California, Inc. v. United States,
37 Fed. Cl. 68 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Conti v. United States,
291 F.3d 1334 (Fed. Cir. 2002),
cert. denied, 537 U.S. 1112 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54, 55

Davidson Industrial, Inc. AGBCA No. 95-166-1,
96-2 BCA ¶ 28,299 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

Dolan v. City of Tigard,
512 U.S. 374 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Energy Capital Corp. v. United States,
1314, (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 62

Essex Electro Engineers v. Danzig,
224 F.3d 1283 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Federal Crop Ins. Corp. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Glendale Federal Bank, F.S.B. v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 63

H. Landau & Co. v. United States,
886 F.2d 322 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Hage v. United States,
35 Fed. Cl. 147 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 25

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Hardeman-Monier-Hutcherson v. United States,
458 F.2d 1364, 198 Ct. Cl. (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Harris v. Department of Veterans Affairs,
142 F.3d 1463 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Kaiser Aetna v. United States,
444 U.S. 164 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

LaSalle Talman Bank F.S.B. v. United States,
317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 60, 63

Lamirage, Inc. v. United States,
44 Fed. Cl. 192 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Lenry v. United States,
156 Ct. C 297 F.2d 550 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Lucas v. South Carolina Coastal Council,
505 U.S. 1003 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

M & J Coal Co. v. United States,
47 F.3d 1148 (Fed. Cir.),
cert. denied, 516 U.S. 808 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Maritrans Inc. v. United States,
342 F.3d 1344 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

McAbee Constr., Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Meyers Cos., Inc v. United States,
41 Fed. Cl. 303 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Mitchell Arms, Inc. v. United States,
7 F.3d 212 (Fed. Cir. 1993),
cert. denied, 511 U.S. 1106 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Mountain States Telephone and Telegraph Co. v. United States,
499 F.2d 611 (Ct. Cl. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26

Ness Investment Corp. v. United States Department of Agriculture, Forest Service,
360 F. Supp. 127 (D. Ariz. 1973),
aff'd, 512 F.2d 706 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Oman-Fischbach Int'l (JV) v. Pirie,
276 F.2d 1380 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Oroville-Tonasket Irrigation Dist. v. United States,
33 Fed. Cl. 14 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Pacific Gas & Elec. Co. v. United States,
3 Cl. Ct. 329 (1983),
aff'd, 738 F.2d 452 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 59

Renda Marine, Inc. v. United States,
____ Fed. Cl. ____, 2005 WL 1793421 (No. 02-306C, July 28, 2005) . . . . . . . . . . 47

S.A. Healey Co. v. United States,
216 Ct. Cl. 172, 576 F.2d 299 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 32

Scott Timber Co. v. United States,
333 F.3d 1358 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Son Broadcasting v. United States,
52 Fed. Cl. 815 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20, 23, 28, 31

Southern Comfort Builders, Inc. v. United States,
___ Fed. Cl. ____, 2005 WL 1804325 (No. 00-542C, July 29, 2005) . . . . . . . . . . . 46

Sun Oil Co. v. United States,
215 Ct. Cl. 716 F.2d 786 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

T&M Distributors, Inc. v. United States,
185 F.3d 1279 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Torncello v. United States,
681 F.2d 756 Ct. Cl. (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Trauma Serv. Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Walter Dawgie Ski Corp. v. United States,
30 Fed. Cl. 115 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29, 30, 33

Wetsel-Oviatt Lumber Co., Inc. v. United States,
38 Fed. Cl. 563 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

## STATUTES


16 U.S.C. § 497 . . . . . . . . . . 16

16 U.S.C. § 580d . . . . . . . . . . 19

16 U.S.C. § 5954(a)(3) . . . . . . . . . . 62

41 U.S.C. § 602(a) . . . . . . . . . . 14, 18


## REGULATIONS


36 C.F.R. 211.20-211.37 . . . . . . . . . . 8

36 C.F.R. 251 . . . . . . . . . . 10

36 C.F.R. § 251.51 . . . . . . . . . . 36

36 C.F.R. § 251.55 . . . . . . . . . . 16


## OTHER AUTHORITIES


John D. Calamari & Joseph M. Perillo, The Law of Contracts § 14.9 (4th ed.1998)) . . . . . 56

Corbin on Contracts § 564, p. 20 (Interim Ed. 2002) . . . . . . . . . . 26

Restatement (Second) of Contracts, § 344 . . . . . . . . . . 56

Restatement (Second) of Contracts, § 347 . . . . . . . . . . 56

Restatement (Second) of Contracts, § 350 . . . . . . . . . . 57

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 02-1795C<br>(Senior Judge Merow) |

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to Appendix A, ¶ 14(b) of the Rules of the United States Court of Federal Claims, and this Court's March 29, 2005 Order, defendant, the United States, respectfully files this Memorandum of Contentions of Fact and Law.

## CONTENTIONS OF FACT

### I. History Of Sweetwater Lodge And Bridges

#### A. Location

The buildings and other site improvements (collectively, "the lodge") owned by The Sweetwater, A Wilderness Lodge LLC ("The Sweetwater") are located on 15.4 acres in the Shoshone National Forest ("the Shoshone"), approximately 3.5 miles north of Wyoming State Highway 14/16/20, also known as the "Yellowstone Highway." Forest Service Road 423 ("Sweetwater Road") is an unpaved road that runs approximately 3.5 miles from the Wapiti Campground up the Sweetwater Creek drainage to The Sweetwater's lodge.

Sweetwater Road is classified on the Shoshone's INFRA road database as a Level 2 road. The Forest Service Handbooks states that Level 2 is the maintenance level "[a]ssigned

to roads open for use by high clearance vehicles. Passenger car traffic is not a consideration."

There are three bridges for vehicular traffic on Sweetwater Road. The first bridge on FSR 423, FS No. 423-.3, spans the North Fork ("the North Fork bridge"), and is located approximately .3 miles north of the Yellowstone Highway. The other two bridges, FS Nos. 423-2.5 and 423-3.0, span Sweetwater Creek ("the Sweetwater bridges"), and are located approximately 2.5 and 3.0 miles from the Yellowstone Highway.

It appears from Forest Service records that permittees built the Sweetwater bridges from available materials. The Forest Service required lodge permittees in the 1960s and 1970s to upgrade the condition of the Sweetwater bridges. Forest Service records from the 1970s indicate that the then-permittee owned bridges. The Forest Service built the North Fork bridge in 1981 for approximately $85,000.

The Forest Service maintains no trails in the Sweetwater Creek drainage beyond the lodge because it is a pristine area. Few members of the public other than guests at the lodge use Sweetwater Road because "there's really no place for – for people to go." The Sweetwater's lawyer who met with the Forest Service before The Sweetwater bought the lodge testified that "I don't know why you would want to drive up that road unless it was to go to the lodge."

### B. The Lodge Permittee Immediately Preceding The Sweetwater Entered A Cooperative Road Maintenance Agreement With The Forest Service

The permittees who operated the lodge from 1983 until 1995 were David and Nancy Brannon d/b/a Brannons' Wilderness Lodge. The Brannons' permit was amended in 1985 to include a "Memorandum Of Understanding For Cooperation In Road Maintenance ("the

Brannons' MOU"), under which the Forest Service assumed responsibility for bridge and road maintenance for Forest Service traffic, and permittee assumed responsibility for "traffic generated from use of lands leased by the COOPERATORS for the purposes of operating and maintaining a guest lodge."

The Brannons' MOU provided that "The FOREST SERVICE shall: 1. Assume road maintenance responsibility for all National Forest traffic as defined and for two bridges (FS No. 423-2.5 and FS No. 423-3.0), including abutments and approaches." The MOU's "Definition of Terms" section defines "National Forest traffic" as "traffic generated by use of National Forest lands or road systems for recreation purposes exclusive of traffic related to commercial, administration, or protection needs of lands owned or leased by the COOPERATORS." The Brannons' MOU also provided that "New construction or reconstruction, such as bridge replacement, will be agreed to as part of the yearly Joint Maintenance plan."

A prospective purchaser of the lodge, Ms. Wanda Smith, spoke with the Forest Engineer of the Shoshone, Jim Fischer, on or about May 15, 1995 about the road and bridge conditions. Mr. Fischer discussed with her the possibility of replacing the bridges with fords. He noted that he recorded in his calendar for that day that "Ms. Smith isn't real excited about that." Ms. Smith did not purchase the lodge from the Brannons because of her concerns about the road and bridges.

Mike Bree, one of the Forest Service employees who had responsibility at that time for administering permits in the Shoshone National Forest, spoke to the Brannons, who were upset that the Forest Service talked about the road and bridges with Ms. Smith. Mr. Bree

told the Brannons that the Forest Service has "to make sure that anybody that's going to purchase it knows the good points and the bad points, everything about it."

## II. The Sweetwater Buys The Lodge

### A. Negotiations Between The Brannons And Jeff Mummery

Jeff Mummery is the manager of The Sweetwater. He is also the president of Western Wyoming Properties & Investment Corporation, which owns shares of The Sweetwater. Mr. Mummery is self-employed, and engages in financial consulting regarding real estate.

On Friday, May 19 1995, Mr. Mummery learned from Buck Wilkerson, a friend who was a realtor, that the closing on the Brannons' sale of the lodge had fallen through, and that Mr. Mummery "could make [him]self a good deal and buy it." Mr. Wilkerson told Mr. Mummery that he thought the previous prospective purchaser had been prepared to pay $450,000 for the lodge. Mr. Wilkerson told Mr. Mummery that the Brannons were very motivated to sell the lodge, because they were retiring, had made a commitment to buy a boat, and had made no bookings for the lodge for the summer season that was just beginning because they had been negotiating the sale of the lodge for several months.

Mr. Mummery testified in his deposition that "I looked at it as a bargain sale." He also testified that "since I looked at it as a bargain sale, I wasn't going to evaluate how – their gross revenues or net revenues or how they – they ran their business." Unlike the Brannons, who lived at the lodge and who Mr. Mummery said "charged their whole life to it," Mr. Mummery did not intend to live at the lodge or operate it with his wife, but intended to hire a cook.

On Sunday morning, May 21, 1995, Mr. Mummery faxed Mr. Brannon an offer on

the lodge for $275,000. The Brannons made a counter-offer for $287,500, which Mr. Mummery, as president of Western Wyoming Properties, accepted later that day, May 21, 1995. Paragraph 8 of the original offer provided for a closing date of June 21, 1995.

Mr. Mummery testified that "I didn't look at the bridges before I put in the offer. I mean, I – I looked at them driving out. . . . my primary concern at the time was even getting the – you know, I – I had offered substantially less than I think he'd felt his lodge was worth. I mean, you know, 40 percent less, or in that neighborhood." Mr. Mummery elected not to consult an engineer about the bridges before he bought the lodge.

### B. During A June 12, 1995 Meeting To Discuss The Terms Of The Permit, The Sweetwater Declined To Enter Any Agreement About The Bridges

On June 12, 1995, Mr. Mummery and The Sweetwater's lawyer, Bill Simpson, met with three Forest Service representatives – Bob Rossman, Monte Barker, and Mike Bree – to discuss the permit that The Sweetwater desired to obtain for the lodge. At the time of the meeting, Bob Rossman was Acting District Ranger for the Wapiti District of the Shoshone, where the lodge is located. Mr. Rossman was the only Forest Service line officer at the meeting. In an internal Forest Service email dated June 13, 1995, Mr. Rossman summarized the discussions that he, Mr. Barker, and Mr. Bree held with Mr. Mummery and Mr. Simpson the preceding day.

In his deposition, Mr. Rossman testified that his concern during the June 12, 1995 meeting was that before Mr. Mummery closed the sale on the lodge, that he have "knowledge of the condition of the access, the risks associated with it, and being able to make a decision to purchase the facilities with that in mind." Mr. Rossman recalled that the participants in the meeting discussed "that the Sweetwater drainage is unstable, the bridges are in poor condition and not expected to last in perpetuity, that they could fail and could fail at any time

. . . [a]nd if that happened, that the Forest Service had no wherewithal at the present time, and to our knowledge at the time for the foreseeable future, to replace those bridges."

Mr. Barker similarly recalled that during the June 12, 1995 meeting "there was never any commitment from the Forest Service that we would build or replace or fix the bridges. The only – I guess there may be an implication that the fact that we did talk about it had been put on the CIP list, and we would do to the best of our ability to elevate it as a concern from a public safety perspective to look at the bridges again, but there was never any commitment made that we would in any way fix the bridges."

The participants in the June 12, 1995 meeting had a copy of the Brannons' permit and MOU. Mr. Mummery stated that The Sweetwater would not enter into any road maintenance agreement with the Forest Service for Sweetwater Road or the Sweetwater bridges. Mr. Mummery did not want to enter into a road maintenance agreement because he was concerned about protecting his other assets from lawsuits arising from accidents on the road. In his deposition, Mr. Mummery agreed that "I elected not to enter into an agreement that the Forest Service explicitly assumed responsibility for the bridges." Mr. Mummery also testified that "I do not believe either Mr.Simpson or myself specifically stated to the Forest Service the request to put in writing that if the bridges had a catastrophic failure, they would replace them."

