**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-1795C |
| | ) | (Judge Merow) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S POST-TRIAL BRIEF**

Kevin R. Garden
THE GARDEN LAW FIRM P.C.
Suite 325
901 North Pitt Street
Alexandria, VA 22314
(703) 535-5565

Date: December 22, 2005

## TABLE OF CONTENTS

STATEMENT OF THE CASE ........ 1

A. Nature of the Case ........ 1

B. Statement of the Facts ........ 2

STATEMENT OF THE ISSUES ........ 10

ARGUMENT ........ 11

I. The Contract Disputes Act applies to the Term SUP. ........ 11

II. The Forest Service committed a breach of contract by representing that the bridges, which provided the only access to the lodge, were safe for vehicular travel. ........ 15

III. The Forest Service breached its duty to cooperate and not to hinder contract performance by preventing funds from being used to replace the Sweetwater bridges, which were critical for commercial lodge operations ........ 22

A. The purpose of the Term SUP, as well as the Forest Service's representations to The Sweetwater, demonstrate that the Forest Service was obligated to seek funding to maintain vehicular access to the lodge. ........ 25

B. The Forest Service's culpability in creating the situation in 1997 that precluded performance further established its duty to assist in seeking funding necessary to maintain vehicular access to the lodge. ........ 27

C. Because of The Sweetwater's reliance on the Forest Service's specific assurances prior to entering into the contract as well as during the contract, the Forest Service could not cease its efforts to seek and apply available funds to restore vehicular access to the lodge. ........ 30

D. The Forest Service's specific reasons for blocking available funding from being used to restore vehicular access to the lodge constituted a breach of its implied duty to cooperate and not to hinder performance of the contract. ... 35

E. Even if the Forest Service had decided to cease efforts to fund the repair of the Sweetwater bridges because the bridges were too low of a priority compared to other projects on the Forest, this decision would still constitute a breach of the Forest Service's implied duty to cooperate and not hinder

contract performance. .................................................................... 37

IV. The Forest Service breached the contract by failing to compensate The Sweetwater as required under clause 15 in situations such as the present where it terminates lodge operations in the public interest. ........................................................................ 41

V. The Forest Service is liable to The Sweetwater for all damages directly flowing from the Forest Service's breach of contract, which total $3,066,208 ...................... 45

*A. Operating expenses actually incurred* ................................................................ 47

*B. Lost profits* ........................................................................................ 47

*C. Value of Sweetwater Lodge* ........................................................................ 49

VI. In the event that the Forest Service did not breach its contract with The Sweetwater, its actions in preventing further operations under the Term SUP constituted a taking which is compensable under the Fifth Amendment. ................................................ 51

VII. Conclusion ........................................................................................ 53

## TABLE OF AUTHORITIES

*Cases*

*Ace-Federal Reporters, Inc. v. Barram*,
226 F.3d 1329 (Fed. Cir. 2000) ....................48

*Aerodex, Inc. v. United States*,
417 F.2d 1361, 189 Ct. Cl. 344 (1969) .................... 17

*Alpine Camping Services*,
B-238625, B-238625.2, 90-1 CPD ¶ 580.................... 14

*Anderson v. Hayes Constr. Co.*,
243 N.Y. 140, 153 N.E. 28 (1926).................... 40

*Bluebonnett Savings Bank v. United States*,
266 F.3d 1348 (Fed. Cir. 2001) ....................45, 46, 48

*Bluebonnet Savings Bank FSB v. United States*,
67 Fed. Cl. 231 (2005) ....................51

*Cedar Lumber, Inc. v. United States*,
5 Cl. Ct. 539 (1984)....................23, 37

*CEMS, Inc. v. United States*,
59 Fed. Cl. 168 (2003) .................... 24

*Centex Corp. v. United States*,
395 F.3d 1283 (Fed. Cir. 2005)....................23, 25, 40

*Commerce International Co. v. United States*,
338 F.2d 81 (Ct. Cl. 1964) .................... 25, 26, 29

*Davidson Industries, Inc.*,
AGBCA No. 95-166-1, 96-2 BCA ¶ 28,299 (1996) .................... 44

*Detroit Housing Corp. v. United States*,
55 Fed. Cl. 410 (2003) .................... 15

*Elec. & Missile Facilities, Inc. v. United States*,
189 Ct. Cl. 237, 416 F.2d 1345 (Ct. Cl. 1969) .................... 46

*Energy Capital Corp. v. United States*,
302 F.3d 1314 (Fed. Cir. 2002) ........................................................................ 48, 49

*Fordyce v. United States*,
7 Cl. Ct. 591 (1985) .............................................................................................. 50

*Franconia Associates v. United States*,
61 Fed. Cl. 718 (2004) ...................................................................................... 40-41

*George A. Fuller v. United States*,
108 Ct. Cl. 70, 69 F. Supp. 409 (1947) ................................................................ 23

*Greyback Concession*,
B-239913, 90-2 CPD ¶ 278 (1990) ....................................................................... 14

*Hardeman-Monier-Hutcherson v. United States*,
458 F.2d 1364 (Ct. Cl. 1972) ........................................................................... 17, 21

*Helene Curtis Indus., Inc. v. United States*,
312 F.2d 774, 160 Ct. Cl. 437 (1963) ................................................................... 17

*J.A. Jones Constr. Co. v. United States*,
390 F.2d 886, 182 Ct. Cl. 615 (1968) ................................................................... 17

*J.F Shea Co., Inc. v. United States*,
4 Cl. Ct. 46 (1983) ................................................................................................ 21

*Kehm Corp. v. United States*,
93 F. Supp. 620 (Ct. Cl. 1950) ........................................................................ 23, 25

*Kirby Forest Industries, Inc. v. United States*,
467 U.S. 1 (1984) .................................................................................................. 52

*LaSalle Tallman Bank, FSB v. United States*,
317 F.3d 1363 (Fed. Cir. 2003) ............................................................................ 47

*LaVan v. United States*,
382 F.3d 1340 (Fed. Cir. 2004) ............................................................................ 47

*Lenry, Inc. v. United States*,
297 F.2d 550 (Ct. Cl. 1962) .................................................................................. 30

*Lewis-Nicholson v. United States*,
550 F.2d 26 (Ct. Cl. 1977) ........................................................................ 23, 25, 37

*L.L. Hall Construction Company v. United States*,
379 F.2d 559 (Ct. Cl. 1966) ........................................................ 23

*Locke v. United States*,
151 Ct. Cl. 262, 283 F.2d 521 (1960) ........................................................ 48

*Meyers Cos., Inc. v. United States*,
41 Fed. Cl. 303 (1998). ........................................................ 18

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
538 U.S. 803 (2003)........................................................ 13

*Oman-Fishbach International (JV) v. Pirie*,
276 F.3d 1380 (Fed. Cir. 2002) ........................................................ 30

*Oroville-Tonasket Irrigation District v. United States*,
33 Fed. Cl. 14 (1995) ........................................................ 14

*Peter Kiewet Sons' Co. v. United States*,
138 Ct. Cl. 668 (1954) ........................................................ 24

*Petrochem Services, Inc. v. United States*,
837 F.2d 1076 (Fed. Cir. 1988) ........................................................ 21

*Precision Pine & Timber, Inc. v. United States*,
50 Fed. Cl. 35 (2001)........................................................ 23, 33

*Ryco Constr., Inc. v. United States*,
55 Fed. Cl. 184 (2002) ........................................................ 24

*S.A. Healey Co. v. United States*,
576 F.2d 299 (Ct. Cl. 1978) ........................................................ 29, 31, 34

*Sacramento Nav. Co. v. Salz*,
273 U.S. 326 (1927)........................................................ 23, 37

*Son Broadcasting, Inc. v. United States*,
42 Fed. Cl. 532 (1998) ........................................................ 34

*Specialty Assembling & Packing Co. v. United States*,
174 Ct. Cl. 153, 355 F.2d 554 (1966) ........................................................ 47

*Steve Rados, Inc.*,

AGBCA No. 77-130-4, 82-1 BCA ¶ 15,624 .......... 23

*Tecom, Inc. v. United States*,
66 Fed. Cl. 736 (2005) .......... 24

*The Federal Group, Inc. v. United States*,
67 Fed. Cl. 87 (2005) .......... 21

*Thompson v. Cherokee Nation of Oklahoma*,
334 F.3d 1075 (Fed. Cir. 2003), *aff'd*, 125 S. Ct. 1172 (2005) .......... 39

*United States v. Beebe*,
180 U.S. 343 (1901) .......... 43

*Walter Dawgie Ski Corporation v. United States*,
30 Fed. Cl. 115 (1993) .......... 23, 25, 26, 29

*Watch Hill Concession, Inc.*,
IBCA No. 4284-2000, 01-1 BCA ¶ 31,298 (2001) .......... 13

*Wetsel-Oviatt Lumber Co. Inc. v. United States*,
38 Fed. Cl. 563 (1997) .......... 44

*Womack v. United States*,
182 Ct. Cl. 299 (1968) .......... 17

*Statutes and Regulations*

16 U.S.C. § 497 .......... 2

28 U.S.C. § 2680(a) .......... 18

31 U.S.C. § 3551(1)(A) .......... 14, 15

41 U.S.C. § 601 *et seq* .......... 11

41 U.S.C. § 602(a) .......... 12

36 C.F.R. § 251.50(a) .......... 2, 20

36 C.F.R. § 251.52 .......... 43

36 C.F.R. § 251.53(d) ........................................................................................................ 2

36 C.F.R. § 251.60(h)(2)(i) ..................................................................................................... 20

*Miscellaneous*

RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) ......................................................... 24

John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 297 (3d ed. 1995)). ........................................................................................................................ 24

GAO Redbook ........................................................................................................................ 40

## STATEMENT OF THE CASE

### I. Nature of the Case

Pursuant to the Court's Order dated December 16, 2005, plaintiff The Sweetwater, A Wilderness Lodge LLC ("The Sweetwater") respectfully submits its post-trial brief.

As the Court is aware, this case involves the issue of whether the Forest Service breached its contract with The Sweetwater. The contract between the parties called for The Sweetwater to provide for public recreation by operating facilities which it had purchased on the Shoshone National Forest ("Shoshone") as a commercial lodge. Joint Exhibit 1 [hereinafter cited to as "JX __}; Plaintiff's Proposed Findings of Fact at ¶¶ 16-18 (submitted along with Plaintiff's Post-trial Brief)[hereinafter cited to as "PPFF ¶_]. However, as the Forest Service's own expert admitted, the only way viable commercial operations could occur was if there was vehicular access over several Forest Service bridges leading to the lodge. As the evidence in this case shows, the Forest Service's failure to disclose to The Sweetwater that it "basically condemned" those bridges as of 1992 caused the cessation of operations in 1997. Thereafter, the Forest Service subsequently rejected funding to replace those bridges which would have allowed for operations to resume after the Forest Service had repeatedly assured The Sweetwater that it was seeking funds to replace the bridges and restore vehicular access to the lodge. Finally, the Forest Service's decision to prevent any vehicular access to The Sweetwater by prohibiting such access over the North Fork bridge conclusively shows that the agency has decided that it does not intend to permit any further operations under the Term Special Use Permit ("Term SUP") it had entered into with The Sweetwater.

The evidence conclusively shows that the Forest Service has breached its contract with The Sweetwater in several instances. First, the Forest Service's failure to disclose its reports and

conclusions as to the unsafe condition of the bridges as of 1992 to The Sweetwater prior to it closing on its purchase of the lodge facilities in 1995 constituted a breach of contract. In addition, the evidence also shows that the Forest Service's subsequent rejection of funding which was made available in 1999 to restore vehicular access to the lodge also constituted a breach of contract. Finally, the Forest Service's decision to restrict any vehicular access to The Sweetwater obligated the Forest Service to provide equitable consideration to The Sweetwater for its lodge facilities, and the agency's failure to do so constitutes an additional breach of contract.

