**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 02-1795C<br>(Judge Merow) |

**PLAINTIFF'S PROPOSED FINDING OF FACT**

Pursuant to the Court's Order dated December 16, 2005, plaintiff The Sweetwater, A Wilderness Lodge LLC (hereinafter "The Sweetwater") hereby submits its proposed findings of fact.

*Location of the Sweetwater Lodge*

1. The Sweetwater Lodge is located on, and entirely surrounded by, Forest Service land within the Shoshone National Forest ("Shoshone"). *See* Joint Exhibit 1 at p. 16 [hereinafter cited to as "JX __"]; Defendant's Corrected Proposed Findings of Uncontroverted Facts at ¶ 1 (dated December 23, 2003)[hereinafter cited to as "Def. Facts ¶ __"].

2. The lodge assets are located in a canyon at the end of the Sweetwater Road (also referred to as FSR 423), which is a road approximately 3.5 miles in length. *The Sweetwater, A Wilderness Lodge LLC v. The United States*, No. 02-1795c (slip opinion)(Dec. 30, 2004)(at

2)[hereinafter cited to as "*Sweetwater* at __"]; Tr. 809:16-812:21[1]; Declaration of Jeffrey C. Mummery at ¶¶ 4-5 (App. 213-214 in Appendix to Plainitiff's Memorandum in Support of its Cross-Motion for Summary Judgment As To Liability On Counts I and II and Opposition to Defendant's Motion to Dismiss Count II For Lack of Subject Matter Jurisdiction and Motion to Dismiss Counts I and II for Failure to State a Claim, or, In the Alternative, Motion for Summary Judgment on Counts I and II (Feb. 6, 2004)[hereinafter cited to as "Mummery Dec. at ¶ __ (App. __"].

3. Sweetwater Road, which is controlled and maintained by the Forest Service, provides the only vehicular access to the lodge and is part of the Forest Service's road system. JX 5 at p. 1 (Sweetwater Road "provides the only access for the permitted lodge owner and it's users"); *Sweetwater* at 2.

4. There are three bridges on Sweetwater Road, all of which are owned and controlled by the Forest Service. The first bridge is located approximately a quarter mile from the beginning of Sweetwater Road where it meets Yellowstone Highway. This bridge spans the North Fork of the Shoshone River and is hereinafter referred to as the "North Fork Bridge." There are two additional bridges on Sweetwater Road at distances of approximately 2.5 and 3 miles from the Yellowstone Highway, both of which span Sweetwater Creek. These two bridges are hereinafter referred to as the "Sweetwater bridges." *Sweetwater* at 1-2.

[1] "Tr." refers to the transcript of the hearing held in Cody, Wyoming on September 19-29, 2005 by page and line number.

5. The creek which the Sweetwater bridges spanned is subject to flash flooding throughout the year during rainstorms, and most often during the spring during snowmelt, where the water level would suddenly increase dramatically and anyone trying to cross the creek, whether they were on foot or in a vehicle, could be swept away and killed. Tr. 802:9-807:25; Tr. 910:13-911:6; Tr. 1695:17-1696:21.

6. The owner of the lodge assets would be unable to operate an ongoing resort business without vehicular access over the Sweetwater bridges. Tr. 2719:9-2723:15 (the Forest Service's expert witness concluded that accessing the lodge via fords using horses or vehicles was not feasible); Defendant's Exhibit 62 (at pages 67-69)[hereinafter cited to as "DX __"]; Mummery Dec. at ¶ 49 (App. 225); Tr. 823:10-16 (Mr. Barker, who is an experienced backcountry ranger, also concluded that accessing the lodge via horseback was not a viable option).

7. The absence of vehicular access would severely limit any operating season for the lodge, greatly increase operating and other overhead expenses for lodge operations, greatly increase the risk of injury or death to lodge patrons, and similarly increase liability to the lodge. Tr. 2722:4-15 (Forest Service's expert witness admitted that season would be cut in half using fords); Mummery Dec. ¶ 49 (App. 225).

8. As one Forest Service employee familiar with the permit and lodge operations stated, operating the lodge without vehicular access over the bridges would be a total change from what the Forest Service intended the operations to be at the time the permit was signed. Tr. 853:13-18 (testimony of Monte Barker).

9. A Forest Service report prepared in 1992 and revised in 1997 supporting replacement of the Sweetwater bridges concluded that "[s]hould the [Sweetwater] bridges fail and this access be lost, legal action resulting in considerable cost to the government will surely be forth coming from the lodge permittee *as well as the service to the public being lost.*" JX 10(page 5)(emphasis added). In addition, in a letter to the Forest Service dated 1986, the prior permittee stated that "a major catastrophe (*i.e.*, a bridge wash-out) would obviously wipe us out." Plaintiff's Exhibit 4 [hereinafter cited to as "PX __"].

10. The lodge contributes to about 20% of the use made by the public of the road. Tr. 105:2-8. Sweetwater Road also provides public recreational access to the Shoshone National Forest and is used by the Forest Service for administrative purposes related to monitoring and maintaining the Forest. Tr. 847:7-848:10; JX 5 (page 1); Tr.921:21-922:11. The Forest Service was encouraging more public use of the Sweetwater Road by equestrians hauling horse trailers up the road and had built a turn-around for those vehicles at the end of the road just before the permit area. Tr. 171:4-17 Tr. 849:18-851:25.

*Lodge facilities*

11. The facilities at The Sweetwater Lodge include an original lodge building with a dining room, lounge area with original river rock fireplace, office, additional room, cook's quarters, two bathrooms, large kitchen with butlers' pantry, and laundry room with additional storage. JX 1 (p. 1/16); PX 44 (Que Mangus appraisal).

12. The facilities also include a main cabin with living room, dining area, full kitchen, bathroom, Master bedroom, loft with walk out balcony, large enclosed front porch, full basement which has Sweetwater Spring and spring box therein, and attached maintenance shop, and another large cabin including living room with native rock fireplace and chimney, dining room, bedroom, bathroom, kitchen and attached covered porch. JX 1 (p. 1/16); PX 44 (Que Mangus appraisal).

13. The facilities also include four additional cabins all of which include a sitting room/bedroom with native rock fireplace and chimney, dressing room, bathroom and covered porch with view of Sweetwater Creek. JX 1 (p.1/16); PX 44 (Que Mangus appraisal).

*Nature of Term SUPs*

14. In order to use the Sweetwater Lodge, the owner must obtain a Term Special Use Permit ("Term SUP") from the Forest Service. 36 C.F.R. § 251.50(a); Tr. 97:23-25.

15. If a Term SUP is abandoned, terminated, revoked or cancelled, the owner of the assets must remove them on its own expense from National Forest lands. 36 C.F.R. § 251.60(h)(2)(i).

16. One of the purposes of recreational Term SUPs is to serve, by regulation and by purpose, as a delivery system to provide public services. Tr. 1949:17-1950:16 (testimony of Gary Reynolds, the Recreation, Wilderness and Land Staff Officer for the Shoshone).

17. The purpose of Term Special Use Permits is to provide "a service that the Forest Service is supposed to provide to the public and deem that a private entity could do—could do the job so the Forest Service wouldn't have to open up a lodge." Tr. 78:20-789:1 (testimony of Mike Bree); Tr. 801:18-802:8; *see* Tr. 857:20-25.

18. Mr. Monte Barker, who was a member of the Shoshone special use permit team, stated that "concessionaire permittees are part of the Forest Service who are permitted to provide a service that we want provided, it's not for convenience of the permittee. It's to meet a responsibility providing public service to the public, and so we allow the numbers and the locations in order to provide what we feel to meet the public need." Tr. 834:5-11. Mr. Barker further stated that he treated permittees as employees. Tr. 866:20-23.

19. By their own conditions, Term SUPs create an obligation against the United States by requiring the United States to pay equitable consideration for any improvement authorized by the permit which the Forest Service revokes, for reasons other than breach of the provisions, prior to the end of the term or by mutual consent with the permit holder. *Sweetwater* at 4-5; 36 C.F.R. § 251.51 (Term permits provide compensable rights to permittees); JX 1 (at clause 15).

*The Forest Service's 1992 inspection of the Sweetwater bridges*

24. In the course of pursuing discovery in this case, The Sweetwater discovered for the first time that in 1992, three years before it purchased the lodge assets, the Shoshone requested bridge inspectors from the Wasatch-Cache National Forest to inspect the Sweetwater bridges. Tr. 1390:6-1391:20.

25. As of 1992, the Sweetwater bridges had not been load rated. Tr. 1885:7-22; Tr. 1891:12-1892:7. However, it was Forest Service policy to close bridges which had not been load rated. *Id*. The Forest Service engineer admitted that the Forest Service's failure to close the bridges absent a load rating was a violation of Forest Service policy. *Id*.

26. The Shoshone Forest Engineer, Mr. Jim Fischer, admitted that, after the bridge inspectors conducted a technical inspection of the Sweetwater bridges in 1992, they stated to the Shoshone that "you need to close those bridges immediately." Tr. 1392:5-1395:7; *Sweetwater* at 2. The Forest Service employees on the Shoshone argued that they could not close the bridges because the Forest did not want to face the consequences of the impact of bridge closure on the lodge owner given the critical need for vehicular access to lodge operations. *Sweetwater* at 2; Tr. 1394:18-24. Mr. Fischer later described this inspection as "basically condemning" the bridges. JX 7 (page 1).

27. The bridge inspectors, in response to the Shoshone employees reaction to their inspection results, purportedly agreed to the Shoshone placing a 3 ton weight limit sign by the bridges. *Sweetwater* at 2; Tr. 1394:24-1395:3. Mr. Fischer referred to this outcome as a "compromise" that would "probably" be safe for motorists. *Sweetwater* at 2; Tr. 1394:25; Tr. 1396:17; Tr. 1582:8-1583:13.

28. However, the Forest Service bridge inspectors did not load rate the bridges before or after they put up the 3 ton weight limit sign. Tr. 1402:11-13; Tr. 1885:7-22; Tr. 1891:12-1892:7.

29. Mr. Fischer testified that, pursuant to his office's standard operating procedure, Ms. Jennifer Watson would have been informed of this matter. Tr. 1409:24-1412:1. However, Ms. Watson denied having any knowledge. Tr. 2026:15-24.

