IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 02-1795C<br>(Senior Judge Merow) |

**DEFENDANT'S POST-TRIAL BRIEF**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
1100 L St. N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
E-mail: john.williamson@usdoj.gov

OF COUNSEL:

KENNETH S. CAPPS
Attorney-Advisor
Office of the General Counsel
Mountain Region
U.S. Department of Agriculture
P.O. Box 25005
Denver, CO 80225-0005

December 23, 2005

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. The Permit Issued To The Sweetwater Is A License, Not A Contract For Services . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. The Permit Is Not A Contract Covered By The Contract Disputes Act . . . . . 3

III. The Forest Service Does Not Owe, And Did Not Violate, Any Implied Contractual Duties That Plaintiff Asserts In Count I . . . . . . . . . 5

A. The Terms Of The Permit Do Not Require The Forest Service To Replace The Bridges . . . . . . . . . . . . . . . . . . . . 5

B. The Parties' Discussions Before The Permit Issued Preclude Any Implied Duty To Ensure Access Over Bridges To The Lodge . 11

1. Mr. Rossman Lacked Authority To Commit The Government To Replacing The Bridges . . . . . . . . . . . . . 12

2. The Government Clearly Stated That The Sweetwater Would Have To Use Fords As Its Means Of Access If The Bridges Failed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

C. The Alleged Actions Of The Forest Service After The Permit Issued Did Not Breach Any Implied Duties To Cooperate And Not Hinder . . . . . . . . . . . . . 18

IV. The Forest Service Has Not Violated Clause 15 Of The Permit, As Asserted In Count II . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

V. Plaintiff's Failure To Operate The Lodge As A Public Resort Was A Material Breach Of Contract That Excused Any Alleged Non-Performance By The Forest Service . . . . . . . . . . . . . . . . . 31

VI. The Forest Service Has Not Committed Any Tortious Breach Of The Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

VII. Plaintiff Is Unable To State A Claim For A Fifth Amendment Taking . . . . . 38

VIII. Plaintiff Is Not Entitled To Recover Any Breach Of Contract Damages . . . 43

A. Plaintiff Could Have Covered Its Out-Of-Pocket Expenses By Operating The Lodge Using Bridges 1997-2001, And Using Fords 2001-Present . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

B. Plaintiff Cannot Meet Any Of The Three Requirements To Recover Lost Profits . . . . . . . . . . . . . . . . . . . . . 48

1. The Lost Profits That Plaintiff Claims Were Not Foreseeable, Because The Parties Contemplated Plaintiff Operating With Fords . . . . . . . . . . . . . . . . . . . . . . . 48

2. Plaintiff Cannot Prove It Would Have Made A Profit, Because It Never Tried To Operate The Lodge According To Its Present Plan . . . . . . . . . . . . . . . . . . . . . . . . 49

3. The Measure Of The Lost Profits Plaintiff Seeks Is Far From "Reasonably Certain" . . . . . . . . . . . . . . . . . . . . . 52

C. Plaintiff Is Not Entitled To Recover The Market Value Or Replacement Cost Of Its Lodge As Damages For Breach Of Contract . . . . . . . . . . . . . . . . 57

1. Plaintiff's Expert Used A Flawed Analysis To Arrive At His Value, Which Is Inconsistent With His Appraisals Of Other Lodges . . . . . . . . . . . . . . . . . . . . . . . . 59

2. There Is No Legal Support Or Business Justification For Plaintiff To Recover The Reconstruction Cost Of The Lodge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

## TABLE OF AUTHORITIES

### CASES

Alaska Pulp Corp. v. United States,
59 Fed. Cl. 400 (2004) . . . . . . . . . . 43

Allied-General Nuclear Servs. v. United States,
839 F.2d 1572 (Fed. Cir.),
cert. denied, 488 U.S. 819 (1988) . . . . . . . . . . 40-41

Alpine Camping Servs.,
B-238 90-1 CPD ¶ 580 . . . . . . . . . . 5

Alves v. United States,
133 F.3d 1454 (Fed. Cir. 1998) . . . . . . . . . . 40

American Pelagic Fishing Co., L.P. v. United States,
379 F.3d 1363 (Fed. Cir. 2004),
cert. denied, ___ U.S. ____, 125 S. Ct. 2963 (2005) . . . . . . . . . . 40, 41, 42

Anderson v. United States,
344 F.3d 1343 (Fed. Cir. 2003) . . . . . . . . . . 13

Andrus v. Allard,
444 U.S. 51 (1979) . . . . . . . . . . 42

B-West Imports, Inc. v. United States,
75 F.3d 633 (Fed. Cir. 1996) . . . . . . . . . . 40

Bonneville Assocs. v. United States,
43 F.3d 648 (Fed. Cir. 1994) . . . . . . . . . . 4

Bradley v. Chiron Corp.,
136 F.3d 1317 (Fed. Cir. 1999) . . . . . . . . . . 12, 13, 19

Caldwell & Santmyer, Inc. v. Glickman,
55 F.3d 1578 (Fed. Cir. 1995) . . . . . . . . . . 22, 24

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) . . . . . . . . . . 48, 51, 52, 54

Casa de Cambio Comdiv S.A., de C. v. United States,
291 F.3d 1356 (Fed. Cir. 2002)
cert denied, 538 U.S. 921 (2003) . . . . . . . . . . 34

Castle v. United States,
301 F.3d 1328 (Fed. Cir. 2002),
cert. denied, 539 U.S. 925 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Cedar Lumber v. United States,
5 Cl. Ct. 539, 459 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

Chancellor Manor v. United States,
331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Christopher Village , L.P. v. United States,
360 F.3d 1319 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

Coll. Point Boat Corp. v. United States,
267 U.S. 12 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Contel of California, Inc. v. United States,
37 Fed. Cl. 68 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Conti v. United States,
291 F.3d 1334 (Fed. Cir. 2002),
cert. denied, 537 U.S. 1112 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Dalton v. Cessna Aircraft Co.,
98 F.3d 1298 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Davidson Indus., Inc.,
AGBCA No. 95-166-1, 96-2 BCA ¶ 28, 299 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . 29

Dolan v. City of Tigard,
512 U.S. 374 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Energy Capital Corp. v. United States,
302 F.3d 1314 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 57

Essex Electro Engineers v. Danzig,
224 F.3d 1283 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Federal Crop Ins. Corp. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Glendale Federal Bank, F.S.B. v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 61

H. Landau & Co. v. United States,
886 F.2d 322 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

Hage v. United States,
35 Fed. Cl. 147 (1996) . . . . . . . . . . 2, 3, 16

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . 43

Hardeman-Monier-Hutcherson v. United States,
458 F.2d 1364, 198 Ct. (1972) . . . . . . . . . . 37

Harris v. Department of Veterans Affairs,
142 F.3d 1463 (Fed. Cir. 1998) . . . . . . . . . . 26

Hughes Communications Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2002) . . . . . . . . . . 39

Kaiser Aetna v. United States,
444 U.S. 164, (1979) . . . . . . . . . . 41

Kania v. United States,
650 F.2d 264, 227 Ct. (1981) . . . . . . . . . . 46

LaSalle Talman Bank F.S.B. v. United States,
317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . 45, 64, 66

Lamirage, Inc. v. United States,
44 Fed. Cl. 192 (1999) . . . . . . . . . . 28

Lenry v. United States,
156 Ct. C 297 F.2d 550 (1962) . . . . . . . . . . 10, 11

Lion Raisins Inc. v. United States,
416 F.3d at 1372 . . . . . . . . . . 47, 48

M & J Coal Co. v. United States,
47 F.3d 1148 (Fed. Cir.),
cert. denied, 516 U.S. 808 (1995) . . . . . . . . . . 40, 41

Maritrans Inc. v. United States,
342 F.3d 1344 (Fed. Cir. 2003) . . . . . . . . . . 40

McAbee Constr., Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . 26

Meyers Cos., Inc v. United States,
41 Fed. Cl. 303 (1998) . . . . . . . . . . 34

Mitchell Arms, Inc. v. United States,
7 F.3d 212 (Fed. Cir. 1993),
cert. denied, 511 U.S. 1106 (1994) . . . . . . . . . . 40

Mountain States Telephone and Telegraph Co. v. United States,
499 F.2d 611 (Ct. Cl. 1974) . . . . . . . . . . 1, 8, 9

Ness Investment Corp. v. United States Department of Agriculture, Forest Service,
360 F. Supp. 127 (D. Ariz. 1973),
aff'd, 512 F.2d 706 (9th Cir. 1975) . . . . . . . . . . 8

Oman-Fischbach Int'l (JV) v. Pirie,
276 F.2d 1380 (Fed. Cir. 2002) . . . . . . . . . . 11

Oroville-Tonasket Irrigation Dist. v. United States,
33 Fed. Cl. 14 (1995) . . . . . . . . . . 4

Pacific Gas & Elec. Co. v. United States,
3 Cl. Ct. 329 (1983),
aff'd, 738 F.2d 452 (Fed. Cir. 1984) . . . . . . . . . . 5, 9

Precision Pine & Timber, Inc. v. United States,
63 Fed. Cl. 122 (2004) . . . . . . . . . . 46

Renda Marine, Inc. v. United States,
66 Fed. Cl. 639 ( 2005) . . . . . . . . . . 35, 36

Robinson v. United States,
305 F.3d 1330 (Fed. Cir. 2002) . . . . . . . . . . 45, 49

S.A. Healey Co. v. United States,
216 Ct. Cl. 576 F.2d 299 (1978) . . . . . . . . . . 19, 20

Scott Timber Co. v. United States,
333 F.3d 1358 (Fed. Cir. 2003) . . . . . . . . . . 35

Sierra Club v. Hickel,
433 F.2d 24 (9th Cir. 1970),
aff'd, 405 U.S. 727 (1972) . . . . . . . . . . 1

Ski Corp. v. United States,
30 Fed. Cl. 115 (1993) . . . . . . . . . . 18

Son Broadcasting v. United States,
52 Fed. Cl. 815 (2002) . . . . . . . . . . passim

Southern Comfort Builders, Inc.,
67 Fed. Cl. 124 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

Sun Oil Co. v. United States,
215 Ct. Cl. 716, 572 F.2d 786 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

T&M Distributors, Inc. v. United States,
185 F.3d 1279 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Torncello v. United States,
681 F.2d 756, 213 Ct. (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Walter Dawgie Ski Corp. v. United States,
30 Fed. Cl. 115 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

Wetsel-Oviatt Lumber Co., Inc. v. United States,
38 Fed. Cl. 563 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Yancheng Baolong Biochemical Products Co., Ltd. v. United States,
406 F.3d 1377 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## STATUTES

16 U.S.C. § 497 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8

16 U.S.C. § 580d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

16 U.S.C. § 5954(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Contract Disputes Act, 41 U.S.C. § 602(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

36 C.F.R. § 251.51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 26

36 C.F.R. § 251.55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9

## OTHER AUTHORITIES

Corbin on Contracts § 564, p. 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Restatement (Second) of Contracts, § 344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Restatement (Second) of Contracts, § 347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Restatement (Second) of Contracts, § 350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

John D. Calamari & Joseph M. Perillo, The Law of Contracts § 14.9 (4th ed.1998)) . . . . . 56

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE SWEETWATER, A WILDERNESS LODGE LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 02-1795C
(Senior Judge Merow)

**DEFENDANT'S POST-TRIAL BRIEF**

Pursuant to Appendix A, ¶ 19 of the Rules of the United States Court of Federal Claims, and this Court's December 19, 2005 Order, defendant, the United States, respectfully files this post-trial brief.

**I. The Permit Issued To The Sweetwater Is A License, Not A Contract For Services**

The permit issued to The Sweetwater, A Wilderness Lodge LLC ("The Sweetwater") is not a contract for services, as plaintiff contends, but is a license whose terms are set by the Forest Service using authority delegated from Congress to manage National Forest System lands. The Court of Claims has stated that "management and control over lands of the United States is in Congress under Article IV, Section 3 of the Constitution." Mountain States Telephone and Telegraph Co. v. United States, 499 F.2d 611, 613 (Ct. Cl. 1974).

The court noted that this congressional power, which is unlimited, may be delegated to the Executive. Id. (citing Sierra Club v. Hickel, 433 F.2d 24, 28 (9th Cir. 1970), aff'd, 405 U.S. 727 (1972) (interpreting the Term Permit Act, 16 U.S.C. § 497). The Term Permit Act authorizes the Secretary of Agriculture

> under such regulations as he may make and upon such terms and conditions as he may deem proper, [] to permit the use and occupancy of suitable areas of land within the national forests . . . for the purpose of constructing or maintaining hotels, resorts, and any other structures or facilities necessary or desirable for recreation, public convenience, or safety. . . . The authority provided by this section shall be exercised in such manner as not to preclude the general public from full enjoyment of the natural, scenic, recreational, and other aspects of the national forests.

16 U.S.C. § 497 (emphasis added).

The Department of Agriculture has promulgated regulations to carry out this congressional delegation to set the terms and conditions of special use permits, including term special use permits. 36 C.F.R. Part 251, Subpart B. Those regulations define a "term permit" as "a special-use authorization to occupy and use National Forest System land . . . for a specified period which is both revocable and compensable according to its terms." 36 C.F.R. § 251.51. The nature of the interest created by a term permit is a license, that provides a revocable personal privilege to the permittee to occupy National Forest System lands and conduct activities only for the purposes specified in the permit. 36 C.F.R. § 251.55.

The permit issued to plaintiff possesses "the traditional characteristics of a revokable license." Hage v. United States, 35 Fed. Cl. 147, 166 (1996). In Hage, the Court noted that the permit could not be assigned or transferred, and created a personal privilege for the specific purpose of grazing cattle according to the terms of the permit for a period not to exceed ten years. Id. at 167. The Court also relied upon the fact that the Forest Service had reserved the right to cancel the permit. Id.

Likewise, the first sentence of the permit issued to The Sweetwater states that "[p]ermission is granted to . . . use subject to the conditions set out below, the following described lands," and identifies the personal "privileges granted by this permit" to occupy and use National Forest land (emphasis added). JX[1] 1. The permits cannot be assigned or transferred (clauses 12 and 51), grants personal privileges (clauses 6, 9, 38, 46, and 49), and is terminable at the discretion of the authorized Forest Service officer (clause 15). Id.

Even if the Court finds that the permit is a contract in some respects, this does not resolve the central issue in this case: does the permit give rise to the specific contractual duties that plaintiff asserts were breached by the Government? As shown below in section "III.," the permit does not give rise to any implied duty to repair or replace the Sweetwater bridges, as asserted in Count I. Moreover, as shown below in section "IV.," the permit does not give rise to any duty to pay plaintiff equitable consideration pursuant to clause 15 because the Forest Service has not repaired or replaced the bridges (as asserted in Count II). Thus, even if the Court finds that the permit is a contract in some respect, the Court should still rule in favor of the Government on Counts I and II, because the Government does not owe the specific contractual duties asserted by plaintiff.

