IN THE UNITED STATES COURT OF FEDERAL CLAIMS

THE SWEETWATER, A WILDERNESS LODGE LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 02-1795C
(Senior Judge Merow)

**DEFENDANT'S PROPOSED FINDINGS OF FACTS**

Pursuant to Appendix A, ¶ 19 of the Rules of the United States Court of Federal Claims, and this Court's December 19, 2005 Order, defendant, the United States, respectfully files this post-trial brief.

## I. Background

### A. Sweetwater Road

1. The 1990 Forest Service map of the north half of Shoshone National Forest (“the Shoshone”) is the map of the northern half of the Shoshone, including the Wapiti District, that was in effect until a new map issued in 2004. Tr. 1513:5-24; DX 72.

2. The map shows that Forest Service Road 423 ("Sweetwater Road") is a dirt road that runs approximately 3.5 miles on the Shoshone's land from the Wapiti Campground on Wyoming State Highway 14/16/20 (the "Yellowstone Highway" or "North Fork Highway") up the Sweetwater Creek drainage. DX 72; Tr. 796:16-19; Tr. 1325:13-16.

3. The 1990 map depicts Sweetwater Road using solid parallel black lines, which the legend defines as “Improved Road, Dirt.” DX 72. The next higher category of road on the legend is “Improved Road, Gravel.” Id.

4. Wapiti District Ranger Brent Larson testified about Sweetwater Road: "it's dirt, it's not gravel. And in that particular part of the world, if it rains, you better have a four wheel drive or you're probably not going to go very far." Tr. 1325:13-16.

5. Wapiti District Recreation Technician Mike Bree testified about Sweetwater Road: "people out here normally know that when you get on a dirt road – and it's not gravel, it's dirt – that you take a high clearance vehicle. I mean, it's kind of – it's an unwritten rule." Tr. 796:16-19.

6. On the 1990 map of the north half of the Shoshone, the number for Sweetwater Road, "423," is stacked vertically, which the legend defines as "Low standard Forest Road (<u>high-clearance vehicles</u>)." DX 72 (emphasis added); Tr. 871:23-24, 874:6-16, 1323:17-1324:10.

7. Shoshone National Forest Engineer Jim Fischer testified that Sweetwater Road has been identified and maintained by the Forest Service as a maintenance level 2 road for purposes of the Forest Service Handbook and the INFRA road inventory database. Tr. 1549:24-1550:9.

8. Mr. Fischer testified that Sweetwater Road, like other maintenance level 2 roads, was not maintained for low-clearance vehicles, such as passenger cars. Tr. 1518:1-14, 1519:17-25.

9. The Forest Service Handbook states that Level 2 is the maintenance level "[a]ssigned to roads open for use by high clearance vehicles. Passenger car traffic is not a

consideration." FSH 7709.58, 12.3.2.b (DPFUF[1] ¶ 6).

10. Mr. Larson testified that the first time he drove up Sweetwater Road in 1996, he was “absolutely” certain that he saw a large sign posted by the Forest Service on Sweetwater Road right after the road crossed the North Fork bridge that stated, “Road Not Maintained For Passenger Vehicles,” and that appeared to have been there for several years. Tr. 1294:1-1295:19, 1320:17-25.

11. Mr. Fischer testified also testified that in the mid 1990s, the Forest Service posted a large sign on Sweetwater Road right after the road crossed the North Fork bridge that stated wording “to the effect that the was a narrow mountain road that was not maintained for passenger cars.” Tr. 1520:9-1521:10.

12. Mr. Fischer that the posting of the sign was prompted by funding constraints for road work caused in the 1993-95 time period by the Great American Outdoors program. Tr. 1522:16-1523:2.

13. The Forest Service Handbook provides that "if estimated costs exceed available funding, it may be necessary to defer work, reduce maintenance frequencies, close roads, or allow roads to deteriorate." FSH 7709.58, 12 (DPFUF ¶ 7).

14. The Forest Service has no need for Sweetwater Road for range management purposes for grazing livestock, or for timber harvesting, because there is no timber base in Sweetwater Canyon. Tr. 815:17-21. The primary use of the road is for the lodge owned by

---

[1] “DPFUF ¶ ____” refers to defendant’s December 23, 2003 corrected proposed findings of uncontroverted facts filed in support of its motion for summary judgment. As plaintiff’s counsel proposed at the pre-trial conference, defendant has cited certain DPFUF with which plaintiff agreed.

The Sweetwater, A Wilderness Lodge LLC ("The Sweetwater") and dispersed recreation. Tr. 815:21-25.

15. Few members of the public other than guests of the lodge used Sweetwater Road, principally day-use hunters during the hunting season who used high-clearance vehicles to hunt from the road or tow horse trailers up the road. Tr. 847:19-848:10, 879:24-880:8, 944:4-16, 1283:22-1284:6.

**B. Sweetwater Bridges**

16. There are three bridges for vehicular traffic on Sweetwater Road. The first bridge on FSR 423, No. 423-.2, spans the North Fork of the Shoshone River ("the North Fork bridge"), and is located approximately .2 miles from the North Fork Highway. DX 64/40.

17. The other two bridges, Nos. 423-2.5 and 423-3.0, span Sweetwater Creek ("the Sweetwater bridges"), and are located approximately 2.5 and 3.0 miles, respectively, from the North Fork Highway. DX 64/40.

18. Jeff Mummery, The Sweetwater's manager, testified that the father of a friend of Mr. Mummery's was the original permittee of the lodge now owned by The Sweetwater, and that this previous permittee built the original bridge over the North Fork of the Shoshone River as well as the Sweetwater bridges. Tr. 142:12-23.

19. The Forest Service required lodge permittees in the 1960s and 1970s to upgrade the condition of the Sweetwater bridges. DX 3/2, ¶ 7; DX 3/7; DX 3/11; DX 4/10-15.

20. In March 1992, the Shoshone prepared a Forest Service Region 2 "Capital Investment Project Description Form" that proposed replacing the bridges. JX 5. The

proposal was updated by Mr. Fischer in February 1997. JX 10.

21. The Sweetwater bridges were inspected in August 1992 by Forest Service bridge inspectors from the Wasatch-Cache National Forest. DX 9, DX 10. The inspections recommended that both bridges be replaced. DX 9, DX 10; Tr. 1397:4-24; 1448:18-1449:1.

22. After completing the inspection forms, the bridge inspectors discussed the condition of the bridges with Jim Fischer, the Forest Engineer of the Shoshone from 1986 until 2001. Tr. 1372:2-3, 1390:6-15, 1392:1-4. The inspectors did not perform a technical load-rating, but using their judgment as professional engineers, said that the bridges were probably safe with signage that limited their use to vehicles no more than 3 to 5 tons. Tr. 1402:3-1403:5.

23. In 1993, signs were posted on the approaches to the bridges that stated, "WEIGHT LIMIT 3 TONS." Tr. 1402:3-10. The signs were still present when Mr. Fischer inspected the bridges in March 1997. JX 13/3, JX 13/4, JX 14/1.

24. Mr. Fischer maintained a list that he used to track the projects that the Shoshone proposed for the Capital Investment Program ("CIP") during each fiscal year. JX 2. In the list, for fiscal year 1994, he recorded next to "Sweetwater Bridges" the notation "Indef. Postponed, do w/Mtce $." JX 2/4; DPFUF ¶ 86.

**C. <u>Sweetwater Lodge</u>**

25. The lodge, cabins, and other facilities (collectively, "the lodge") owned by The Sweetwater are located on a 15.4 acre site approximately 3.5 miles north of the North Fork Highway on the Sweetwater Road. JX 1/16; DX 72.

26. The Forest Service maintains no trails or campsites in the Sweetwater Creek

drainage beyond the lodge because the terrain is so steep, it is a de facto pristine area. Tr. 884:8-885:12.

