**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 02-1795C<br>(Judge Merow) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S POST-TRIAL BRIEF**

Kevin R. Garden
THE GARDEN LAW FIRM P.C.
Suite 325
901 North Pitt Street
Alexandria, VA 22314
(703) 535-5565

Date: February 1, 2006

## Table of Contents

A. The government's post-trial brief simply restates all of its prior arguments related to the contractual status of the TSUP which this Court has rejected ............................1

B. Even the Forest Service's own employees admitted that The Sweetwater did not agree to operate the lodge using fords as a means of access, and further testified that doing so would be dangerous and inappropriate....................................................2

C. The Forest Service contract administrator admitted that clause 30 did not pertain to any risk of the bridges being washed out, thus conclusively rebutting the interpretation now being forwarded by the Forest Service's lawyers at this late stage of the litigation......................................................................................5

D. The funds needed to repair the Sweetwater bridges were made available by Congress and higher-level Forest Service officials, but were rejected by Forest Service employees in the same positions of those who had promised they would seek such funds in the first place .......................................................................7

E. There was no sign on the Sweetwater Road warning against passenger vehicle use .....9

F. The implied duty to cooperate and not hinder is necessary to ensure performance of the contract and does not create new contractual obligations .................................11

G. The implied duty to cooperate and not to hinder is an integral part of the contract, and thus the government employee authorized to sign the contract does not need a separate authorization to enter into such an obligation...............................................14

H. Defendant's desperate effort to portray The Sweetwater's claim as being based on a warranty of site availability is totally fallacious .....................................................15

I. The Forest Service's own employees provided conclusive evidence that the CDA applies to the contract at issue ........................................................................16

J. The Forest Service's actions in this case, which consisted of misrepresentations, endangerment of the public safety and concealment of critical facts, do not constitute good faith conduct.........................................................................17

K. The Forest Service's argument that its successful efforts to prevent operations did not constitute a termination of the permit is pure (and disingenuous) semantics.........20

L. The Sweetwater never breached its contract and the Forest Service's belated allegations in this regard are simply a litigation tactic in an effort to distract attention from the Forest Service's conduct in this matter ..........................................21

M. The Forest Service is precluded from asserting that The Sweetwater could have operated in 1997-2001 given that the Forest Service explicitly allowed The Sweetwater not to operate based on safety issues........................................................23

N. The government provided no evidence whatsoever to rebut The Sweetwater's out of pocket expenses or lost profits....................................................................24

O. The Sweetwater operated the lodge in the only season such operations were possible ......................................................................................................26

P. The government cannot use The Sweetwater's limited period of operations, which it is responsible for, to bootstrap its argument that The Sweetwater does not have a sufficiently established history of profitability...........................................26

Q. The cost of cure is inapplicable when the non-breaching party cannot cure the situation..............................................................................................27

R. Mr. Mangus clearly testified that a best fit analysis was appropriate to assess The Sweetwater's value, given the number of cabins at the lodge compared to other lodges, and the government's expert admitted that his data, when properly presented, showed the same point..................................................................28

S. The assessment by the government's expert of the lodge value was anchored on the Brannon's sale price in 1995, which was clearly a distressed sale and not an appropriate indicator of market price...........................................................29

T. Conclusion..............................................................................................30

**Table of Authorities**

<u>*Cases*</u>

*Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329 (Fed. Cir. 2000) ................................27

*Alpine Camping Services.*, B-238625, 90-1 CPD ¶ 580 ........................................................16

*Bluebonnet Savings Bank v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) ...........................27

*Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578 (Fed. Cir. 1995) ................................20

*CEMS, Inc. v. United States*, 59 Fed. Cl. 168 (2003) .............................................................12

*Centex Corp. v. United States*, 49 Fed. Cl. 691 (2001), *aff'd, Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005)........................................................12

*Helix Electric, Inc. v. United States*, 68 Fed. Cl. 571 (2005) ..................................................13

*H&S Manufacturing, Inc. v. United States*, 66 Fed. Cl. 301 (2005).......................................20

*Kehm Corp. v. United States*, 93 F. Supp. 620 (Ct. Cl. 1950) .................................................14

*LaSalle Tallman Bank, FSB v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003).............27

*Lion Raisins, Inc. v. United States*, 64 Fed. Cl. 536 (2005), *appeal dism'd*, (Fed. Cir 2005).........................................................................19

*Locke v. United States*, 151 Ct. Cl. 262, 283 F.2d 521 (1960) ...............................................27

*Oroville-Tonasket Irrigation District v. United States*, 33 Fed. Cl. 14 (1995).........................16

*Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35 (2001) ..................................19

*Ryco Constr., Inc. v. United States*, 55 Fed. Cl. 184 (2002)...................................................12

*S.A.Healey Co. v. United States*, 216 Ct. Cl. 172, 576 F.2d 299 (1978) ...................................3

*Son Broadcasting v. United States*, 52 Fed. Cl. 815 (2002) ...................................................16

*Tecom, Inc. v. United States*, 66 Fed. Cl. 736 (2005)..........................................................19

*Walter Dawgie Ski Corp. v. United States*, 30 Fed. Cl. 115 (1993) ........................................15

*Statutes*

Contract Disputes Act, 41 U.S.C. § 601 et seq. .................................................... 16-17

*Miscellaneous*

John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 297 (3d ed. 1995) .......................................................................................................12

RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) ............................................................19

The Sweetwater hereby responds to Defendant's Post-Trial Brief ("Brief"). Rather than restate all of its arguments which are set forth in Plaintiff's Post-Trial Brief, The Sweetwater only addresses herein issues or arguments meriting a particular response beyond which is set forth in The Sweetwater's prior submissions.

**A. The government's post-trial brief simply restates all of its prior arguments related to the contractual status of the TSUP which this Court has rejected.**

While the government reasserts all of the prior arguments it has made in this proceeding as to the TSUP in this matter merely constituting a non-binding license, the government does not seek reconsideration of this Court's December 31, 2004 decision which rejected those arguments.[1] Therefore, The Sweetwater does not reassert herein the extensive bases for the TSUP constituting a contract which it set forth in its prior submissions pertaining to this issue. However, to the extent the Court were to reconsider its prior ruling, The Sweetwater respectfully requests the opportunity to submit additional arguments related to this issue.

Because the TSUP constitutes a binding contractual agreement between the parties, and the Forest Service's actions at issue herein pertain to the very purpose of that agreement (*i.e.*, providing public recreational opportunities through the operation of a lodge), the contractual aspects of the TSUP apply directly to the issues in this case and the Forest Service's actions constitute a violation of its contractual obligations.

[1] While the government sets out various cites to statutes and regulations in its argument, none of those authorities state that a TSUP is not considered to be a contract by the government.

**B. Even the Forest Service's <u>own employees</u> admitted that The Sweetwater did not agree to operate the lodge using fords as a means of access, and further testified that doing so would be dangerous and inappropriate.**

The government continues to incorrectly assert that The Sweetwater had agreed to use fords to operate its lodge if vehicular access over the bridges was lost. Defendant's Post-Trial Brief at 16 [hereinafter "Brief"]. However, as the evidence produced in the trial unequivocally established, the Forest Service's own employees who attended the June 12, 1995 meeting admitted that The Sweetwater did not agree to the use of fords to operate the lodge and the Forest Service did not expect it to operate under those conditions. Plaintiff's Proposed Finding of Fact ¶¶ 5, 6, 8, 63-69 [hereinafter "PPFF"]. As the government's own expert stated best:

"Fords do not work."

