IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC, Plaintiff, | ) | |
| v. | ) | No. 02-1795C (Senior Judge Merow) |
| THE UNITED STATES, Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S PROPOSED FINDINGS OF FACTS**

Pursuant to the Court's Order dated January 27, 2006, plaintiff The Sweetwater, A Wilderness Lodge LLC ("The Sweetwater") respectfully files this post-trial brief. Set forth below are defendant's proposed findings of fact, and immediately following each proposed fact is The Sweetwater's response.

1. The 1990 Forest Service map of the north half of Shoshone National Forest ("the Shoshone") is the map of the northern half of the Shoshone, including the Wapiti District, that was in effect until a new map issued in 2004. Tr. 1513:5-24; DX 72.

**Response**: The Sweetwater currently has no basis to object to defendant's proposed fact, but points out that the map was not incorporated into The Sweetwater's Term Special Use Permit ("TSUP").

2. The map shows that Forest Service Road 423 ("Sweetwater Road") is a dirt road that runs approximately 3.5 miles on the Shoshone's land from the Wapiti Campground on Wyoming State Highway 14/16/20 (the "Yellowstone Highway" or "North Fork Highway") up the Sweetwater Creek drainage. DX 72; Tr. 796:16-19; Tr. 1325:13-16.

**Response**: The Sweetwater objects to defendant's assertion that the map "shows" that the Sweetwater Road was a dirt road. The photographs of the Sweetwater Road, which show a smooth surface, are the best evidence of its physical condition. JX 13. Furthermore, The Sweetwater objects to defendant's assertion as irrelevant because the map makes no reference to the condition of the Sweetwater bridges, but does note that they <u>are present</u>. Thus, to the extent the map shows that the Forest Service maintains access on the Sweetwater Road as a "dirt" road, it also shows that the Forest Service maintains access over the Sweetwater bridges on that road.

3. The 1990 map depicts Sweetwater Road using solid parallel black lines, which the legend defines as "Improved Road, Dirt." DX 72. The next higher category of road on the legend is "Improved Road, Gravel." <u>Id.</u>

**Response:** The Sweetwater currently has no basis to object to defendant's proposed fact as to what the map depicts, but notes that the actual physical condition of the road is the best evidence of the road's condition, and that the map shows that the Forest Service maintains bridge access along the Sweetwater Road.

4. Wapiti District Ranger Brent Larson testified about Sweetwater Road: "it's dirt, it's not gravel. And in that particular part of the world, if it rains, you better have a four wheel drive or you're probably not going to go very far." Tr. 1325:13-16.

**Response**: While Mr. Larson testified as noted, defendant fails to point out that, "in that particular part of the world," passenger cars regularly traveled to the lodge. Plaintiff's Proposed Finding of Fact ¶ 31 [hereinafter "PPFF"]. The Sweetwater also points out that Mr. Larson's comments are not referring to bridge access.

5. Wapiti District Recreation Technician Mike Bree testified about Sweetwater Road: "people out here normally know that when you get on a dirt road – and it's not gravel, it's dirt – that you take a high clearance vehicle. I mean, it's kind of – it's an unwritten rule." Tr. 796:16-19.

**Response**: The Sweetwater does not dispute that Mr. Bree testified as noted, but points out that "people out [t]here" regularly used passenger cars when traveling to the lodge (PPFF 31), thus showing that Mr. Bree's conclusions are not supported by the evidence of actual use on Sweetwater Road by "people out there."

6. On the 1990 map of the north half of the Shoshone, the number for Sweetwater Road, "423," is stacked vertically, which the legend defines as "Low standard Forest Road (<u>high-clearance vehicles</u>)." DX 72 (emphasis added); Tr. 871:23-24, 874:6-16, 1323:17-1324:10.

**Response**: The Sweetwater does not dispute that the map defendant refers to above sets out the numbers noted in a "stacked" fashion, but notes that even Mr. Monte Barker, a seasoned Forest Service employee, had no idea what the "stacked" arrangement of the numbers indicated. Tr. 870:19-871:3. Furthermore, The Sweetwater notes that the Forest Service's recent decision to close the North Fork bridge to any vehicle use contradicts the indications alleged by the Forest Service as to the use that can be made of the road. PPFF ¶ 193.

7. Shoshone National Forest Engineer Jim Fischer testified that Sweetwater Road has been identified and maintained by the Forest Service as a maintenance level 2 road for purposes of the Forest Service Handbook and the INFRA road inventory database. Tr. 1549:24-1550:9.

**Response:** The Sweetwater agrees that Mr. Fischer testified as noted above, but further notes that another Forest Service employee, Mr. Barker, testified that the Sweetwater Road had, at some point previously, been listed as a Level 3 road. Tr. 859:25-860:8. The Sweetwater further notes that the road level does not pertain to the condition or existence of the bridges on that road. Mr. Koenig, an engineer with the Shoshone National Forest, testified that the Level 2 designation has nothing to do with the bridges on that road, except to determine how often they are inspected. Tr. 1938:22-1940:21. He further stated that a road would require bridges if they are needed for appropriate access along the road, which is determined based on the purposes for which the road is used. Tr. 1939:19-1940:21. Mr. Koenig also testified that the Forest Service usually assigns Level 3 to roads needed for a commercial business. Tr. 1940:14-16.

Further, the Forest Service never referred to the internal classification level of Sweetwater Road at the June 12th meeting or thereafter until this dispute arose. Tr. 137:13-21. Nor was the designation of Sweetwater Road as a "Level 2" road set forth anywhere in the Term SUP. *See* JX 1. "Level 2" is a designation set forth in internal Forest Service documents and defined in its internal manual, which the Forest Service has repeatedly asserted is not binding as a matter of law. *See Western Radio Services Co., Inc. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996). The Sweetwater would also point out that the terms of the Forest Service Handbook or Manual were never disclosed to The Sweetwater, nor does the Forest Service consider the Forest Service policy manuals to be part of the TSUP. Tr. 2059:22-2060:13.

In addition, Mr. Fischer testified that, while Level 2 roads are inspected every four years, Level 3 roads are inspected every two years. Tr. 1405:3-11. Mr. Fischer specifically noted in 1997 that the Sweetwater Road had not been inspected every two years because it had been "basically condemned" in 1992 (JX 7, p. 1), thus indicating that the normal inspection cycle for Sweetwater Road was every two years, which is the cycle for Level 3 roads (not Level 2 roads).

8. Mr. Fischer testified that Sweetwater Road, like other maintenance level 2 roads, was not maintained for low-clearance vehicles, such as passenger cars. Tr. 1518:1-14, 1519:17-25.

**Response**: The Sweetwater does not dispute that Mr. Fischer testified as noted above, but notes that passenger cars regularly traveled to the lodge. PPFF at ¶ 31. The Sweetwater further notes that Mr. Fischer did not testify as to the maintenance of the bridges.

9. The Forest Service Handbook states that Level 2 is the maintenance level "[a]ssigned to roads open for use by high clearance vehicles. Passenger car traffic is not a consideration." FSH 7709.58, 12.3.2.b (DPFUF ¶ 6).

**Response**: The Sweetwater does not dispute that the Forest Service Handbook states as noted above, but points out the Forest Service Handbook does not address the maintenance of bridges, nor was it incorporated into the TSUP, and finally the Handbook is not binding as law but instead is internal Forest Service policy. *See Western Radio Services Co., Inc. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996). While the Forest Service did state at the June 1995 meeting that it would pursue funding to replace the bridges if access over them was lost, the Forest Service never referred to the internal classification level of Sweetwater Road at the June 12th meeting or thereafter until this dispute arose. Tr. 137:13-21. The Sweetwater would also point out that the terms of the Forest Service Handbook or Manual were never disclosed to The Sweetwater, <u>nor does the Forest Service consider the Forest Service policy guidelines to be part of the TSUP</u>. Tr. 2059:22-2060:13.

10. Mr. Larson testified that the first time he drove up Sweetwater Road in 1996, he was “absolutely” certain that he saw a large sign posted by the Forest Service on Sweetwater Road right after the road crossed the North Fork bridge that stated, “Road Not Maintained For Passenger Vehicles,” and that appeared to have been there for several years. Tr. 1294:1-1295:19, 1320:17-25.

**Response**: The Sweetwater does not object that Mr. Larson testified as noted above, but notes that Mr. Monte Barker of the Forest Service testified that no such signs were put up along Sweetwater Road. Tr. 860:2-12. Further, Mr. Tom Koenig also recalled no such signs as of 2000 when he arrived on the Forest. Tr. 1858:22-25. Mr. Michael Bree also contradicted Messrs. Larson and Fischer when he testified that the Forest Service had never restricted the type of cars which could use Sweetwater Road. Tr. 797:14-798:1. In addition, Ms. Watson had no recollection of any large sign meeting the description provided by Mr. Larson. Tr. 2006:23-2009:18. Instead, she recalled a small sign, 12" by 14" which had brown lettering with yellow background. Also, Mr. Ralph Wilkerson and Mr. Mummery, both of whom traveled Sweetwater Road frequently, testified unequivocally that no sign warning against passenger vehicle use ever existed. Tr. 2920:15-2921:15; Tr. 2268:11-2270:2.

11. Mr. Fischer also testified that in the mid 1990s, the Forest Service posted a large sign on Sweetwater Road right after the road crossed the North Fork bridge that stated wording "to the effect that the was a narrow mountain road that was not maintained for passenger cars." Tr. 1520:9-1521:10.

**Response**: The Sweetwater does not object that Mr. Fischer testified as noted above, and respectfully refers the Court to its response to paragraph 10 above.

12. Mr. Fischer [sic] that the posting of the sign was prompted by funding constraints for road work caused in the 1993-95 time period by the Great American Outdoors program. Tr.

1522:16-1523:2.

**Response**: The Sweetwater does not object that Mr. Fischer testified as noted above, and respectfully refers the Court to its response to paragraph 10 above.

13. The Forest Service Handbook provides that "if estimated costs exceed available funding, it may be necessary to defer work, reduce maintenance frequencies, close roads, or allow roads to deteriorate." FSH 7709.58, 12 (DPFUF ¶ 7).

**Response**: The Sweetwater does not dispute that the Forest Service Handbook states as set forth above, but notes that the Forest Service Handbook was not incorporated into The Sweetwater's TSUP and that it is not binding as law. The Sweetwater would also point out that the terms of the Forest Service Manual were never disclosed to The Sweetwater, <u>nor does the Forest Service consider the Forest Service Manual to be part of the TSUP</u>. Tr. 2059:22-2060:13.

14. The Forest Service has no need for Sweetwater Road for range management purposes for grazing livestock, or for timber harvesting, because there is no timber base in Sweetwater Canyon. Tr. 815:17-21. The primary use of the road is for the lodge owned by The Sweetwater, A Wilderness Lodge LLC ("The Sweetwater") and dispersed recreation. Tr. 815:21-25.

**Response**: The Sweetwater does not dispute the facts set forth above. The Sweetwater further notes that Mr. Koenig, an engineer with the Shoshone National Forest, testified that a Level 2

road may require bridges if they are needed for appropriate access along the road, which is determined based on the purposes for which the road is used. Tr. 1939:19-1940:21. As noted above, the Forest Service has admitted that a purpose of Sweetwater Road is to provide for access to the Sweetwater lodge.

15. Few members of the public other than guests of the lodge used Sweetwater Road, principally day-use hunters during the hunting season who used high-clearance vehicles to hunt from the road or tow horse trailers up the road. Tr. 847:19-848:10, 879:24-880:8, 944:4-16, 1283:22-1284:6.

**Response**: The Sweetwater disputes the allegation above. The lodge contributes to about 20% of the use made by the public of the road. Tr. 105:2-8. Sweetwater Road also provides public recreational access to the Shoshone National Forest and is used by the Forest Service for administrative purposes related to monitoring and maintaining the Forest. Tr. 847:7-848:10; JX 5 (page 1); Tr.921:21-922:11. The Forest Service was encouraging more public use of the Sweetwater Road by equestrians hauling horse trailers up the road and had built a turn-around for those vehicles at the end of the road just before the permit area. Tr. 171:4-17 Tr. 849:18-851:25.

16. There are three bridges for vehicular traffic on Sweetwater Road. The first bridge on FSR 423, No. 423-.2, spans the North Fork of the Shoshone River ("the North Fork bridge"), and is located approximately .2 miles from the North Fork Highway. DX 64/40.

**Response**: The Sweetwater does not dispute the allegations above.

17. The other two bridges, Nos. 423-2.5 and 423-3.0, span Sweetwater Creek ("the Sweetwater bridges"), and are located approximately 2.5 and 3.0 miles, respectively, from the North Fork Highway. DX 64/40.

**Response**: The Sweetwater does not dispute the allegations above.

18. Jeff Mummery, The Sweetwater's manager, testified that the father of a friend of Mr. Mummery's was the original permittee of the lodge now owned by The Sweetwater, and that this previous permittee built the original bridge over the North Fork of the Shoshone River as well as the Sweetwater bridges. Tr. 142:12-23.

**Response**: The Sweetwater does not dispute the allegations above.

19. The Forest Service required lodge permittees in the 1960s and 1970s to upgrade the condition of the Sweetwater bridges. DX 3/2, ¶ 7; DX 3/7; DX 3/11; DX 4/10-15.

**Response**: The Sweetwater disputes the allegations above because The Sweetwater's review of the record shows that Defendant's Exhibits 3 and 4 were not admitted as evidence in this case. Thus, the government's assertion has no factual basis.

20. In March 1992, the Shoshone prepared a Forest Service Region 2 "Capital Investment Project Description Form" that proposed replacing the bridges. JX 5. The proposal was updated by Mr. Fischer in February 1997. JX 10.

**Response**: The Sweetwater does not dispute the allegations above.

21. The Sweetwater bridges were inspected in August 1992 by Forest Service bridge inspectors from the Wasatch-Cache National Forest. DX 9, DX 10. The inspections recommended that both bridges be replaced. DX 9, DX 10; Tr. 1397:4-24; 1448:18-1449:1.

**Response**: The Sweetwater agrees to the first sentence set forth above. The Sweetwater disputes the allegation in the second sentence above. The Shoshone Forest Engineer, Mr. Jim Fischer, admitted that, after the bridge inspectors conducted a technical inspection of the Sweetwater bridges in 1992, they stated to the Shoshone that “you need to close those bridges immediately.” Tr. 1392:5-1395:7; *Sweetwater* Order (Dec. 30, 2003) at 2. The Forest Service employees on the Shoshone argued that they could not close the bridges because the Forest did not want to face the consequences of the impact of bridge closure on the lodge owner given the critical need for vehicular access to lodge operations. *Sweetwater* at 2; Tr. 1394:18-24. Mr. Fischer later described this inspection as “basically condemning” the bridges. JX 7 (page 1).

22. After completing the inspection forms, the bridge inspectors discussed the condition of

the bridges with Jim Fischer, the Forest Engineer of the Shoshone from 1986 until 2001. Tr. 1372:2-3, 1390:6-15, 1392:1-4. The inspectors did not perform a technical load-rating, but using their judgment as professional engineers, said that the bridges were probably safe with signage that limited their use to vehicles no more than 3 to 5 tons. Tr. 1402:3-1403:5.

**Response**: The Sweetwater disputes the allegations above. The inspectors did not complete the inspection forms, because they omitted completing the load rating portion of the inspection forms as well as the overall structural evaluation rating on the second page of each form for the Sweetwater bridges. *See* JX 7/2/ 7/3, 7/8, 7/9. (The inspection form for the main North Fork bridge shows that both these portions of the inspection form were completed for that bridge. JX 7/4, 7/5.) The Sweetwater agrees that the inspectors did not complete a technical load-rating, but disputes the remaining allegations in the second sentence and respectfully refers the Court to its response to paragraph 21 above. The Sweetwater further notes that Mr. Fischer referred to this outcome as a "compromise" that would "probably" be safe for motorists. *Sweetwater* at 2; Tr. 1386:17; Tr. 1582:8-1583:13.

23. In 1993, signs were posted on the approaches to the bridges that stated, "WEIGHT LIMIT 3 TONS." Tr. 1402:3-10. The signs were still present when Mr. Fischer inspected the bridges in March 1997. JX 13/3, JX 13/4, JX 14/1.

**Response:** The Sweetwater does not dispute the allegation set forth above, but notes that the Forest Service had never conducted a load rating to assess if in fact the bridges were safe. PPFF

172-174. Mr. Fischer referred to the posting of these signs as a "compromise" that would "probably" be safe for motorists. *Sweetwater* at 2; Tr. 1394:25; Tr. 1396:17; Tr. 1582:8-1583:13.