At the time of the June 12, 1995 meeting, Mr. Mummery understood that the Forest Service could not commit itself to replacing the Sweetwater bridges if they failed. He testified that the Forest Service representatives stated at the June 12, 1995 meeting that if there were a catastrophic failure of the bridges, they would have to go through "a budgeting and procurement process that <u>they couldn't guarantee the outcome of</u> to be able to repair or

replace the bridges." Mr. Mummery understood that the Forest Service representatives at the June 12, 1995 meeting, including Mr. Rossman, whom the permit identifies as the "Issuing Officer," lacked the authority to bind the Forest Service to repairing or replacing the bridges. Mr. Mummery also understood and was told clearly that once the decision was moved up the chain of command, that a decision could be made not to replace the bridges.

Mr. Rossman recalls that The Sweetwater representatives were told during the meeting that if the bridges became impassable, the Forest Service would allow The Sweetwater to use fords to cross Sweetwater Creek. Mr. Bree testified about the June 12, 1995 meeting that "we talked about alternatives and what the conversation went was that we would -- worst case scenario, we would put fords in. . . . If the bridges washed out, we weren't going to replace them, and that we would put fords in." Mr. Barker also testified that during the June 12, 1995 meeting "there was never any agreement that we would put fords in or that we would do anything. It was just when it washes out, if it does, fords would be the only option, and we'll have to take a look at it then and evaluate the situation based on the situation."

Mr. Mummery testified that he recalls that after the subject of fords arose during the June 12, 1995 meeting, "I -- I don't remember who said it again -- it might have been Simpson -- but obviously temporary fords were better than no access, so you had to have something." He expected that if the bridges became impassable, it could take three years or more to replace the bridges.

Clause 16 of the Brannons' permit provided that if the Forest Service "shall determine that the public interest requires termination of this permit" the Government would pay "equitable consideration" for the permittee's improvements, and that if the Forest Service and

the permittee were unable to agree upon the amount of the consideration, "the Forest Service shall determine the amount and if the permittee is dissatisfied with the amount thus determined to be due him he may appeal the determination in accordance with the Appeal Regulation (36 C.F.R. 211.20-211.37) and the amount as determined on appeal shall be final and conclusive."

The lawyer who represented The Sweetwater at the June 12, 1995 meeting, Bill Simpson, has no recollection of any discussion during the meeting about paragraph 16 of the Brannons' permit. Acting District Ranger Bob Rossman does not recall any discussion during the June 12, 1995 meeting about the subjects addressed in paragraph 16 of the Brannons' permit. During the June 12, 1995 meeting, none of the Forest Service representatives communicated to The Sweetwater representatives, either by action or omission, that the Forest Service agreed to make any payment to The Sweetwater if the Forest Service did not repair or replace the Sweetwater bridges, or did not pursue efforts to obtain funds to repair or replace the Sweetwater bridges.

Neither during the June 12, 1995 meeting, nor at any other time to Mr. Rossman's knowledge, did Mr. Mummery or Mr. Simpson ever say anything that suggested that if paragraph 16 were included in a permit issued to The Sweetwater, they interpreted it to mean that the Forest Service agreed to pay The Sweetwater "equitable consideration" for the lodge if the Forest Service did not repair or replace the Sweetwater bridges.

### C. The Sweetwater Completes Its Purchase Of The Lodge, And The Forest Service Issued A Permit On August 21, 1995

The Sweetwater closed its purchase of the lodge from the Brannons on June 21, 1995. At no time before The Sweetwater closed on the purchase of the lodge on June 21, 1995 did Mr. Mummery ask the Forest Service for any written information that they had about the

condition of the road and bridges because "seeing that these bridges were more of the homemade variety, I assumed that probably there was no engineering involvement." There was never any time when Mr. Mummery asked the Forest Service for information that they refused to provide to him.

On August 21, 1995, the Forest Service issued a term special use permit for The Sweetwater to operate a public resort on 15.4 acres at the end of Sweetwater Road. Mr. Rossman was not a contracting officer, and did not hold a warrant, when he signed the permit issued to The Sweetwater using delegated authority as Acting Forest Supervisor.

The front page of the permit states that it was "issued for the purpose of [m]aintaining and operating a public resort." The front page also states, "[t]his use shall be actually exercised at least 93 days each year, unless otherwise authorized in writing," and that "[t]his permit is accepted subject to the conditions set forth herein, and to conditions 3 to 55 attached hereto, and made a part of this permit."

Neither the permit nor the 1995 or 1996 annual operating plans, which were incorporated into the permit, contained any references to replacing the Sweetwater bridges or to maintenance or repair of Sweetwater Road. Clause 15 of the permit sets forth a process pursuant to which "equitable consideration" is paid to the permittee if the Forest Service "determine[s] that the public interest requires termination of this permit." Clause 15 makes no reference to paying The Sweetwater equitable consideration if the Forest Service did not repair or replace the Sweetwater bridges.

Clause 15, titled “Risks and Hazards,” states that “[a]valanches, rising waters, high winds, falling limbs or trees, and other hazards are natural phenomena in the Forest that present risks which the holder assumes. The holder has responsibility of [sic] inspecting the

site, lot, right-of-way, and immediate adjoining area for dangerous trees, hanging limbs, and other evidence of hazardous conditions and, after securing permission from the Forest Service, of removing such hazards." Clause 53, titled "Disputes," states that "[a]ppeal of any provisions of this authorization or any requirements thereof shall be subject to the appeal regulations at 36 CFR 251, Subpart C or revisions thereof."

**III. The Forest Service Has Shown Good Faith In Its Decisions About <u>Whether To Fund The Replacement Of The Sweetwater Bridges</u>**

The Sweetwater bridges were inspected in August 1992 by Forest Service bridge inspectors from the Wasatch-Cache National Forest. After performing the inspections, the bridge inspectors discussed the condition of the bridges with Jim Fischer, the Forest Engineer of the Shoshone from 1986 until 2001. The inspectors did not perform a technical load-rating, but using their judgment as professional engineers, said that the bridges were probably safe with signage that limited their use to vehicles no more than 3 to 5 tons. The inspection reports recommended the replacement of the abutments for the lower bridge (FS No. 423-2.5), and the replacement of the entire upper bridge (FS No. 423-3.0). In 1993, signs were posted on the approaches to the bridges that stated, "WEIGHT LIMIT 3 TONS."

In March 1992, the Shoshone had prepared a Forest Service Region 2 "Capital Investment Project Description Form" that proposed replacing the bridges. The proposal was updated by Mr. Fischer in February 1997. The estimated cost to replace the two bridges was $186,000.

Mr. Fischer maintained a list that he used to track the projects that the Shoshone proposed for the Capital Investment Program ("CIP") during each fiscal year. In the list, for fiscal year 1994, he recorded next to "Sweetwater Bridges" the notation "Indef. Postponed, do w/Mtce $," meaning that the project was indefinitely postponed, and might be done with

maintenance dollars.

On June 11, 1996, Mr. Fischer sent an internal email to Bob Rossman and other Forest Service employees stating that Mr. Fischer had met with Mr. Mummery, and told him that the Shoshone had the new bridges back into the CIP for fiscal year 1998 or 1999. At a June 5, 1996 meeting, Mr. Fischer had succeeded in getting the project back into the CIP for fiscal years 1998 and 1999 for the Shoshone's proposal that was forwarded to the regional office. Road and bridge projects like the Sweetwater bridges, which were not connected to a recreational project (such as a campground), were not identified as line items on the list of projects submitted to Congress for budgetary approval.

The proposal remained subject to competing priorities for CIP funds on the Shoshone. In fiscal years 1998 and again in 1999, Mr. Fischer testified that the project was deferred, possibly because the Shoshone was shorthanded in the engineering section, and possibly because it could not be fit into the budget.

Mr. Fischer testified that during fiscal year 2000, funds became available from the Forest Service's regional office to replace the Sweetwater bridges, and that he intended to proceed with construction of the bridges, but that as a result of conversations that he had with Wapiti District Ranger Brent Larson and Forest Supervisor Rebecca Aus, the decision was made not to go forward with the project.

Forest Supervisor Rebecca Aus testified that sometime in 1999 or 2000, she spoke with Wapiti District Ranger Brent Larson and perhaps Forest Engineer Jim Fischer about funding the replacement of the Sweetwater bridges. Ms. Aus determined that the project once again should be indefinitely postponed because any CIP money available was better spent on campgrounds than on replacing the Sweetwater bridges, which were on a Level 2

road that was by definition a low-maintenance road for high-clearance vehicles.

Mr. Mummery testified that it was Mr. Larson who proposed going through the process of seeking termination of the permit in the public interest as one possible option of addressing Mr. Mummery's desire for new bridges. Rebecca Aus, the Forest Supervisor, testified that Mr. Larson raised the prospect of terminating The Sweetwater's permit in the public interest pursuant to paragraph 15, but that she could not see any basis for terminating the permit in the public interest, because the lodge was consistent with the Shoshone's Forest Plan.

In late 2000, Mr. Mummery requested that the Forest Service permit him to perform work to upgrade the bridges. At the suggestion of the Shoshone's Bridge Inspector, Tom Koenig, who said there was no point in putting money into the bridges if they could not be load rated, Mr. Mummery retained an engineer, who determined that the deteriorated condition of the bridges prevented him from load rating the bridges in January 2001. The Forest Service then determined that it must close the Sweetwater bridges to vehicular access by the public, which it did in April 2001.

## IV. <u>The Sweetwater Has Never Operated The Lodge As A Public Resort</u>

In November or December 1995, Mr. Mummery tried to sell the lodge to Daren Singer and Bram Lassiter. In February 1996, Mr. Mummery signed a sales contract to sell all the stock of The Sweetwater to Mr. Carl Bixby for $600,000. However, Mr. Mummery never informed the Forest Service that he had signed the sales contract, even though paragraph 51 of the permit requires that the permittee "shall immediately notify the Forest Supervisor when a sale and transfer in ownership of the permitted improvements is planned."

Mr. Mummery granted Mr. Bixby and his family and friends exclusive use of the

lodge during 1996 in return for payments totaling $71,500. Section 2343.3 of the Forest Service Manual requires a permittee to operate a lodge "in a manner that ensures the general public has full access to the facilities," and denies "exclusive or preferential use by holders, their employees, families, friends, business associates, partners, stockholders, lenders, or others who may have a monetary interest in the facilities." Mr. Bixby was unable to close the purchase of the lodge, and the owners of The Sweetwater kept 10 percent of the purchase price – $60,000 – pursuant to the terms of the sales contract.

In February 1997, a prospective sale of the lodge to Ray and Judi Sutherland for $595,000 fell through because the Sutherlands contacted the Forest Service and asked about the condition of the Sweetwater bridges. On February 19, 1997, Jennifer Watson of the Forest Service faxed copies of the 1992 bridge inspections to the Sutherlands with a note from Shoshone Forest Engineer Jim Fischer stating that the bridges had been "basically condemned in '92."

The Forest Service sent the Sutherlands a letter the next day, on February 20, 1997, explaining that the bridges had not been condemned, and that the 1992 bridge inspections were given a rating code of 2, which indicated "a deficiency that may be dealt with through load limit restrictions." The letter also stated:

> While the Shoshone Forest clearly desires to maintain access in the Sweetwater Drainage, that access would more likely become seasonal fords of the Sweetwater River should the condition of the bridges deteriorate to the point where they can no longer be used. As explained in previous discussion, this is because funding for replacement of these bridges is not currently available, and the liklihood [sic] of obtaining adequate funding to replace these bridges in the future is low.
>
> When Jeff Mummery purchased this lodge several years ago, the condition of the bridges was an issue at that time. He agreed that fords would be an acceptable alternative for access to the lodge should the bridges either fail or become unsafe. Whether this method of access will be adequate for you and

> your proposed business at the Sweetwater Lodge must figure into your business plans.

Id. Mr. Mummery received a copy of the February 20, 1997 letter.

At Mr. Mummery's request, on February 27, 1997, the Forest Service sent a second letter about the Sweetwater bridges, this one addressed to Mr. Mummery, for which he proposed language to District Ranger Brent Larson.

Mr. Mummery testified that once he learned about the 1992 bridge inspections in February 1997, he determined that he could not operate the lodge because of the risk of liability. Mr. Mummery testified that no one from the Forest Service before April 2001 ever told him that he could not use the bridges.

Paragraph 54 of the permit requires the permittee to prepare annually an operating plan. The Sweetwater did not submit any operating plans from May 1996 until May 2002, even though Forest Service representatives repeatedly asked Mr. Mummery for The Sweetwater to submit a written proposal for how he could operate the lodge.

After the Forest Service sent a written "Notice of Non-Compliance And Opportunity To Cure" on December 21, 2001, The Sweetwater did submit an operating plan on May 1, 2002. Neither the permit nor the operating plan was ever amended in writing to relieve The Sweetwater of its obligation to operate the lodge 93 days per year as a public resort.

## ISSUES OF FACT AND LAW

1. Whether the permit issued to The Sweetwater is a contract.

2. Whether the permit issued to The Sweetwater is a contract covered by the Contract Disputes Act, 41 U.S.C. § 602(a).

3.a. Whether the permit issued to The Sweetwater could give rise to any implied contractual duty to replace the bridges when The Sweetwater declined to enter a

memorandum of understanding addressing the subject of road and bridge maintenance, and the Forest Service expressly disclaimed any commitment to replace the Sweetwater bridges before The Sweetwater closed its purchase of its lodge.

3.b. Whether the Forest Service breached any implied contractual duty to obtain funds to replace the Sweetwater bridges when no official authorized to bind the Government ever agreed to approve the replacement of the bridges.