## II. Statement of the Facts

In 1995, The Sweetwater became interested in purchasing a lodge and all of its assets which were located on federally-owned land within the Shoshone. PPFF ¶ 34. Because the lodge was located on Forest System land, the lodge owner must obtain a Forest Service Term SUP in order for the lodge to remain on the Forest. 36 C.F.R. §§ 251.50(a), 251.53(d). In addition, in order to obtain the Term SUP, the lodge owner must operate the lodge and provide public recreational opportunities. PPFF ¶ 14. The Forest Service issues Term SUPs to private entities to ensure a stability of tenure where recreational facilities have been constructed on Forest System land for long-term use. Defendant's Responses to Plaintiff's Proposed Finding of Uncontroverted Facts at ¶ 3 (March 29, 2004)(Forest Service Manual 2711.3); 36 C.F.R. § 251.53(d); 16 U.S.C. § 497.

The lodge assets are located along Sweetwater Creek at the bottom of a canyon that runs off of a main highway which provides access to Yellowstone National Park. PPFF ¶ 2. The facilities are three and one-half (3 ½) miles up Sweetwater Road, which is a Forest Service road (also referred to as "FSR 423") that first crosses a main bridge over the North Fork of the

Shoshone River and then twice crosses Sweetwater Creek. PPFF ¶ 3. The bridges at issue in this case are the two which cross Sweetwater Creek and are inspected, controlled and maintained by the Forest Service, as is Sweetwater Road itself. PPFF ¶ 3. Sweetwater Road provides the only way vehicles can access the lodge. PPFF ¶ 3. This vehicular access is crucial to having feasible commercial lodge operations. PPFF ¶¶ 6. The bridges and Sweetwater Road are identified on the map attached to the Term SUP, but are not included within the permit area. JX 1 (at JX 1/16). The lodge facilities include extensive, well-maintained cabins and other buildings which are located along Sweetwater Creek. PPFF ¶¶ 11-13.

In May of 1995, The Sweetwater initiated discussions with the lodge owners at the time, David and Nancy Brannon, and then met with representatives of the Forest Service before completing its purchase of the lodge assets to discuss the Forest Service road and bridges which provided the necessary access to the lodge. PPFF ¶¶ 34-88. At that meeting, the Acting Forest Supervisor took the position that "[t]he Forest Plan of the Shoshone National Forest allocates that area up there to a public lodge facility; therefore, there is a commitment on the part of the Forest to provide for that use to the extent it can. All Forest Plan implementation is subject to dollars available, but I think it's probably – no, it's not probably, it's standard practice and intent when one has allocated a use on the Forest *to do your best* to implement that." PPFF ¶¶ 55-56. The Forest Service also stated to the representatives of The Sweetwater at the June 1995 meeting that "it [is] our intent to keep the [Sweetwater] road open to the best of our ability." PPFF ¶ 53. The Forest Service also stated that "it [is] our intent to support, to the degree that we [can], access to the lodge facility." PPFF ¶ 53.

At the June 12, 1995 meeting the parties discussed the use of fords as a means of accessing the lodge temporarily if bridge access were lost. PPFF ¶¶ 63-69. As stated by Mr. Barker, who

attended the meeting on behalf of the Forest Service, the parties did not discuss the use of fords as a means to operate the lodge given the safety issues which would arise. PPFF ¶ 66; PX 38.[1] In addition, Mr. Rossman further stated that, if the Forest Service installed fords in an emergency situation, it would not in any way affect the Forest Service's efforts to obtain funds to restore vehicular access with bridges. PPFF ¶ 68.

The Sweetwater and Forest Service agreed to the terms of the Term SUP and the document was subsequently executed on August 21, 1995. PPFF ¶ 92. The Term SUP was issued for the purpose of The Sweetwater "maintaining and operating a public resort" by renting cabins and implementing the lodge facilities. JX 1. In addition, the Term SUP stated that "[t]his use shall actually be exercised at least 93 days each year." JX 1. The Term SUP also included a provision (clause 15) that addressed the allocation of risk if the Forest Service subsequently took action to terminate the lodge operations in the public interest. PPFF ¶ 96; JX 1.

After cleaning up the lodge area in 1995 from the prior owner's activities, The Sweetwater operated in 1996 in a manner consistent with its permit's terms and representations made to it by Forest Service personnel as to what type of operations were expected and allowed. PPFF ¶¶ 98-103. Notwithstanding that it was the first season it was open for business and it was just beginning to develop a client base, The Sweetwater operated at a profit of $ 34,995. JX 23 (at

[1] The individual who later became the Forest Supervisor in 1996, Rebecca Aus, incorrectly understood that The Sweetwater had agreed in the meeting in 1995 to the use of fords as a method to operate the lodge on a permanent basis. PPFF ¶ 162. However, the email drafted by Mr. Rossman the day after the meeting did not explicitly state whether fords were to be used to operate the lodge, and Mr. Barker, who also attended the meeting, unequivocally stated that no such agreement had been made by The Sweetwater or proposed by the Forest Service at the meeting or at any time thereafter. PPFF ¶¶ 64-66; JX 6. In addition, Mr. Rossman stated that the use of fords would not in any way impact the effort of the Forest Service to seek funds to restore vehicular access over the bridges. PPFF ¶ 63.

23/7); PPFF ¶ 99.

In January of 1997, The Sweetwater entered into an agreement to sell the lodge assets to Ray and Judi Sutherland for $595,000. PPFF ¶ 106. As did The Sweetwater when it was pursuing a purchase of the lodge assets, the Sutherlands had discussions with the Forest Service as to the Forest Service road and bridges providing access to the lodge. PPFF ¶ 107. However, unlike with its communications with The Sweetwater, the Forest Service provided the Sutherlands with a newly created written document that stated that the bridges over Sweetwater Creek had been "basically condemned" back in 1992 and the bridges were "inadequate, should be closed." PPFF ¶ 107. This document was not included in the Forest Service file in 1995 when The Sweetwater purchased the lodge, but was added in 1997 by the Forest Engineer in a note he drafted and sent to the Sutherlands. PPFF ¶¶ 108-109. While the Forest Service later attempted to withdraw its statement to the Sutherlands by asserting that no 'formal' condemnation had occurred, the Sutherlands did not complete their purchase because of this information. PPFF ¶ 110.

Because of safety and liability concerns over the bridges, The Sweetwater then informed the Forest Service that it could not operate the lodge in the 1997 season and invite paying guests to the lodge. PPFF ¶ 120. The Forest Service agreed with this decision and did not require The Sweetwater to operate or to submit an Operating Plan. PPFF ¶ 121. In February of 1997, The Sweetwater requested that the Forest Service clarify exactly what its position was as to the Sweetwater bridges and the continuation of lodge operations under the permit. *See* PPFF ¶ 114. The Forest Service shortly thereafter wrote a letter to The Sweetwater which stated that the Forest Service would include the Sweetwater bridges in its list of projects to be funded in FY 1999. JX 12; PPFF ¶¶ 114-115. The only qualification the Forest Service placed on its commitment was to state that the receipt of the funds was dependent upon Congress's approval. *Id.* The letter

identified no other restrictions or caveats. *Id.* Based on this letter and the Forest Service's continuing assurances that it was seeking funds to replace the Forest Service bridges, The Sweetwater continued to incur the expense of maintaining the lodge in the absence of any cash flow from on-going operations. PPFF ¶ 118. Brent Larson, the District Ranger and a line officer, stated to The Sweetwater that the Forest Service would continue its efforts to rebuild the bridges or, if not, "find another solution" to the problem. PPFF ¶ 126.

After issuing this letter, Mr. Larson concluded that the lodge operations were not the best use of the permit area. PPFF ¶ 127. The lodge was unique in that it was the only facility anywhere in the area that penetrated deep into the forest and was well away from the main highway. PPFF ¶ 132. The lodge area was immediately adjacent to pristine lands and designated sensitive Wilderness area. PPFF ¶ 133. The area near the lodge was considered crucial habitat for bighorn sheep as well as elk, and was also important habitat for grizzly bear. PPFF ¶ 13. Human activity in these types of areas was determined by Forest Service biologists to have a detrimental effect on these threatened and sensitive wildlife species. PPFF ¶¶ 135, 138. In addition, Sweetwater Road was causing harmful impacts on Sweetwater Creek because it was contributing to sedimentation that was harming the trout fishery in that stream. PPFF ¶136. If the road was to remain open, these problems had to be fixed. PPFF ¶ 137.

Because he felt the lodge was not the best use of the permit area, Mr. Larson determined that it was in the overall interest of the public as well as the lodge owner to pursue a so-called "conservation buyer." PPFF ¶ 127. Mr. Larson testified:

> I have said several times, we would be better off trying to secure the lodge through a conservation buyer than- than continuing on with the permit up there; or, you know, do away with the permit and not have to deal with the road issues and the bridge issues . . . .

PPFF ¶ 129. A "conservation buyer" was a private individual or entity that would agree to purchase the lodge assets and then remove the lodge and restore the area to its natural condition. PPFF ¶ 130.

Mr. Larson also stated that he took this action to terminate lodge operations in order to eliminate the Forest Service's continuing financial road and bridge obligations caused by the presence of the lodge and thereby save the government money. PPFF ¶ 142.

Mr. Larson informed The Sweetwater of his efforts to locate a conservation buyer. PPFF ¶ 145. However, The Sweetwater informed him that, while it was not opposed to selling its lodge to a conservation buyer, it did not think such efforts were worthwhile because a conservation buyer would not likely be able to pay a fair value for the lodge due to having inadequate financial resources. PPFF ¶ 145. Mr. Larson continued his efforts nonetheless. However, potential conservation buyers informed Mr. Larson that the sales price for The Sweetwater was too high for them to afford. PPFF ¶ 140.

Completely unknown to The Sweetwater, Mr. Larson had apparently also decided that he would take efforts to *prevent* any funds that otherwise were granted by Congress for replacement of the Sweetwater bridges from being used for that purpose because using funds to replace the bridges conflicted with his efforts to locate a conservation buyer. PPFF ¶¶ 146-148. Mr. Larson had called Mr. Jim Fischer, who was the Forest Service employee on the Shoshone responsible for obtaining and appropriating the funding for bridge replacement projects, and shared this strategy with him. PPFF ¶ 146. As a result of that conversation, Mr. Fischer admitted that he started "dragging his feet" as to pursuing the funding for the bridges. PPFF ¶ 148.

In late 1999, while Mr. Larson was still seeking a conservation buyer in order to terminate lodge operations and despite Mr. Fischer's foot-dragging, the funding that was necessary to

replace the Sweetwater bridges was approved by Congress and sent to the Forest Service for use in replacing the Sweetwater bridges. PPFF ¶ 149. Mr. Fischer, who received notification that the funding had been made available, then spoke to Mr. Larson. PPFF ¶ 150. Mr. Larson stated to Mr. Fischer that there was "really good possibility" that he would locate a conservation buyer to buy the lodge. PPFF ¶ 150. As a result, they decided that Mr. Fischer should *return the money* to the Regional Office because replacement of the bridges was inconsistent with the goal of obtaining a conservation buyer. PPFF ¶ 151. Mr. Fischer testified:

> It was pretty much between Brent [the District Ranger] and myself of- of let's – you know – let's pull the bridges from the program until we know for sure what's going to happen with these [conservation buyer] proposals.

PPFF ¶ 151. Mr. Fischer then testified that he called the Regional Office to reject the funds, telling them:

> Hey, you know, our decision is we're not going to build this bridge this year because of the conservation – because of what appeared at the time as a really good possibility that the conservation organizations would – you know, were going to be able to buy the lodge.

PPFF ¶ 153. Mr. Larson subsequently admitted that, when he spoke to Mr. Fischer, he did not have *any* conservation buyers lined up, much less any letters of intent, draft contracts or any indication of interest. PPFF ¶ 156. But for this conversation with District Ranger Larson about the goal of a conservation buyer and the "manipulations" by the Forest Service as to the funding issues, the bridges would have been built. PPFF ¶ 157.

The Sweetwater was *never* informed that (1) the Forest Service was intending to, or in fact did, block the application of funds provided by Congress and approved by the Region to replace the Sweetwater bridges, and that (2) any future efforts to obtain funding were non-existent. PPFF ¶ 164. In reliance on the Forest Service's previous written statements in 1997 and continuing oral

assertions that it was trying to locate funding to replace the bridges, The Sweetwater continued to maintain the lodge, and kept it in excellent condition so that it was ready for operations. PPFF ¶ 166.