*The Sweetwater's purchase of the lodge*

30. The Brannons had been operating the lodge assets since 1983 under a Term SUP issued by the Forest Service. JX 3.

31. At the time the Brannons operated the lodge, visitors to the lodge typically accessed it in passenger cars, including cars such as Cadillacs and other cars, and the Forest Service did not restrict that use with signs on the road or otherwise. Tr. 137:22-138:2; Tr. 797:14-798:1; Tr. 860:2-12; Tr. 1380:25-1381:5; Tr. 2268:11-2270:17.[2]

[2]The two Forest Service employees who together agreed to send the funding back which otherwise would have resulted in the Sweetwater bridges being repaired, Messrs. Larson and Fischer (*see* ¶¶ 151-153 *supra*), testified that they recalled a large sign located on the side of Sweetwater Road which stated that the road was not maintained for passenger cars. However, Mr. Barker of the Forest Service testified that no such signs were put up. Tr. 860:2-12. Nor did Mr. Koenig recall any signs as of 2000 when he arrived on the Forest. Tr. 1858:22-25. Mr. Bree also testified that the Forest Service had never restricted the type of cars which could use Sweetwater Road. Tr. 797:14-798:1. In addition, Ms. Watson had no recollection of any large sign meeting the description provided by Mr. Larson. Tr. 2006:23-2009:18. Also, Mr. Wilkerson and Mr. Mummery, both of whom traveled the road frequently, testified unequivocally that no sign ever existed. Tr. 2920:15-2921:15; Tr. 2268:11-2270:2. Finally, the Forest Service did not produce any photographs or documentation showing that such a sign had been ordered or placed on the road. Moreover, it would be illogical to place a sign warning passenger cars to go back on the other side of the North Fork bridge, because once they got to that point there was no easy turnaround point. *See* Tr. 1221:24-1222:10 (Mr. Larson explained that gates had been placed on the North Fork bridge because there was no convenient space along the Sweetwater Road if a traveler needed to turn around). The fact is that no specific warning against the use of the road by passenger cars was ever present on Sweetwater Road.

32. In 1995, the previous owner of the lodge, the Brannons, entered into discussions to sell the lodge to Wanda Smith, but Ms. Smith did not go through with the transaction after speaking to James Fischer, who was an engineer with the Forest Service. Def. Facts at ¶ 19; Tr. 763:5-764:2; Tr. 1412:19-1414:15. Afterwards, the Brannons were extremely angry at the Forest Service for disclosing information to Ms. Smith about the bridges leading to the lodge and confronted Forest Service personnel about their comments. Tr. 765:15-766:13; Def. Facts ¶ 21.

33. When Mr. Bree spoke to Mr. Fischer, the Forest Engineer, about the safety of the Sweetwater bridges at this time, he "didn't really get a straight answer from him on the safety of the bridges and whether the public could use them or not." Tr. 783:2-4.

34. Shortly after the Brannon's confrontation with the Forest Service, The Sweetwater became interested in purchasing the lodge facility. Tr. 74:14-75:22; Tr. 767:12-22.

35. Mr. Mummery was told about the lodge being for sale by a friend of his who was the real estate agent selling the lodge, and who told him that a prior sale of the lodge had not closed. Tr. 75:2-8. Mr. Mummery was informed that the prior sale had not gone through because the prospective buyer had been unable to finance the purchase. Tr. 106:20-107:4.

36. Mr. Jeffrey Mummery, who has been the Managing Member of The Sweetwater since its inception in 1995 (Tr. 65:l-66:9), resides approximately 13-14 miles from the lodge facilities, which is a 20 minute drive from his house. Tr. 67:6-13, 23-24.

37. Prior to purchasing The Sweetwater, Mr. Mummery has experience working as a guide for an outfitter as well as operating a hotel/resort on the Yellowstone Highway between Cody and Yellowstone National Park. Tr. 73:1-20.

38. Mr. Mummery first visited the lodge with Gary Fales, an experienced lodge owner who lives close to the lodge. Tr. 76:10-24; 82:11-16. After reviewing the lodge and area, Mr. Fales recommended to Mr. Mummery that he buy the lodge. Tr. 81:7-8.

39. At the time, the bridges had a standard official load rating sign before them indicating that they had a 3 ton weight limit (i.e., the bridges were safe for passage by vehicles weighing up to 3 tons), which Mr. Mummery understood to indicate that the bridges were safe for public use. Tr. 77:23-78:16; Tr. 128:22. Mr. Fischer testified that those signs had been placed by the bridges by the Forest Service with the intention that people would conclude that the bridges were safe for use by passenger cars and pick up trucks (Tr. 1402:3-1403:5), and Ms. Aus agreed that it would be reasonable for The Sweetwater to assume the bridges were safe given these signs. Tr. 1631:18-1632:22; Tr. 1673:22-24. These vehicles were the very types which were used by lodge guests. Tr. 137:22-138:2; Tr. 797:14-798:1; Tr. 1380:25-1381:5.

40. When Messrs. Mummery and Fales visited with Mrs. Brannon, she was distraught because a sale of the lodge the Brannons had arranged had fallen through and indicated to Mr. Mummery that they very much wanted to sell the lodge, and quickly. Tr. 78:19; Tr. 80: 4-5; 81:1-5; Def. Facts ¶ 26. The Brannons had already packed up their belongings in anticipation of

selling the lodge. Tr. 79:3-9. The Brannons had a contract to buy a boat which they were going to live on in Oregon which created a financial problem for them. Tr. 79: 7-9; 80:7-9; 100: 11-19; Def. Facts ¶ 25.

41. Dave Brannon in fact had recently found out that there was an out-of-statement judgment against him that was going to be filed against him and that he needed to sell his assets quickly to avoid losing them. Tr. 504:10-23; Tr. 2257:9-18.

42. The Brannons had been asking $450,000-500,000 for the lodge. Tr. 81: 12-13; Def. Facts ¶ 24. Mrs. Brannon informed Mr. Mummery that they would sell the lodge for less than the price they had been asking. Tr. 81: 13-14.

43. Mr. Mummery then was shown around the lodge the next day by Mr. Brannon. Tr. 84:8-11. The Brannons were distressed and wanted out. Tr. 93:12-13; Tr. 1350:20-24; Tr. 1352:7-10 (Mr. Larson testified that Mr. Mummery had told him that The Sweetwater purchased the lodge at less than market value and the Brannons had pleaded with him to buy it or they would lose their assets); Tr. 2328:3-9 (Mr. Mangus, plaintiff's expert, was aware that the Brannon's had sold the lodge under distress).

44. After visiting and inspecting the lodge with Mr. Fales, and then again with Mr. Wilkerson, Mr. Mummery offered the Brannons $275,000 for the lodge facilities. Tr. 94:2; DX 17. Mr. Brannon was upset because the offer was low. Tr. 482:25-483:4. The Brannons counter-offered at $287,500 and Mr. Mummery accepted the offer. Tr. 96:15-97:5. The offer

was explicitly "subject to the buyer approving issue of a new special use permit to buyer." DX 17, p. 3; Tr. 97: 15-20. Mr. Mummery had included that language to ensure that he would not have to buy the lodge if he could not obtain the permit which he wanted. Tr. 98: 6-22.

*Meetings between The Sweetwater and Forest Service*

45. Prior to The Sweetwater closing on the purchase of the lodge assets, representatives of The Sweetwater met with representatives of the Forest Service to discuss the issuance of a Term SUP to The Sweetwater for the purpose of operating the lodge facility. Tr. 101:19-102:14; Tr. 155:20-156:2.

46. One of these meetings occurred on or around June 12, 1995 at which representatives of The Sweetwater and the Forest Service discussed the issuance of a Term SUP. Tr. 108:23-110:3.

47. The Forest Service personnel at the June 12th meeting were "acting on behalf of" the Forest Supervisor. Tr. 813:19-23; Tr. 928:10-929:25. The current Forest Supervisor stated that The Sweetwater was entitled to rely upon the representations made by the Forest Service line officer at the meeting. Tr. 1744:23-1745:4; Tr. 1747:9-1748:15.

48. The Forest Service stated to the representatives of The Sweetwater that the Term SUP was a "legally binding document" to which all parties were agreeing. Tr. 814:18-19.

49. One of the purposes of the meeting was for the Forest Service to provide The Sweetwater with a full disclosure as to the condition of the bridges so that The Sweetwater could decide

whether to go ahead with the purchase of the lodge. Def. Facts ¶ 50; Tr. 896:5-14; Tr. 914:19-915:21; Tr. 956:8-10. The Forest Service was aware that The Sweetwater was relying on the Forest Service's statements to determine whether or not it should purchase the lodge. Tr. 897:16-17.

50. With respect to the Term SUP, the District Rangers on the Forest had been delegated authority to sign Term SUPs as the Forest Supervisor and make decisions related to the administration of those permits. Tr. 1271: 9-19; Tr. 1281:19-1282:10; Tr. 1316:1-9 (delegation never formally cancelled in writing); Tr. 1317:12-24 (Mr. Larson stated that the Forest Service Manual provided support for District Ranger's issuing Term Special Use Permits). At the time of the June 12, 1995 meeting, Mr. Rossman was authorized to make recommendations to the Forest as to obtaining funds to repair or replace the bridges, and it was the Forest Engineer who made the decisions on which particular bridges were to be repaired or replaced "because the money came down to him." Tr. 777:9-778:18.

51. Vehicular access on Sweetwater Road was critical to operating the lodge, but the Forest Service insisted on keeping the Sweetwater Road a public road because it did not want to allow the lodge owner to restrict the public's access to that road. Tr. 135:16-136:2; *see* Tr. 173:24-174:2; Tr. 587:3-7; Tr. 769:6-770:11; Tr. 784:7-10; Tr. 808:16-22; Tr. 817:9-14; PX 38.

52. The primary uses for Sweetwater Road are to provide access to the recreating public, which includes the lodge visitors, and to allow for Forest Service monitoring of soil and water

conditions in the area and along the full length of Sweetwater Road. Tr. 815: 21- 816:4; Tr. 875:4-7; 875:18-876:4.

53. At the meeting, the Forest Service representatives stated to the representatives of The Sweetwater that "it [is] our intent to keep the [Sweetwater] road open to the best of our ability." Tr. 129:2-6; Tr. 129:17-130:24; Tr. 135:2-8; *see* Tr. 135:2-15. They further stated that it was the agency's intent to support, to the degree that it could, access to the lodge facility. Tr. 825:5-8. These were the kind of commitments which Mr. Simpson, who attended the meeting as The Sweetwater's counsel, had sought from the meeting. Tr. 1112:13-25. Based on his working history with the Forest Service and its employees, Mr. Simpson felt that these commitments were sufficient. Tr. 1114:14-1115:3; *see* PPFF ¶ 47 (Ms. Aus stated that The Sweetwater was entitled to rely upon the representations made by the Forest Service at this meeting).

54. The position taken by the Forest Service was that "we are responsible for working with the lodges and making sure that they operate because the purpose of that particular permit is—is a service that the Forest Service is supposed to provide to the public and deem that a private entity could do—could do the job so the Forest Service wouldn't have to open up a lodge." Tr. 788:20-789:1.