## II. The Permit Is Not A Contract Covered By The Contract Disputes Act

Even if the Court were to conclude that the permit is a contract in some respect, the Court should reject plaintiff's assertion that the permit issued to The Sweetwater is a contract for the "procurement of services" within the meaning of the Contract Disputes Act, 41 U.S.C. § 602(a). As this Court stated in Son Broadcasting v. United States, 52 Fed. Cl. 815,

[1] "JX ___" refers to the parties' joint trial exhibits.

821 (2002), regarding term special use permits that granted use of a communication site, "[b]y their plain language, the Permits and incorporated Site Plan are not contracts by which the Forest Service acquired commercial supplies or services. The parties agree that the primary responsibility of Forest Supervisors is the management of National Forest System land, not the procurement of goods and services."

This Court has also stated that "[a] 'procurement' is an acquisition by purchase, lease, or barter, of property or services for the direct benefit or use of the federal government." Oroville-Tonasket Irrigation Dist. v. United States, 33 Fed. Cl. 14, 21 (1995) (citing Bonneville Assocs. v. United States, 43 F.3d 648, 653 (Fed. Cir. 1994)). In Oroville, the Court noted that Congress authorized the Secretary of the Interior "to construct, operate, and maintain" the irrigation project at issue, and that "ownership of the project is retained by the United States." 33 Fed. Cl. at 22. The Court determined that because the irrigation district was required by contract "to carry out the obligation placed by Congress on the Secretary of the Interior to operate and maintain the project in question. . . . Clearly by the contract in question, the government has procured the services of OTID to operate and maintain a government-owned facility. This is a procurement of services." Id. (emphasis added).

In contrast, the permit is not a contract with plaintiff to operate or maintain a Government-owned facility. JX 1. The Sweetwater owns all the improvements that are located within the 15.4 acre site identified in its permit; indeed, the alleged loss of this property is the basis of most of its damages claim. Any responsibilities that the permit requires The Sweetwater to perform to care for the Forest lands within or around its site are strictly a result of its occupancy, and are not services that the Government set out to find someone to provide. DPFF ¶ 28.

Similarly, the Government Accountability Office ("GAO") decision that was cited by plaintiff in its pre-trial brief also involved the provision of services to maintain and operate Government-owned facilities. Alpine Camping Servs., B-238,625, 90-1 CPD ¶ 580. In Alpine, the Forest Service issued a prospectus inviting offerors to submit proposals for two special use permits for campground concessionaire operations. Id. The GAO noted that the permits were "issued pursuant to 16 U.S.C. § 580d, which authorizes the Secretary of Agriculture to require concessionaires to, at their expense, recondition and maintain Forest Service recreation facilities" (emphasis added), such as "to replace, paint and straighten barricades, signs, posts, tables, restrooms, etc.; recondition and install fire rings and hydrant posts." Id. Because the Forest Service had conducted a competition to select a concessionaire to maintain the Government-owned campground facilities, the GAO stated that "we conclude that the prospectus at issue is a procurement for services." Id

The Forest Service never has conducted a competition to select a concessionaire to operate a lodge on the site occupied by The Sweetwater's lodge, and the Government has never owned the lodge. DPFF ¶ 27. Thus, the permit is not covered by the Contract Disputes Act, because it is not a contract for the "procurement of services," as plaintiff asserts.

## III. The Forest Service Does Not Owe, And Did Not Violate, Any Implied Contractual Duties That Plaintiff Asserts In Count I

### A. The Terms Of The Permit Do Not Require The Forest Service To Replace The Bridges

To determine what, if any, contractual duties arise from the permit issued to The Sweetwater, the Court should start by examining the text of the permit. In Son Broadcasting, this Court observed that "[c]ourts have reached divergent conclusions about whether a

particular permit constitutes a binding contract. However, they agree that an examination of the language and characteristics of the permit is critical to the determination." 52 Fed. Cl. at 822.

The site plan that was incorporated in the communication site permit at issue in Son Broadcasting expressly provided that "'a third antenna tower which may be self supporting may be authorized when the technical capacity of the intial [sic] two towers is reached.'" Id. at 817. The Court stated "[t]he plain language of these provisions suggests that although the Forest Service has the discretion to authorize a third tower, the exercise of that discretion is conditioned upon the technical capacity of the first two towers having been reached." Id. at 825 (emphasis added). The Court also noted that the permit expressly provided that "'[t]he Forest Service agrees not to issue authorizations to additional users'" until it was satisfied that the additional users had agreed to pay rent to the original permittee to compensate it for the original expense it had borne to develop the site. Id. at 823. The Court also noted that the permit "plainly provides that the Forest Service reserved the right to authorize other users only if 'such use does not interfere with the rights and privileges' authorized by the Permit." Id. at 825 (emphasis added).

Based upon the express language in the permit and site plan, the Court found that "[p]laintiff's rights under the contract embodied in these documents included the right to rent out all available space on its tower – as long as it was economically and technologically feasible – before the Forest Service could authorize construction of a third tower." Id. (emphasis added). The Court held "that the Special Use Permit, together with the incorporated Site Plan, constitutes a binding contract between plaintiff and the government and that this contract prohibited construction of the third tower until the first two had reached

capacity." Id. at 820. The Court's holding that the permit formed a contract was limited to enforcing what it found to be a specific right of the permittee – that the Forest Service would refrain from authorizing construction of a third tower until the first two reached their capacity – that was expressly provided in the permit and site plan.

In contrast, the permit issued to The Sweetwater does not expressly grant the permittee any right that the Forest Service would repair or replace the Sweetwater bridges. As plaintiff concedes, plaintiff declined to enter into a memorandum of understanding ("MOU") that was incorporated into the permit and addressed financial responsibilities for the road and bridges, as had the previous permittees, the Brannons. DPFF ¶ 78. In contrast, the Brannons entered into an MOU in which the Forest Service made the limited commitment that "[n]ew construction or reconstruction, such as bridge replacement, will be agreed to as part of the yearly Joint Maintenance plan." DPFF ¶ 33.

Because The Sweetwater declined to enter a similar MOU to the one entered by the Brannons, the Forest Service did not make even the limited commitment of considering on an annual basis whether to agree to replace the bridges. The permit issued to The Sweetwater is silent on the subject of replacing the bridges, because the Forest Service never agreed to commit itself to paying to replace them. JX 1. "[A] provision should not be found by 'implication' when the testimony convincingly shows that such a provision was intentionally omitted." Corbin on Contracts § 564, p. 20 (Interim Ed. 2002).

If any informal understanding were reached between The Sweetwater and the Forest Service, it was that Jeff Mummery, The Sweetwater's manager, would "maintain the road as he sees fit" for the guests of his lodge, as described in a contemporaneous email by Acting Wapiti District Ranger Bob Rossman. DPFF ¶ 71. The MOU signed by the Brannons

provided that the permittee was responsible for road maintenance for all traffic to the lodge. JX 4/3. The road was a Level 2 maintenance road, and was marked on the 1990 Shoshone National Forest map (which was in effect in 1995) as an improved dirt road that was intended for high-clearance vehicles. DPFF ¶¶ 4-7. Signs at the foot of the road prominently notified motorists that the road was not maintained for passenger cars. Id. ¶¶ 10-12. Mr. Brannon used a grader to ensure that the low-clearance passenger vehicles could reach the lodge. Id. ¶ 34. Mr. Mummery remained responsible for ensuring that passenger cars could reach the lodge in accordance with his discussions with Forest Service before the permit issued. DPFF ¶ 71.

As the Court of Claims has recognized, it lies within the discretion of the Forest Service to establish the terms and conditions of special use permits, including term special use permits. Mountain States Telephone, 499 F.2d at 613-14. In Mountain States Telephone, the Court of Claims refused to read new terms into the special use permit at issue, rejecting the plaintiff's request to "'judicially set conditions and terms for a use permit'" that had not been set by the Forest Service in the permit. 499 F.2d at 616 (quoting Ness Investment Corp. v. United States Department of Agriculture, Forest Service, 360 F. Supp. 127, 128 (D. Ariz. 1973), aff'd, 512 F.2d 706 (9th Cir. 1975)). This Court should follow the precedent of Mountain States, and should reject The Sweetwater's attempt to set by judicial means new terms that the Forest Service did not include in the permit.

This Court should be especially reluctant to imply terms over the objection of the Forest Service under the Term Permit Act where Congress expressly reserved to the Secretary the unilateral authority to set the terms and conditions for occupancy and use of the National Forest lands. 16 U.S.C. § 497. In the Act, Congress granted the Secretary of

Agriculture the unilateral authority to set all terms and conditions of term permits with a duration of less than 30 years and for sites fewer than 80 acres. Id, The Secretary is unable to fulfill this statutory mandate if the courts impose implied obligations that were contemplated and expressly rejected by the parties. In the regulations that implement the Term Permit Act, the Secretary reserved "all rights not expressly granted." 36 C.F.R. § 251.55(b).

Here, the permit issued to The Sweetwater twice emphasizes that the Secretary only intends to authorize the use and occupancy of the permit area under the expressly enumerated terms. The first unnumbered sentence of the permit states: "Permission is hereby granted to . . . the permittee, to use subject to the conditions set out below, the following described lands or improvements for the period ending 12/31/14." JX 1/1. Permit clause 2 also makes it clear that no other "implied" terms are allowed by informing the prospective permittee that: "This permit is accepted subject to the conditions set forth herein, and to conditions 3 to 55 attached hereto and made a part of this permit." Id.

The Claims Court relied upon Mountain States to find that no implied-in-fact contract was formed in a case involving facts similar to this one. Pacific Gas & Elec. Co. v. United States, 3 Cl. Ct. 329 (1983), aff'd, 738 F.2d 452 (Fed. Cir. 1984). In PG&E, the Claims Court declined to find that an implied-in-fact contract had arisen when the Forest Service and PG&E never finalized an agreement about the costs of reconstructing a road that PG&E used heavily. Id. at 340. The court and noted the broad scope of the Secretary of Agriculture's discretion in regulating the national forests, including "tax-supported road systems in national forests that suffer substantial use by private entities." Id. at 342.

Here, the parties did not enter into a MOU or any other agreement that expressly required the Forest Service to assume the cost of replacing the Sweetwater bridges to ensure passenger car access to the lodge. DPFF 80-82; JX 1, JX 4. Moreover, the permit expressly provides that The Sweetwater assumed the risk that the road or bridges leading to The Sweetwater's lodge would become impassable. Clause 30 of the permit, titled "Risks and Hazards," states in its entirety: "Avalanches, rising waters, high winds, falling limbs or trees, and other hazards are natural phenomena in the Forest that present risks which the holder assumes. The holder has responsibility of [sic] inspecting the site, lot, right-of-way, and immediate adjoining area for dangerous trees, hanging limbs, and other evidence of hazardous conditions and, after securing permission from the Forest Service, of removing such hazards." JX 1, ¶ 30. Clause 30 placed upon the permittee the risk that heavy rainfall or snowmelt in Sweetwater Creek would wash out Sweetwater Road or the abutments that supported the Sweetwater bridges.

Mr. Mummery understood that he was responsible for hazardous conditions on Sweetwater Road, not just on the 15.4 acre site for his lodge. DPFF ¶ 71. The risk that erosion from Sweetwater Creek presented to the abutments to the Sweetwater bridges was contemplated and discussed by The Sweetwater and the Forest Service at the June 12, 1999 meeting before the permit issued. DPFF ¶ 72. Mr. Mummery testified at trial that when he discussed the bridges with Forest Service representatives in June 1995 before the permit issued, "I was concerned about a big flood, a washout, a gullywasher, whatever you want to call it, that wiped out the bridges." DPFF ¶ 73. Acting Wapiti District Ranger Bob Rossman testified that he told Mr. Mummery during the June 1995 meeting that the bridges were "vulnerable" to such a washout. DPFF ¶¶ 74-75.

The Court of Claims rejected a contractor's claim that the Government bore responsibility for ensuring vehicular access to a construction site despite a flood that rendered unavailable access roads to the site. Lenry v. United States, 156 Ct. Cl. 46, 297 F.2d 550 (1962). The contractor had anticipated using the roads in its method of operation, which was not a part of the contract itself. Id. The court rejected the plaintiff's claim that because parts of existing roads that led to the construction site were shown on the contract drawings, that the Government "impliedly warranted, for the life of the contract, the continued availability of the streets intended by plaintiff to be used as access roads." 297 F.2d at 553. The court stated, "plaintiffs make no attempt to define the scope of the warranty they find implicit in the contract. . . . Had defendant ever intended to make such a unique and all-encompassing guarantee, and had plaintiffs expected it, we believe they would have so specified in clear and unmistakable language." Id.

If the Forest Service had intended to assume responsibility for ensuring that the Sweetwater Road and bridges would remain passable for cars for the 20-year life of the permit, it would have expressly stated that commitment in the permit. Instead, clause 30 of the permit provides that the permittee assumed the risk that rising waters might render the roads or bridges impassable.

The Court of Appeals for the Federal Circuit cited Lenry in a decision that also rejected a contractor's assertion that an implied warranty of access was created to reach a construction site. Oman-Fischbach Int'l (JV) v. Pirie, 276 F.2d 1380, 1385 (Fed. Cir. 2002). In Oman-Fischbach, the court relied in part upon the standard site investigation clause, FAR 52.236-3, which the court ruled placed the burden of determining the availability of roads upon the contractor. Id. The court of appeals also found that the risk of increased costs

caused by third parties, like the flood in Lenry, were not shifted to the Government unless the parties had agreed so "in unmistakable terms." Id. In Son Broadcasting, this Court also relied upon Lenry in holding that the permit did not support any implied warranty of access. 30 Fed. Cl. at 128. Here, if the permit issued to The Sweetwater is treated as a contract, clause 30 similarly required The Sweetwater to assume the responsibility for ensuring that the road and bridges leading to its lodge remained passable.

**B. The Parties' Discussions Before The Permit Issued Preclude Any Implied Duty To Ensure Access Over Bridges To The Lodge**

Plaintiff has acknowledged that the promise that it seeks to enforce is not expressly stated in the permit. Instead, plaintiff rests its case upon its assertion that the permit is a contract that gives rise to implied duties to cooperate and not hinder The Sweetwater's performance of its alleged contractual duty to operate a public resort. Tr. 12:6-20. The specific duty that plaintiff asserts it was owed by the Forest Service was to ensure that the two Sweetwater bridges remained passable to provide access to the lodge in all conditions, as opposed to fords, which could not be used during high water caused by snowmelt or heavy rains, and might only be accessible to high-clearance vehicles even during low water. Tr. 12:21-13:11, 141:4-142:8.