27. The Forest Service never has conducted a competition to select a concessionaire to operate a lodge on the site occupied by The Sweetwater's lodge, and the Government has never owned the lodge. Tr. 969:22-970:22, 977:9-15, 1975:20-1977:13; DX 4/10-15.

28. Any responsibilities that the permit requires The Sweetwater to perform to care for the Forest lands within or around its site are strictly a result of its occupancy, and are not services that the Government set out to find someone to provide. Tr. 1977:14-24.

**D. The Brannons**

29. The permittees who operated the lodge from 1983 until 1995 were David and Nancy Brannon d/b/a Brannons' Wilderness Lodge. JX 3.

30. The Brannons' permit was amended in 1985 to include a "Memorandum Of Understanding For Cooperation In Road Maintenance ("the Brannons' MOU"), under which the Forest Service assumed responsibility for bridge and road maintenance for Forest Service traffic, and permittee assumed responsibility for "traffic generated from use of lands leased by the COOPERATORS for the purposes of operating and maintaining a guest lodge." JX 4/3.

31. In the Brannons' MOU, the Forest Service made the limited commitment that "[n]ew construction or reconstruction, such as bridge replacement, will be agreed to as part of the yearly Joint Maintenance plan." JX 4, ¶ C.4.

32. The Brannons' MOU provided that "The FOREST SERVICE shall: 1.

Assume road maintenance responsibility for all National Forest traffic as defined and for two bridges (FS No. 423-2.5 and FS No. 423-3.0), including abutments and approaches." JX 4/3, ¶ B.1. The MOU's "Definition of Terms" section defines "National Forest traffic" as "traffic generated by use of National Forest lands or road systems for recreation purposes exclusive of traffic related to commercial, administration, or protection needs of lands owned or leased by the COOPERATORS." JX 4/2.

33. The Brannons' MOU also provided that "New construction or reconstruction, such as bridge replacement, will be agreed to as part of the yearly Joint Maintenance plan." JX 4/3, ¶ C.4.

34. Mr. Brannon used a grader to maintain Sweetwater Road, and ensured that guests driving low-clearance passenger vehicles could reach the lodge. Tr. 1524:9-11, 20-22.

35. A prospective purchaser of the lodge, Ms. Wanda Smith, spoke with the Forest Engineer of the Shoshone, Jim Fischer, on or about May 15, 1995 about the road and bridge conditions. Tr. 1412:19-1413:15. Mr. Fischer discussed with her the possibility of replacing the bridges with fords. Tr. 1413:7-15. He noted that he recorded in his calendar for that day that "Ms. Smith isn't real excited about that." DX 13/1.

36. Ms. Smith did not purchase the lodge from the Brannons because of her concerns about the road and bridges. Tr. 763:25-765:14, 780:6-781:3, 858:16-19.

37. Mike Bree, a Forest Service employee who had responsibility for permit administration at that time, spoke to the Brannons, who were upset that the Forest Service talked about the road and bridges with Ms. Smith. Tr. 765:15-766:13. Mr. Bree told the Brannons that the Forest Service has "to make sure that anybody that's going to purchase it

knows the good points and the bad points, everything about it." Tr. 766:14-19.

## II. <u>The Sweetwater Agrees To Buy The Lodge</u>

38. In addition to serving as the manager of The Sweetwater, Mr. Mummery is also the president of Western Wyoming Properties & Investment Corporation, which owns shares of The Sweetwater. Tr. 470:12-22; DX 19/1. Mr. Mummery is engaged in buying and selling real estate. Tr. 470:4-11.

39. On Friday, May 19 1995, Mr. Mummery learned from Buck Wilkerson, a friend who was a realtor, that the closing on the Brannons' sale of the lodge had fallen through, and that Mr. Mummery "could make [him]self a good deal and buy it." Tr. 478:1-8; DPFUF ¶ 23.

40. Mr. Wilkerson told Mr. Mummery that he thought the previous prospective purchaser had been prepared to pay $450,000 for the lodge. Tr. 478:9-12; DPFUF ¶ 24.

41. Mr. Wilkerson told Mr. Mummery that the Brannons were very motivated to sell the lodge. Tr. 478:13-479:18. Mr. Mummery understood that the Brannons were moving to Coos Bay, Oregon, and had made a commitment to buy a boat, and had made no bookings for the lodge for the summer season that was just beginning because they had been negotiating the sale of the lodge for several months. DPFUF ¶ 25.

42. The same day that Mr. Wilkerson told Mr. Mummery about the opportunity to buy the lodge from the Brannons, Mr. Mummery visited the lodge with his friend Gary Fales, who owns Rimrock Ranch, another North Fork lodge. Tr. 75:17-76:9.

43. During his visit, Mr. Mummery spoke to Mrs. Brannon, who was distraught that the sale to Ms. Smith had not closed. Tr. 78:17-21. Mr. Brannon was 70 or 71, and she

was concerned that the lodge was too much for him to handle. Id. 78:24-79:2. The Brannons planned to retire, and had a contract to buy a boat to live on in Coos Bay, Oregon. Tr. 79:2-9.

44. In his deposition, Mr. Mummery testified that "I looked at it as a bargain sale." He also testified that"since I looked at it as a bargain sale, I wasn't going to evaluate how – their gross revenues or net revenues or how they – they ran their business." DPFUF ¶ 28; Tr. 479:24-480:6.

45. Mr. Mummery claimed during his direct examination that he had owned the Yellowstone Valley Inn on the North Fork Highway, though on cross-examination, he admitted that he had just leased it for one year, and had never been the manager or owner of any hotel or motel during his "checkered" business career. Tr. 407:22-24, 411:8-9, 476:5-13.

46. Mr. Mummery's initial business plan was to operate the lodge much as the Brannons had by employing the cook that Mrs. Brannon had hired. Tr. 86:6-87:1, 490:10-491:24.

47. Mr. Mummery's wife told him not to buy the lodge. Tr. 676:21-677:8.

48. Mr. Mummery returned to look at the lodge again on Saturday, May 20, 1995, and spoke to Dave Brannon. Tr. 83:13-84:11.

49. Mr. Brannon started sales discussions with Mr. Mummery at $425,000. DPFUF ¶ 30.

50. On Sunday morning, May 21, 1995, Mr. Mummery sent Mr. Brannon an offer on the lodge for $275,000. Tr. 482:6-8. Paragraph 20 of Mr. Mummery's offer provided that if it were accepted by 6:00 p.m. that day, it would form a contract. JX 9.

51. Mr. Mummery did not deliver the offer in person because he knew that Mr. Brannon would be angry. Mr. Mummery testified that Mr. Brannon "came back just ballistic." Tr. 482:9-483:4; DPFUF ¶ 32.

52. The Brannons faxed to Mr. Mummery a counter-offer for $287,500 with a date and time of 2:40 p.m. Sunday, May 21, 1995. Paragraph 2 of the counter-offer specified that it expired at 4:00 p.m. that day. DPFUF ¶ 33.

53. Mr. Mummery, as president of Western Wyoming Properties, accepted the counter-offer on May 21, 1995. Paragraph 8 of the original offer provided for a closing date of June 21, 1995. DPFUF ¶ 34.

54. In his deposition, Mr. Mummery testified that "I didn't look at the bridges before I put in the offer. I mean, I – I looked at them driving out. . . . my primary concern at the time was even getting the – you know, I – I had offered substantially less than I think he'd felt his lodge was worth. I mean, you know, 40 percent less, or in that neighborhood." DPFUF ¶ 35.

55. At trial, Mr. Mummery testified that he was most interested in the lodge for resale rather than to operate: “I thought I was making a good deal vis-vis market value. In other words, <u>if I decided to do nothing with it</u>, I could sell it and get my money out of it.” Tr. 498:17-20 (emphasis added).