PX 66; Tr. 2862:7-9. Thus, while fords were discussed as a means by which The Sweetwater could *access* the lodge for maintenance purpose, they were never discussed as a means by which The Sweetwater could *operate* the lodge as a public resort. The government attempts to gloss over this key fact in its post trial brief by referring to the use of fords to "access" the lodge, and then basing its legal arguments on the use of fords to "operate" the lodge. *See* Brief at 16 (Mr. Rossman "told The Sweetwater that it would have to use fords as the means of *access* to the lodge if the bridges failed")(emphasis added). However, as the Forest Service employees admit, the parties never considered using the fords for operating the lodge and the government's legal sleight-of-hand fails.[2]

[2] The government misleadingly attempts to portray Mr. Mummery's explanation of some of the reasons why fords would not suffice for operations (*i.e.*, they could only, at best, allow for limited physical access to even maintain the lodge), as constituting Mr. Mummery's agreement to the use of fords for operations. Brief at 17; Def. PPFF ¶ 95. Further, the government's argument *completely ignores* the testimony of its own employees that attempting to operate the

The government has also shifted its argument on this issue to assert that, because the parties contemplated *some* interruption in operations if the bridge access was lost and while fords were in use, the government therefore had *no duty* to seek funds to replace the bridges in such an event. Brief at 13. This assertion is patently fallacious.

While the parties discussed at their June 12, 1995 meeting the potential need for fords to temporarily access the lodge structures for maintenance purposes, even the Forest Service's own employees who were present at that meeting admit that The Sweetwater never agreed (nor did the Forest Service propose) to use fords to operate the lodge as a public resort.[3] Thus, fords were discussed only as temporary means to maintain the lodge while vehicular access over the bridges was restored. PPFF ¶¶ 63-66; *see* JX 12 (letter to Jeff Mummery from Brent Larson)(February 27, 1997)(referring to "temporary fords"). The use of fords clearly was never discussed as a substitute for bridges, and in fact Mr. Rossman (who attended the June meeting and later signed the contract as Acting Forest Supervisor) unequivocally confirmed this fact. PPFF ¶ 68 (Mr. Rossman stated that, if bridge access were subsequently lost, the Forest Service "certainly wouldn't have [] pulled" its request for funds to repair or replace the bridges).[4] As to the

---

lodge with fords would endanger the lives of guests and was inappropriate and simply implausible. PPFF ¶¶ 5, 64-65. As Mr. Barker, a seasoned back country ranger, testified, this fact was so obvious that it did not even need to be stated. PPFF ¶ 65.

[3] Mr. Bree also pointed out that he did not recall any discussion at the meeting about the fords being permanent (Tr. 722:12-20) and that Ms. Watson incorrectly wrote down that he had referred to the fords as being permanent. Tr. 776:1-777:2.

[4] Mr. Rossman's statement as to the Forest Service agreeing to seek funds if bridge access were lost is the equivalent of the contracting representative in *S.A.Healey Co. v. United States*, 216 Ct. Cl. 172, 576 F.2d 299 (1978), approving the contractor's plans for operation. *See* Brief at 19. In both cases, the contractor informed the agency of what it would need from the agency in regard to efforts toward financial support, in both cases the agency agreed and the contractor then proceeded in reliance on these representations. And in both cases, the agency subsequently did not make the efforts it had stated it would make. (contd.)

government's assumption of risk argument, Mr. Rossman's testimony unequivocally shows that The Sweetwater did not assume the risk that, if bridge access were lost, the Forest Service would make no efforts to restore it. In fact, it demonstrates exactly the opposite- the parties agreed that, if bridge access were lost, the Forest Service would engage in good faith efforts to restore that access by seeking necessary funds.

Moreover, in the present case, the interruption of operations was not due to the bridges becoming impassable during the course of the contract or based on some intervening physical event, but instead was caused by the Forest Service's concealment of its prior inspections of those same bridges in 1992. PPFF ¶¶ 106-121. Thus, the Forest Service's conduct was the *cause* for The Sweetwater's inability to operate beginning in 1997 and continuing thereafter, and the Forest Service cannot exonerate itself for liability arising from an interference with the contract caused by its own fault.[5]

---

Mr. Rossman's statement also shows that the Forest Service would not subsequently decide that it would not devote available funds to the bridges. As the Court noted at trial:

> But the problem really is what is the level of obligation? Assurances were made to Mr. Mummery that funding would be sought and that usually involves seeking the funding and getting it.
>
> The question in this case is does that mean that if you get that funding you can devote it to whatever priority that you wanted to or do you have to devote it to what you agreed to devote it to in the beginning?

Tr. 1669:13-20. In addition, because the Forest Service precluded *any chance* of the bridges being funded as of 1999/2000 and thereafter, it cannot be considered as having met this obligation. PPFF ¶ 154.

[5] Because the government was at fault for the inability to operate as of 1997, the fact that The Sweetwater recognized that funds to improve the bridges (which was an issue discussed in the June 1995 meeting) may take several years to arrive is irrelevant because, but for the government's wrongful conduct, The Sweetwater would have been able to operate while waiting for those funds.

Regarding the issue of damages, The Sweetwater could not have mitigated its damages by operating the lodge with fords. *See* Brief at 43-47. First, even the Forest Service admitted that operating by using fords through Sweetwater Creek was inappropriate and dangerous (PPFF ¶¶ 5, 6, 63-66) and its expert succinctly stated "fords do not work." PX 66. Second, only the Forest Service could install fords, which it never did, so the Forest Service made it *impossible* for The Sweetwater to have mitigated its damages in this manner (even if it could have operated using fords). Tr. 2172:24-2175:2.[6]

**C. The Forest Service contract administrator admitted that clause 30 did not pertain to any risk of the bridges being washed out, thus conclusively rebutting the interpretation now being forwarded by the Forest Service's lawyers at this late stage of the litigation.**

While the government now alleges that clause 30 of the TSUP placed the risk on The Sweetwater that the Sweetwater bridges could be washed out (Brief at 10-11), the Forest Service's contract administrator, Mr. Larson, clearly rejected that very same interpretation at the trial. Mr. Larson testified as follows:

> Q Looking at paragraph 30, doesn't that place, especially in the second sentence there, "An affirmative obligation on Mr. Mummery and the Sweetwater to inspect the site [lot] and right of way to his lodge for hazards," is that correct?
>
> A Mm-hmm.
>
> Q So he had an obligation that if he thought those bridges were dangerous, he had an obligation not to bring people over there, correct?

[6] The government incorrectly states that its own expert, Mr. Frome, concluded that The Sweetwater could operate using fords and turn a "small profit." Brief at 45. While Mr. Frome concluded that operations could cover operating expenses, they would not produce enough revenue to pay any salaries, and thus would produce no profit. Tr. 2723:12-15l; Tr. 2862:4-2863:1; PX 66. Thus, he concluded "fords do not work." PX 66. The Sweetwater cannot be forced to work without compensation (thus at a loss) solely to mitigate the government's damages. Furthermore, Mr. Frome prepared a purely economic analysis and never took into account the inability to operate due to the dangerous conditions. *See* PPFF ¶¶ 5, 6, 63-66 (Forest Service employees stated it would be inappropriate to operate lodge using fords).

A I think you're misrepresenting paragraph 30.

Q Okay.

A That's physical hazards that are on site that he should remove from the permit area.

Q So you're telling me that clause 30 only really applies to physical hazards that are in the area?

A That's what it says.

Tr. 1363:9-25; *see* JX 1 at p. 9.

Clause 30, which states that "[a]valanches, rising waters, high winds, falling limbs or trees, and other hazards are natural phenomena in the Forest that present risks which the holder assumes," clearly refers to natural events or acts of God that can cause personal injury. JX 1/9. The attempt by the Forest Service's attorneys in this litigation to assert that clause 30 was deemed to apply to the bridges, which are outside the permit area and not a natural hazard, has been clearly rejected by the agency itself as an incorrect interpretation of that clause.