24. Mr. Fischer maintained a list that he used to track the projects that the Shoshone proposed for the Capital Investment Program ("CIP") during each fiscal year. JX 2. In the list, for fiscal year 1994, he recorded next to "Sweetwater Bridges" the notation "Indef. Postponed, do w/Mtce $." JX 2/4; DPFUF ¶ 86.

**Response**: The Sweetwater does not dispute the statements set forth above.

25. The lodge, cabins, and other facilities (collectively, "the lodge") owned by The Sweetwater are located on a 15.4 acre site approximately 3.5 miles north of the North Fork Highway on the Sweetwater Road. JX 1/16; DX 72.

**Response**: The Sweetwater does not dispute the statements set forth above, and points out that the site is entirely surrounded by National Forest.

26. The Forest Service maintains no trails or campsites in the Sweetwater Creek drainage beyond the lodge because the terrain is so steep, it is a de facto pristine area. Tr. 884:8-885:12.

**Response**: The Sweetwater disputes the statements set forth above. There are several existing

campsites in the drainage (Tr. 878:25-879:23), and the Forest Service has noted the important recreational benefit provided by Sweetwater Road, which is used by the Forest Service for administrative purposes related to monitoring and maintaining the Forest. Tr. 847:7-848:10; JX 5 (page 1); Tr.921:21-922:11 As Mr. Barker testified:

> Q Another point maybe along those lines I want to try to get clarified here, the Forest Service again has maintained that they need to keep the Sweetwater Road open to the public. But we've heard that one of the reasons that they didn't seek funding for the road was that the public doesn't really use it.
>
> A That's not correct.
>
> Q The public does use it?
>
> A Yes.
>
> Q Can you describe what use is made of it?
>
> A Well, basically, it's one of the very few roads on the North Fork that you can travel. The -- the primary use, I would say, is during hunting season. You can drive out there in the fall and a lot of people -- not a lot, some people day hunt during the winter time. Some of the trappers used to go up there, but it wasn't a high amount of use, but it was one of the few roads -- there's really only two roads, the Elk Fork Road and that road, that go off the main highway, other than to a lodge or a campground when we closed Kitty Creek. So there's not much roaded opportunity off the main highway. And so, that has generally been the thought; that we'd like to have some motorized access for folks, older folks or handicapped folks that want to hunt and want to go up there. And it was a nice drive. It's a beautiful setting if you drive up there on a Sunday afternoon and back, and so there was use of the road. It wasn't mainstream high use.

.

Tr. 847:7-848:10.

27. The Forest Service never has conducted a competition to select a concessionaire to operate a lodge on the site occupied by The Sweetwater's lodge, and the Government has never owned the lodge. Tr. 969:22-970:22, 977:9-15, 1975:20-1977:13; DX 4/10-15.

**Response**: The Sweetwater disputes the statements set forth above as not being supported by the record. The Sweetwater review of the trial transcript has demonstrated that Defendant's Exhibit 4 was not admitted into the record in this case. Additionally, no conclusive evidence was presented as to the operations of the lodge going back to its inception.

28. Any responsibilities that the permit requires The Sweetwater to perform to care for the Forest lands within or around its site are strictly a result of its occupancy, and are not services that the Government set out to find someone to provide. Tr. 1977:14-24.

**Response**: The Sweetwater disputes the allegations set forth above. One of the purposes of recreational Term SUPs is to serve, by regulation and by purpose, as a delivery system to provide public services. Tr. 1949:17-1950:16 (testimony of Gary Reynolds, the Recreation, Wilderness and Land Staff Officer for the Shoshone). The purpose of Term Special Use Permits is to provide "a service that the Forest Service is supposed to provide to the public and deem that a private entity could do—could do the job <u>so the Forest Service wouldn't have to open up a lodge</u>." Tr. 788:20-789:1 (testimony of Mike Bree)(emphasis added); Tr. 801:18-802:8; *see* Tr. 857:20-25. Mr. Monte Barker, who was a member of the Shoshone special use permit team, stated that "concessionaire permittees are part of the Forest Service who are permitted to provide a service that we want provided, it's not for convenience of the permittee. It's to meet a responsibility providing public service to the public, and so we allow the numbers and the locations in order to provide what we feel to meet the public need." Tr. 834:5-11. Mr. Barker

further stated that he treated permittees as employees. Tr. 866:20-23.

29. The permittees who operated the lodge from 1983 until 1995 were David and Nancy Brannon d/b/a Brannons' Wilderness Lodge. JX 3.

**Response**: The Sweetwater does not dispute the allegation set forth above.

30. The Brannons' permit was amended in 1985 to include a "Memorandum Of Understanding For Cooperation In Road Maintenance ("the Brannons' MOU"), under which the Forest Service assumed responsibility for bridge and road maintenance for Forest Service traffic, and permittee assumed responsibility for "traffic generated from use of lands leased by the COOPERATORS for the purposes of operating and maintaining a guest lodge." JX 4/3.

**Response**: The Sweetwater does not dispute the allegation set forth above.

31. In the Brannons' MOU, the Forest Service made the limited commitment that "[n]ew construction or reconstruction, such as bridge replacement, will be agreed to as part of the yearly Joint Maintenance plan." JX 4, ¶ C.4.

**Response**: The Sweetwater does not dispute the allegation set forth above.

32. The Brannons' MOU provided that "The FOREST SERVICE shall: 1. Assume road

maintenance responsibility for all National Forest traffic as defined and for two bridges (FS No. 423-2.5 and FS No. 423-3.0), including abutments and approaches." JX 4/3, ¶ B.1. The MOU's "Definition of Terms" section defines "National Forest traffic" as "traffic generated by use of National Forest lands or road systems for recreation purposes exclusive of traffic related to commercial, administration, or protection needs of lands owned or leased by the COOPERATORS." JX 4/2.

**Response**: The Sweetwater does not dispute the allegation set forth above.

33. The Brannons' MOU also provided that "New construction or reconstruction, such as bridge replacement, will be agreed to as part of the yearly Joint Maintenance plan." JX 4/3, ¶ C.4.

**Response**: The Sweetwater does not dispute the allegation set forth above.

34. Mr. Brannon used a grader to maintain Sweetwater Road, and ensured that guests driving low-clearance passenger vehicles could reach the lodge. Tr. 1524:9-11, 20-22.

**Response**: The Sweetwater does not dispute the allegation set forth above.

35. A prospective purchaser of the lodge, Ms. Wanda Smith, spoke with the Forest Engineer of the Shoshone, Jim Fischer, on or about May 15, 1995 about the road and bridge conditions.

Tr. 1412:19-1413:15. Mr. Fischer discussed with her the possibility of replacing the bridges with fords. Tr. 1413:7-15. He noted that he recorded in his calendar for that day that "Ms. Smith isn't real excited about that." DX 13/1.

**Response**: The Sweetwater does not dispute the allegation set forth above.

36. Ms. Smith did not purchase the lodge from the Brannons because of her concerns about the road and bridges. Tr. 763:25-765:14, 780:6-781:3, 858:16-19.

**Response**: The Sweetwater disputes the allegation set forth above based on it having been informed that Ms. Smith did not purchase the lodge because she could not obtain sufficient funding. Tr. 106:20-107:4.

37. Mike Bree, a Forest Service employee who had responsibility for permit administration at that time, spoke to the Brannons, who were upset that the Forest Service talked about the road and bridges with Ms. Smith. Tr. 765:15-766:13. Mr. Bree told the Brannons that the Forest Service has "to make sure that anybody that's going to purchase it knows the good points and the bad points, everything about it." Tr. 766:14-19.

**Response**: The Sweetwater does not dispute the allegation set forth above.

38. In addition to serving as the manager of The Sweetwater, Mr. Mummery is also the president of Western Wyoming Properties & Investment Corporation, which owns shares of The Sweetwater. Tr. 470:12-22; DX 19/1. Mr. Mummery is engaged in buying and selling real estate. Tr. 470:4-11.

**Response**: The Sweetwater does not dispute the allegation set forth above.

39. On Friday, May 19 1995, Mr. Mummery learned from Buck Wilkerson, a friend who was a realtor, that the closing on the Brannons' sale of the lodge had fallen through, and that Mr. Mummery "could make [him]self a good deal and buy it." Tr. 478:1-8; DPFUF ¶ 23.

**Response**: The Sweetwater does not dispute the allegation set forth above.

40. Mr. Wilkerson told Mr. Mummery that he thought the previous prospective purchaser had been prepared to pay $450,000 for the lodge. Tr. 478:9-12; DPFUF ¶ 24.

**Response**: The Sweetwater does not dispute the allegation set forth above.

41. Mr. Wilkerson told Mr. Mummery that the Brannons were very motivated to sell the lodge. Tr. 478:13-479:18. Mr. Mummery understood that the Brannons were moving to Coos Bay, Oregon, and had made a commitment to buy a boat, and had made no bookings for the lodge for the summer season that was just beginning because they had been negotiating the sale

of the lodge for several months. DPFUF ¶ 25.

**Response**: The Sweetwater does not dispute the allegation set forth above.

42. The same day that Mr. Wilkerson told Mr. Mummery about the opportunity to buy the lodge from the Brannons, Mr. Mummery visited the lodge with his friend Gary Fales, who owns Rimrock Ranch, another North Fork lodge. Tr. 75:17-76:9.

**Response**: The Sweetwater does not dispute the allegation set forth above.

43. During his visit, Mr. Mummery spoke to Mrs. Brannon, who was distraught that the sale to Ms. Smith had not closed. Tr. 78:17-21. Mr. Brannon was 70 or 71, and she was concerned that the lodge was too much for him to handle. Id. 78:24-79:2. The Brannons planned to retire, and had a contract to buy a boat to live on in Coos Bay, Oregon. Tr. 79:2-9.

**Response**: The Sweetwater does not dispute the allegation set forth above.

44. In his deposition, Mr. Mummery testified that "I looked at it as a bargain sale." He also testified that "since I looked at it as a bargain sale, I wasn't going to evaluate how – their gross revenues or net revenues or how they – they ran their business." DPFUF ¶ 28; Tr. 479:24-480:6.

**Response**: The Sweetwater does not dispute the allegation set forth above.

45. Mr. Mummery claimed during his direct examination that he had owned the Yellowstone Valley Inn on the North Fork Highway, though on cross-examination, he admitted that he had just leased it for one year, and had never been the manager or owner of any hotel or motel during his “checkered” business career. Tr. 407:22-24, 411:8-9, 476:5-13.

**Response**: The Sweetwater disputes the allegation set forth above. Mr. Mummery explicitly was referring to a “diverse” background when he used the phrase “checkered, diverse and broad-ranging” and the government’s reference to “checkered” above borders on being knowingly deceptive. Further, the citations do not demonstrate that Mr. Mummery claimed to “own” the Yellowstone Inn, but more importantly he clearly stated that his company operated it under a lease/purchase agreement. Furthermore, the testimony clearly shows that Mr. Mummery testified that, other than operating the Yellowstone Inn, he had not operated any other hotels. Tr. 476:2-13.

46. Mr. Mummery’s initial business plan was to operate the lodge much as the Brannons had by employing the cook that Mrs. Brannon had hired. Tr. 86:6-87:1, 490:10-491:24.

**Response**: The Sweetwater does not dispute the allegation set forth above.

47. Mr. Mummery’s wife told him not to buy the lodge. Tr. 676:21-677:8.

**Response**: The Sweetwater disputes the allegation set forth above. Mr. Mummery testified as set forth below:

> Q Okay. Now, before you purchased the lodge, before you even signed the sales contract on it with the Brannons, you asked your wife, your present wife, what she thought of buying the lodge, and she told you not to do it, correct?
>
> A She didn't like the idea. She didn't hate the idea, don't get me wrong. If my wife had really disagreed with me, I wouldn't have done it.

Tr. 676:21-677:3.

48. Mr. Mummery returned to look at the lodge again on Saturday, May 20, 1995, and spoke to Dave Brannon. Tr. 83:13-84:11.

**Response**: The Sweetwater does not dispute the allegation set forth above.

49. Mr. Brannon started sales discussions with Mr. Mummery at $425,000. DPFUF ¶ 30.

**Response**: The Sweetwater does not dispute the allegation set forth above.

50. On Sunday morning, May 21, 1995, Mr. Mummery sent Mr. Brannon an offer on the lodge for $275,000. Tr. 482:6-8. Paragraph 20 of Mr. Mummery's offer provided that if it were accepted by 6:00 p.m. that day, it would form a contract. JX 9.

**Response**: The Sweetwater does not dispute the allegation set forth above.

51. Mr. Mummery did not deliver the offer in person because he knew that Mr. Brannon would be angry. Mr. Mummery testified that Mr. Brannon "came back just ballistic." Tr. 482:9-483:4; DPFUF ¶ 32.

**Response**: The Sweetwater does not dispute the allegation set forth above.

52. The Brannons faxed to Mr. Mummery a counter-offer for $287,500 with a date and time of 2:40 p.m. Sunday, May 21, 1995. Paragraph 2 of the counter-offer specified that it expired at 4:00 p.m. that day. DPFUF ¶ 33.

**Response**: The Sweetwater does not dispute the allegation set forth above.

53. Mr. Mummery, as president of Western Wyoming Properties, accepted the counter-offer on May 21, 1995. Paragraph 8 of the original offer provided for a closing date of June 21, 1995. DPFUF ¶ 34.

**Response**: The Sweetwater does not dispute the allegation set forth above.

54. In his deposition, Mr. Mummery testified that "I didn't look at the bridges before I put in the offer. I mean, I – I looked at them driving out. . . . my primary concern at the time was even getting the – you know, I – I had offered substantially less than I think he'd felt his lodge was

worth. I mean, you know, 40 percent less, or in that neighborhood." DPFUF ¶ 35.

**Response**: The Sweetwater disputes the allegation set forth above and notes that Mr. Mummery's deposition was not offered into evidence. Mr. Mummery testified that he drove over the bridges, and he was not concerned about their safety because they had been posted with a weight limit that indicated the Forest Service had assessed those bridges as safe for vehicular traffic.

> Q Did you drive over the bridges on the Sweetwater Road?
>
> A Both bridges, yes. All three bridges.
>
> Q Did either of you make a comment about those bridges on that trip?
>
> A No. I don't think there's -- you know, the bridges had signage that said I believe weight limit three tons.
>
> Gary and I have ridden horseback probably thousands of miles in these forests, and we've crossed all sorts of bridges and ravines and gaps and draws, so to drive a car or in this case I think we might have been in a pickup truck, but to drive a pickup truck over those bridges was not -- you know, it's not something we would have focused on as being dangerous

Tr. 77:3-17. Ms. Aus agreed that it would be reasonable for The Sweetwater to assume the bridges were safe given these signs. Tr. 1631:18-1632:22; Tr. 1673:22-24. These signs, however, were a false representation and in fact the Forest Service never load rated the bridges and the bridges should have been closed under Forest Service policy. PPFF ¶¶ 25, 172-174.

55. At trial, Mr. Mummery testified that he was most interested in the lodge for resale rather than to operate: "I thought I was making a good deal vis-vis market value. In other words, <u>if I</u>

decided to do nothing with it, I could sell it and get my money out of it." Tr. 498:17-20 (emphasis added).

**Response**: The Sweetwater disputes defendant's allegation above, which is clear misconstrual of Mr. Mummery's testimony. As the testimony shows, Mr. Mummery clearly stated that, even **if** he did not operate the lodge, he could sell it for a much higher amount than he purchased it for, which gave him added comfort to purchase the lodge. Mr. Mummery did not state that he was "most interested" in reselling the lodge, and in fact he operated it in 1996.

56. Mr. Mummery testified that when he looked at the bridges in 1995, that the northern abutment to the lower Sweetwater bridges was in the same condition as shown in the inspection photograph taken in 1997. Tr. 524:24-525:17.

**Response**: The Sweetwater does not dispute the allegation set forth above.

57. Mr. Mummery's concern was that the Sweetwater bridges might fail in high water because the abutments were exposed to scouring. Tr. 522:11-523:19.

**Response**: The Sweetwater does not dispute the allegation set forth above.

58. Mr. Mummery had a full month to obtain information about the Sweetwater bridges between signing the sales contract on May 21, 1995 and the contractually specified date on

which the purchase closed, June 21, 1995. DX 17/2, ¶ 8.