4. Whether the Forest Service has effected a termination in the public interest of the permit issued to The Sweetwater that requires the Forest Service to pay The Sweetwater "equitable consideration" pursuant to clause 15 of the permit.

5. Whether plaintiff's failure to operate the lodge relieves the Forest Service of responsibility for any alleged violation of the permit.

6. Whether the plaintiff can pursue a claim for tortious breach of contract at trial when it has not pleaded that claim in its complaint.

7.a. Whether plaintiff can state a claim for a Fifth Amendment taking if plaintiff concurrently pursues damages for breach of contract.

7.b. Whether plaintiff possesses any property interest in the permit or in its buildings and site improvements that is compensable pursuant to the Fifth Amendment.

8.a. Whether plaintiff is entitled to recover any breach of contract damages for out-of-pocket expenses when it has failed to operate its lodge, as required by the permit.

8.b. Whether plaintiff meets all three requirements to recover lost profits for breach of contract.

8.c. Whether, if the Court determines that the Government is liable on Count I, the proper measure of plaintiff's damages is the replacement cost of the bridges.

8.d. Whether, if the Court determines that the Government is liable on Count II, plaintiff is entitled to recover the reconstruction cost or market value of its lodge as "equitable consideration" for termination of the permit.

## CONTENTIONS OF LAW

### I. The Permit Issued To The Sweetwater Is A License, Not A Contract For Services

The permit issued to The Sweetwater is not a contract for services, as plaintiff contends, but is a license whose issuance has been authorized by Congress pursuant to its management and control of public lands granted in Article IV, Section 3 of the Constitution. Pl. Mem.[1] 27-37. The Term Permit Act authorizes the Secretary of Agriculture "under such regulations as he may make and upon such terms and conditions as he may deem proper, [] to permit the use and occupancy of suitable areas of land within the national forests . . . for the purpose of constructing or maintaining hotels, resorts, and any other structures or facilities necessary or desirable for recreation, public convenience, or safety." 16 U.S.C. § 497 (emphasis added). The nature of the interest created by a term permit is a license, that provides a revocable personal privilege to the permittee to occupy National Forest System lands and conduct activities only for the purposes specified in the permit. 36 C.F.R. § 251.55.

The permit issued to plaintiff possesses "the traditional characteristics of a revokable license." Hage v. United States, 35 Fed. Cl. 147, 166 (1996). The first sentence of the permit states that "[p]ermission is granted to . . . use subject to the conditions set out below, the following described lands," and states the personal "privileges granted by this permit" to

---

[1] "Pl. Mem." refers to Plaintiff's Memorandum of Contentions of Fact and Law, filed July 12, 2005.

occupy and use National Forest land (emphasis added). This is consistent with the definition of license expressed by Bill Simpson, the lawyer who represented The Sweetwater during its discussions with the Forest Service preceding issuance of the permit: "a privilege, not necessarily a contractual right, so that it can be revoked or terminated at the discretion of the issuing agency, subject to certain terms and right of review." The permit provides that it "may be revoked upon breach of any of the conditions herein" (¶ 14), and that it cannot be assigned or transferred ( Id. ¶¶ 12, 51).

The Court has ruled that the permit is “sufficiently contractual” for the Court to exercise jurisdiction over plaintiff’s claims, because clause 15 of the permit provides that the permittee will be compensated if the Forest Service terminates the permit in the public interest. Dec. 30, 2004 Order at 12. While we respectfully disagree with the Court’s ruling, we agree that the Court has properly reserved for trial the threshold issue presented by Counts I and II of the complaint: whether the permit gives rise to the specific contractual duties that plaintiff asserts were breached by the Government.

As shown below in sections “III.” and “IV.,” the permit does not give rise to any implied duty to repair or replace the Sweetwater bridges (as asserted in Count I), nor any duty to pay plaintiff equitable consideration pursuant to clause 15 because the Forest Service has not repaired or replaced the bridges (as asserted in Count II). Thus, even if the Court concludes that the permit is a contract in some respects, the Court should still rule in favor of the Government on Counts I and II, because the Government does not owe the specific contractual duties asserted by plaintiff.

## II. The Permit Is Not A Contract Covered By The Contract Disputes Act

Even if the Court were to conclude that the permit is a contract in some respects, the

Court should reject plaintiff's assertion that the permit issued to The Sweetwater is a contract for the "procurement of services" within the meaning of the Contract Disputes Act, 41 U.S.C. § 602(a). Pl. Mem. 36. Plaintiff cites no decisions of this Court in support of its assertion, but relies only upon a single decision of the Government Accountability Office ("GAO") and the observations of two lower-level Forest Service employees, neither of whom are lawyers or hold any authority to speak on behalf of the Government.

As this Court stated in Son Broadcasting v. United States, 52 Fed. Cl. 815, 821 (2002), regarding term special use permits that granted use of a communication site, "[b]y their plain language, the Permits and incorporated Site Plan are not contracts by which the Forest Service acquired commercial supplies or services. The parties agree that the primary responsibility of Forest Supervisors is the management of National Forest System land, not the procurement of goods and services."

This Court has also stated that "[a] 'procurement' is an acquisition by purchase, lease, or barter, of property or services for the direct benefit or use of the federal government." Oroville-Tonasket Irrigation Dist. v. United States, 33 Fed. Cl. 14, 21 (1995) (citing Bonneville Assocs. v. United States, 43 F.3d 648, 653 (Fed. Cir. 1994)). In Oroville, the Court noted that Congress authorized the Secretary of the Interior "to construct, operate, and maintain" the irrigation project at issue, and that "ownership of the project is retained by the United States." 33 Fed. Cl. at 22. The Court determined that because the irrigation district was required by contract "to carry out the obligation placed by Congress on the Secretary of the Interior to operate and maintain the project in question. . . . Clearly by the contract in question, the government has procured the services of OTID to operate and maintain a

government-owned facility. This is a procurement of services." Id. (emphasis added).

In contrast, the Forest Service did not enter into a contract with plaintiff to operate or maintain a Government-owned facility. The Sweetwater owns all the improvements that are located within the 15.4 acre site identified in its permit; indeed, the alleged loss of this property is the basis of most of its damages claim. Any responsibilities that the permit requires The Sweetwater to perform to care for the Forest lands within or around its site are strictly a result of its occupancy, and are not services that the Government set out to find someone to provide.

Similarly, the GAO decision cited by plaintiff also involved the provision of services to maintain and operate Government-owned facilities. Alpine Camping Servs., B-238,625, 90-1 CPD ¶ 580. In Alpine, the Forest Service issued a prospectus inviting offerors to submit proposals for two special use permits for campground concessionaire operations. Id. The GAO noted that the permits were "issued pursuant to 16 U.S.C. § 580d, which authorizes the Secretary of Agriculture to require concessionaires to, at their expense, recondition and maintain Forest Service recreation facilities" (emphasis added), such as "to replace, paint and straighten barricades, signs, posts, tables, restrooms, etc.; recondition and install fire rings and hydrant posts." Id. Because the Forest Service had conducted a competition to select a concessionaire to maintain the Government-owned campground facilities, the GAO stated that "we conclude that the prospectus at issue is a procurement for services." Id

The Forest Service never has conducted a competition to select a concessionaire to operate a lodge on the site occupied by The Sweetwater's lodge, and the Government has

never owned the lodge. Thus, the permit is not covered by the Contract Disputes Act, because it is not a contract for the “procurement of services,” as plaintiff asserts.

## III. The Forest Service Does Not Owe, And Did Not Violate, Any Implied Contractual Duties That Plaintiff Asserts In Count I

### A. The Terms Of The Permit Do Not Require The Forest Service To Replace The Bridges

To determine what, if any, contractual duties arise from the permit issued to The Sweetwater, the Court should start with the text of the permit. In Son Broadcasting, one of the principal cases on which plaintiff relies, this Court observed that "[c]ourts have reached divergent conclusions about whether a particular permit constitutes a binding contract. However, they agree that an examination of the language and characteristics of the permit is critical to the determination.” 52 Fed. Cl. at 822.

The site plan that was incorporated in the communication site permit at issue in Son Broadcasting expressly provided that “‘a third antenna tower which may be self supporting may be authorized when the technical capacity of the intial [sic] two towers is reached.’” Id. at 817. The Court stated “[t]he plain language of these provisions suggests that although the Forest Service has the discretion to authorize a third tower, the exercise of that discretion is conditioned upon the technical capacity of the first two towers having been reached.” Id. at 825. The Court noted that the permit expressly provided that “‘[t]he Forest Service agrees not to issue authorizations to additional users’” until it was satisfied that the additional users had agreed to pay rent to the original permittee to compensate it for the original expense it had borne to develop the site. Id. at 823. The Court also noted that the permit “plainly provides that the Forest Service reserved the right to authorize other users only if ‘such use does not interfere with the rights and privileges’ authorized by the Permit.” Id. at 825.

Based upon the express language in the permit and site plan, the Court found that "[p]laintiff's rights under the contract embodied in these documents included the right to rent out all available space on its tower – as long as it was economically and technologically feasible – before the Forest Service could authorize construction of a third tower." Id. (emphasis added). The Court held "that the Special Use Permit, together with the incorporated Site Plan, constitutes a binding contract between plaintiff and the government and that this contract prohibited construction of the third tower until the first two had reached capacity." Id. at 820. The Court's holding that the permit formed a contract was limited to enforcing what it found to be a specific right of the permittee – that the Forest Service would refrain from authorizing construction of a third tower until the first two reached their capacity – that was explicitly provided in the permit and site plan.

In contrast, the permit issued to The Sweetwater does not grant the permittee any right that the Forest Service would repair or replace the Sweetwater bridges. As plaintiff concedes, and as the Court noted in its December 30, 2004 order, plaintiff declined to enter into a memorandum of understanding ("MOU") that addressed road and bridge maintenance and was incorporated into the permit, as had the previous permittees, the Brannons.

Indeed, the permit expressly provides that The Sweetwater assumed the risk that the road or bridges leading to The Sweetwater's lodge would become impassable. Clause 30 of the permit, titled "Risks and Hazards," states in its entirety: "Avalanches, rising waters, high winds, falling limbs or trees, and other hazards are natural phenomena in the Forest that present risks which the holder assumes. The holder has responsibility of [sic] inspecting the site, lot, right-of-way, and immediate adjoining area for dangerous trees, hanging limbs, and other evidence of hazardous conditions and, after securing permission from the Forest

Service, of removing such hazards." Clause 30 placed upon the permittee the risk that heavy rainfall or snowmelt in Sweetwater Creek would wash out Sweetwater Road or the abutments that supported the Sweetwater bridges.

The risk that Sweetwater Creek presented to the Sweetwater bridges was contemplated and discussed by The Sweetwater and the Forest Service before the permit issued. Jeff Mummery, the owner of The Sweetwater, testified in his deposition that when he discussed the bridges with Forest Service representatives in June 1995 before the permit issued, "What I was worried about was a catastrophic failure from a flood primarily." However, clause 30 placed upon the permittee all risk for any failure of the bridges resulting from rising waters in Sweetwater Creek, whether resulting from a single catastrophic event or through less dramatic storms or annual snowmelt that eroded the abutments. The clause also placed upon the permittee the responsibility to inspect the right-of-way for hazardous conditions caused by rising waters, such as debris or unsafe bridges, and to seek permission from the Forest Service to remove the hazards.

The Court of Claims rejected a contractor's claim that the Government bore responsibility for ensuring vehicular access to a construction site despite a flood that rendered unavailable access roads to the site. Lenry v. United States, 156 Ct. Cl. 46, 297 F.2d 550 (1962). The contractor had anticipated using the roads in its method of operation, which was not a part of the contract itself. Id. The court rejected the plaintiffs' claim that because parts of existing roads that led to the construction site were shown on the contract drawings, that the Government "impliedly warranted, for the life of the contract, the continued availability of the streets intended by plaintiff to be used as access roads." 297 F.2d at 553. The court stated, "plaintiffs make no attempt to define the scope of the warranty

they find implicit in the contract. . . . Had defendant ever intended to make such a unique and all-encompassing guarantee, and had plaintiffs expected it, we believe they would have so specified in clear and unmistakable language." Id.

If the Forest Service had intended to assume responsibility for ensuring that the Sweetwater Road and bridges would remain passable for cars for the 20-year life of the permit, it would have expressly stated that commitment in the permit. Instead, clause 30 of the permit provides that the permittee assumes the risk that rising waters might render the roads or bridges impassable.

The Court of Appeals for the Federal Circuit cited Lenry in a decision that also rejected a contractor's assertion that an implied warranty of access was created to reach a construction site. Oman-Fischbach Int'l (JV) v. Pirie, 276 F.2d 1380, 1385 (Fed. Cir. 2002). In Oman-Fischbach, the court relied in part upon the standard site investigation clause, FAR 52.236-3, which the court ruled placed the burden of determining the availability of roads upon the contractor. Id. If the permit issued to The Sweetwater is treated as a contract, clause 30 similarly required The Sweetwater to assume the responsibility for ensuring that the road and bridges leading to its lodge remained passable. The court of appeals also found that the risk of increased costs caused by third parties, like the flood in Lenry, were not shifted to the Government unless the parties had agreed so "in unmistakable terms." Id. In Son Broadcasting, this Court also relied upon Lenry in holding that the permit did not support any implied warranty of access. 30 Fed. Cl. at 128.