When The Sweetwater began to explore other possible solutions in 2000 that might enable it to operate, which included its possibly undertaking efforts to repair the bridges in exchange for improved permit terms that would allow it to absorb the expense and resume operations, the Forest Service then instructed The Sweetwater to hire a structural engineer to determine if the bridge could be "load rated" (*i.e.*, assigned a maximum weight load). PPFF ¶ 171. The bridges at that point in time had no load rating, which was contrary to Forest Service policy. PPFF ¶ 172. The private structural engineer concluded that the bridge could not be load-rated, and the Forest Service then used this conclusion to formally close the bridges in April 2001 and prevent any possibility of a resumption of operations. PPFF ¶ 173.[2] To prevent any public or lodge visitors from using the bridges, the Forest Service placed a padlocked gate on the bridge over the North Fork of the Shoshone River at the beginning of the road to the lodge in April 2001. PPFF ¶ 176. The Forest Service then initiated an appraisal of the lodge assets for the purpose of purchasing them, but terminated that process when it was unable to finance a purchase. PPFF ¶ 178.

The next action the Forest Service took towards The Sweetwater was to issue a letter to it in December 2001 stating that The Sweetwater was not in compliance with its permit because it

[2]The Forest Service's own inspector admitted that, the prior summer, he inspected the bridges and was aware of the same physical conditions that led to the private inspector concluding that the bridge could not be load rated. PPFF ¶ 173, n.10. The Forest Service inspector stated that, had the Forest Service attempted to load rate the bridges in 2000, it would have come to the same conclusion as the private inspector. *Id.* Instead of arranging to have the bridge load rated by the Forest Service, he encouraged The Sweetwater to do so. *Id.* This avoided the appearance of the Forest Service being responsible for the closing.

was not open to the public. PPFF ¶ 183. As a result of this alleged non-compliance, the Forest Service had the authority to order The Sweetwater to tear down its lodge, remove all remnants of its facilities and return the area to its natural state, all at The Sweetwater's expense. PPFF ¶ 184.

Notwithstanding its representations before and during the term of the contract at issue, the Forest Service has now removed the Sweetwater bridges from eligibility for funding. PPFF ¶ 192. In addition, the Forest Service has decided to tear out the current bridge structures over Sweetwater Creek and restrict high clearance access over the North Fork bridge, thus precluding even high-clearance vehicles from accessing the lodge. PPFF ¶ 193.

**STATEMENT OF THE ISSUES**

1. Whether the Forest Service committed a breach of contract by failing to disclose, prior to executing the Term SUP, that it had previously determined that the Sweetwater bridges were unsafe for vehicular use?

2. Whether the Forest Service breached its duty to cooperate and not to hinder by preventing funds from being used to replace the Sweetwater bridges which were critical to lodge operations when it had informed The Sweetwater that such funds were being sought?

3. Whether the Forest Service breached the contract by failing to compensate The Sweetwater as required under the contract's terms when it took actions to terminate lodge operations in the public interest?

4. If the Forest Service actions do not constitute a breach of contract, whether the Forest Service has taken The Sweetwater's property in violation of the Fifth Amendment?

## ARGUMENT

### I. The Contract Disputes Act applies to the Term SUP.

As demonstrated by the testimony of the Forest Service personnel who are most experienced with Term SUPs, the Term SUP in this case was entered into by the Forest Service in order to procure recreational services which it would have provided had no contract been issued. PPFF ¶ 17. This type of procurement falls under the Contract Disputes Act, 41 U.S.C. § 601 *et seq*. ("CDA"). Therefore, contrary to the Forest Service's assertions, the clear evidence in this case demonstrates that The Sweetwater's Term SUP is subject to the terms of the CDA.

The Contract Dispute Act ("CDA") states:

> Unless otherwise specifically provided herein, this chapter applies to any express or implied contract (including those of the nonappropriated fund activities described in sections 1346 and 1491 of title 28) entered into by an executive agency for—
>
> (1) the procurement of property, other than real property in being;
>
> (2) **the procurement of services**;
>
> (3) the procurement of construction, alteration, repair or maintenance of real property; or,
>
> (4) the disposal of personal property.

41 U.S.C. § 602(a)(emphasis added).

As to whether or not a Term SUP is entered into in order for the Forest Service to obtain services, the Forest Service officials involved in administering these contracts have stated it best. Ms. Aus, in her letter asserting that The Sweetwater had not complied with the terms of the Term SUP, stated that "the Sweetwater Lodge Special Use Authorization [was] issued to you for the purposes of operating a public resort." JX 21 (p. 1). Ms. Aus then further stated:

> Commercial developments for public resort operations are permitted only to the extent that they serve a public need for services or facilities. The minimum public services to be provided by the permittee and the minimum number of days of operation, are identified as a condition of the permit.
>
> The minimum requirements for public services contained in the Sweetwater Lodge permit are for the operation of a public resort, providing rental of cabins, meals and day use trail rides. These services are required to be available for a minimum of 93 days each year.

JX 21 (p. 1).

As the Forest Service Recreation, Wilderness and Land Staff Officer testified,[Term SUPs are, by regulation and by purpose, a delivery system to provide public services. PPFF ¶ 16. Another Forest Service official who was a member of the Shoshone National Forest special use permit team reiterated the same statement:

> [C]oncessionaire permittees are part of the Forest Service who are permitted to provide a service that we want provided, it's not for convenience of the permittee, it's to meet a responsibility providing public service to the public, and so we allow the numbers and the locations in order to provide what we feel to meet the public need.

PPFF ¶ 18; *see* PPFF ¶¶ 54, 87. In addition, the Forest Service's form for collecting payments under the Term SUP is entitled ""Fee Determination Data- Commercial Public Service Use." PX 21. Thus, while the Forest Service has arrived at a different conclusion, the evidence in this case related to why the Term SUP was issued and what it achieves shows that it clearly is the type of contract which is covered by the CDA.

Notably, the Interior Board of Contract Appeals ("IBCA") in *Watch Hill Concession, Inc.*, IBCA No. 4284-2000, 01-1 BCA ¶ 31,298 (2001) reaffirmed the Board's long-held position that National Park Service concession contracts are CDA contracts over which it has jurisdiction. The IBCA's reasoning, which is equally applicable to Forest Service Term SUPs, is that where a contract requires the holder to perform specific

services or make improvements for the benefit of federal lands in the course of its business operations such as those requirements placed on a campground operator, the contract is one for the procurement of services and thus covered by the CDA.[3] Among other obligations, The Sweetwater's Term SUP states that "[t]he permittee shall maintain the improvements *and premises* to standards of repair, orderliness, neatness, sanitation, and safety acceptable to the forest officer in charge." JX 1 (clause 4 of Term SUP )(emphasis added); *see Oroville-Tonasket Irrigation District v. United States*, 33 Fed. Cl. 14, 22 (1995)(finding that contract requiring repair, operation, and maintenance of federal property falls under the CDA). Thus, The Sweetwater's Term SUP is a contract for the procurement of services and thus is covered by the CDA.

Additional support for the Term SUP being covered by the CDA is provided by *Alpine Camping Services*, B-238625, B-238625.2, 90-1 CPD ¶ 580. That matter involved a bid protest to GAO of a Forest Service campground concession issued pursuant to a SUP. GAO has jurisdiction over protests of solicitations by federal agencies "for offers for a contract for the procurement of property or services." 31 U.S.C. § 3551(1)(A)("CICA"). GAO held that the contract was one for the procurement of services because the FS "requires concessionaires to perform specific tasks designed to protect the land, maintain the campsites, preserve structures in accordance with Forest Service standards and specifications, and enforce Forest Service rules and regulations." The GAO concluded that:

[3] The United States Supreme Court in *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 811 (2003), specifically cited affirmatively to the IBCA's decision in *Watch Hill* as providing concessioners with the ability to pursue CDA claims under concession type contracts.

> [W]hile the prospectus ultimately results in permits to use and occupy federal land, the tasks required to be performed as a condition to receiving the permits are intended to benefit the government and further the functions of the Forest Service. [citations omitted.] Under the circumstances here, we conclude that the prospectus at issue is ***a procurement for services*** which we will consider under our CICA bid protest authority.

*Alpine Camping* at 2 (emphasis added); s*ee also Greyback Concession*, B-239913, 90-2 CPD ¶ 278 (1990)(GAO decided a post-*Alpine Camping* protest of award of a Forest Service SUP). Notably, the CDA *uses the same language as CICA* to identify contracts to which it applies. *Compare* 41 U.S.C. § 602(a)(2)(the CDA applies to contracts "for the procurement of services") *to* 31 U.S.C. § 3551(1)(A)(CICA applies to solicitations for contracts "for the procurement of property or services").

As demonstrated above, the Term SUP at issue in this case was entered into by the Forest Service for the purpose of procuring public recreational services and thus falls within the applicability of the CDA.

## II. The Forest Service committed a breach of contract by representing that the bridges, which provided the only access to the lodge, were safe for vehicular travel.

When The Sweetwater was considering purchasing the lodge facilities and entering into the Term SUP which was necessary for operation of those facilities, the Forest Service represented that the bridges over Sweetwater Creek were safe for vehicular use. PPFF ¶¶ 39, 53, 55. However, this representation was false (PPFF ¶¶ 24-28), and the Forest Service failed to disclose critical information it possessed which demonstrated that, as of 1992, the Forest Service had concluded that the bridges were not safe for vehicular use. PPFF ¶ 82. The Forest Service's false

representations and failure to disclose this critical information constituted a breach of contract.

The government has committed a breach of the contract if the plaintiff can show that: (1) the government made a representation; (2) the misrepresentation was either fraudulent or material; (3) the misrepresentation induced plaintiff to enter into the contract; and (4) plaintiff was justified in relying on the misrepresentation. *Detroit Housing Corp. v. United States*, 55 Fed. Cl. 410 (2003). Each of these elements is present in this case.

The critical representation in this case was that the Forest Service bridges leading to the lodge were in a safe condition and could be used by a lodge operator to perform its contract with the Forest Service. This representation was made by the Forest Service when it kept the road and bridges open for public use with no signs warning that it was unsafe for lodge use or other indicia of the fact that qualified Forest Service bridge inspectors had reviewed the bridges in 1992 and had concluded that they "need[ed] to close those bridges immediately" because of the safety risk they posed. PPFF ¶ 26.[4] The Shoshone employees argued in 1992 that they could not close the bridges because of the ramifications due to the lodge needing the bridges for operations. PPFF ¶ 26.[5] Because of this argument, a "compromise" was reached that left the bridges open. PPFF ¶ 27.

The determination of the qualified Forest Service bridge inspectors was kept out of the

---

[4]In addition, the Forest Service policy was to close any bridge that had not been load rated. PPFF ¶ 25. While the Sweetwater bridges had not been load rated, they were kept open and a 3-ton weight limit sign indicating such a load rating had occurred was placed by them. PPFF ¶ 27.

[5]This fact further demonstrates that the Forest Service was aware that lodge operations *required* vehicular access. If such access was not necessary and the lodge could be operated by means of alternative means, the Shoshone would not have kept otherwise dangerous bridges open for public use after 1992. Further, it is consistent both with the Forest Service written determination that "[s]hould the bridges fail and this access be lost, . . . the service to the public [will be] lost" (JX 10 (at 10/5) as well as the prior lodge owners' notification to the Forest Service of this same fact. PX 4 (page 2).

Forest Service files and only came to light in 1997 when it was disclosed to the Sutherlands, who were interested in buying the lodge from The Sweetwater. PPFF ¶¶ 107-109. At that point in time, the Forest Service informed the prospective purchasers that the bridges had been "basically condemned" in 1992 and that the bridges should be replaced. PPFF ¶ 107. While the Forest Service's purpose at the meeting between the parties on June 12, 1995 had been to provide The Sweetwater with all pertinent information so that it could make its own decision on the purchase of the lodge facilities, this information and the Forest Service's conclusion was not disclosed to The Sweetwater at that time. PPFF ¶¶ 82-83, 107-109. As stated in *Hardeman-Monier-Hutcherson v. United States*, 458 F.2d 1364, 1371-72 (Ct. Cl. 1972):

> It is well settled in this court that where the Government possesses special knowledge, not shared by the contractor, which is vital to the performance of the contract, the Government has an affirmative duty to disclose such knowledge. It cannot remain silent with impunity. *Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 160 Ct. Cl. 437 (1963). *See also, e.g., Aerodex, Inc. v. United States*, 417 F.2d 1361, 189 Ct. Cl. 344 (1969); *J.A. Jones Constr. Co. v. United States*, 390 F.2d 886, 182 Ct. Cl. 615 (1968).