55. Because the Shoshone Forest Plan allocates the area around the lodge as being for the purpose of a lodge facility, the Forest Service agreed that it had a commitment to provide for the operation of the lodge to the extent it could. Tr. 824:14-25; Tr. 925:2-12; Tr. 1750:2-7. This commitment included the Forest Service keeping the road open to the best of its ability, as well

as the Forest Service supporting vehicular access to the lodge facility. Tr. 132:14-133:8; Tr. 825:1-8; Tr. 926:24-927:3.

56. The individual who executed the Term SUP as the Acting Forest Supervisor, who was present at the 1995 meeting, summarized his comments at the 1995 meeting as being based on the fact that "[t]he Forest Plan of the Shoshone National Forest allocates that area up there to a public lodge facility; therefore, there is a commitment on the part of the Forest to provide for that use to the extent it can. All Forest Plan implementation is subject to dollars available, but I think it's probably – no, it's not probably, it's standard practice and intent when one has allocated a use on the Forest *to do your best* to implement that." Tr. 131:7-132:13; Tr. 925:2-926:23.

57. The Term SUP entered into by the parties contained a clause which provided for the Forest Service to compensate the permittee if the Forest Service terminated lodge operations. JX 1 (clause 15). This clause was discussed at the June 12, 1995 meeting. Tr. 538:12-22; Tr. 788:6-789:1; Tr. 793:25-794:1.

58. At the June 12th meeting, the Forest Service officials pointed out to The Sweetwater that, notwithstanding their commitment to making their best efforts to obtain funds to replace the bridges if it became necessary to allow contract performance, the funding was subject to approval by other employees in the Forest Service's Regional Office and Congress, and the Forest Service was legally precluded from guaranteeing that funding would be received because the agency could not legally commit to the expenditure of appropriated funds in future years. Tr. 770:12-771:10.

59. In making this point, the Forest Service distinguished between actions and decision which were within their control, and those that were outside of it (such as decisions to be made at the Regional level). Tr. 897:16-22.

60. As to actions within its control, the Forest Service did state that it would seek such funds should it become necessary for lodge operations. Tr. 771:7-10, Tr. 783:17-23 (Mr. Bree testified that the "we emphasized that don't count on the bridges being replaced in the near future, that we would *try* and that was the key word is we would try to get funding for the bridges, but we weren't going to guarantee it"); Tr. 784:19-21 ("Mr. Rossman advised Mr. Mummery that he'd do it, and he could try to get money, but it was no guarantees"); Tr. 785:1-3 (Mr. Bree testified that "we came to an unwritten agreement that everybody would try to do what they could do to allow Mr. Mummery to operate"); Tr. 786:23-787:1 ("It was kind of like everything was thrown out, and the Forest Service said they would try to get money to replace the bridges, and that's kind of where everybody just walked away").

61. At that particular point in time, the Forest had no funds presently allocated in its budget for improving the existing condition of the bridges (which were open to public traffic) or for replacing them. Tr. 770:12-771:3.

62. Subject to the two limitations of Regional Office approval and available appropriated funds from Congress, the Forest did commit to its best efforts to ensure the lodge operation could perform pursuant to the requirements of the permit. Tr. 771:7-10; Tr. 773:7-12 (Mr. Bree

testified that the Forest Service gave The Sweetwater assurances in the June 12, 1995 meeting that The Sweetwater would have access to operate its lodge).

63. At the June 12th meeting the parties also discussed that, in the event the bridges were to become impassable in the future, the Forest Service would construct fords to provide temporary access until funds could be obtained to repair the bridges or the loss of access could otherwise be addressed. Tr. 145:16-25; Tr. 772:3-773:6; Tr. 932:10-933:12; Tr. 935:17-937:6 (testimony of Robert Rossman that providing fords in the event the bridge access was lost would not impact the Forest Service's effort in seeking funds to replace the bridges); *see* JX 12 (letter written to The Sweetwater by Ms. Watson and signed by Mr. Larson in 1997 describing agreed-upon use of fords as "temporary"); Tr. 2074:11-2076:20. This access was sought so that The Sweetwater would be able to maintain the lodge until bridge access could be restored. Mummery Dec. ¶ 17 (App. 217).

64. Mr. Barker, who attended the June 1995 meeting, was asked about the issue of the fords and stated as follows:

> [I]n knowing the area, there is little doubt in my opinion that [the use of fords] was temporary only because it wouldn't be feasible to have invitees thinking that they're going to come up this road [without bridge access]. And—and when we—when we have a special use permit, I think we have a higher obligation because we're inviting people to go up there. And I don't see any way possible that you could operate this [lodge] on a sustained basis with fords because of the high water situation.

Tr. 818:1-819:22; *see* Tr. 1232:17-1233:13; Tr. 1233:23-1234:22.[3] Mr. Barker further stated

---

[3] Mr. Larson subsequently reported back to Ms. Aus and Ms. Watson in 2001, before the

that "our [the Forest Service's] number one charge is public safety over all other things and that would not be- I don't feel that [it] would be appropriate to access a public service lodge with a ford that crosses a major bridge." Tr. 819:25-820:3.[4]

65. The Sweetwater had previously informed the Forest Service that use of fords would not permit viable lodge operations due to the high water conditions that frequently occurred on Sweetwater Creek, and The Sweetwater continued to inform it of that fact after obtaining the permit. Tr. 138:7-139:9; Tr. 140:5-142:8; Tr. 821:23-822:11. As Mr. Barker stated, the fact that fords could not provide permanent access was so obvious, it was beyond having to be stated. Tr. 822:24-823:3.

66. Mr. Barker further agreed with Mr. William Simpson's characterization of the meeting in a letter dated May 2, 2001 (JX 17). Tr. 843:17-844:20. In that letter, Mr. Simpson stated:

> My recollection of the statements of Jeff Mummery at that meeting is that while Mr. Mummery was agreeable with the contingency of building and using fords through streams in the event any of the bridges failed along the Sweetwater Creek Road, the use of any such ford would be only temporary while bridges were being replaced or reconstructed. Mr. Mummery did not state that a ford would be a permanent substitute for any bridge which may need repairs and replacement.

JX 17.

---

non-compliance letter was written, that Mr. Barker had unequivocally stated that The Sweetwater had not agreed to the use of fords on a long term basis. Tr. 1234:23-1235:14. Mr. Barker also told Ms. Watson this fact as well in April 2002. PX 38.

[4] The Forest Service does not close fords during period when using the ford may be dangerous. Tr. 957:21-958:4.

67. In the event access over the bridges was lost, Mr. Barker testified that, given the current ability of the lodge to use the bridges, the Forest Service stated that it "would do our best to get [the bridges] on the CIP list to look at the bridges and to upgrade the road." Tr. 820:14-16; *see* Tr. 22-25. As to the issue of what would occur if the access over the bridges was lost, Mr. Barker stated that the Forest Service would then install fords to provide emergency access to the lodge and "then what we would do in the Forest Service was to elevate this situation. We got a problem, folks, that we need to address, and we'll elevate it to the best of our ability at that time because it would be more of an emergency situation that would have to be dealt with." Tr. 821:12-22.

68. Mr. Rossman stated that, if bridge access were subsequently lost, the Forest Service "certainly wouldn't have [] pulled" its request for funds to repair or replace the bridges at that point. Tr. 937:4-5.[5] (Ms. Aus later admitted that she was unaware that Mr. Rossman had represented to The Sweetwater in the June 1995 meeting that the Forest Service had committed to do its best to provide vehicular access. Tr. 1749:7-16.)

69. It was never stated at the meeting or at any other point that, if the Forest Service decided not to replace the bridges, it would not resolve the access problem that was created by implementing otherwise applicable contract terms, or that The Sweetwater would have to operate permanently using some other method of access. Tr. 125:16-25; Mummery Dec. ¶ 23 (App. 219).

[5] As set forth in paragraph 154 below, this action is precisely what the Forest Service subsequently did when bridge access was lost.

70. During the June 12, 1995 meeting in which the Forest Service made it representations as to its efforts to obtain funds should bridge access be lost, the parties negotiated the terms and their respective obligations under the Term SUP, as demonstrated by the fact that they discussed whether or not to include an MOU as part of the permit (Tr. 965:8-9), and they deleted clause 44 which had been in the Brannons' permit. Tr. 123:3-124:18; Tr. 588:10-589:20; Tr. 927:10-928:9; JX 3 (at JX 3/12)(clause 44).

71. Mr. Rossman also stated that "the authority to make a decision about whether the funds were there for replacement of the bridges" was a decision that "would have been handed off to the engineering shop" because "[i]t's an engineering function." Tr. 962:20-963:4.

72. The e-mail drafted by Mr. Rossman on June 13, 1995 purporting to summarize the meeting of June 12, 1995 was never disclosed to The Sweetwater before 2001. Tr. 152:3-7; Tr. 938:16-18; JX 6.

73. The Sweetwater did not enter into a formal road maintenance agreement similar to the one the prior permittee had held because doing so would make The Sweetwater liable for injuries to members of the general public related to the Sweetwater bridges or road. Tr. 111:10-20; Tr. 118:18-119:9; JX 4 (attached to Brannon's Term Special Use Permit).

74. Because the Forest Service, as a condition in the permit and for the Forest Service's own

benefit, required The Sweetwater to carry liability insurance and to indemnify the Forest Service for any liability arising from The Sweetwater's operations under the permit, The Sweetwater would not have been able to obtain insurance if it had accepted any responsibility for maintaining the road and bridges. Tr. 113: 10-20; Tr. 115:10-20; JX 1 (at page 9, clauses 28, 29).

75. The Forest Service did not state that The Sweetwater's decision not to sign the road maintenance agreement would in any way reduce the Forest Service's responsibilities towards the Sweetwater Road. Tr. 121: 13-20. In fact, the Forest Supervisor, Ms. Aus, later admitted that the road maintenance agreement was irrelevant to the issues related to the bridges. Tr. 1737:16-1738:4.

76. The Sweetwater nonetheless agreed informally to complete minor maintenance on the road and bridges at The Sweetwater's sole discretion. Tr. 785:9-15.

77. The Forest Service agreed not to include in The Sweetwater's permit the language set forth in clause 44 of the Brannon's permit based on the understanding reached by the parties that the Forest Service had the sole responsibility to maintain the road which accessed the lodge. Tr. 123:3-124:18; Tr. 588:10-589:20; Tr. 927:10-928:9; JX 3 (at JX 3/12).

78. At the meeting, the Forest Service emphasized the value of the road to them and the public in general. Tr. 126:1-128:1; Tr. 815:2-15.