The Federal Circuit has ruled that the implied duties to cooperate and not hinder performance of Government contracts are "an aspect of the duty of good faith and fair dealing." Essex Electro Engineers v. Danzig, 224 F.3d 1283 (Fed. Cir. 2000). The Federal Circuit has also ruled that "implied covenants of good faith and fair dealing are limited to assuring compliance with the express terms of the contract and cannot be extended to create new obligations not contemplated in the contract." Bradley v. Chiron Corp., 136 F.3d 1317, 1326 (Fed. Cir. 1999).

In the circumstances of this case, the Court should not imply any duty to replace the Sweetwater bridges for at least two reasons: (1) the Forest Service official who issued the permit lacked authority to enter a binding contract that committed the Government to funding the replacement of the bridges; and (2) the permittee understood that he might have to use fords as a means of access for an indefinite period if the bridges became impassable.

### 1. Mr. Rossman Lacked Authority To Commit The Government To Replacing The Bridges

Mr. Mummery admitted that at the June 12, 1995 meeting before The Sweetwater closed its purchase of the lodge, the Forest Service representatives clearly stated that they lacked the authority to commit the Forest Service to ensuring all-weather access to the lodge by bridges. DPFF ¶¶ 88-91. During his testimony, Bill Simpson, the lawyer who represented The Sweetwater at the meeting, agreed that Forest Service employee Monte Barker, with the concurrence of Acting District Ranger Bob Rossman, did not make any unconditional commitment to rebuild the bridges. DPFF ¶ 92.

Mr. Mummey also testified that he understood that higher-level Forest Service officials might decide not to fund replacement of the bridges if they became impassable. Id. ¶ 91. Moreover, the Forest Service representatives stated clearly that it was unlikely that approval would be granted to fund the bridges for the foreseeable future, because they were a low priority in relation to other higher-use capital improvement projects. DPFF ¶¶ 83-87.

In these circumstances, no binding commitment to replace the bridges could arise from the June 12, 1995 meeting. No contract can be formed with the Government unless the Government representatives whose conduct is relied upon possess actual authority to bind the United States in contract. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947); Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003). Authority to bind the

Government may be implied when such authority is considered to be an integral part of the duties assigned to an agency's employee. H. Landau & Co. v. United States, 886 F.2d 322 (Fed. Cir. 1989).

Mr. Rossman was Acting District Ranger for the Wapiti District in 1995, and signed the permit as the "Acting Forest Supervisor." JX 1/1. The Forest Service Manual only permits Forest Supervisors to delegate authority to District Rangers to issue special use permits for terms of less than five years, or for "standardized" permits on sites approved in the Forest plan. DX 37 (FSM 2704.34). Mr. Larson testified that Barry Davis, who was Forest Supervisor for the Shoshone in 1995, had purported to delegate to District Rangers authority to issue all term permits. DPFF ¶ 63; DX 7/2.

Even if Mr. Davis were able to delegate authority to Mr. Rossman to issue the permit to The Sweetwater as the "Acting Forest Supervisor" (JX 1/1), Mr. Rossman, as an Acting District Ranger, was not authorized to issue a permit that assumed responsibility for replacing the Sweetwater bridges. The standard permit issued for use of the lodge eventually acquired by The Sweetwater did not include any responsibility for the Government to replace the bridges. As Mr. Mummery was aware, the bridges were built by previous permittees, and had always been their responsibility. DPFF ¶¶ 18-19. The permit issued to the Brannons in 1983 specifically charged the permittees with responsibility for "operating and maintaining . . . two bridges (FS No. 423-2[.]5 and 423-3.0)." JX 3/1. In 1985, the Forest Service agreed to assume maintenance responsibility for the Sweetwater bridges, but made no commitment regarding "bridge replacement" other than agreeing to address the subject in a yearly joint maintenance plan. JX 4, ¶ C.4. The permit issued to The Sweetwater states, like the

Brannons' permit, that it was issued for the purpose of operating a public resort on a 15.4 acre site, but does not refer to the bridges in any fashion. JX 1.

The exclusion of the bridges from the scope of the permit issued to The Sweetwater was not a positive representation that the Forest Service would replace the bridges. Mr. Rossman was not authorized to alter the standard permit previously issued. FSM 2704.34. Moreover, Mr. Rossman was not a contracting officer when he signed the permit issued to The Sweetwater, and did not have a warrant that authorized him to incur the substantial expense of procuring two bridges. DPFF ¶ 65. Authority to contract cannot be implied "to bind the government in contract when an agency's internal procedures specifically preclude its agent from exercising such authority." Contel of California, Inc. v. United States, 37 Fed. Cl. 68, 73 (1996).

Plaintiff's assertion that Mr. Rossman possessed authority to commit the Forest Service to obtaining funds to replace the bridges is another important distinction between this case and Son Broadcasting. The Court concluded that the Forest Service officials in Son Broadcasting possessed authority to bind the Government, even though they lacked warrants. 52 Fed. Cl. at 820-21. However, the plaintiff in that case did not seek to enforce any alleged right that the Forest Service would pay the plaintiff any money, but instead contended that the Forest Service was required not to authorize construction of a third tower on the communication site until the first two towers reached capacity. Id. at 819. The Court determined that the permit was a binding contract because the Forest Supervisor was authorized by regulation to issue a special use permit that granted the permittee a specific described right to rent out space on its tower and preclude construction of a third tower until the technical capacity of its tower was reached. Id. at 821 (citing 36 C.F.R. § 251.54(c)).

The Court did not determine that Forest Supervisors possess the authority to bind the Government to an agreement requiring the disbursement of funds.

Similarly, in PG&E, representatives of the Forest Service and PG&E held meetings to discuss the costs of reconstructing the road, and both sides understood that negotiators at the Forest level could not enter a final agreement, but could only recommend actions to the Regional Forester. 3 Cl. Ct. at 332, 339. Ultimately, the Regional Forester determined that the Forest Service was not required to make a cost share agreement with the plaintiff, but might make contributions to the costs of reconstruction "'based on benefits to the public in relation to management of National Forest lands.'" Id. at 334-35.

The Claims Court declined to find an implied-in-fact contract in part because the Forest Service representatives lacked authority to bind the Government in contract. Id. at 340. This Court reached the same conclusion regarding the grazing permit in Hage, ruling that the Forest Service did not have the authority to bind the Government in contract, "[e]ven if the plaintiffs believed the permit to be a contract." 35 Fed. Cl. at 167.

### 2. The Government Clearly Stated That The Sweetwater Would Have To Use Fords As Its Means Of Access If The Bridges Failed

Even if Mr. Rossman did possess the authority to bind the Government to a promise to replace the bridges, he and the other Forest Service representatives expressly stated at the June 12, 1995 meeting that they could not promise to replace the bridges, but instead, told The Sweetwater that it would have to use fords as the means of access to the lodge if the bridges failed. DPFF ¶¶ 93-94.

This was reasonable in light of the history of the lodge. Mr. Mummery, as a long-time resident of Cody, was personally aware that the bridges had been the responsibility of the permittee. DPFF ¶ 18. The usage of the road for purposes other than the lodge was light,

and principally occurred during the hunting season, by hunters who used high-clearance vehicles to hunt from the road or tow horse trailers up the road. DPFF ¶¶ 14-15. The Forest Service witnesses provided uncontradicted testimony that after Sweetwater Road was closed to vehicular access by the public in 2001, there were almost no complaints from the public. DPFF ¶ 180. Fords are used on other roads in the Shoshone National Forest and other national forests that are open to the public for recreational purposes. DPFF ¶ 98.

At trial, Mr. Mummery admitted that he did not have any problem with using fords to operate his lodge, but quibbled that the word “temporary” should have been inserted into Mr. Rossman’s summary of the June 12, 1995 meeting. DPFF ¶¶ 95-96. However, it is undeniable that Sweetwater Road was identified on the 1990 Shoshone National Forest map that was in effect in 1995 as a “high-clearance” road. DPFF ¶ 6. In addition, both Forest Engineer Jim Fischer and Wapiti District Ranger Brent Larson testified that signs were posted on the road, probably in the 1993-95 period, stating that the road was not maintained by the Forest Service for passenger car vehicles. DPFF ¶¶ 10-12.

Although Mr. Mummery vehemently denied that such a sign was ever posted (Tr. 2921:9-15), it is noteworthy that Mr. Mummery’s recollections regarding the presence or absence of signs on Sweetwater Road have evolved as this case has progressed. In paragraph 13 of his declaration in support of The Sweetwater’s February 2004 cross-motion for summary judgment, he swore that “[n]o warning signs of any type were ever placed at the bridges from 1995 to the present.” DPFF ¶ 76. However, at trial, Mr. Mummery testified that he clearly recalled seeing the “Weight Limit 3 Tons” warning signs in 1995 when he visited the lodge, which he claimed led him to conclude that the bridges were safe if used by vehicles weighing less than 3 tons. DPFF ¶ 77.

In light of Mr. Rossman's express refusal to assume any duty to replace the bridges, plaintiff is precluded from expanding the scope of any implied duties to cooperate and not hinder to include an implied duty to repair or replace the bridges. This Court should not now rewrite the results of the alleged negotiation session, and imply into the permit a contractual duty that is much broader than the duties the Forest Service was prepared to assume in the MOU that it offered to The Sweetwater. JX 3.

Plaintiff has failed to distinguish the circumstances of this case from Walter Dawgie Ski Corp. v. United States, 30 Fed. Cl. 115, 129-31 (1993), in which this Court rejected a very similar claim by a ski resort owner who contended that the term special use permit issued to him required the Forest Service to provide vehicular access to the permitted site at all times. In Walter Dawgie, the only paved route of access to the ski resort was closed by road construction from 8:30 a.m. to 4:30 p.m. Monday through Thursday, which the permittee claimed had a significant impact on its ability "to conduct business during regular business hours." Id. at 118, 122.

The plaintiff contended that the permit gave rise to an implied duty not to hinder the resort operator in performing the obligations allegedly required by the permit. Id. at 129. The Court ruled that "[w]hile the duty not to hinder performance assuredly incorporates certain assurances of access, the Forest Service never assured [the permittee], expressly or impliedly, of unlimited and uninterrupted access to the permitted property," and granted summary judgment for defendant. Id. at 131 (emphasis added).

Similarly, the Forest Service never assured The Sweetwater of bridges to provide unlimited and uninterrupted access to the lodge for all forms of vehicles in all weather conditions.

**C. The Alleged Actions Of The Forest Service After The Permit Issued Did Not Breach Any Implied Duties To Cooperate And Not Hinder**

Plaintiff asserts that after the permit issued in August 1995, the Forest Service violated what plaintiff asserts was an implied duty for the Forest Service to "do its best" to secure funding to replace the bridges. Plaintiff relies upon S.A. Healey Co. v. United States, 216 Ct. Cl. 172, 576 F.2d 299 (1978), which is fundamentally different from this case. In S.A. Healey, the plaintiff submitted to the contracting agency a proposed construction program that projected expected earnings for each of the four years of the contract. 576 F.2d at 301. The authorized representative of the contracting officer approved the proposed program, including the earnings. Id. The agency then requested from Congress $1,800,000 in earnings for the second year of the contract, much less than the approved amount of $4,887,000. Id. at 302.

The court agreed with plaintiff's assertion that "after approving the proposed schedule, the government had a duty to facilitate that schedule, by requesting full fiscal year funding of Congress." Id. at 303 (emphasis added). The court applied the implied duty to cooperate to an express agreement of the parties: the amount of earnings that the contracting officer's authorized representative had approved for payment by the Government. In contrast, even plaintiff concedes that the Forest Service representatives at the June 1995 meeting made clear that they lacked the authority to enter any agreement that granted The Sweetwater any right that the Forest Service would replace the Sweetwater bridges.

The court's ruling in S.A. Healey is consistent with a more recent decision of the Federal Circuit holding that "implied covenants of good faith and fair dealing are limited to assuring compliance with the express terms of the contract." Bradley, 136 F.3d at 1326. The court's ruling in S.A. Healey is also consistent with this Court's ruling in Son Broadcasting,

which enforced what the Court found to be an express right that the Forest Service granted the permittee in the permit. 52 Fed. Cl. at 825. The language in the permit issued to The Sweetwater on which plaintiff relies – the requirement that The Sweetwater "maintain[] and operat[e] a public resort" – does not grant a right to the permittee, but instead imposes a duty upon it. JX 1.

District Ranger Brent Larson's February 20, 1997 letter to the prospective purchasers of the lodge, Ray and Judi Sutherland, confirmed that it was unlikely that the Forest Service would obtain funding to replace the bridges: "access would more likely become seasonal fords of the Sweetwater River should the condition of the bridges deteriorate . . . . funding for replacement of these bridges is not currently available, and the lik[e]lihood of obtaining adequate funding to replace these bridges in the future is low." JX 11.

It was only at Mr. Mummery's insistence that Mr. Larson sent a second letter dated February 27, 1997 that stated that "[r]eplacement bridges for these two bridges crossing Sweetwater Creek are currently included in the Forest's Capital Improvement Program for FY 1999." JX 12. However, Mr. Larson also stated that funding for the project "is subject to Congressional approval, and I cannot guarantee it will be available at that time." Id. As Mr. Larson had already informed Mr. Mummery in the February 20, 1997 letter, it was unlikely that the Forest would obtain sufficient funds to replace the bridges, because Congress was unlikely to appropriate sufficient funds to permit the Shoshone National Forest to fund all projects in its Capital Improvement Program ("CIP"). JX 11.

Moreover, Mr. Larson's February 27, 1997 letter was incapable of binding the Forest Service to obtain or seek funding to replace the bridges. Unlike the authorized representative of the contracting officer, who approved the earnings in S.A. Healey, Mr. Larson lacked

authority to approve the project to replace the bridges. Like Mr. Rossman, he was not a contracting officer, and pursuant to the Forest Service Manual ("FSM"), only held authority to administer the permit, not to alter its terms. DX 37 (FSM 2704.22). Rebecca Aus, who had become Forest Supervisor in August 1996, made clear upon her arrival that she followed the delegation of authority set forth in the Forest Service Manual. Tr. 1315:13-1314:9. Mr. Larson was not authorized to issue a new permit for The Sweetwater's lodge that changed the terms of the permit in any way, and thus was not authorized to bind the Government to a commitment to fund the replacement of the bridges. DX 37 (FSM 2704.34).

Plaintiff has accused the Forest Service of numerous other actions and omissions that erroneously presume that, by issuing a permit that required The Sweetwater to operate a public resort, the Forest Service had assumed a contractual duty to "do its best" to seek funding to replace the bridges, so that vehicles could reach the lodge at all times. However, as this Court noted in Walter Dawgie, the duty not to hinder does not imply an unlimited right of access, but at most, implied only that the Forest Service would permit The Sweetwater to access the lodge using fords. Walter Dawgie, 30 Fed Cl. at 131.