56. Mr. Mummery testified that when he looked at the bridges in 1995, that the northern abutment to the lower Sweetwater bridges was in the same condition as shown in the inspection photograph taken in 1997. Tr. 524:24-525:17.

57. Mr. Mummery’s concern was that the Sweetwater bridges might fail in high

water because the abutments were exposed to scouring. Tr. 522:11-523:19.

58. Mr. Mummery had a full month to obtain information about the Sweetwater bridges between signing the sales contract on May 21, 1995 and the contractually specified date on which the purchase closed, June 21, 1995. DX 17/2, ¶ 8.

59. On June 9, 1995, a certificate of organization for The Sweetwater was filed with the Wyoming Secretary of State. The Sweetwater's operating agreement stated that it was organized for the purpose of "ownership, development, management and sale of the property formerly known as 'Brannon's Wilderness Lodge.'" DPFUF ¶ 37.

60. Mr. Mummery now believes that Mr. Brannon breached the sales contract by overstating the viability of the Sweetwater bridges. Tr. 501:2-502:1, 503:6-9.

## III. June 12, 1995 Meeting To Discuss Terms Of Permit

### A. The Forest Service Personnel Present Lacked Authority To Commit The Government To Replacing The Bridges Or Buying The Lodge

61. On June 12, 1995, Mr. Mummery and The Sweetwater's lawyer, Bill Simpson, met with three Forest Service representatives – Bob Rossman, Monte Barker, and Mike Bree – to discuss the permit that The Sweetwater desired to obtain for the lodge. Tr. 108:19-110:3.

62. At the time of the meeting, Bob Rossman was Acting District Ranger for the Wapiti District. Tr. 908:18-24. Mr. Rossman was the only Forest Service line officer at the meeting. Monte Barker was a member of a special uses permits team, and dealt with lodges. Tr. 800:19-801:4. Mike Bree was also a member of the special uses permits team, and along with Mr. Barker worked with Jennifer Watson on special use permits. Tr. 757:9-758:4, 760:6-761:12.

63. Mr. Larson testified that Barry Davis, who was Forest Supervisor for the Shoshone in 1995, had purported to delegate to District Rangers authority to issue all term permits. Tr. 1271:6-1272:2, 1281:19-1282:10.

64. Mr. Rossman believed that he had authority to sign the permit issued to The Sweetwater on behalf of the Forest Supervisor, but he did not hold any authority to act as Forest Supervisor with respect to any decisions regarding replacement of the Sweetwater bridges. Tr. 963:8-23.

65. Mr. Rossman has never held a warrant as a contracting officer. Tr. 967:24-968:1.

66. Mr. Mummery knew and trusted Mr. Barker from his previous dealings with him, but understood that Mr. Barker "was not the ranking officer in the room." Tr. 133:15-16.

**B. The Purpose Of The Meeting Was To Explain, Not Negotiate, The Terms Of The Permit**

67. Mr. Rossman testified that the discussion at the June 12, 1995 meeting was "merely discussion for purposes of information and understanding" about the terms of the permit that the Forest Service subsequently issued, and Mr. Mummery signed on behalf of The Sweetwater. DPFUF ¶ 41.

68. Mr. Rossman testified that he was not negotiating about the permit terms during the June 12, 1995 meeting, because the Forest Service dictated the terms of the permit, "and it would be up to Mr. Mummery to agree, by his signature, that those are the terms he'll abide by." DPFUF ¶ 42. Mr. Rossman regarded the meeting as an opportunity to explain the permit terms to Mr. Mummery. Tr. 965:2-7.

69. The participants in the June 12, 1995 meeting had a copy of the Brannons' permit. Tr. 122:16-21.

70. In a June 13, 1995 email to Jim Fischer that copied Mike Bree, Monte Barker, and Jennifer Watson, Mr. Rossman summarized as follows the discussions that he, Mr. Barker, and Mr. Bree held with Mr. Mummery and Mr. Simpson the preceding day:

> JEFF DOESN'T HAVE A PROBLEM WITH GOING TO FORDS AS A CONTINGENCY FOR BRIDGE FAILURE OR **UNSAFE BRIDGE CONDITION**. WE ALSO AGREE NOT TO HAVE A ROAD MTC AGREEMENT. JEFF IS CONCERNED ABOUT THE LIABILITY HE ASSUMES FOR GENERAL PUBLIC, AS OPPOSED TO GUESTS. OUR APPROACH IS TO MAINTAIN THE ROAD IN ACCORDANCE WITH OUR SYSTEM OF SETTING PRIORITIES ZONALLY, WHERE THE LIABILITY IS BASICALLY OURS ANYWAY. JEFF, HAVING AN INTEREST IN THE SAFETY OF HIS GUESTS, WILL MAINTAIN THE ROAD AS HE SEES FIT WHILE WE WILL COMMUNICATE AND MONITOR PROBLEM AREAS INFORMALLY (WITHOUT THE AGREEMENT). IT IS UNDERSTOOD THAT WE DO NOT HAVE A PRIORITY ON MAINTAINING THIS ROAD, AND ARE NOT LIKELY TO ALLOCATE DOLLARS TO IT.

DX 18 (emphasis added).

**C. The Parties Discussed The Poor Condition Of The Bridges**

71. At trial, Mr. Mummery read into the record the following sentence in Acting District Ranger Bob Rossman's email that summarizes the June 12, 1995 meeting to discuss the permit: "'JEFF, HAVING AN INTEREST IN THE SAFETY OF HIS GUESTS, WILL MAINTAIN THE ROAD AS HE SEES FIT WHILE WE COMMUNICATE AND MONITOR PROBLEM AREAS INFORMALLY WITHOUT AN AGREEMENT.'" Tr. 147:5-8 (emphasis added). Mr. Mummery testified regarding this sentence, "That's called for in my permit. I don't know the exact clause, but there's a clause in my permit where I'm responsible for certain hazardous conditions. You know, a tree. Let's say there's

a road approaching my lodge, and it's got a tree that's about to fall over, but it hasn't quite fallen over, but it could strand somebody up there or fall on their vehicles or whatever. I have an obligation in my permit to inform the Forest Service and then do what I can do to assist them in correcting the problem." Tr. 147:9-19.

72. The risk that erosion from Sweetwater Creek presented to the abutments to the Sweetwater bridges was contemplated and discussed by The Sweetwater and the Forest Service at the June 12, 1999 meeting before the permit issued. Tr. 524:1-7.

73. Jeff Mummery, the owner of The Sweetwater, testified at trial that when he discussed the bridges with Forest Service representatives in June 1995 before the permit issued, "I was concerned about a big flood, a washout, a gullywasher, whatever you want to call it, that wiped out the bridges." Tr. 129:13-15.

74. Acting Wapiti District Ranger Bob Rossman testified that he told Mr. Mummery during the June 1995 meeting that the bridges were "vulnerable" to such a washout. Tr. 920:12.

75. Mr. Rossman had observed that the bridges were in poor repair, and that the abutments appeared highly eroded and "vulnerable to high water at any time." Tr. 950:2-14.

76. In paragraph 13 of his declaration in support of The Sweetwater's February 6, 2004 cross-motion for summary judgment, Mr. Mummery swore that "[n]o warning signs of any type were ever placed at the bridges from 1995 to the present."

77. At trial, Mr. Mummery testified that he recalled seeing the "Weight Limit 3 Tons" warning signs on May 21, 1995 when he visited the lodge, and concluded that the bridges were safe if used by vehicles weighing less than 3 tons. Tr. 77:8-10, 78:14-16.

**D. The Sweetwater Declined To Enter Any Agreement About Maintenance Of Sweetwater Roads And Bridges**

78. At the June 12, 1995 meeting, plaintiff declined to enter into a memorandum of understanding ("MOU") that was incorporated into the permit and addressed financial responsibilities for the road and bridges, as had the Brannons. Tr. 534:21-535:15; JX 4.