Furthermore, even if the government's unsupported interpretation that The Sweetwater somehow assumed the risk pursuant to clause 30 of the bridges being washed out were correct (even though the Forest Service's own contract administrator says it is incorrect), it does not eliminate the Forest Service's implied duty to assist in restoring that access upon such an event. This implied duty is all the more prevalent when such vehicular access is critical to contract performance. PPFF ¶ 6.

The government again engages in blatant misrepresentation in its effort to argue that Mr. Mummery agreed that The Sweetwater had assumed the risk of the bridges being lost due to a flood or other physical event. Brief at 11. While the government argues that Mr. Mummery

testified that he was concerned about a flood washing out the bridges, Mr. Mummery never testified that he felt that The Sweetwater *assumed the risk* of such an event. In fact, to the contrary, he clearly testified that he was concerned with establishing the Forest Service's responsibility in such an event. The full context of Mr. Mummery's testimony is set forth below.

> Q Now, at this June 1995 meeting did the Forest Service express or make any statements or representations about their level of commitment to that road?
>
> A Well, the overall level of commitment was one of we can't promise you anything if there's a catastrophic failure. By the same token, it's very important to us. We'll make our best effort. We'll seriously go after solving your problem.
>
> We talked about the bridges in various stages at the meeting because we talked about a lot of other stuff, forest usage. It was a long meeting and we jumped from subject to subject, but the end result of the bridge issue in my mind was this. I wasn't so concerned about the maintenance, the daily or summer maintenance or whatever you call it. I was concerned about a big flood, a washout, a gullywasher, whatever you want to call it, that wiped out the bridges.
>
> I was concerned. Where would I be if that happened? What we decided, and I believe we decided very clearly, was that first of all if that happened the Forest Service had an interest in maintaining that road for public access as well as my lodge and for their own administrative purposes.

Tr, 128:23-129:21. Thus, the government's efforts to portray clause 30 of the contract as somehow nullifying the government's obligations to seek funds to restore vehicular access over the Sweetwater bridges is wholly without basis in the record.

### D. The funds needed to repair the Sweetwater bridges were made available by Congress and higher-level Forest Service officials, but were rejected by Forest Service employees in the same positions of those who had promised they would seek such funds in the first place.

The Forest Service essentially asserts that, because The Sweetwater was informed by Mr. Rossman, who signed the TSUP as Acting Forest Supervisor and who was also the District Ranger at the time, that any funds necessary to repair the bridges had to be approved at higher

levels, the same Forest Service officials who promised to seek such funds were free to reject those funds when they were later sought and obtained. Brief at 13. However, the government's argument is clearly duplicitous. Because the funds were approved by Congress and the Regional Office, the Forest Service employees on the Shoshone National Forest, who had repeatedly asserted that they were seeking such funds to replace the bridges, were not free to then reject those funds upon their arrival.

Furthermore, the Forest Service employees who were placed in charge of budget issues for construction of bridges (Mr. Fischer with Mr. Larson's input), admittedly rejected those funds to avoid any Forest Service liability under the contract. PPFF ¶¶ 146-154.[7] This action was taken in secret, and never disclosed to The Sweetwater prior to this litigation.

While the record demonstrates that the funds were rejected to avoid contract liability, Ms. Aus testified that the purported designation of the Sweetwater Road as a level 2 road was a key issue in her mind as to whether or not to replace the bridges. Tr. 1648:17-1649:3; 1689:19-1690:4; 1716:23-1717:5; 1717:9-16. However, the issue of whether or not the Sweetwater Road was a level 2 road is a red-herring. First, a level 2 designation applies to the road condition and is irrelevant to any bridges on the road, except to determine how often those bridges are inspected. Tr. 1938:22-1940:21. Second, the purported level 2 status of the road as a matter of internal Forest Service policy (not pursuant to any law or regulation) was never established, and at least one Forest Service employee believed it had been designated as a level 3 road at some

---

[7] While the government completely ignores the detailed and incriminating testimony of Messrs. Larson and Fischer as to why the funds were rejected (Brief at 23; PPFF ¶¶ 146-153)(Mr. Fischer notes that Ms. Aus was involved in these communications and approved their decision) and asserts that Ms Rebecca Aus made the decision on her own to reject the funds and that the decision had nothing to do with pursuing a conservation buyer, the fact is that Ms. Aus' assertions are directly contradicted by other Forest Service employees as well as her own actions. *See* Plaintiff's Post-Trial Brief at 36-38.

point in the past. Tr. 859:25-860:8. Finally, the designation of the Sweetwater Road being a level 2 road under the Forest Service's internal policy was never disclosed to The Sweetwater, much less was The Sweetwater informed that this designation was relevant to any of the assurances the Forest Service provided as to seeking funds to replace the Sweetwater bridges (which is consistent with the fact that the designation of a road as a level 1, 2 or 3 is irrelevant to the bridges on that road). Tr. 137:13-21.

**E. There was no sign on the Sweetwater Road warning against passenger vehicle use.**

Notwithstanding that this case has been in litigation since 2002, and has been subject to extensive briefing, depositions and other discovery, the Forest Service now, *for the very first time*, is attempting to assert that it had placed a very large and highly conspicuous sign on Sweetwater Road warning against use of the road by passenger vehicles. Brief at 8.[8] However, the assertion, which is based solely on the testimony at trial of the two individuals (Messrs. Larson and Fischer) who colluded to prevent the application of funds to the replacement of the Sweetwater bridges, is not only unsupported but is directly contradicted by other Forest Service employees, third parties and Mr. Mummery.

Mr. Monte Barker of the Forest Service testified that no such signs were put up along Sweetwater Road. Tr. 860:2-12. If in fact a large (2' by 4') sign had been in place by the Forest

[8] Notably, the Forest Service made no mention of such a sign in its pre-trial statement of facts or in its prior summary judgment pleadings, which specifically focused on the issue of signage on Sweetwater Road. The omission of this factual allegation in its pre-trial statement of fact constitutes a violation of RCFC Appendix A (Sec. 14(b)), which requires the defendant to set forth a "full and concise statement of facts" it expects to prove. This allegation should be stricken or disregarded on this basis. Had this (false) factual allegation been raised in a timely manner in the three years this case was pending rather than raised in a "trial by ambush" manner at the hearing, The Sweetwater would have been able to document that there is *no physical evidence* along the road that any sign had ever been present.

Service on that road, Mr. Barker would have recalled something in that regard. Further, Mr. Tom Koenig also recall no such signs as of 2000 when he arrived on the Forest. Tr. 1858:22-25. Mr. Michael Bree also contradicted Messrs. Larson and Fischer when he testified that the Forest Service had never restricted the type of cars which could use Sweetwater Road. Tr. 797:14-798:1. In addition, Ms. Watson had no recollection of any large sign meeting the description provided by Mr. Larson. Tr. 2006:23-2009:18. Instead, she recalled a small brown sign about 12” by 14” in size. Notably, the Forest Service ignores her testimony in its brief.[9]

Also, Mr. Ralph Wilkerson and Mr. Mummery, both of whom traveled Sweetwater Road frequently, testified unequivocally that no sign warning against passenger vehicle use ever existed. Tr. 2920:15-2921:15; Tr. 2268:11-2270:2. The Forest Service attempts to question the credibility of Mr. Mummery’s testimony (but ignores Mr. Wilkerson’s) by alleging that Mr. Mummery has been inconsistent in his comments as to signage on Sweetwater Road. Brief at 17. The basis for the Forest Service’s attack on Mr. Mummery’s credibility is that he did not previously identify the “3 ton weight limit” signs as “warning” signs, thus making his credibility questionable. *Id*. However, even the government itself in its *own brief* refers to those weight limit signs as constituting a representation that the bridges were “safe” for the uses required by the lodge. Brief at 36 (“[t]he signs accurately represented that the bridges were deemed safe for use by cars and light trucks”). Thus, Mr. Mummery would not be expected to have considered

[9]Ms. Watson could potentially have been recalling the brown sign on the gate at the tope of the road and at the edge of the lodge permit area which was put up by The Sweetwater and warned against driving into the permit area itself. DX 63/8. That sign, which was put up by the permittee, made no reference to passenger vehicle use. Tr. 2922:4-2927:5. Similarly, Messrs. Larson and Fischer could have been recalling a 3’ by 5’ sign on two posts which the Brannons had installed before the North Fork bridge which merely welcomed people to the lodge. Tr. 2925:25-2926:9.

such signs as "warning" signs and the Forest Service's effort to discredit him on this basis is meritless.