**Response**: The Sweetwater does not dispute the allegation set forth above. However, one of the purposes of the June 1995 meeting with the Forest Service was for the Forest Service to provide The Sweetwater with a full disclosure as to the condition of the bridges so that The Sweetwater could decide whether to go ahead with the purchase of the lodge. Def. Facts ¶ 50; Tr. 896:5-14; Tr. 914:19-915:21; Tr. 956:8-10. The Forest Service was aware that The Sweetwater was relying on the Forest Service's statements to determine whether or not it should purchase the lodge, and it provided no documents which in any way demonstrated that the bridges had previously been "basically condemned." Tr. 897:16-17; PPFF ¶ 49. The current Forest Supervisor Ms. Aus stated that The Sweetwater was entitled to rely upon the representations made by the Forest Service line officer at the meeting. Tr. 1744:23-1745:4; Tr. 1747:9-1748:15.

59. On June 9, 1995, a certificate of organization for The Sweetwater was filed with the Wyoming Secretary of State. The Sweetwater's operating agreement stated that it was organized for the purpose of "ownership, development, management and sale of the property formerly known as 'Brannon's Wilderness Lodge.'" DPFUF ¶ 37.

**Response**: The Sweetwater does not dispute the allegation set forth above.

60. Mr. Mummery now believes that Mr. Brannon breached the sales contract by overstating the viability of the Sweetwater bridges. Tr. 501:2-502:1, 503:6-9.

**Response**: The Sweetwater disputes the allegation set forth above. Mr. Mummery did not state that he believe Mr. Brannon had breached the sales contract because of the bridges, but instead because of other issues related to property on the site. As Mr. Mummery testified, but which the government omits:

> So I mean there is a whole bunch of stuff out there that I don't -- but I don't think I was in any way suggesting that I held Brannon responsible for the bridges because the reality is I didn't think Brannon had anything to do with the bridges. My relationship was with the U.S. Government and the Forest Service over the bridges, and I started from day one. I didn't want Brannon involved in the bridges.

Tr. 502: 17-25. As Mr. Mummery explained:

> But my main reason for feeling that Brannon, and I think I stated it in this deposition, I wouldn't know where to refer to it, my main reason for feeling that Brannon breached the contract was he took furnishings, paintings, equipment, kitchen equipment, and other things that belonged -- that I thought I had bought.

Tr. 502: 17-23.

61. On June 12, 1995, Mr. Mummery and The Sweetwater's lawyer, Bill Simpson, met with three Forest Service representatives – Bob Rossman, Monte Barker, and Mike Bree – to discuss the permit that The Sweetwater desired to obtain for the lodge. Tr. 108:19-110:3.

**Response:** The Sweetwater does not dispute the allegation above, but notes that one of the purposes of the meeting was for the Forest Service to provide The Sweetwater with a full disclosure as to the condition of the bridges so that The Sweetwater could decide whether to go

ahead with the purchase of the lodge. Def. Facts ¶ 50; Tr. 896:5-14; Tr. 914:19-915:21; Tr. 956:8-10. The Forest Service was aware that The Sweetwater was relying on the Forest Service's statements to determine whether or not it should purchase the lodge. Tr. 897:16-17; PPFF ¶ 49.

62. At the time of the meeting, Bob Rossman was Acting District Ranger for the Wapiti District. Tr. 908:18-24. Mr. Rossman was the only Forest Service line officer at the meeting. Monte Barker was a member of a special uses permits team, and dealt with lodges. Tr. 800:19-801:4. Mike Bree was also a member of the special uses permits team, and along with Mr. Barker worked with Jennifer Watson on special use permits. Tr. 757:9-758:4, 760:6-761:12.

**Response**: The Sweetwater does not dispute the allegation above, but notes that with respect to the Term SUP, the District Rangers on the Forest had been delegated authority to sign Term SUPs as the Forest Supervisor and make decisions related to the administration of those permits. Tr. 1271: 9-19; Tr. 1281:19-1282:10; Tr. 1316:1-9 (delegation never formally cancelled in writing); Tr. 1317:12-24 (Mr. Larson stated that the Forest Service Manual provided support for District Ranger's issuing Term Special Use Permits). At the time of the June 12, 1995 meeting, Mr. Rossman was authorized to make recommendations to the Forest as to obtaining funds to repair or replace the bridges, and it was the Forest Engineer who made the decisions on which particular bridges were to be repaired or replaced "because the money came down to him." Tr. 777:9-778:18.

63. Mr. Larson testified that Barry Davis, who was Forest Supervisor for the Shoshone in 1995, had purported to delegate to District Rangers authority to issue all term permits. Tr. 1271:6-1272:2, 1281:19-1282:10.

**Response**: The Sweetwater does not dispute the allegation set forth above, except to note that this delegation was "purported" by the Forest Service itself. Tr. 1271: 9-19; Tr. 1281:19-1282:10; Tr. 1316:1-9.

64. Mr. Rossman believed that he had authority to sign the permit issued to The Sweetwater on behalf of the Forest Supervisor, but he did not hold any authority to act as Forest Supervisor with respect to any decisions regarding replacement of the Sweetwater bridges. Tr. 963:8-23.

**Response:** The Sweetwater agrees that Mr. Rossman had authority to sign the TSUP, and disagrees with the remaining allegations above and respectfully refers the Court to its substantive assertions in its response to paragraph 62 above.

65. Mr. Rossman has never held a warrant as a contracting officer. Tr. 967:24-968:1.

**Response:** The Sweetwater disagrees with the allegation above to the extent the government is asserting that Mr. Rossman did not have the authority to enter into the contract which he signed on behalf of the Forest Service.

66. Mr. Mummery knew and trusted Mr. Barker from his previous dealings with him, but understood that Mr. Barker "was not the ranking officer in the room." Tr. 133:15-16.

**Response**: The Sweetwater does not dispute the allegations set forth above.

67. Mr. Rossman testified that the discussion at the June 12, 1995 meeting was "merely discussion for purposes of information and understanding" about the terms of the permit that the Forest Service subsequently issued, and Mr. Mummery signed on behalf of The Sweetwater. DPFUF ¶ 41.

**Response**: The Sweetwater objects to the government's citation to its pre-trial proposed facts which refer to Mr. Rossman's deposition, which conflicts with Mr. Rossman's trial testimony. As Mr. Rossman acknowledged, one of the purposes of the meeting was for the Forest Service to provide The Sweetwater with a full disclosure as to the condition of the bridges so that The Sweetwater could decide whether to go ahead with the purchase of the lodge. Def. Facts ¶ 50; Tr. 896:5-14; Tr. 914:19-915:21; Tr. 956:8-10. The Sweetwater further notes that the Forest Service personnel at the June 12th meeting were "acting on behalf of" the Forest Supervisor. Tr. 813:19-23; Tr. 928:10-929:25. The current Forest Supervisor stated that The Sweetwater was entitled to rely upon the representations made by the Forest Service line officer at the meeting. Tr. 1744:23-1745:4; Tr. 1747:9-1748:15. The Forest Service stated to the representatives of The Sweetwater that the Term SUP was a "legally binding document" to which all parties were agreeing. Tr. 814:18-19. The Forest Service was aware that The Sweetwater was relying on the

Forest Service's statements to determine whether or not it should purchase the lodge. Tr. 897:16-17.

68. Mr. Rossman testified that he was not negotiating about the permit terms during the June 12, 1995 meeting, because the Forest Service dictated the terms of the permit, "and it would be up to Mr. Mummery to agree, by his signature, that those are the terms he'll abide by." DPFUF ¶ 42. Mr. Rossman regarded the meeting as an opportunity to explain the permit terms to Mr. Mummery. Tr. 965:2-7.

**Response**: While The Sweetwater does not dispute that Mr. Rossman testified as noted above in his deposition, it respectfully refers to its response to paragraph 67 above.

69. The participants in the June 12, 1995 meeting had a copy of the Brannons' permit. Tr. 122:16-21.

**Response**: The Sweetwater does not dispute the allegations above.

70. In a June 13, 1995 email to Jim Fischer that copied Mike Bree, Monte Barker, and Jennifer Watson, Mr. Rossman summarized as follows the discussions that he, Mr. Barker, and Mr. Bree held with Mr. Mummery and Mr. Simpson the preceding day:

> JEFF DOESN'T HAVE A PROBLEM WITH GOING TO FORDS AS A CONTINGENCY FOR BRIDGE FAILURE OR **UNSAFE BRIDGE CONDITION**. WE ALSO AGREE NOT TO HAVE A ROAD MTC

> AGREEMENT. JEFF IS CONCERNED ABOUT THE LIABILITY HE ASSUMES FOR GENERAL PUBLIC, AS OPPOSED TO GUESTS. OUR APPROACH IS TO MAINTAIN THE ROAD IN ACCORDANCE WITH OUR SYSTEM OF SETTING PRIORITIES ZONALLY, WHERE THE LIABILITY IS BASICALLY OURS ANYWAY. JEFF, HAVING AN INTEREST IN THE SAFETY OF HIS GUESTS, WILL MAINTAIN THE ROAD AS HE SEES FIT WHILE WE WILL COMMUNICATE AND MONITOR PROBLEM AREAS INFORMALLY (WITHOUT THE AGREEMENT). IT IS UNDERSTOOD THAT WE DO NOT HAVE A PRIORITY ON MAINTAINING THIS ROAD, AND ARE NOT LIKELY TO ALLOCATE DOLLARS TO IT.

DX 18 (emphasis added).

**Response**: The Sweetwater does not dispute that Mr. Rossman drafted an internal email as noted above, which he did not disclose to anyone outside the Forest Service and which does not state that fords would be used as a means to operate the lodge. As the evidence demonstrates, at the June 12th meeting the parties discussed that, in the event the bridges were to become impassable in the future, the Forest Service would construct fords to provide temporary access until funds could be obtained to repair the bridges or the loss of access could otherwise be addressed. Tr. 145:16-25; Tr. 772:3-773:6; Tr. 932:10-933:12; Tr. 935:17-937:6 (testimony of Robert Rossman that providing fords in the event the bridge access was lost would not impact the Forest Service's effort in seeking funds to replace the bridges); *see* JX 12 (letter written to The Sweetwater by Ms. Watson and signed by Mr. Larson in 1997 describing agreed-upon use of fords as "temporary"); Tr. 2074:11-2076:20. This access was sought so that The Sweetwater would be able to maintain the lodge until bridge access could be restored. Mummery Dec. ¶ 17 (App. 217). Mr. Barker, who attended the June 1995 meeting, was asked about the issue of the fords and stated as follows:

> [I]n knowing the area, there is little doubt in my opinion that [the use of fords]

> was temporary only because it wouldn't be feasible to have invitees thinking that they're going to come up this road [without bridge access]. And—and when we—when we have a special use permit, I think we have a higher obligation because we're inviting people to go up there. And I don't see any way possible that you could operate this [lodge] on a sustained basis with fords because of the high water situation.

Tr. 818:1-819:22; *see* Tr. 1232:17-1233:13; Tr. 1233:23-1234:22. Mr. Barker further stated that "our [the Forest Service's] number one charge is public safety over all other things and that would not be- I don't feel that [it] would be appropriate to access a public service lodge with a ford that crosses a major bridge." Tr. 819:25-820:3. The Sweetwater had previously informed the Forest Service that use of fords would not permit viable lodge operations due to the high water conditions that frequently occurred on Sweetwater Creek, and The Sweetwater continued to inform it of that fact after obtaining the permit. Tr. 138:7-139:9; Tr. 140:5-142:8; Tr. 821:23-822:11. The government's expert at trial he agreed, and simply stated "Fords do not work." PX 66; Tr. 2862:7-9. As Mr. Barker stated, the fact that fords could not provide permanent access was so obvious, it was beyond having to be stated. Tr. 822:24-823:3. Mr. Barker further agreed with Mr. William Simpson's characterization of the meeting in a letter dated May 2, 2001 (JX 17). Tr. 843:17-844:20. In that letter, Mr. Simpson stated:

> My recollection of the statements of Jeff Mummery at that meeting is that while Mr. Mummery was agreeable with the contingency of building and using fords through streams in the event any of the bridges failed along the Sweetwater Creek Road, the use of any such ford would be only temporary while bridges were being replaced or reconstructed. Mr. Mummery did not state that a ford would be a permanent substitute for any bridge which may need repairs and replacement.

JX 17.

71. At trial, Mr. Mummery read into the record the following sentence in Acting District Ranger Bob Rossman's email that summarizes the June 12, 1995 meeting to discuss the permit: "'JEFF, HAVING AN INTEREST IN THE SAFETY OF HIS GUESTS, WILL <u>MAINTAIN THE ROAD AS HE SEES FIT</u> WHILE WE COMMUNICATE AND MONITOR PROBLEM AREAS INFORMALLY WITHOUT AN AGREEMENT.'" Tr. 147:5-8 (emphasis added). Mr. Mummery testified regarding this sentence, "That's called for in my permit. I don't know the exact clause, but there's a clause in my permit where I'm responsible for certain hazardous conditions. You know, a tree. Let's say there's a road approaching my lodge, and it's got a tree that's about to fall over, but it hasn't quite fallen over, but it could strand somebody up there or fall on their vehicles or whatever. I have an obligation in my permit to inform the Forest Service and then do what I can do to assist them in correcting the problem." Tr. 147:9-19.

**Response**: The Sweetwater does not dispute that government counsel asked Mr. Mummery to read the email from Mr. Rossman and that Mr. Mummery testified above as to his obligation to notify the Forest Service of hazardous conditions on the Forest related to his operations. The Sweetwater further notes that the Forest Service contract administrator, Brent Larson, specifically stated that Mr. Mummery was not obligated to address conditions outside his permit area, which would include the bridges. Mr. Larson testified as follows:

Q Looking at paragraph 30, doesn't that place, especially in the second sentence there, "An affirmative obligation on Mr. Mummery and the Sweetwater to inspect the site [lot] and right of way to his lodge for hazards," is that correct?

A Mm-hmm.

Q So he had an obligation that if he thought those bridges were dangerous, he had an obligation not to bring people over there, correct?

A I think you're misrepresenting paragraph 30.

Q Okay.

A That's physical hazards that are on site that he should remove from the permit area.

Q So you're telling me that clause 30 only really applies to physical hazards that are in the area?

A That's what it says.

Tr. 1363:9-25; *see* JX 1 at p. 9.

72. The risk that erosion from Sweetwater Creek presented to the abutments to the Sweetwater bridges was contemplated and discussed by The Sweetwater and the Forest Service at the June 12, 1999 meeting before the permit issued. Tr. 524:1-7.

**Response**: The Sweetwater does not dispute that the parties discussed the potential loss of bridge access at the June 12th meeting, but notes that the Forest Service specifically agreed that, if access were lost, it would seek funds to restore that access. PPFF ¶¶ 63-69.

73. Jeff Mummery, the owner of The Sweetwater, testified at trial that when he discussed the bridges with Forest Service representatives in June 1995 before the permit issued, "I was concerned about a big flood, a washout, a gullywasher, whatever you want to call it, that wiped out the bridges." Tr. 129:13-15.

**Response**: The Sweetwater does not dispute that Mr. Mummery testified as noted, and points out that Mr. Mummery specifically placed the risk of such an event on the Forest Service by ensuring that the Forest Service would seek funds to restore bridge access in such an event. The full context of Mr. Mummery's testimony is set forth below.

> Q Now, at this June 1995 meeting did the Forest Service express or make any statements or representations about their level of commitment to that road?
>
> A Well, the overall level of commitment was one of we can't promise you anything if there's a catastrophic failure. By the same token, it's very important to us. We'll make our best effort. We'll seriously go after solving your problem.
>
> We talked about the bridges in various stages at the meeting because we talked about a lot of other stuff, forest usage. It was a long meeting and we jumped from subject to subject, but the end result of the bridge issue in my mind was this. I wasn't so concerned about the maintenance, the daily or summer maintenance or whatever you call it. I was concerned about a big flood, a washout, a gullywasher, whatever you want to call it, that wiped out the bridges.
>
> I was concerned. Where would I be if that happened? What we decided, and I believe we decided very clearly, was that first of all if that happened the Forest Service had an interest in maintaining that road for public access as well as my lodge and for their own administrative purposes.

Tr, 128:23-129:21.

74. Acting Wapiti District Ranger Bob Rossman testified that he told Mr. Mummery during the June 1995 meeting that the bridges were "vulnerable" to such a washout. Tr. 920:12.