As the Court of Claims has recognized, it lies within the discretion of the Forest Service to establish the terms and conditions of special use permits, including term special use permits. Mountain States Telephone and Telegraph Co. v. United States, 499 F.2d 611,

613-14 (Ct. Cl. 1974). In Mountain States, the Court of Claims refused to read new terms into the special use permit at issue, rejecting the plaintiff's request to "'judicially set conditions and terms for a use permit'" that had not been set by the Forest Service in the permit. 499 F.2d at 616 (quoting Ness Investment Corp. v. United States Department of Agriculture, Forest Service, 360 F. Supp. 127, 128 (D. Ariz. 1973), aff'd, 512 F.2d 706 (9th Cir. 1975)). This Court should follow the precedent of Mountain States (which plaintiff has not addressed, let alone distinguished in its pre-trial brief), and should reject The Sweetwater's attempt to judicially set new terms that the Forest Service did not include in the permit.

### B. The Parties' Discussions Before The Permit Issued Preclude Any Implied Duty To Ensure Access By Car To The Lodge

Acknowledging that the promise that it seeks to enforce is not expressly stated in the permit, plaintiff asserts in Count I that the permit is a contract that gives rise to implied duties to cooperate and not hinder The Sweetwater's performance of its alleged contractual duty to operate a public resort. Pl. Mem. 3. The Federal Circuit has ruled that the implied duties to cooperate and not hinder performance of Government contracts are "an aspect of the duty of good faith and fair dealing." Essex Electro Engineers v. Danzig, 224 F.3d 1283 (Fed. Cir. 2000). The Federal Circuit has also ruled that "implied covenants of good faith and fair dealing are limited to assuring compliance with the express terms of the contract and cannot be extended to create new obligations not contemplated in the contract." Bradley v. Chiron Corp., 136 F.3d 1317, 1326 (Fed. Cir. 1999).

Plaintiff acknowledges that the scope of the implied duty to cooperate and not hinder "is dependent on the particular facts and circumstances of the case at hand." Pl. Mem. 29 (citing Commerce Int'l Co. v. United States, 338 F.2d 81, 86 (Ct. Cl. 1964) and Walter

Dawgie Ski Corp. v. United States, 30 Fed. Cl. 115, 130 (1993)). The implied duty that plaintiff asserts the Forest Service owed pursuant to the permit was "to maintain FSR 423 to provide vehicle access to the site." Dec. 30, 2004 Order at 12. Although plaintiff contends that it "has *never* argued that this case involved a guarantee that access would exist" (Pl. Mem. 6 n.2, emphasis in original), plaintiff later asserts that the permit requires the Forest Service to "'do [its] best' as to events within its control to ensure that the lodge had sufficient access for operations." Id. 30 (emphasis added). The specific implied duty asserted by plaintiff is that the Forest Service would ensure that the two Sweetwater bridges remained passable so that cars could reach plaintiff's lodge.

The conduct of the parties before the permit issued contradicts the implied duty that plaintiff asserts. Plaintiff agrees that at the June 12, 1995 meeting before the permit was issued, The Sweetwater and the Forest Service had a copy of the permit issued to the Brannons, including the Memorandum of Understanding ("MOU") regarding road maintenance. Paragraph ¶ C.4. of the MOU carefully limited the Forest Service's responsibility regarding the Sweetwater bridges, stating that "[n]ew construction or reconstruction, such as bridge replacement, will be agreed to as part of the yearly Joint Maintenance plan." Thus, the Brannons' MOU reserved the subject of replacing the bridges for future consideration by the parties, and required that bridge replacement would take place only if the parties "agreed." The MOU did not require the Forest Service to reconstruct or replace the bridges.

If the permit is to be treated like a contract, as plaintiff contends, then the parties' discussion concerning the permit and MOU should be treated like any other negotiation

session between contracting parties. The Forest Service did not agree in the MOU to do anything more than consider in the yearly maintenance plan whether it would agree to replace the bridges. Plaintiff declined to enter that MOU or any other written agreement with the Forest Service regarding the road or bridges because of plaintiff's concerns about liability. The implied duty to replace the bridges that plaintiff asserts is flatly contradicted by the clearly expressed intent of the Forest Service in the proposed MOU, in which it declined to assume any responsibility for replacing the bridges. "[A] provision should not be found by 'implication' when the testimony convincingly shows that such a provision was intentionally omitted." Corbin on Contracts § 564, p. 20 (Interim Ed. 2002).

The Claims Court found that no implied-in-fact contract was formed in a similar situation. Pacific Gas & Elec. Co. v. United States, 3 Cl. Ct. 329 (1983), aff'd, 738 F.2d 452 (Fed. Cir. 1984). In PG&E, the Claims Court declined to find that an implied-in-fact contract had arisen when the Forest Service and PG&E never finalized an agreement about the costs of reconstructing a road that PG&E used heavily. Id. at 340. The court relied upon the ruling in Mountain States to note the broad scope of the Secretary of Agriculture's discretion in regulating the national forests, including "tax-supported road systems in national forests that suffer substantial use by private entities." Id. at 342. Likewise, here the Forest Service declined to enter any agreement that obligated it to maintain the Sweetwater Road or bridges to ensure passenger car access to the lodge. Sweetwater Road is classified as a Level 2 road, which is only intended for use by four-wheel-drive vehicles that can ford streams, and unlike cars, do not require bridges.

No contract can be formed with the Government unless the Government

representatives whose conduct is relied upon have actual authority to bind the United States in contract. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947); Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003). Further, "[a]nyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government." Trauma Service Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997).

Here, it is undisputed that Mr. Mummery understood that the Forest Service representatives at the June 12, 1995 meeting, including Bob Rossman, the Acting District Ranger who later signed the permit using delegated authority as the Acting Forest Supervisor, lacked the authority to bind the Forest Service to repairing or replacing the bridges: "Difficulty was clearly the people I was in the room with were not the ones that would approve the funding, whatever amount it may be." Mr. Mummery also testified that he understood and was told clearly that once the decision was moved up the chain of command, a decision could be made not to replace the bridges.

Similarly, in PG&E, representatives of the Forest Service and PG&E held meetings to discuss the costs of reconstructing the road, and both sides understood that negotiators at the Forest level could not enter a final agreement, but could only recommend actions to the Regional Forester. 3 Cl. Ct. at 332, 339. Ultimately, the Regional Forester determined that the Forest Service was not required to make a cost share agreement with the plaintiff, but might make contributions to the costs of reconstruction "'based on benefits to the public in relation to management of National Forest lands.'" Id. at 334-35. The Claims Court declined to find an implied-in-fact contract in part because the Forest Service representatives

lacked authority to bind the Government in contract. Id. at 340. This Court reached the same conclusion regarding the grazing permit in Hage, ruling that the Forest Service did not have the authority to bind the Government in contract, "[e]ven if the plaintiffs believed the permit to be a contract." 35 Fed. Cl. at 167.

Authority to bind the Government may be implied when such authority is considered to be an integral part of the duties assigned to an agency's employee. H. Landau & Co. v. United States, 886 F.2d 322 (Fed. Cir. 1989). However, authority to contract cannot be implied "to bind the government in contract when an agency's internal procedures specifically preclude its agent from exercising such authority." Contel of California, Inc. v. United States, 37 Fed. Cl. 68, 73 (1996). Mr. Rossman was Acting District Ranger for the Wapiti District in 1995, and signed the permit as the "Issuing Officer." Mr. Rossman was not a contracting officer when he signed the permit issued to The Sweetwater, and did not have a warrant that authorized him to incur the substantial expense of procuring two bridges.

Plaintiff's assertion that Mr. Rossman possessed authority to commit the Forest Service to obtaining funds to replace the bridges is another important distinction between this case and Son Broadcasting. The Court concluded that the Forest Service officials in Son Broadcasting possessed authority to bind the Government, even though they lacked warrants. 52 Fed. Cl. at 820-21. However, the plaintiff in that case did not seek to enforce any alleged right that the Forest Service would pay the plaintiff any money, but instead contended that the Forest Service was required not to authorize construction of a third tower on the communication site until the first two towers reached capacity. Id. at 819. The Court determined that the permit was a binding contract because Forest Supervisors are authorized

by regulation to convey land use rights. Id. at 821. The Court did not determine that Forest Supervisors possess the authority to bind the Government to an agreement requiring the disbursement of funds.

Moreover, Mr. Rossman expressly told plaintiff's representatives that it was unlikely that the Forest Service would replace the Sweetwater bridges if they became impassable because the significant cost and limited public benefit would make replacing the bridges a poor expenditure of tax dollars. Mr. Rossman told plaintiff's representatives that if the bridges became impassable, that fords would be the means that the permittee would use to gain access to the lodge.

Although Mr. Mummery disagrees with Mr. Rossman's account of what was said at the meeting, Mr. Mummery does not dispute that he understood that the Forest Service could not commit itself to replacing the Sweetwater bridges if they failed. Mr. Rossman was the only Forest Service line officer at the meeting, and the only one who possessed authority to set the terms of the permit.

In light of Mr. Rossman's express refusal to assume any duty to replace the bridges, plaintiff is precluded from expanding the scope of any implied duties to cooperate and not hinder to include an implied duty to repair or replace the bridges. This Court should not now rewrite the results of the alleged negotiation session, and imply into the permit a contractual duty that is much broader than the duties the Forest Service was prepared to assume in a MOU.

Plaintiff has failed to distinguish the circumstances of this case from Walter Dawgie, the only reported decision in which a Forest Service term permittee asserted a breach of the

implied duty to cooperate and not hinder. 30 Fed. Cl. at 129-31. In Walter Dawgie, the only paved route of access to a ski resort was closed by road construction from 8:30 a.m. to 4:30 p.m. Monday through Thursday, which the permittee claimed had a significant impact on its ability "to conduct business during regular business hours." Id. at 118, 122. The plaintiff contended that the permit gave rise to an implied duty not to hinder the resort operator in performing the obligations allegedly required by the permit. Id. at 129. The Court ruled that "[w]hile the duty not to hinder performance assuredly incorporates certain assurances of access, the Forest Service never assured [the permittee], expressly or impliedly, of unlimited and uninterrupted access to the permitted property," and granted summary judgment for defendant. Id. at 131. Here, the Forest Service affirmatively disclaimed, both in the proposed MOU and in Mr. Rossman's oral statements, any assurance of unlimited access by cars, but told The Sweetwater that fords would provide continued access in the event that the bridges failed.

**C. The Alleged Actions Of The Forest Service After The Permit Issued Did Not Breach Any Implied Duties To Cooperate And Not Hinder**

Plaintiff asserts that after the permit issued in August 1995, the Forest Service violated what plaintiff asserts was an implied duty for the Forest Service to "do its best" to secure funding to replace the bridges. Pl. Mem. 29. Plaintiff relies upon S.A. Healey Co. v. United States, 216 Ct. Cl. 172, 576 F.2d 299 (1978), which is fundamentally different from this case. In S.A. Healey, the plaintiff submitted to the contracting agency a proposed construction program that projected expected earnings for each of the four years of the contract. 576 F.2d at 301. The authorized representative of the contracting officer approved the proposed program, including the earnings. Id. The agency then requested from Congress

$1,800,000 in earnings for the second year of the contract, much less than the approved amount of $4,887,000. Id. at 302.

The court agreed with plaintiff's assertion that "after approving the proposed schedule, the government had a duty to facilitate that schedule, by requesting full fiscal year funding of Congress." Id. at 303 (emphasis added). The court applied the implied duty to cooperate to an express agreement of the parties: the amount of earnings that the contracting officer's authorized representative had approved for payment by the Government. In contrast, even plaintiff concedes that the Forest Service representatives at the June 1995 meeting made clear that they lacked the authority to enter any agreement that granted The Sweetwater any right that the Forest Service would replace the Sweetwater bridges.

The court's ruling in S.A. Healey is consistent with a more recent decision of the Federal Circuit holding that "implied covenants of good faith and fair dealing are limited to assuring compliance with the express terms of the contract." Bradley, 136 F.3d at 1326. The court's ruling in S.A. Healey is also consistent with this Court's ruling in Son Broadcasting, which enforced what the Court found to be an express right that the Forest Service granted the permittee in the permit. The language in the permit issued to The Sweetwater on which plaintiff relies – the requirement that The Sweetwater "maintain[] and operat[e] a public resort" – does not grant a right to the permittee, but instead imposes a duty upon it.

Plaintiff asserts that "the Forest Service then stated in a letter to The Sweetwater in 1997 that it would seek funding" to replace the bridges. Pl. Mem. 29. On the contrary, District Ranger Brent Larson's February 20, 1997 letter to the prospective purchasers of the lodge, Ray and Judi Sutherland, did not state that Forest Service would seek funding.

Rather, it stated that the Forest Service was unlikely that it could obtain funding to replace the bridges: "access would more likely become seasonal fords of the Sweetwater River should the condition of the bridges deteriorate . . . . funding for replacement of these bridges is not currently available, and the lik[e]lihood of obtaining adequate funding to replace these bridges in the future is low."