While The Sweetwater does not need to demonstrate that the Forest Service intended to mislead it,[6] Forest Service personnel revealed that, in the month prior to The Sweetwater purchasing the lodge, the Forest Service had provided information about the bridges to a woman interested in buying the lodge. PPFF ¶ 32. After speaking to the Forest Service, the woman subsequently terminated her efforts to purchase the lodge after receiving information about the bridges. PPFF ¶ 32. When the lodge owner at the time heard of this fact, he became very upset

[6]"An intent to mislead is not an essential element of actionable misrepresentation in the breach of contract context." *Womack v. United States*, 182 Ct. Cl. 299 (1968), *quoted in Detroit Housing*, 55 Fed. Cl. at 414.

with the Forest Service for disclosing information about the bridges to the woman and strongly conveyed his displeasure to the agency. PPFF ¶ 32. In the immediately following month, the Forest Service provided *no information* about the bridges' structural status or prior inspections to The Sweetwater when it became interested in purchasing the lodge assets. PPFF ¶¶ 82-85. The Sweetwater's understanding was that the woman had not purchased the lodge because she could not get adequate financing. PPFF ¶ 35.

Misrepresentation occurs when the government misleads a contractor by a negligently untrue representation of fact, or fails to disclose information that it has a duty to disclose. *Meyers Cos., Inc. v. United States*, 41 Fed. Cl. 303 (1998). The misrepresentation about the status of the lodge was material because the safe status of the bridges was critical to lodge operations. PPFF ¶¶ 3-8. The status of the bridges is important not only for ensuring the public's physical safety, but also for not causing legal liability should an accident occur. PPFF ¶ 95; JX 1 (clauses 28, 29). While the government may be able to take the risk of leaving a defective bridge open because it enjoys sovereign immunity where the decision to leave the bridge open is discretionary,[7] a private business has no such protection. Therefore, by being aware that qualified Forest Service bridge inspectors concluded in 1992 that the bridges were in poor enough shape to be "basically condemned" and that no work had been done to repair the bridges since this time, the lodge operator would take on an unreasonable liability risk if it were to invite paying guests to its lodge knowing they had to cross these unsafe bridges.

[7] *See* 28 U.S.C. § 2680(a).

In addition, the Forest Service *required* The Sweetwater to agree to indemnify the Forest Service should there be any liability resulting from the lodge's operation.[8] Therefore, not only was the Forest Service likely protected by sovereign immunity, it also had the additional protection of an indemnification from the lodge owner for accidents to lodge guests occurring *on the Forest Service's own poorly maintained bridges*. Thus, even if not otherwise obligated to disclose the critical facts related to the prior bridge inspections, the Forest Service had an obligation to inform The Sweetwater of these facts given that it was explicitly requiring The Sweetwater to sign an indemnification agreement that would protect the Forest Service from liability arising from those same facts.

Also, the Forest Service required The Sweetwater to identify the United States as a co-insured entity on its insurance policy. JX 1 (clause 29). By having the United States expressly named as an insured party on the policy, and with the Forest Service having knowledge of the unsafe condition of the bridges, the Forest Service created a significant risk that the policy would not be honored if someone were injured due to the bridges because of the agency having withheld material information. However, if such event were to occur, the Forest Service would likely be immune from liability, and the lodge operator would be left with full liability and *no insurance coverage whatsoever*. At a minimum, by requiring The Sweetwater to obtain an insurance policy that included the United States as a co-insured, and *also* indemnify the Forest Service, the Forest Service had an obligation to inform The Sweetwater of facts that could result in the nullification of the required insurance policy.

[8]Clause 28 of the Term SUP states "[t]he holder shall indemnify the United States against any liability for damage to life or property arising from the occupancy or use of National Forest lands under his permit." JX 1.

As The Sweetwater's actual conduct in 1997 shows, as soon as The Sweetwater learned of this information, it shut down its operations. PPFF ¶ 120. Obviously, had The Sweetwater known of this information in 1995, it never would have purchased a lodge it would be unable to operate. In addition, the Forest Service knew that safe vehicular access over the bridges was critical to any lodge owner being able to operate a business. PPFF ¶¶ 6-9. In fact, the prior lodge owner informed the Forest Service of this precise fact. PPFF ¶ 9. Therefore, it is clear that the Forest Service's representations by keeping the road publicly open with no warning signs induced The Sweetwater to purchase the lodge assets and enter into a contract with the Forest Service to operate those assets as an on-going lodge business.

Finally, The Sweetwater was justified in relying on the Forest Service's representations. First, the Forest Service was involved in the purchase of the lodge assets and clearly understood that the value of the lodge assets was totally dependent on them being operated as an on-going business. PPFF ¶¶ 14, 91. In order for the lodge owners to operate an on-going business, the Forest Service required any lodge owner to have a permit which specifically obligated it to provide a recreational business to members of the public. 36 C.F.R. § 251.50(a); PPUF ¶ 14. Without a permit, the assets would have to be removed. 36 C.F.R. § 251.60(h)(2)(i). In addition, by not placing any warning signs on its own bridges which it knew were the only way vehicles could access the lodge, the Forest Service was aware that its actions indicated that it had determined the bridges to be safe and usable by the lodge for its business. PPFF ¶ 39. Therefore, given the Forest Service's awareness of the significance of its bridges to lodge operations and that its keeping the bridges open to the public indicated their adequacy for lodge operations, The Sweetwater had every reason to rely on the Forest Service's representations and conduct.

Based on the same facts which show a tortious breach of contract, the Forest Service

breached the contract by failing to disclose superior knowledge related to the Forest Service's determinations that the bridges had been "basically condemned" back in 1992. The government breaches a contract where:

> (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor; and (4) the government failed to provide the relevant information.

*Petrochem Services, Inc. v. United States,* 837 F.2d 1076, 1079 (Fed. Cir. 1988)(citations omitted); *see The Federal Group, Inc. v. United States*, 67 Fed. Cl. 87, 100 (2005); *J.F Shea Co., Inc. v. United States*, 4 Cl. Ct. 46, 53 (1983). As the courts have held, when the government possesses superior knowledge, "[i]t cannot remain silent with impunity." *See The Federal Group*, 67 Fed. Cl. at 102, *quoting Hardeman-Monier-Hutcherson v. United States*, 198 Ct. Cl. 472, 475, 458 F.2d 1364 (1972).

In the present case, The Sweetwater undertook to perform the contract by providing commercial lodge operations without knowledge that the bridges over which its guests had to travel had in fact been found unsafe by the Forest Service and "basically condemned." PPFF ¶ 109. The Forest Service knew that The Sweetwater had no knowledge of these findings because they had not been disclosed outside the agency. PPFF ¶ 109. In addition, The Sweetwater had no reason to obtain this information because the bridges were currently open for public use, thus leading any reasonable person to believe that they had been found to be safe for public travel. PPFF ¶ 39. In addition, the Forest Service had placed official signs by the bridges stating that they were safe for public use in vehicles at or below 3 tons, further indicating that the bridges had been

load rated for that weight. PPFF ¶ 39. [9] Also, no contract terms placed The Sweetwater on notice to inquire about whether the bridges had been found to be unsafe. *See* JX 1. Finally, the Forest Service has admitted that they never provided The Sweetwater with the information about the unsafe condition of the bridges. PPFF ¶¶ 82, 85. While Mr. Rossman, who later signed the contract, stated that he was unaware of the information's existence and would certainly have disclosed it if he had known of it (PPFF ¶ 83), Ms. Watson stated that she would have provided it if The Sweetwater had shown more concern about the bridge condition. PPFF ¶ 84.

The foregoing demonstrates that the Forest Service's actions in 1995 in falsely representing the status of the Sweetwater bridges and withholding critical information as to the actual condition of those bridges constituted a breach of contract as either a tortious breach of the contract in this matter or due to its failure to disclose superior knowledge related to its evaluation of the condition of those bridges.

**III. The Forest Service breached its duty to cooperate and not to hinder contract performance by preventing funds from being used to replace the Sweetwater bridges, which were critical for commercial lodge operations.**

After some of the information regarding the Forest Service's inspection of the bridges in 1992 was disclosed in 1997 and The Sweetwater was forced to cease operations, the Forest Service then induced The Sweetwater to continue maintaining the lodge in preparation for resuming operations by reaffirming its commitment to seek funds to replace the Sweetwater bridges. However, as demonstrated below, the Forest Service instead was actually committed to preventing any further operations at the lodge, and took affirmative actions to block such operations. These

[9] In fact, no load rating had been made for the bridges, which made the signs indicating a specific safe weight completely misleading. PPFF ¶¶ 25, 28.

actions constituted a breach of the Forest Service's duty to cooperate and not hinder performance of the contract which it had entered into with The Sweetwater.

It is well-established that there is an "implied provision of every contract, whether it be one between individuals or between an individual and the Government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance." *Lewis-Nicholson*, 550 F.2d 26, 32 (Ct. Cl. 1977), *quoting George A. Fuller*, 69 F. Supp. at 411 (Ct. Cl. 1947); *L.L. Hall Construction Company v. United States*, 379 F.2d 559, 563 (Ct. Cl. 1966); *Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 58-59 (2001); *Walter Dawgie Ski Corporation v. United States*, 30 Fed. Cl. 115, 130 (1993); *Cedar Lumber, Inc. v. United States*, 5 Cl. Ct. 539, 549 (1984); *Steve Rados, Inc*., AGBCA No. 77-130-4, 82-1 BCA ¶ 15,624 (citing *Sacramento Nav. Co. v. Salz*, 273 U.S. 326, 329 (1927)).[10] This obligation is binding on the parties as if it were expressly written out in the contract (*Kehm Corp. v. United States*, 93 F. Supp. 620, 623 (Ct. Cl. 1950); *Precision Pine*, 50 Fed. Cl. at 54) and applies to the government just as it does to private parties. *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).[11]

The Court of Claims further held that:

Indeed, not only must the Government refrain from hindering the contractor's

---

[10]The duty to cooperate and the duty not to interfere are separate, but related duties. *Precision Pine*, 50 Fed. Cl. at 59, n.31. Breach of the duty to cooperate requires an unreasonable action or a failure to take essential action ("such as failing to help in a solution of a problem that has arisen in contract performance"), and breach of the duty not to interfere requires wrongful action or "active interference." *Id.* As the facts in this case demonstrate, the government has breached both of these duties.

[11] The duty also includes an obligation not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract. *Centex*, 395 F.3d at 1304.

performance, *it must do whatever is necessary to enable the contractor to perform*.

*Lewis-Nicholson*, 550 F.2d at 32 (emphasis added), *citing Kehm Corp*., 93 F. Supp. at 623 (Ct. Cl. 1950). Furthermore:

> [W]hen some government action is essential for the contractor to perform and the government wrongfully fails or refuses to take that action, then the government has breached its implied duty to cooperate.

*CEMS, Inc. v. United States*, 59 Fed. Cl. 168, 195 (2003), *quoting Ryco Constr., Inc. v. United States*, 55 Fed. Cl. 184, 192 (2002) (*citing* John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 297 (3d ed. 1995)).

This Court has recently held in explaining the duties to cooperate and not to hinder, which are part of the over-arching duty of good faith and fair dealing:

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor *believes his conduct to be justified*. But the obligation goes further; bad faith may be overt or may consist of inaction, and fair dealing may *require more than honesty*. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: . . . [evasion of the spirit of the bargain] . . . lack of diligence and slacking off . . . and interference with or failure to cooperate in the other party's performance . . . Similarly, under the implied duty not to hinder performance, Government actions that are unreasonable under the circumstances constitute a breach.

*Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 770 (2005), *quoting* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)(emphasis in original); *see also Tecom*, at 767, 770 (noting that a breach of the duty to cooperate and not to hinder can be caused by gross negligence or gross error in decision making as well as subterfuges, evasiveness and inaction). In addition, this duty has been expressed as the obligation "not to *willfully or negligently* interfere with the contractor in the performance of his contract." *Peter Kiewet Sons' Co. v. United States*, 138 Ct. Cl. 668, 674 (1954)(emphasis added). Further, claims for a breach of the government's duty to cooperate and

not to hinder are to be treated like any other claim for breach of contract and the presumption of good faith by the government has no relevance. *Tecom*, 66 Fed. Cl. at 771.