79. The Forest Service never referred to the internal classification level of Sweetwater Road at the June 12th meeting or thereafter until this dispute arose. Tr. 137:13-21. Nor was the designation of Sweetwater Road as a "Level 2" road set forth anywhere in the Term SUP. *See* JX 1. "Level 2" is a designation set forth in internal Forest Service documents and defined in its internal manual, which is not binding as a matter of law.

80. Mr. Barker testified that the Sweetwater Road had, at some point previously, been listed as a Level 3 road. Tr. 859:25-860:8. In addition, Mr. Fischer testified that, while Level 2 roads are inspected every four years, Level 3 roads are inspected every two years. Tr. 1405:3-11. Mr. Fischer specifically noted in 1997 that the Sweetwater Road had not been inspected every two years because it had been "basically condemned" in 1992 (JX 7, p. 1), thus indicating that the normal inspection cycle for Sweetwater Road was every two years, which is the cycle for Level 3 roads (not Level 2 roads).

81. Mr. Koenig, an engineer with the Shoshone National Forest, testified that a Level 2 road may require bridges if they are needed for appropriate access along the road, which is determined based on the purposes for which the road is used. Tr. 1939:19-1940:21. Mr. Koenig also testified that the Forest Service usually assigns Level 3 to roads needed for a commercial business. Tr. 1940:14-16.

82. The Forest Service did not bring any bridge inspection reports or other documents to the June 12, 1995 meeting. Tr. 152:16-153:11; Tr. 922:12-16. Mr. Rossman testified that he was unaware of any 1992 bridge inspection report regarding the Sweetwater bridges. Tr. 917:23-

918:11; Tr. 924:12-14. While the Forest Service had previously concluded in 1992 that "[d]eterioration of the substructures [of the Sweetwater] bridges requires immediate attention in order to insure that the safety of the users," the Forest Service did not disclose these findings to The Sweetwater. Tr. 919:15-920:4; JX 5. Nor did the Forest Service disclose that it had determined as of 1992 that the "current bridge condition is not safe." Tr: 919:15-920:4; JX 5 at p. 2.

83. While Mr. Rossman was aware that the Forest Service inspected bridges, he, like The Sweetwater, was not aware that it prepared bridge inspection reports. Tr. 918:12-23. Accordingly, Mr. Rossman did not indicate to The Sweetwater at the June 12th meeting that the Forest Service possessed bridge inspection reports. Tr. 918:24-919:2. Had Mr. Rossman been aware of these documents, including the report which stated that the bridges were "inadequate, should be closed," he testified that he "certainly would have shared that knowledge." Tr. 922:25-923:8; *see* Tr. 923:9-924:11.

84. Ms. Watson, who did not attend the June 12, 1995 meeting, stated that, if The Sweetwater had shown more concern as to the condition of the bridges, she would have given it more information about the bridges. Tr. 2031:24-2032:9. However, the very purpose of the June 12, 1995 meeting was to discuss the access issue and the status of the bridges which the Forest Service held out as being safe.

85. These documents, which were not disclosed, included the statement that the Sweetwater bridges "presently do not meet any engineering standards and do not provide for public and

administrative safety." JX 10; Tr. 1387:13-23.

86. Mr. Barker believed that, given clause 15 of the Term SUP, the three options the Forest had if the bridges became impassable were to bring the road up to applicable standards, privatize the road, or purchase the lodge from The Sweetwater. Tr. 825:23-827:6. Clause 15 was discussed by the parties at the June 1995 meeting. Tr. 836:24-25.

87. Mr. Barker, a Forest Service employee and member of the Shoshone special use permit team, further testified:

> Whether today or then, I feel that based on -- based on the idea that concessionaire permittees are part of the Forest Service who are permitted to provide a service that we want provided, it's not for convenience of the permittee, it's to meet a responsibility providing public service to the public, and so we allow the numbers and the locations in order to provide what we feel to meet the public need.
>
> With that said, then whether or not -- I guess that there is that implied responsibility, then, that you provide adequate ancillary facilities, access, opportunities to—opportunities to that concessionaire to-- to fulfill that obligation that we require.
>
> In order to fulfill that, then I would assume that you would have at least the essential facilities available to you to meet that obligation of the forest for public service, public safety, and in the public interest.
>
> So that I guess my thinking at that time is if we can't get the road where it's at least usable to meet the intent of bringing people up there, then we have a responsibility to, under the terms to the permit in other words-- I believe there is something there about for a higher and better interest. If we can't provide the interest that we had foreseen with issuance of that permit, then probably we would compensate that permittee and get out of there.
>
> It's a compensable permit, because if we can't do what it was intended to do, then I think we have a responsibility and obligation to meet our standard one way or the other. Either fix the road, purchase that term permit, that portion of it back, or allow -- give it to the permittee. That was the option I looked at that I told—that I

> told you.
>
> I mean, any of the one of the options is valid. If we either -- if it's a public road, keep it up. If it's a private road, they keep it up. Or if we do away with the road and do what's necessary as far as the compensation and the permit, they can't be successfully operated.

Tr. 834:3-835:22.

88. The Forest Service stated to The Sweetwater during the June 12th meeting that the Term SUP was renewable provided the permittee had complied with applicable laws. Tr. 153:22-155:3 Tr. 545:25-546:12; Tr. 547:20-548:2; *see* Tr. 861:18-25; Tr. 986:9-23.

89. Prior to executing a Term SUP and pursuant to regulation, the Forest Service conducts a review of the potential permittee's ability to perform the requirements of the Term SUP, which includes both its experience and its financial resources. The Forest Service does not enter into a Term SUP unless it determines that the other party has the necessary ability and is able to meet the permit's requirements. *See* 36 C.F.R. § 251.54(e)(5)(iv).

90. In addition, as part of the process of entering into a Term SUP, the Forest Service made a determination that there is a need and a demand for the service to be provided under The Sweetwater's Term SUP, and that the operation would be financially viable. Tr. 1983:15-1984:6; Tr. 1987:25-1988:11.

91. The Sweetwater closed on the lodge on June 21, 1995, at a meeting attended by a Forest Service representative. Tr. 483:12-484:1. At the meeting and upon the transfer of ownership,

the Forest Service accepted the relinquished permit from the prior permittee and agreed to issuing a new permit to The Sweetwater. Tr. 483:19-25.

*Execution of the Term SUP*

92. On August 21, 1995, The Sweetwater and the Forest Service executed the Term SUP. JX 1; Tr. 2003:17-20. The Term SUP was executed on behalf of the Forest Service by Robert Rossman as the Acting Forest Supervisor. Tr. 910:8-9. It was "standard operating procedure" on the Forest that, even though the Forest Supervisor was present, the District Ranger would sign the Term SUP as Acting Forest Supervisor. Tr. 963:24-964:10.

93. The bridges were not included within the designated permit area under The Sweetwater's subsequent permit. JX 1; Tr. 103:23.

94. In the Term SUP, the Forest Service agreed to a process by which it would review and approve construction or development by The Sweetwater on the permit area. JX 1 (clause 3). In return, The Sweetwater agreed within the 15.4 acre area of the permit "to maintain the improvements and premises [*i.e.*, federal lands] to standards of repair, orderliness, neatness, sanitation, and safety acceptable to the forest officer in charge." JX 1 (clause 4). The Term SUP also obligated The Sweetwater to pay an annual fee of $1,400 to the Forest Service. JX 1 (clause 19).

95. The Term SUP required The Sweetwater to insure its operations, name the United States as a coinsured on the face of the insurance policy, and indemnify the United States in the event

any liability arose related to The Sweetwater's operations. JX 1 (clause 28, 29). This indemnification requirement placed full liability on The Sweetwater for liability resulting from its operations, which would include any maintenance of the Sweetwater Road or bridges that was performed. *Id.;* Mummery Dec. ¶ 28 (App. 220).

96. The Term SUP also contained clause 15, which states in pertinent part:

> If during the term of this permit or any extension thereof, the Secretary of Agriculture *or any official of the Forest Service acting by or under his authority shall determine that the public interest requires termination of this permit*, this permit shall terminate upon thirty days' written notice to the permittee of such determination, and the United States shall have the right thereupon to purchase the permittee's improvements, to remove them, or to require the permittee to remove them, at the option of the United States, *and the United States shall be obligated to pay an equitable consideration* for the improvements or for removal of the improvements and damages to the improvements resulting from their removal.

JX 1 (clause 15)(emphasis added).

97. The Forest Service consistently maintained that the Sweetwater Road had to be kept open to the public. Tr. 845:18-25.

98. After executing the Term SUP, The Sweetwater spent the remainder of 1995 cleaning up the permit area, including areas the Forest Service had requested be improved. Tr. 157:16-159:7; Tr. 773:17-774:12; Pl. App. 221 (Mummery Dec. ¶ 31).

*1996 Operations*

99. The Sweetwater operated the lodge in 1996 consistent with the terms of its Term SUP

and enjoyed a positive cash flow in the first year of operations. Tr. 407:1-8; JX 23 (at p. 23/7); Mummery Dec. ¶ 33 (App. 222).

100. The Sweetwater entered into an arrangement with Carl Bixby by which Mr. Bixby would be responsible for the costs associated with operating the lodge, seek guests for the lodge in the computer industry and The Sweetwater would operate the lodge. Tr. 159:18-163:10.

101. The arrangement with Mr. Bixby involved a potential sale of stock in The Sweetwater, but would not have resulted in the change of ownership because The Sweetwater would still own the lodge facility. JX 8; Tr. 163:19-22. Because of financial problems, Mr. Bixby did not go through with the stock purchase. Tr. 164:10-167:1. In addition, while the lodge was open and ready for business, Mr. Bixby only brought in a few guests during the summer of 1996. 166:20-167:1. Mr. Bixby later accused The Sweetwater of having failed to properly market the lodge to the public pursuant to the agreement between him and The Sweetwater. Tr. 168:14-19.

102. While several Forest Service employees visited the lodge in 1996, none ever raised any concern that the lodge was operating in a manner inconsistent with the terms of the permit. Tr. 168:20-169:7; Tr. 866:4-7 (Mr. Barker visited the lodge "quite a few times in 1996").

103. The Sweetwater placed advertisements in the fall of 1996 to prepare for its 1997 season. Pl. App. 180 (Mummery 259:22-260:15).

104. In the summer of 1996, Rebecca Aus became the new Forest Supervisor on the Shoshone

National Forest (Tr. 1627:1-2), and in late 1996, Mr. Brent Larson took over as the new District Ranger. Tr. 982:4-19.

105. Mr. Larson's personal feeling with respect to the lodge was that he did not want to see funding put into replacing the Sweetwater bridges and he thought the Forest would be better off if Sweetwater Lodge were removed. Tr. 1309:15.

*Disclosure of 1992 Forest Service bridge inspection and effective "condemnation"*

106. In January 1997, The Sweetwater entered into an agreement to sell the lodge assets to Ray and Judi Sutherland for $595,000. Tr. 178: 23-24; JX 9.