Thus, even if the permit did give rise to an implied duty to provide access, the Forest Service has not failed to fulfill this duty. Plaintiff concedes that he has never asked that the Forest Service install fords, and has never attempted to operate the lodge using fords, and thus has breached any duty to cooperate that arises from the permit. DPFF ¶ 154. Cedar Lumber v. United States, 5 Cl. Ct. 539, 459 (1984) ("there is an implied obligation on both parties to cooperate and not to hinder the performance of the other party") (emphasis added).

Moreover, neither Mr. Larson nor Mr. Fischer, who plaintiff accuses of perpetrating these alleged misdeeds, were authorized to bind the Government to procure replacement

bridges. Neither was a contracting officer or held a warrant, so they could not agree to assume any contractual duties that were not present when the permit issued, particularly any duties that required the Forest Service to incur the substantial expense of replacing the bridges. DPFF ¶¶ 157-58.

Mr. Fischer was also not a line officer, and possessed no authority to issue or administer permits. FSM 2704.34. As District Ranger, Mr. Larson possessed authority to administer the permit, but did not possess authority to determine how the Shoshone National Forest balanced the competing demands with the Capital Improvement Program. That authority was reserved to the Forest Supervisor, Rebecca Aus, who was responsible for “integration of special use activities with other resources management.” DX 37 (FSM 2704.22). Even Ms. Aus, however, was not a contracting officer, and thus was not authorized to enter contracts to replace the Sweetwater bridges. DPFF ¶ 159.

Even if there were a duty to seek funds to replace the bridges, the Government has not breached that duty. If a plaintiff shows that by action or omission the Government has not cooperated in the contractor’s performance, then the Government may still "negate liability by showing that the government conducted itself in a diligent, good faith manner" (emphasis added). Cedar Lumber, 5 Cl. Ct. at 550. Government officials are presumed to act in good faith, and a contractor "can overcome this presumption only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it." Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995) (quoting Torncello v. United States, 681 F.2d 756, 770, 213 Ct. Cl. 20 (1982)); accord T&M Distributors, Inc. v. United States, 185 F.3d 1279, 1285 (Fed. Cir. 1999). There is no evidence that the Forest

Service has demonstrated a specific intent to injure The Sweetwater by not funding the repair or replacement of the Sweetwater bridges.

The Shoshone National Forest sought to secure funding to replace the Sweetwater bridges through the Forest Service's CIP Program. In fiscal year 1992, a March 1992 CIP proposal to replace the bridges was accepted into the "hopper" of projects eligible for funding. DPFF ¶ 20. However, in 1994, the CIP proposal to replace the Sweetwater bridges was indefinitely postponed because of a lack of funds. DPFF ¶ 24. In June 1996, Mr. Fischer told Jeff Mummery that the proposal to replace the bridges had been put back into the CIP program. DPFF ¶ 151. As discussed above, Mr. Larson told Mr. Mummery in the February 20, 1997 letter that a request for CIP funding had been made to replace the bridges in fiscal year 1999. JX 11. However, the project was postponed to fiscal year 2000, probably because of a lack of funds and engineering personnel. DPFF ¶ 160.

Mr. Fischer testified that during fiscal year 2000, as the result of conversations he had with Mr. Larson and Ms. Aus, replacement of the bridges was indefinitely postponed. DPFF ¶ 166. Ms. Aus determined that the project should be once again indefinitely postponed because any available CIP money was better spent on campgrounds than on replacing the Sweetwater bridges, which were on a Level 2 road that was by definition a low-maintenance road for high-clearance vehicles. DPFF ¶ 167-68.

This course of conduct does not manifest any specific intent to injure The Sweetwater. Caldwell & Santmyer, 55 F.3d at 1581. The Shoshone has had limited funding and personnel to devote to CIP projects, and has devoted its resources toward recreational projects such as campgrounds that offer the greatest value to the public. Devoting resources to higher-priority projects than replacing the Sweetwater bridges does not, as a matter of law,

evidence any bad faith sufficient to violate any duty of good faith and fair dealing. This is particularly true when The Sweetwater understood, when it bought the lodge, that a higher-level Forest Service line officer might decide not to fund the proposal to replace the bridges. DPFF ¶ 91.

Ultimately, both Mr. Fischer and Mr. Larson lacked the authority granted to Ms. Aus. Plaintiff erroneously assumes that because Ms. Aus had delegated to Mr. Larson day-to-day administration of the permit issued to The Sweetwater, and that because Mr. Fischer represented the Shoshone in regional discussions about prioritizing capital improvement program projects, that Ms. Aus had ceded all her authority to decide whether to replace the Sweetwater bridges. These assertions are inconsistent with Ms. Aus's testimony regarding in her involvement in the decision-making process. DPFF ¶ 167-68.

Plaintiff's assertion regarding Ms. Aus's alleged lack of authority is also contradicted by the respective responsibilities that the Forest Service Manual establishes for line officers:

> 2704.22 – Forest Supervisor. It is the responsibility of the Forest Supervisor to:
>
> 1. Provide management direction that ensures integration of special use activities and objectives into the programs and projects at the Ranger District level.
> 2. Ensure <u>integration of special use activities with other resources management</u> in developing and implementing the National Forest land and resource management plan. . . .
>
> 2704.23 – District Ranger. Each District Ranger is responsible for all special use activities on the District. Except for those responsibilities specifically reserved by the Forest Supervisor, it is the responsibility of the District Ranger to:
>
> 1. Assure high-quality <u>on-the-ground administration</u> of the special-uses program.

FSM 2704.22-23 (emphasis added). Ms. Aus only delegated to Mr. Larson responsibility to administer the permit on a day-to-day basis. Thus, as Forest Supervisor, Ms. Aus reserved

her responsibility to determine whether the Shoshone's limited funds were better spent on other Forest Service resources, such as heavily used campgrounds on the Yellowstone Highway, rather than on replacing the Sweetwater bridges.

In sum, the permit did not give rise to any implied duties to replace the bridges or seek funding for that purpose. Even if the Court concludes that such a duty did arise, the Forest Service has acted in good faith, and did not breach any implied duties to cooperate and not hinder.

## IV. The Forest Service Has Not Violated Clause 15 Of The Permit, As Asserted In Count II

Plaintiff has asserted that clause 15 of the permit requires the Forest Service to compensate The Sweetwater if the Forest Service "terminates lodge operations under the permit for the public interest," and asserted further that "the Forest Service did in fact deliberately terminate lodge operations." Pl. Mem.[2] 30 (emphasis added). Both assertions are incorrect.

Plaintiff tries to rewrite the terms of clause 15. First, clause 15 states that the Forest Service will pay the permittee equitable consideration if a duly authorized Forest Service official determines that "the public interest requires termination of this permit," not termination of "lodge operations" (emphasis added). JX 1. The requirement to compensate the permittee only arises if the Forest Service revokes permission to conduct the activities allowed by the permit, and is not triggered by cessation of the lodge's operations.

Second, it was The Sweetwater, not the Forest Service, that in 1997 chose not to operate the lodge until the bridges were replaced. The Forest Service has never effected any

---

[2] "Pl. Mem." refers to plaintiff's pre-trial Memorandum of Contentions of Fact and Law, filed July 9, 2005.

"termination of this permit" within any reasonable interpretation of the ordinary meaning of that phrase. The front page of the permit grants The Sweetwater "[p]ermission . . . to use subject to the conditions set out below" 15.4 acres in the Shoshone National Forest "for the purpose of maintaining and operating a public resort." JX 1. It is indisputable that the Forest Service has never terminated The Sweetwater's permission to use the site of its lodge for the purpose of operating a public resort. Forest Service regulations define both "termination" and "revocation" as "the cessation of a special use authorization." 36 C.F.R. § 251.51. The Notice of Non-Compliance that the Forest Service served on The Sweetwater in December 2001 "provide[d] notice of facts that may warrant revocation of your permit," but the Forest Service has never proceeded to terminate or revoke the permit, despite The Sweetwater's subsequent failure to submit an acceptable operating plan. DPFF ¶ 178.

Plaintiff has failed to address, let alone distinguish, Federal Circuit precedent holding that when interpreting a contract, a court begins with the plain language, and gives it its ordinary meaning. E.g., McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (in interpreting a contract, "[w]e begin with the plain language"); Harris v. Department of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998) ("[w]e give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning"). Plaintiff has failed to offer any reason why the portion of the permit that states "termination of this permit" should be read to mean "termination of lodge operations."

Even if this were a reasonable interpretation, Mr. Mummery testified that it was he who concluded that he could not operate the lodge, and that the Forest Service never prohibited him from operating the lodge anytime before the bridges were closed to vehicular

traffic in April 2001. DPFF ¶ 147. Nor did the Forest Service ever refuse to provide fords that would allow The Sweetwater to operate the lodge. DPFF ¶ 154. Thus, the Forest Service never "terminated" lodge operations.

Clause 15 also does not require the Forest Service to buy The Sweetwater's lodge if the bridges were not replaced. At trial, Mr. Mummery testified that during the June 12, 1995 meeting, he stated that if the Forest Service decided not to replace the bridges, he understood he would be compensated pursuant to the termination provisions of clause 15 of the permit. DPFF ¶ 99. However, this assertion is inconsistent with the testimony of all three Forest Service employees who attended the meeting as well as the testimony of The Sweetwater's own lawyer, Bill Simpson, who does not recall any discussion regarding clause 16 of the Brannons' permit, which contains the same termination provision contained in clause 15 of the permit that was issued to The Sweetwater. DPFF ¶ 101-06.

Mr. Mummery proposed a term in the 1995 operating plan that provided that the permittee had the right to apply for compensation pursuant to clause 15 if the lodge's operations were suspended to prevent conflicts with grizzly bears. DPFF ¶ 107. However, he never sought to amend the 1995 or any subsequent operating plan to incorporate the alleged representation by the Forest Service that it would buy his lodge if the bridges were not replaced. DPFF ¶ 108.

If the Forest Service representatives had agreed with Mr. Mummery's interpretation of clause 15 during the June 1995 meeting, as he now claims, why did he never state in his extensive correspondence with District Ranger Brent Larson during 2001 that the Forest Service had promised that it would buy his lodge if it decided not to rebuild The Sweetwater bridges? JX 16, JX 18, JX 20. Mr. Mummery's trial testimony is also inconsistent with

plaintiff's complaint (¶¶ 9-10), which makes no mention of this alleged representation at the June 1995 meeting, even though it asserts that the Forest Service has violated clause 15 of the permit. Compl. ¶¶ 37-39.

Mr. Mummery asserted that he believed that Mr. Rossman and the other Forest Service representatives at the June 1995 meeting possessed the authority to commit the Forest Service to buying the lodge if the bridges were not replaced, but this is inconsistent with this admission that he understood that they lacked the authority to commit Forest Service funds to replace the bridges. DPFF ¶¶ 88-91. However, he never asked Mr. Rossman or the other representatives at the June 12, 1995 meeting whether they possessed the authority to commit the Government to buying the lodge if the bridges were not replaced. DPFF ¶ 100. "Anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government." Trauma Service Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997).

It is undisputed that clause 15 makes no reference to replacing the bridges, and that The Sweetwater chose not to obtain an express commitment from the Forest Service about what would happen if the bridges failed. JX 1; DPFF ¶ 80. Clause 15 says nothing to suggest that not replacing the bridges would ipso facto constitute a determination to terminate the permit for the lodge, much less an agreement to "buy[]" the lodge. JX 1/3, ¶ 15. On the contrary, clause 15 requires first, a determination that terminating the permit is in the public interest, and second, completion of a process pursuant to which the Forest Service retains final authority to determine the amount of equitable consideration. Id. "A party may not rely upon its subjective understanding of an agreement to overcome the plain

and unambiguous terms of a written agreement." Lamirage, Inc. v. United States, 44 Fed. Cl. 192, 198 (1999).

In support of its assertion that defendant has violated clause 15, plaintiff relies upon a single decision of this Court that is readily distinguishable from the circumstances of this suit, Wetsel-Oviatt Lumber Co., Inc. v. United States, 38 Fed. Cl. 563, 565 (1997). In Wetsel-Oviatt, the Forest Service conducted an "Environmental Assessment" that substantially restricted the amount of timber that could be harvested pursuant to the sales contracts. Id. at 567. The Government admitted that as a result of the environmental assessment, the Forest Service had no intention of permitting the timber to be harvested. Id. at 570. The contracts contained termination clauses providing that the contract could be terminated "upon determination that Purchaser's Operations would cause serious environmental damage." Id. at 568.

The Court ruled that because the Forest Service had determined that the harvest would be environmentally harmful, it could not deny that it had terminated the contract, noting that "the government has conceded that a termination has taken place." Id. at 570 n.7 (citing Davidson Indus., Inc., AGBCA No. 95-166-1, 96-2 BCA ¶ 28,299 (1996)). Similarly, in Davidson, there was no dispute that the Forest Service had suspended a portion of a timber sale contract until completion of a consultation process with the United States Fish and Wildlife Service about concerns over the effect on the spotted owl and marbled murrelet. 96-2 BCA ¶ 28,299.

In contrast to the environmental assessments in Wetsel-Oviatt and Davidson, the Forest Service never performed an environmental assessment or any other analysis that concluded that operation of The Sweetwater's lodge caused serious environmental damage.

DPFF ¶ 156. On the contrary, Shoshone Forest Supervisor Rebecca Aus testified that operation of the lodge is consistent with the Forest Plan for the Shoshone. DPFF ¶ 169. As a result, Ms. Aus, in consultation with Wapiti District Ranger Brent Larson, determined that the public interest did not require termination of the permit. DPFF ¶ 156. Unlike in Wetsel-Oviatt and Davidson, the Forest Service does not concede, and the facts do not support, that it has terminated the permit or the operations of The Sweetwater's lodge.

Plaintiff has asserted that because Mr. Larson was delegated authority to administer the permit on a day-to-day basis, that he also possessed authority to terminate the permit pursuant to clause 15. Pl. Mem. 31. Acting Wapiti District Ranger Bob Rossman issued the permit to The Sweetwater, using his supposed delegated authority to sign the permit on August 21, 1995 as "Acting Forest Supervisor." JX 1. As District Ranger, Mr. Larson was only delegated authority to administer the permit on a day-to-day basis. Tr. 1635:2-11; DX 37 (2704.33). Thus, Mr. Larson lacked the necessary authority to make any decision to terminate the permit, which could only be terminated by the Forest Supervisor. FSM 2704.33. Plaintiff has failed to prove that there was any "termination of this permit" within the meaning of clause 15.

Mr. Larson only began his search for a conservation buyer in response to Mr. Mummery's decision in February 1997 not to operate the lodge, which Mr. Mummery now contends resulted from his concerns about liability for accidents on the bridges, although in 1997 and 1998, he told Mr. Larson that he could not take advance bookings if the bridges were unreliable. DPFF ¶ 142, 144, 155. The reason that Mr. Larson pursued a conservation buyer was to relieve Mr. Mummery of his obligation to operate the lodge. DPFF ¶ 155.