79. Mr. Mummery explained further, "So it was liability, and it – it was my primary concern, period. From day one, from the moment that I looked at it, the moment that I saw the memorandum of understanding, it all had to do with: Would I be liable?" DPFUF ¶ 47.

80. The Sweetwater did not enter into any written agreement that explicitly required the Forest Service to replace the bridges if they became unsafe or impassable. Tr. 535:9-15.

81. Mr. Mummery testified in his deposition that "I do not believe either Mr. Simpson or myself specifically stated to the Forest Service the request to put in writing that if the bridges had a catastrophic failure, they would replace them." DPFUF ¶ 49.

82. Mr. Simpson has sought written permission from the Forest Service on behalf of other clients to ensure access across Forest Service land. Tr. 1125:25-1127:25.

**E. The Sweetwater Representatives Understood That The Forest Service Representatives Could Not Commit To Replacing The Bridges**

83. Mr. Rossman testified that during the June 12, 1995 meeting, "I know that we conveyed the information that if the bridges failed, that they would not be replaced. I'm not using the word 'never,' but for the foreseeable future, there's no way that we would be funding that." Tr. 956:15-19.

84. Mr. Bree testified about the June 12, 1995 meeting that "we talked to Mr. Mummery about replacing of the bridges, but at that particular time, we did not have the funding to replace those bridges, and we also did not anticipate funding coming down from the Regional Office to replace those bridges.. And we advised him that . . . . we would put in for the capital improvement money if the opportunity arose, but we – we weren't going to guarantee that we were going to replace those bridges." Tr. 770:17-771:3.

85. Mr. Barker testified that during the June 12, 1995 meeting "that was the whole idea. Does Jeff want to go ahead and obtain this permit with the understanding that we can't make commitments on the road. All we can do is put in for CIP and do the best of our ability to try to get funding to do that, which would take CIP money because it was well outside our financial. I can't make and the ranger can't make <u>financial obligations</u> of that magnitude." Tr. 837:13-21 (emphasis added).

86. Mr. Barker testified further that during the June 12, 1995 meeting, Forest Service representatives "made very clear that with the magnitude of financial investment for this road, that really, access is the lodge, and it has very little other opportunities. There's not a lot of camping areas out there that – that – you know, we – we weren't we couldn't give him much hope that that kind of funding would come to fruition here when it compared against other accesses and bridges on the – on the – in the region because that's a regional pot of money." Tr. 838:1-10.

87. Mr. Barker testified that "I think it was Mr. Mummery's understanding that, yeah, we – you can't do anything right now, and I'll do the best I can with the understanding that you folks are going to put in for a CIP proposal. And I know fully well that it's probably

low on the totem, but you know, it's a shot." Tr. 894:9-14.

88. At the time of the June 12, 1995 meeting, Mr. Mummery understood from what the Forest Service representatives said that they could not commit the Forest Service to replacing the Sweetwater bridges if they failed: "there were no guarantees. The personnel at that meeting could not promise that they would jump up with a bunch of money and fix my bridge."[2] Tr. 129:22-25.

89. He testified further, "I was told by the Forest Service that they had to go through an application process to obtain money to repair the bridges. And I understood that. I understood that the personnel there could not guarantee what the outcome of that would be." Tr. 537:14-18.

90. Mr. Mummery understood that the Forest Service representatives at the June 12, 1995 meeting, including Mr. Rossman, whom the permit identifies as the "Issuing Officer," lacked the authority to bind the Forest Service to repairing or replacing the bridges, and agreed with the accuracy of the following testimony in during his deposition: "Difficulty was clearly the people I was in the room with were not the ones that would approve the funding, whatever amount it may be, so the difficulty was that I would have to go to – the way I looked at it, is I had to lobby for my case; that I would have to get these people, who seemed to agree that they would put the proposal forward, and then I would hopefully have to go to the next level to make the decision." Tr. 542:14-23.

91. Mr. Mummery also testified that he understood and was told clearly that once

---

[2] As the Court noted a trial, Mr. Mummery again later referred to obtaining funds to fix"my bridges." Tr. 248:17-18, 249:5-6. Mr. Mummery denied that he owned the bridges, but referred to his description as "a kind of possessory psychological thing." Tr. 249:7-13.

the decision was moved up the chain of command, that a decision could be made not to replace the bridges. Tr. 541:6-12, 580:21-581:2. Although he testified that he believed that if a higher-level Forest Service official decided not to replace the bridges, The Sweetwater would be compensated pursuant to clause 15 of the permit (Tr. 541:12-20), he acknowledged that the persons at the meeting "could not make the approval for the money" (Tr. 543:1-2).

92. During his testimony, Bill Simpson agreed that at June 1995 meeting, Forest Service employee Monte Barker, with the concurrence of Acting District Ranger Bob Rossman, did not make any unconditional commitment that the Forest Service would rebuild the bridges, but merely said that they would do what they were personally able to do: "we will do everything within our power to try to get funding to get money and if we have it, we'll advise you. If we don't, we'll advise you of that. If we get the money, we'll help you." Tr. 1135:23-1136:7 (emphasis added).

**F. The Participants Contemplated That The Sweetwater Would Use Fords To Operate The Lodge If The Bridges Became Impassable**

93. Mr. Rossman testified that at the June 12, 1995 meeting: "I believe that we made it clear that if the bridges went, they were gone. And if he wanted to access his lodge that – using vehicles, then he would need to have fords in order to do that." Tr. 934:17-20.

94. Mr. Bree testified that "I specifically remember telling him that we would not issue a permit if – if we then decided that he couldn't operate it because of the roads and bridges. . . . if it was a worst case scenario, the Forest Service would put in fords so he could operate his – his – his business." Tr. 771:17-20, 772:13-15.

95. Mr. Mummery understood from his discussion with Forest Service representatives at the June 12, 1995 meeting that if the bridges became impassable, he would

have to use fords to operate the lodge, though he did not regard this as a permanent solution because it would reduce the lodge's season: "as a compromise they would at least be able to put in temporary f[]ords so that that portion of the season which maybe less than 50 percent of what you'd consider the normal summer season comes after high water so that I would – you know, it was clear that we were talking about if you had to deal with f[]ords it had to be a temporary issue because you really just automatically cut the business in half." Tr. 130:8-16 (emphasis added); Tr. 772:25-773:3.

96. Mr. Mummery reviewed the sentence in Mr. Rossman's email about the June 12, 1995 meeting that states "JEFF DOESN'T HAVE A PROBLEM WITH GOING TO FORDS AS A CONTINGENCY FOR BRIDGE FAILURE OR UNSAFE BRIDGE CONDITION," and commented: "That's true. I did not have problem with the f[]ord, but the key word that I was concerned about here is temporary. To my mind, that was very important that that be included." Tr. 145:16-25; DX 18.

97. Mr. Mummery testified that at the time of the meeting, he understood that if the bridges became impassable, it might take three years or possibly longer to replace them. Tr. 576:22-577:11.

98. Forest Supervisor Rebecca Aus testified that fords are used on other roads in the Shoshone National Forest that are open to the public for recreational uses. Tr. 1786:7-1787:12, 1692:15-1693:6.

**G. There Was No Agreement That The Forest Service Would Pay Equitable Consideration If It Were Unable To Replace The Bridges**

99. Mr. Mummery gave conflicting testimony about his conversations regarding clause 15. At one point, he testified, "I asked them that, I said are you choosing to close my

lodge if you don't replace the bridge. No, we aren't." Tr. 543:9-11 (emphasis added). He later testified that he asked whether clause would apply if the Forest Service chose not to replace the bridges, and received an "affirmative" response. Tr. 546:8-12.