Finally, the Forest Service did not produce any photographs or documentation (such as order forms or invoices) showing that such a sign had been ordered or placed on Sweetwater Road. Moreover, it would be illogical to place on the other side of the North Fork bridge a sign warning passenger cars to go back, because once travelers got to that point there was no easy turnaround point. *See* Tr. 1221:24-1222:10 (Mr. Larson explained that gates had been placed on the North Fork bridge itself because there was no convenient space along the Sweetwater Road if a traveler on Sweetwater Road needed to turn around). Further, the government asserts that the large sign was in place exactly when Mr. Brannon was operating the lodge and passenger cars were routinely visiting the lodge. PPFF ¶ 31. It makes no logical sense for the alleged sign to be present at this point, nor is it likely that Mr. Brannon would have allowed such a posting that discouraged the very type of users present in his business. The fact is that no specific warning against the use of the road by passenger cars was ever present on Sweetwater Road, and Messrs. Larson's and Fischer's unsupported oral assertions are simply their effort to ensure that removal of the lodge comes at no cost to the Forest Service.

## F. The implied duty to cooperate and not hinder is necessary to ensure performance of the contract and does not create new contractual obligations.

The government boldly issues a warning to the Court that it "should be especially reluctant" to enforce the implied duty to cooperate and not to hinder arising under the contract at issue "over the objection of the Forest Service." Brief at 8. The government's warning, however, is based on its deliberate mischaracterization of the duty to cooperate and not to hinder as constituting an essentially explicit obligation that the Forest Service repair or replace the

Sweetwater bridges.[10] The Forest Service then argues that adding such an obligation to the permit is impermissible. However, the Forest Service's characterization of the duty at issue is entirely incorrect and a blatant strawman argument. [11] Moreover, the Forest Service's reasoning would totally eviscerate the implied duty to cooperate and not to hinder.

The duty to cooperate and not to hinder is a promise contained in the contract and The Sweetwater's claim that this promise was breached does not create a new obligation. *See Centex Corp. v. United States*, 49 Fed. Cl. 691, 709 n. 39 (2001)("[A] party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations")(citations omitted), *aff'd*, *Centex Corp. v. United States*, 395 F.3d 1283 (Fed. Cir. 2005). In this case, the government had a duty to cooperate and not to hinder contract performance by assisting in efforts to restore vehicular access which was critical to contract performance. The Forest Service's unequivocal statements at the time The Sweetwater entered

---

[10] In its brief, the government repeatedly misstates The Sweetwater's argument by asserting that "the specific duty that [The Sweetwater] asserts it was owed by the Forest Service was to ensure that the two Sweetwater bridges remained passable to provide access to the lodge in all conditions" Brief at 12 (emphasis added). The government has even entitled a 6-page argument in its brief with "The Terms of the Permit Do Not Require The Forest Service To Replace the Bridges." Brief at 5. However, The Sweetwater is not alleging that the Forest Service had committed to replace the bridges, but rather that it had an obligation to assist in permitting performance of the contract. *See, e.g., CEMS, Inc. v. United States*, 59 Fed. Cl. 168, 195 (2003)("[W]hen some government action is essential for the contractor to perform and the government wrongfully fails or refuses to take that action, then the government has breached its implied duty to cooperate"), *quoting Ryco Constr., Inc. v. United States*, 55 Fed. Cl. 184, 192 (2002) (*citing* John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 297 (3d ed. 1995).

[11] The government even goes so far with its strawman argument to invoke cases discussing implied-in-fact contracts and attempts to portray The Sweetwater as asserting that it had a implied-in-fact contract. Brief at 9. However, in the present case, there is an actual contract. *See* JX 1. The government's attempt to portray obligations arising under the duty to cooperate and not to hinder as constituting implied-in-fact contracts further demonstrates the fallacy of the government's argument.

the contract and thereafter[12] that it would seek such funds if bridge access were lost were directly relevant to the specific scope of this duty.[13] However, the Forest Service's subsequent and contrary actions to secretly prevent those same funds from being used to replace the bridges when in fact they were obtained (in order to pursue the elimination of lodge operation), was conduct that clearly violated this duty.

While the Forest Service never had *guaranteed* the funds would be obtained to repair the bridges (nor has The Sweetwater ever made such an allegation), it did have a duty to assist in seeking such funds, as it stated to The Sweetwater it would do at the June 1995 meeting and thereafter. Because these funds were necessary to permit contract performance, this particular duty goes to the very basis for the existence of the implied duty to cooperate and not to hinder.[14] While the government asserts that the Forest Service rejected the obligation which The Sweetwater is seeking to enforce (Brief at 9), the exact opposite is true. As the Forest Service employees admitted, they *agreed* to seek funds if bridge access was lost. PPFF ¶¶ 53, 54, 55, 56, 60, 67, 68. It is precisely this obligation which The Sweetwater is seeking to enforce. Furthermore, the reason the Forest Service specifically rejected these funds when they were made available, *i.e.*, to seek a no-cost solution to its continuing road and bridge obligations by

[12]In his February 27, 1997 letter to The Sweetwater, Mr. Larson was *reaffirming* the agreement between the parties which was made at the time the permit was signed. Contrary to the government's current assertion, Mr. Larson was not creating a new agreement or changing the agreement (which the government asserts he had no authority to do). Brief at 21.

[13]While the government insists that The Sweetwater's decision not to include an MOU like the Brannons had in their permit somehow reduces the Forest Service's obligations under the contract as to the bridges, Ms. Aus testified that the MOU was irrelevant to the bridge issue. Tr. 1737:16-1738:4.

[14] The implied duty at issue here is very distinct from obligations which clearly are separate from the contract itself. *See Helix Electric, Inc. v. United States*, 68 Fed. Cl. 571, 586-87 (2005)(finding that implied duty under contract did not extend to efforts outside and unrelated to contract performance).

eliminating lodge operations, further supports that it has violated its implied duty as confirmed by its express representations to The Sweetwater that it would seek such funds for the replacement of those bridges. JX 12 (letter from Brent Larson dated February 27, 1997 to The Sweetwater).

The government further continues its efforts to eviscerate the implied duty to cooperate and not to hinder by making the patently ridiculous argument that the language in the TSUP which states that the contract is "accepted subject to conditions set forth herein" constitutes an express disclaimer of the implied duty to cooperate and not to hinder. Brief at 9. Under this legal reasoning, any contract which contains an integrated contract clause would be disclaiming the implied duty to cooperate. This is an unreasonable argument. As this Court has held, the implied duty is a necessary and integral part of every contract, and is deemed to be explicitly set forth therein. *Kehm Corp. v. United States*, 93 F. Supp. 620, 623 (Ct. Cl. 1950.