**Response:** The Sweetwater does not dispute that Mr. Rossman testified as noted above, but would point out that Mr. Rossman also testified that in such an event the Forest Service would seek funds to restore the bridge access. At the meeting, the Forest Service representatives stated to the representatives of The Sweetwater that "it [is] our intent to keep the [Sweetwater] road open to the best of our ability." Tr. 129:2-6; Tr. 129:17-130:24; Tr. 135:2-8; *see* Tr. 135:2-15. They further stated that it was the agency's intent to support, to the degree that it could, access to the lodge facility. Tr. 825:5-8. As Mr. Rossman testified, because the Shoshone Forest Plan allocates the area around the lodge as being for the purpose of a lodge facility, the Forest Service agreed that it had a commitment to provide for the operation of the lodge to the extent it could. Tr. 824:14-25; Tr. 925:2-12; Tr. 1750:2-7. This commitment included the Forest Service keeping the road open to the best of its ability, as well as the Forest Service supporting vehicular access to the lodge facility. Tr. 132:14-133:8; Tr. 825:1-8; Tr. 926:24-927:3. Mr. Rossman summarized his comments at the 1995 meeting as being based on the fact that "[t]he Forest Plan of the Shoshone National Forest allocates that area up there to a public lodge facility; therefore, there is a commitment on the part of the Forest to provide for that use to the extent it can. All Forest Plan implementation is subject to dollars available, but I think it's probably – no, it's not probably, it's standard practice and intent when one has allocated a use on the Forest *to do your best* to implement that." Tr. 131:7-132:13; Tr. 925:2-926:23. Finally, Mr. Rossman stated that, if bridge access were subsequently lost, the Forest Service "**certainly wouldn't have [] pulled" its request for funds to repair or replace the bridges at that point**. Tr. 937:4-5 (emphasis added).[1] But, in fact, it did. PPFF 151, 154, 192.

[1] The current Forest Supervisor, Ms. Aus, stated that The Sweetwater was entitled to rely

75. Mr. Rossman had observed that the bridges were in poor repair, and that the abutments appeared highly eroded and "vulnerable to high water at any time." Tr. 950:2-14.

**Response**: The Sweetwater does not dispute that Mr. Rossman testified as noted above, but points out that Mr. Rossman also stated that the Forest Service would seek funds in the event bridge access were lost, as noted in The Sweetwater's response above.

76. In paragraph 13 of his declaration in support of The Sweetwater's February 6, 2004 cross-motion for summary judgment, Mr. Mummery swore that "[n]o warning signs of any type were ever placed at the bridges from 1995 to the present."

**Response**: The Sweetwater does not dispute the allegation above, and notes that even the government considers the 3 ton weight limit signs to be indicative of safe conditions. Brief at 36 ("[t]he signs accurately represented that the bridges were deemed safe for use by cars and light trucks").

77. At trial, Mr. Mummery testified that he recalled seeing the "Weight Limit 3 Tons" warning signs on May 21, 1995 when he visited the lodge, and concluded that the bridges were safe if used by vehicles weighing less than 3 tons. Tr. 77:8-10, 78:14-16.

---

upon the representations made by the Forest Service line officer at the meeting. Tr. 1744:23-1745:4; Tr. 1747:9-1748:15.

**Response**: The Sweetwater disputes the allegation above to the extent it characterizes the weight limit signs as "warning signs," and notes that the Forest Service also deemed that these signs represent to third parties that the bridges were determined safe for use by lodge visitors. Defendant's Post-Trial Brief at 36 ("[t]he signs accurately [sic] represented that the bridges were deemed safe for use by cars and light trucks").[2]

78. At the June 12, 1995 meeting, plaintiff declined to enter into a memorandum of understanding ("MOU") that was incorporated into the permit and addressed financial responsibilities for the road and bridges, as had the Brannons. Tr. 534:21-535:15; JX 4.

**Response**: The Sweetwater does not dispute the above allegation, and notes that the Forest Supervisor believed that, if The Sweetwater had signed the MOU, it would have then given the Forest Service an "escape clause" to avoid any obligations. PX 36; Tr. 1735:4-1737:7.

79. Mr. Mummery explained further, "So it was liability, and it – it was my primary concern, period. From day one, from the moment that I looked at it, the moment that I saw the memorandum of understanding, it all had to do with: Would I be liable?" DPFUF ¶ 47.

---

[2] The government's continued insistence that the bridges were in fact safe is directly rebutted by the admission by Forest Service employees that those bridges should never have been left open for public use given that they had no load rating. PPFF ¶¶ 172-174.

**Response**: The Sweetwater does not dispute the above allegation.

80. The Sweetwater did not enter into any written agreement that explicitly required the Forest Service to replace the bridges if they became unsafe or impassable. Tr. 535:9-15.

**Response**: The Sweetwater does not dispute the above allegation, and notes that the Forest Service employees informed The Sweetwater that the Anti-Deficiency Act prevented any such commitment. PPFF ¶ 58.

81. Mr. Mummery testified in his deposition that "I do not believe either Mr. Simpson or myself specifically stated to the Forest Service the request to put in writing that if the bridges had a catastrophic failure, they would replace them." DPFUF ¶ 49.

**Response**: The Sweetwater does not dispute the above allegation.

82. Mr. Simpson has sought written permission from the Forest Service on behalf of other clients to ensure access across Forest Service land. Tr. 1125:25-1127:25.

**Response:** The Sweetwater does not dispute the allegation above, but points out that the situations Mr. Simpson was discussing involved private inholdings, and did not involve contracts entered into with the Forest Service to provide public recreational services on Forest Service land. Tr. 1128:18-1129:10; 1146:5-1147:9.

83. Mr. Rossman testified that during the June 12, 1995 meeting, “I know that we conveyed the information that if the bridges failed, that they would not be replaced. I’m not using the word ‘never,’ but for the foreseeable future, there’s no way that we would be funding that.” Tr. 956:15-19.

**Response**: The Sweetwater does not dispute that Mr. Rossman made the assertion noted above, but notes that, to the extent the government is asserting that the Forest Service would not seek emergency funding if bridge access was lost, it is wrong- the Forest Service agreed to pursue emergency funding if the bridge access was lost. Tr. 190:2-11; Tr. 187:18-188:8; JX 12.

84. Mr. Bree testified about the June 12, 1995 meeting that "we talked to Mr. Mummery about replacing of the bridges, but at that particular time, we did not have the funding to replace those bridges, and we also did not anticipate funding coming down from the Regional Office to replace those bridges.. And we advised him that . . . . we would put in for the capital improvement money if the opportunity arose, but we – we weren’t going to guarantee that we were going to replace those bridges.” Tr. 770:17-771:3.

**Response**: The Sweetwater does not dispute the above allegation.

85. Mr. Barker testified that during the June 12, 1995 meeting "that was the whole idea. Does Jeff want to go ahead and obtain this permit with the understanding that we can’t make

commitments on the road. All we can do is put in for CIP and do the best of our ability to try to get funding to do that, which would take CIP money because it was well outside our financial. I can't make and the ranger can't make <u>financial obligations</u> of that magnitude." Tr. 837:13-21 (emphasis added).

**Response**: The Sweetwater does not dispute the above allegation.

86. Mr. Barker testified further that during the June 12, 1995 meeting, Forest Service representatives "made very clear that with the magnitude of financial investment for this road, that really, access is the lodge, and it has very little other opportunities. There's not a lot of camping areas out there that – that – you know, we – we weren't we couldn't give him much hope that that kind of funding would come to fruition here when it compared against other accesses and bridges on the – on the – in the region because that's a regional pot of money." Tr. 838:1-10.

**Response**: The Sweetwater does not dispute the above allegation, but notes that these comments were in regard to current level of efforts to obtain funds at the existing time in 1995, when the bridge access was open and <u>before</u> bridge access was lost, and did not address Forest Service efforts in the event such access was lost.

87. Mr. Barker testified that "I think it was Mr. Mummery's understanding that, yeah, we – you can't do anything right now, and I'll do the best I can with the understanding that you folks

are going to put in for a CIP proposal. And I know fully well that it's probably low on the totem, but you know, it's a shot." Tr. 894:9-14.

**Response**: The Sweetwater does not dispute the above allegation, but notes that these comments were in regard to efforts to obtain funds before bridge access was lost, and did not address Forest Service efforts in the event such access was lost. Additionally, it further confirms that the Forest Service had committed to seek funds for the Sweetwater bridges.

88. At the time of the June 12, 1995 meeting, Mr. Mummery understood from what the Forest Service representatives said that they could not commit the Forest Service to replacing the Sweetwater bridges if they failed: "there were no guarantees. The personnel at that meeting could not promise that they would jump up with a bunch of money and fix my bridge." Tr. 129:22-25.

**Response**: The Sweetwater does not dispute the above allegation, but notes that these comments were in regard to efforts to obtain funds before bridge access was lost, and did not address Forest Service efforts in the event such access was lost.

89. He testified further, "I was told by the Forest Service that they had to go through an application process to obtain money to repair the bridges. And I understood that. I understood that the personnel there could not guarantee what the outcome of that would be." Tr. 537:14-18.

**Response**: The Sweetwater does not dispute the above allegation, but notes that these comments were in regard to the outcome of efforts to seek funds, and those efforts (which the Forest Service committed to) did result in funds being obtained subsequently. But those funds were then rejected so the Forest Service could pursue a conservation buyer. PPFF ¶¶ 146-153.

90. Mr. Mummery understood that the Forest Service representatives at the June 12, 1995 meeting, including Mr. Rossman, whom the permit identifies as the "Issuing Officer," lacked the authority to bind the Forest Service to repairing or replacing the bridges, and agreed with the accuracy of the following testimony in during his deposition: “Difficulty was clearly the people I was in the room with were not the ones that would approve the funding, whatever amount it may be, so the difficulty was that I would have to go to – the way I looked at it, is I had to lobby for my case; that I would have to get these people, who seemed to agree that they would put the proposal forward, and then I would hopefully have to go to the next level to make the decision.” Tr. 542:14-23.

**Response**: The Sweetwater does not dispute the above allegation, but notes that the funding that was subsequently sought *was in fact approved* by all the employees at the “next level” (PPFF 149) and then was rejected by Forest Service employees in the *same positions* as those who had assured The Sweetwater that they would seek those funds for repairing the bridges. PPFF ¶ 151.

91. Mr. Mummery also testified that he understood and was told clearly that once the decision was moved up the chain of command, that a decision could be made not to replace the

bridges. Tr. 541:6-12, 580:21-581:2. Although he testified that he believed that if a higher-level Forest Service official decided not to replace the bridges, The Sweetwater would be compensated pursuant to clause 15 of the permit (Tr. 541:12-20), he acknowledged that the persons at the meeting "could not make the approval for the money" (Tr. 543:1-2).

**Response**: The Sweetwater does not dispute the above allegation, but notes that the funding that was subsequently sought *was in fact approved* by all the employees at the "next level" (PPFF 149) and then was rejected by Forest Service employees in the *same positions* as those who had assured The Sweetwater that they would seek those funds for repairing the bridges. PPFF 151.

92. During his testimony, Bill Simpson agreed that at June 1995 meeting, Forest Service employee Monte Barker, with the concurrence of Acting District Ranger Bob Rossman, did not make any unconditional commitment that the Forest Service would rebuild the bridges, but merely said that they would do what they were personally able to do: "we will do everything within our power to try to get funding to get money and if we have it, we'll advise you. If we don't, we'll advise you of that. If we get the money, we'll help you." Tr. 1135:23-1136:7 (emphasis added).

**Response**: The Sweetwater does not dispute the above allegation, but notes that the Forest Service did get the money (PPFF 149), but did not help The Sweetwater. PPFF ¶¶ 152-154.

93. Mr. Rossman testified that at the June 12, 1995 meeting: "I believe that we made it clear that if the bridges went, they were gone. And if he wanted to access his lodge that – using vehicles, then he would need to have fords in order to do that." Tr. 934:17-20.

**Response**: The Sweetwater does not dispute that Mr. Rossman testified as noted above. As the evidence demonstrates, at the June 12th meeting the parties discussed that, in the event the bridges were to become impassable in the future, the Forest Service would construct fords to provide temporary access until funds could be obtained to repair the bridges or the loss of access could otherwise be addressed. Tr. 145:16-25; Tr. 772:3-773:6; Tr. 932:10-933:12; Tr. 935:17-937:6 (testimony of Robert Rossman that providing fords in the event the bridge access was lost would not impact the Forest Service's effort in seeking funds to replace the bridges); *see* JX 12 (letter written to The Sweetwater by Mr. Larson in 1997 describing agreed-upon use of fords as "temporary"); Tr. 2074:11-2076:20. This access was sought so that The Sweetwater would be able to maintain the lodge until bridge access could be restored. Mummery Dec. ¶ 17 (App. 217). Mr. Barker, who attended the June 1995 meeting, was asked about the issue of the fords and stated as follows:

> [I]n knowing the area, there is little doubt in my opinion that [the use of fords] was temporary only because it wouldn't be feasible to have invitees thinking that they're going to come up this road [without bridge access]. And—and when we—when we have a special use permit, I think we have a higher obligation because we're inviting people to go up there. And I don't see any way possible that you could operate this [lodge] on a sustained basis with fords because of the high water situation.

Tr. 818:1-819:22; *see* Tr. 1232:17-1233:13; Tr. 1233:23-1234:22. Mr. Barker further stated that

"our [the Forest Service's] number one charge is public safety over all other things and that would not be- I don't feel that [it] would be appropriate to access a public service lodge with a ford that crosses a major bridge." Tr. 819:25-820:3. The Sweetwater had previously informed the Forest Service that use of fords would not permit viable lodge operations due to the high water conditions that frequently occurred on Sweetwater Creek, and The Sweetwater continued to inform it of that fact after obtaining the permit. Tr. 138:7-139:9; Tr. 140:5-142:8; Tr. 821:23-822:11. As Mr. Barker stated, the fact that fords could not provide permanent access was so obvious, it was beyond having to be stated. Tr. 822:24-823:3. Mr. Barker further agreed with Mr. William Simpson's characterization of the meeting in a letter dated May 2, 2001 (JX 17). Tr. 843:17-844:20. In that letter, Mr. Simpson stated:

> My recollection of the statements of Jeff Mummery at that meeting is that while Mr. Mummery was agreeable with the contingency of building and using fords through streams in the event any of the bridges failed along the Sweetwater Creek Road, the use of any such ford would be only temporary while bridges were being replaced or reconstructed. Mr. Mummery did not state that a ford would be a permanent substitute for any bridge which may need repairs and replacement.

JX 17.

94. Mr. Bree testified that "I specifically remember telling him that we would not issue a permit if – if we then decided that he couldn't operate it because of the roads and bridges. . . . if it was a worst case scenario, the Forest Service would put in fords so he could operate his – his – his business." Tr. 771:17-20, 772:13-15.

**Response**: The Sweetwater objects to the government's improper editing of Mr. Bree's

testimony above, and notes that the full context of Mr. Bree's comments, set out below, demonstrates that the Forest Service had committed itself to assist in restoring access over the bridges if it was lost, and that Mr. Barker and Mr. Rossman were handling the discussion of fords and at the time Mr. Bree did not even know what a ford was.

Q Was it the Forest's position at that meeting that it would not let Mr. Mummery stay with his lodge because of inaccessible bridges?

A Well, again, the whole purpose of the meeting was to come to some resolution on how we would allow Mr. Mummery, if he purchased that, to operate. I specifically remember telling him that we would not issue a permit if -- if we then decided that he couldn't operate it because of the roads and the bridges. And the worse case scenario would be we would put fords in. That was Monte and, I believe, Bob Rossman took the lead on that conversation. Because, as I stated earlier in my -- in my deposition, I didn't at that time know what a ford was and --

Q You didn't drive one?

A I drove a Dodge.

Q I'm sorry, the Judge wanted me to get that joke on the record. Let's turn to that issue of the fords, Mr. Bree. As you mentioned, when the issue came up, you didn't even know what a ford meant at that point in time. Did you subsequently then come to the conclusion, though, that -- well, what was your conclusion as to whether or not the discussion about fords was to use fords on a permanent basis or on some kind of temporary basis to operate the lodge?

A My -- my opinion of the conversation was we were going -- if it was a worse case scenario, the Forest Service would put fords in so he could operate his -- his -- his business. **I don't specifically remember anybody using the word "permanent"**, but I know later on, I talked to Mr. Rossman about it and asked him how they -- what kind of fords they were talking about after we had some discussion about it. Because Mr. Rossman was a hydrologist and still is. So he was explaining to me the different processes of putting a ford in. It could be gravel. It can be wire mesh and gravel, or it could be concrete, and so there was several options of putting a ford in.

The discussion in that -- with the fords was Mr. Mummery brought up was by putting fords in and removing the bridges, that would cut his business time down because of the high water. So --

Q I think you mentioned that Mr. Barker and Mr. Rossman took the lead on this particular issue?

A Yes.