It was only at Mr. Mummery's insistence that Mr. Larson sent a second letter dated February 27, 1997 that stated that "[r]eplacement bridges for these two bridges crossing Sweetwater Creek are currently included in the Forest's Capital Improvement Program for FY 1999." However, Mr. Larson also stated that funding for the project "is subject to Congressional approval, and I cannot guarantee it will be available at that time." As Mr. Larson had already informed Mr. Mummery in the February 20, 1997 letter, it was unlikely that the Forest would obtain sufficient funds to replace the bridges, because Congress was unlikely to appropriate sufficient funds to permit the Shoshone National Forest to fund all projects in its Capital Improvement Program.

Moreover, Mr. Larson's February 27, 1997 letter was incapable of binding the Forest Service to obtain or seek funding to replace the bridges. Unlike the authorized representative of the contracting officer, who approved the earnings in S.A. Healey, Mr. Larson lacked authority to approve the project to replace the bridges. He was not a contracting officer, and pursuant to the Forest Service Manual ("FSM"), only held authority to administer the permit, not to alter its terms. FSM 2704.22.

Plaintiff also accuses the Forest Service of numerous other actions and omissions, such as "blocking" funds from being applied to the bridges. Pl. Mem. 30. Plaintiff continues

to erroneously assert that funds "arrived at the Forest Service from Congress" (Pl. Mem. 32), when this is inconsistent with the testimony of Forest Engineer Jim Fischer, who stated that roads and bridges that were connected to recreational projects were not funded on a project-specific basis by Congress. All these accusations erroneously presume that, by issuing a permit that required The Sweetwater to operate a public resort, the Forest Service had assumed a contractual duty to "do its best" to seek funding to replace the bridges, so that cars could reach the lodge.

However, as this Court noted in Walter Dawgie, the duty not to hinder does not imply an unlimited right of access, but at most, implied only that the Forest Service would permit The Sweetwater to access the lodge using fords. Thus, even if the permit did give rise to an implied duty to provide access, the Forest Service has fulfilled this duty, because plaintiff concedes that the Forest Service has never refused to install fords. In contrast, The Sweetwater has breached any duty to cooperate that arises from the permit, because it has never requested that the Forest Service install fords, and has never attempted to operate the lodge using fords. Cedar Lumber v. United States, 5 Cl. Ct. 539, 459 (1984) ("there is an implied obligation on both parties to cooperate and not to hinder the performance of the other party") (emphasis added).

Moreover, neither Mr. Larson nor Mr. Fischer, who plaintiff accuses of perpetrating these alleged misdeeds, were authorized to bind the Government to procure replacement bridges. Neither was a contracting officer or held a warrant, so they could not agree to assume any contractual duties that were not present when the permit issued, particularly any duties that required the Forest Service to incur the substantial expense of replacing the

bridges.

Mr. Fischer was also not a line officer, and possessed no authority to issue or administer permits. As District Ranger, Mr. Larson possessed authority to administer the permit, but did not possess authority to determine how the Shoshone National Forest balanced the competing demands with the Capital Improvement Program. That authority was reserved to the Forest Supervisor, Rebecca Aus, who was responsible for "integration of special use activities with other resources management." Forest Service Manual ("FSM") 2704.22. Even Ms. Aus, however, did not hold a warrant. Only contracting officers are authorized on behalf of the Forest Service to enter contracts to replace bridges, such as the bridge on Blackwater Creek, near The Sweetwater's lodge.

Even if there were a duty to seek funds to replace the bridges, the Government has not breached that duty. If a plaintiff shows that by action or omission the Government has not cooperated in the contractor's performance, then the Government may still "negate liability by showing that the government conducted itself in a diligent, good faith manner" (emphasis added). Cedar Lumber, 5 Cl. Ct. at 550. Government officials are presumed to act in good faith, and a contractor "can overcome this presumption only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it." Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995) (quoting Torncello v. United States, 681 F.2d 756, 770, 213 Ct. Cl. 20 (1982)); accord T&M Distributors, Inc. v. United States, 185 F.3d 1279, 1285 (Fed. Cir. 1999). There is no evidence that the Forest Service has demonstrated a specific intent to injure The Sweetwater by not funding the repair or replacement of the Sweetwater bridges.

The Shoshone National Forest sought to secure funding to replace the Sweetwater bridges through the Forest Service's CIP Program. In fiscal year 1992, a March 1992 CIP proposal to replace the bridges was accepted into the "hopper" of projects eligible for funding. However, in 1994, the CIP proposal to replace the Sweetwater bridges was indefinitely postponed because of a lack of funds. In June 1996, the Forest Engineer for the Shoshone, Jim Fischer, told Jeff Mummery that the proposal to replace the bridges had been put back into the CIP program. The Wapiti District Ranger, Brent Larson, told Mr. Mummery in a February 20, 1997 letter that a request for CIP funding had been made to replace the bridges in fiscal year 1999. However, the project was postponed to fiscal year 2000, probably because of a lack of funds and engineering personnel.

Mr. Fischer testified that during fiscal year 2000, funds became available from the Forest Service's regional office to replace the Sweetwater bridges, and that he intended to proceed with construction of the bridges, but that as a result of conversations that he had with Wapiti District Ranger Brent Larson and Forest Supervisor Rebecca Aus, the decision was made not to go forward with the project. Forest Supervisor Rebecca Aus testified that sometime in 1999 or 2000, she spoke with Mr. Larson and perhaps Mr. Fischer about funding the replacement of the Sweetwater bridges. Ms. Aus determined that the project should be once again indefinitely postponed because any CIP money available was better spent on campgrounds than on replacing the Sweetwater bridges, which were on a Level 2 road that was by definition a low-maintenance road for high-clearance vehicles. In her deposition, Ms. Aus testified that as far as she was concerned, "the funding on the bridges was always a matter of whether or not there were higher priorities on the Forest for funding.

It had nothing to do with whether or not there was a conservation buyer."

This course of conduct does not manifest any specific intent to injure The Sweetwater. Caldwell & Santmyer, 55 F.3d at 1581. The Shoshone has had limited funding and personnel to devote to CIP projects, and has devoted its resources toward recreational projects such as campgrounds that offer the greatest value to the public. Devoting resources to higher-priority projects than replacing the Sweetwater bridges does not, as a matter of law, evidence any bad faith sufficient to violate the duty of good faith and fair dealing. This is particularly true when The Sweetwater understood, when it bought the lodge, that a decision could be made by a higher-level Forest Service line officer, that the proposal to replace the bridges would not be funded.

Ultimately, both Mr. Fischer and Mr. Larson lacked the authority granted to Ms. Aus. Plaintiff erroneously asserts that because Ms. Aus had delegated to Mr. Larson day-to-day administration of the permit issued to The Sweetwater, and that because Mr. Fischer represented the Shoshone in regional discussions about prioritizing capital improvement program projects, that she had ceded all her authority to decide whether to replace the Sweetwater bridges. These assertions are inconsistent with Ms. Aus's testimony above regarding in her involvement in the decision-making process. As Gary Reynolds, the Shoshone's Recreation, Wilderness and Land Staff Officer, testified, the general practice in the Shoshone is that "Becky [Aus] makes most of the decisions on this Forest."

Plaintiff's assertion regarding Ms. Aus's alleged lack of authority is also contradicted by the respective responsibilities that the Forest Service Manual establishes for line officers:

> 2704.22 – Forest Supervisor. It is the responsibility of the Forest Supervisor to:

> 1. Provide management direction that ensures integration of special use activities and objectives into the programs and projects at the Ranger District level.
> 2. Ensure <u>integration of special use activities with other resources management</u> in developing and implementing the National Forest land and resource management plan. . . .
>
> 2704.23 – District Ranger. Each District Ranger is responsible for all special use activities on the District. Except for those responsibilities specifically reserved by the Forest Supervisor, it is the responsibility of the District Ranger to:
> 1. Assure high-quality <u>on-the-ground administration</u> of the special-uses program.

FSM 2704.22-23 (emphasis added). Ms. Aus testified that she only delegated to Mr. Larson responsibility to "monitor the use on the permit . . . the day-to-day questions that a permittee might have." Thus, as Forest Supervisor, Ms. Aus reserved her responsibility to determine whether the Shoshone's limited funds were better spent on other Forest Service resources, such as heavily used campgrounds on the Yellowstone Highway, rather than on replacing the Sweetwater bridges.

In sum, the permit did not give rise to any implied duties to replace the bridges or seek funding for that purpose. Even if the Court concludes that such a duty did arise, the Forest Service has acted in good faith, and did not breach any implied duties to cooperate and not hinder.

## IV. The Forest Service Has Not Violated Clause 15 Of The Permit, As Asserted In Count II

Plaintiff asserts that clause 15 of the permit requires the Forest Service to compensate The Sweetwater if the Forest Service "terminates lodge <u>operations</u> under the permit for the public interest," and asserts further that "the Forest Service did in fact deliberately terminate lodge <u>operations</u>." Pl. Mem. 30 (emphasis added). Both assertions are incorrect.

Plaintiff tries to rewrite the terms of clause 15. First, clause 15 states that the Forest Service will pay the permittee equitable consideration if a duly authorized Forest Service official determines that "the public interest requires termination of this permit," not termination of "lodge operations" (emphasis added). The requirement to compensate the permittee only arises if the Forest Service revokes permission to conduct the activities allowed by the permit, and is not triggered by cessation of the lodge's operations.

Second, it was The Sweetwater, not the Forest Service, that in 1997 chose not to operate the lodge until the bridges were replaced. The Forest Service has never effected any "termination of this permit" within any reasonable interpretation of the ordinary meaning of that phrase. The front page of the permit grants The Sweetwater "[p]ermission . . . to use subject to the conditions set out below" 15.4 acres in the Shoshone National Forest "for the purpose of maintaining and operating a public resort." It is indisputable that the Forest Service has never terminated The Sweetwater's permission to use the site of its lodge for the purpose of operating a public resort. Forest Service regulations define both "termination" and "revocation" as "the cessation of a special use authorization." 36 C.F.R. § 251.51. The Notice of Non-Compliance that the Forest Service served on The Sweetwater in December 2001 "provide[d] notice of facts that may warrant revocation of your permit," but the Forest Service has never proceeded to terminate or revoke the permit, despite The Sweetwater's subsequent failure to submit an acceptable operating plan.

Plaintiff has failed to address, let alone distinguish, Federal Circuit precedent holding that when interpreting a contract, a court begins with the plain language, and gives it its ordinary meaning. E.g., McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed.

Cir. 1996) (in interpreting a contract, "[w]e begin with the plain language"); Harris v. Department of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998) ("[w]e give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning").

Nor does plaintiff offer any reason why "termination of this permit" should be read to mean "termination of lodge operations." Even if this were a reasonable interpretation, Mr. Mummery testified that it was he who concluded that he could not operate the lodge, and that the Forest Service never prohibited him from operating the lodge anytime before the bridges were closed to vehicular traffic in April 2001. Nor did the Forest Service ever refuse to provide fords that would allow The Sweetwater to operate the lodge. Thus, the Forest Service never "terminated" lodge operations.

Clause 15 also does not require the Forest Service to buy The Sweetwater's lodge if the bridges were not replaced. At one point during Mr. Mummery's deposition, he advanced for the first time the contention that during the June 12, 1995 meeting, he told the Forest Service representatives that "[i]f, in fact, I fail to have access to my business because the bridges are not there, then my presumption is that Article 15 would kick in, and you would be closing my lodge over a public choice, so to speak, which it says the public good, and if that's the case, you would be buying my lodge." Mr. Mummery testified that the Forest Service representatives at the meeting "didn't respond in the positive, but they didn't respond in the negative."

It is undisputed that clause 15 makes no reference to replacing the bridges, and that The Sweetwater chose not to obtain an express commitment from the Forest Service about

what would happen if the bridges failed. Clause 15 says nothing to suggest that not replacing the bridges would ipso facto constitute a determination to terminate the permit for the lodge, much less an agreement to "buy[]" the lodge. On the contrary, clause 15 requires first, a determination that terminating the permit is in the public interest, and second, completion of a process pursuant to which the Forest Service retains final authority to determine the amount of equitable consideration. "A party may not rely upon its subjective understanding of an agreement to overcome the plain and unambiguous terms of a written agreement." Lamirage, Inc. v. United States, 44 Fed. Cl. 192, 198 (1999).

In support of its assertion that defendant has violated clause 15, plaintiff relies upon a single decision of this Court that is readily distinguishable from the circumstances of this suit, Wetsel-Oviatt Lumber Co., Inc. v. United States, 38 Fed. Cl. 563, 565 (1997).
Pl. Mem. 33. In Wetsel-Oviatt, the Forest Service conducted an "Environmental Assessment" that substantially restricted the amount of timber that could be harvested pursuant to the sales contracts. Id. at 567. The Government admitted that as a result of the environmental assessment, the Forest Service had no intention of permitting the timber to be harvested. Id. at 570. The contracts contained termination clauses providing that the contract could be terminated "upon determination that Purchaser's Operations would cause serious environmental damage." Id. at 568.

The Court ruled that because the Forest Service had determined that the harvest would be environmentally harmful, it could not deny that it had terminated the contract, noting that "the government has conceded that a termination has taken place." Id. at 570 n.7 (citing Davidson Indus., Inc., AGBCA No. 95-166-1, 96-2 BCA ¶ 28,299 (1996)). Similarly,

in Davidson, there was no dispute that the Forest Service had suspended a portion of a timber sale contract until completion of a consultation process with the United States Fish and Wildlife Service about concerns over the effect on the spotted owl and marbled murrelet. 96-2 BCA ¶ 28,299.