The specific nature and scope of the government's duty to cooperate and not to hinder is dependent on the particular facts and circumstances of the case at hand. *Commerce International Co. v. United States*, 338 F.2d 81, 86 (Ct. Cl. 1964) ("the nature and scope of [the duty to cooperate] is to be gathered from the particular contract, its context, and its surrounding circumstances"); *Walter Dawgie*, 30 Fed. Cl. at 130 ("the nature and scope of this duty depends on the facts and circumstances of the case"). As set forth below, the Forest Service's wrongful and unreasonable actions in the present case constituted a breach of its duty to cooperate and not to hinder The Sweetwater's performance of its contract.

### A. The purpose of the Term SUP, as well as the Forest Service's representations to The Sweetwater, demonstrate that the Forest Service was obligated to seek funding to maintain vehicular access to the lodge.

The Term SUP requires The Sweetwater to provide services to the public on the Shoshone as a commercial lodge. JX 1. However, vehicular access over the bridges on the Forest Service road leading to the lodge is essential for commercial lodge operations. PPFF ¶¶ 6-9. Therefore, it is clear that, by issuing the permit, the Forest Service not only intended to maintain vehicular access over Sweetwater Road in a manner that allowed contract performance, but was also obligated to take reasonable efforts to ensure such access was available. *See Lewis-Nicholson*, 550 F.2d at 32 (emphasis added)("not only must the Government refrain from hindering the contractor's performance, it must do whatever is necessary to enable the contractor to perform"),

*citing Kehm Corp*., 93 F. Supp. at 623 (Ct. Cl. 1950).[12] This obligation was further enhanced by the Forest Service's explicit representations to The Sweetwater at the time that The Sweetwater was considering the purchase of the lodge facilities and entering into the required contract with the Forest Service to operate those facilities. *See Commerce International Co. v. United States*, 338 F.2d 81, 86 (Ct. Cl. 1964) ("the nature and scope of [the duty to cooperate] is to be gathered from the particular contract, its context, and its surrounding circumstances"); *Walter Dawgie*, 30 Fed. Cl. at 130 ("the nature and scope of this duty depends on the facts and circumstances of the case"). As the current Forest Supervisor admitted, The Sweetwater was entitled to rely on the representations made by the Forest Service at this meeting. PPFF ¶ 47.

In order to maintain the lodge facilities on the Shoshone National Forest, the owner was required to enter into a Term SUP with the Forest Service. PPFF ¶ 14. The Term SUP required the lodge owner to "maintain[] and operat[e the lodge] as a public resort." JX 1. Prior to entering into the Term SUP at issue in this matter, The Sweetwater met with the Forest Service to confirm the scope of the Forest Service's commitment and obligations as to ensuring necessary vehicular access to the lodge which would enable this performance to occur. PPFF ¶¶ 45-88.

In that meeting, the Forest Service made representations to The Sweetwater, which it knew would be relied upon, that the agency was committed to ensuring access to the lodge facilities which were necessary for performance of the Term SUP. PPFF ¶¶ 48-49, 53-56, 60-68. These assertions included the Forest Service's statement that "it [is] our intent to keep the [Sweetwater]

[12]The duty to cooperate and not to hinder is a promise contained in the contract and The Sweetwater's claim that this promise was breached does not create a new obligation. *See Centex*, 49 Fed. Cl. 691, 709 n. 39 ("[A] party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations")(citations omitted), *aff'd*, *Centex*, 395 F.3d 1283 (Fed. Cir. 2001).

road open to the best of our ability." PPFF ¶ 53. Given that access to the lodge to allow for commercial operations was critical, the Forest Service further asserted that "it [is] our intent to support, to the degree that we [can], access to the lodge facility." PPFF ¶ 53. Moreover, because the Shoshone Forest Plan allocates the area around the lodge as being for the purpose of a lodge facility, the Forest Service agreed that it had a commitment to provide for the operation of the lodge to the extent it could. PPFF ¶ 55. The Forest Service also agreed that, if bridge access was lost and fords needed to be installed to maintain the facility, such an event would not affect the Forest Service's efforts to obtain funding for the bridges. PPFF ¶ 68. Moreover, it would have been illogical for the Forest Service to have issued the permit if it did not intend to maintain such access so that the permit could be performed. *See* Tr. 1665:22-1667:19.

While the Forest Service also pointed out that it could not guarantee that funding for the bridges could be obtained due to circumstances outside their control (such as the need for Congressional approval), this caveat did not exonerate the agency from an obligation to pursue such funding using its best efforts. As Mr. Rossman clearly stated, the Forest Service indicated that it would continue efforts to obtain funds to repair the bridges, but it could not guarantee that those efforts would be successful. PPFF ¶ 58. In fact, the only reason those funds were subsequently not obtained was because the Forest Service did in fact discontinue its efforts to obtain the funds. PPFF ¶¶ 146-154.

### B. The Forest Service's culpability in creating the situation in 1997 that precluded performance further established its duty to assist in maintaining vehicular access to the lodge.

The circumstances relevant to assessing the scope of the Forest Service's implied duties under the contract include not only the nature of the Term SUP, but also the fact that the Forest

Service itself created the problem faced by The Sweetwater as of 1997 and thereafter. This responsibility arose because of the Forest Service's failure to provide to The Sweetwater critically important information at the time The Sweetwater was purchasing the lodge assets in 1995. This information, which was provided to Mr. and Mrs. Sutherland in 1997 when they were interested in buying the lodge, caused the Sutherlands not to purchase the lodge. PPFF ¶ 110. This disclosure, which was not previously made to The Sweetwater, not only prevented The Sweetwater from selling the lodge, but it also prevented it from continuing to operate the lodge. PPFF ¶ 120. This inability to operate, which the Forest Service agreed with, was caused by the numerous liability as well as safety issues raised by the Forest Service's disclosure of the results of its previous bridge inspections. PPFF ¶ 120.[13]

The Sweetwater informed the Forest Service of its inability to conduct further lodge operations in early 1997 due to the bridge issue, thus making the Forest Service aware that the contract could not be operated because of the situation involving the bridges. PPFF ¶ 120. At this time, the Forest Service informed The Sweetwater in writing that it had placed the bridges on its priority list for funding which would be received in FY 1999. PPFF ¶ 115. The Forest Service qualified its assertion, and also at the same time confirmed its commitment to The Sweetwater, by pointing out that Congressional approval was the remaining required step for bridge replacement. *Id.*[14] This letter was written after the Forest Service had sent a prior letter to the Sutherlands

---

[13]The Sweetwater had an obligation under its contract to ensure and be responsible for the safety of its guests, and was even required under the contract to indemnify the government for any liability caused by its operations. JX 1 (clauses 28, 29). Therefore, if the government or The Sweetwater were sued for injuries caused to a lodge guest by the Forest Service's bridges being harmful, The Sweetwater would ultimately be financially responsible for the government's *own negligence*.

which represented to them that the likelihood of obtaining funding for the bridges was low. JX 11. Obviously, regardless of any separate representation made by the Forest Service to the Sutherlands as a prospective new contracting party, the Forest Service clearly represented to The Sweetwater as its current contracting party that access would be maintained and such funding for the bridges *would be sought* from Congress. JX 12. This representation that every effort would be made to obtain funding if the bridges became impassable was consistent with the prior representations made to The Sweetwater at the June 12, 1995 meeting. PPFF ¶¶ 58-68. Moreover, the Forest Service represented that the only event that could prevent the funding from being used to replace the bridges was if Congress denied it. JX 12 ("this funding is subject to Congressional approval and I cannot guarantee that it will be available at that time").

The Forest Service's responsibility for the circumstances surrounding the interference with contract performance are directly relevant to the scope of its duty to cooperate and not to interfere. *See Commerce International Co. v. United States*, 338 F.2d 81, 86 (Ct. Cl. 1964) ("the nature and scope of [the duty to cooperate] is to be gathered from the particular contract, its context, and its surrounding circumstances"); *Walter Dawgie*, 30 Fed. Cl. at 130 ("the nature and scope of this duty depends on the facts and circumstances of the case"). The Forest Service's actions not only directly caused the need to cease operations in 1997, but also involved an omission of critical information to The Sweetwater. This action then caused The Sweetwater to incur expenses with no ability to recoup them. The Forest Service's subsequent actions in rejecting funds to replace

[14]The Sweetwater was reasonable in construing the Forest Service's statements as limiting The Sweetwater's risk to the situation where Congress did not approve sufficient funds for replacement of the Sweetwater bridges. *See S.A. Healey Co. v. United States*, 576 F.2d 299, 305 (Ct. Cl. 1978)(finding that contractor was reasonable to construe clause qualifying government's liability as contingent on Congress making funds available to limit its own risk to this

the bridges constituted a breach of its obligation to cooperate and not to interfere with contract performance.

This case is distinguished from *Lenry, Inc. v. United States*, 297 F.2d 550 (Ct. Cl. 1962) because in *Lenry*, the interference with contract performance was due to an unforeseen Act of God, and was not caused or compounded by the fault of either party. *Lenry*, 297 F.2d at 551. In the present case, the inability to operate the lodge as a commercial resort as of 1997 was due to the Forest Service's previous failure to disclose critical information about the condition of the Sweetwater bridges. In addition, the plaintiff in *Lenry* was alleging that the government had guaranteed the availability of certain streets under a warranty of site availability, and the case did not involve a breach of the government's duty to cooperate and not to hinder contract performance. *Id.* *Oman-Fishbach International (JV) v. Pirie*, 276 F.3d 1380 (Fed. Cir. 2002) is similarly inapplicable because that case also involved an implied warranty of site availability. In rejecting such a warranty, the Court noted that the contract had explicitly required the contractor to assess for itself the conditions of the site, which thereby refuted any implied warranty. *Id*. at 1384-85. No such obligation was placed on The Sweetwater under its Term SUP.

**C. Because of The Sweetwater's reliance on the Forest Service's specific assurances prior to entering into the contract as well as during the contract, the Forest Service could not cease its efforts to seek and apply available funds to restore vehicular access to the lodge.**

The Forest Service's assurances to The Sweetwater prior to the parties entering into the Term SUP as to its intent to pursue funding needed for vehicular access to the lodge were critical for contract performance. In addition, because Sweetwater Road was the only means by which

contingency).

vehicles could access the lodge facilities, once The Sweetwater entered into the contract with the Forest Service, it had no alternative options for performance in the event the Forest Service decided to prevent funding for the bridges if such funding became necessary. Thus, because of this reliance, the Forest Service was not free to cease its efforts towards maintaining vehicular access to the lodge after the Term SUP was executed. *See S.A. Healey Company v. United States*, 576 F.2d 299, 306-307 (Ct. Cl. 1978).

The facts clearly show that, after inducing The Sweetwater to enter into the Term SUP, the Forest Service subsequently ceased further efforts to obtain needed funding for vehicular access to the lodge. Unknown to The Sweetwater, in 1999, the funding for the initial phase in replacing the Sweetwater bridges was approved by Congress and received by the Forest Service. PPFF ¶ 149; Defendant's Corrected Proposed Findings of Uncontroverted Facts ¶ 92. However, in the interim, Mr. Larson had decided that the lodge was not the best use of the permit area. PPFF ¶ 127. As a result, he had initiated an effort to locate a so-called private "conservation buyer," such as an environmental group, that would purchase the lodge from The Sweetwater, terminate the Forest Service permit, remove the lodge assets and return the land in the permit area to its natural state. PPFF ¶¶ 127, 130. And this buyer would do so at no expense to the Forest Service. PPFF ¶ 130.