107. However, the Sutherlands were informed by the Forest Service as part of their discussions with the agency that the bridges over Sweetwater Creek had been "basically condemned" back in 1992. Tr. 1429:21-1430:1432:4; JX 7 (page 1); Tr. 2064:14-18. The Forest Service sent a document to the Sutherlands in February of 1997 that stated:

> We did not inspect the two upper bridges in '94 or '96 – they were basically condemned in '92.

JX 7.[6]

[6] Mr. Rossman testified that, had he known of this conclusion at the time of the June 1995 meeting with The Sweetwater, he would have disclosed it. However, he was never informed about it. Tr. 948:20-949:20.

108. The Forest Engineer added an additional note to the prior bridge inspection forms that stated, as to both bridges, "should be closed." Tr. 1432:16-1433:25; Tr. 1435:24-1436:13; *compare* JX 10 *to* JX 7.[7]

109. This prior determination was not set forth in the Forest Service file in 1995, but was added by the Forest Engineer in a note he sent to the Sutherlands in 1997. Tr. 1432:16-1433:25. No information related to the existence of an inspection by the Forest Service of the bridges in 1992 had previously been provided to The Sweetwater. Tr. 153:12-14.

110. While the Forest Service then attempted to withdraw its statement to the Sutherlands by asserting in a letter dated February 20, 1997 that no 'formal' condemnation had occurred (JX 11), the Sutherlands did not complete their purchase because of the bridges, and gave up a $5,000 deposit which they had put down towards their purchase contract. Tr. 191: 13-23.

111. The letter to the Sutherlands noted that the several components of the bridges had been rated as "2" in prior bridge inspection reports (which had not been provided to The Sweetwater). JX 11; Tr. 183:9-12. The letter further stated that a bridge which was condemned would be given a rating of "0" and would then be closed to all traffic. JX 11. This representation was wrong because, as shown below, no components on a bridge could be rated with a "0" or "1" *until* the bridge had first been closed.

[7] In responding to questions on this issue in the trial, Mr. Fischer asserted that "when I made this statement [that the bridges should be closed], I had absolutely no intent of trying to tell somebody that the bridges should be closed." Tr. 1435:3-5. Mr. Fischer's attempts at denial are patently absurd.

112. Mr. Fischer initially testified that, if the bridge inspectors had *recommended* closing the Sweetwater bridges, they would have given them a “0” or “1” rating. Tr. 1397:19-24. However, Mr. Fischer later admitted that bridge inspectors could not close a bridge. Tr. 1448:3-7; Tr. 1611:9-11 (bridge inspectors cannot close bridges, but only make recommendations that they be closed). Because codes “0” or “1” only apply to bridges that are *already* closed (Tr. 1613:25-1614:22; DX 23 at p. 23/51), and the bridge inspectors themselves could not close bridges, they could not give the Sweetwater bridges a rating of “0” or “1”. Tr. 1615:3-13. Thus, a “2” rating which the bridge inspectors gave to components of the bridges was the lowest possible rating they could give. Tr. 1617:3-5; DX 23 at p. 23/51. In addition, the Forest Service inspectors did not complete an overall rating of the bridges in 1992. JX 7 at pp. 3 and 9 (while bridge inspectors gave the bridges’ substructures the lowest possible rating given that the bridges were still open (see JX 7/2 and JX 7/8), they gave no rating given for overall Structural Evaluation for bridges)(see JX 7/3 and 7/9).

113. The Sweetwater strongly disagreed with the Forest Service’s statement in its letter to the Sutherlands that The Sweetwater had ever agreed to the use of fords as a means to operate the lodge. Tr. 184:18-21; Tr. 185:12-22; *see* JX 11.

*Forest Service representations of its effort to resolve the access problem*

114. By letter dated February 27, 1997 which was written “to clarify the Shoshone Forest’s position in regards to the bridges across Sweetwater Creek on [Sweetwater Road],” the Forest Service stated to The Sweetwater that:

> Should the existing bridges crossing Sweetwater Creek deteriorate to the point where they can no longer be used before money is available for their replacement, alternative solutions to provide access to the area will be explored at that time. Alternatives could involve the construction of temporary fords to serve as access while pursuing any emergency funding sources available for more permanent solutions.

JX 12.

115. In the same letter, the Forest Service represented to The Sweetwater that the Forest Service had requested funds from Congress to install replacement bridges on Sweetwater Road. JX 12; Tr. 1024:6-11. The February 27, 1997 letter stated in pertinent part:

> This letter is to clarify the Shoshone National Forest's position in regards to the bridges across Sweetwater Creek on Forest Development Road Number 423. This road provides access to National Forest lands on the Sweetwater Drainage as well as the Sweetwater Wilderness Lodge.
>
> . . .
>
> Replacement bridges for these two bridges crossing Sweetwater Creek are currently included in the Forest's Capital Improvement Program for FY 1999. However, this funding is subject to Congressional approval and I cannot guarantee that it will be available at that time.
>
> . . .
>
> It is the Forest's intention to continue to provide access to National Forest lands in the Sweetwater drainage.

JX 12.

116. The Forest Service put no further conditions or qualifications on its efforts to seek funds other than that the success of the funding effort was dependent upon Congress approving its funding. Tr. 1024:12-23; JX 12.

117. Mr. Larson explained to The Sweetwater at the time he wrote this letter that his reference to not being able to guarantee funding would be available "at that time" was a reference to the

fact that the Forest Service budget process might delay the receipt of funds, and that if a delay occurred the parties could seek emergency funding. Tr. 188:16-190:1. This explanation was consistent with what the Forest Service stated at the June 1995 meeting. Tr. 190:2-11.

118. This representation encouraged The Sweetwater to continue incurring expenses to maintain The Sweetwater without ongoing operations. Tr. 189:7-191:12; Tr. 211: 6-18; Mummery Dec. ¶¶ 56, 61, 65-66 (Pl. App. 226-228).

119. The Forest Service prioritized the projects it felt merited funding. Tr. 995:24-996:17. The Shoshone was also given an expected budget amount and made a request to the Regional Office for these projects which cost totaled this amount, starting at the top of the priority list and working down. Tr. 998:21-999:3. The decision of which projects the Shoshone would request funding for was a group decision made by the employees with knowledge of the particular projects. Tr. 998:14-19; Tr. 1421:22-1422:3.

*Cessation of operations in 1997*

120. Because of the safety and liability concerns over the bridges, The Sweetwater informed the Forest Service in late winter 1997 that it could not operate the lodge in the 1997 season and invite paying guests to the lodge due to the liability created by the Forest Service's bridge evaluations. Def. Facts ¶ 109; Tr. 185:1-9; 194:17-196:14; Tr. 1024:24-1025:7; Tr. 1034:24-1035:6; Tr. 1036:2-16.

121. The Forest Service approved this decision and did not require The Sweetwater to operate or to submit an Operating Plan. Tr. 1025:8-11; Tr. 1025:22-1026:6; Tr. 1168:20-1169:10.

122. The Sweetwater submitted annual reports to the Forest Service in 1999 and 2000 stating that The Sweetwater had been closed during the prior year due to the bridges, and no one in the Forest Service objected to its assertions. PX 21, 25; Tr. 199:7-201:7.

123. As a matter of Forest Service policy and law, the Forest Service is required to provide The Sweetwater written notice if the Forest Service believes there are grounds for permit revocation not requiring an immediate suspension, and must also provide The Sweetwater a reasonable time to cure any alleged non-compliance. 36 C.F.R. § 251.60(e); JX 21 )(p. 2).

124. In 1997 (and continuing up to 2001), the Forest Service did not dispute or otherwise contradict in any communications to The Sweetwater that the Sweetwater bridges were not in proper condition for safe vehicular passage. Tr. 206: 3-14; Mummery Dec. ¶ 60 (App. 227). Nor did the Forest Service demand or request that The Sweetwater conduct operations in 1997, 1998, 1999, 2000 or 2001. Tr. 1028:24-1030:4.

125. After receiving the February 27, 1997 letter, The Sweetwater repeatedly inquired about the Forest Service's continuation of its efforts to fix the bridges and was informed that the Forest Service was continuing its efforts to obtain funds for this purpose. Tr. 204: 7-14; Tr. 1040:11-25; Mummery Dec. ¶ 57 (Pl. App. 226).

126. Mr. Larson stated to The Sweetwater that the Forest Service would continue its efforts to rebuild the bridges or, if not, "find another solution" (Tr. 1038:23-1040:10), which Mr. Mummery understood to be the exercise of clause 15 of the contract. *See* JX 16. Mr. Larson also testified that The Sweetwater was justified in believing that the Forest Service was pursuing funding to replace the bridges. Tr. 1188:12-17.

*Forest Service decision to seek a "conservation buyer" and eliminate the lodge and bridges*

127. At some point after issuing the letter to The Sweetwater dated February 27, 1997 and prior to 1999, Mr. Larson had decided that it was in the overall interest of the public and the lodge owner to have the lodge operations terminated, which would be achieved by locating a conservation buyer. Tr. 206:15-207:20; Tr. 1027:24-1028:21.

128. The District Ranger's idea actually was initiated by a local environmentalist and then pursued by Mr. Larson. Tr. 1045:6-23; *see* Tr. 1163:11-1164:12; PX 18.

129. Mr. Larson testified:

> I have said several times, we would be better off trying to secure the lodge through a conservation buyer than- than continuing on with the permit up there; or, you know, do away with the permit and not have to deal with the road issues and the bridge issues.

Tr. 1200:7-21.

130. A "conservation buyer" was a private individual or entity that would agree to purchase the lodge assets and then agree to waive the permit back to the Forest Service, remove the lodge

and restore the area to its natural condition. Tr. 1046:2-12.

131. The effect of locating a "conservation buyer" was that the lodge would be removed and the area restored to its natural condition. Tr. 1045:24-1046:12.

132. The Forest Service determined that The Sweetwater lodge facilities were unique in that they were the only facilities anywhere in the area that penetrated deep into the forest and were well away from the main highway. JX 28 (page 26); Tr. 1160:22-1161:21.

133. The lodge area was located near pristine forest land and was adjacent to designated sensitive Wilderness area. Tr. 809:16-810:10; Tr. 884:14-17. The area around and near the lodge was considered crucial habitat for bighorn sheep as well as elk, and was also important habitat for grizzly bear. PX 28 (page 22); Tr. 1158:8-1160:21. Removing the lodge would enhance the area for purposes of grizzly bear habitat. Tr. 1052:1-17.

134. A local environmental group had raised concerns with Mr. Larson over the importance of the area used by the lodge to threatened and endangered wildlife species. Tr. 1052:21-1053:8.