At no time did Mr. Larson conclude that "the public interest requires termination of the permit," which is the necessary prerequisite set by clause 15 to trigger the requirement to pay equitable consideration to the permittee, nor did he possess the authority to make that determination. DPFF ¶ 156; JX 1; Tr. 1272:6-25. The Roads Analysis prepared by the staff of the Shoshone National Forest during 2002-03 does not demonstrate any motivation or decision by Mr. Larson during 1997-2000 to put the land area where the lodge operations occurred to a better public use. PX 28.

In sum, plaintiff's assertion that the Forest Service has violated clause 15 of the permit is belied by the plain terms of the permit, which require the Forest Service to pay plaintiff only if the Forest Service terminates the right to conduct operations, not if the permittee determines it must cease operations. Plaintiff's claim fails because Mr. Larson could not, and did not, determine that the public interest required termination of the permit.

## V. Plaintiff's Failure To Operate The Lodge As A Public Resort Was A Material Breach Of Contract That Excused Any Alleged Non-Performance By The Forest Service

The Government cannot be held liable for breach of contract for failing to replace the bridges in 1997 and thereafter, because plaintiff violated the terms of the permit in 1996 by not operating the lodge as a public resort. Christopher Village , L.P. v. United States, 360 F.3d 1319, 1334 (Fed. Cir. 2004) ("When ' a party to a contract . . . is sued for its breach [it] may ordinarily defend on the ground that there existed, at the time [of the breach], a legal excuse for nonperformance.'") (quoting Coll. Point Boat Corp. v. United States, 267 U.S. 12, 15 (1925)).

Plaintiff cannot disavow Mr. Mummery's numerous admissions that The Sweetwater has violated the terms of the permit by never operating the lodge as a public resort. Mr.

Mummery testified that once he made contact with Mr. Carl Bixby in late 1995, Mr. Mummery did not try to secure any other bookings for the 1996 season, because he was operating the lodge “exclusively” for Mr. Bixby and his family and friends. DPFF ¶¶ 127-28. Mr. Mummery contended that Mr. Bixby was supposed to obtain customers for the lodge, even though The Sweetwater was still the permittee. DPFF ¶ 129. It is evident from Mr. Mummery's testimony that he had no regard for the permit's requirement that he operate a "public resort," and did not believe that the permit governed to whom he rented the lodge.

Further confirmation of the non-public nature of the lodge's operations during 1996 is that on April 7, 1997, after Mr. Mummery told the Forest Service that he was unable to operate the lodge, he told Forest Service Realty Specialist Jennifer Watson, "admittedly I haven't opened the lodge, which perhaps in retrospect is good" (emphasis added), a revealing comment that Ms. Watson recorded verbatim in her calendar. DPFF ¶ 146.

It is also indisputable that The Sweetwater breached clauses 51 and 54 of the permit. Clause 51 requires the permittee to notify the Forest Service when a "transfer in ownership of their permitted improvements is planned." JX 1/14. Mr. Mummery testified that clause 52 applied to the sales contract that The Sweetwater's owners signed to sell all their interest in The Sweetwater to Mr. Bixby, because The Sweetwater still owned the lodge. Tr. 167:12-168:3. Clause 51 does not contain the limitation that plaintiff seeks to read into it, because "ownership of their permitted improvements" is not limited to a transfer of title, but also includes any direct or indirect transfers in ownership of the permitted property, whether executed through a transfer of title or a stock sale. JX 1/14.

This is evident from Clause 54, which requires the permittee to notify the Forest Service of the “[n]ames of stockholders who acquire stock shares causing their ownership to

exceed 50 percent of shares issued or who otherwise acquire controlling interest in the corporation" (emphasis added). If the term "ownership" as used in clause 51 were interpreted as plaintiff contends, then permittees could always evade the requirement to give advance notice to the Forest Service of any changes in ownership or control of a corporate permittee by structuring the transaction as a sale of the permittee's stock. A contract must be read as a whole so as not to render portions of it as meaningless. Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996).

It is undisputed that The Sweetwater submitted no operating plan between the May 1996 plan and the inadequate plan submitted in July 2002. DPFF ¶ 149. Thus, if the permit were a contract, The Sweetwater's failure to comply with the unambiguous conditions set forth in the permit excused any non-performance by the Forest Service of the alleged contract. Christopher Village, 360 F.3d at 1334.

## VI. The Forest Service Has Not Committed Any Tortious Breach Of The Permit

Plaintiff did not plead in Counts I and II of its original complaint any allegations that stated a claim for tortious breach of contract or misrepresentation. Plaintiff's first amended complaint added a taking claim in Count III, but did not amend or supplement the allegations pleaded in Counts I and II. Plaintiff first asserted a claim for tortious breach of contract in its cross-motion for summary judgment, which was filed months after fact discovery closed. In our opposition to plaintiff's cross-motion for summary judgment, we objected to plaintiff's assertion of this new cause of action as untimely. Plaintiff still has not sought leave to amend its complaint, but asserted tortious breach of contract as a legal theory in its pre-trial brief. Pl. Mem. 33-36.

Plaintiff should not be allowed to pursue at trial a new theory of liability that is not pleaded in any fashion in its complaint. In Southern Comfort Builders, Inc. v. United States, 67 Fed. Cl. 124, 153 (2005), this Court recently held after a trial that a plaintiff who fails to plead a claim in its complaint waives that claim:

> The United States Court of Appeals for the Federal Circuit has stated on numerous occasions that a plaintiff's failure to raise a claim or argument in its complaint may be deemed as a waiver of that argument by the plaintiff. See Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1366 (Fed. Cir. 2002), cert. denied, 538 U.S. 921 (2003) ("[W]e conclude that we need not address Casa's agency theory because it was not properly raised. No mention of this theory appears in Casa's complaint. Under the circumstances, we hold that Casa waived any claim it may have against the government based on such a theory").

Plaintiff's failure to plead its tortious breach of contract claim contrasts with the plaintiff in one of the chief cases upon which The Sweetwater relies, who had asserted its misrepresentation claim in the claim for equitable adjustment that it filed with the Corps of Engineers on December 30, 1992. Meyers Cos., Inc v. United States, 41 Fed. Cl. 303, 307, 311 n.8 (1998).

This Court recently held that it did not posses jurisdiction to hear a superior knowledge claim that was not presented to a contracting officer, and that arose from different facts than the claims that were addressed in the contracting officer's final decision. Renda Marine, Inc. v. United States, 66 Fed. Cl. 639, 720 (2005) (citing Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003)). If the Court determines that the permit is a CDA contract, then it possesses no jurisdiction to consider plaintiff's tortious breach of contract claim. Plaintiff did not assert any misrepresentation or tortious breach of contract in its May 2002 "claim" letter to Forest Supervisor Rebecca Aus.

The Government acknowledged at trial that if such a claim were presented, Ms. Aus would also deny that claim, even though she is not a contracting officer. Tr. 1770:1-3. However, the tortious breach of contract claim that plaintiff now asserts is based upon allegations regarding the conduct of the Forest Service before the permit issued, in contrast to the breach of contract and taking claims pleaded in the complaint, which allege misconduct by the Forest Service from 1997 until the present. Renda Marine, Inc., 66 Fed. Cl. at 720 (2005). Moreover, plaintiff waived this claim by not pleading it. Southern Comfort Builders, 67 Fed. Cl. at 153.

In any event, there is no merit to plaintiff's claim for tortious breach of contract. The Forest Service made no misrepresentation that the Sweetwater bridges were safe for use by the lodge owner. Bridge inspectors from the Wasatch-Cache National Forest inspected the Sweetwater bridges in August 1992. DPFF ¶ 21. In their reports, they recorded their recommendation that the bridges should be replaced in part or in whole, but they did not conclude that the bridges were unsafe or needed to be closed or condemned. Id. As Mr. Larson explained in his February 20, 1997 letter to prospective purchasers of the lodge, Ray and Judi Sutherland, the statement that the Sweetwater bridges "are condemned is not correct. When the bridges were last inspected in 1992, several of the bridge components were given a rating code of '2.' This code indicates a deficiency which may be dealt with through load limit restrictions. As a point of reference, a bridge which is condemned would have a code of '0,' and would be immediately closed to all traffic." JX 11.

The bridge inspectors discussed the condition of the bridges with Shoshone National Forest Engineer Jim Fischer, and collectively exercised what Mr. Fischer described as their "professional judgment" to determine that the bridges were probably safe to continue using

so long as they were posted as limited to vehicles under three tons. DPFF ¶ 22. Within a few months after the August 1992 inspections, signs were posted on the approaches to the Sweetwater bridges that stated, "WEIGHT LIMIT 3 TONS." DPFF ¶ 23. These signs were still present in the summer of 1995, when The Sweetwater bought the lodge. DPFF ¶ 77. The signs accurately represented that the bridges were deemed safe for use by cars and light trucks, but were not deemed safe for travel by heavier trucks or other heavier vehicles.

Allowing cars and light trucks to use the bridges in 1995 cannot reasonably have been interpreted as a representation by the Forest Service that the bridges would remain safe for vehicular passage for the entire 20-year term of the permit that The Sweetwater sought. Even a casual inspection of the bridges in 1995 would have led a reasonably prudent person to conclude, from the signs and the visible deficiencies in the bridges' abutments, that they were nearing the end of the useful life, and required repair or replacement, as the inspectors had recommended in 1992. DPFF ¶¶ 56-57.

Even if allowing cars and light trucks to continue using the bridges could have been a representation that the bridges would remain passable for the duration of the permit, Acting District Ranger Bob Rossman told The Sweetwater's representatives during the June 1995 meeting that the bridges were vulnerable. DPFF ¶¶ 74-75. Indeed, the substantial likelihood that the bridges would fail during the term of the permit was the premise of much of the discussion of the meeting, as noted in Mr. Rossman's email summarizing the discussion at the meeting. DX 18. Any representation implicit in keeping the bridges open was superseded by Mr. Rossman's statements at the meeting, which expressly informed The Sweetwater that it could not count on the bridges remaining passable. DPFF ¶¶ 74-75.

The Forest Service did not have any duty to take affirmative steps to disclose the inspection reports to The Sweetwater. The Government only possesses an affirmative duty to disclose knowledge that is not shared by a contractor, or cannot be readily obtained by him. In Hardeman-Monier-Hutcherson v. United States, 458 F.2d 1364, 198 Ct. Cl. 472 (1972), the limited bidding period did not permit the contractor to make its own observations of sea and wind conditions at a construction site, which were so rough that it had taken a Navy vessel much longer than expected to conduct soundings. Id. at 1365, 1369. The Court of Claims concluded that in these circumstances, the Government had a duty to disclose to the contractor the Navy's reports on weather conditions at the site, and should not have refused the contractor's request for the reports. Id. at 1372.

This case is different in two important respects from Hardeman-Monier-Hutcherson, First, the condition of the Sweetwater bridges could be readily observed by anyone who visited the site and looked or walked under the bridges. The recommendation contained in the bridge inspection reports – that the bridges should be replaced – was evident to anyone who made a site visit. Mr. Mummery had a full month to conduct such a site visit between signing the sales contract on May 21, 1995 and the contractually specified date on which the purchase closed, June 21, 1995. DPFF ¶ 58.

Second, the Wasatch-Cache inspectors' August 1992 reports on the Sweetwater bridges were included in the Shoshone's files, which were available for inspection by plaintiff at any time, just as they were made available to other prospective purchasers of the lodge, such as Roy and Judi Sutherland, or any other citizen. DPFF ¶ 111. Forest Service officials provided information about the condition of the bridges to Wanda Smith and to the Sutherlands, and would not have refused to provide information to The Sweetwater, too, if it

had conducted any due diligence before closing its purchase of the lodge. DPFF ¶ 35. In these circumstances, plaintiff cannot prove any claim for tortious breach of contract, misrepresentation, or superior knowledge, none of which plaintiff has pleaded.

## VII. Plaintiff Is Unable To State A Claim For A Fifth Amendment Taking

Plaintiff asserts in Count III of its first amended complaint that "by condemning the bridges, and thus preventing all vehicular traffic from reaching The Sweetwater [lodge], the Forest Service effected a taking of the value of Plaintiff's permit and of Plaintiff's property." Compl. ¶ 42. We opposed plaintiff's motion for leave to file the amended complaint because it pleaded the taking claim as an additional count that plaintiff could pursue concurrently with the breach of contract claims pleaded in Counts I and II, rather than as an alternative count. Plaintiff stated in its pre-trial brief that it pleaded the taking claim "as an alternative claim to its breach of contract claim[s] . . . . In the event that the court does not conclude that the Forest Service has breached the contract or is otherwise liable to The Sweetwater for the value of the lodge." Pl. Mem. 25.

Later in its pre-trial brief, however, plaintiff indicated that it did not assert a taking claim as an alternative to Counts I and II, but only as an alternative to recovering "equitable consideration" pursuant to clause 15 of the permit, as pleaded in Count II: "In the event that the Court determines that the Forest Service has terminated the Term SUP, but clause 15 does not apply, The Sweetwater asserts that the Forest Service has taken its property (both the lodge facilities and the contract) without just compensation, as required under the Fifth Amendment." Pl. Mem. 37-38. This indicates that The Sweetwater intends to pursue its taking claim if the Court denies recovery pursuant to clause 15 of the permit, even if other breach of contract remedies remain available to plaintiff.

Our position remains that plaintiff cannot pursue its taking claim so long as plaintiff is concurrently pursuing any remedies for breach of contract. If the Court concludes that the permit is a contract, then plaintiff is limited to remedies for breach of contract, and cannot also seek just compensation for a taking claim. As the Federal Circuit has stated in rejecting the assertion of concurrent taking and breach of contract claims:

> Indeed, the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim. Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786, 818 (1978) (citation omitted). Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. *Id.* Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights. *Id.*

Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2002); see also Castle v. United States, 301 F.3d 1328, 1342 (Fed. Cir. 2002), cert. denied, 539 U.S. 925 (2003) (rejecting taking claim in part because "plaintiffs retained the full range of remedies associated with any contractual property right they possessed").

Even if the Court denies plaintiff any recovery for breach of contract, plaintiff is still unable to state a claim for a compensable taking. The Federal Circuit has developed a two-part test to evaluate claims that a governmental action constitutes a taking of private property without just compensation. Maritrans Inc. v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003) (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)); Chancellor Manor v. United States, 331 F.3d 891, 901-02 (Fed. Cir. 2003). First, the Court must determine whether a protected property interest existed, or in other words, that "the use interest proscribed by the governmental action was part of the owner's title to begin with." M & J Coal, 47 F.3d at 1154 (citing Lucas v. South

Carolina Coastal Council, 505 U.S. 1003 (1992)). Second, if the claimant can establish the existence of a protected property interest for purposes of the Fifth Amendment, the Court must then determine whether the governmental action at issue was a compensable taking of that property interest. Id.