100. Mr. Mummery never asked whether Mr. Rossman or the other Forest Service representatives had the authority to make a decision to terminate the permit in the public interest, which would require the expenditure of Government funds to compensate the lodge owner pursuant to clause 15 of the permit. Tr. 547:2-13.

101. Clause 16 of the Brannons' permit is substantively identical to clause 15 of the permit issued to The Sweetwater, and provides that if the Forest Service "shall determine that the public interest requires termination of this permit" the Government would pay "equitable consideration" for the permittee's improvements, and that if the Forest Service and the permittee were unable to agree upon the amount of the consideration, "the Forest Service shall determine the amount and if the permittee is dissatisfied with the amount thus determined to be due him he may appeal the determination in accordance with the Appeal Regulation (36 C.F.R. 211.20-211.37) and the amount as determined on appeal shall be final and conclusive." JX 13.

102. The lawyer who represented The Sweetwater at the June 12, 1995 meeting, Bill Simpson, has no recollection of any discussion during the meeting about clause 16 of the Brannons' permit. Tr. 1139:12-1140:16.

103. Acting District Ranger Bob Rossman does not recall any discussion during the June 12, 1995 meeting about whether clause 15 granted the permittee a right to compensation of the bridges weren't replaced or repaired. Tr. 967:7-15. Mr. Rossman

believes that he would recall if that subject had been discussed. Tr. 967:16-23.

104. Mr. Barker testified that "we made very clear that although we understand the situation, we can make no commitments as far as financial or otherwise on this road <u>or what might happen if the permittee couldn't operate</u>." Tr. 828:10-13 (emphasis added).

105. Mr. Barker said that at the meeting, no commitment was made that if the Forest Service was unable to replace the bridges, that The Sweetwater would receive compensation for the lodge. Tr. 896:15-897:22.

106. Mr. Bree testified that he does not believe that Mr. Mummery said that he interpreted clause 15 to mean that if the Forest Service decided not to replace the bridges, then he expected to be compensated for the lodge. Tr. 789:2-24.

107. Mr. Mummery proposed a term in the 1995 operating plan that provided that the permittee had the right to <u>apply</u> for compensation pursuant to clause 15 if the lodge's operations were suspended to prevent conflicts with grizzly bears. DX 22/8.

108. Mr. Mummery never sought to amend the permit or the 1995 or any subsequent operating plan to incorporate the alleged representation by the Forest Service that it would buy his lodge if the bridges were not replaced, even though he did amend the 1996 operating plan to address other issues regarding access. JX 1, DX 22/3, DX 28/4; Tr. 2114:14-2115:19.

## IV. <u>On June 21, 1995, The Sweetwater Closed On Its Purchase Of The Lodge</u>

109. At no time before The Sweetwater closed on the purchase of the lodge on June 21, 1995 did Mr. Mummery ask the Forest Service for any written information that they had about the condition of the Sweetwater bridges or Sweetwater Road. Tr. 519:12-520:10.

110. There was never any time when Mr. Mummery asked the Forest Service for information that they refused to provide to him. DPFUF ¶ 71.

111. The Wasatch-Cache inspectors' August 1992 reports on the Sweetwater bridges were included in the Shoshone's files, which were available for inspection by The Sweetwater, just as information was made available to the Sutherlands in 1997. Tr. 2124:5-10.

112. Mr. Mummery elected not to consult an engineer about the bridges before Western Wyoming Properties purchased the lodge. Tr. 496:13-15.

113. The Sweetwater closed its purchase of the lodge from the Brannons on June 21, 1995. DPFUF ¶ 72.

## V. <u>On August 21, 1995, The Forest Service Issued A Permit For The Lodge</u>

114. On August 21, 1995, the Forest Service issued a term special use permit for The Sweetwater to operate a public resort on 15.4 acres at the end of Sweetwater Road. JX 1.

115. The front page of the permit states that it was "issued for the purpose of [m]aintaining and operating a public resort." JX 1/1. The permit states further, "This use shall be actually exercised at least 93 days each year, unless otherwise authorized in writing." <u>Id.</u>

116. The front page of the permit states that "[t]his permit is accepted subject to the conditions set forth herein, and to conditions 3 to 55 attached hereto, and made a part of this permit." JX 1/1.

117. Neither the permit nor the 1995 or 1996 annual operating plans, which were

incorporated into the permit, contained any references to replacing the Sweetwater bridges or to maintenance or repair of Sweetwater Road. JX 1, DX 22, DX 28.

118. Clause 8 of the permit requires the permittee to "exercise diligence in protecting from damage the land and property of the United States covered by and used in connection with this permit." JX 1/2.

119. Clause 15 of the permit sets forth a process pursuant to which "equitable consideration" is paid to the permittee only if the Forest Service "determine[s] that the public interest requires termination of this permit." JX 1/3.

120. Clause 15 provides further that if the Forest Service and the permittee are unable to agree upon the amount of equitable consideration, "the Forest Service shall determine the amount and if the permittee is dissatisfied with the amount thus determined to be due him he may appeal the determination in accordance with the Appeal Regulation (36 C.F.R. 251 Subpart C) and the amount as determined on appeal shall be final and conclusive on the parties hereto." JX 1/3.

121. Clause 15 makes no reference to paying The Sweetwater equitable consideration if the Forest Service did not repair or replace the Sweetwater bridges. JX 1/3.

122. Clause 30, titled "Risks and Hazards," states that "[a]valanches, rising waters, high winds, falling limbs or trees, and other hazards are natural phenomena in the Forest that present risks which the holder assumes. The holder has responsibility of [sic] inspecting the site, lot, right-of-way, and immediate adjoining area for dangerous trees, hanging limbs, and other evidence of hazardous conditions and, after securing permission from the Forest Service, of removing such hazards." JX 1/9.

## VI. The Sweetwater Has Never Operated The Lodge As A Public Resort

123. Plaintiff chose not to operate the lodge during 1995. Tr. 157:16-20. After closing its purchase of the lodge on June 21, 1995, plaintiff spent the remainder of the operating season cleaning up the lodge site. Tr. 157:16-159:7.

124. In November or December 1995, Mr. Mummery showed the lodge to Daren Singer and Bram Lassiter as "part of [his] efforts to sell the lodge," and quoted them the price of $650,000. Tr. 605:23-606:6, 612:1-615:22; DX 27, ¶ 4.

125. In 1995 and 1996, Mr. Mummery listed the lodge for sale with a realtor, Jim Sommers, who Mr. Mummery allowed to prepare a brochure to promote the lodge. Tr. 608:20-609:3; DX 34.

126. In February 1996, Mr. Mummery signed a sales contract to sell all the stock of The Sweetwater to Mr. Carl Bixby for $600,000. JX 8. However, Mr. Mummery never informed the Forest Service that he had signed the sales contract, even though clause 51 of the permit requires that the permittee "shall immediately notify the Forest Supervisor when a sale and transfer in ownership of the permitted improvements is planned." JX 1.

127. Mr. Mummery operated the lodge "exclusively for the purposes" of Mr. Bixby and his family and friends during 1996 in return for payments totaling $71,500. Tr. 625:22-626:5; 164:1-7.

128. No one else besides Mr. Bixby and his family and friends used the lodge during the 1996 season. Tr. 166:25-167:1.

129. Mr. Mummery testified that he did not market the lodge because Mr. Bixby was supposed to obtain customers for the lodge, even though The Sweetwater was still the

permittee, and "we were getting paid whether we marketed or not." Tr. 627:20-628:5.

130. Section 2343.3 of the Forest Service Manual requires a permittee to operate a lodge "in a manner that ensures the general public has full access to the facilities," and denies "exclusive or preferential use by holders, their employees, families, friends, business associates, partners, stockholders, lenders, or others who may have a monetary interest in the facilities." DX 12/10-11.

131. Mr. Bixby was unable to close the purchase of the lodge, and the owners of The Sweetwater kept 10% of the purchase price – $60,000 – pursuant to the terms of the sales contract. JX 8/2, ¶ 1(a).