**G. The implied duty to cooperate and not to hinder is an integral part of the contract, and thus the government employee authorized to sign the contract does not need a separate authorization to enter into such an obligation.**

As a follow-up point flowing from its incorrect statement that The Sweetwater is asserting that the Forest Service had an explicit duty to repair or replace the Sweetwater bridges, the government then asserts that, because Messrs. Rossman, Larson and Fischer had no warrant to enter into a contractual obligation for that repair or replacement, The Sweetwater's argument fails. Brief at 14. However, as discussed above, The Sweetwater has not asserted that the Forest Service had an explicit obligation to repair or replace the Sweetwater bridges. Rather, the Forest Service had an obligation to seek funds to solve the problem which prevented contract performance (lack of vehicular access over the bridges), *exactly as it had said it would* do when

The Sweetwater entered into the contract and as it continued to assert thereafter. *See, e.g.*, JX 12 (letter from Brent Larson dated February 27, 1997 to The Sweetwater). Because the implied duty to cooperate and not to hinder is an integral part of any contract, it is absurd for the government to assert that a government employee must have a warrant to enter into such an implied duty in order for that duty to be part of any contract.

**H. Defendant's desperate effort to portray The Sweetwater's claim as being based on a warranty of site availability is totally fallacious.**

The government also incorrectly attempts to portray The Sweetwater's arguments as asserting a warranty of site availability. Brief at 11-12. However, The Sweetwater has never made such an assertion. This government's argument again demonstrates its effort to recharacterize The Sweetwater's argument into something else other than a straightforward claim that the government violated its duty to cooperate and not to hinder. Given the egregious facts which demonstrate that this violation occurred, the government's continuing desire to change the legal issue at the heart of this case is understandable, but nonetheless inappropriate.[15] Thus, the government's assertions as to how and when a warranty of site availability arises are totally irrelevant to this matter.

---

[15] For example, in *Walter Dawgie Ski Corp. v. United States*, 30 Fed. Cl. 115 (1993) and unlike in the present case, the Forest Service had no role or involvement at all in the events which prevented contract performance, which were due solely to the actions of the Federal Highway Administration. *See* Brief at 18. Thus, the government's assertion that the situation in *Walter Dawgie* is applicable here, and that The Sweetwater has "failed to distinguish the circumstances of this case from *Walter Dawgie*" is entirely meritless. See Brief at 18, 21.

## I. The Forest Service's own employees provided conclusive evidence that the CDA applies to the contract at issue.

Understandably, in attempting to assert that the TSUP in this case is not covered by the Contract Disputes Act ("CDA"), the government pretends that its own employees never testified to this very issue. Brief at 3-5. The reason why the government avoids this testimony of its own personnel is because the testimony conclusively establishes that The Sweetwater's TSUP is *exactly the type of contract to which the CDA applies*. *See* Plaintiff's Post-Trial Brief at 11-14; PPFF ¶¶ 16-18.

Instead, the government cites to *Son Broadcasting v. United States,* 52 Fed. Cl. 815 (2002), which involved a TSUP for operation of a private communications tower, to support its assertion that the CDA does not apply to The Sweetwater's contract. Brief at 3-4. While both cases involved a TSUP, the public recreational services required under The Sweetwater's permit are entirely distinct from the private telecommunication tower at issue n *Son Broadcasting.* Thus, the government's citation to *Son Broadcasting* on this issue does not support its position.[16]

The government then makes what can only be called a silly argument by asserting that contracts which are entered into without competition cannot be subject to the CDA. Brief at 5 ("The Forest Service never has conducted a competition to select a concessionaire to operate a

---

[16]As the government's cite to *Oroville-Tonasket Irrigation District v. United States*, 33 Fed. Cl. 14, 21 (1995), demonstrates, the fact that the government was not paying funds to The Sweetwater for the services it provided is irrelevant to whether the CDA applies. Further, the government's expert concluded that the government was requiring The Sweetwater to pay less than market value for annual rent (Tr. 2867:5-25), which demonstrates a type of barter of a lower price in exchange for agreeing to provide services to the public. In addition, the Forest Service had the right to regulate the type of services and set prices charged by the permittee. JX 1/13 (clause 47). A procurement under the CDA is any manner of acquisition, whether by purchase, lease or even barter. *Oroville-Tonasket Irrigation Dist.*, 33 Fed. Cl. at 21. In the present case, the Forest Service authorized The Sweetwater to operate on federal lands in exchange for its agreement to provide recreational services to the public. JX 1; *see Alpine Camping Servs*., B-238625, 90-1 CPD ¶ 580 (campground concession contract, through which concessioner received payment from public, was a procurement).

lodge on the site occupied by The Sweetwater's lodge [] [t]hus, the permit is not covered by the Contract Disputes Act"). Nothing in the CDA requires "competition." Moreover, under this rationale, any contract to obtain services or goods for the government which is entered into pursuant to a sole source award is not covered by the CDA. This position is so erroneous as to merit no further discussion. The government's assertion that CDA contracts must also be for services to maintain government owned facilities (Brief at 4-5) is similarly unavailing because no such qualifications are set forth in the CDA.

### J. The Forest Service's actions in this case, which consisted of misrepresentations, endangerment of the public safety and concealment of critical facts, do not constitute good faith conduct.

The government boldly asserts that the Forest Service conducted itself in a "diligent, good faith manner" in the course of its dealings with The Sweetwater. Brief at 22. However, the facts show that the Forest Service's conduct was not in good faith, but instead it was shameful. For example, the Forest Service stated that the purpose of the June 1995 meeting was to provide The Sweetwater with all the information it needed, including information related to the Sweetwater bridges, so that it could fully assess the risks associated with its purchase of the lodge facilities. The Forest Service then admits that it *withheld* from The Sweetwater the fact that qualified individuals had inspected the Sweetwater bridges in 1992 and "basically condemned" them. PPFF ¶¶ 82-85 (Mr. Rossman claimed that he did not know about the 1992 inspection report, but if he had, he "certainly would have shared that knowledge").[17]

---

[17]Given that the issue of a tortious breach of contract was fully briefed prior to trial, the facts relevant to that issue were tried without objection by the government and government counsel explicitly admitted that it would have been futile to raise that issue with the agency (Tr. 1767:9-1768:5; 1769:12-1770:5), the government's allegations as to the need for The Sweetwater to amend its complaint are incorrect pursuant to RCFC 12(b). Nonetheless, The Sweetwater will amend those pleadings if deemed necessary by this Court.

To compound the deception, the Forest Service had also placed weight limit signs at the bridges representing that they had been load rated and deemed safe for the very type of traffic used by the lodge. Brief at 36. However, *no load rating had ever occurred*, and in fact the Forest Service policy dictated that the bridges should have been immediately closed rather than being posted as safe for passenger vehicles. PPFF ¶¶ 25, 172-174. Instead, the Forest Service left them open for public use with the Forest Service knowing that visitors traveling over them could be seriously injured or killed. Clearly the only concern driving the Forest Service was fiscal matters related to its budget, not visitor safety. It is implausible to presume that any responsible government official would deem that as good faith conduct.

Further, the Forest Service also told The Sweetwater at the June 1995 meeting that the Forest Service would pursue efforts to obtain funds to replace the bridges if access over them was lost, and it again reiterated this commitment in a written letter to The Sweetwater dated February 27, 1997 as well as in innumerous verbal communications with Mr. Mummery. However, the Forest Service then secretly rejected these very funds when they had been sought *and obtained* for that exact purpose, and then made the bridges ineligible for funding. Moreover, the Forest Service continued to inform The Sweetwater that it was pursuing such funds long after it had secretly rejected them and removed the bridges from the list of eligible projects! Additionally, the *reason* the funds were rejected was to allow the Forest Service to pursue a no-cost termination of lodge operations because the Forest Service had already determined that, while it wanted to terminate operations, it did not have funding that would make this possible at

the time.[18] For government counsel to boldly assert that these actions constitute good faith conduct is completely incomprehensible.[19]

Contrary to the government's continuing assertion, The Sweetwater does not need to prove bad faith in order to prove that the government breached the contract. Unreasonable or wrongful conduct is all that is required. *Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 59, n.31 (2001). This Court has recently held in explaining the duties to cooperate and not to hinder, which are part of the over-arching duty of good faith and fair dealing:

> *Subterfuges* and *evasions* violate the obligation of good faith in performance even though the actor *believes his conduct to be justified*. But the obligation goes further; bad faith may be overt or may consist of inaction, and fair dealing may *require more than honesty*. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: . . . [evasion of the spirit of the bargain] . . . lack of diligence and slacking off . . . and interference with or failure to cooperate in the other party's performance. . . .

*Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 770 (2005), *quoting* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)(some emphasis added). Further, claims for a breach of the government's duty to cooperate and not to hinder are to be treated like any other claim for breach of contract and the presumption of good faith by the government has no relevance. *Tecom*, 66 Fed. Cl. at 771.

---

[18]The District Ranger, Mr. Larson, even went so far as to assert that he was only acting out of a desire to assist Mr. Mummery, but then he was forced to admit that his telephone call to Mr. Fischer in which he attempted to persuade Mr. Fischer (successfully) not to use the funds that had arrived for The Sweetwater bridges to replace those bridges was directly contrary to Mr. Mummery's interest. PPFF ¶ 163. The fact that the Forest Service purported to be acting out of a desire to assist Mr. Mummery, but no one in the Forest Service ever disclosed their conduct to Mr. Mummery, is highly indicative of the fact that these individuals knew their conduct was wrong.

[19]The Sweetwater believes that it is obligated to point out to the Court similar conduct by government counsel in another matter where he boldly made entirely implausible arguments in a similarly desperate effort to defend the conduct of fellow government employees. *See Lion Raisins, Inc. v. United States*, 64 Fed. Cl. 536, 541-44 (2005)(referring to trial counsel's assertions as "glib," "astonishing," an "insult" to the Court's orders and giving his arguments "the light touch they deserve"), *appeal dism'd*, (Fed. Cir 2005).

The Court's reasoning in *Tecom* has been strongly supported in subsequent Court opinions, with the Court noting recently that "[t]he Government's long touted desideratum that 'irrefragable proof' is needed to demonstrate the absence of good faith in the administration of government contracts has been given its last rites." *H&S Manufacturing, Inc. v. United States*, 66 Fed. Cl. 301, 311 n. 19 (2005). While the government makes one last assertion that, in order for it to breach implied duty to cooperate, it has to have "a specific intent to injure," the case to which it cites (*Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995)) is addressing an allegation by a contractor that the government had specifically acted in "bad faith." Brief at 23. Because The Sweetwater is not alleging bad faith,[20] and the failure to act in good faith is not tantamount to an allegation of bad faith, the government's argument fails.

**K. The Forest Service's argument that its successful efforts to prevent operations did not constitute a termination of the permit is pure (and disingenuous) semantics.**

The government makes the unreasonable argument that, even if it has prevented operations from occurring under the permit, it has not terminated the permit. Brief at 25. The government's argument is simply a game of disingenuous semantics. The disingenuousness of the argument is further demonstrated by the fact that, if the permittee does not conduct operations under the permit, the permit must be revoked. PPFF ¶¶ 14-15. Thus, the government's termination of operations is the equivalent of its termination of the permit.

[20] The Sweetwater is cognizant of the high level of proof some courts have imposed in order for a contractor to prove that the government acted in "bad faith," and therefore, while The Sweetwater certainly believes the government's conduct in its case is inappropriate and condemnable, it has not pursued a finding of bad faith solely because such a finding is not needed in order for it to establish a breach.

**L. The Sweetwater never breached its contract and the Forest Service's belated allegations in this regard are simply a litigation tactic in an effort to distract attention from the Forest Service's conduct in this matter.**

In an effort to eliminate The Sweetwater's claim, the Forest Service has raised in the course of this litigation the argument that The Sweetwater materially breached the terms of its Term SUP in 1996 by not operating as a public resort in 1996 and therefore has no legal basis to assert its breach of contract claim. Brief at 31-33. However, the government's allegations are now reduced to a passing reference in two brief paragraphs of its brief. Brief at 32-31. The government's assertion is without any supportable basis and is directly contradicted by the evidence in this case.

The Sweetwater clearly was operating and open to the public in 1996. *See* PPFF at ¶¶ 99-102. The Forest Service refers to no evidence to the contrary, and instead attempts to misportray Mr. Mummery's actions and words as somehow constituting an admission that the lodge was not open to the public. Notably, the Forest Service provides no evidence that any member of the public were ever excluded from the lodge. These government's effort to use a misinterpretation of Mr. Mummery's as the basis for their allegation fails.

The government asserts that The Sweetwater did not operate a "public" lodge in 1996, in contravention of the terms of its Term SUP, because Mr. Mummery "did not try to secure bookings for the 1996 season." Brief at 32. However, as Mr. Mummery clearly explained, Mr. Bixby was given the exclusive responsibility to locate and obtain guests for the lodge. PPFF ¶ 100. While these efforts did not produce significant numbers of guests, at worst they show the inability of Mr. Bixby to market the lodge, as he had stated he would. These efforts do not constitute a material breach of the contract.

The other bases for the Forest Service's argument is a single comment made by Mr. Mummery which the Forest Service asserts conclusively demonstrates that the lodge was not open to the public. Brief at 32. However, Mr. Mummery's comment to Ms. Watson that he had not opened the lodge as of April of 1997, which was made shortly after the 1992 bridge inspection records were revealed, clearly was a reference to the fact that Mr. Mummery was glad that he had not yet opened for 1997 and brought people over bridges which the Forest Service had "basically condemned." The Forest Service's desperate attempt to build an argument for material breach on this assertion is baseless.[21]

Moreover, the overall facts in this case demonstrate that the Forest Service cannot validly assert that The Sweetwater's operations in 1996 constituted a material breach of contract which would absolve the Forest Service of responsibility for its own conduct. The Sweetwater was reasonable in its understanding that the way it operated in 1996 was consistent with the terms of the Term SUP, which merely requires operation of a "public resort" with no further explanation. JX 1 (p. 1).

The government also raises the patently incorrect argument that The Sweetwater breached clauses 51 and 54 of its TSUP by not providing "notice" to the Forest Service as requested in those clauses. Brief at 32. However, clause 51, which required advance notice, explicitly applied to transfers of ownership of the lodge facilities. JX 1/14. Because The Sweetwater was the owner of the facilities and the stock sale contemplated with Mr. Bixby would not change ownership (The Sweetwater would retain ownership), this clause does not

[21] In addition, the fact that Ms. Watson did not state to Mr. Mummery in response to his comment that he was in breach of contract for not operating demonstrates that even Ms. Watson did not interpret Mr. Mummery's comment in the manner trial counsel now tries to portray it. Furthermore, the Forest Service is required to provide an opportunity to cure any alleged breach of a TSUP. 36 C.F.R. § 251.60(e); *see Anchustegui v. Dept. of Agriculture,* 257 F.3d 1124 (9th Cir. 2001).

apply. *See* Tr. 2055:25-2056:10. Clause 54, which applies to changes related to stock ownership and would have applied to the Bixby arrangement if it had gone through, only requires notice after a sale occurs. JX 1/14. Because no sale occurred (the stock sale to Mr. Bixby was never completed)(*see* Tr. 2055:25-2056:10), the notice provisions of this clause never were engaged. The government's insistence that these clauses were not complied with and that such noncompliance constitutes a "material breach" of the contract is entirely incorrect.[22]

The government's final argument is a two-sentence assertion that The Sweetwater's failure to submit an operating plan from 1997-2002 constituted a material breach. Brief at 33. The government fails to acknowledge that the contract administrator explicitly told The Sweetwater that it did not have to submit such a plan. PPFF ¶¶ 120-121. Thus, the government's patently incorrect assertion did not merit even the two-sentences which it was given.