Tr. 771:11-773:6 (emphasis added). Mr. Bree also testified that the "we emphasized that don't count on the bridges being replaced in the near future, that we would *try* and that was the key word is we would try to get funding for the bridges, but we weren't going to guarantee it." Tr. 771:7-10, Tr. 783:17-23. Mr. Bree further testified that "we came to an unwritten agreement that everybody would try to do what they could do to allow Mr. Mummery to operate." Tr. 785:1-3. Tr. 773:7-12. Mr. Bree again testified that the Forest Service gave The Sweetwater assurances in the June 12, 1995 meeting that The Sweetwater would have access to operate its lodge. Tr. 771:7-10; Tr. 773:7-12.

95. Mr. Mummery understood from his discussion with Forest Service representatives at the June 12, 1995 meeting that if the bridges became impassable, he would have to use fords to operate the lodge, though he did not regard this as a permanent solution because it would reduce the lodge's season: "<u>as a compromise</u> they would at least be able to put in temporary f[]ords so that that portion of the season which maybe less than 50 percent of what you'd consider the normal summer season comes after high water so that I would – you know, it was clear that we were talking about if you had to deal with f[]ords it had to be a temporary issue because you really just automatically <u>cut the business in half</u>." Tr. 130:8-16 (emphasis added); Tr. 772:25-773:3.

**Response**: The Sweetwater does not dispute that Mr. Mummery testified as quoted above, but notes that his testimony represents that the discussion related to the use of fords to temporarily access the lodge because of the significant impact it would have on his ability to operate. The Sweetwater further notes that the Forest Service employees agreed that operating using fords was dangerous and inappropriate. PPFF ¶ 64. Even the Forest Service's own expert stated: "Fords do not work." PX 66.

96. Mr. Mummery reviewed the sentence in Mr. Rossman's email about the June 12, 1995 meeting that states "JEFF DOESN'T HAVE A PROBLEM WITH GOING TO FORDS AS A CONTINGENCY FOR BRIDGE FAILURE OR UNSAFE BRIDGE CONDITION," and commented: "That's true. I did not have problem with the f[]ord, but the key word that I was concerned about here is temporary. To my mind, that was very important that that be included." Tr. 145:16-25; DX 18.

**Response**: The Sweetwater does not dispute that Mr. Mummery testified as noted above, and notes that Mr. Mummery was not referring to temporary operations, but the temporary status of the fords until bridge access could be restored.

97. Mr. Mummery testified that at the time of the meeting, he understood that if the bridges became impassable, it might take three years or possibly longer to replace them. Tr. 576:22-577:11.

**Response**: The Sweetwater does not dispute that Mr. Mummery testified as noted above, but notes that The Sweetwater's inability to operate from 1997 on was due to the Forest Service's failure to disclose that it had "basically condemned" the bridges as of 1992, thus the Forest Service was at fault for the inability to operate from 1997 and thereafter.

98. Forest Supervisor Rebecca Aus testified that fords are used on other roads in the Shoshone National Forest that are open to the public for recreational uses. Tr. 1786:7-1787:12, 1692:15-1693:6.

**Response**: The Sweetwater does not dispute that Ms. Aus testified that there are fords on the Shoshone National Forest, but points out the Ms. Aus admitted that none of those fords are used by lodges or other established operations in order to access their businesses. Tr. 1694:6-1695:6. The Sweetwater also points out that the government's own expert said "[f]ords do not work." PX 66.

99. Mr. Mummery gave conflicting testimony about his conversations regarding clause 15. At one point, he testified, "I asked them that, I said are you choosing to close my lodge if you don't replace the bridge. <u>No, we aren't</u>." Tr. 543:9-11 (emphasis added). He later testified that he asked whether clause would apply if the Forest Service chose not to replace the bridges, and received an "affirmative" response. Tr. 546:8-12.

**Response**: The Sweetwater objects to the government's characterization of Mr. Mummery's testimony as being conflicting, and asserts that a review of the full context of the limited quotes above demonstrates that Mr. Mummery clearly understood that clause 15 would apply when the government terminated operations by preventing vehicular access over the bridges. Furthermore, Mr. Mummery's comment was a description of the government's response to him that, at that time, they had no intention of closing the lodge or of not seeking funds to restore bridge access, if in fact it was lost. PPFF ¶ 68 (Mr. Rossman stated that the Forest Service "certainly woudn't have [] pulled" its request for funds to repair the bridges); *see* Tr. 536:3-557:7.

100. Mr. Mummery never asked whether Mr. Rossman or the other Forest Service representatives had the authority to make a decision to terminate the permit in the public interest, which would require the expenditure of Government funds to compensate the lodge owner pursuant to clause 15 of the permit. Tr. 547:2-13.

**Response:** The Sweetwater does not deny that Mr. Mummery never asked the explicit question referred to above, but notes that the contract which the Forest Service representatives signed explicitly sets forth the obligation to compensate The Sweetwater.

101. Clause 16 of the Brannons' permit is substantively identical to clause 15 of the permit issued to The Sweetwater, and provides that if the Forest Service "shall determine that the public interest requires termination of this permit" the Government would pay "equitable consideration" for the permittee's improvements, and that if the Forest Service and the permittee were unable to

agree upon the amount of the consideration, "the Forest Service shall determine the amount and if the permittee is dissatisfied with the amount thus determined to be due him he may appeal the determination in accordance with the Appeal Regulation (36 C.F.R. 211.20-211.37) and the amount as determined on appeal shall be final and conclusive." JX 13.

**Response**: The Sweetwater does not dispute that the Brannon's permit contained clause 16, and that such clause is the best evidence of its contents.

102. The lawyer who represented The Sweetwater at the June 12, 1995 meeting, Bill Simpson, has no recollection of any discussion during the meeting about clause 16 of the Brannons' permit. Tr. 1139:12-1140:16.

**Response:** The Sweetwater does not dispute the Mr. Simpson did not recall the conversation which occurred as to clause 16, and notes that the Forest Service employees did recall such a conversation. Tr. 788:6-789:1; 793:25-794:1 (testimony of Mr. Bree explicitly stating that the clause requiring compensation was discussed at the June 12, 1995 meeting); Tr. 836:16-837:1 (Mr. Barker stated that he assumes that it was discussed at the meeting).

103. Acting District Ranger Bob Rossman does not recall any discussion during the June 12, 1995 meeting about whether clause 15 granted the permittee a right to compensation of the bridges weren't replaced or repaired. Tr. 967:7-15. Mr. Rossman believes that he would recall if that subject had been discussed. Tr. 967:16-23.

**Response**: The Sweetwater does not dispute the Mr. Rossman testified that he had no recollection of the conversation which occurred as to clause 15, and notes that other Forest Service employees did recall such a conversation. Tr. 788:6-789:1; 793:25-794:1 (testimony of Mr. Bree explicitly stating that the clause requiring compensation was discussed at the June 12, 1995 meeting); Tr. 836:16-837:1 (Mr. Barker stated that he assumes that it was discussed at the meeting).

104. Mr. Barker testified that "we made very clear that although we understand the situation, we can make no commitments as far as financial or otherwise on this road or what might happen if the permittee couldn't operate." Tr. 828:10-13 (emphasis added).

**Response**: The Sweetwater does not dispute that Mr. Barker testified as noted above.

105. Mr. Barker said that at the meeting, no commitment was made that if the Forest Service was unable to replace the bridges, that The Sweetwater would receive compensation for the lodge. Tr. 896:15-897:22.

**Response**: The Sweetwater does not dispute that Mr. Barker testified as noted above, but points out that the Forest Service employees clearly stated that the Forest Service would seek funds to replace the bridges. PPFF ¶¶ 53-63.

106. Mr. Bree testified that he does not believe that Mr. Mummery said that he interpreted clause 15 to mean that if the Forest Service decided not to replace the bridges, then he expected to be compensated for the lodge. Tr. 789:2-24.

**Response**: The Sweetwater does not dispute that Mr. Bree testified as noted above, if he said what we think he said and not what we do not think he said.

107. Mr. Mummery proposed a term in the 1995 operating plan that provided that the permittee had the right to apply for compensation pursuant to clause 15 if the lodge's operations were suspended to prevent conflicts with grizzly bears. DX 22/8.

**Response**: The Sweetwater does not dispute the allegation set forth above.

108. Mr. Mummery never sought to amend the permit or the 1995 or any subsequent operating plan to incorporate the alleged representation by the Forest Service that it would buy his lodge if the bridges were not replaced, even though he did amend the 1996 operating plan to address other issues regarding access. JX 1, DX 22/3, DX 28/4; Tr. 2114:14-2115:19.

**Response**: The Sweetwater does not dispute the allegation set forth above.

109. At no time before The Sweetwater closed on the purchase of the lodge on June 21, 1995 did Mr. Mummery ask the Forest Service for any written information that they had about the

condition of the Sweetwater bridges or Sweetwater Road. Tr. 519:12-520:10.

**Response**: The Sweetwater does not dispute the allegation set forth above to the extent that Mr. Mummery did not explicitly ask the Forest Service "do you have any documents that pertain to any bridge inspections," but notes that the reason no such question was asked was because the Forest Service, in the June 1995 meeting, specifically intended to provide Mr. Mummery all the relevant information related to the Sweetwater bridges, and did not provide him with any written information they held about the condition of the bridges. Additionally, the Forest Service had placed signs before each of the bridges which the Forest Service admits in its current brief were intended to convince people that they were safe. Brief at 36 ("[t]he signs accurately represented that the bridges were deemed safe for use by cars and light trucks"). Thus, because the Forest Service now admits that its policy in fact required it to close the bridges for safety reasons (PPFF 25), the Forest Service's actions constitute a clear misrepresentation.

110. There was never any time when Mr. Mummery asked the Forest Service for information that they refused to provide to him. DPFUF ¶ 71.

**Response:** The Sweetwater does not dispute the allegation above, but notes that Mr. Mummery clearly did not ask for any information given that the Forest Service had purported to provide him with all relevant information about the bridges at the June 1995 meeting and had placed signs by the bridges to indicate that the Forest Service had evaluated them as safe.

111. The Wasatch-Cache inspectors' August 1992 reports on the Sweetwater bridges were included in the Shoshone's files, which were available for inspection by The Sweetwater, just as information was made available to the Sutherlands in 1997. Tr. 2124:5-10.

**Response:** The Sweetwater does not dispute the allegation set forth above, but notes that the Forest Service misled The Sweetwater into reasonably believing the Forest Service possessed no such documents in its office files. As Mr. Rossman clearly testified, if he had known of the 1992 inspection reports, he would have provided them to The Sweetwater. Tr. 922:25-923:8; *see* Tr. 923:9-924:11. While Mr. Rossman was aware that the Forest Service inspected bridges, he, like The Sweetwater, was not aware that it prepared bridge inspection reports. Tr. 918:12-23. Accordingly, Mr. Rossman did not indicate to The Sweetwater at the June 12th meeting that the Forest Service possessed bridge inspection reports. Tr. 918:24-919:2. In contrast, the Forest Service did not mislead the Sutherlands into believing no such files existed. Furthermore, the Forest Service admitted that the documents it provided to the Sutherlands were not in its files as of 1995, but in fact were documents which Mr. Fischer augmented with additional, explicit statements as to the significance of the 1992 bridge inspections. PPFF ¶¶ 107-109.

112. Mr. Mummery elected not to consult an engineer about the bridges before Western Wyoming Properties purchased the lodge. Tr. 496:13-15.

**Response:** The Sweetwater disputes the allegation above to the extent it refers to an “election” given that Mr. Mummery was deliberately led by the Forest Service to believe that the bridges

were safe.

113. The Sweetwater closed its purchase of the lodge from the Brannons on June 21, 1995. DPFUF ¶ 72.

**Response**: The Sweetwater does not dispute the allegation set forth above.

114. On August 21, 1995, the Forest Service issued a term special use permit for The Sweetwater to operate a public resort on 15.4 acres at the end of Sweetwater Road. JX 1.

**Response**: The Sweetwater does not dispute the allegation set forth above.

115. The front page of the permit states that it was "issued for the purpose of [m]aintaining and operating a public resort." JX 1/1. The permit states further, "This use shall be actually exercised at least 93 days each year, unless otherwise authorized in writing." Id.

**Response**: The Sweetwater does not dispute the allegation set forth above.

116. The front page of the permit states that "[t]his permit is accepted subject to the conditions set forth herein, and to conditions 3 to 55 attached hereto, and made a part of this permit." JX 1/1.

**Response**: The Sweetwater does not dispute the allegation set forth above.

117. Neither the permit nor the 1995 or 1996 annual operating plans, which were incorporated into the permit, contained any references to replacing the Sweetwater bridges or to maintenance or repair of Sweetwater Road. JX 1, DX 22, DX 28.

**Response**: The Sweetwater does not dispute the allegation set forth above.

118. Clause 8 of the permit requires the permittee to "exercise diligence in protecting from damage the land and property of the United States covered by and used in connection with this permit." JX 1/2.

**Response**: The Sweetwater does not dispute the allegation set forth above.

119. Clause 15 of the permit sets forth a process pursuant to which "equitable consideration" is paid to the permittee only if the Forest Service "determine[s] that the public interest requires termination of this permit." JX 1/3.

**Response**: The Sweetwater disputes the allegation set forth above because the word “only” is not present in clause 15, and further notes that the Forest Service action of choosing not to follow its contractual obligation to allow performance of the contract is tantamount to deciding to terminate lodge operations.

120. Clause 15 provides further that if the Forest Service and the permittee are unable to agree upon the amount of equitable consideration, "the Forest Service shall determine the amount and if the permittee is dissatisfied with the amount thus determined to be due him he may appeal the determination in accordance with the Appeal Regulation (36 C.F.R. 251 Subpart C) and the amount as determined on appeal shall be final and conclusive on the parties hereto." JX 1/3.

**Response**: The Sweetwater does not dispute the allegation set forth above.

121. Clause 15 makes no reference to paying The Sweetwater equitable consideration if the Forest Service did not repair or replace the Sweetwater bridges. JX 1/3.

**Response**: The Sweetwater does not dispute the allegation set forth above.

122. Clause 30, titled "Risks and Hazards," states that "[a]valanches, rising waters, high winds, falling limbs or trees, and other hazards are natural phenomena in the Forest that present risks which the holder assumes. The holder has responsibility of [sic] inspecting the site, lot, right-of-way, and immediate adjoining area for dangerous trees, hanging limbs, and other evidence of hazardous conditions and, after securing permission from the Forest Service, of removing such hazards." JX 1/9.

**Response**: The Sweetwater does not dispute the allegation set forth above, but notes that while the government now alleges that clause 30 of the TSUP placed the risk on The Sweetwater that

the Sweetwater bridges could be washed out (G. Brief at 10-11), the Forest Service's contract administrator, Mr. Larson, clearly rejected that very same interpretation at the trial. Mr. Larson testified as follows:

> Q Looking at paragraph 30, doesn't that place, especially in the second sentence there, "An affirmative obligation on Mr. Mummery and the Sweetwater to inspect the site [lot] and right of way to his lodge for hazards," is that correct?
>
> A Mm-hmm.
>
> Q So he had an obligation that if he thought those bridges were dangerous, he had an obligation not to bring people over there, correct?
>
> A I think you're misrepresenting paragraph 30.
>
> Q Okay.
>
> A That's physical hazards that are on site that he should remove from the permit area.
>
> Q So you're telling me that clause 30 only really applies to physical hazards that are in the permit area?
>
> A That's what it says.

Tr. 1363:9-25; *see* JX 1 at p. 9.

123. Plaintiff chose not to operate the lodge during 1995. Tr. 157:16-20. After closing its purchase of the lodge on June 21, 1995, plaintiff spent the remainder of the operating season cleaning up the lodge site. Tr. 157:16-159:7.

**Response**: The Sweetwater does not dispute the allegation set forth above.

124. In November or December 1995, Mr. Mummery showed the lodge to Daren Singer and Bram Lassiter as “part of [his] efforts to sell the lodge,” and quoted them the price of $650,000. Tr. 605:23-606:6, 612:1-615:22; DX 27, ¶ 4.

**Response**: The Sweetwater disputes the allegation set forth above, and notes that Mr. Singer and Lassiter approached Mr. Mummery about whether he was willing to sell water from Sweetwater spring, and when he said he was not interested, they then asked if they could buy the lodge. Tr. 443: 22-444:8; 606:11-608:19.

125. In 1995 and 1996, Mr. Mummery listed the lodge for sale with a realtor, Jim Sommers, who Mr. Mummery allowed to prepare a brochure to promote the lodge. Tr. 608:20-609:3; DX 34.

**Response**: The Sweetwater does not dispute the allegation set forth above, and sets forth below the relevant testimony.