In contrast to the environmental assessments in Wetsel-Oviatt and Davidson, the Forest Service never performed an environmental assessment or any other analysis that concluded that operation of The Sweetwater's lodge caused serious environmental damage. On the contrary, Shoshone Forest Supervisor Rebecca Aus testified that operation of the lodge is consistent with the Forest Plan for the Shoshone. As a result, Ms. Aus, in consultation with Wapiti District Ranger Brent Larson, determined that the public interest did not require termination of the permit. Unlike in Wetsel-Oviatt and Davidson, the Forest Service does not concede, and the facts do not support, that it has terminated the permit or the operations of The Sweetwater's lodge.

Plaintiff asserts that because Mr. Larson was delegated authority to administer the permit on a day-to-day basis, that he also possessed authority to terminate the permit pursuant to clause 15. Pl. Mem. 31. It is undisputed that Acting Wapiti District Ranger Bob Rossman issued the permit to The Sweetwater, using his delegated authority to sign the permit on August 21, 1995 as "Acting Forest Supervisor." Both Forest Supervisor Rebecca Aus and Wapiti District Ranger Brent Larson testified that as District Ranger, Mr. Larson was only delegated authority to administer the permit on a day-to-day basis. Thus, Mr. Larson lacked the necessary authority to make any decision to terminate the permit, which could only be terminated by the Forest Supervisor or a District Ranger acting with delegated

authority. Plaintiff is unable to prove that there was any "termination of this permit" within the meaning of clause 15.

Plaintiff asserts that Mr. Larson decided that the lodge operations were not the best use of the land, and attempted to locate a private conservation buyer “who would tear the lodge down.” Pl. Mem. 32. This is inaccurate. What prompted Mr. Larson's search for a conservation buyer was not any decision by Mr. Larson that the lodge operations should be terminated, but Mr. Mummery's decision in February 1997 not to operate the lodge, which now he contends resulted from his concerns about liability for accidents on the bridges.[2] The reason that Mr. Larson pursued a conservation buyer was to relieve Mr. Mummery of his obligation to operate the lodge.

Nor did the Forest Service advocate that the lodge should be removed. Mr. Larson stated that any conservation group would most likely require removal as their reason for purchasing the lodge. Mr. Larson may have explored the potential benefits for The Sweetwater and the public of a conservation buyer. However, at no time did he conclude that "the public interest <u>requires</u> termination of the permit," which is the necessary prerequisite set by clause 15 to trigger the requirement to pay equitable consideration to the permittee, nor did he possess the authority to make that determination. Mr. Mummery acknowledges that Mr. Larson proposed finding a conservation buyer as a means of freeing The Sweetwater from the requirement of operating the lodge, but contends that Mr. Larson never voiced his opposition to replacing the bridges.

---

[2] Mr. Larson testified that in 1997 and 1998, Mr. Mummery did not mention concerns about liability, but contended that he could not operate the lodge because the possibility that the bridges might fail prevented him from taking advance bookings from guests.

It is also incorrect that Mr. Larson was motivated by a desire "to put the land area where the lodge operations occurred to a better public use." Plaintiff's assertion is based principally upon a roads analysis report that assessed the effect of Sweetwater Road upon animal habitat. As Mr. Larson explained, "there's no decisions made in this document. It's simply an analysis of the situation. . . .the biologist is looking out for the well-being of the wildlife species that are using that area. . . .We don't always implement their recommendation." In addition, the roads analysis report was prepared in 2002 and 2003, several years after the time when plaintiff alleges Mr. Larson decided to terminate the lodge operations.

In sum, plaintiff's assertion that the Forest Service has violated clause 15 of the permit is belied by the plain terms of the permit, which require the Forest Service to pay plaintiff only if the Forest Service terminates the right to conduct operations, not if the permittee determines it must cease operations. Plaintiff's claim fails because Mr. Larson could not, and did not, determine that the public interest required termination of the permit.

## V. Plaintiff's Failure To Operate The Lodge As A Public Resort Was A Material Breach Of Contract That Excused Any Alleged Non-Performance By The Forest Service

Plaintiff cannot disavow Mr. Mummery's numerous admissions that The Sweetwater has violated the terms of the permit by never operating the lodge as a public resort. Mr. Mummery testified that once he made contact with Mr. Carl Bixby in late 1995, Mr. Mummery did not try to secure any other bookings for the 1996 season, because Mr. Bixby

"wanted to take the whole season."[3] Mr. Mummery explained that pursuant to the sales contract that The Sweetwater and Mr. Bixby (d/b/a Atlantis Three) signed in February 1996, Mr. Bixby "would pay the overhead of the lodge. . . . he was going to buy the lodge, and we were operating exclusively for his purposes" (emphasis added). "Exclusively" was a term of his choosing. He also stated, "What we did is we said, well, okay, we will reserve the lodge for you, and this is our price, and we will charge you what it costs us to do it less a management fee."

Despite prompting from his counsel, Mr. Mummery confirmed his description of Mr. Bixby's access as "exclusive":

> Q: And as long as Mr. Bixby kept sending the checks, then he had exclusive right of access to the lodge?
>
> A: Sure. Sure.
>
> Mr. Garden: Objection to the term "exclusive." I think you threw that in. Did you understand he used the word "exclusive"?
>
> The Witness: Well, yes, he had – he was paying for the right to use the lodge, just like any person paying to use the lodge, yes. You know, we had no limits on us as to how we could rent out the lodge."

It is evident from Mr. Mummery's testimony that he had no regard for the permit's requirement that he operate a "public resort," and did not believe that the permit governed to whom he rented the lodge. He testified that "as long as Bixby paid for the lodge, he could

[3] During his September 25, 2003 deposition, in response to a line of examination about how the financial arrangement with Mr. Bixby was structured, Mr. Mummery testified that Mr. Bixby "made some overtures that maybe he would like to buy the lodge from us." After the deposition, The Sweetwater produced documents concerning its transactions with Mr. Bixby, which revealed that in February 1996, Mr. Bixby actually signed a sales contract agreeing to purchase all ownership interest in The Sweetwater and its assets.

rent the whole lodge." When asked, "did you rent it to anyone else?," he said, "No, we didn't."

Further confirmation of the non-public nature of the lodge's operations during 1996 is that on April 7, 1997, after Mr. Mummery told the Forest Service that he was unable to operate the lodge, he told Forest Service Realty Specialist Jennifer Watson, "admittedly I haven't opened the lodge, which perhaps in retrospect is good" (emphasis added), a revealing comment that Ms. Watson recorded verbatim in her calendar.

It is also indisputable that The Sweetwater breached clauses 51 and 54 of its permit. Clause 51 requires the permittee to notify the Forest Service when a "transfer in ownership of their permitted improvements is planned." Plaintiff contends that this clause 51 does not apply to the sales contract that The Sweetwater's owners signed to sell all their interest in The Sweetwater to Mr. Bixby, because The Sweetwater still owned the lodge. Pl. Mem. 19 n.11. Clause 51 does not contain the limitation that plaintiff seeks to read into it, because "ownership of their permitted improvements" is not limited to a transfer of title, but also includes any direct or indirect transfers in ownership of the permitted property, whether executed through a transfer of title or a stock sale.

This is evident from Clause 54, which requires the permittee to notify the Forest Service of the “[n]ames of stockholders who acquire stock shares causing their ownership to exceed 50 percent of shares issued or who otherwise acquire controlling interest in the corporation” (emphasis added). If the term “ownership” as used in clause 51 were interpreted as plaintiff contends, then permittees could always evade the requirement to give advance notice to the Forest Service of any changes in ownership or control of a corporate

permittee by structuring the transaction as a sale of the permittee's stock.

Plaintiff tries to draw another meaningless distinction between the "proposals" that Mr. Mummery continually described orally to District Ranger Brent Larson and other Forest Service personnel about how he might operate the lodge, and the operating plan that the permit required The Sweetwater to provide annually. It is undisputed that The Sweetwater submitted no operating plan between the May 1996 plan and the inadequate plan submitted in July 2002.

Thus, if the permit were a contract, The Sweetwater's failure to comply with the unambiguous conditions set forth in the permit excused any non-performance by the Forest Service of the alleged contract.

## V. The Forest Service Has Not Committed Any Tortious Breach Of The Permit

Plaintiff did not plead in Counts I and II of its original complaint any allegations that stated a claim for tortious breach of contract or misrepresentation. Plaintiff's first amended complaint added a taking claim in Count III, but did not amend or supplement the allegations pleaded in Counts I and II. Plaintiff first asserted a claim for tortious breach of contract in its cross-motion for summary judgment, which was filed months after fact discovery closed. In our opposition to plaintiff's cross-motion for summary judgment, we objected to plaintiff's assertion of this new cause of action as untimely. Plaintiff still has not sought leave to amend its complaint, but has asserted tortious breach of contract as a legal theory in its pre-trial brief. Pl. Mem. 33-36.

Plaintiff should not be allowed to pursue at trial a new theory of liability that is not pleaded in any fashion in its complaint. In Southern Comfort Builders, Inc. v. United States,

____ Fed. Cl. ____, 2005 WL 1804325 at *31 (No. 00-542C, July 29, 2005), this Court recently held after a trial that a plaintiff who fails to plead a claim in its complaint waives that claim:

> The United States Court of Appeals for the Federal Circuit has stated on numerous occasions that a plaintiff's failure to raise a claim or argument in its complaint may be deemed as a waiver of that argument by the plaintiff. See Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1366 (Fed. Cir. 2002), cert. denied, 538 U.S. 921 (2003) ("[W]e conclude that we need not address Casa's agency theory because it was not properly raised. No mention of this theory appears in Casa's complaint. Under the circumstances, we hold that Casa waived any claim it may have against the government based on such a theory").

Plaintiff's failure to plead its conduct contrasts with the plaintiff in one of the chief cases upon which The Sweetwater relies, who had asserted its misrepresentation claim in the claim for equitable adjustment that it filed with the Corps of Engineers on December 30, 1992. Meyers Cos., Inc v. United States, 41 Fed. Cl. 303, 307, 311 n.8 (1998).

This Court recently held that it did not posses jurisdiction to hear a superior knowledge claim that was not presented to a contracting officer, and that arose from different facts than the claims that were addressed in the contracting officer's final decision. Renda Marine, Inc. v. United States, ____ Fed. Cl. ____, 2005 WL 1793421 at *82 (No. 02-306C, July 28, 2005) (citing Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003)). If the Court determines that the permit is a CDA contract, then it possesses no jurisdiction to consider plaintiff's tortious breach of contract claim. Plaintiff did not assert any misrepresentation or tortious breach of contract in its May 2002 "claim" letter to Forest Supervisor Rebecca Aus. The tortious breach of contract claim that plaintiff now asserts is based upon allegations regarding the conduct of the Forest Service before the permit issued,

in contrast to the breach of contract and taking claims pleaded in the complaint, which allege misconduct by the Forest Service from 1997 until the present.

In any event, there is no merit to plaintiff's claim for tortious breach of contract. Plaintiff's assertion that the Forest Service misrepresented that the Sweetwater bridges were safe for use by the lodge owner is incorrect. Pl. Mem. 33-34. Bridge inspectors from the Wasatch-Cache National Forest inspected the Sweetwater bridges in August 1992. In their reports, they recorded their recommendation that the bridges should be replaced in part or in whole, but they did not conclude that the bridges were unsafe or needed to be closed or condemned. As Mr. Larson explained in his February 20, 1997 letter to prospective purchasers of the lodge, Ray and Judi Sutherland, the statement that the Sweetwater bridges "are condemned is not correct. When the bridges were last inspected in 1992, several of the bridge components were given a rating code of '2.' This code indicates a deficiency which may be dealt with through load limit restrictions. As a point of reference, a bridge which is condemned would have a code of '0,' and would be immediately closed to all traffic."

The bridge inspectors discussed the condition of the bridges with Shoshone National Forest Engineer Jim Fischer, and collectively exercised what Mr. Fischer described as their "professional judgment" to determine that the bridges were probably safe to continue using so long as they were posted as limited to vehicles under three tons. Within a few months after the August 1992 inspections, signs were posted on the approaches to the Sweetwater bridges that stated, "WEIGHT LIMIT 3 TONS." These signs were still present in the summer of 1995, when The Sweetwater bought the lodge. The signs accurately represented that the bridges were deemed safe for use by cars and light trucks, but were not deemed safe

for travel by heavier trucks or other heavier vehicles.

Allowing cars and light trucks to use the bridges in 1995 cannot reasonably have been interpreted as a representation by the Forest Service that the bridges would remain safe for vehicular passage for the entire 20-year term of the permit that The Sweetwater sought. Even a casual inspection of the bridges in 1995 would have led a reasonably prudent person to conclude, from the signs and the visible deficiencies in the bridges' abutments, that they were nearing the end of the useful life, and required repair or replacement, as the inspectors had recommended in 1992.

Even if allowing cars and light trucks to continue using the bridges could have been a representation that the bridges would remain passable for the duration of the permit, Acting District Ranger Bob Rossman told The Sweetwater's representatives during the June 1995 meeting that "the bridges are in poor condition and not expected to last in perpetuity, that they could fail and could fail at any time." Indeed, the substantial likelihood that the bridges would fail during the term of the permit was the premise of much of the discussion of the meeting, as noted in Mr. Rossman's email summarizing the discussion at the meeting. The parties discussed what would happen if the bridges failed, because Mr. Rossman had told The Sweetwater's representatives that this might happen at any time. Any representation implicit in keeping the bridges open was superseded by Mr. Rossman's statements, which expressly informed The Sweetwater that it could not count on the bridges remaining passable.