While Mr. Larson had informed The Sweetwater of his belief that the lodge was not the best use of the permit area and of his efforts to locate a conservation buyer, he *never* informed The Sweetwater that he intended to cease pursuing funds to replace the bridges, much less actually block the use of any such funds that were received because it was inconsistent with the goal of obtaining a conservation buyer. PPFF ¶ 163. Even without his informing The Sweetwater of this critical fact, The Sweetwater told Mr. Larson that it believed that pursuit of a conservation buyer was *not* a worthwhile endeavor because such a buyer would not likely be able to pay a fair price for

the lodge. PPFF ¶ 145. Obviously, the lower the lodge value, the better the chance that a conservation buyer could acquire it. Mr. Larson was aware that the absence of bridges could cause a reduction in the lodge value and increase the likelihood that a conservation buyer could purchase the lodge. PPFF ¶ 141 (Mr. Larson stated that "if you don't have access, you don't have value").[15]

In late 1999, James Fischer, the Forest Service employee responsible for receiving and applying funding for bridge projects, informed Mr. Larson that funding needed to replace the Sweetwater bridges had been received. PPFF ¶ 150. Mr. Larson informed Mr. Fischer that the funds should be rejected because he was in the process of locating a conservation buyer and was "pretty positive" he would do so. PPFF ¶ 150. Replacement of the bridges would be inconsistent with this effort and would also decrease the chances of its success because it would bolster or increase the sale price of the lodge. Mr. Fischer agreed with this strategy and took the affirmative action of rejecting the funding. PPFF ¶ 151. However, at this time, the Forest Service had no sales agreement or indication that any party would likely buy the lodge. PPFF ¶ 156. Mr. Fischer, who was the employee responsible for managing these types of projects, stated that if the funding had not been rejected, the bridges *would have been built*. PPFF ¶ 157.[16]

---

[15]Mr. Larson agreed with the subjective views of the conservation buyers he had talked to that The Sweetwater's sales price was too high (even though those buyers had not completed any appraisal) and would have to come down in order for any sale to a conservation buyer to occur. PPFF ¶ 140. Mr. Larson's actions, either by omission or commission, to reduce the value of the lodge constituted a breach of the Forest Service's duties under the contract.

[16]Mr. Larson testified that it was his intention that if no conservation buyer was located, the Forest Service would then replace the bridges. PPFF ¶ 168. No conservation buyer was ever located, but the Forest Service never replaced the bridges. Instead, when it was clear to the Forest Service that no conservation buyer would buy the lodge and allow for termination of lodge operations, Rebecca Aus, the Shoshone Forest Supervisor, ordered The Sweetwater to operate without the bridges (which it was aware could not be done) or be found to be in breach of the contract. JX 21. Mr. Larson called this a "radical" change of direction in the administration of the

The one hurdle to bridge replacement the Forest Service had identified to The Sweetwater in its February 27, 1997 letter, *i.e.*, the need for Congressional approval, was in fact overcome. PPFF ¶ 149. In addition, Forest Service Regional Office support for the funding to replace the bridges was obtained. PPFF ¶¶ 149, 159. After taking all actions necessary to secure the funding and after the funding was *actually received* by the Forest Service, the funding was then rejected by the Shoshone. PPFF ¶¶ 151-153. And the reason for the rejection was because Messrs. Larson and Fischer, with the consent of the Forest Supervisor, determined that it was in the public interest to cease all permit operations. PPFF ¶ 153.

This decision to affirmatively and deliberately block the funds which the Forest Service had told The Sweetwater it would seek and which had already been received as part of the effort to replace the bridges constituted a breach of the Forest Service's duty to cooperate and not to hinder.

> When the Government fails to take essential action, or when the Government's conduct during contract performance is unreasonable such as failing to help in a solution of a problem that has arisen in contract performance, it will be said to have breached its implied duty to cooperate with the performance of the contract.

*Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 59 (2001). In the present case, the Forest Service was aware that vehicular passage over the bridges was essential to performance of the contract. PPFF ¶ 6-9.[17] In recognition of this fact, the Forest Service stated to The Sweetwater in 1997 that it would seek funds from Congress to replace the bridges and The Sweetwater relied

---

Term SUP. PPFF ¶ 186.

[17]Furthermore, if the Forest Service believed lodge operations could occur without vehicular access, it would not have allowed The Sweetwater to remain closed from 1997-2001 solely because there was no vehicular access. PPFF ¶ 121. This lengthy pre-dispute conduct of the Forest Service is especially persuasive in further showing that the Forest Service recognized that the lodge could not operate without vehicular access.

on this representation. PPFF ¶ 12. Moreover, The Sweetwater's inability to perform the contract in 1997 arose because of the fact that the Forest Service had failed to inform it that the Forest Service's own bridge inspectors had "basically condemned" the bridges in 1992. The Forest Service's representation that it would make efforts to solve the problem created by its own improper conduct, and then its subsequent (and secret) decision to *affirmatively block* the solution to the problem, was unreasonable.[18] Further, given the clear interference that occurred which violated its implied duty, the government is incorrect in arguing that, in the absence of an explicit provision in the contract stating that the Forest Service would seek funds to replace the bridges, it is precluded from any liability for its deliberate actions to *block* funding that already had arrived.

As demonstrated by *S.A. Healey Company v. United States*, 576 F.2d 299, 306-307 (Ct. Cl. 1978), once the government informs a contractor that it intends to seek funds to assist contract performance, it has an obligation to do so under its duty to cooperate and not interfere even though it otherwise may not have been contractually required to seek funds. In *S.A. Healey*, the contract stated that funds would be made available under the contract for compensating the contractor, but the liability of the government for funding was contingent on Congress making the funds available. *Id*. at 300. The contractor submitted its estimated earnings under the contract for the following year which the agency approved, but the agency subsequently only sought a portion of those costs from Congress. *Id*. at 301-02. As a result, the contractor had to suspend operations when funding was exhausted. *Id.* at 302. The contractor then sought an equitable adjustment for

[18]Even if the Forest Service had discretion as to how it applied its funds or whether to terminate the contract in the public interest, this discretion does not immunize it from having breached the contract based on other representations or commitments. *Son Broadcasting, Inc. v. United States*, 42 Fed. Cl. 532, 537 (1998) ("Even with discretion, defendant could have breached its promises to plaintiff, a conclusion that is supported here by plaintiff's allegations of fact").

its costs in having to suspend operations, which the agency denied. *Id*. at 302. The contractor filed a claim for its costs, asserting that after the government had agreed to its estimated earnings schedule, it had a duty to at least seek those funds from Congress. *Id*. at 303. The Court agreed, noting that "[i]t seems to us not unreasonable to require either that the agency request the amounts it has approved for earnings under the contract, or, alternatively, to disapprove the construction program [and allow the contractor to avoid its costs]. This is simply part and parcel of the implied duty of cooperation and noninterference which is inherent in any contract." *Id*. at 306-07 (citations omitted).

In the present case, the Forest Service stated to The Sweetwater that it would seek funds for replacement of the Sweetwater bridges should such funding become necessary, but then after The Sweetwater entered into a contract with the Forest Service and funding became necessary, it decided to reject funds which in fact had been received for the purpose of replacing the Sweetwater bridges. In addition, it then decided to not seek any such funds in the future but instead to prohibit vehicular access up Sweetwater Road. PPFF ¶¶ 192-193.

**D. The Forest Service's specific reasons for blocking available funding from being used to restore vehicular access to the lodge constituted a breach of its implied duty to cooperate and not to hinder performance of the contract.**

The unreasonableness and wrongfulness of the Forest Service's conduct is further augmented by the *reason* the available funds were blocked from being used towards replacing the bridges. Mr. Larson interfered with the use of funds to replace the bridges (which would have maintained the fair market value of the lodge) in order to facilitate termination of lodge operations for the public interest through the solicited involvement of a third party (a so-called "conservation buyer"). By obtaining a conservation buyer, the Forest Service would achieve a substantial

amount of desired benefits and avoid a substantial liability.

First, the Forest Service would obtain the desired cessation of lodge operations and removal of the lodge. PPFF ¶¶ 129, 130. The Forest Service had agreed with local environmental groups that the lodge was located in and detrimental to a prime habitat area for sensitive and threatened wildlife species such as grizzly bears, big horn sheep and elk. PPFF ¶ 133-135. Second, the road to the lodge, which was necessary for lodge operations, was causing harmful environmental impacts to Sweetwater Creek. PPFF ¶ 136. However, the road was necessary for lodge operations. PPFF ¶¶ 6-8. And finally, Mr. Larson was acting specifically to save the Forest Service the financial cost of having to maintain the road and bridges, which he felt the Forest Service was obligated to do while the lodge was present. PPFF ¶ 142.

Because the Forest Service's actions caused The Sweetwater to be in the situation where it owned a lodge it could not operate, the Forest Service had a clear obligation to assist in a solution to the problem. However, by representing that it would seek funding for replacing the bridges, the Forest Service caused The Sweetwater to take the reasonable action of continuing to incur costs while it awaited the funding for that replacement. PPFF ¶ 118. Because The Sweetwater continued to inquire about the status of the Forest Service's funding efforts (PPFF ¶ 167), the Forest Service was clearly aware of The Sweetwater's reliance on its representations.

These actions constitute a breach of the Forest Service's duty to cooperate and not to hinder The Sweetwater's performance of its contract. *Lewis-Nicholson,* 550 F.2d 26, 32 (Ct. Cl. 1977), *quoting George A. Fuller*, 69 F. Supp. at 411 (Ct. Cl. 1947); *L.L. Hall Construction Company v. United States*, 379 F.2d 559, 563 (Ct. Cl. 1966); *Precision Pine & Timber, Inc. v. United States,* 50 Fed. Cl. 35, 58-59 (2001); *Walter Dawgie Ski Corporation v. United States,* 30 Fed. Cl. 115, 130 (1993); *Cedar Lumber, Inc. v. United States,* 5 Cl. Ct. 539, 549 (1984); *Steve Rados, Inc.*,

AGBCA No. 77-130-4, 82-1 BCA ¶ 15,624 (citing *Sacramento Nav. Co. v. Salz*, 273 U.S. 326, 329 (1927)).

The Sweetwater, however, does not need to prove bad faith to prove a breach occurred. Unreasonable or wrongful conduct is all that is required. *Precision Pine*, 50 Fed. Cl. at 59, n.31. The Forest Service's self-serving and misleading conduct which violated its contractual obligations also resulted in substantial harm to The Sweetwater. Moreover, the Forest Service's actions have in fact resulted in exactly what it sought – a cessation of lodge operations at no cost to the Forest Service. The Forest Service's conduct in this matter is a clear and glaring example of exactly the type of behavior that the implied duty to cooperate and not to hinder is intended to prevent.

**E. Even if the Forest Service had decided to cease efforts to fund the repair of the Sweetwater bridges because the bridges were too low of a priority compared to other projects on the Forest, this decision would still constitute a breach of the Forest Service's implied duty to cooperate and not hinder contract performance.**

While the very clear testimony of Mr. Fischer as well as other evidence contradicts her claim, the Forest Supervisor, Ms. Aus, has asserted that she decided in 1999/2000 to cease further efforts towards obtaining funds for repairing the Sweetwater bridges because she decided she had higher priority projects to fund. Tr. 1657:16-1658:5; *see* PPFF ¶¶ 151-153. However, even if Ms. Aus's assertion was credible, the Forest Service was not free to cease its efforts to seek funds to replace the Sweetwater bridges.

Ms. Aus has testified that it was her opinion in 1999-2000 that the funds should not be used to replace the bridges, but she asserts that the decision not fund the replacement of the Sweetwater bridges had absolutely nothing to do with the Forest Service's pursuit of a conservation buyer. Tr.

1655:1-10 ("I don't recall hooking the conservation buyer together with the bridges at all"). She has asserted that she had informed Mr. Larson in a meeting that the funds were better used for higher priority projects and that the funds were instead used on the Wapiti Campground project. Tr. 1657:18-1658:5; Tr. 1675:12-21. However, Mr. Larson has no recollection of her ever identifying projects which she believed were a higher priority. Tr. 1207:18-1208:25. Furthermore, Mr. Larson very clearly stated that the funding source for the bridges and the Wapiti Campground were two separate pools of money. Tr. 997:2-17. Therefore, it was not possible for funds for the bridges to have been used for the Wapiti Campground, as Ms. Aus asserted. In fact, Mr. Fischer admitted that no such request to apply the funds to different project was made nor was it possible. PPFF ¶ 155.