135. Human activity in these types of areas was determined by Forest Service biologists to have a detrimental effect on these threatened and sensitive wildlife species. PX 28 (pages 22-23); Tr. 1156:8-1160:21.

136. In addition, the road leading to the lodge was causing harmful impacts on Sweetwater

Creek because it was contributing to sedimentation that was harming the trout fishery in that stream. Tr. 1053:9-21; Tr. 1054:1-1055:3; Tr. 1859:1-1860:20; PX 56.

137. If the road was to remain open, these problems had to be fixed. Tr. 1862:3-17. The cost of fixing this would have been substantial. Tr. 1861:6-20.

138. In a formal report, the Forest Service's biologists concluded that:

> The Sweetwater Road (FSR #423) is of concern relative to spring and winter use. The lower Sweetwater drainage is crucial winter range and crucial birthing area for both bighorn sheep and elk. The area is also important spring and fall habitat for the grizzly bear and receives high amounts of bear use during these periods even though it is not within the recovery area. . . . From a wildlife perspective, effective restriction of all classes and types of public motorized use during the winter and spring periods are recommended.

PX 28 (page 22)(Roads Analysis Report; Supplemental Document to the Upper/Middle Lower Fork Shoshone River Watershed Assessment Report (Shoshone National Forest).

139. In addition, the Shoshone also had a target as to a certain number of miles that it was to attempt to decommission annually and removing the lodge would allow for the FSR 423 to be decommissioned as part of this effort. Tr. 1164:25-1165:23; Tr. 1953:8-1954:2. In fact, a Forest Service employee felt that it could "easily justify decommissioning FSR 423 if given the opportunity. PX 30; Tr. 1955:7-1958:20.

140. Mr. Larson had also been told by environmentalists he was contacting about possibly purchasing the lodge as "conservation buyers" that the asking price for the lodge was too high. Tr. 209:4-15; Tr. 1181:6-1185:2.

141. In response to a question as to whether the access to the lodge would lower its value, Mr. Larson responded "in the appraisal world, if you don't have access, you don't have value." Tr. 1186:15-1187:2. Mr. Larson had been told this by one of the prospective environmental buyers. Tr. 210:20-25.

142. Mr. Larson stated that he also took this action to terminate lodge operations in order to eliminate the Forest Service's continuing road and bridge obligations caused by the presence of the lodge and thereby save the government money. *See* JX 22 (discussing costs to Forest Service of maintaining road); Tr. 942:15-943:11 (same); Tr. 1047:4-20; Tr. 1202:7-1203:24.

143. Mr. Larson admitted that pursuing a conservation buyer was more advantageous to the Forest Service than The Sweetwater selling the lodge to another operator. Tr. 1049:5-10; Tr. 1173:20-24; Tr. 1201:21-1202:6.

144. Mr. Larson spoke to the Regional Forester as well as the Forest Supervisor about his strategy as well as others in the Forest Service, and was given the "green light" to proceed. Tr. 1047:21-1048:13; Tr. 1055:4-1056:21; Tr. 1174:6-1180:13. The Regional Forester (Mr. Laverty), Forest Supervisor (Ms. Aus) and Forest budget specialist (Mr. Fischer) all told him "Go for it. If you can make it happen, yeah, do it." Tr. 1048:3-4; Tr. 1180:9-13; *see* 1203:20-1204:14.

145. Mr. Larson informed The Sweetwater of his efforts to locate a conservation buyer. Tr. 1044:1-2; Mummery Dec. ¶ 62 (App. 227). However, The Sweetwater informed him that it was skeptical of pursuing a conservation buyer and did not think such efforts were worthwhile because a conservation buyer would not likely pay a fair value for the lodge. *Id.* at ¶ 63; Tr. 1044:7-22; Tr. 1291:19-24. Provided that it would result in a payment of fair market value, The Sweetwater did not oppose the strategy of the Forest Service to seek an alternative way to ensure that The Sweetwater would be compensated for its assets. JX 20 (letter to Brent Larson from Jeff Mummery dated July 12, 2001 stating that "[i]n lieu of obtaining funds through the federal government, I have no objection to the Forest Service pursuing the possible purchase of Sweetwater Lodge's assets by the Nature Conservancy or similar organizations").

146. Mr. Larson had called Mr. Jim Fischer, who was the Forest Service employee on the Shoshone responsible for obtaining and appropriating the funding for bridge replacement projects, and shared this strategy with him. Tr. 1180:14-1181:5; Tr. 1204:15-1205:2; Tr. 1416:16-22.

147. Mr. Larson admitted that the reason he was contacting Mr. Fischer was to engage in a strategy of getting Mr. Fischer to slow down the process of obtaining funds to replace the Sweetwater bridges which would give the Forest Service more time to locate a conservation buyer. Tr. 1205:3-1206:7; *see* Tr. 1206:8-1207:17; Tr. 1305:16-1306:24; Tr. 1492:19-23.

148. As a result of that conversation, Mr. Fischer admitted that he started "dragging his feet" as to moving forward with replacing the bridges. Tr. 1501:24-1502:15; *see* Tr. 1492:16-18; Tr. 1596:3-7.

149. In late 1999, while Mr. Larson was still seeking a conservation buyer in order to terminate lodge operations and despite Mr. Fischer's foot-dragging, the funding that was necessary to initiate the replacement of the Sweetwater bridges was approved by the Regional Office and Congress and sent to the Forest Service. Tr. 1492:24-1497:3; Tr. 1494:8-10. As defendant has admitted, "**during Fiscal Year 2000, funds became available from the Forest Service's regional office to replace the Sweetwater bridges**." Defendant's Corrected Proposed Findings of Uncontroverted Facts ¶ 92 (emphasis added).

150. Mr. Fischer, who received notification of the funding, then spoke to Mr. Larson. Tr. 1492:24-1494:17. Mr. Fischer was led to believe that there was "a really good possibility" that the Forest Service would locate a conservation buyer to purchase the lodge. Tr. 1493:6-10.

151. As a result of this conversation, Messrs. Larson and Fischer decided that Mr. Fischer should *return the money* because replacement of the bridges was inconsistent with this goal of obtaining a conservation buyer. Tr. 1494:14-17. Mr. Fischer testified:

> It was pretty much between Brent and myself of- of let's – you know – let's pull the bridges from the program until we know for sure what's going to happen with these [conservation buyer] proposals.

Tr. 1494:14-17.

152. Mr. Fischer then testified that he or Mr. Larson informed Ms. Aus of decision to prevent the bridges from being funded, and she did not express an opinion one way or the other. Tr. 1503:12-20; Def. Facts ¶ 92.

153. Mr. Fischer then testified that he called the regional office to reject the funds, telling them:

> Hey, you know, our decision is we're not going to build this bridge this year because of the conservation – because of what appeared at the time as a really good possibility that the conservation organizations would – you know, were going to be able to buy the lodge.

Tr. 1493:6-10.

154. By doing so, the bridges were no longer eligible for any funding. Tr. 1507:21-23; Tr. 1509:15-18. However, the funding would likely have been received if the Forest requested it in the future. Tr. 1508:10-12.

155. The Shoshone did not request that the funds be applied to any other Forest projects. Tr. 1493:11-21.

156. Mr. Larson subsequently admitted that, when he spoke to Mr. Fischer, he did not have any conservation buyers lined up, much less any letters of intent, draft contracts or any indication of interest, but he was "hopeful." Tr. 1209:9-1210:4.

157. If Mr. Larson and Mr. Fischer had not taken steps to block funding for use in replacing the Sweetwater bridges, the bridges would have been built. As Mr. Fischer stated:

> [Question] So but for the conversation with Brent Larson and the decision about the conservation buyer, the bridges would have been built?
>
> [Mr. Fischer] They would.

Tr. 1495:12-14; *see* Tr. 1495:3-15 (Mr. Fischer stated that "if those manipulations hadn't been done, we would have designed and built the bridges").

158. As Mr. Fischer further stated, "it appeared the money was in the bank and so we were – it was still this thing of do we or don't we build them? What's going to happen you know with the status of the lodge? Is it going to be purchased by somebody that's going to let the permit lapse and then as a permittee have to remove the facilities?" Tr. 1496:22-1497:3.

159. At this point in time, the Shoshone National Forest had no further obstacles to its using the funds on the replacement of the Sweetwater bridges. Tr. 1564:8-11.

160. While the Sweetwater bridges were not identified explicitly in any funding request sent to Congress, the funding request sent to Congress had included the money for the Sweetwater bridges, and Congress approved that funding. Tr. 1497:24-1498:11.

161. As to the impact on the decision not to fund the bridges on The Sweetwater's operations, Ms. Aus testified as follows:

> [T]he fact that he was not operating obviously was not something that I was aware

> of. I clearly did not associate not replacing the bridges with his ability to operate. I believe that Mr. Mummery, the level two maintenance, the high-clearance—the level two maintenance standard that we set for that road, we would be able to maintain and that he could continue to operate his lodge using that standard. So I don't see how the decision related to the bridges negatively affects his ability to operate.

Tr. 1689:19-1690:4.

162. Ms. Aus also stated that her view was affected by the fact that she had been told by Mr. Rossman that The Sweetwater had agreed to use fords on a permanent basis to operate its lodge if bridge access was lost. Tr. 1690:5-23.[8] In addition, Ms. Aus had never been told by anyone, even as of the trial, that her own agency's expert had agreed that the lodge could not be operated using fords. Tr. 1694:1-4; *see* ¶ 6, supra (Forest Service expert agreed that the lodge could not be operated using fords as the method of access).

163. While the Forest Service employees have asserted that their actions were driven by a benevolent desire to assist The Sweetwater (*see, e.g.*, Tr. 1173:22-1174:5), no one in the Forest Service ever informed The Sweetwater that the Forest Service's efforts to locate a conservation buyer would result in it discontinuing its efforts to obtain funding to replace the bridges. Tr. 1166:2-1167:8. In addition, Mr. Larson admitted that his efforts to prevent funding from being applied to the bridges (which was kept secret from The Sweetwater) was contrary to The

[8] As demonstrated previously the Forest Service employees who attended the June 12, 1995 meeting did not state that The Sweetwater had agreed to the use of fords as a permanent method to operate the lodge. Nor did Mr. Rossman's e-mail which he drafted the next day state the fords would be used as a permanent means to operate the lodge. *See* JX 6.

Sweetwater's goals, and was pursued because it was directly consistent with the Forest Service goal of having the lodge removed at no cost to the Forest Service. Tr. 1211:5-1213:16.

164. Nor did anyone in the Forest Service ever inform The Sweetwater in 1999, 2000 or any point thereafter that funding to initiate replacement of the bridges had actually been obtained, but was rejected because the Forest Service was pursuing a conservation buyer. Tr. 248:18-20; Mummery Dec. ¶ 67 (App. 228); JX 16 (Mr. Mummery stated to the Forest Service by letter dated April 2, 2001 that he "was hopeful that [Mr. Larson's] efforts to secure funding would have been successful by now"); Tr. 230:3-20.