Plaintiff cannot prove that it held a protected property interest in either the permit issued to it, or in its operation of the lodge and other improvements on Forest land. In numerous decisions, the Federal Circuit has rejected taking claims asserting that a property interest exists in a permit and in personal property used pursuant to the permit. American Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1374-83 (Fed. Cir. 2004), cert. denied, ___ U.S. ____, 125 S. Ct. 2963 (2005); Conti v. United States, 291 F.3d 1334, 1341-43 (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003); Alves v. United States, 133 F.3d 1454, 1457 (Fed. Cir. 1998); B-West Imports, Inc. v. United States, 75 F.3d 633, 638 (Fed. Cir. 1996); Mitchell Arms, Inc. v. United States, 7 F.3d 212, 216 (Fed. Cir. 1993), cert. denied, 511 U.S. 1106 (1994) (citing Allied-General Nuclear Servs. v. United States, 839 F.2d 1572 (Fed. Cir.), cert. denied, 488 U.S. 819 (1988)).

In American Pelagic, the Federal Circuit reversed this Court's holding that a taking of the plaintiff's fishing permit had occurred, and explained why no property interest could exist in the permit:

> In Conti, we explained that because he could not assign, sell, or transfer his swordfishing permit, because it did not confer exclusive fishing privileges, and because the government at all times retained the right to revoke, suspend, or modify it, Paul Conti did not possess a property interest in his permit. 291 F.3d at 1341-42. This "absence of crucial indicia of a property right, coupled with the government's irrefutable retention of the right to suspend, revoke, or modify" the swordfishing permit "compels the conclusion that the permit bestowed a revocable license, instead of a property right." Id. at 1342.

American Pelagic, 379 F.3d at 1374.

No property interest can exist in the permit issued to The Sweetwater for these same reasons. Clause 46 of the permit requires the permittee to allow "free and unrestricted access to and upon the premises" by other users of the Forest (JX 1/12), and thus does not possess the right to exclude others, "'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" Dolan v. City of Tigard, 512 U.S. 374, 384 (1994) (quoting Kaiser Aetna v. United States, 444 U.S. 164, 176 (1979)). Clause 14 of the permit also provides that it "may be revoked upon breach of any of the conditions herein," and clauses 12 and 51 provide that it cannot be assigned or transferred. Like the permits in American Pelagic and the other cases cited above, the permit issued to The Sweetwater was a revocable license.

Plaintiff also cannot prove that any property interest in its lodge has been taken by the Government. Plaintiff remains in possession of his property, and is able to gain access to it across the Sweetwater bridges (using a key it possesses) and to occupy the lodge. DPFF ¶ 179. Similarly, in Andrus v. Allard, 444 U.S. 51, 54 (1979), the Supreme Court stated that regulations prohibiting the sale of Indian artifacts containing eagle feathers were not a taking: "The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them."

In Conti, the Federal Circuit rejected the plaintiff's assertion that a ban on drift gillnet fishing was a taking because it "deprived him of a particular use of his property." 291 F.3d at 1343. The court affirmed this Court's conclusion that the ban did not render his fishing vessel valueless, because "Mr. Conti's continuing ability 'to sell the vessel and the gear, fish in a different fishery, or put both the nets and the vessel to other uses,' Conti, 48 Fed. Cl. at 537, precluded a finding that a regulatory taking had occurred." Conti, 291 F.3d at 1343.

Likewise, plaintiff does not possess any compensable property interest in a particular use of the lodge: operating it with access over bridges. The closing of the bridges to the public has not deprived plaintiff of its ability to operate the lodge using other means of access, such as high-clearance vehicles cable of using fords. Plaintiff was informed before it closed its purchase of the lodge that it was unlikely that the Forest Service would replace the bridges if they became impassable, and that it would have to operate the lodge using fords. DPFF ¶¶ 93-96. Thus, plaintiff possessed no property interest in operating the lodge with bridges when it acquired the lodge in 1995, because plaintiff acquired the lodge subject to uncertainty about the continued availability of the bridges. American Pelagic, 379 F.3d at 1381.

Plaintiff also retains the ability to sell the lodge. As discussed below, plaintiff cannot support its assertion that the closing of the bridges to the public has rendered the lodge worthless. Plaintiff's own expert appraiser, Mr. Que Mangus, conceded at trial that even without access by cars over the bridges, the lodge still possessed value. DPFF ¶ 212. Because plaintiff can sell the lodge or put it to another use consistent with the permit, plaintiff does not possess any compensable property interest in the lodge, and cannot state a claim for a Fifth Amendment taking.

## VIII. Plaintiff Is Not Entitled To Recover Any Breach Of Contract Damages

Plaintiff seeks three categories of damages for its breach of contract claims: out-of-pocket expenses, lost profits, and value of the lodge facilities. "In the event of a breach, contract law recognizes that the promisee has three enforceable interests: expectation, reliance, and restitution." Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1308 (Fed. Cir. 2004) (citing Restatement (Second) of Contracts § 344). "The benefits that were

expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well. See Restatement (Second) of Contracts § 347." Glendale Federal Bank, F.S.B. v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). "As reliance damages, the non-breaching party 'may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract,'" such as out-of-pocket expenses. Hansen, 367 F.3d at 1309 (quoting John D. Calamari & Joseph M. Perillo, The Law of Contracts § 14.9 (4th ed.1998)).

Plaintiff has never identified its legal theory for recovering any of these three categories of damages. It cannot, however, recover lost profits and the value of the lodge as expectancy damages, and seek out-of-pocket costs as reliance damages, because expectancy and reliance damages are mutually exclusive. Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 402 (2004) (the "theories of expectancy, . . . reliance, and restitution" are "alternative measures"). Plaintiff does not appear to seek restitution, which would require restoring Mr. Mummery to the position he occupied before purchasing the lodge.

Even if the Court were to find the Government liable on Count I or Count II, or both, plaintiff cannot prove that it is entitled to recover any damages for out-of-pocket expenses, lost profits, or the value of the lodge, no matter what theory of damages plaintiff pursues. Plaintiff has failed to prove any legal or factual basis for the damages that it seeks.

### A. Plaintiff Could Have Covered Its Out-Of-Pocket Expenses By Operating The Lodge By Bridges 1997-2001, And By Fords 2001-Present

First, plaintiff cannot recover its out-of-pocket expenses for 1995-1996, even though it has included those years in its damages claim. PX 42. Plaintiff has not even alleged, let alone proved, any reason that the Government is liable for its expenses during those two years. Plaintiff chose not to operate the lodge during 1995. DPFF ¶ 123. Plaintiff did not

close its purchase of the lodge until June 21, 1995, and spent the remainder of the operating season cleaning up the lodge site. Id. In 1996, plaintiff granted Carl Bixby exclusive use of the lodge. DPFF ¶¶ 127-28. No actions or omissions of the Government prevented plaintiff from earning revenues during the 1995 and 1996 seasons, nor is there any other reason that the Government should be held liable for plaintiff's out-of-pocket expenses for 1995 and 1996.

Second, plaintiff cannot recover its out-of-pocket expenses for 1997-2000, the four years preceding the closing of the bridges to the public in April 2001. The Sweetwater chose not to operate the lodge during those years, even though the Sweetwater bridges remained open to the public and were deemed safe for operation by Forest Engineer Jim Fischer when he inspected them in March 1997, and again by Forest Service engineer Tom Koenig when he inspected the bridges in August 2000. DPFF ¶¶ 145-48.

Plaintiff had a duty to mitigate its damages, which it failed to carry out by not making reasonable efforts to operate the lodge while the bridges remained open for public passage. Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (adopting legal standard for duty to mitigate damages set forth in Restatement (Second) of Contracts § 350, comment b (1981): "As a general rule, a party cannot recover damages for loss that he could have avoided by reasonable efforts"). Plaintiff asserts that it would have earned profits by operating during the period 1997-2005. PX 41. Thus, if plaintiff had operated at least during the period 1997-2000 using the bridges, then it would have generated revenues that would have covered the out-of-pocket expenses it now seeks from the Government.

Plaintiff also anticipated at the time that it purchased the lodge that the bridges might become impassable, and that it might be unable to operate the lodge using its preferred

method of access for three years or longer. DPFF ¶ 97. The Federal Circuit has stated that "the non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." LaSalle Talman Bank F.S.B. v. United States, 317 F.3d 1363, 1371 (Fed. Cir. 2003). For this reason, even if the Government had fulfilled its alleged duty to pursue efforts to obtain funds to replace the bridges, then plaintiff should not recover any out-of-pocket expenses for, at a minimum, the three years 2001-03.

Even without using the bridges, plaintiff could have operated the lodge anytime from 1997 until the present using fords rather than bridges as a means of access. One of the Government's experts, John Frome, concluded that it was likely that if the lodge operated using fords, it would have turned a small profit, which would have covered the out-of-pocket expenses it now expects the Government to pay. DX 64/71-73. Plaintiff cannot prove that it was unable to cover most or all of its expenses by operating the lodge using fords, because plaintiff never tried to operate the lodge using fords. DPFF ¶ 154. For this reason, plaintiff should not be awarded its out-of-pocket expenses as reliance damages for any years from 1997 through the present.

Finally, even if the Court determined that plaintiff is entitled to recover its out-of-pocket expenses, plaintiff has failed to prove that it is entitled to recover many of the expenses that it seeks, none of which are provided in the permit, unlike a true CDA contract governed by the Federal Acquisition Regulations ("FAR"). JX 1. The largest of these are the pre-litigation legal expenses that plaintiff claims in an amount exceeding $140,000. PX 42. All the legal expenses that plaintiff incurred in 2001 and 2002 were for purposes of paying plaintiff's counsel Kevin Garden or his former law firm, Saltman & Stevens, to

represent the Sweetwater in its dispute with the Forest Service before this lawsuit was filed in December 2002. PX 52.

The Court of Claims has ruled that attorney fees are not normally the type of consequential damages awarded in breach of contract cases, and denied any recovery because the Court did not possess jurisdiction over such a claim. Kania v. United States, 650 F.2d 264, 269, 227 Ct. Cl. 458 (1981); Precision Pine & Timber, Inc. v. United States, 63 Fed. Cl. 122, 140 (2004) (citing Kania in denying attorney fees as contract damages). More recently, the United States Court of Appeals for the Federal Circuit concluded that there was no waiver of sovereign immunity for "damages" in an anti-dumping duty case; therefore, the United States could not be held liable for attorney fees as a contempt sanction, or for "damages," for violation of a preliminary injunction issued in that type of case. Yancheng Baolong Biochemical Products Co., Ltd. v. United States, 406 F.3d 1377, 1382-83 (Fed. Cir. 2005)(citing cases). Certainly, if the United States could not be held liable in Yancheng for contempt "damages" in the form of attorney fees, here it cannot be held liable for "damages" that are admittedly attorney fees and costs.

Another recent decision by the Federal Circuit supports our position that The Sweetwater cannot characterize its attorney fees and expenses as claims for general "damages." Plaintiff's claims are, in essence, for attorney fees and expenses, claims for which the United States has not waived sovereign immunity. See Lion Raisins Inc. v. United States, 416 F.3d at 1372 (plaintiff cannot seek compensation under the "guise" of a takings claim for what is essentially a challenge to invalid agency action). So too here, plaintiff cannot sue for attorney fees and costs under the guise of a claim for "damages."

In addition, The Sweetwater seeks $91,768 in interest expense, which is not compensable. If The Sweetwater had bought the lodge with cash, there would have been no interest charge. Whether to borrow money is a management decision, and is not a reimbursable contract expense. DX 64/63. Plaintiff also failed to show any reason why it should be compensated for the following claimed expenses, which were allegedly incurred while the lodge was moth-balled:

- over $40,000 for taxes during the period 1997-2004, when the lodge was not generating any revenues (PX 42);
- $24,000 ($6,000 per year) in management fees that Mr. Mummery was paid for the years 2001-04, after the bridges were closed to public vehicular access (Id.); and
- over $15,000 for telephone expenses and nearly $20,000 for utilities for the years 1997-2004, when the lodge was not operating during this period. Id.

**B. Plaintiff Cannot Meet Any Of The Three Requirements To Recover Lost Profits**

To recover expectancy damages, including lost profits, a plaintiff must prove three elements: (1) the lost profits were within the contemplation of the parties because the loss was foreseeable; (2) there would have been a profit but for the breach; and (3) the measure of damages must be reasonably certain. California Fed. Bank v. United States, 395 F.3d 1263, 1268 (Fed. Cir. 2005). "The inability to prove by a preponderance of the evidence that profits would have been made but for the breach will therefore preclude recovery on a lost profits theory." Id. at 1268 (emphasis added). Plaintiff is unable to meet any of these three requirements, conceding that "lost profits and opportunity costs are difficult to estimate and subject to many variables." Pl. Mem. 21.

**1. The Lost Profits That Plaintiff Now Seeks Were Not Foreseeable,**

**Because The Parties Contemplated Plaintiff Operating With Fords**

First, plaintiff cannot prove that the lost profits were within the contemplation of the parties. During their meeting in June 1995 before the permit issued, representatives of the Forest Service and The Sweetwater discussed using fords as a means of access to the lodge if the bridges became impassable. DPFF ¶¶ 93-96. The representatives of The Sweetwater stated that using fords would diminish the season for the lodge, but did not state that it would refuse to operate the lodge with fords, or would be unable to turn a profit using fords. DPFF ¶ 95. Thus, the Forest Service had no reason before the permit issued to foresee that The Sweetwater would seek to recover the profits that it claims it would have made operating the lodge with bridges.

Moreover, even if the Court concludes that the Forest Service authorized or acquiesced in The Sweetwater's failure to operate the lodge, at no time before or after the permit issued did the Forest Service ever agree to indemnify or compensate The Sweetwater for the lost profits that it chose to forego by not operating. It is undisputed that the Forest Service never directed The Sweetwater to cease operations anytime before the bridges were closed to the public in April 2001. DPFF ¶ 147. In any event, The Sweetwater should not receive any lost profits for the period 1997-2000, when it could have taken reasonable efforts to avoid its alleged damages by continuing to operate the lodge using the bridges. Robinson, 305 F.3d at 1333.

In addition, plaintiff expected when it purchased the lodge that it might be unable to operate the lodge using bridges for three years while the Forest Service sought funds to replace the bridges. DPFF ¶ 97. Thus, plaintiff is not entitled to recover lost profits for the

period 2001-2003, because that would place it in a better position than if the alleged breach had not occurred. LaSalle, 317 F.3d at 1371.

### 2. Plaintiff Cannot Prove It Would Have Made A Profit, Because It Never Tried To Operate The Lodge According To Its Present Plan

Second, plaintiff cannot prove that The Sweetwater would have made a profit but for the breach. Mr. Mummery has never demonstrated any intent to operate Sweetwater lodge for the benefit of the public. Mr. Mummery did not review the Brannons' books, even though his initial business plan was to operate the lodge much as the Brannons had by employing the cook that Mrs. Brannon had hired. DPFF ¶ 44. Indeed, he testified that he didn't care, because he thought that he gotten a bargain sale. Id.. He didn't look at the bridges before putting in his offer to buy the lodge. DPFF ¶ 54.