132. Mr. Mummery admitted that after the Bixby sale collapsed, he never sought, let alone secured, the $200,000 in financing that is the basis for the business plan that he did not prepare until 2005 for purposes of this lawsuit. Tr. 639:7-640:13.

133. In February 1999, Mr. Mummery did obtain a $110,000 loan for the lodge, but used the bulk of the money – $90,000 – to pay off his note to the Brannons, and did not spend the remainder on the lodge until over a year later, during the summer of 2000. Tr. 220:18-221:8.

134. Mr. Mummery has never replaced roofs on two of the five guest cabins, even though these were noted as deficiencies in the 1995 and 1996 operating plans that he reviewed and approved. Tr. 598:4-601:9; DX 22/9, DX 28/10.

135. Mr. Mummery did not remodel the interiors of any of the cabins during the 1996 season. Tr. 718:25-719:8.

136. Jim Sommers ran advertisements for The Sweetwater's lodge in the

newspaper, and in early 1997 introduced Mr. Mummery to Ray and Judi Sutherland as prospective buyers of the lodge. Tr. 629:18-630:2; DX 33.

137. Mr. Mummery testified that "any inquiries to have the lodge sold or not sold were all unsolicited by me." Tr. 175:22-24.

138. In February 1997, a prospective sale of the lodge to Ray and Judi Sutherland for $595,000 fell through after the Forest Service faxed copies of the 1992 bridge inspections to the Sutherlands with a note dated February 14, 1997 from Forest Engineer Jim Fischer stating that the bridges had been "basically condemned in '92." Tr. 178:9-180:15; JX 7.

139. The Forest Service sent the Sutherlands a letter the next day, on February 20, 1997, explaining that the bridges had not been condemned, and that the 1992 bridge inspections were given a rating code of 2, which indicated "a deficiency that may be dealt with through load limit restrictions." Tr. 2066:2-13; JX 11. The letter also stated:

> While the Shoshone Forest clearly desires to maintain access in the Sweetwater Drainage, that access would more likely become seasonal fords of the Sweetwater River should the condition of the bridges deteriorate to the point where they can no longer be used. As explained in previous discussion, this is because funding for replacement of these bridges is not currently available, and the liklihood [sic] of obtaining adequate funding to replace these bridges in the future is low.
>
> When Jeff Mummery purchased this lodge several years ago, the condition of the bridges was an issue at that time. He agreed that fords would be an acceptable alternative for access to the lodge should the bridges either fail or become unsafe. Whether this method of access will be adequate for you and your proposed business at the Sweetwater Lodge must figure into your business plans.

Id. Mr. Mummery received a copy of the February 20, 1997 letter. Tr. 181:11-19.

140. At Mr. Mummery's request, on February 27, 1997, the Forest Service sent a second letter about the Sweetwater bridges, this one addressed to Mr. Mummery, for which

he proposed language to District Ranger Brent Larson. Tr. 1019:12-16, 186:19-24; JX 12.

141. Mr. Larson believed that it was accurate to state in the letter that the Sweetwater bridges were included in the CIP program for 1999, because that did not necessarily mean that they would be funded. Tr. 1355:22-1356:1.

142. Mr. Mummery testified that after he learned about the 1992 bridge inspections in February 1997, he determined that he could not operate the lodge because of the risk of liability. Tr. 194:13-196:5. Mr. Mummery testified that he told Mr. Larson that either the bridges would have to be fixed, or a professional engineer could certify that the bridges were safe, and when Mr. Larson said that could not be done, Mr. Mummery chose not to operate. Tr. 196:6-14; 1293:6-14.

143. Mr. Mummery agreed that the 1992 bridge inspection reports did not say that the bridges could not be used for passage of the guests to the lodge. Tr. 649:19-25.

144. Brent Larson testified that in 1997 and 1998, Mr. Mummery stated that he could not operate because he could not take advance bookings with confidence that the bridges would be functional when his guests arrived. Tr. 1025:12-1027:20.

145. Forest Engineer Jim Fischer, a professional engineer, inspected the Sweetwater bridges in March 1997, and did not conclude that the bridges should be closed. Tr. 1293:18-19; JX 13/5, JX 14/3.

146. On April 7, 1997, after Mr. Mummery told the Forest Service that he was unable to operate the lodge, he told Forest Service Realty Specialist Jennifer Watson, "admittedly I haven't opened the lodge, which perhaps in retrospect is good" (emphasis added), a revealing comment that Ms. Watson recorded verbatim in her calendar.

Tr. 2125:23-2125:22; DX 41.

147. Mr. Mummery testified that at no time before the Sweetwater bridges were closed to public vehicular access in April 2001 did anyone from the Forest Service tell him that he was barred from using the bridges to operate the lodge. Tr. 647:15-648:4. He testified, "remember now in the summer of 2000 the bridges are still open for access." Tr. 657:9-10.

148. Forest Service engineer Tom Koenig inspected the Sweetwater bridges in August 2000, and did not conclude that the bridges needed to be closed. DX 46, DX 47.

149. Clause 54 of the permit requires the permittee to prepare annually an operating plan. JX 1/14. The Sweetwater did not submit any operating plans from May 1996 until May 2002, even though Forest Service representatives repeatedly asked Mr. Mummery for The Sweetwater to submit a written proposal for how he could operate the lodge. Tr. 636:20-237:23, 2115:14-22, 2118:14-2120:3.

150. One of these ideas included restricting access to the road to lodge guests beginning at the lower Sweetwater bridge. Tr. 1229:11-1230:21, Once Mr. Larson determined that there was unlikely to be much public resistance to this proposal, and Ms. Watson suggested that he submit a proposal, Mr. Mummery then backpedaled, and declined to pursue the idea further. Tr. 202:10-206:2.

## VII. The Forest Service Has Shown Good Faith In Its Decisions About Whether To Fund The Replacement Of The Sweetwater Bridges

151. On June 11, 1996, Mr. Fischer sent an internal email to Bob Rossman and other Forest Service employees stating that Mr. Fischer had met with Mr. Mummery, and told him that "we now have the new bridges back into our budget system for FY98 or 99."

DX 29. Mr. Fischer testified that at a June 5, 1996 meeting, he had succeeded in getting the project back into the CIP for fiscal years 1998 and 1999 for the Shoshone's proposal that was forwarded to the regional office. DPFUF ¶ 87.

152. The bridges are not shown on Mr. Fischer's CIP list for fiscal year 1995, but appear for fiscal year 1996 with the notation "Des. w/NFRD FY98, Const. 99," which Mr. Fischer testified meant that they were intended to be designed in fiscal year 1998, and constructed in fiscal year 1999. JX 2; DPFUF ¶ 88.

153. The Wapiti District Ranger, Brent Larson, told Mr. Mummery in a February 27, 1997 letter that a request for CIP funding had been made to replace the bridges in fiscal year 1999. JX 12.

154. At no time after this letter was sent did Mr. Mummery ever ask for the Forest Service to construct fords to provide an alternative means of access to the lodge, nor did he ever try to operate the lodge using fords. Tr. 650:1-5, 1719:7.

155. Mr. Larson began to search for a conservation buyer in response to Mr. Mummery's decision in February 1997 not to operate the lodge. Tr. 1289:20-1291:18. The reason that Mr. Larson pursued a conservation buyer was to relieve Mr. Mummery of his obligation to operate the lodge. Id.

156. At no time did Ms. Aus or Mr. Larson conclude that "the public interest requires termination of the permit," which clause 15 provides is the condition precedent for the requirement to pay equitable consideration to the permittee. Tr. 1297:15-1298:14.

157. Mr. Fischer was not a Forest Service line officer. 778:12-18, 1506:2-5.

158. Mr. Larson was not a contracting officer and did not hold a warrant.

Tr. 1271:23-1272:14.