**M. The Forest Service cannot properly assert that The Sweetwater could have operated in 1997-2001 given that the Forest Service explicitly allowed The Sweetwater not to operate based on serious safety issues.**

The government asserts that The Sweetwater could have operated in 1997-2001 by bringing the public over the Sweetwater bridges, and its failure to do so demonstrates a failure to take reasonable measures to mitigate its damages. Brief at 44. The government's position is appalling. As was conclusively shown at the trial, even the Forest Service's own policy required

[22] In addition, Ms. Watson testified that the only reason for the notice provisions was to protect the "relationship" between the permittee and Forest Service and that a failure to notify the Forest Service caused no harm to the Forest Service, but simply increased the permittee's risk because the Forest Service may not approve of the new owner. Tr. 2052:2-2055:10. Because these clauses do not protect the government's interest nor would their violation cause harm to the Forest Service, it is implausible to assert that, even if they were violated (which they were not), the violation constitutes a material breach of the contract.

that the Sweetwater bridges should have been closed as of 1997 because of the risk they posed to public safety. PPFF ¶¶ 25, 172-174. The government's assertion that The Sweetwater should have endangered public lives as well as its own financial existence given the liability risks by continuing to operate after being informed of the 1992 inspection results (over bridges the Forest Service policy required it to close) is absurd.[23] Furthermore, because the Forest Service agreed with The Sweetwater that no operations should occur as of 1997 (PPFF ¶¶ 121-124), the Forest Service cannot now claim as a litigation position that such operations *should* have occurred.

**N. The government provided no evidence whatsoever to rebut The Sweetwater's out of pocket expenses or lost profits**.

While the government now attempts to attack The Sweetwater's operating expenses and lost profits, the simple fact is that the government provided *no evidence* to rebut either the existence or reasonableness of those expenses. Mr. Mummery testified at great length, and with substantial support, as to both the existence and reasonableness of those expenses and lost profits. *See* Tr. 456:13-459:4 (Mr. Mummery's testimony as to his damages accepted by the Court). While the government had hired an expert who reviewed The Sweetwater's expenses and lost profits,[24] the fact that the government did not call that individual to testify demonstrates that the government recognized those expenses and profits were reasonable. The government's extensive post-trial arguments are forwarded solely via its counsel's bald assertions and do not constitute evidence in rebuttal to these damages.[25]

[23] The Forest Service had insulated itself even from its own negligence by requiring The Sweetwater to indemnify it for any liabilities arising from The Sweetwater's operations. PPFF ¶ 95. Thus, if a visitor to the lodge was injured on the Sweetwater bridges and sued the Forest Service, the Forest Service could have sought indemnification from The Sweetwater.

[24] *See* Defendant's List of Trial Witnesses (filed August 12, 2005)(listing Jack Bakken as an expert witness to rebut The Sweetwater's damages).

While the government attempts to characterize the professional legal fees set forth in The Sweetwater's damages as litigation fees which are not appropriate as damages (Brief at 45-46), Mr. Mummery clearly testified that the fees set forth in his damages exclude litigation or claims related fees and involved costs of professional legal advice related to performance of this contract. Tr. 398:25-399:9. The government provides no evidence to the contrary.

The government similarly makes only the most cursory objection to other actual operating expenses incurred by The Sweetwater, but provides absolutely no evidence to rebut that those expenses were in fact incurred. Nor does the government provide any support for its claim that these very real costs are somehow not compensable.

Finally, as to lost profits, The Sweetwater points out that even the government's own appraisal expert estimated those annual profits to be $37,456 for 2000. DX 62/63.[26] As such, using the government's figures and the same methodology as used in The Sweetwater's original claim letter (JX 23/7), the lost profits from 1997-2005 would be no less than approximately $486,717.[27]

---

[25]Government counsel now raises various factual issues as to what elements should be included in a proper damage calculation. For example, it asserts that the purported absence of "cost of goods sold" from The Sweetwater's calculations renders those calculations inappropriate and it asserts that the "proper measure" of lost profits would be to include management fees. Brief at 52. However, government counsel presented no evidence or witnesses to support its current allegations as to The Sweetwater's lost profit calculations, which are clearly a post-trial effort to re-examine the witness or challenge the evidence. The government made no such challenges in the trial itself. We would further note that, as to the management fee issue, even the government's own expert excluded those from his own income assessments and concluded that The Sweetwater was profitable in 1996. DX 62 (report page 61). While government counsel also makes various assertions as to the comparability of The Sweetwater to other lodges (which Mr. Mummery testified to at length), the government provided no witnesses, much less experts, to support these arguments.

[26]Utilizing Mr. Frome's profit analysis of $37,456 for 2000 would result in $486,777 based on the methodology utilized in The Sweetwater's claim letter of May 28, 2002, for the period 1997-2005. JX 23/7.

**O. The Sweetwater operated the lodge in the only season such operations were possible.**

The government now tries to assert that The Sweetwater never intended to operate the lodge. Brief at 49-51. However, this allegation is conclusively rebutted by the simple fact that The Sweetwater did operate the lodge in the only season when such operations were possible. PPFF ¶¶ 99-105. Pursuant to the Forest Service's requests, after The Sweetwater purchased the lodge in 1995 it cleaned up the site during the remainder of that season. PPFF ¶ 98. The Sweetwater then operated in 1996. PPFF ¶¶ 99-105. The following winter, the Forest Service's previously concealed 1992 bridge inspections were revealed, and no further operations could occur. PPFF ¶¶ 106-122, In fact, the Forest Service agreed with this closure. PPFF ¶ 121. The government cannot reasonably assert that The Sweetwater did not intend to operate when operations in fact occurred, and they only stopped upon the disclosure of own previously-concealed report.

**P. The government cannot use The Sweetwater's limited period of operations, which it is responsible for, to bootstrap its argument that The Sweetwater does not have a sufficiently established history of profitability.**

The government is now seeking to benefit from its own breach by asserting that The Sweetwater did not operate for a sufficient period to establish its profitability. Brief at 51-57. However, the government's expert, John Frome, determined that The Sweetwater would be a profitable entity. *See* DX 62 (report pages 56-61). The fact that Mr. Frome determined in his report submitted to the Court that The Sweetwater's profit could be established with reasonable certainty sufficient for his own analysis rebuts the government's current claim that The

---

[27]This figure is a straightforward mathematical calculation where the $37,456 figure is reduced a reasonable growth rate of 6% per year going back from 2000-1997, and increased at that same from 2000-2005, and then the results of those figures are increased by an equitable 8% cost of money calculation. The government's own expert used a much higher 10% growth figure for income adjustments (see DX 62/60(using 60% for 6 year period of 1994-2000).

Sweetwater's profitability was too speculative for the Court to conclude that profits would occur. In reality, the government's argument goes to the precise amounts of those profits. However, the only reason those profits are not established with certainty is because the government's breach prevented operations. "[W]hen damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Tallman Bank, FSB v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003). "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery," and the court's duty is to "make a fair and reasonable approximation of the damages." *Bluebonnet Savings Bank v. United States*, 266 F.3d 1348, 1356-57 (Fed. Cir. 2001), *quoting Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000), *quoting Locke v. United States*, 151 Ct. Cl. 262, 283 F.2d 521, 524 (1960).