> Q But you testified in your deposition that you began to make efforts to sell the lodge in 1995; isn't that correct?
>
> A I made efforts to sell the lodge to the degree that somebody who asked me to buy it. You know, I had a lot of people -- as soon as I bought that lodge for some reason all the sudden everybody wanted to see the lodge. Jim Sommers called me up and asked me if he could make a brochure out of my lodge, which he did. Buck Wilkerson must have asked me on umpteen occasions if he could list my lodge for sale.
> I had people -- that lodge was very sweet place that people were always asking me about buying it.

Tr. 608:7-19.

126. In February 1996, Mr. Mummery signed a sales contract to sell all the stock of The Sweetwater to Mr. Carl Bixby for $600,000. JX 8. However, Mr. Mummery never informed the Forest Service that he had signed the sales contract, even though clause 51 of the permit requires that the permittee "shall immediately notify the Forest Supervisor when a sale and transfer in ownership of the permitted improvements is planned." JX 1.

**Response**: The Sweetwater does not dispute the allegation set forth above, and notes that a stock sale does not involve a transfer in ownership when the owner of the lodge (The Sweetwater, A Wilderness Lodge LLC) stays the same. The Forest Service included a separate clause, clause 54, which specifically applied to stock sales and required notice only after the stock sale is completed. JX 1.

127. Mr. Mummery operated the lodge "exclusively for the purposes" of Mr. Bixby and his family and friends during 1996 in return for payments totaling $71,500. Tr. 625:22-626:5; 164:1-7.

**Response**: The Sweetwater disputes the allegation set forth above and notes that Mr. Mummery testified that Mr. Bixby had exclusive marketing control over the lodge pursuant to the business plan he had with Mr. Bixby. As Mr. Mummery testified, The Sweetwater entered into an arrangement with Carl Bixby by which Mr. Bixby would be responsible for the costs associated with operating the lodge, seek guests for the lodge in the computer industry and The Sweetwater

would operate the lodge. Tr. 159:18-163:10.

128. No one else besides Mr. Bixby and his family and friends used the lodge during the 1996 season. Tr. 166:25-167:1.

**Response**: The Sweetwater does not dispute the allegation set forth above.

129. Mr. Mummery testified that he did not market the lodge because Mr. Bixby was supposed to obtain customers for the lodge, even though The Sweetwater was still the permittee, and "we were getting paid whether we marketed or not." Tr. 627:20-628:5.

**Response**: The Sweetwater does not dispute the allegation set forth above, but notes that many tourist industries use other entities to locate and obtain customers. Tr. 728:23-729:5.

130. Section 2343.3 of the Forest Service Manual requires a permittee to operate a lodge "in a manner that ensures the general public has full access to the facilities," and denies "exclusive or preferential use by holders, their employees, families, friends, business associates, partners, stockholders, lenders, or others who may have a monetary interest in the facilities." DX 12/10-11.

**Response**: The Sweetwater does not dispute the allegations above, but notes that the Forest Service Manual was not incorporated into the TSUP, nor is it binding in any way as law or

otherwise applicable to the TSUP. JX 1; *Western Radio Services Co., Inc. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996). The Sweetwater would also point out that the terms of the Forest Service Manual were never disclosed to The Sweetwater, <u>nor does the Forest Service consider the Forest Service Manual to be part of the TSUP</u>. Tr. 2059:22-2060:13.

131. Mr. Bixby was unable to close the purchase of the lodge, and the owners of The Sweetwater kept 10% of the purchase price – $60,000 – pursuant to the terms of the sales contract. JX 8/2, ¶ 1(a).

**Response**: The Sweetwater disputes the allegation set forth above because Mr. Bixby was purchasing the stock in the company which owned the Sweetwater Lodge. The Sweetwater does not dispute that Mr. Bixby did not close on his stock purchase and the owners of stock in The Sweetwater retained funds per the terms of the stock sale agreement.

132. Mr. Mummery admitted that after the Bixby sale collapsed, he never sought, let alone secured, the $200,000 in financing that is the basis for the business plan that he did not prepare until 2005 for purposes of this lawsuit. Tr. 639:7-640:13.

**Response**: The Sweetwater does not dispute the allegation set forth above, but notes that within four months he was approached by another entity (the Sutherlands) to sell the lodge (PPFF ¶ 106), thus it would not have made sense to expend resources on financing.

133. In February 1999, Mr. Mummery did obtain a $110,000 loan for the lodge, but used the bulk of the money – $90,000 – to pay off his note to the Brannons, and did not spend the remainder on the lodge until over a year later, during the summer of 2000. Tr. 220:18-221:8.

**Response**: The Sweetwater does not dispute the allegation set forth above.

134. Mr. Mummery has never replaced roofs on two of the five guest cabins, even though these were noted as deficiencies in the 1995 and 1996 operating plans that he reviewed and approved. Tr. 598:4-601:9; DX 22/9, DX 28/10.

**Response**: The Sweetwater does not dispute the allegation set forth above, but notes that the "deficiencies" were noted by Ms. Watson and Mr. Bree, who had no experience at all in assessing building conditions. Tr. 2141:15-3143:14.

135. Mr. Mummery did not remodel the interiors of any of the cabins during the 1996 season. Tr. 718:25-719:8.

**Response**: The Sweetwater does not dispute the allegation set forth above.

136. Jim Sommers ran advertisements for The Sweetwater's lodge in the newspaper, and in early 1997 introduced Mr. Mummery to Ray and Judi Sutherland as prospective buyers of the lodge. Tr. 629:18-630:2; DX 33.

**Response**: The Sweetwater does not dispute the allegation set forth above.

137. Mr. Mummery testified that “any inquiries to have the lodge sold or not sold were all unsolicited by me.” Tr. 175:22-24.

**Response**: The Sweetwater does not dispute the allegation set forth above.

138. In February 1997, a prospective sale of the lodge to Ray and Judi Sutherland for $595,000 fell through after the Forest Service faxed copies of the 1992 bridge inspections to the Sutherlands with a note dated February 14, 1997 from Forest Engineer Jim Fischer stating that the bridges had been "basically condemned in '92." Tr. 178:9-180:15; JX 7.

**Response**: The Sweetwater does not dispute the allegation set forth above.

139. The Forest Service sent the Sutherlands a letter the next day, on February 20, 1997, explaining that the bridges had not been condemned, and that the 1992 bridge inspections were given a rating code of 2, which indicated "a deficiency that may be dealt with through load limit restrictions." Tr. 2066:2-13; JX 11. The letter also stated:

> While the Shoshone Forest clearly desires to maintain access in the Sweetwater Drainage, that access would more likely become seasonal fords of the Sweetwater River should the condition of the bridges deteriorate to the point where they can no longer be used. As explained in previous discussion, this is because funding for replacement of these bridges is not currently available, and the liklihood [sic]

> of obtaining adequate funding to replace these bridges in the future is low.
>
> When Jeff Mummery purchased this lodge several years ago, the condition of the bridges was an issue at that time. He agreed that fords would be an acceptable alternative for access to the lodge should the bridges either fail or become unsafe. Whether this method of access will be adequate for you and your proposed business at the Sweetwater Lodge must figure into your business plans.

Id. Mr. Mummery received a copy of the February 20, 1997 letter. Tr. 181:11-19.

**Response**: The Sweetwater does not dispute that the above-referenced letter was sent and that it contained the assertions noted. However, The Sweetwater disagrees with those assertions. PPFF ¶ 111-113.

140. At Mr. Mummery's request, on February 27, 1997, the Forest Service sent a second letter about the Sweetwater bridges, this one addressed to Mr. Mummery, for which he proposed language to District Ranger Brent Larson. Tr. 1019:12-16, 186:19-24; JX 12.

**Response**: The Sweetwater disputes the allegation set forth above because Mr. Larson drafted the letter. As Mr. Larson testified, Mr. Mummery did not dictate the Forest Service's position in any matters nor would he sign anything that he did not feel was accurate and correct. Tr. 1019:22-1020:2.

141. Mr. Larson believed that it was accurate to state in the letter that the Sweetwater bridges were included in the CIP program for 1999, because that did not necessarily mean that they would be funded. Tr. 1355:22-1356:1.

**Response**: The Sweetwater agrees that Mr. Larson testified as noted above, and notes that Mr. Larson also stated in the letter that the only event which would preclude the funds from being obtained and used for the bridges was Congressional approval, which in fact occurred. JX 12; PPFF ¶ 149. Mr. Larson's testimony above demonstrates the duplicitous game which he apparently was playing.

142. Mr. Mummery testified that after he learned about the 1992 bridge inspections in February 1997, he determined that he could not operate the lodge because of the risk of liability. Tr. 194:13-196:5. Mr. Mummery testified that he told Mr. Larson that either the bridges would have to be fixed, or a professional engineer could certify that the bridges were safe, and when Mr. Larson said that could not be done, Mr. Mummery chose not to operate. Tr. 196:6-14; 1293:6-14.

**Response**: The Sweetwater does not dispute the allegation set forth above except that Mr. Mummery had no choice but to not operate given the Forest Service's conduct and the terms of the TSUP.

143. Mr. Mummery agreed that the 1992 bridge inspection reports did not say that the bridges could not be used for passage of the guests to the lodge. Tr. 649:19-25.

**Response**: The Sweetwater disputes the allegation set forth above, and notes that the 1992 bridge inspection reports, when clarified by Mr. Fischer, explicitly stated more accurately what had occurred in the 1992 inspection, which was that the inspectors concluded the bridges "should be closed." JX 7. As the Court noted at trial, the bridges should have been closed in 1992 because they were subsequently closed in 2001 based on the same facts and conditions that existed in 1992. Tr. 1777:19-1780:5.

144. Brent Larson testified that in 1997 and 1998, Mr. Mummery stated that he could not operate because he could not take advance bookings with confidence that the bridges would be functional when his guests arrived. Tr. 1025:12-1027:20.

**Response**: The Sweetwater does not dispute that Mr. Larson testified as noted above.

145. Forest Engineer Jim Fischer, a professional engineer, inspected the Sweetwater bridges in March 1997, and did not conclude that the bridges should be closed. Tr. 1293:18-19; JX 13/5, JX 14/3.

**Response**: The Sweetwater disputes the allegation above because Mr. Fischer stated that the bridges were in the same condition as in 1992, and that the conclusion in 1992 was that the bridges "should be closed," as he himself noted on the 1992 inspection reports. PPFF ¶ 108. Therefore, Mr. Fischer did conclude the bridges should be closed, he simply chose not to do anything about it.

146. On April 7, 1997, after Mr. Mummery told the Forest Service that he was unable to operate the lodge, he told Forest Service Realty Specialist Jennifer Watson, "admittedly I haven't opened the lodge, which perhaps in retrospect is good" (emphasis added), a revealing comment that Ms. Watson recorded verbatim in her calendar. Tr. 2125:23-2125:22; DX 41.

**Response**: The Sweetwater does not dispute that Ms. Watson noted the comment set forth above in her calendar, but further notes that she did not interpret it as indicating Mr. Mummery had acted in violation of his permit because she said nothing to him about construing his comment as indicating a permit violation. The Sweetwater further points out that this exchange occurred just after Mr. Mummery had decided not to open given that he had just learned about the 1992 bridge inspections which the Forest Service had concealed.

147. Mr. Mummery testified that at no time before the Sweetwater bridges were closed to public vehicular access in April 2001 did anyone from the Forest Service tell him that he was barred from using the bridges to operate the lodge. Tr. 647:15-648:4. He testified, “remember now in the summer of 2000 the bridges are still open for access.” Tr. 657:9-10.

**Response**: The Sweetwater does not dispute the allegation set forth above, and notes that Mr. Mummery was pointing out that he could still maintain the lodge by accessing the lodge over the bridges (no padlocked gates had been put up at that point), thus fords were not necessary to provide this maintenance capability.

148. Forest Service engineer Tom Koenig inspected the Sweetwater bridges in August 2000, and did not conclude that the bridges needed to be closed. DX 46, DX 47.

**Response:** The Sweetwater disagrees with the allegation above, because Mr. Koenig knew in conducting his inspection that the bridges had not been load rated and that they should have been closed as a result, but were not. PPFF ¶¶ 25, 174. Therefore, Mr. Koenig clearly knew that the bridges should be closed, but chose to do nothing about it.

149. Clause 54 of the permit requires the permittee to prepare annually an operating plan. JX 1/14. The Sweetwater did not submit any operating plans from May 1996 until May 2002, even though Forest Service representatives repeatedly asked Mr. Mummery for The Sweetwater to submit a written proposal for how he could operate the lodge. Tr. 636:20-237:23, 2115:14-22, 2118:14-2120:3.

**Response:** The Sweetwater agrees that the permit refers to an annual operating plan, but disagrees with the other allegations above noting that the Forest Service expressly told The Sweetwater that it did not need to submit an operating plan. PPFF ¶ 121. Given the Forest Service's assertion that it did not require The Sweetwater to submit an operating plan from 1997 on, the government's continued assertion that The Sweetwater violated the permit by not submitting an operating plan is frivolous.

150. One of these ideas included restricting access to the road to lodge guests beginning at the lower Sweetwater bridge. Tr. 1229:11-1230:21, Once Mr. Larson determined that there was unlikely to be much public resistance to this proposal, and Ms. Watson suggested that he submit a proposal, Mr. Mummery then backpedaled, and declined to pursue the idea further. Tr. 202:10-206:2.

**Response**: The Sweetwater disputes the allegation above, noting that the Forest Service refused to include in the permit, or even tie together to the permit, the issue of The Sweetwater having private use of the road. Tr. 1195:22-1196:15. Moreover, Mr. Larson expressly noted that the Forest Service remained concerned about privatizing the road and never explicitly offered to do so because of this concern.

> Q So you went back to Mr. Mummery [after you purportedly talked to people and concluded there would be no public outcry if the Forest Service closed the road] and said, Jeff, guess what? We can do this and there wont' be much of a problem?
>
> A Well --
>
> Q You didn't do that, did you?
>
> A Well, we talked about it, but there's always a risk. There's always something that could come out of it. It's not black and white. I don't know everybody in this town and I don't talk to everyone in town.

Tr. 1270:12-21.

151. On June 11, 1996, Mr. Fischer sent an internal email to Bob Rossman and other Forest Service employees stating that Mr. Fischer had met with Mr. Mummery, and told him that "we now have the new bridges back into our budget system for FY98 or 99." DX 29. Mr. Fischer testified that at a June 5, 1996 meeting, he had succeeded in getting the project back into the CIP for fiscal years 1998 and 1999 for the Shoshone's proposal that was forwarded to the regional office. DPFUF ¶ 87.

**Response**: The Sweetwater does not dispute the allegation set forth above.

152. The bridges are not shown on Mr. Fischer's CIP list for fiscal year 1995, but appear for fiscal year 1996 with the notation "Des. w/NFRD FY98, Const. 99," which Mr. Fischer testified meant that they were intended to be designed in fiscal year 1998, and constructed in fiscal year 1999. JX 2; DPFUF ¶ 88.

**Response**: The Sweetwater does not dispute the allegation set forth above.

153. The Wapiti District Ranger, Brent Larson, told Mr. Mummery in a February 27, 1997 letter that a request for CIP funding had been made to replace the bridges in fiscal year 1999. JX 12.

**Response**: The Sweetwater does not dispute the allegation set forth above.

154. At no time after this letter was sent did Mr. Mummery ever ask for the Forest Service to construct fords to provide an alternative means of access to the lodge, nor did he ever try to operate the lodge using fords. Tr. 650:1-5, 1719:7.

**Response**: The Sweetwater does not dispute the allegation set forth above, and notes that up to 2001 Mr. Mummery was able to access the lodge for his maintenance purposes using the bridges (which had not been padlocked yet), and therefore he did not need fords to be constructed.

155. Mr. Larson began to search for a conservation buyer in response to Mr. Mummery's decision in February 1997 not to operate the lodge. Tr. 1289:20-1291:18. The reason that Mr. Larson pursued a conservation buyer was to relieve Mr. Mummery of his obligation to operate the lodge. Id.

**Response**: The Sweetwater disagrees with the allegations above. Mr. Larson testified that he pursued a conservation buyer because he did not believe the lodge should remain on the forest. PPFF ¶¶ 105, 129. While Mr. Larson initially attempted to claim that he was only trying to help Mr. Mummery, he later was forced to admit that his efforts to contact Mr. Fischer and talk him out of actually restoring lodge operations by repairing the bridges were contrary to Mr. Mummery's interests and consistent with his goal of removing the lodge. PPFF 143, 163.

156. At no time did Ms. Aus or Mr. Larson conclude that "the public interest requires termination of the permit," which clause 15 provides is the condition precedent for the

requirement to pay equitable consideration to the permittee. Tr. 1297:15-1298:14.