Plaintiff inaccurately asserts that The Sweetwater would not have purchased the lodge before the bridges were repaired if the Forest Service had disclosed the inspectors'

alleged conclusion that the bridges "'should be closed immediately.'" Pl. Mem. 35. However, the inspectors' reports did not recommend immediate closure. Plaintiff also inaccurately asserts that "the Forest Service was involved in the purchase of the lodge assets." Id. The Forest Service was not a party to the purchase of the lodge from the Brannons by Mr. Mummery. The sales contract was signed by Mr. Mummery before he ever spoke to any representative of the Forest Service.

The Forest Service did not have any duty to take affirmative steps to disclose the inspection reports to The Sweetwater. The Government only possesses an affirmative duty to disclose knowledge that is not shared by a contractor, or cannot be readily obtained by him. In Hardeman-Monier-Hutcherson v. United States, 458 F.2d 1364, 198 Ct. Cl. 472 (1972), the limited bidding period did not permit the contractor to make its own observations of sea and wind conditions at a construction site, which were so rough that it had taken a Navy vessel much longer than expected to conduct soundings. Id. at 1365, 1369. The Court of Claims concluded that in these circumstances, the Government had a duty to disclose to the contractor the Navy's reports on weather conditions at the site, and should not have refused the contractor's request for the reports. Id. at 1372.

This case is different in two important respects from Hardeman-Monier-Hutcherson, First, the condition of the Sweetwater bridges could be readily observed by anyone who visited the site and looked or walked under the bridges. The recommendation contained in the bridge inspection reports – that the bridges should be replaced – was evident to anyone who made a site visit. Mr. Mummery had a full month to conduct such a site visit between signing the sales contract on May 21, 1995 and the contractually specified date on which the

purchase closed, June 21, 1995.

Second, the Wasatch-Cache inspectors' August 1992 reports on the Sweetwater bridges were included in the Shoshone's files, which were available for inspection by plaintiff at any time, just as they were available to other prospective purchasers of the lodge, such as Wanda Smith and Roy and Judi Sutherland, or any other citizens. Forest Service officials provided information about the condition of the bridges to Ms. Smith and to the Sutherlands, and would not have refused to provide this information to The Sweetwater, too, if it had conducted any due diligence before closing its purchase of the lodge. In these circumstances, plaintiff cannot prove any claim for tortious breach of contract, misrepresentation, or superior knowledge, none of which plaintiff has pleaded.

## VII. <u>Plaintiff Is Unable To State A Claim For A Fifth Amendment Taking</u>

Plaintiff asserts in Count III of its first amended complaint that “by condemning the bridges, and thus preventing all vehicular traffic from reaching The Sweetwater [lodge], the Forest Service effected a taking of the value of Plaintiff’s permit and of Plaintiff’s property.” Compl. ¶ 42. We opposed plaintiff’s motion for leave to file the amended complaint because it pleaded the taking claim as an additional count that plaintiff could pursue concurrently with the breach of contract claims pleaded in Counts I and II, rather than as an alternative count. Plaintiff states in its Memorandum of Contentions of Fact and Law that it has pleaded the taking claim “as an alternative claim to its breach of contract claim[s] . . . . In the event that the court does not conclude that the Forest Service has breached the contract or is otherwise liable to The Sweetwater for the value of the lodge.” Pl. Mem. 25.

Later in its Memorandum of Contentions of Fact and Law, however, plaintiff

indicates that it has not asserted a taking claim as an alternative to Counts I and II, but only as an alternative to recovering "equitable consideration" pursuant to clause 15 of the permit, as pleaded in Count II: "In the event that the Court determines that the Forest Service has terminated the Term SUP, but clause 15 does not apply, The Sweetwater asserts that the Forest Service has taken its property (both the lodge facilities and the contract) without just compensation, as required under the Fifth Amendment." Pl. Mem. 37-38. This indicates that The Sweetwater intends to pursue its taking claim if the Court denies recovery pursuant to clause 15 of the permit, even if other breach of contract remedies remain available to the Court.

Our position remains that plaintiff cannot pursue its taking claim so long as plaintiff is concurrently pursuing any remedies for breach of contract. If the Court concludes that the permit is a contract, then plaintiff is limited to remedies for breach of contract, and cannot also seek just compensation for a taking claim. As the Federal Circuit has stated in rejecting the assertion of concurrent taking and breach of contract claims:

> Indeed, the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786, 818 (1978) (citation omitted). Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. *Id.* Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights. *Id.*

Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2002); see also Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002), cert. denied, 539 U.S. 925 (2003) (rejecting taking claim in part because "plaintiffs retained the full range

of remedies associated with any contractual property right they possessed").

Even if the Court denies plaintiff any recovery for breach of contract, plaintiff is still unable to state a claim for a compensable taking. The Federal Circuit has developed a two-part test to evaluate claims that a governmental action constitutes a taking of private property without just compensation. Maritrans Inc. v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003) (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)); Chancellor Manor v. United States, 331 F.3d 891, 901-02 (Fed. Cir. 2003). First, the Court must determine whether a protected property interest existed, or in other words, that "the use interest proscribed by the governmental action was part of the owner's title to begin with." M & J Coal, 47 F.3d at 1154 (citing Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992)). Second, if the claimant can establish the existence of a protected property interest for purposes of the Fifth Amendment, the Court must then determine whether the governmental action at issue was a compensable taking of that property interest. Id.

Plaintiff cannot prove that it held a protected property interest in either the permit issued to it, or in its operation of the lodge and other improvements on Forest land. In numerous decisions, the Federal Circuit has rejected taking claims asserting that a property interest exists in a permit and in personal property used pursuant to the permit. American Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1374-83 (Fed. Cir. 2004), cert. denied, ___ U.S. ____, 125 S. Ct. 2963 (2005); Conti v. United States, 291 F.3d 1334, 1341-43 (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003); Alves v. United States, 133 F.3d 1454, 1457 (Fed. Cir. 1998); B-West Imports, Inc. v. United States, 75 F.3d 633, 638 (Fed.

Cir. 1996); Mitchell Arms, Inc. v. United States, 7 F.3d 212, 216 (Fed. Cir. 1993), cert. denied, 511 U.S. 1106 (1994) (citing Allied-General Nuclear Servs. v. United States, 839 F.2d 1572 (Fed. Cir.), cert. denied, 488 U.S. 819 (1988)).

In American Pelagic, the Federal Circuit reversed this Court's holding that a taking of the plaintiff's fishing permit had occurred, and explained why no property interest could exist in the permit:

> In Conti, we explained that because he could not assign, sell, or transfer his swordfishing permit, because it did not confer exclusive fishing privileges, and because the government at all times retained the right to revoke, suspend, or modify it, Paul Conti did not possess a property interest in his permit. 291 F.3d at 1341-42. This "absence of crucial indicia of a property right, coupled with the government's irrefutable retention of the right to suspend, revoke, or modify" the swordfishing permit "compels the conclusion that the permit bestowed a revocable license, instead of a property right." Id. at 1342.

American Pelagic, 379 F.3d at 1374.

No property interest can exist in the permit issued to The Sweetwater for these same reasons. The permittee is required to allow "free and unrestricted access to and upon the premises" by other users of the Forest, and thus does not possess the right to exclude others, "'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" Dolan v. City of Tigard, 512 U.S. 374, 384 (1994) (quoting Kaiser Aetna v. United States, 444 U.S. 164, 176 (1979)). Clause 14 of the permit also provides that it "may be revoked upon breach of any of the conditions herein," and clauses 12 and 51 provide that it cannot be assigned or transferred. Like the permits in American Pelagic and the other cases cited above, the permit issued to The Sweetwater was a revocable license.

Plaintiff also cannot prove that any property interest in its lodge has been taken by the Government. Plaintiff remains in possession of his property, and is able to gain access to it

across the Sweetwater bridges (using a key it possesses) and to occupy the lodge. Similarly, in Andrus v. Allard, 444 U.S. 51, 54 (1979), the Supreme Court stated that regulations prohibiting the sale of Indian artifacts containing eagle feathers were not a taking: "The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them."

In Conti, the Federal Circuit rejected the plaintiff's assertion that a ban on drift gillnet fishing was a taking because it "deprived him of a particular use of his property." 291 F.3d at 1343. The court affirmed this Court's conclusion that the ban did not render his fishing vessel valueless, because "Mr. Conti's continuing ability 'to sell the vessel and the gear, fish in a different fishery, or put both the nets and the vessel to other uses,' Conti, 48 Fed. Cl. at 537, precluded a finding that a regulatory taking had occurred." Conti, 291 F.3d at 1343.

Likewise, plaintiff does not possess any compensable property interest in a particular use of the lodge: operating it with access by cars. The closing of the bridges to the public has not deprived plaintiff of its ability to operate the lodge using other means of access, such as all-terrain vehicles or horses. Plaintiff was informed before it closed its purchase of the lodge that it was unlikely that the Forest Service would replace the bridges if they became impassable. Thus, no right to operate the lodge using the bridges to provide access for cars inhered in The Sweetwater's title when it acquired the lodge in 1995, because it acquired the lodge subject to uncertainty about the continued availability of the bridges. American Pelagic, 379 F.3d at 1381.

Plaintiff retains the ability to sell the lodge. As discussed below, plaintiff cannot support its assertion that the closing of the bridges to the public has rendered the lodge

"worthless." Pl. Mem. 24. Plaintiff's own expert appraiser, Mr. Que Mangus, acknowledged during his deposition that even without access by cars over the bridges, the lodge still possessed value. Because plaintiff can sell the lodge or put it to another use consistent with the permit, plaintiff does not possess any compensable property interest in the lodge, and cannot state a claim for a Fifth Amendment taking.

## VIII. Plaintiff Is Not Entitled To Recover Any Breach Of Contract Damages

Plaintiff seeks three categories of damages for its breach of contract claims: out-of-pocket expenses, lost profits, and value of the lodge facilities. "In the event of a breach, contract law recognizes that the promisee has three enforceable interests: expectation, reliance, and restitution." Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1308 (Fed. Cir. 2004) (citing Restatement (Second) of Contracts § 344). "The benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well. See Restatement (Second) of Contracts § 347." Glendale Federal Bank, F.S.B. v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). "As reliance damages, the non-breaching party 'may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract.'" Hansen, 367 F.3d at 1309 (quoting John D. Calamari & Joseph M. Perillo, The Law of Contracts § 14.9 (4th ed.1998)).

Even if the Court were to find the Government liable on Count I or Count II, or both, plaintiff cannot prove that it is entitled to recover any damages for out-of-pocket expenses, lost profits, or the value of the lodge. Plaintiff has failed to address, let alone prove, the legal basis for the damages that it seeks.

**A. <u>Plaintiff Could Have Covered Its Out-Of-Pocket Expenses By Operating</u>**

First, plaintiff cannot recover its out-of-pocket expenses for 1997-2000, the four years preceding the closing of the bridges to the public in April 2001. The Sweetwater chose not to operate the lodge during those years, even though the bridges remained open to the public and were deemed safe by Forest Service engineers who inspected them during that period. It is undisputed that the Forest Service never directed The Sweetwater to cease operations anytime before the bridges were closed to the public in April 2001.

Plaintiff had a duty to mitigate its damages, which it failed to carry out by not making reasonable efforts to operate the lodge while the bridges remained open for public passage. <u>Robinson v. United States</u>, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (adopting legal standard for duty to mitigate damages set forth in Restatement (Second) of Contracts § 350, comment b (1981): "As a general rule, a party cannot recover damages for loss that he could have avoided by reasonable efforts"). Plaintiff asserts that it would have earned profits by operating during the period 1997-2005. Pl. Mem. 20-21. Thus, if plaintiff had operated at least during the period 1997-2000 using the bridges, then it would have generated revenues that would have covered the out-of-pocket expenses it now seeks from the Government.

Plaintiff also anticipated at the time that it purchased the lodge that the bridges might become impassable, and that it might be unable to operate the lodge using its preferred method of access for three years or longer while the Forest Service sought funds to replace the bridges. The Federal Circuit has stated that "the non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." <u>LaSalle Talman Bank F.S.B. v. United States</u>,

317 F.3d 1363, 1371 (Fed. Cir. 2003). For this reason, even if the Government had fulfilled its alleged duty to pursue efforts to obtain funds to replace the bridges, then plaintiff should not recover any out-of-pocket expenses for, at a minimum, the three years 2001-03.

Even without using the bridges, plaintiff could have operated the lodge anytime from 1997 until the present using fords rather than bridges as a means of access. One of the Government's experts, John Frome, has concluded that it was likely that if the lodge operated using fords, it would have turned a small profit, which would have covered the out-of-pocket expenses it now expects the Government to pay. Plaintiff cannot prove that it was unable to cover most or all of its expenses by operating the lodge using fords, because plaintiff never tried to operate the lodge using fords. For this reason, plaintiff should not be awarded its out-of-pocket expenses as reliance damages for any years from 1997 through the present.

Finally, even if the Court determined that plaintiff is entitled to recover its out-of-pocket expenses, plaintiff cannot prove that many of the expenses that it seeks are reasonable and properly substantiated, including but not limited to claimed expenses for interest and legal expenses for this lawsuit.