Also, while Ms. Aus asserted that she made the decision not to fund the Sweetwater bridges, Mr. Fischer's very clear testimony was that, while Ms. Aus was involved in the discussions, the decision to reject the funding for the Sweetwater bridge was made by he and Mr. Larson and subsequently approved by Ms. Aus, and that the decision was based on their intent not to interfere with the Forest Service's pursuit of a conservation buyer. PPFF ¶¶ 151-153; *see* PPFF ¶ 50 (decisions on funding issues "came down to Mr. Fischer"). Even when Mr. Fischer contacted the Regional Office to inform it of this decision, he very clearly stated that the decision was based on pursuit of a conservation buyer and not specific projects that had a higher priority. PPFF ¶ 153.[19] Ms. Aus's testimony that she does not "recall" the two issues ever being "hooked up" stands in stark contrast to Mr. Fischer's testimony as well as Mr. Larson's testimony. Moreover, as Ms. Aus acknowledged, there is no documentation in any of the voluminous record in this case

---

[19] Ms. Aus acknowledged that Mr. Fischer was in charge of budget and funding issues as

which supports her assertions. Tr. 1681:23-1682:9.

Ms. Aus further alleged that in her mind she simply could not justify funding the bridges and doing so would not pass the "red face test." Tr.1663:11-24 (the transcript incorrectly reads "red base test"). However, the fact that the Forest Service was subsequently willing to place the Sweetwater bridges <u>at the top of its funding list</u> in exchange for The Sweetwater withdrawing its complaint in this case contradicts the Forest Supervisor's assertions that an effort to fund the bridges was contrary to the public interest. *See Sweetwater* at 10; Tr. 1663:11-1664:13.

Moreover, even if the Forest Supervisor's testimony were accepted as true (contrary to the overwhelming evidence), it does not exonerate the Forest Service in this matter. While the Forest Supervisor may have believed that she had discretion to apply her funds regardless of her agency's prior assertions to The Sweetwater when it was considering entering the contract, it is a "principle of appropriation law" that "in the absence of a statutory cap or other explicit statutory restriction, an agency is *required* to reprogram [funds] if doing so is necessary to meet debts or obligations. In other words, '[i]n some situations, the agency's discretion may rise to the level of a duty.'" *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1086 (Fed. Cir. 2003), *aff'd*, 125 S. Ct. 1172 (2005), *citing* GAO Redbook at 2-26. Because the Forest Service had an obligation pursuant to its contractual duties under the Term SUP, the Forest Supervisor did not have discretion to block funding or redirect it to other projects.

Given that the ability to perform the contract hinged on vehicular access over the Sweetwater bridges, if the Forest Service had entered into the Term SUP with the unexpressed view that it could take actions to prevent vehicular access to the lodge, its conduct would have

---

well as pulling together the views of the Forest related to these issues. Tr. 1650:11-1651:2.

been tantamount to fraud. *See Centex Corp. v. United States*, 49 Fed. Cl. 691, 709 (Fed. Cl. 2001)(holding that if the government had entered into contract negotiations with the view that it could, "in its unfettered discretion," later take action to prevent the other party from the benefits it was entitled to under a contract, such action would be "tantamount to fraud"), *aff'd*, *Centex Corp. v. United States*, 295 F.3d 1283 (Fed. Cir. 2005).

The Forest Service has asserted in its defense that it was acting out of concern for the United States taxpayer. Tr. 24:13-17. While the government enters into contracts in its proprietary capacity, the government's assertion appears to be an effort to invoke its sovereign role as a form of defense to this breach claim. However, even if such issues were relevant to its defense in this contract breach action, it is never in the interest of the taxpayer when the government breaches its contracts with taxpayers. The Court's comments in *Franconia Associates* are equally applicable here:

> While [the government's] solipsistic approach does not directly implicate Congress' waiver of sovereign immunity, it does so indirectly, clashing with the sentiments underlying Judge Cardozo's oft-quoted statement that "[t]he exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced." *Anderson v. Hayes Constr. Co.*, 243 N.Y. 140, 147, 153 N.E. 28, 29-30 (1926). One looking for further evidence of this need go no farther than the report accompanying the 1860 legislation that greatly expanded the jurisdiction of this court's predecessor, in which Congress observed that the government's "obligations to pay its debts and perform its contracts is quite as imperative as those which rest upon other parties amenable to the laws." H. Rep. 513 at 2 (1860). The same report continued that "when the government enters into a contract," "its rights, duties, and obligations are to be adjudged and considered in all respects and in all places precisely as if it were a private party; and when it approaches the altar of justice, and submits its rights to the jurisdiction of civil judges, it comes, in all respects, as an ordinary suitor. There is no law for the citizen, in respect to obligations of a pecuniary character, which the government is not bound to observe. . . . " Id. at 4-5.

*Franconia Associates v. United States*, 61 Fed. Cl. 718, 770-771 (2004).

## IV. The Forest Service breached the contract by failing to compensate The Sweetwater as required under clause 15 in situations such as the present where it terminates lodge operations in the public interest.

The Term SUP at issue contains a clause that requires the Forest Service to compensate The Sweetwater in the event that the Forest Service terminates lodge operations under the permit. JX 1 (clause 15). The Forest Service in fact made such a decision when it decided to block the replacement of the Sweetwater bridges by preventing funding made available for that purpose from being used. In addition, the Forest Service again reiterated this decision more recently by deciding to tear down the Sweetwater bridges and restrict vehicular access over the North Fork bridge, thereby effectively preventing the performance of any commercial lodge operations called for under the Term SUP. Because the Term SUP contains a contract provision that addresses situations where the Forest Service has terminated lodge operations, but the Forest Service has failed to invoke that clause, the Forest Service's actions constitute a breach of contract.

In the present case, after talking to his superiors about his conclusions, Mr. Larson, the Forest Service line officer who was authorized to administer the permit and who oversaw the land area where the lodge is located (referred to as the "Wapiti District"), decided that the lodge operations were not the best use of the land. PPFF ¶¶ 127-129, 144. Accordingly, he sought a method in which lodge operations would be terminated. PPFF ¶¶ 127-145. This involved locating a private conservation buyer who would tear the lodge down. PPFF ¶¶ 127, 130. He shared his strategy with the Regional Forester, Forest Supervisor and others in the Forest Service, all of whom approved it. PPFF ¶ 144. As a direct part of his strategy, Mr. Larson blocked the repair of the Sweetwater bridges because that repair was not consistent with, and in fact would interfere with his goal of terminating lodge operations. PPFF ¶¶ 146-153. Preventing the repair of The

Sweetwater bridges prevented continued lodge operations, essentially terminating them. PPFF ¶¶ 6-9.

The Sweetwater's contract contains a specific clause which obligates the Forest Service to compensate The Sweetwater when the Forest Service terminates lodge operations under the permit for the public interest as opposed to the permit holder's fault. JX 1 (clause 15). While the Forest Service did in fact deliberately terminate lodge operations through its actions for a greater public benefit, it has refused to compensate The Sweetwater under its contract as it is required to do. This failure constitutes a breach of The Sweetwater's contract and makes the Forest Service liable for compensation as otherwise calculated under the applicable contract clause.

Clause 15 of the contract states:

> If during the term of this permit or any extension thereof, the Secretary of Agriculture *or any official of the Forest Service acting by or under his authority shall determine that the public interest requires termination of this permit*, this permit shall terminate upon thirty days' written notice to the permittee of such determination, and the United States shall have the right thereupon to purchase the permittee's improvements, to remove them, or to require the permittee to remove them, at the option of the United States, *and the United States shall be obligated to pay an equitable consideration* for the improvements or for removal of the improvements and damages to the improvements resulting from their removal.

JX 1 (clause 15)(emphasis added). In the present case, the Forest Supervisor had delegated to Mr. Larson, as she was authorized to do under Forest Service policy, the authority that had been delegated to her to administer the terms of The Sweetwater Term SUP, which included clause 15. PPFF ¶ 50; 36 C.F.R. § 251.52. In addition, the Forest Supervisor was advised by Mr. Larson of his actions in seeking a conservation buyer and blocking funds to replace the bridges because of this strategy. PPFF ¶ 144. Even if Mr. Larson did not have sufficient authority to undertake this action, the Regional Forester's and Forest Supervisor's approval of his conduct ratified those actions. PPFF ¶ 144; *see United States v. Beebe*, 180 U.S. 343, 354 (1901).

Mr. Larson's actions were motivated by the desire, which was shared by local environmental groups, to put the land area where the lodge operations occurred to a better public use. PPFF ¶¶ 131-139. This motivation was shared by both the Regional Forester and Forest Supervisor. PPFF ¶ 144. This use included removing the lodge to improve the habitat for sensitive or endangered wildlife species such as the grizzly bear, big horn sheep and elk. PPFF ¶ 138. It also included eliminating an on-going harm to Sweetwater Creek due to the sedimentation that occurred from run-off coming from Sweetwater Road. PPFF ¶ 136. The actions were also driven by the motive of eliminating an on-going Forest Service financial output caused by its continuing upkeep of the road and bridges leading to the lodge. In other words, Mr. Larson was acting with the approval of his superiors to save the Forest Service money. PPFF ¶ 142. When Mr. Larson was informed that funding that had been previously sought for the specific purpose of replacing the bridges had arrived at the Forest Service from Congress, he took the affirmative step of ensuring that funding was not used for that purpose. PPFF ¶ 147. This action completed the goal of terminating lodge operations given that he was aware that lodge operations had not been occurring, and would not be able to occur without passable bridges.

In a similar situation involving a Forest Service timber sale contract, the Forest Service attempted to escape the obligations it had contractually agreed would apply when it took certain actions by not formally invoking the contract clause that contained the obligation. *Wetsel-Oviatt Lumber Co. Inc. v. United States*, 38 Fed. Cl. 563, 569-570 (1997). The Court rejected this effort. In *Wetsel-Oviatt*, the contract obligated the Forest Service to compensate the purchaser when the government terminated a portion of the contract. *Id.* at 569-570. While the government admitted that it had effectively terminated the contract, it claimed that because it had not formally invoked the contract clause providing compensation for such terminations, it had no obligation to

compensate the purchaser. *Id.* at 570. The Court relied on a similar conclusion reached by the AGBCA in resolving another case where the Forest Service tried the same tactic.

In that case, *Davidson Industries, Inc.*, AGBCA No. 95-166-1, 96-2 BCA ¶ 28,299 (1996), the Forest Service suspended a contract for environmental reasons and the contract contained three clauses obligating the Forest Service to compensate the purchaser in such an event. *Id.* at 141,302-03. In that case, the Forest Service argued that a particular clause providing for compensation in the situation that existed was not applicable because it required a formal decision by the Chief of the Forest Service. *Id.* at 141,303-304. As summarized by the Court of Federal Claims:

> In *Davidson*, the government attempted to escape compensating a contractor for timber the government deleted from a timber contract by taking refuge behind procedures required for modification and termination of the contract, even though the government had, in substance, already canceled portions of the contract. So too in the instant case.

*Wetsel-Oviatt*, 38 Fed. Cl. at 569-570. The Court in *Wetsel-Oviatt* also concluded, as had the *Davidson* board panel, that:

> Although clause C8.2 vests the Chief of the Forest Service with authority to terminate, the Forest Service cannot seek to avoid determination that a termination has effectively taken place—particularly where the government has conceded that a termination has taken place—because documentation does not indicate the Chief of the Forest Service's formal approval. *See Davidson Indus. Inc.*, 96-2 BCA ¶ 28,299 at 141,303-304.

In the present case, the Forest Service clearly took direct and deliberate affirmative actions to terminate lodge operations. Whether or not it complied with each particular formal procedural requirement under clause 15 of the contract is irrelevant where an effective termination has occurred. In such an instance, the Forest Service is contractually liable under clause 15 of the permit to compensate The Sweetwater for its actions.

**V. The Forest Service is liable to The Sweetwater for all damages directly flowing from the Forest Service's breach of contract, which total $2,408,750.**

As demonstrated above, the Forest Service has breached its contract with The Sweetwater and is therefore liable to The Sweetwater for all reasonable and consequential damages resulting from the breach. "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001). Had the Forest Service not breached The Sweetwater's contract, The Sweetwater would have been able to operate from 1997 through 2005, and then would have been compensated for the lodge pursuant to clause 15.