165. Had the Forest Service informed The Sweetwater in 1999 or 2000 that funding had been obtained for the purpose of replacing the bridges, The Sweetwater would have insisted that such funding be applied to the bridges rather than rejected while further efforts were made towards locating a conservation buyer. Mummery Dec. ¶ 68 (App. 229).

166. In reliance on the Forest Service's previous written statements in 1997 and continuing oral assertions that it was trying to locate funding to replace the bridges, The Sweetwater continued to maintain the lodge, and kept it in excellent condition so that it was ready for operations. Mummery Dec. ¶ 61(App. 227).

167. As its inability to operate the lodge continued, The Sweetwater regularly inquired of the Forest Service as to the progress of the Forest Service's efforts to seek funds to repair the bridges, and was repeatedly told by the Forest Service that efforts were continuing. Tr. 215:22-

216:1.

168. Mr. Larson felt that, if “push came to shove” and he was unable to locate a conservation buyer and The Sweetwater was unable to continue without operating, the Forest Service would then replace the Sweetwater bridges. Tr. 1260:21-1261:3; Tr. 1303:9-1304:4. .

*Forest Service formal closing of Sweetwater bridges and FSR 423*

169. The Sweetwater began to push the Forest Service in1999-2000 for a solution to the current issue related to its bridges over Sweetwater Creek. Tr. 213:19-25; Tr. 1217:18-24.

170. The Sweetwater made repairs in 2000 in anticipation of potentially reopening the lodge upon being able to restore access over the bridges. Tr. 215:8-21; Tr. 220:2-221:8.

171. When The Sweetwater began to explore other possible solutions in late 2000 that might enable it to operate, which included its possibly undertaking efforts to repair the bridges in exchange for improved permit terms that would allow it to justify the expense, the Forest Service suggested having a meeting at the bridges and then recommended that The Sweetwater hire a structural engineer to determine if the bridge could be “load rated” (*i.e.*, assigned a maximum weight load). Def. Facts ¶ 99; Tr. 224: 4-15; Tr. 1883:9-1884:4; Tr. 1894:17-1897:6; Tr. 1218:15-24.

172. The bridges at that point in time had no load rating, which was contrary to Forest Service policy. Tr. 1885:7-22; Tr. 1891:12-1892:7. The condition of the bridges in 2000 was the same

as their condition in 1997 and 1992. Tr. 1872: 6-11 (Mr. Koenig testified that the bridge condition in 2000 was the same as it was in 1997); *compare* JX 7 (1992 inspection) *with* JX 13 (page 5)(1997 inspection) *and* JX 14 (page 5)(1997 inspection); Tr. 1777:19-1780:25.

173. The structural engineer concluded that he could not load rate the bridges, and the Forest Service then used this conclusion to formally close the bridges in April 2001. Tr. 226: 10-22; JX 15.[9]

174. However, the condition of the bridges in 2001 which the Forest Service used as a reason to close them was the same as it had been in 1992, but the Forest Service had not closed the bridges at that point. Tr. 1872: 6-11 (Mr. Koenig testified that the bridge condition in 2000 was the same as it was in 1997); *compare* JX 7 (1992 inspection) *with* JX 13 (page 5)(1997 inspection) *and* JX 14 (page 5)(1997 inspection); Tr. 1777:19-1780:25

175. When the Forest Service prepared a press release to announce its decision to close the road, it specifically mentioned that it would cost more than $500,000 to make the road safe for use in an effort to quell any public discontent with its decision. Tr. 1224:18-1225:10; PX 31.

[9]The Forest Service's own inspector admitted that, the prior summer, he inspected the bridges and was aware of the same physical conditions that led to the private inspector concluding that the bridge could not be load rated and that, had the Forest Service attempted to load rate the bridges in 2000, it would have come to the same conclusion. Tr. 1902:19-1903:18. Instead of arranging to have the bridge load rated by the Forest Service, he encouraged The Sweetwater to do so. Tr. 224: 4-15; Tr. 1883:9-1884:4; Tr. 1894:17-1897:6; Tr. 1218:15-24.

176. To prevent any public or lodge visitors from using the bridges, the Forest Service placed a padlocked gate on the bridge over the North Fork of the Shoshone River at the beginning of the road to the lodge. Tr. 1221:20-23; Mummery Dec. ¶ 73 (App. 229); PX 31.

177. After the bridges were closed, The Sweetwater reiterated the fact that it could not operate without vehicular access. Tr. 1244:12-20.

178. In the summer of 2001, the Forest Service initiated an appraisal of the lodge value for the purpose of potentially purchasing the lodge assets. Tr. 245:24-248:13; Tr. 250:1-19: Tr. 1237:25-1238:8; Tr. 2081:16-22.

179. At this point, the Forest Service discussed the idea of applying funds that would otherwise go into restoring the bridges to the purchase of the lodge itself, but concluded that it would not be able to use funds for this purpose. Tr. 1237:11-24; Tr. 1242:7-1243:12; Tr. 1248:24-1249:20; Tr. 2081:23-2082:24.

180. In an internal e-mail from Mr. Gary Reynolds, Staff Officer, Recreation, Wilderness, Lands for the Shoshone, marked "URGENT – Sweetwater appraisal," Mr. Reynolds stated that the appraisal process had ended and "[t]he main problem with the appraisal is that we have no way to finance a purchase of the improvements." PX 34; Tr. 1962:18-1965:6.

181. At some point in or around 2001, the Forest Service determined that there was no possibility that lodge operators could be terminated through a conservation buyer purchasing the lodge. Tr. 1236:19-1237:10.

182. Mr. Larson stated that he had never affirmatively recommended terminating a Term SUP (which would trigger clause 15) "because there are other ways to get out" of the situation. Tr. 1275:20-1276:7.

*Forest Service's issuance of noncompliance letter*

183. The next action the Forest Service took towards The Sweetwater was to issue a letter to it in December 2001 stating that it was not in compliance with its permit because it was not open to the public "at least 93 days each year." Tr. 1713:5-9; Tr. 1253:5-1254:3; JX 21. In that letter, the Forest Service asserted that it was considering revoking The Sweetwater's Term SUP for lack of compliance with its terms. *Id.*

184. As a result of this alleged non-compliance, the Forest Service had the authority to order The Sweetwater to tear down its lodge, remove all remnants of its facilities and return the area to its natural state, all at The Sweetwater's expense. JX 1 (clause 11 of Term SUP); 36 C.F.R. § 251.60(h)(2)(i); Tr. 1256:24-1257:22. As a result, the Forest Service would no longer need the road and it could be removed. Tr. 1268:9-1269:5.

185. While the Forest Service alleged in the noncompliance letter that The Sweetwater had not operated since 1997, it was merely making a "point of record" because the Forest Service had

allowed The Sweetwater not to operate. Tr. 1030:15-23; Tr. 1265:21-25.

186. Mr. Larson felt that the Forest Service's accusation that The Sweetwater had breached its contract by not operating and should be forced to try to operate without bridges was "a radical change of direction" from how he had been managing the matter. Tr. 1267:2-16.

187. While The Sweetwater did not believe it had violated any terms of its Term SUP, it submitted an Operating Plan for operations. DX 54; Mummery Dec. ¶ 78 (App. 230).

188. In response to that proposed Operating Plan, the Forest Supervisor offered to "insure that the bridge reconstruction on Sweetwater [] be at the top of the Shoshone National Forest request for funds," but *only if* The Sweetwater waived all present *and future* monetary claims against the Forest Service. DX 54 (page 4); Tr. 1770:7-1772:17; *Sweetwater* at 10.

*Submission of a CDA Claim*

189. The Sweetwater submitted a claim to the Forest Service dated May 28, 2002 pursuant to the Contract Disputes Act ("CDA") for breach of contract in order to recoup these substantial damages. JX 23. Those specific damages are outlined in that claim letter and include lost profits, operating expenses and the replacement value of the lodge assets. JX 23

190. In response to that claim, the Forest Supervisor asserted that the Term SUP was not a contract, therefore, there could be no cognizable claim pursuant to the CDA. DX 55.

191. The Sweetwater bridges are currently blocked by padlocked gates on each end of each bridge. Tr. 1221:7-23. These gates make crossing the bridges absolutely impossible by any type of typical vehicle, even high clearance vehicles. Tr. 846:1-5.

192. The Forest Service is currently making no efforts to seek any funding to replace the Sweetwater bridges. Tr. 1908:10-23; Tr. 1912:5-18; PX 35.

193. The Forest Service is currently planning on removing the two Sweetwater bridges as soon as the present litigation concludes, and establishing the bridge over the North Fork as a "trail bridge," which means high clearance vehicles will not be allowed to cross over it, and thus will not be able to access the lodge. Tr. 1906:5-1914:14; PX 35.

*Damages*

194. The Sweetwater submitted a claim letter to the Forest Service dated May 28, 2002. JX 23. Its damages were broken out into three categories: operating expenses, lost profits and the value of the lodge. *Id.*

195. The Sweetwater subsequently revised its damage calculations. PX 41, 42.

196. The lodge was only able to operate in 1996, and at the time a sale of the stock in The Sweetwater was pending. Tr. 362:10-13.

*Operating Expenses*

197. The Sweetwater expended significant operating expenses in maintaining the lodge operations from 1997 through 2005. PX 42; PX 43; Tr. 365:8-17; Tr. 376:14-25.

198. The Sweetwater's operating expenses are based on its annual financial statements and ledgers, which were prepared by its accountant. Tr. 365:13-19 (PX 42 is a summary of the expenses set forth in The Sweetwater's annual financial statements and ledgers for 1997-2005); Tr. 373:15-18)(JX 42 is the most accurate summary of The Sweetwater's expenses); Tr. 37813-24; Tr. 381:8-21; PX 52 (copies of The Sweetwater's legal bills). The expenditures incurred by The Sweetwater during 1997-2005 are set forth in PX 42. Tr. 265:13-14.

199. The Sweetwater's general ledgers were prepared by its accountant based on The Sweetwater's cancelled checks and bank statements. Tr. 369:2-8; PX 43.

200. The Sweetwater deducted appropriate items from its costs that are not properly charged to the government as damages in this matter. Tr. 365:23-366:7.

201. The Sweetwater's operating expenses include costs incurred for the following items: Accounting and legal costs; advertising; amortization; bank charges; business promotion; contract labor; depreciation; donations; dues and subscriptions; fees, gas, oil and tires; insurance; interest expense; legal; liquor; miscellaneous; management fee; office expense; outside services; pest control; postage; rent; repairs and maintenance; supplies; taxes and licenses; telephone; travel and entertainment; utilities; and vehicle expenses. PX 42.