Mr. Mummery claims that he has never solicited offers to buy the lodge, even though his realtor has advertised the lodge. DPFF ¶¶ 125, 136. There is no denying, though, that within a matter of months of buying the lodge, he was engaged in efforts to sell it to Darin Singer and Bram Lassiter. DPFF ¶ 124. By February 1996, Mr. Mummery had signed a sales agreement for $600,000 – more than double what he paid for it – with Carl Bixby, who agreed to buy the lodge sight unseen. DPFF ¶ 126.

Mr. Mummery never corrected deficiencies noted in the 1995 and 1996 operating plans, such as replacing roofs on two of the five guest cabins. DPFF ¶ 134. He also never submitted any written proposals to the Forest Service regarding the many ideas that he discussed with them orally beginning in 1997, and which they helped him to explore during repeated visits to the lodge by Jennifer Watson and Brent Larson. DPFF ¶ 149. One of these ideas included restricting access to the road to lodge guests beginning at the lower Sweetwater bridge. DPFF ¶ 150. Once Mr. Larson determined that there was unlikely to be much

public resistance to this proposal, Mr. Mummery then backpedaled, and declined to pursue the idea further. Id.

Once the owners of plaintiff signed a contract to sell their ownership interest in the lodge to Carl Bixby in February 1996, plaintiff granted the buyer exclusive access to the lodge. DPFF ¶¶ 127-28. Plaintiff made no efforts to operate the lodge for the benefit of the public during the 1996 season, and concedes that it never has tried to operate the lodge at any time since then, nor did it submit any operating plans to the Forest Service between 1996 and 2002. DPFF ¶¶ 147, 149.

Mr. Mummery testified that the business plan upon which he now bases his lost profits claim was based upon the assumption that after the sale to the Sutherlands failed to close in March 1997, he was forced to operate the lodge. DPFF ¶ 195. However, he was in the very same situation the preceding year, when his sale to Mr. Bixby failed to close in August 1996, for reasons that were indisputably not the fault of the Government. However, Mr. Mummery admitted that at no time after the sale to Mr. Bixby fell through did Mr. Mummery ever secure the $200,000 financing he now claims he could have and would have obtained. DPFF ¶ 132. His failure during the winter of 1996-97 to make preparations to operate the lodge during the 1997 season, such as by seeking customers or securing financing, is convincing evidence that he never would have made the investments in the lodge in 1997 that he testified were essential to allowing him to renovate the cabins and charge much higher rates. When he did secure financing on the lodge in February 1999, he only invested $20,000 in the lodge. DPFF ¶ 133.

The financial records for the 1996 season indicate that plaintiff did not earn a profit in that year, wholly independently of any alleged breach by the Government, because The Sweetwater excluded from its expenses payments made to management and interest costs.

DPFF ¶ 196. Once these payments are counted as expenses, The Sweetwater did not earn a profit. DPFF ¶ 197. Even if plaintiff earned a profit in 1996, it did so by violating the requirement in its permit that it operate the lodge as a "public resort." JX 1. If the Forest Service had learned of this violation of the permit, it might have revoked the permit, and plaintiff would have been unable to earn the profits it now seeks because of its own conduct, not because of the alleged breach by the Government. California Fed., 395 F.3d at 1268.

In addition, plaintiff cannot prove that it would have earned any profit during the years after 1996. The Sweetwater was a new business, and was unlikely to make a profit because of the small number of cabins, and Mr. Mummery's decision to live off-site, which required the expense of an on-site manager. DPFF ¶ 198. Energy Capital Corp. v. United States, 302 F.3d 1314, 1326 (Fed. Cir. 2002) ("the nature of a new venture may make it difficult to recover lost profits"). Mr. Mummery has never before managed a dude ranch or guest lodge in a National Forest. DPFF ¶ 45. His only prior experience in the lodging industry was leasing for one year the Yellowstone Valley Inn, a roadside motel that is not in the Shoshone National Forest, and that does not offer horseback riding, fishing, or the amenities that Mr. Mummery now aspires to offer. DPFF ¶ 45, 199.

#### 3. The Measure Of The Lost Profits Plaintiff Seeks Is Far From "Reasonably Certain"

Third, plaintiff cannot recover any lost profits, because their measure is far from "reasonably certain." California Fed., 395 F.3d at 1268. At most, plaintiff operated the lodge for a single season, 1996, and claims to have made a profit of $34,995. DPFF ¶ 192. Plaintiff extrapolated these alleged 1996 profits at a six percent rate for the years 1997-2001 as the basis for seeking lost profits totaling $312,256 in its May 28, 2002 "claim" letter to Forest Supervisor Rebecca Aus. DPFF 193. In its pre-trial brief, plaintiff extrapolated from the

unreliable basis of the 1996 season to estimate that it has lost $960,000 in profits for the entire 20-year term of the permit. Pl. Mem. 21.

When properly measured, there were no profits at all during 1996. The Sweetwater's claim for profits appears to be derived by subtracting all expenses, except for the $14,000 management fee paid to Mr. Mummery and Mr. Jackson and $15,376.37 in interest, from the $71,500 payment from Mr. Bixby that is shown as "sales." PX 43, TS 2059. There are no entries for "cost of goods sold" that reflect the variable costs of running the lodge, as would have been the case had it been open to the public, other than an enigmatic entry of $5,076.06 for "supplies." PX 43, TS 2059.

Thus, there is no relationship between revenues and expenses that is representative of the profits that the lodge might or might not have produced if operated as a public resort according to the operating plans The Sweetwater submitted to the Forest Service. Moreover, the payments to a manager should not be excluded, particularly because Mr. Mummery now proposes to pay $24,000 per year to a resident manager. DPFF ¶ 198. Once this expense and complete variable costs are included, such as the cost of goods sold, the lodge did not turn a profit during its single year of operation in 1996.

Plaintiff also presents an alternative, even more uncertain manner of estimating its lost profits based upon a "projection of what its business plan would have been," conceding that it never developed a business plan during the time that it contends it operated the lodge. Pl. Mem. 21. The 1995 and 1996 operating plans that The Sweetwater submitted to the Forest Service do not contain any projections about its expected revenues, or any business plan that identified the revenue that The Sweetwater expected to generate from its different activities. DPFF ¶ 187.

The only profit projections or business plan of any kind that the Sweetwater ever developed before this lawsuit was filed were prepared between June 15 and June 21, 1995. DPFF ¶ 188. Mr. Mummery testified that these projections were based upon the Brannons' business plan, which was a year-round "gourmet getaway" that was principally based on one-night stays by guests on Friday and Saturday nights, during which guests were offered 7-course suppers and a champagne brunch the following morning. DPFF ¶ 189. However, The Sweetwater's business plan was based on stays by "weekly guests." DX 17/5. The two operating plans that The Sweetwater submitted to the Forest Service in 1995 and 1996 proposed an operation that more closely resembled the other dude ranch outfits on the North Fork, which offer horseback riding, fishing, and hiking rather than a "gourmet getaway." DX 22, DX 28, DX 64/37-38.

The business plan on which The Sweetwater bases its latest damages calculations is what Mr. Mummery claims he would have done in 1997, after the sale to the Sutherlands did not close. DPFF ¶ 195. However, what he planned to do in 1996 after the sale to Mr. Bixby did not close was quite different, and much more modest than his latest vision for the lodge: renting the lodge to family reunions. DPFF ¶ 191.

The only contemporaneous profits that Mr. Mummery projected in 1995 topped out at $32,514 in 1999, much closer to Mr. Frome's estimate than Mr. Mummery's 2005 business plan, which was created in 2005 just for this lawsuit, and was never put into practice. DX 17/5. The new business plan is based entirely upon Mr. Mummery "pretending"that The Sweetwater invested $200,000 in the lodge in 1997. DPFF ¶ 195. The Sweetwater never proposed such an investment in 1997 or at any other time before expert discovery in this lawsuit. It borrowed $110,000 in 1999, but only invested $20,000 in the lodge. DPFF ¶ 133.

Because plaintiff has never demonstrated any intent to operate the lodge, it cannot prove that, but for the Government's alleged breach, it would have earned profits.

The new business plan is fundamentally different from the operations described in the 1995 and 1996 operating plans, which described a lower capacity for guests and fewer revenue-generating activities. DX 22, DX 28. Plaintiff also inflates its lost profits claim by proposing to charge rates as high as premier establishments such as UXU and Rainbow Ranch Lodge, which have larger capacities, more activities, and owner-operators who live in their lodges and have proven records of earning profits. DPFF ¶¶ 202-204.

Plaintiff's alternative manner of estimating its lost profits yields a total of $1,667,000 for the 20-year term of the permit, much more than its estimate of $960,000 that is based upon the 1996 season. This wide range between these two estimates in itself demonstrates that plaintiff's claim for lost profits is not "reasonably certain." California Fed., 395 F.3d at 1268.

Plaintiff claims that it would have earned profits of $104,047 in 2005, and between $50,676 in 1998 to $166,067 in 2014, based upon the business plan that it created specifically for purposes of this suit. PX 41. A much more certain guide of what profits, if any, the lodge might have earned is the income data for the other North Fork lodges during the past 10 years. Government expert John Frome analyzed this data as part of his income analysis, and concluded that the effective gross income per unit for the lodge would be $31,838, and the likely expense ratio would be 75 percent. DX 64/60-62. Thus, for five cabins, the net operating income would be $39,798 as of March 15, 2005. DX 64/63. However, Mr. Frome noted that "management and profit have not been taken as a line-item expense in the analysis." Id. Once the management expense of $25,000 per year for Mr. Jackson is

considered, the expected profit for 2005 even if bridges were in place is approximately $15,000, much less than the $104,047 projected by Mr. Mummery.

Mr. Mummery now seeks over $1.6 million in lost profits, and blames the Government for his failure to operate the lodge. The fundamental constraint on the profits that The Sweetwater lodge might generate is that it has many fewer cabins than any of the other North Fork lodges. Whether it is treated as having five or six guest units, it still has roughly half the number of units as the next smallest of the North Fork lodges, UXU and Rimrock Ranch, which both have 10 units. DX 64/62. Moreover, because Mr. Mummery now proposes to operate the lodge as a couples-only retreat, its capacity would only be a dozen guests, which is less than half of the capacity of the UXU (30 guests), and an even smaller fraction than the other lodges, many of which accommodate more than two persons per cabin, and charge on a per guest basis. DX 65/31 (UXU); DX 66/5 (Blackwater), 66/10 (Crossed Sabres), 66/12 (Goff Creek). A number of the other lodges, such as Blackwater, UXU, Crossed Sabres, Goff Creek, and Rimrock require minimum stays of one week, ensuring their occupancy rates remain high. DX 65/5, 66/8, 66/10, 66/12.

It is the guest capacity, not the restaurant operations, that largely determine the income-generating ability of any lodge. As Mr. Mummery himself testified, one of his friends who is a successful restaurant operator said that he would give away food to keep his cabins full, and Mr. Mummery claims that one makes 8-10 percent profit on food, but 80 percent profit on rooms. DPFF ¶¶ 200-01. In addition, the greater the number of cabins, the more revenue generated to cover the lodge's fixed costs.

The Sweetwater also has no amenities to attract guests. There will be no horseback riding offered, even though almost all other lodges on the North Fork and in the surrounding

areas offer horseback riding. DPFF ¶ 206. As Mr. Mummery acknowledged, Cody is cowboy country. Id. The hiking from the lodge is severely limited by the steep terrain. DPFF ¶ 26 There are no hot springs or golf courses. DPFF ¶ 207. Guests at the lodge smell sulphurous fumes from a warm spring, and see an abandoned mineshaft and the scars from a disastrous forest fire that mar the view. Id. Sweetwater Creek has a streambed composed of volcanic rocks, unlike premier trout fishing rivers and streams, which have a sedimentary bottom. DPFF ¶ 209. There is meager enticement for couples to reserve months in advance rooms for $250 per night plus meals. The lodges that Mr. Mummery proposed as models – Rainbow Ranch, Jenny Lake, and Chico Hot Springs – all have many more amenities. DPFF ¶ 202-204.

UXU has demonstrated its ability to charge the highest rate on the North Fork: $1,675 per person for a six-night stay, including meals and fishing. DX 64/37. Mr. Mummery proposes to charge even more than this, once meals and fishing is added to the $250 per night room charge, yet offers many fewer activities at a time when the premier resorts that he compares himself against are offering more than solitude in the wilderness, such as spas, hot springs, and conference centers. DPFF ¶¶ 202-04; DX 64/37-38, 66/5-15.

Finally, the Court should reject plaintiff's claim for future lost profits from the present through 2014, when the 20-year term of the permit expires. Plaintiff made at least three attempts to sell the lodge within the first two years of buying it, so it is unlikely that the plaintiff would continue to operate the lodge for the entire 20-year term of the permit. In addition, the Court should reject plaintiff's claim that lost profits are due for a renewal of the permit through 2034. Clause 39 of the permit provides that the permit "shall expire and become void on December 13, 2014, but a new special-use authorization to occupy and use

the same National Forest System land may be granted." JX 1/11 (emphasis added). The authorized officer is not required to issue a renewal permit, just as a contracting officer is not required to exercise the option periods of a contract. For these reasons, and because it is uncertain whether plaintiff would have earned any profits as a new venture, or how any such hypothetical profits could reasonably be calculated, the Court should not award future lost profits. Energy Capital Corp. v. United States, 302 F.3d at 1325-26.

**C. Plaintiff Is Not Entitled To Recover The Market Value Or Replacement Cost Of Its Lodge As Damages For Breach Of Contract**

Plaintiff appears to assert that if the Court finds the Government liable on Count I, then plaintiff is entitled to recover the entire market value of the buildings and site improvements (with access as it was in 1995), because the lodge is no longer a viable business as a result of the Forest Service not replacing the Sweetwater bridges. However, plaintiff is not entitled to recover the entire market value of the lodge, because plaintiff has failed to analyze the "cost of cure," and show that the cost of replacing the bridges exceeds the market value of the lodge (with 1995 access).

Whether one uses the valuations of the lodge presented by plaintiff or defendant, the value of the lodge exceeds the cost of replacing the bridges. Plaintiff's appraiser, Que Mangus, testified that if the Sweetwater bridges were open to the public, as in 1995, the market value of the lodge would be $900,000. Tr. 2384:12-14. Plaintiff also relies upon an estimate by District Ranger Brent Larson in an April 2001 press release that it would cost "more than $500,000" to bring the Sweetwater Road and three bridges on it "up to standard." PX 31. Even if it cost $650,000 to replace the bridges, this would mean that the lodge is worth at least $250,000 as is, with the bridges closed to the public.