159. Rebecca Aus, Forest Supervisor of the Shoshone National Forest, is not a contracting officer. Tr. 1766:16-20; PX 55.

160. In fiscal years 1998 and again in 1999, Mr. Fischer testified that the project was deferred, possibly because the Shoshone was shorthanded in the engineering section, and possibly because it could not be fit into the budget. DPFUF ¶ 91.

161. Mr. Fischer's principal concern was not that the bridges would collapse if a passenger car or light truck passed over them, but that the bridges would wash out. Tr. 1576:5-11.

162. Mr. Fischer testified that he did not interfere with efforts to obtain funding for the bridges: "I hadn't been dragging my feet to slow down the funding. I was dragging my feet on going into final design of the bridges." Tr. 1502:2-11, 1596:8-1597:10.

163. Mr. Fischer was concerned that $186,000 would not be enough to rebuild the Sweetwater bridges. Tr. 1485:14-21.

164. Mr. Fischer testified that during fiscal year 2000, it appeared that within the total amount appropriated by Congress to the Forest Service there would be sufficient funds to rebuild the Sweetwater bridges. Tr. 1498:6-11, 1500:11-1501:3.

165. The funds had not been earmarked by Congress, and the Shoshone retained the ability to decide whether to spend the funds it was authorized by the region to spend. Tr. 1564:7-14.

166. The project to rebuild the Sweetwater bridges was indefinitely postponed during fiscal year 2000. Tr. 1501:4-23.

167. Forest Supervisor Rebecca Aus considered replacing the Sweetwater bridges as a low priority, because Sweetwater Road was a maintenance level 2 road, and access to the lodge could be provided by high-clearance vehicles using fords rather than bridges. Tr. 1648:17-1649:3, 1657:4-1658:5.

168. Ms. Aus considered campgrounds and water systems to be higher priorities among the large amount of deferred maintenance on the Shoshone. Tr. 1660:10-1661:6.

169. Shoshone Forest Supervisor Rebecca Aus testified that operation of the lodge is consistent with the Forest Plan for the Shoshone. Tr. 1701:9-1702:21.

170. In late 2000, Mr. Mummery requested that the Forest Service permit him to perform work to upgrade the bridges after Brent Larson told him that it was unlikely that the bridges would be funded, or that a conversation buyer could be found. Tr. 652:16-654:22, 221:9-224:22. At trial, Mr. Mummery initially testified that until July 2001, he had not been told that the proposal to replace “my bridges” would not be funded. Tr. 248:16-25.

171. At the suggestion of the Shoshone's Bridge Inspector, Tom Koenig, who said there was no point in putting money into the bridges if they could not be load rated, Mr. Mummery retained an engineer, who determined that the deteriorated condition of the bridges prevented him from load rating the bridges in January 2001. Tr. 225:14-23; JX 15.

172. The Forest Service then determined that it must close the Sweetwater bridges to vehicular access, which it did in April 2001. Tr. 226:10-24; PX 31.

173. Mr. Mummery testified that it was Mr. Larson who proposed going through the process of seeking termination of the permit in the public interest as one possible option of addressing Mr. Mummery's preference not to operate the lodge: "the idea of buying the

damn lodge was [Mr. Larson's] idea. He's the one that thought that, boy, I don't -- you know, if, in fact, we can't get the money reasonably for the road, maybe it's a better idea to invest that kind of money in buying you out of your lodge than putting in bridges anyway." DPFUF ¶ 94.

174. In an April 2, 2001 letter that Mr. Mummery sent to Mr. Larson, Mr. Mummery referred to a proposal that originated long after the permit issued: "I am seriously interested in exploring the alternative which we have been loosely discussing since last fall, which is the idea of the Forest Service paying the limited liability company the replacement value of the Sweetwater Lodge assets, with the understanding, of course, that the limited liability company would relinquish the permit" (emphasis added). JX 16.

175. In a July 12, 2001 letter to Mr. Larson, Mr. Mummery reiterated his understanding that clause 15 did not grant him a contractual right to equitable consideration if the bridges were not replaced, but rather established a process that was controlled by the Forest Service : "I welcome the opportunity to meet the appraiser selected by the Forest Service so we can seriously pursue the option under clause 15 of the Term Special Use Permit which allows for the Forest Service to determine that the public would be served by termination of the permit and purchasing the permitttee's improvements." DX 50.

176. After the Forest Service sent a written "Notice of Non-Compliance And Opportunity To Cure" on December 21, 2001, The Sweetwater did submit an operating plan on May 1, 2002. JX 21, DX 54.

177. Neither the permit nor the operating plan was ever amended in writing to relieve The Sweetwater of its obligation to operate the lodge 93 days per year as a public

resort. JX 1.

178. The Notice of Non-Compliance that the Forest Service served on The Sweetwater in December 2001 "provide[d] notice of facts that may warrant revocation of your permit," but the Forest Service has never proceeded to terminate or revoke the permit, despite The Sweetwater's subsequent failure to submit an acceptable operating plan. JX 21, DX 54.

179. Plaintiff remains in possession of its property, and is able to gain access to it across the Sweetwater bridges (using a key it possesses to unlock the gates) and to occupy the lodge. December 30, 2004 Order, p. 7.

180. The Forest Service witnesses provided unrebutted testimony that since Sweetwater Road was closed to vehicular access by the public in 2001, there have been almost no complaints from the public. Tr. 890:18-891:2; 1016:17-25, 2137:18-25.

181. By letter dated May 28, 2002, The Sweetwater sent to the Forest Service what purported to be "claim pursuant to the Contract Disputes Act, 41 U.S.C. § 601 et seq.," which allegedly arose from "the Forest Service's breach of its obligations" under the permit issued to The Sweetwater. JX 23/1. The letter was addressed to Rebecca Aus, the Forest Supervisor of the Shoshone National Forest, whom it identified as "Rebecca Aus, Contracting Officer." Id.

182. The May 28, 2002 letter asserted that "as a result of the Forest Service's breach," The Sweetwater had suffered damages that totaled $2,549,034, including out-of-pocket costs, lost profits, and the replacement cost of the lodge. JX 23/1-2.

183. The May 28, 2002 letter requested from Ms. Aus "a written Contracting

Officer's final decision." JX 23/7.

184. By letter dated July 22, 2002, Ms. Aus provided a written decision in response to The Sweetwater's May 28, 2002 purported "claim" letter. Ms. Aus stated that she did not hold any authority to serve as a contracting officer for the special use permit, and that she lacked any delegation of contracting authority whatsoever. DX 54. She also stated that the permit issued to The Sweetwater was not a contract but a license pursuant to 36 C.F.R. Part 251, Part B, and rejected any obligation by the Government for The Sweetwater's "claim." Id.

185. Ms. Aus's July 22, 2002 letter also notified The Sweetwater that "[w]ritten decisions made by the Forest Service relating to administration of special use permits are subject to administrative appeal under 36 C.F.R. Part 251, Subpart C." DX __.

186. The Sweetwater never appealed Ms. Aus's written decision dated July 22, 2002 pursuant to the appeals procedures set forth in 36 C.F.R. Part 251, Subpart C. Complaint ¶¶ 30, 38-39.

## VIII. Plaintiff Is Not Entitled To Recover Any Damages

### A. Plaintiff's Lost Profits Claim Is Speculative

187. The 1995 and 1996 operating plans that The Sweetwater submitted to the Forest Service do not contain any projections about its expected revenues, or any business plan that identified the revenue that The Sweetwater expected to generate from its different activities. JX 22, JX 28.

188. The only profit projections or written business plan that The Sweetwater developed before this lawsuit was filed were prepared between June 15 and June 21, 1995.

DX 17/5; Tr. 669:4-24.