**Q. The cost of cure is inapplicable when the non-breaching party cannot cure the situation.**

The government provides no legal support for its assertion that a "cost of cure" method of assessing the lodge value is applicable in this situation. Brief at 57-58. Moreover, as the government's own expert essentially acknowledged, this methodology is inapplicable in the present case. Tr. 2864:25-2866:10. The "cost of cure" method which the government's expert conducted is based on the supposition that the damaged party can cure the deficiency and restore its property's value upon being awarded the funds necessary to accomplish that restoration. However, this argument makes no sense in the present situation where The Sweetwater is unable to cure the problem because The Sweetwater is not authorized to build bridges on federal lands, and the Forest Service has now admitted that it intends to prohibit vehicle traffic over the North Fork bridge, thus preventing any viable lodge operations even if the Sweetwater bridges were

restored. *Id*.; PPFF ¶ 193. As both the government's and The Sweetwater's experts agreed, without a permit, the lodge value was at best merely "reclamation" or "salvage value." Tr. 2310:18- 2311:14; Tr. 2866:24-2867:4.

**R. Mr. Mangus clearly testified that a best fit analysis was appropriate to assess The Sweetwater's value, given the number of cabins at the lodge compared to other lodges, and the government's expert admitted that his data, when properly presented, showed the same point**.

Relying upon an article in a journal which was not submitted as evidence, the government asserts that Mr. Mangus' method of assessing the value of The Sweetwater lodge was incorrect. Brief at 59.[28] However, as Mr. Mangus testified, the data relevant to the lodges near The Sweetwater shows that this analysis is the correct value. Because The Sweetwater had fewer cabins than the other lodges, and *both experts' data* showed that the per unit price increased if the number of cabins at a lodge decreased, it was appropriate to make this adjustment to properly assess the value of The Sweetwater. PPFF ¶¶ 222-224.

While Mr. Frome attempted to demonstrate to the Court that the sales prices did not reflect this pattern using a table in his report, Mr. Frome admitted that he had included in his table sales prices that *he himself had concluded were not appropriate market sales*. Tr. 2828:15-2848:2; PX 62, 63, 64.[29] When these specific sales were removed from his chart, Mr. Frome's data reflected the *exact same pattern* which Mr. Mangus had addressed. Tr. 2847:5-2848:2; PX

[28] The Sweetwater hereby moves to strike defendant's citation at page 59 of its brief to an article in an outside journal. That article was not presented or admitted as evidence, its author's expertise is unknown and the article itself is not provided, only government's counsel's summary of its conclusions. The government's citation to this journal is a blatantly inappropriate effort to supplement the record in this case.

[29]These included sales between family members, sales made in great haste by out of town sellers, structures that were not operated as lodges and the Brannon sale price, which was arrived at because Mr. Brannon was trying to sell his lodge quickly to protect his assets from an out of state judgment. Tr. 2828:15-2848:2.

64; *compare* PX 44 (page 24)(Mr. Mangus' best fit line) *with* PX 64 (the line established by Mr. Frome's data when the non-market sales data was removed). Mr. Frome's preparation of his table was a blatant effort to mislead the Court and hide the fact that Mr. Mangus was exactly correct.

**S. The assessment by the government's expert of the lodge value was anchored on the Brannon's sale price in 1995, which was clearly a distressed sale and not an appropriate indicator of market price.**

As shown on PX 65, the government's calculation of the proper market price of The Sweetwater lodge as of 2001 and 2005 was based on the price which Mr. and Mrs. Brannon sold that lodge for in 1995. Tr. 2848:4-2850:16; 2851:2-2854:25. However, that price was not a proper market price because Mr. Brannon was trying to liquidate his assets as part of a desperate effort to flee an out of state court judgment against him. PPFF ¶¶ 40-41. The government's expert completely ignored this undisputed fact.[30] While the government's expert generated a lot of paper and extraneous data, his analysis of the market value of the lodge was essentially that The Sweetwater's value as of 2001 was the Brannon sale price ($287,500 in 1995) with an annual market increase of approximately 3.6%. Tr. 2848:4-2850:16; 2851:2-2854:25; PX 65. However, this 1995 sales price was not a valid market price given Mr. Brannon's circumstances, and the government's expert's refusal to recognize this undisputed fact demonstrates that he was clearly biased in his analysis.

Additionally, Mr. Frome's value assessment was based on a chart which contained plusses and minuses to assess how a lodge compared to The Sweetwater. DX 64 (report page

[30]The government's expert was from Afton, Wyoming, which is as far from Cody as Pittsburgh, Pennsylvania is from Alexandria, Virginia. Tr. 2777:14- 2778:14. Furthermore, the first thing the government's expert did upon being hired by the government to learn about the lodge value was to call Mr. Mangus, The Sweetwater's expert. Tr. 2384:25-2386:3.

53). However, the entire conclusion of the government's expert would be fundamentally changed by changing *one single + or -* on his chart in his report, such as his assessment of the quality of "tree cover." Tr. 2815:7-19. For example, had he concluded that The Sweetwater had better minor amenities, such as tree cover, than UXU Lodge, his conclusion would have been that those lodges are directly comparable. Tr. 2856:16-2857:13.[31] This fact showed the unreliability of Mr. Frome's assessment.

**T. Conclusion**

For the reasons set forth above and in its prior submissions to the Court, plaintiff The Sweetwater, A Wilderness Lodge LLC respectfully requests that the Court find that defendants in this case have breached the contract between the parties and are liable for damages caused by that breach as set forth in Attachment A, plus applicable CDA interest beginning on May 28, 2002.[32] In the alternative, The Sweetwater requests that the Court find that the defendants have engaged in an uncompensated taking of the Sweetwater Lodge and are liable to The Sweetwater for the value of its property and contract, which totals $2,721,886[33] along with appropriate interest from the date of the taking.

Respectfully submitted,

s/Kevin R. Garden

Kevin R. Garden
THE GARDEN LAW FIRM P.C.

[31] Mr. Frome also admitted that he chose factors for assessing the lodge that essentially nullified The Sweetwater's significant value enhancement based on its secluded location. Tr. 2819:1-2821:6.

[32] A summary of The Sweetwater's damages is attached hereto as Attachment A, with appropriate citations to the record.

[33] This value includes $900,000 for the lodge, $329,700 for the permit value based on the location, $532,186 out of pocket costs, and $960,000 for the value of the TSUP based on the projected revenues.

Suite 325
901 North Pitt Street
Alexandria, VA 22314
(703) 535-5565

Dated: February 1, 2006

Attachment A

## Projected Potential Variations of Sweetwater Lodge Damages

| | Value Range | | | |
|---|---|---|---|---|
| **Lodge Value** | $ 900,000 [1] | [-] | $ 1,475,000 [2] |
| **Location value** | $ 329,700 [3] | | $ 329,700 [3] |
| **Operating Expenses** | $ 532,186 [4] | | $ 532,186 [4] |
| **Lost profits (1997-2005)** | $ 492,500 [5] | [-] | $ 830,518 [6] |
| **Lost profits (2006-2014)** | $ 467,500 [7] | [-] | $ 836,568 [8] |
| | **$ 2,721,886** | | **$ 4,003,972** |

[1] Lodge Value Appraised Value as assessed by Que Mangus. PX 44.

[2] Lodge Replacement Value as assessed by John Pucetas. PX 45.

[3] Value as set forth in claims letter. JX 23/11.

[4] The Sweetwater's annual General Ledgers (PX 42, PX 43).

[5] PPFF ¶ 205. Includes $12,184 for costs incurred through April 2005, which excludes the legal charge of $9,247.26. PX 43 (at p. 200005)($21,431.69-$9,247.26).

[6] Based on Operating Plan for 1997-2005. PX 41 at p. 10.

[7] Based on claims letter methodology for 2006-2014. PPFF ¶ 205.

[8] Based on Operating Plan for 2006-2014. PX 41 at p. 10.