**Response:** The Sweetwater disagrees with the allegation above, and notes that Ms. Aus pursued the purchase of the lodge in the public interest, but only ceased that effort when she was unable to locate a method to obtain sufficient funds, but not because of any decision that doing so was not in the public interest. PPFF ¶¶ 178-180.

157. Mr. Fischer was not a Forest Service line officer. 778:12-18, 1506:2-5.

**Response**: The Sweetwater does not dispute the allegation set forth above.

158. Mr. Larson was not a contracting officer and did not hold a warrant. Tr. 1271:23-1272:14.

**Response**: The Sweetwater disputes the allegation set forth above, noting that Mr. Larson was delegated the authority to enter into TSUPs. PPFF 50.

159. Rebecca Aus, Forest Supervisor of the Shoshone National Forest, is not a contracting officer. Tr. 1766:16-20; PX 55.

**Response**: The Sweetwater disputes the allegation set forth above, noting that Ms. Aus was fully authorized to enter into TSUPs.

160. In fiscal years 1998 and again in 1999, Mr. Fischer testified that the project was deferred, possibly because the Shoshone was shorthanded in the engineering section, and possibly because it could not be fit into the budget. DPFUF ¶ 91.

**Response**: The Sweetwater cannot respond to the allegation set forth above given that the "project" is not identified.

161. Mr. Fischer's principal concern was not that the bridges would collapse if a passenger car or light truck passed over them, but that the bridges would wash out. Tr. 1576:5-11.

**Response**: The Sweetwater does not dispute the allegation set forth above.

162. Mr. Fischer testified that he did not interfere with efforts to obtain funding for the bridges: "I hadn't been dragging my feet to slow down the funding. I was dragging my feet on going into final design of the bridges." Tr. 1502:2-11, 1596:8-1597:10.

**Response**: The Sweetwater does not dispute the allegation set forth above in which Mr. Fischer clearly admits that he was, and was authorized to, prevent the funding from being used to replace the Sweetwater bridges, and authorized to slow down the process by "dragging his feet".

163. Mr. Fischer was concerned that $186,000 would not be enough to rebuild the Sweetwater

bridges. Tr. 1485:14-21.

**Response**: The allegation above is wrong. Mr. Fischer clearly stated that the funds would cover the cost of bridge construction, but that he was concerned whether or not the funds would also assist in the additional road work that he thought was needed as well. Tr. 1487:17-1488:8; Tr. 1482:4-6. However, he stated that the roadwork could always be done later in a piece meal manner. Tr. 1489:17-1490:7. Mr. Fischer also unequivocally stated that, but for his and Mr. Larson's "manipulations", the Sweetwater bridges would have been built. PPFF ¶ 157. Thus, there was no question that the Sweetwater bridges would have been built if the funds obtained for that purpose had not been rejected.

164. Mr. Fischer testified that during fiscal year 2000, it appeared that within the total amount appropriated by Congress to the Forest Service there would be sufficient funds to rebuild the Sweetwater bridges. Tr. 1498:6-11, 1500:11-1501:3.

**Response**: The Sweetwater does not dispute the allegation set forth above.

165. The funds had not been earmarked by Congress, and the Shoshone retained the ability to decide whether to spend the funds it was authorized by the region to spend. Tr. 1564:7-14.

**Response**: The Sweetwater does not object to the phrase "earmarked by Congress" as set forth

above. However, the funds clearly were “earmarked” by the Regional Office of the Forest Service. The Shoshone admits that it in fact it was given the funds to replace the Sweetwater bridges and that the budget request which produced those funds was specifically based on the amount of funds needed for the Sweetwater bridges. Tr. 1416:19-1417:7 (budget amount based on compilation of specific projects, such as Sweetwater bridges); Tr. 1422:20-1424:5 (Shoshone determined which projects went on list to form the basis for the budget request). The fact that the funds were “earmarked” for the Sweetwater bridges is demonstrated by the fact that, when the Shoshone decided not to use them for the Sweetwater bridges, it could not then apply them anywhere else. It had to return them to the Regional office. PPFF ¶¶ 153-155. Thus, the Forest Service had clearly “earmarked” the funds for the Sweetwater bridges. Further, although it is a matter of law, the Forest Service’s contractual obligations, along with its repeated assertions to The Sweetwater, obligated it to apply those funds, if and when obtained, to replace the Sweetwater bridges. PPFF ¶ 119.

166. The project to rebuild the Sweetwater bridges was indefinitely postponed during fiscal year 2000. Tr. 1501:4-23.

**Response**: The Sweetwater does not dispute the allegation set forth above.

167. Forest Supervisor Rebecca Aus considered replacing the Sweetwater bridges as a low priority, because Sweetwater Road was a maintenance level 2 road, and access to the lodge could be provided by high-clearance vehicles using fords rather than bridges. Tr. 1648:17-1649:3,

1657:4-1658:5.

**Response**: The Sweetwater disputes the allegation set forth above because it was clearly contradicted by the testimony of Messrs. Fischer and Larson (PPFF ¶¶ 149-152) as well as the Forest Supervisor's subsequent offer to put the Sweetwater bridges back at the top of the Shoshone's priority list for funds. DX 54; Tr. 1770:7-1772:17.

168. Ms. Aus considered campgrounds and water systems to be higher priorities among the large amount of deferred maintenance on the Shoshone. Tr. 1660:10-1661:6.

**Response**: The Sweetwater disputes the allegation set forth above. While Ms. Aus claimed she felt campgrounds were a higher priority for the funds and thus funding should be applied to them instead of the Sweetwater bridges, Mr. Larson and Mr. Fischer very clearly stated that the funding source for the bridges and the Wapiti Campground were two separate pools of money. Tr. 997:2-17; Tr. 1427:14-23. Therefore, it simply was not possible for funds for the bridges to have been used for the Wapiti Campground, as Ms. Aus asserted, nor does it make any logical sense that sending back funds from one pot of funds is related to obtaining funds from a totally separate fund. In fact, Mr. Fischer admitted that no such request to apply the funds to campgrounds or any different project was made nor was it possible for the Forest to do so. PPFF ¶ 155. The Forest did not apply the funds to another Forest project, but had to return them to the Region. PPFF ¶¶ 153-155.

169. Shoshone Forest Supervisor Rebecca Aus testified that operation of the lodge is consistent with the Forest Plan for the Shoshone. Tr. 1701:9-1702:21.

**Response**: The Sweetwater does not dispute the allegation set forth above, but notes that Ms. Aus recently indicated that she is in the process of changing the Forest Plan with respect to what special uses, such as lodges like The Sweetwater, are allowed on the Forest. Tr. 1703:23-1705:25; 70 Fed. Reg. 55102-103 (September 20, 2005). Thus, it appears that the Forest Service strategy is to remove the Sweetwater lodge first (without compensation), and then change the Forest Plan to eliminate these type of operations in this area. If the Forest Service changed the Forest Plan while the lodge was present, it clearly would have to compensate The Sweetwater under clause 15 of the TSUP. JX 1.

170. In late 2000, Mr. Mummery requested that the Forest Service permit him to perform work to upgrade the bridges after Brent Larson told him that it was unlikely that the bridges would be funded, or that a conversation buyer could be found. Tr. 652:16-654:22, 221:9-224:22. At trial, Mr. Mummery initially testified that until July 2001, he had not been told that the proposal to replace "my bridges" would not be funded. Tr. 248:16-25.

**Response**: The Sweetwater does not dispute the allegation set forth above, but notes that Mr. Larson only spoke to the likelihood of funding being obtained, and that Mr. Mummery in fact was never told that the bridges would definitely not be funded until this litigation. Further, Mr. Larson never told Mr. Mummery that the Forest Service had already received funding for the bridges, but rejected it. PPFF ¶ 163.

171. At the suggestion of the Shoshone's Bridge Inspector, Tom Koenig, who said there was no point in putting money into the bridges if they could not be load rated, Mr. Mummery retained an engineer, who determined that the deteriorated condition of the bridges prevented him from load rating the bridges in January 2001. Tr. 225:14-23; JX 15.

**Response**: The Sweetwater does not dispute the allegation set forth above.

172. The Forest Service then determined that it must close the Sweetwater bridges to vehicular access, which it did in April 2001. Tr. 226:10-24; PX 31.

**Response**: The Sweetwater does not dispute the allegation set forth above and would further point out that the bridges should have been closed in 1992 for the very same reason. PPFF ¶¶ 25, 172-174.

173. Mr. Mummery testified that it was Mr. Larson who proposed going through the process of seeking termination of the permit in the public interest as one possible option of addressing

Mr. Mummery's preference not to operate the lodge: "the idea of buying the damn lodge was [Mr. Larson's] idea. He's the one that thought that, boy, I don't -- you know, if, in fact, we can't get the money reasonably for the road, maybe it's a better idea to invest that kind of money in buying you out of your lodge than putting in bridges anyway." DPFUF ¶ 94.

**Response**: The Sweetwater disputes the allegation set forth above because Mr. Mummery did not prefer for The Sweetwater not to operate the lodge, Mr. Larson did. Mr. Mummery was urging the Forest Service to seek funding so that The Sweetwater <u>could</u> operate.

174. In an April 2, 2001 letter that Mr. Mummery sent to Mr. Larson, Mr. Mummery referred to a proposal that originated long after the permit issued: "I am seriously interested in exploring the alternative which we have been <u>loosely discussing since last fall</u>, which is the idea of the Forest Service paying the limited liability company the replacement value of the Sweetwater Lodge assets, with the understanding, of course, that the limited liability company would relinquish the permit" (emphasis added). JX 16.

**Response**: The Sweetwater does not dispute the allegation set forth above because it refers to the Forest Service's specific proposal to purchase the lodge, which is consistent with the Forest Service's obligation under clause 15 of the TSUP.

175. In a July 12, 2001 letter to Mr. Larson, Mr. Mummery reiterated his understanding that clause 15 did not grant him a contractual right to equitable consideration if the bridges were not

replaced, but rather established a process that was controlled by the Forest Service : "I welcome the opportunity to meet the appraiser selected by the Forest Service so we can seriously pursue the option under clause 15 of the Term Special Use Permit which allows for the Forest Service to determine that the public would be served by termination of the permit and purchasing the permitttee's improvements." DX 50.

**Response**: The Sweetwater does not dispute the quoted material above, but disputes the remaining allegations as argument as to the meaning of Mr. Mummery's statement. The Sweetwater respectfully refers the Court to its memorandum as to the contractual rights related to the payment of equitable consideration under clause 15 of the TSUP.

176. After the Forest Service sent a written "Notice of Non-Compliance And Opportunity To Cure" on December 21, 2001, The Sweetwater did submit an operating plan on May 1, 2002. JX 21; DX 54.

**Response**: The Sweetwater does not dispute the allegation set forth above.

177. Neither the permit nor the operating plan was ever amended in writing to relieve The Sweetwater of its obligation to operate the lodge 93 days per year as a public resort. JX 1.

**Response**: The Sweetwater does not dispute the allegation set forth above, but notes that the contract administrator waived that obligation by both explicit statements and lack of any enforcement of the clause. PPFF ¶ 121.

178. The Notice of Non-Compliance that the Forest Service served on The Sweetwater in December 2001 "provide[d] notice of facts that may warrant revocation of your permit," but the Forest Service has never proceeded to terminate or revoke the permit, despite The Sweetwater's subsequent failure to submit an acceptable operating plan. JX 21, DX 54.

**Response**: The Sweetwater does not dispute the quoted allegation set forth above, but notes that the Forest Service's issuance of a non-compliance letter is the required first procedural step towards terminating or revoking the TSUP. *See Anchustegui v. Dept. of Agriculture*, 257 F.3d 1124 (9th Cir. 2001). In addition, because the Forest Service did not require The Sweetwater to submit an operating plan, The Sweetwater cannot be properly described as having "failed" to do so.

179. Plaintiff remains in possession of its property, and is able to gain access to it across the Sweetwater bridges (using a key it possesses to unlock the gates) and to occupy the lodge. December 30, 2004 Order, p. 7.

**Response**: The Sweetwater does not dispute the allegation set forth above.

180. The Forest Service witnesses provided unrebutted testimony that since Sweetwater Road was closed to vehicular access by the public in 2001, there have been almost no complaints from the public. Tr. 890:18-891:2; 1016:17-25, 2137:18-25.

**Response**: The Sweetwater currently has no basis to dispute the subjective description set forth above as to the Forest Service receiving "almost no" complaints from the public after closing Sweetwater Road, whatever that may mean. The Sweetwater notes that the Forest Service admitted that, at the time it informed the public that it was closing Sweetwater Road, it also stated that it would cost over half a million dollars to make the road and bridges safe and that the Forest Service included this language knowing it would likely prevent people from complaining about their decision. Tr. 1224:18-1225:10; PX 31.

181. By letter dated May 28, 2002, The Sweetwater sent to the Forest Service what purported to be "claim pursuant to the Contract Disputes Act, 41 U.S.C. § 601 et seq.," which allegedly arose from "the Forest Service's breach of its obligations" under the permit issued to The Sweetwater. JX 23/1. The letter was addressed to Rebecca Aus, the Forest Supervisor of the Shoshone National Forest, whom it identified as "Rebecca Aus, Contracting Officer." Id.

**Response:** The Sweetwater does not dispute the allegation set forth above.

182. The May 28, 2002 letter asserted that "as a result of the Forest Service's breach," The Sweetwater had suffered damages that totaled $2,549,034, including out-of-pocket costs, lost

profits, and the replacement cost of the lodge. JX 23/1-2.

**Response:** The Sweetwater does not dispute the allegation set forth above.

183. The May 28, 2002 letter requested from Ms. Aus "a written Contracting Officer's final decision." JX 23/7.

**Response:** The Sweetwater does not dispute the allegation set forth above.

184. By letter dated July 22, 2002, Ms. Aus provided a written decision in response to The Sweetwater's May 28, 2002 purported "claim" letter. Ms. Aus stated that she did not hold any authority to serve as a contracting officer for the special use permit, and that she lacked any delegation of contracting authority whatsoever. DX 54. She also stated that the permit issued to The Sweetwater was not a contract but a license pursuant to 36 C.F.R. Part 251, Part B, and rejected any obligation by the Government for The Sweetwater's "claim." Id.

**Response:** The Sweetwater does not dispute that Ms. Aus responded as noted above, but disputes the substance of her response, which constitutes legal argument.

185. Ms. Aus's July 22, 2002 letter also notified The Sweetwater that "[w]ritten decisions made by the Forest Service relating to administration of special use permits are subject to administrative appeal under 36 C.F.R. Part 251, Subpart C." DX __.

**Response:** The Sweetwater does not dispute that Ms. Aus responded as noted above, but disputes the substance of her response, which constitutes legal argument.

186. The Sweetwater never appealed Ms. Aus's written decision dated July 22, 2002 pursuant to the appeals procedures set forth in 36 C.F.R. Part 251, Subpart C. Complaint ¶¶ 30, 38-39.

**Response:** The Sweetwater does not dispute the allegation set forth above.

187. The 1995 and 1996 operating plans that The Sweetwater submitted to the Forest Service do not contain any projections about its expected revenues, or any business plan that identified the revenue that The Sweetwater expected to generate from its different activities. JX 22, JX 28.

**Response:** The Sweetwater does not dispute the allegation set forth above.

188. The only profit projections or written business plan that The Sweetwater developed before this lawsuit was filed were prepared between June 15 and June 21, 1995. DX 17/5; Tr. 669:4-24.

**Response:** The Sweetwater does not dispute the allegation set forth above.

189. Mr. Mummery testified that his initial profit projections were based upon the Brannons' business plan, which was a year-round "gourmet getaway" that was principally based on one-night stays by guests on Friday and Saturday nights, during which guests were offered 7-course suppers followed by a champagne brunch the following morning. Tr. 491:1-4, 2140:7-10.

**Response:** The Sweetwater does not dispute the allegation set forth above, but notes that the initial business plan as of 1995 subsequently changed.

190. Mr. Mummery did not intend to operate the lodge with his wife, as did the Brannons, because in 1995 his wife had her hands full with their son, who was then three years old. Tr. 677:1-11.

**Response:** The Sweetwater disputes the allegation above because Mr. Mummery's wife did in fact operate the lodge with Mr. Mummery. The government omits the following portion of Mr. Mummery's testimony:

> Once I had it, I can tell you truthfully she loved it. She loved the place. If you want her to testify to that, we can get her to, because she spent a great deal of time -- I hope we have pictures somewhere of it -- doing the gardens, doing the lawn. She is a bit of a -- you know, she did a lot of work. She cared about the place. It's a beautiful spot. It's hard not to care about it. You've been there.