**B. Plaintiff Cannot Meet Any Of The Three Requirements To Recover Lost Profits**

To recover expectancy damages, including lost profits, a plaintiff must prove three elements: (1) the lost profits were within the contemplation of the parties because the loss was foreseeable; (2) there would have been a profit but for the breach; and (3) the measure of damages must be reasonably certain. California Fed. Bank v. United States, 395 F.3d 1263, 1268 (Fed. Cir. 2005). "The inability to prove by a preponderance of the evidence that profits would have been made but for the breach will therefore preclude recovery on a lost

profits theory." Id. at 1268 (emphasis added). Plaintiff is unable to meet any of these three requirements, conceding that "lost profits and opportunity costs are difficult to estimate and subject to many variables." Pl. Mem. 21.

First, plaintiff cannot prove that the lost profits were within the contemplation of the parties. During their meeting in June 1995 before the permit issued, representatives of the Forest Service and The Sweetwater discussed the likelihood of using fords as a means of access to the lodge if the bridges became impassable. The representatives of The Sweetwater did not state that it would be unable to operate the lodge profitably using fords. Thus, the Forest Service had no reason before the permit issued to foresee the lost profits that The Sweetwater now seeks.

Moreover, even if the Court concludes that the Forest Service authorized or acquiesced in The Sweetwater's failure to operate the lodge, at no time after the permit issued did the Forest Service ever agree to indemnify or compensate The Sweetwater for the lost profits that it chose to forego by not operating. In any event, The Sweetwater should not receive any lost profits for the period 1997-2000, when it could have taken reasonable efforts to avoid its alleged damages by continuing to operate the lodge using the bridges. Robinson, 305 F.3d at 1333.

In addition, plaintiff expected when it purchased the lodge that it might be unable to operate the lodge using bridges for three years while the Forest Service sought funds to replace the bridges. Thus, plaintiff is not entitled to recover lost profits for the period 2001-2003, because that would place it in a better position than if the alleged breach had not occurred. LaSalle, 317 F.3d at 1371.

Second, plaintiff cannot prove that The Sweetwater would have made a profit but for the breach. As soon as plaintiff bought the lodge in 1995, it began efforts to try to sell the lodge rather than operate it. Once the owners of plaintiff signed a contract to sell the lodge to a buyer in February 1996, plaintiff granted the buyer exclusive access to the lodge. Plaintiff made no efforts to operate the lodge for the benefit of the public during the 1996 season, and concedes that it never has tried to operate the lodge at any time since then, nor did it submit any operating plans to the Forest Service between 1996 and 2002. Because plaintiff has never demonstrated any intent to operate the lodge, it cannot prove that, but for the Government's alleged breach, it would have earned profits.

The financial records for the 1996 season indicate that plaintiff did not earn a profit in that year, wholly independently of any alleged breach by the Government, because The Sweetwater excluded from its expenses payments made to management and interest costs. Once these payments are counted as expenses, it did not earn a profit. Even if plaintiff did earn a profit in 1996, it did so by violating the requirement in its permit that it operate the lodge as a "public resort." If the Forest Service had learned of this violation of the permit, it might have revoked the permit, and plaintiff would have been unable to earn the profits it now seeks because of its own conduct, not because of the alleged breach by the Government. California Fed., 395 F.3d at 1268.

In addition, plaintiff cannot prove that it would have earned any profit during the years after 1996. The Sweetwater was a new business, and was unlikely to make a profit because of the small number of cabins, and Mr. Mummery's decision to live off-site, which required the expense of an on-site manager. Energy Capital Corp. v. United States, 302 F.3d

1314, 1326 (Fed. Cir. 2002) ("the nature of a new venture may make it difficult to recover lost profits").

Third, plaintiff cannot recover any lost profits because their measure is far from "reasonably certain." California Fed., 395 F.3d at 1268. At most, plaintiff operated the lodge for a single season, 1996. Plaintiff used its alleged profits from this single season as the basis for seeking lost profits totaling $312,256 in its May 28, 2002 "claim" letter to Forest Supervisor Rebecca Aus. Plaintiff has now extrapolated from the unreliable basis of the 1996 season to estimate that it has lost $960,000 in profits for the entire 20-year term of the permit. Pl. Mem. 21.

Plaintiff also presents an alternative, even more uncertain manner of estimating its lost profits based upon a "projection of what its business plan would have been," conceding that it never developed a business plan during the time that it contends it operated the lodge. Pl. Mem. 21. The 1995 and 1996 operating plans that The Sweetwater submitted to the Forest Service do not contain any projections about its expected revenues, or any business plan that identified the revenue that The Sweetwater expected to generate from its different activities.

The new business plan is based entirely upon the assumption that The Sweetwater invested $200,000.00 in the lodge in 1997. The Sweetwater never proposed such an investment in 1997 or at any other time before expert discovery in this lawsuit. The new business plan is fundamentally different from the operations described in the 1995 and 1996 operating plans, which described a lower capacity for guests and fewer revenue-generating activities. Plaintiff also inflates its lost profits claim by equating itself to dissimilar lodges,

which have larger capacities, more activities, and owner-operators who live in their lodges and have proven records of earning profits.

Plaintiff's alternative manner of estimating its lost profits yields a total of $1,667,000 for the 20-year term of the permit, much more than its estimate of $960,000 that is based upon the 1996 season. This wide range between these two estimates in itself demonstrates that plaintiff's claim for lost profits is not "reasonable certain." " California Fed., 395 F.3d at 1268.

Finally, the Court should reject plaintiff's claim for future lost profits from the present through 2014, when the 20-year term of the permit expires. Plaintiff has made multiple attempts to sell the lodge, so it is unlikely that the plaintiff would continue to operate the lodge for the entire term of the permit. For this reason, and because it is uncertain whether plaintiff have earned any profits as a new venture, or how any such hypothetical profits could reasonably be calculated, the Court should not award future lost profits. Energy Capital Corp. v. United States, 302 F.3d at 1325-26.

**C. Plaintiff Is Not Entitled To Recover The Market Value Or Replacement Cost Of Its Lodge As Damages For Breach Of Contract**

Plaintiff appears to assert that even if the Court finds the Government liable on Count I, then plaintiff is entitled to recover the market value of the buildings and site improvements (with access as it was in 1995) because the lodge "is no longer a viable business due directly to the Forest Service's breach of the Term SUP." Pl. Mem. 23. However, plaintiff is not entitled to recover the entire market value of the lodge, because this is not the correct measure of damages for breach of the alleged duty to replace the bridges asserted in Count I. Plaintiff's assertion that closing the bridges to the public has rendered the lodge worthless is

based on the erroneous assumption that the cost or replacing the bridges exceeds the market value of the lodge (with 1995 access).

As will be shown at trial, whether one uses the numbers adopted by plaintiff or defendant, the value of the lodge exceeds the cost of replacing the bridges. Plaintiff asserts that the lodge is worth "at least $1,200,000" if the Sweetwater bridges were open to the public, as in 1995. Pl. Mem. 24. Plaintiff also relies upon an estimate by District Ranger Brent Larson in an April 2001 press release that it would cost "more than $500,000" to bring the Sweetwater Road and bridges "up to standard." Even if it cost $700,000 to replace the bridges, this would mean that the lodge is worth at least $500,000 as is, with the bridges closed to the public. Plaintiff has not performed any independent analysis of the cost of replacing the bridges that will enable it to prove its assumption that the cost to replace the bridges exceeds the market value of the lodge (with 1995 access).

At trial, the experienced Wyoming appraiser retained an expert by the Government, Mr. Frome, will present his opinion that the market value of the lodge is $415,000, applying the extraordinary assumption that access is the same as it was in 1995. Mr. Frome engaged an experienced Wyoming bridge contractor, Mr. Wayne Baker, who prepared an estimate that the current cost of replacing both Sweetwater bridges using Forest Service specifications is approximately $110,000. Mr. Frome has applied this estimate to his appraisal as the "cost to cure," and has concluded that the "as is" market value of the lodge in its present condition (with bridges closed to the public) is $305,000.

Plaintiff is only entitled to recover as damages "[t]he benefits that were expected from the contract," Glendale Federal, 239 F.3d at 1380, and is not entitled "to achieve a

position superior to the one it would reasonably have occupied had the breach not occurred." LaSalle, 317 F.3d at 1371. If the Court finds the Government liable on Count I, it should not award plaintiff the full market value of the lodge, but should only award plaintiff reasonable expectancy damages for the cost of the replacement bridges (approximately $110,000), which are the benefit that plaintiff asserts it expected to receive pursuant to the permit. Awarding the plaintiff the market value of the lodge, rather than the cost of building replacement bridges, would place plaintiff in a better position than if the breach asserted in Count I had not occurred.

In Count II, plaintiff asserts that the Forest Service, in effect, has terminated the permit in the public interest by not replacing the Sweetwater bridges. Pl. Mem. 30-33. Plaintiff further asserts that because the permit has been terminated in the public interest, plaintiff should receive "equitable consideration" for its lodge and other site improvements pursuant to clause 15 of the permit. Id. 22. If the Court finds that the Forest Service has terminated the permit in the public interest, then it should remand to the Forest Service the issue of the proper amount of equitable consideration owed to The Sweetwater, so that the parties can pursue the procedure set forth in clause 15 of the permit.

If the Court finds that the Government is liable on Count II, and chooses to address the measure of "equitable consideration" for purposes of clause 15, it should reject plaintiff's assertion that it is entitled to recover either the replacement cost or the market value of the buildings and site improvements. Plaintiff does not cite any legal authority for its assertion that clause 15 requires the Government to pay the "reconstruction cost, less physical depreciation" for plaintiff's buildings and site improvements.

The "replacement" expert retained by plaintiff has prepared numerous estimates of the reconstruction cost less physical depreciation of capital improvements in national parks that are owned by parties to concession contracts with the National Park Service. By statute, each National Park Service concesssioner possesses a "leasehold surrender interest" in each capital improvement it constructs that is "equal to the initial value (construction cost of the capital improvement) . . . less depreciation." 16 U.S.C. § 5954(a)(3). There is no similar statutory entitlement that provides that a permittee whose term special use permit is terminated by the Forest Service in the public interest will receive reconstruction cost less physical depreciation as equitable consideration.

Plaintiff presents contradictory rationales for using reconstruction cost as the measure of equitable consideration. It asserts that because it "cannot move its lodge facilities to another location, it is entitled to be compensated for the cost of rebuilding those facilities (less current physical depreciation) in another location" (Pl. Mem. 22), but also asserts that the reconstruction cost "method of valuation is appropriate because of its unique location which is not comparable to any other lodge in the Shoshone National Forest." Id. 23. The permit does not grant The Sweetwater any rights in real estate, and clause 15 does not grant The Sweetwater any right to compensation for its location.

Plaintiff must prove that there are unique features to its buildings and site improvements, not its location, to justify recovering the cost of reconstructing its buildings and site improvements. This it is unable to do, because there is nothing unique about the buildings and site improvements.

Plaintiff's other expert, an appraiser, states in his report what he refers to as the

"Substitution Principle: An informed purchaser would pay no more for a property than the cost of acquiring an existing property with the same utility." The cost of acquiring an existing property that can serve the same purpose as The Sweetwater's lodge provides a much more reasonable basis for measuring what is "equitable consideration" for purposes of clause 15 than reconstruction cost, because plaintiff should receive at most the cost of acquiring a similar lodge, not the cost of reconstructing its current lodge.

Plaintiff's appraiser presents an opinion of the market value of the buildings and site improvements using a sales comparison approach. However, his appraisal treats the permit as a leasehold, and compares it to other Forest Service permitted operations as leaseholds. The permit is a license, not a lease, and does not convey any exclusive rights in real estate. The appropriate measure of equitable consideration for purposes of clause 15 is to analyze the permit as if it were a leasehold for appraisal purposes, and then segregate the contributory value of the buildings and site improvements from the hypothetical leasehold interest in the land, as done by the Government's expert, John Frome, using the extraordinary assumption that access was the same as it was in 1995. At trial, Mr. Frome will present his expert opinion that the contributory value of the buildings and site improvements as of the date of his inspection in March 2005 is $215,000, using the assumption that access is as it was in 1995. This is the maximum amount of damages that the plaintiff should recover if the Court rules that the Government is liable on Count II.

If the Court found the Government to be liable on both Counts I and II, then plaintiff should only recover the contributory value of its buildings and site improvements. Awarding the cost of building replacement bridges and the contributory value of the buildings and site

improvements would place plaintiff in a better position than if the breaches asserted in Counts I and II had not occurred. In essence, plaintiff's breach of contract claim is that the Forest Service should have either replaced the bridges, or terminated the permit. Thus, plaintiff should not be compensated for both the replacement of the bridges and the value of the lodge.

**CONCLUSION**

For the foregoing reasons, the Government respectfully request that this Court deny plaintiff all relief it seeks in its first amended complaint, and grant us such other relief as the Court may see fit.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
1100 L St. N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972

Attorneys for Defendant

OF COUNSEL:

KENNETH S. CAPPS
Attorney-Advisor
Office of the General Counsel
Mountain Region
U.S. Department of Agriculture
P.O. Box 25005
Denver, CO 80225-0005

August 12, 2005

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 12th day of August, 2005, a copy of the foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John H. Williamson