The Sweetwater's damages include its unrecovered operating expenses, which total **$520,000** from 1997 through March 2006. PX 42; PPFF ¶ 202. These costs involve actual operating expenditures incurred by The Sweetwater during the period it was unable to operate under its permit. In addition, The Sweetwater is entitled to its lost net profits above and beyond these expenditures. Using The Sweetwater's projected business plan methodology at PX 41, these lost profits total $1,667,007 for the period 1997-2014. PX 41 (p. 10). Using The Sweetwater's actual profits from 1996 as a base number, (*i.e,* the claims letter methodology), these lost profits total $960,000 for the period 1997-2014.[20] As of the trial date in 2005 (September 2005), the average of total profits for the period 1997-2005 (business plan profit of $880,000 and claim's

[20] Lost profits for the entire contract period that The Sweetwater was unable to operate, 1997-2014, would average $1,313,500 (using $1,667,007 and $960,000), and all totals in lost profits have been discounted back to the September 2005 value using an 8% discount rate. *See* PX 42 (p. 10).

letter methodology of $492,500) would equal **$661,250**.[21] In addition, the present market value of the lodge facilities was established by The Sweetwater's expert as $900,000, and the reproduction cost less depreciation was $1,475,000. The average of these two figures is $1,187,500. With an additional annual increase of 4% applied to figure, the total is **$1,227,500.** This figure best represents the appropriate damage figure for the lodge facilities as of 2005. Thus, the total damages incurred by The Sweetwater which were caused by the Forest Service's breach total **$2,408,750**, plus applicable CDA interest.

As the Federal Circuit has held, "[t]he ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision.: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" *Bluebonnet Savings*, 266 F.3d at 1355, *quoting Elec. & Missile Facilities, Inc. v. United States*, 189 Ct. Cl. 237, 416 F.2d 1345, 1358 (Ct.Cl. 1969)(*quoting Specialty Assembling & Packing Co. v. United States*, 174 Ct. Cl. 153, 355 F.2d 554, 572 (1966). In addition, "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Tallman Bank, FSB v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003). As shown below, The Sweetwater has established its damages with sufficient evidence.

*A. Operating expenses actually incurred*

Because the Forest Service breached the contract by failing to disclose to The Sweetwater its 1992 bridge inspection reports, The Sweetwater was unable to operate its lodge from 1997 to

[21] These damages are not duplicative with The Sweetwater's claim for operating expenses because, had the Forest Service not breached The Sweetwater's contract, The Sweetwater would have recouped its operating expenses, as well as receiving its lost profits. *See* PX 41 (p.

the present. During the period 1997-2004, The Sweetwater incurred $459,201in operating costs to maintain its lodge facilities. The costs have been documented and established with certainty. *See* PX 42; PPFF ¶¶ 197-203. The additional expenses for 2005 have been estimated as approximately $60,800. PPFF ¶ 202. However, because The Sweetwater was not operating, it could not recoup these costs with revenue from lodge operations. Therefore, The Sweetwater is entitled to these foreseeable costs totaling **$520,000** as damages caused by the breach.

*B. Lost profits*

Lost profits can be recovered where the preponderance of evidence shows (1) that they were the proximate result of the breach, (2) they were within the contemplation of the parties because the loss was foreseeable, and (3) there is a sufficient basis for estimating their amount with reasonable certainty. *LaVan v. United States*, 382 F.3d 1340, 1351 (Fed. Cir. 2004). In addition, "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery," and the court's duty is to "make a fair and reasonable approximation of the damages." *Bluebonnet Savings*, 266 F.3d at 1356-57, *quoting Ace-Federal Reporters, Inc. v. Barra*m, 226 F.3d 1329, 1333 (Fed. Cir. 2000), *quoting Locke v. United States*, 151 Ct. Cl. 262, 283 F.2d 521, 524 (1960). In addition, The Sweetwater's lost profit evidence demonstrates that this is a case where "the trial court [can draw] reasonable inferences based upon the evidence, not a case in which the trial court [must] engage[] in unsupported speculation. *See Locke v. United States*, 283 F.2d 521, 524, 151 Ct. Cl. 262, 267-68 (1960)("Certainty [of damages] is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the

10)(deducting operating expenses from total profits).

damages. In circumstances such as these we may act upon probable and inferential as well as direct and positive proof"); *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1329 (Fed. Cir. 2002). As shown on PX 42, The Sweetwater's lost profits total $830,000 for the period 1997 through March of 2006. Had the Forest Service not breached its contract, The Sweetwater would have been able to operate during this period. *See* JX 1. Thus, this amount represents the total amount of lost profits which The Sweetwater would have been entitled to earn under the contract given the effective termination as of 2005 under its business projections.[22] Using The Sweetwater's actual profits from 1996, the total amount of profits which The Sweetwater would have received from 1997 through March 2006 would have been $492,500. PPFF ¶ 205. The average of these two lost profit figures is **$661,250**.

In addition, because The Sweetwater operated in 1996, it was not a new venture. Regardless, the Federal Circuit has held that new ventures are not precluded by law from establishing lost profits. *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1326-27 (Fed. Cir. 2002). In addition, the established profitability of the other lodges in the area, which the government admitted were comparable operations, further supports the reasonable certainty of The Sweetwater's profits. *See* DX 62 (pp. 62/58-62/63 (discussing profits of comparable lodges on the Shoshone National Forest).

Finally, The Sweetwater's claim for lost profits does not include the expenses which it actually incurred between 1997-2005. Therefore, recovery of both its operating expenses as well

---

[22] Because the contract term extended until 2014, if the Forest Service is deemed to be liable for future lost profits, The Sweetwater would be entitled to the total amount of profits it would have earned through 2014. These additional profits total $1,667,000 based on the business plan methodology (PX 41) and $960,000 by the claims letter methodology. The average of these two figures is **$1,313,500**.

as its lost profits does not result in duplicative damages.

*C. Value of Sweetwater Lodge*

Because the lodge facilities must be operated as a commercial resort or be removed from the Shoshone National Forest, the facilities have no value if this use is precluded. As demonstrated at the trial, the Forest Service precluded this use by rejecting funds which would have restored commercial operations through replacement of the bridges.

In addition to its unrecovered operating expenses and lost profits, The Sweetwater is entitled to "equitable consideration" for the lodge facilities pursuant to clause 15 of the Term SUP. JX 1. As the evidence set forth above demonstrates, the Forest Service conclusively terminated operations under the permit by deciding to tear out the Sweetwater bridges and prohibit any vehicular access over the North Fork bridge. Under the terms of the contract, The Sweetwater is entitled to "equitable consideration" for its lodge facilities in the event the Forest Service decides to terminate operations. JX 1 (clause 15). The Forest Service's actions essentially, effectively and knowingly resulted in the termination of operations. Thus, The Sweetwater is entitled to the compensation constituting equitable consideration owed to it under the terms of the contract. The Sweetwater demonstrated that the reproduction cost of the lodge facilities, less physical depreciation, was $1,475,000. *See* PX 45; PPFF ¶¶ 227-235. This value represents what it would cost The Sweetwater to rebuild the same structure which it currently owns on the Shoshone. PPFF ¶¶ 227-235. This general method of valuing the lodge is the same method used by the Forest Service's sister agency, the National Park Service, in contracts which that agency has with its concessioners on National Parks. PPFF ¶ 228; s*ee Fordyce v. United States,* 7 Cl. Ct. 591, 594-95

(1985).[23] In fact, this method was used by the National Park Service on concession buildings in Yellowstone National Park, which is adjacent to Shoshone. PPFF ¶ 228. Thus, the fact that this method is used by a sister agency in very comparable situations demonstrates that it constitutes a reasonable method by which to assess "equitable consideration."

In the alternative, The Sweetwater also established that the fair market value of the lodge as of May 2005 was $900,000. PX 44; PPFF ¶¶ 211-226. This value was based on what a willing buyer would pay to a willing seller and reflects the amount which The Sweetwater would have received had it sold the lodge as of this date. The average of these two figures is $1,187,500. When an increase of 4% annually for the period May 2005 through March 2006 is added, the total becomes **$1,227,500**.

The validity of this figures is confirmed by applying the projected income valuation approach, as follows. *See* Tr. 464:2-466:23. The Sweetwater has submitted both a claims letter (JX 23) and a draft financial business plan (PX 41). Utilizing the same methodology as the claims letter, The Sweetwater's projected earnings for the 2005 season are at least $60,000. Utilizing the business plan methodology, The Sweetwater's projected earnings are at least $104,000. The average of these two methodologies is $82,000. Utilizing the projected income valuation approach and multiplying the $82,000 by 15, the lodge value is shown to be $1,230,000, which is comparable to the $1,227,500 average shown above. Tr. 464:2-466:23.

Finally, award to The Sweetwater of its operating expenses, lost profits and the value of the lodge does not place The Sweetwater in a superior position than it would have been had the Forest

[23] The contract in *Fordyce* also included a cap on the value of the lodge set at its fair market value. *Fordyce, 7* Cl. Ct. at 595. However, the compensation clause under the Term SUP has no such cap. *See* JX 1 (clause 15).

Service not breached. *See Bluebonnet Savings Bank FSB v. United States*, 67 Fed. Cl. 231, 236 (2005). This fact is true because, but for the breach, The Sweetwater would have been able to operate from 1997-2005, recoup its operating expenses incurred during this period, obtain its lost profits above and beyond these expenses, and then be compensated by the Forest Service under clause 15 when the Forest Service decided to terminate operations. These amounts are precisely what The Sweetwater is seeking now.

**VI. In the event that the Forest Service did not breach its contract with The Sweetwater, its actions in preventing further operations under the Term SUP constituted a taking which is compensable under the Fifth Amendment.**

In the present case, the Forest Service has taken actions which have effectively, directly and knowingly precluded any further operations of the Sweetwater Lodge. Because the lodge cannot remain on the Shoshone unless it is operated as a commercial lodge, the Forest Service's actions have taken the value of the lodge as well as the value of the contract. In the event that the Court were to determine that the Forest Service has not breached its contact with The Sweetwater as demonstrated above, the Forest Service's actions would then constitute a taking of The Sweetwater's property without just compensation.

When the government takes property for public use, it is obliged under the Fifth Amendment to provide "just compensation" which the U.S. Supreme Court has held to mean in most cases "the fair market value of the property on the date it was appropriated." *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 10 (1984). "Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking." *Id.*

In the present case, the Term SUP contains clause 15, which addresses situations where the

Forest Service terminates the Term SUP in the public interest. In the event that the Court determines that the Forest Service has terminated the Term SUP, but clause 15 does not apply, The Sweetwater asserts that the Forest Service has taken its property (both the lodge facilities and contract) without just compensation, as required under the Fifth Amendment. Because the Forest Service's actions in accomplishing this taking have occurred over time, The Sweetwater asserts that the best measure of the date of taking is the time of trial. *See Kirby Forest Industries*, 467 U.S. at 16-17 ("courts and commissions understandably have adopted the convention of using the date of the commencement of the trial as the date of the valuation"). The Sweetwater has demonstrated that the value of the lodge as of May 2005 was **$900,000**, and that the Forest Service has taken all of The Sweetwater's property given that it cannot be removed or otherwise used pursuant to the Forest Service's actions.

In addition, in the event the Forest Service has effected a taking, it has also taken the value of the contract. The appropriate value of the contract is based on the lost profits which would have been received under it. Those lost profits total $1,667,000 under The Sweetwater's projected business plan. Using the methodology set forth in The Sweetwater's claims letter (PX 27), they total $960,000. The average of these two is **$1,313,500**. This amount is therefore an appropriate figure for valuing the contract rights taken by the Forest Service. Thus, just compensation under the Fifth Amendment would require the government to pay **$2,213,500** to The Sweetwater.

## VII. Conclusion

For the reasons set forth above and in its prior submissions to the Court, plaintiff The Sweetwater, A Wilderness Lodge LLC respectfully requests that the Court find that defendants in this case have breached the contract between the parties and are liable for damages caused by that

breach totaling $ 2,408,750 plus applicable CDA interest. In the alternative, The Sweetwater requests that the Court find that the defendants have engaged in an uncompensated taking of the Sweetwater Lodge and are liable to The Sweetwater for the value of its property and contract, which totals $2,213,500 along with appropriate interest from the date of the taking.

Respectfully submitted,

s/Kevin R. Garden

Kevin R. Garden
THE GARDEN LAW FIRM P.C.
Suite 325
901 North Pitt Street
Alexandria, VA 22314
(703) 535-5565

Dated: December 22, 2005