202. In addition, because The Sweetwater's operating expenditures ends at 2004, The Sweetwater estimated that its operating expenses in 2005 up to September would be an additional $40,000. Tr. 462:9-24. Using this same methodology, The Sweetwater's operating expenses from January 2005 through March 2006 (the time period since the period used in its claims letter) would be $60,800. This estimate would bring The Sweetwater's total claim for operating expenses to $520,000.

203. The total of these operating expenses from 1997-March 2006 is $520,000.

*Lost profits*

204. In its claim letter dated May 28, 2002, The Sweetwater set forth a claim for lost profits based on its actual operations in 1996. PX 23; Tr. 403:4-405:16.

205. The annual lost profit amount based on The Sweetwater's operations in 1996 was $34,995 and was based on The Sweetwater's business records for 1996. JX 23; Tr. 405:11-13; PX 43 (TS 2055-TS 2059; TS 2095-TS 2107). The claims letter calculation for estimated lost profits through December 2002 totals $312,256. JX 23. Using this same methodology, the current total of lost profits up to mid-September of 2005 would be at least $492,500, and $960,000 for the entire period 1997-2014 discounted back to 2005 value.

206. Because The Sweetwater had not yet operated the lodge with its own long-term business plan prior to being forced to close operations in 1997, for purposes of calculating the profits it

would have obtained from 1997-2005, it determined what its revenues would likely have been had it operated in 1997 through 2005 under a long-term business plan. Tr. 407:16-411:21; Tr. 363:6-11; PX 41.

207. The lost profit calculation only includes activities currently authorized under the Term SUP. Tr. 414:4-7.

208. The lost profit calculation is based on a detailed operating calendar. PX 41 (at p. 1); Tr. 418:2-423:22. The calculation also includes a breakdown of the revenue for the lodge from the various income streams, including cabin rental (PX 41 at page 3; Tr. 429:23-435:9), food and beverage revenue (PX 41 at page 4; Tr. 435:11-439:5), and revenue from other sources such as guided fishing trips (PX 41 at page 5; Tr. 439:10-442:13). These revenue sources, exclusive of the cost of goods sold, total $477,901 for calendar year 2005 only. PX 41 at page 6; Tr. 444:9-446:2.

209. Deducting personnel costs of $174,304 (PX 41 at page 7; Tr. 446:2-449:16), and operating expenses of $199,550 (PX 41 at page 8; Tr. 449:23-450:12), the total profit for 2005, but for the breach, would have been $104,047. PX 41 at page 9; Tr. 450:13-451:5.

210. By calculating reasonable rates of growth using The Sweetwater's business plan model, the total lost profits for The Sweetwater from 1997-2005 total $830,000 and $1,667,007 for the entire period 1997-2014, discounted back to 2005 value. PX 41 at 10; Tr. 451:6-455:4.

*Value of the lodge facilities*

211. Mr. Que Mangus conducted an appraisal of the value of the lodge facilities as of May 4, 2005. PX 44. Mr. Mangus lived in the Cody area all his life and has been appraising properties since 1983, and has been licensed appraiser for the past twelve years. Tr. 2294:6-2295:16.

212. Mr. Mangus' experience focuses on properties in Park County, which is were Cody is located. Tr. 2294:24-25; Tr. 2302:12-16. Since 1983, he has appraised almost all if not all of the lodges located on the Shoshone National Forest between Cody, Wyoming and Yellowstone National Park. Tr. 2299:4-24. Mr. Mangus' appraisals have been within +/- 5% of the final sale price agreed upon by the parties. Tr. 2301:14-18.

213. The National Forest lodges on the Shoshone National Forest exist in a unique market situation. Tr. 2302:17-2303:1. As Mr. Mangus noted, the supply of such lodges is limited but the demand is high. Tr. 2315:2-6.

214. Mr. Mangus' analysis was conducted to determine a market value of the lodge facilities as of May 4, 2005 with access, which is the value which would be paid by a willing buyer to a willing seller. Tr. 2303:17-23045:16.

215. Mr. Mangus used a sales comparison approach in determining the market value of the lodge given that his experience has shown that buyers of lodges on the North Fork in the Shoshone National Forest are not concerned with the revenue produced by the lodge or the condition of the facilities, but largely purchase the lodges as a lifestyle choice. Tr. 2307:12-

2308:6; Tr. 2361:9-2362:8.

216. To conduct his valuation, Mr. Mangus reviewed records from sales of other lodges, public records at the Courthouse, discussed the lodge with realtors and investigated other markets outside of the Cody area. Tr. 2311:20-2312:20.

217. Mr. Mangus concluded that the Sweetwater Lodge's location well off the highway provided it seclusion that benefited its sales price. This seclusion is unique among all the lodges within the Shoshone National Forest. Tr. 2315:21-2316:19.

218. In locating comparable market sales, Mr. Mangus focused on sales which were of the most similar properties in the area close to the May 2005 time frame. Tr. 2333:3-24. He then was required to make adjustments because of the fact that no two properties are the same. Tr. 2333:14-16.

219. As Mr. Mangus stated, with respect to collecting information about other property sales, the maxim "the more, the better" does <u>not</u> apply because the key is the unique similarities of the other properties that must be used in a comparative analysis. Tr. 2333:25-2334:16.

220. Mr. Mangus determined that the sales of the Absaroka Lodge, Bill Cody Inn and UXU Lodge between July 2004 and May 2005 were the most similar and most comparable sales. *See* PX 44 (page 16-18). Mr. Mangus has personal knowledge of each of these lodges. Tr. 2348:21-2346:6.

221. To correlate the sales price of these three lodges to The Sweetwater, Mr. Mangus determined the per unit price for each lodge and then made a time adjustment based on a 4% annual rate to calculate the sale prices as of May 2005. PX 44 (page 18); Tr. 2337:14-2338:2; Tr. 4342:4-2343:16.

222. Because each lodge has a different number of units, Mr. Mangus then had to make an adjustment to account for the different sizes of the lodges. Tr. 2350:24-2353:7. Because the sale history of the lodges revealed that buyers would pay on overall lower price for a lodge with fewer units, but nonetheless pay more per unit where there were fewer units, Mr. Mangus calculated what the increased per unit price is for lodges with fewer units. Tr. 2351:6-2353:7. Because of this trend, it is inappropriate to make a straight mathematical calculation by dividing the total sales price by the number of units. Tr. 2358:7-25.

223. In order to calculate the appropriate adjustment to make, Mr. Mangus used the data from the three most comparable sales and established a "best fit" line. PX 44 (page 24); Tr. 2353:8-2356:6. The data from these sales demonstrated that the fewer the number of units in a lodge, the higher the per unit price for the lodge. PX 44 (page 24). This increase was approximately $7,993.64 in unit price for each unit reduction that occurred. *Id*. In fact, the data used by the government's expert reflected this same trend when inapplicable sales were removed from his data. Tr. 2841:5-2842:14; PX 63; Tr. 2847:5-2818:2; PX 64.

224. After the additional adjustments were made to each of the per unit prices for the

Absaroka Lodge, Bill Cody Inn and UXU Ranch for criteria such as site improvements and nonrealty assets (*see, e.g.*, Tr. 2363:21-2366:15)(adjustments to Absaroka Lodge price), Mr. Mangus calculated the adjusted per unit price for The Sweetwater based on each of the three sale prices for the Absaroka Lodge, Bill Cody Inn and UXU Ranch. DX 18.

225. Mr. Mangus then concluded that, because The Sweetwater was most comparable to the UXU Ranch, which had an adjusted sale price of $151,346 per unit, the appropriate unit sale price for The Sweetwater was $150,000. Tr. 2381:15-2382:13; PX 44 (page 28). Even though The Sweetwater had fewer units than UXU Ranch, Mr. Mangus did not adjust The Sweetwater's per unit price higher than UXU Ranch's to stay within the range established by UXU Ranch. Tr. 14-2383:11. This result ended up with The Sweetwater's per unit price being conservative given the established trend of per unit prices increasing as the total number of units in a lodge decreased. *See* PX 44 (page 24).

226. The sales price established for May 2005 could also be adjusted using the 4% annual rate to apply it to different years, up to 5 years. Tr. 2380:18-2381:14.

227. In addition to the appraisal by Mr. Mangus, Mr. John Pucetas also calculated the cost of reproducing the Sweetwater Lodge, less the actual physical depreciation which currently exists at the lodge facilities based on their current condition. DX 45; Tr. 2503:2-2504:18.

228. Mr. Pucetas has extensive experience in assessing the same value for resort facilities located in neighboring National Parks, such as Yellowstone National Park. Tr. 2497:18-

2501:12. This value is done pursuant to the formula set forth in the contracts which the lodge operators have with the National Park Service. Tr. 2505:5-2507:1.

229. To conduct his analysis, Mr. Pucetas visited the lodge and took extensive photographs of the facilities and determined the relevant floor dimensions needed for calculating the costs of reproduction. Tr. 2515:15-2516:14.

230. Mr. Pucetas then calculated the cost of reproduction on an elemental level for each structure, breaking the buildings down to the costs for their foundations, superstructure, plumbing, etc. PX 45 (pages 2.3-2.19). The costs used by Mr. Pucetas came from construction cost data sources as well as local contractors. Tr. 2521:3-24.

231. Mr. Pucetas also accounted for improvements needed at the site to prepare for constructing the buildings (PX 45)(page 2.19) as well as an adjustment based on the remote location of the buildings. PX 45 (page 2.20).

232. Based on the current physical condition of each aspect of the buildings, Mr. Pucetas then depreciated the buildings. PX 45 (pages 1.1-1.9).

233. Using the same methodology as employed under National Park Service contracts, Mr. Pucetas calculated that the reproduction cost of the Sweetwater Lodge along with the associated and necessary costs is $2,117,834. PX 45 (page 1.1). When the physical depreciation of 30.3% is applied to reduce this figure, the total depreciated cost of reproduction is $1,475,600.

234. Mr. Pucetas testified that the value which was assessed for concessioner structures in Yellowstone National Park was not limited by a market value cap because the properties, due to their location on federal lands, were found not to have a comparable market. Tr. 2505:5-2507:1.

235. The Sweetwater Lodge is unique among the lodges located on the Shoshone National Forest given its location 3.5 miles into the Forest as well as the unique aspects of its structure. Tr. 2487:18-2488:2; Tr. 2507:8-2510:1.

Respectfully submitted,

s/Kevin R. Garden

Kevin R. Garden
The Garden Law Firm P.C.
901 N. Pitt Street, Suite 325
Alexandria, VA 22314

Counsel for Plaintiff

Dated: December 22, 2005