Mr. Mangus conceded that the lodge retains some value. DPFF ¶ 212. Plaintiff did not present at trial any independent analysis of the cost of replacing the bridges that will enable it to prove its assumption that the cost to replace the bridges exceeds the market value of the lodge (with 1995 access). Mr. Mangus testified that he was not asked to develop a second opinion of value of the lodge in its as-is condition, or to measure the cost to cure the loss of access over bridges. DPFF ¶ 213.

At trial, the experienced Wyoming appraiser retained as an expert by the Government, Mr. Frome, presented his opinion that the market value of the lodge as of June 27, 2005 is $415,000, applying the extraordinary assumption that access by bridges was available, as in 1995. DX 65/25. Mr. Frome also offered an opinion of value (assuming access by bridges) as of January 2000 of $335,000, in the event that the Court finds that a breach of contract occurred in 2000. DX 62/6.

Mr. Frome engaged an experienced Wyoming bridge contractor, Mr. Wayne Baker, who prepared an estimate that the current cost of replacing both Sweetwater bridges using Forest Service specifications is approximately $100,000. DX 65/26. Mr. Frome has applied this estimate (with estimates for dirtwork) to his appraisal as the "cost to cure," and has concluded that the "as is" market value of the lodge in its present condition (with bridges closed to the public) is $305,000. DX 65/26.

As shown below, plaintiff has failed to show that there is a sound basis for either its market value of $900,000, or its replacement value of $1.475 million.

### 1. <u>Plaintiff's Expert Used A Flawed Analysis To Arrive At His Value, Which Is Inconsistent With His Appraisals Of Other Lodges</u>

As demonstrated during his cross-examination, the appraisal prepared by Mr. Mangus is inconsistent with Mr. Mangus's recent appraisals of other North Fork lodges using the sales comparison approach. Mr. Mangus performed a "Limited Summary Appraisal" that considered only one appraisal approach – the sales comparison approach – unlike his other appraisals, which used two other approaches, cost and income, as well as the sales comparison approach. DX 74-77.

Using the sales comparison approach, Mr. Mangus extrapolated from the per unit prices of three recent sales of North Fork lodges, which ranged from 10 to 17 units, a per-unit price for a hypothetical six-unit lodge of $164,852.20. PX 44, p. 24. He described this as a "regression analysis" in his expert report (PX 44, p. 26), a term he then discarded during his testimony in favor of a "best fit" analysis. He agreed, though, that his analysis considered the effect of one variable (the number of units) on another variable (the price per unit), which is the essence of regression analysis. DPFF ¶ 214.

Regression analysis requires is unreliable when it relies upon a few data points, and particularly when it uses data points to extrapolate beyond the data set, as Mr. Mangus did.[3] He claimed the existence of a "trend": the fewer the number of units, the higher the price per unit. PX 44, p. 26. However, when one examines not just the three sales that Mr. Mangus used, but all sales of North Fork lodges during the past 10 years, as did Mr. Frome (who actually carried out a true regression analysis) it is apparent that the data supports Mr. Frome's conclusion that "there is no correlation to size of the property in units and selling price per unit." DX 65/14. On the contrary, as Mr. Frome found from examining 12 sales

---

[3] "The Pitfalls Of Using Multiple Regression Analysis In Real Estate Appraisal And How To Avoid Them," Hans R. Isakson, Appraisal Journal (October 2001).

(rather than just 3), "the tight range shown by the unit data" shows that the price per unit remains constant as the number of units varied. DX 65/17. Mr. Mangus's only critique of Mr. Frome's analysis was that he considered "too much data." DPFF ¶ 215. He agreed that using too much data makes it difficult to draw a best fit line. Tr. 2440:8-10.

Based upon this non-existent trend, Mr. Mangus used the hypothetical $164,852.20 price per unit figure to adjust upwards between 18 and 51 percent the actual per-unit prices of the three lodge sales that he considered. PX 44, p. 18. He then based his opinion of value nearly at the top end of this adjusted range, relying most heavily on the adjusted per-unit price of $151,346 for UXU to arrive at his price-per unit for The Sweetwater of $150,000.

Mr. Mangus had never used this "best fit" analysis to find an inverse correlation between number of units and price per unit in any of the numerous other appraisals he has prepared of North Fork lodges during the preceding two years. DX 75-78. Although he conducted a best fit analysis in a recent appraisal, it did not affect his opinion of value, as it did dramatically in his appraisal of The Sweetwater. In Mr. Mangus's recent appraisals of other North Fork lodges, he has consistently determined a price per unit using the sales comparison approach that is much closer to the $83,000 per unit figure found by Mr. Frome than the $150,000 per unit Mr. Mangus claims for The Sweetwater:

- $67,000 per unit, Elephant Head Lodge (November 2003) (DX 78, p. 25);
- $78,500 per unit, Bill Cody's Ranch Inn (May 2004) (DX 77, p. 23); and
- $80,000 per unit, Absaroka Mountain Lodge (September 2004): (DX 75, p. 23).

Even Mr. Mangus's most recent appraisal of UXU Ranch, only prepared in April 2005, valued UXU at $116,000 per unit using the sales comparison approach (DX 76, p. 33), a much

lower figure than the adjusted $151,346 per unit figure for the UXU that is the principal basis for Mr. Mangus's opinion of value for The Sweetwater's lodge. $150,000 per unit is more than the $135,000 per unit a buyer paid for the UXU lodge in May 2005. DX 64/. Unlike Mr. Mummery, however, Hamilton Bryan, who bought UXU in 1996, actually invested in his lodge over $165,000, an amount nearly equivalent to the amount that Mr. Mummery has only talked about putting into The Sweetwater. DX 65/13. That investment paid off in an article about UXU in the December 2000 issue of Architectural Digest (DX 48).

Plaintiffs introduced at trial a September 2005 listing of the Elephant Head Lodge for $1.4 million. PX 59. The listing provides further confirmation that the $83,000 price per unit developed by Mr. Frome is accurate. Because the Elephant Head has 15 units, the listed price is approximately $93,333, only $10,000 more per unit. The list price by definition is a price no one has yet paid, so the actual sales price is likely to be even closer to, or less than, $83,000. At least one prospective purchaser of Elephant Head Lodge, Ms. Jodi Mientikiewicz, determined in December 2003 that even the $67,000 per unit value appraised by Mr. Mangus was too much, and declined to proceed with the purchase. DPFF ¶ 218.

Plaintiff is only entitled to recover as damages "[t]he benefits that were expected from the contract," Glendale Federal, 239 F.3d at 1380, and is not entitled "to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." LaSalle, 317 F.3d at 1371. If the Court finds the Government liable on Count I, it should not award plaintiff the full market value of the lodge, but should only award plaintiff reasonable expectancy damages for the cost of the replacement bridges (approximately $100,000), which are the benefit that plaintiff asserts it expected to receive pursuant to the permit. Awarding the plaintiff the market value of the lodge, rather than the cost of building replacement

bridges, would place plaintiff in a better position than if the breach asserted in Count I had not occurred.

**2. There Is No Legal Support Or Business Justification For Plaintiff To Recover The Reconstruction Cost Of The Lodge**

In Count II, plaintiff asserts that the Forest Service, in effect, has terminated the permit in the public interest by not replacing the Sweetwater bridges. Compl. ¶ 39. Plaintiff further asserts that because the permit has been terminated in the public interest, plaintiff should receive "equitable consideration" for its lodge and other site improvements pursuant to clause 15 of the permit. Id. ¶ 38. As demonstrated above, the permit was never terminated. If the Court finds that the Forest Service has terminated the permit in the public interest, then it should remand to the Forest Service the issue of the proper amount of equitable consideration owed to The Sweetwater, so that the parties can pursue the procedure set forth in clause 15 of the permit. JX 1/3, ¶ 15; 36 C.F.R. Part 251, Subpart C.

If the Court finds that the Government is liable on Count II, and chooses to address the measure of "equitable consideration" for purposes of clause 15, then the appropriate measure of equitable consideration under clause 15 is to analyze the permit as if it were a leasehold for appraisal purposes, and then segregate the contributory value of the buildings and site improvements from the hypothetical leasehold interest in the land, as done by the Government's expert, John Frome, using the extraordinary assumption that access was the same as it was in 1995. DX 60/34. Mr. Mangus's appraisal, too, treated the permit as a leasehold for appraisal purposes, even though the permit is not a lease, but a license, and does not convey any exclusive rights in real estate. PX 44, p. 18. At trial, Mr. Frome presented his expert opinion that the contributory value of the buildings and site improvements as of the date of his inspection in March 2005 is $215,000, using the assumption that access is as it was

in 1995. This is the maximum amount of damages that the plaintiff should recover if the Court rules that the Government is liable on Count II.

The Court should reject plaintiff's assertion that it is entitled to recover the depreciated reconstruction cost of the buildings and site improvements. Plaintiff does not cite any legal authority for its assertion that clause 15 requires the Government to pay the "reconstruction cost, less physical depreciation" for plaintiff's buildings and site improvements calculated by plaintiff's "reconstruction" expert, John Pucetas. PX 45, p. E.1.

Mr. Pucetas has only prepared estimates of reconstruction cost less physical depreciation of capital improvements for properties in national parks that are owned by National Park Service concessioners. By statute, each National Park Service concesssioner possesses a "leasehold surrender interest" in each capital improvement it constructs that is "equal to the initial value (construction cost of the capital improvement) . . . less depreciation." 16 U.S.C. § 5954(a)(3). There is no similar statutory entitlement that provides that a permittee whose term special use permit is terminated by the Forest Service in the public interest will receive reconstruction cost less physical depreciation as equitable consideration. Thus, there is no legal basis for plaintiff to claim that "equitable consideration" pursuant to clause 15 of the permit requires payment of "reconstruction cost minus physical depreciation" to plaintiff. Mr. Pucetas conceded that he does not know what the term "equitable consideration" means. Tr. 258812-19. He described the term as "pretty open-ended." Tr. 2585:1.

If equitable consideration does not mean the contributory value of the improvements, then at most, it requires only fulfilling Mr. Mummery's alleged expectation of being able to operate a lodge that is reachable by passenger cars at all times. This would mean

compensating The Sweetwater for the cost of acquiring a comparable five-cabin lodge, which Mr. Frome calculated to be $415,000, which is much less than Mr. Pucetas's $1.475 million reconstruction cost.

Mr. Pucetas contended that The Sweetwater has a "unique" location, but clause 15 does not confer any right to compensation for the location of the lodge, only for the permittee's "improvements." JX 1/3, ¶ 15. There is nothing unique about the buildings and site improvements. The Sweetwater's lodge is not designated on any register of historic sites. DPFF ¶ 219. As Mr. Pucetas conceded, The Sweetwater is not the only lodge on the North Fork that has a main lodge and cabins with stone chimneys. Tr. 2558:24-2559:2. UXU has a main lodge as well as cabins with stone chimneys, just like The Sweetwater, and UXU has real log cabins, whereas the cabins at The Sweetwater are frame structures covered with log siding. Tr. 2556:19-2559:21.

As plaintiff's other expert, Mr. Mangus, acknowledged, there is no business justification for determining that "equitable consideration" means reconstruction cost. Mr. Mangus stated in his report what he referred to as the "Principle of Substitution: An informed purchaser would pay no more for a property than the cost of acquiring an existing property with the same utility." PX 44, p. 16. The cost of acquiring a similar lodge with five cabins that can serve the same purpose as The Sweetwater's lodge provides a much more reasonable basis for measuring what is "equitable consideration" for purposes of clause 15 than the cost of reconstructing the lodge in a different location. No reasonable buyer would spend $1.475 million to reproduce the lodge ($245,333 per unit for six units), when its market value is, by plaintiff's own estimate, no more than $900,000 ($150,000 per unit). Tr. 2573:5-2574:2). If the Court granted plaintiff the reconstruction cost as "equitable consideration,"

plaintiff would improperly be placed in a better position than if no breach had occurred, because plaintiff could buy an equivalent lodge and pocket the difference between the market value and reconstruction cost. LaSalle, 317 F.3d at 1371.

Mr. Mangus testified that the sales comparison approach is the most reliable method of appraising the value of the lodge, because it is not worth more than a buyer would pay for a similar lodge with 5 cabins. DPFF ¶ 210. Mr. Mangus also testified that he was uncomfortable with calculating the depreciation for the cost approach of appraising the lodge, because most of the buildings were built in 1930 and have been remodeled at least once, making it "always risky" and "not dependable" to calculate the actual age. DPFF ¶ 211. Mr. Mangus did not rely upon the cost approach because he does not believe that buyers consider it be relevant. DPFF ¶ 221. Mr. Frome also declined to use the cost approach, and stated that depreciation is difficult to measure on old buildings like The Sweetwater's lodge. DX 64/47.

Yet this is precisely what Mr. Pucetas has done, opining that the depreciation rate for the lodge structures is approximately 30 percent. PX 45, E.2. This figure is highly uncertain, however. Mr. Pucetas conceded that there are no uniform practices for estimating the effective age of the buildings, and agreed with Mr. Mangus that making such estimates is "fairly subjective." DPFF ¶ 222. The unreliable nature of Mr. Pucetas's estimate is confirmed by the contradiction between his testimony and Mr. Mummery's regarding the Absaroka cabin. Mr. Pucetas stated that based on his inspection, the cabin's roof "had to have been" replaced in its entirety since the 1980s, and he assigned the roof an effective age of five years. Tr. 2563:3-6, 16-19, 2564:4-5. However, Mr. Mummery testified that he never replaced the cabin's roof, even though the 1996 operating plan identified the roof as a deficiency, and stated that it would need to be replaced within approximately five years. Id.

600:19-601:6; DX 28/10. Moreover, Mr. Pucetas' calculation of the reconstruction cost of the lodge is too high, because it includes the cost of the power line to the North Fork highway, which The Sweetwater does not own, as well as indirect costs that The Sweetwater would not pay to anyone else. DX 64/43; Tr. 2566:6-2570:8.

If the Court found the Government to be liable on both Counts I and II, then plaintiff should only recover the contributory value of its buildings and site improvements. In essence, plaintiff's breach of contract claim is that the Forest Service should have either replaced the bridges, or terminated the permit. Awarding the cost of building replacement bridges and the contributory value of the buildings and site improvements would place plaintiff in a better position than if the breaches asserted in Counts I and II had not occurred. Thus, plaintiff should not be compensated for both the replacement of the bridges and the value of the lodge, because this would place plaintiff in a better position than if the breaches had not occurred. LaSalle, 317 F.3d at 1371.

## CONCLUSION

For the foregoing reasons, the Government respectfully request that this Court deny plaintiff all relief it seeks in its first amended complaint, and grant us such other relief as the Court may see fit.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

OF COUNSEL:

KENNETH S. CAPPS
Attorney-Advisor
Office of the General Counsel
Mountain Region
U.S. Department of Agriculture
P.O. Box 25005
Denver, CO 80225-0005

s/ John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
1100 L St. N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972

December 23, 2005

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 23rd day of December, 2005, a copy of the foregoing "DEFENDANT'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John H. Williamson