189. Mr. Mummery testified that his initial profit projections were based upon the Brannons' business plan, which was a year-round "gourmet getaway" that was principally based on one-night stays by guests on Friday and Saturday nights, during which guests were offered 7-course suppers followed by a champagne brunch the following morning. Tr. 491:1-4, 2140:7-10.

190. Mr. Mummery did not intend to operate the lodge with his wife, as did the Brannons, because in 1995 his wife had her hands full with their son, who was then three years old. Tr. 677:1-11.

191. After the Bixby sale failed to close in 1996, Mr. Mummery intended to rent out the lodge for the week to family reunions, which suited the amount of personal time he intended to devote to the business. Tr. 675:22-676:20.

192. At most, plaintiff operated the lodge for a single season, 1996, and claims to have made a profit of $34,995 that year. JX 23; PX 43 (TS 2059).

193. Plaintiff extrapolated these alleged 1996 profits at a six percent rate for the years 1997-2001 as the basis for seeking lost profits totaling $312,256 in its May 28, 2002 "claim" letter to Forest Supervisor Rebecca Aus. JX 23.

194. Mr. Mummery prepared a business plan in 2005 to present a new calculation of The Sweetwater's lost profits and out-of-pocket expenses. Tr. 362:3-363:11.

195. Mr. Mummery testified that the business plan upon which plaintiff now bases his lost profits claim was based upon the assumption that after the sale to the Sutherlands failed to close in March 1997, he was required to operate the lodge (although this was

already a requirement of the permit), and he "pretended" that he had invested $200,000 in remodeling the cabins. Tr. 410:13-14, 412:5-10 ; JX 1/1.

196. The financial records for the 1996 season indicate that plaintiff did not earn a profit in that year, wholly independently of any alleged breach by the Government, because The Sweetwater excluded from its expenses payments made to management and interest costs. PX 43 (TS 2059).

197. Once these payments are counted as expenses, The Sweetwater did not earn a profit. PX 43 (TS 2059).

198. Mr. Mummery's current business plan is based on the presumption that he intends to live off-site and employ a resident assistant manager, unlike most lodge owners, who are couples who live in the lodge. Tr. 176:16-21, 446:19-447:5; PX 41, p. 7.

199. Yellowstone Valley Inn is a roadside motel that is not in the Shoshone National Forest, and that does not offer horseback riding, fishing, or the amenities that Mr. Mummery aspires to offer. DX 64/38.

200. In his current business plan, Mr. Mummery plans to keep the food prices moderate because he was told by a friend who runs a very successful restaurant that he would give away food to keep hotel rooms full. Tr. 436:16-21.

201. Mr. Mummery testified that if you run a very successful restaurant, you make eight or ten percent profit, but you make 80 percent profit when you rent a hotel room. Tr. 436:22-25.

202. Chico Hot Springs Hotel has 110 guest rooms, a conference center that can hold 300 people, and spring-fed swimming pools. Tr. 705:7-706:22.

203. Jenny Lake Lodge is located at the foot of Jenny Lake, and has a spectacular full-on view of the Grand Tetons and a famous restaurant. Tr. 678:15-679:24.

204. Rainbow Ranch Lodge looks out 100 yards onto the Gallatin River, which is well-known for fly fishing, and is near a major downhill and cross-country ski resort, Big Sky, as well as having a swimming pool. Tr. 680:4-681:18, 683:17-687:12.

205. Mr. Mummery now proposes to operate the lodge for adults only. Tr. 690:5-23.

206. In the current business plan for The Sweetwater's lodge, there will be no horseback riding offered, even though almost all other lodges on the North Fork and in the surrounding areas offer horseback riding, and Cody is known as "cowboy country." Tr. 690:24-691:17.

207. There are no spring-fed swimming pools or golf courses at Sweetwater lodge, though guests can smell sulphurous fumes from a warm spring, and see the scars from a disastrous forest fire that mars the view. Tr. 707:8-13, 720:20-721:3, 2678:25-2680:13; DX 64/16.

208. Wildlife that can be seen at The Sweetwater's lodge can also be seen anywhere on the North Fork. Tr. 720:17-19.

209. Sweetwater Creek has a streambed composed of volcanic rocks, unlike premier trout fishing rivers and streams, which have a sedimentary bottom. Tr. 2882:8-2883:6.

**B. The Claimed Value Of The Lodge Is Inflated**

210. Plaintiff's appraiser, Mr. Que Mangus, testified that the sales comparison

approach is the most reliable method of appraising the value of the lodge, because it is not worth more than one would pay for a similar lodge with 5 cabins. Tr. 2407:5-8; PX 44, pp. 2, 16.

211. Mr. Mangus also testified that he was uncomfortable with calculating the depreciation for the cost approach of appraising the lodge, because most of the buildings were built in 1930 and have been remodeled at least once, making it "not dependable" to calculate the actual age. Tr. 2406:18-25, 2410:3-18.

212. Mr. Mangus testified in his deposition that the lodge retains "some" value, but "elaborated" at trial that by "some," he meant "minimal" value. Tr. 2403:3-13.

213. Mr. Mangus testified that he was not asked to develop a second opinion of value of the lodge in its as-is condition, or to measure the cost to cure the loss of access over bridges. Tr. 2403:17-2404:11.

214. Mr. Mangus agreed that his analysis considered the effect of one variable (the number of units) on another variable (the price per unit), which is the essence of regression analysis. Tr. 2424:21-2426:22.

215. Mr. Mangus's only critique of Mr. Frome's appraisal was that it considered "too much data." Tr. 2437:23-2438:5.

216. Based upon a supposed inverse correlation between number of units and price per unit, Mr. Mangus used the hypothetical $164,852.20 price per unit figure to adjust upwards between 18 and 51 percent the actual per-unit prices of the three lodge sales that he considered. PX 44, p. 18. He then based his opinion of value nearly at the top end of this adjusted range, relying most heavily on the adjusted per-unit price of $151,346 for UXU to

arrive at his price-per unit for The Sweetwater of $150,000. Id., p. 28; Tr. 2426:23-2432:2.

217. Mr. Mangus had never used this "best fit" analysis to find an inverse correlation between number of units and price per unit in any of the numerous other appraisals he has prepared of North Fork lodges during the preceding two years. DX 75-78. Although he conducted a best fit analysis in a recent appraisal, it did not affect his opinion of value, as it did dramatically in his appraisal of The Sweetwater. Tr. 2461:13-2463:6.

218. At least one prospective purchaser of Elephant Head Lodge, Ms. Jodi Mientikiewicz, determined in December 2003 that even the $67,000 per unit value appraised by Mr. Mangus was too much, and declined to proceed with the purchase. Tr. 2468:11-2469:25; DX 76.

219. The Sweetwater's lodge is not designated on any register of historic sites. Tr. 2570:13-2571:7.

220. As Mr. Pucetas conceded, The Sweetwater is not the only lodge on the North Fork that has a main lodge and cabins with stone chimneys. Tr. 2558:24-2559:2. UXU has a main lodge as well as cabins with stone chimneys, just like The Sweetwater, and UXU has real log cabins, whereas the cabins at The Sweetwater are frame structures covered with log siding. Tr. 2556:19-2559:21.

221. Mr. Mangus did not rely upon the cost approach because he does not believe that buyers consider it be relevant. Tr. 2410:12-18.

222. Plaintiff's reconstruction cost expert, John Pucetas, conceded that there are no uniform practices for estimating the effective age of the buildings, and agreed with Mr. Mangus that making such estimates is "fairly subjective." Tr. 2565:10-22.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
1100 L St. N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972

Attorneys for Defendant

OF COUNSEL:

KENNETH S. CAPPS
Attorney-Advisor
Office of the General Counsel
Mountain Region
U.S. Department of Agriculture
P.O. Box 25005
Denver, CO 80225-0005

December 23, 2005

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 23rd day of December, 2005, a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John H. Williamson