Tr. 677:25-678:7. Notably, the government did not seek Mrs. Mummery's testimony, nor did it object to Mr. Mummery's hearsay testimony.

191. After the Bixby sale failed to close in 1996, Mr. Mummery intended to rent out the lodge for the week to family reunions, which suited the amount of personal time he intended to devote to the business. Tr. 675:22-676:20.

**Response:** The Sweetwater does not dispute that Mr. Mummery intended to rent the lodge for family reunions, but disputes the remaining allegations above. Again, the government has misrepresented Mr. Mummery's testimony, which is set forth below:

> Q Your new business plan of renting to family reunions and things like that in 1996, that was something that you said -- you testified in your deposition -- suited the personal time that you could devote to running the lodge?
>
> A Well, it made it easier for me because I could have a -- I could have an onsite manager live there, manager/chef, manager/maintenance, and now I think manager/maintenance man is the most important, but at that time a manager/chef, and they would do the day-to-day things. I mean, I fully expected to have to go there on a daily basis. I might miss a day. I might be able to pick which days I go there. I'm going to go there twice some days.

Tr. 675:22-676:10 (emphasis added).

192. At most, plaintiff operated the lodge for a single season, 1996, and claims to have made a profit of $34,995 that year. JX 23; PX 43 (TS 2059).

**Response:** The Sweetwater does not dispute the allegation set forth above.

193. Plaintiff extrapolated these alleged 1996 profits at a six percent rate for the years 1997-

2001 as the basis for seeking lost profits totaling $312,256 in its May 28, 2002 “claim” letter to Forest Supervisor Rebecca Aus. JX 23.

**Response:** The Sweetwater does not dispute the allegation set forth above.

194. Mr. Mummery prepared a business plan in 2005 to present a new calculation of The Sweetwater’s lost profits and out-of-pocket expenses. Tr. 362:3-363:11.

**Response:** The Sweetwater does not dispute the allegation set forth above.

195. Mr. Mummery testified that the business plan upon which plaintiff now bases his lost profits claim was based upon the assumption that after the sale to the Sutherlands failed to close in March 1997, he was required to operate the lodge (although this was already a requirement of the permit), and he “pretended” that he had invested $200,000 in remodeling the cabins. Tr. 410:13-14, 412:5-10 ; JX 1/1.

**Response:** The Sweetwater disputes the characterization of Mr. Mummery’s testimony set forth above. Mr. Mummery testified that the revised business plan addressed the situation where he would not have sold the lodge to the Sutherlands and would have instead prepared to operate it himself. Because Mr. Mummery had intended to sell the lodge to the Sutherlands, but this sale was not completed because of the Forest Service’s breach, Mr. Mummery was never put in the situation where he needed plans to operate from 1997 and thereafter. However, had he been in

that situation, he had established how he would have operated in such an event.

196. The financial records for the 1996 season indicate that plaintiff did not earn a profit in that year, wholly independently of any alleged breach by the Government, because The Sweetwater excluded from its expenses payments made to management and interest costs. PX 43 (TS 2059).

**Response:** The Sweetwater disputes the allegation set forth above, and notes that the government's own expert calculated income to the lodge owner by excluding management costs, because these represent profit to the owner. DX 62 (at report page 61). Further, while The Sweetwater did deduct appropriate interest, the government's allegation that *interest costs* should be deducted as an *expense* demonstrates that such costs are in fact a proper element of damages owed to The Sweetwater.

197. Once these payments are counted as expenses, The Sweetwater did not earn a profit. PX 43 (TS 2059).

**Response:** The Sweetwater disputes the allegation set forth above and notes that the government has failed to provide any evidentiary basis for its assertions. While the government had hired and paid an outside expert to review The Sweetwater's profit, it very notably decided not to call that expert as a witness, thus effectively conceding that it had no basis to contest The Sweetwater's claimed profits. *See* Defendant's List of Trial Witnesses (filed August 12,

2005)(listing Jack Bakken as an expert witness to rebut The Sweetwater's damages).

198. Mr. Mummery's current business plan is based on the presumption that he intends to live off-site and employ a resident assistant manager, unlike most lodge owners, who are couples who live in the lodge. Tr. 176:16-21, 446:19-447:5; PX 41, p. 7.

**Response:** The Sweetwater does not dispute the allegation set forth above.

199. Yellowstone Valley Inn is a roadside motel that is not in the Shoshone National Forest, and that does not offer horseback riding, fishing, or the amenities that Mr. Mummery aspires to offer. DX 64/38.

**Response:** The Sweetwater disputes the allegation set forth above, which are based on a report by Mr. Frome made in 2005 and does not address what amenities were present at Yellowstone Inn when Mr. Mummery operated it. Moreover, Mr. Mummery specifically testified that Yellowstone Valley Inn offered trail rides, which are horseback rides. Tr. 73:13.

200. In his current business plan, Mr. Mummery plans to keep the food prices moderate because he was told by a friend who runs a very successful restaurant that he would give away food to keep hotel rooms full. Tr. 436:16-21.

**Response:** The Sweetwater does not dispute the allegation set forth above.

201. Mr. Mummery testified that if you run a very successful restaurant, you make eight or ten percent profit, but you make 80 percent profit when you rent a hotel room. Tr. 436:22-25.

**Response:** The Sweetwater does not dispute the allegation set forth above.

202. Chico Hot Springs Hotel has 110 guest rooms, a conference center that can hold 300 people, and spring-fed swimming pools. Tr. 705:7-706:22.

**Response:** The Sweetwater does not dispute the allegation set forth above.

203. Jenny Lake Lodge is located at the foot of Jenny Lake, and has a spectacular full-on view of the Grand Tetons and a famous restaurant. Tr. 678:15-679:24.

**Response:** The Sweetwater does not dispute the allegation set forth above, and notes that the view at Jenny Lake lodge is almost as nice as that at Sweetwater Lodge. *See* PX 67.

204. Rainbow Ranch Lodge looks out 100 yards onto the Gallatin River, which is well-known for fly fishing, and is near a major downhill and cross-country ski resort, Big Sky, as well as having a swimming pool. Tr. 680:4-681:18, 683:17-687:12.

**Response:** The Sweetwater does not dispute the allegation set forth above.

205. Mr. Mummery now proposes to operate the lodge for adults only. Tr. 690:5-23.

**Response:** The Sweetwater disputes the allegation set forth above because Mr. Mummery said that he intends to "target" couples rather than families.

206. In the current business plan for The Sweetwater's lodge, there will be no horseback riding offered, even though almost all other lodges on the North Fork and in the surrounding areas offer horseback riding, and Cody is known as "cowboy country." Tr. 690:24-691:17.

**Response:** The Sweetwater disputes the allegation set forth above. Mr. Mummery clearly stated that he would contract out horseback riding so that, while he would offer it, he would not have the downsides associated with that particular type of recreation. Tr. 441:8-20; *see* PX 41 at p. 5.

207. There are no spring-fed swimming pools or golf courses at Sweetwater lodge, though guests can smell sulphurous fumes from a warm spring, and see the scars from a disastrous forest fire that mars the view. Tr. 707:8-13, 720:20-721:3, 2678:25-2680:13; DX 64/16.

**Response:** The Sweetwater does not dispute the allegation set forth above as to the presence of spring-fed pools or a golf course. The Sweetwater disputes the remaining allegations set forth in the response above. There is no evidence that guests can smell sulphorous fumes while at the lodge, nor any reports from any guests of having smelled such fumes. In addition, the Forest

Service itself noted that the area near the lodge which had been burned over forty (40) years ago now provided an example wildlife viewing area. Tr. 2873:6-2874:6. Further, The Sweetwater would note that the panaromic picture in evidence shows an exception view from The Sweetwater. PX 67.

208. Wildlife that can be seen at The Sweetwater's lodge can also be seen anywhere on the North Fork. Tr. 720:17-19.

**Response:** The Sweetwater does not dispute the allegation set forth above, but notes that The Sweetwater is known for exceptional wildlife viewing.

209. Sweetwater Creek has a streambed composed of volcanic rocks, unlike premier trout fishing rivers and streams, which have a sedimentary bottom. Tr. 2882:8-2883:6.

**Response:** The Sweetwater disputes the assertion above, and notes that Mr. Frome, on whose testimony it is based, never fished Sweetwater Creek and was merely speculating. Further, Mr. Frome has no demonstrated expertise in geology or assessing trout streams. Finally and perhaps most importantly, Mr.Wilkerson and Mr. Mangus, both of whom have actually fished Sweetwater Creek, have stated that the fishing on Sweetwater Creek is excellent. Tr. 2267:9-13; 2331:13-22.

210. Plaintiff's appraiser, Mr. Que Mangus, testified that the sales comparison approach is the

most reliable method of appraising the value of the lodge, because it is not worth more than one would pay for a similar lodge with 5 cabins. Tr. 2407:5-8; PX 44, pp. 2, 16.

**Response:** The Sweetwater does not dispute the allegation set forth above, except to note that the Sweetwater Lodge had at least six (6) functioning units.

211. Mr. Mangus also testified that he was uncomfortable with calculating the depreciation for the cost approach of appraising the lodge, because most of the buildings were built in 1930 and have been remodeled at least once, making it "not dependable" to calculate the actual age. Tr. 2406:18-25, 2410:3-18.

**Response:** The Sweetwater does not dispute the allegation set forth above, but notes that, for the very reasons expressed by Mr. Mangus, The Sweetwater sought and engaged an expert, Mr. Pucetas, who specialized in the very area in which Mr.Mangus was not as experienced and who had extensive experience in assessing the replacement value of lodges on federal land in areas in and around Yellowstone National Park. <u>The government did not dispute Mr. Pucetas' expertise</u>. Moreover, the actual age is not used in physical depreciation assessments, but instead the actual remaining life is the pertinent issue (life expectancy – effective age). Tr. 2562:7-25; PX 45 (page 1.2).

212. Mr. Mangus testified in his deposition that the lodge retains "some" value, but "elaborated" at trial that by "some," he meant "minimal" value. Tr. 2403:3-13.

**Response:** The Sweetwater does not dispute the allegation set forth above subject to the clarification that Mr. Mangus was referring to the situation with no bridge access, and notes that Mr. Mangus noted that, *without bridge access*, the lodge was worth about the value of a "pile of rocks" and "might" be worth its reclamation value. Tr. 2310:18- 2311:14. In addition, the government's own expert testified that, without the permit, the lodge was worth "salvage value." Tr. 2866:2867:4.

213. Mr. Mangus testified that he was not asked to develop a second opinion of value of the lodge in its as-is condition, or to measure the cost to cure the loss of access over bridges. Tr. 2403:17-2404:11.

**Response:** The Sweetwater does not dispute the allegation set forth above and notes that Mr. Mangus felt that the Sales Comparison analysis was the most appropriate method to assess the lodge's value, as did the government's own expert. DX 62 (at report page 55).

214. Mr. Mangus agreed that his analysis considered the effect of one variable (the number of units) on another variable (the price per unit), which is the essence of regression analysis. Tr. 2424:21-2426:22.

**Response:** The Sweetwater disputes the allegation set forth above and notes that Mr. Mangus referred to his analysis as a "best fit" analysis. Tr. 2356:16-22. The Sweetwater further disputes

the defendant's allegation as to what the "essence" of a regression analysis is and notes that defendant did not produce any experts or other factual evidence as to a "regression analysis."

215. Mr. Mangus's only critique of Mr. Frome's appraisal was that it considered "too much data." Tr. 2437:23-2438:5.

**Response:** The Sweetwater disputes the allegation set forth above and notes that Mr. Mangus' testified that his "principle" problem with Mr. Frome's analysis, but not his only, was that Mr. Frome, who was not familiar with the Cody area and who actually called Mr. Mangus for assistance when the government hired him (Tr. 2384:25-2386:3), included every piece of data he could collect, rather than use local knowledge (of which he had none) to assess which data was relevant and pertinent. Tr. 2427:23-2438:20. The Sweetwater further notes that Mr. Frome was located as far from Cody, Wyoming as Pittsburgh, Pennsylvania is from Alexandria, Virginia. Tr. 2777:14- 2778:14. Thus, using Mr. Frome to appraise The Sweetwater's lodge was the equivalent of bringing in an appraiser from Pittsburgh to appraise property in Alexandria, Virginia.

216. Based upon a supposed inverse correlation between number of units and price per unit, Mr. Mangus used the hypothetical $164,852.20 price per unit figure to adjust upwards between 18 and 51 percent the actual per-unit prices of the three lodge sales that he considered. PX 44, p. 18. He then based his opinion of value nearly at the top end of this adjusted range, relying most heavily on the adjusted per-unit price of $151,346 for UXU to arrive at his price-per unit for The

Sweetwater of $150,000. Id., p. 28; Tr. 2426:23-2432:2.

**Response:** The Sweetwater does not dispute the allegation set forth above, and notes that Mr. Frome's analysis would also equate The Sweetwater with UXU lodge if only one + or – on the table he used for his analysis were changed. Mr. Frome's value assessment was based on a chart which contained plusses and minuses to assess how a lodge compared to The Sweetwater. DX 64 (report page 53); DX 62 (report page 53). However, the entire conclusion of the government's expert would be fundamentally changed by changing *one single + or -* on his chart in his report, such as his assessment of the quality of "tree cover." Tr. 2815:7-19. For example, had he concluded that The Sweetwater had better minor amenities, such as tree cover, than UXU Lodge, his conclusion would have been that those lodges are directly comparable. Tr. 2856:16-2857:13

217. Mr. Mangus had never used this "best fit" analysis to find an inverse correlation between number of units and price per unit in any of the numerous other appraisals he has prepared of North Fork lodges during the preceding two years. DX 75-78. Although he conducted a best fit analysis in a recent appraisal, it did not affect his opinion of value, as it did dramatically in his appraisal of The Sweetwater. Tr. 2461:13-2463:6.

**Response:** The Sweetwater agrees that Mr. Mangus had not previously used a "best fit" analysis, but disputes the remaining allegation above. As Mr. Mangus testified, the data relevant to the lodges near The Sweetwater shows that this analysis is the correct value. Because The

Sweetwater had fewer cabins than the other lodges, and *both expert's data* showed that the per unit price increased if the number of cabins at a lodge decreased, it was appropriate to make this adjustment to properly assess the value of The Sweetwater. PPFF ¶¶ 222-224. Because Mr. Mangus had never previously appraised The Sweetwater or any lodge with the same number of units, Mr. Mangus' method of appraisal in this matter is not inconsistent with his prior appraisals. Mr. Mangus further testified that, if he had appraised any other lodge that had the same number of cabins as The Sweetwater, he certainly would have used the best fit analysis. Tr. 2487:10-2488:14.

218. At least one prospective purchaser of Elephant Head Lodge, Ms. Jodi Mientikiewicz, determined in December 2003 that even the $67,000 per unit value appraised by Mr. Mangus was too much, and declined to proceed with the purchase. Tr. 2468:11-2469:25; DX 76.

**Response:** The Sweetwater disputes the allegation above as outright conjecture which has absolutely no evidentiary support. While Mr. Mangus testified that Ms. Mientikiewicz did not purchase the lodge, there is no evidence as to why she did not purchase the lodge. The government's speculation that her decision was based on the price is outright guessing.

219. The Sweetwater's lodge is not designated on any register of historic sites. Tr. 2570:13-2571:7.

**Response:** The Sweetwater does not dispute the allegation set forth above.

220. As Mr. Pucetas conceded, The Sweetwater is not the only lodge on the North Fork that has a main lodge and cabins with stone chimneys. Tr. 2558:24-2559:2. UXU has a main lodge as well as cabins with stone chimneys, just like The Sweetwater, and UXU has real log cabins, whereas the cabins at The Sweetwater are frame structures covered with log siding. Tr. 2556:19-2559:21.

**Response:** The Sweetwater does not dispute the allegation set forth above.

221. Mr. Mangus did not rely upon the cost approach because he does not believe that buyers consider it be relevant. Tr. 2410:12-18.

**Response:** The Sweetwater does not dispute the allegation set forth above.

222. Plaintiff's reconstruction cost expert, John Pucetas, conceded that there are no uniform practices for estimating the effective age of the buildings, and agreed with Mr. Mangus that making such estimates is "fairly subjective." Tr. 2565:10-22.

**Response:** The Sweetwater does not dispute the allegation set forth above, but notes that Mr. Pucetas is an expert in such assessments and the government did not challenge his expertise.

Respectfully submitted,

s/Kevin R. Garden

Kevin R. Garden
THE GARDEN LAW FIRM P.C.
Suite 325
901 North Pitt Street
Alexandria, VA 22314
(703) 535-5565

Dated: February 1, 2006