IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 02-1795C<br>(Senior Judge Merow) |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S POST-TRIAL BRIEF**


PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

KATHRYN A. BLEECKER
Assistant Director

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
1100 L St. N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972
E-mail: john.williamson@usdoj.gov

OF COUNSEL:

KENNETH S. CAPPS
Attorney-Advisor
Office of the General Counsel
Mountain Region
U.S. Department of Agriculture
P.O. Box 25005
Denver, CO 80225-0005


February 1, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. The Permit Is Not A Contract Covered By The Contract Disputes Act . . . . . . . . . . . 3

II. The Forest Service Did Not Commit Any Tortious Breach Of The Permit . . . . . . . . 6

III. The Forest Service Never Owed, And Never Breached, Any Implied Duties To Cooperate And Not Hinder Asserted By The Sweetwater . . . . . . . . . . . . 10

A. In 1995 The Forest Service Never Assumed Any Duty To Seek Funds To Replace The Bridges, And Warned The Sweetwater It Would Have To Use Fords . . . . . . . . . . . . . 10

B. The Actions Of The Forest Service In 1997 Did Not Give Rise To Any Duty To Seek Funds To Replace The Bridges . . . . . . . . . . . . . . . . . 16

C. The Forest Service Did Not Breach Any Implied Duties To Cooperate And Not Hinder In 1999-2000 By Declining To Commit Funds To Replace The Bridges . . . . . . . . . . . . . . 18

IV. The Forest Service Has Not Terminated The Lodge's Operations, And Does Not Owe The Sweetwater "Equitable Consideration" Pursuant To Clause 15 . . . . . 25

V. Plaintiff Has Failed To Prove Any Breach Of Contract Damages . . . . . . . . . . . . . . 28

A. Out-Of-Pocket Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B. Lost Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C. Value Of Lodge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VI. Plaintiff Is Unable To State A Claim For A Fifth Amendment Taking . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

## CASES

Alpine Camping Servs.,
B-238,625, 90-1 CPD ¶ 580 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

American Pelagic Fishing Co., L.P. v. United States,
379 F.3d 1363 (Fed. Cir. 2004),
cert. denied, ____ U.S. ____, 125 S. Ct. 2963 (2005) . . . . . . . . . . . . . . . . . . . . . . . . 33

Bluebonnet Sav. Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 32

Cedar Lumber v. United States,
5 Cl. Ct. 539, 459 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Centex Corp. v. United States,
49 Fed. Cl. 691 (2001),
aff'd, 395 F.3d 1283 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Contel of California, Inc. v. United States,
37 Fed. Cl. 68 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Davidson Indus., Inc.,
AGBCA No. 95-166-1,
96-2 BCA ¶ 28,299 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Detroit Housing Corp. v. United States,
55 Fed. Cl. 410 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Giesler v United States,
232 F.3d 864 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Greyback Concession,
B-2239913, 90-2 CPD ¶ 278 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Hardeman-Monier-Hutcherson v. United States,
458 F.2d 1364, 198 Ct. (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

LaVan v. United States,
382 F.3d 1340 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

National Park Hospitality Ass'n v. Department of Interior,
538 U.S. 803 (2003)) ("NPHA") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Oroville-Tonasket Irrigation Dist. v. United States,
33 Fed. Cl. 14 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Pacific Gas & Elec. Co. v. United States,
3 Cl. Ct. 329 (1983),
aff'd, 738 F.2d 452 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Renda Marine, Inc. v. United States,
66 Fed. Cl. 639 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

S.A. Healey Co. v. United States,
216 Ct. Cl. 576 F.2d 299 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Scott Timber Co. v. United States,
333 F.3d 1358 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Son Broadcasting v. United States,
52 Fed. Cl. 815 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

Southern Cal. Fed. Sav. & Loan Ass'n v. United States,
422 F.3d 1319 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Southern Comfort Builders, Inc. v. United States,
67 Fed. Cl. 124 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Thompson v. Cherokee Nation of Okla.,
334 F.3d 1075 (Fed. Cir. 2003),
aff'd, 543 U.S. 631 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Walter Dawgie Ski Corp. v. United States,
30 Fed. Cl. 115 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Watch Hill Concession, Inc., IBCA No. 4284-2000,
01-1 BCA ¶ 31298 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Wetsel-Oviatt Lumber Co., Inc. v. United States,
38 Fed. Cl. 563 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

YRT Serv. Corp. v. United States,
28 Fed. Cl. 366 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Yosemite Park and Curry Co. v. United States,
217 Ct. C 582 F.2d 552 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

## STATUTES

16 U.S.C. § 5954(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

41 U.S.C. § 602(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## REGULATIONS

36 C.F.R. § 51.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

36 C.F.R. § 251.51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 02-1795C<br>(Senior Judge Merow) |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S POST-TRIAL BRIEF**

Pursuant to Appendix A, ¶ 19 of the Rules of the United States Court of Federal Claims, and this Court's January 27, 2006 order, defendant, the United States, respectfully files this response to the post-trial brief filed by plaintiff The Sweetwater, A Wilderness Lodge LLC ("The Sweetwater").

## PRELIMINARY STATEMENT

Defendant has addressed below each of the arguments that plaintiff has presented in its post-trial brief. All of plaintiff's various claims about the conduct of the Forest Service, however, should be considered in light of one fundamental fact: The Sweetwater has never tried to operate its lodge as a public resort.

If the permit is a contract, as plaintiff asserts, then The Sweetwater has failed to perform the contract by operating the lodge as a public resort. The Sweetwater's principal, Jeff Mummery, did not open the lodge to the public during what should have been its first operating season, 1996, granting Mr. Bixby and his family and friends exclusive access. In February 1997, Mr. Mummery chose to cease any operations, offering excuses for his non-

performance that have varied over time. Although he now claims he was concerned about the risk of liability, the Sweetwater bridges were inspected by a professional engineer in March 1997 and deemed safe for travel within the posted load limits.

The February 27, 1997 letter from Wapiti District Ranger Brent Larson notified Mr. Mummery that the Sweetwater bridges would not be replaced for at least three operating seasons. A reasonable business person who believed that the bridges were unsafe would have tried some other way of operating the lodge than vehicular traffic over the bridges. Mr. Mummery chose to forego revenues for these years. He could have asked the Forest Service to install fords, so that he could operate the lodge from mid-July through October, which closely corresponds to what he now claims his high season would have been July through September. He never did. He claims that before the permit was issued, he proposed restricting motorized vehicular access on Sweetwater Road to lodge visitors, but when the Forest Service pursued this idea in 1997, Mr. Mummery backed away from it.

If the permit is a contract, then it is not the Forest Service that has violated its terms. It is The Sweetwater that failed to perform its duty to operate its lodge as a public resort. Mr. Mummery has shirked this duty, preferring to seek from the Government the full value of the lodge as well as its expenses and the profits he claims The Sweetwater would have earned. But The Sweetwater has failed to prove one of its central contentions: that the lodge no longer has any value. The Sweetwater has failed to prove that many of its expenses are justifiable. Most notably, it has failed to prove that it ever took any meaningful steps to operate the lodge and generate the substantial profits that it now seeks, but that exceed many times the profits that it projected when it bought the lodge in 1995. The Court should deny plaintiff any recovery whatsoever.

## ARGUMENT

### I. The Permit Is Not A Contract Covered By The Contract Disputes Act

The permit issued to The Sweetwater is not a contract for the "procurement of services" by the Government within the meaning of the Contract Disputes Act ("CDA"), 41 U.S.C. § 602(a), as plaintiff asserts. Pl. Br.[1] 11-14. The permit only grants permission to The Sweetwater to offer services to the public. It is not a vehicle to procure services for the benefit of the Government. As Gary Reynolds, the staff officer who oversaw special use permits for the Shoshone National Forest ("the Shoshone") explained, the purpose of granting special use permits is "[n]ot to obtain services. Special use permits are to allow uses that provide services of public benefit." Tr.[2] 1977:16-18.

This Court has ruled that a permit issued by the National Park Service to provide lodging and other services to the public is not a procurement. YRT Serv. Corp. v. United States, 28 Fed. Cl. 366 (1993). In YRT, a disappointed bidder challenged the Park Service's award of a concession contract to provide lodging, food, and gift services in Yosemite National Park. 28 Fed. Cl. at 371. The Court stated that "this arrangement does not constitute a procurement, but is a grant of a permit to operate a business and the government is not committing to pay out government funds or incur any monetary liability." Id. at 392 n.23. Similarly, former Shoshone employee Bob Rossman, who now works for the National Park Service, distinguished permittees from concessioners because "we are not paying [permittees] to do our work." Tr. 977:14-15.

The Court distinguished Yosemite Park and Curry Co. v. United States, 217 Ct. Cl.

---

[1] "Pl. Br." refers to plaintiff's post-trial brief, filed December 22, 2005.

[2] "Tr." refers to the transcript of the September 19-29, 2005 trial in this case.

360, 372, 582 F.2d 552, 558, 559 (1978), in which the Park Service paid a contractor to operate a shuttle bus service for the Government in Yosemite. In YRT, the Court stated "unlike in Yosemite, the Park Service is not paying for transportation services but collecting fees in exchange for granting a permit to operate a concession business." YRT, 28 Fed. Cl. at 392 n.23. Like the concession contract in YRT, clause 19 of the permit issued to The Sweetwater, titled "Concession, Flat Fee Clause," requires the permittee to pay the Government an annual flat fee of $1,400.00 for the authorized use of operating a public resort. JX[3] 1/4. The permit does not require the Government to make any payments to The Sweetwater, as required by a procurement contract such as the contract for shuttle bus services in Yosemite.

Plaintiff relies upon an inapposite decision of the Department of Interior Board of Contract Appeals ("IBCA") that involved contracts to perform services on Government-owned facilities. Pl. Br. 12-13. In Watch Hill Concession, Inc., IBCA No. 4284-2000, 01-1 BCA ¶ 31298, the IBCA ruled that it possessed jurisdiction over a claim filed by a concessioner who was terminated for default because it failed to perform needed bulkhead and dock repairs at a marina owned by the Government and operated by the concessioner. Watch Hill, 01-1 BCA ¶ 31298. The IBCA found that the Park Service "decided that it needed to acquire services of a major nature" for the marina from a new concessioner. Id. (emphasis added).

In contrast, the Forest Service does not own The Sweetwater's lodge. DPFF ¶ 28. The Forest Service does not pay The Sweetwater to perform any services on the "premises" where the permit allows The Sweetwater to operate its lodge. Pl. Br. 13 (quoting JX 1, ¶ 4).

[3] "JX" refers to joint trial exhibits.

Plaintiff asserts that the Supreme Court "affirmatively" cited Watch Hill "as providing concessioners with the ability to pursue CDA claims." Pl. Br. 13 n.3 (citing National Park Hospitality Ass'n v. Department of Interior, 538 U.S. 803, 811 (2003)) ("NPHA"). This assertion inaccurately implies that in NPHA, the Supreme Court resolved the question that it granted certiorari to consider: "whether the CDA applies to contracts between NPS and concessioners in the national parks." 538 U.S. at 807. The petitioners challenged a regulation that stated that Park Service concession contracts "are not contracts within the meaning of [the CDA] and are not service or procurement contracts." 36 C.F.R. § 51.3.

As plaintiff's counsel should know, the Supreme Court held that the question was not ripe for review because the Court found that "[a]ll the regulation does is announce the position of the NPS." 538 U.S. at 810. In the passage upon which plaintiff cites, the Court observed that "it appears that, notwithstanding § 51.3, the IBCA has been quite willing to apply the CDA to certain concession contracts," and cited Watch Hill as an example of the IBCA's disregard for 36 C.F.R. § 51.3. Id. at 811. The Court did not in any way endorse the IBCA's ruling in Watch Hill, as plaintiff implies, or suggest that Park Service concession contracts are covered by the CDA.

All the other decisions that plaintiff relies upon (Pl. Br. 13-14) also are distinguishable because they involve Government-owned facilities. Oroville-Tonasket Irrigation Dist. v. United States, 33 Fed. Cl. 14, 21 (1995) (holding that because a procurement was an acquisition for the "direct benefit" of the Government, that contract to operate and maintain a "government-owned facility" was a procurement for services covered by the CDA); Greyback Concession, B-2239913, 90-2 CPD ¶ 278 (concessioners were

issued Forest Service special use permits to operate campgrounds); Alpine Camping Servs., B-238,625, 90-1 CPD ¶ 580 (concession contract that required concessioner to "recondition and maintain Forest Service recreation facilities" was a procurement for services) (emphasis added). Because the permit granted to The Sweetwater does not require the permittee to maintain or operate any Government-owned facilities, it is not a contract for the "procurement of services" within the meaning of the CDA.

## II. The Forest Service Did Not Commit Any Tortious Breach Of The Permit

Plaintiff asserts that the "critical representation" by the Forest Service that constitutes a tortious breach of contract was that the Sweetwater bridges "could be used by a lodge operator to perform its contract with the Forest Service." Pl. Br. 15. The opposite is true. Before the Forest Service granted the permit, it told The Sweetwater that the Sweetwater bridges could not be relied upon to operate the lodge.

Indeed, one of the main reasons for holding the June 12, 1995 meeting between representatives of The Sweetwater and the Forest Service was to discuss what would happen if the bridges failed. As Acting Wapiti District Ranger Bob Rossman recorded in his June 13, 1995 email summarizing the meeting, the participants shared a common recognition that "BRIDGE FAILURE OR UNSAFE BRIDGE CONDITION" was a significant risk during the term of the permit. DX[4] 18; DPFF[5] ¶¶ 71-75. At the meeting, Mr. Rossman warned the representatives of The Sweetwater that the bridges were "vulnerable" (Tr. 920:12), because he had observed before 1983 that "the abutments appeared to be highly eroded and

---

[4] "DX" refers to defendant's trial exhibits.

[5] "DPFF" refers to defendant's post-trial proposed findings of fact, filed December 23, 2005.

vulnerable to high water at any time." Tr. 952:8-14.[6] Mr. Mummery testified that one of the principal subjects discussed at the June 12, 1995 meeting was his concern that a "gullywasher" could "wipe[] out the bridges" because the abutments were exposed to scouring. DPFF ¶¶ 73, 57.

It was this shared understanding that the Sweetwater bridges could not be relied upon to operate the lodge that led to the parties' discussion at the meeting about the use of fords as a contingency in the event that the bridges failed. DPFF ¶¶ 93-96. Plaintiff cannot prove its claim that the Government misrepresented the reliability of the Sweetwater bridges when plaintiff admits that it knew there was a substantial risk that the bridges might fail.

Plaintiff asserts that the Government made this alleged misrepresentation by keeping the Sweetwater bridges open to traffic, and not informing The Sweetwater before it closed its purchase of the lodge in June 1995 that bridge inspectors from the Wasatch-Cache National Forest had "concluded" in 1992 that the Shoshone needed to close the bridges. Pl. Br. 15-16. However, the inspectors' conclusions are reflected in the reports, not in any oral comments that they made to Mr. Fischer after completing the reports, and the reports did not recommend that the bridges be closed. Tr. 1448:15-1449:1; DX 9/1, DX 10/1. As Mr. Mummery acknowledged in his testimony, the August 1992 bridge inspection reports do not state that the bridges could not be used for passage of guests to the lodge. Tr. 649:19-25.

Even if the reports had been provided to The Sweetwater, they would have merely confirmed what both Mr. Rossman and Mr. Mummery already knew at the time of the June 12, 1995 meeting: that the bridges were vulnerable to being washed out because the

---

[6] In DPFF ¶ 75, defendant incorrectly cited Mr. Rossman's testimony as appearing at 950:2-14. The correct cite is 952:8-14. Defendant regrets the inadvertent miscitation, and apologizes for any inconvenience to the Court.

abutments had been heavily scoured, and were in "critical condition." DX 9/1, 10/1. Mr. Fischer's handwritten notes on the reports that the bridges "should be closed" and had been "basically condemned" were not recorded until 1997 (JX 7/1, 7/2, 7/8), and thus cannot support any claim for alleged misrepresentations made to The Sweetwater before it bought the lodge in 1995, as plaintiff asserts. Pl. Br. 16.

Plaintiff implies that the Forest Service withheld the bridge inspection reports from The Sweetwater because Mr. Brannon castigated the Forest Service for responding to inquiries about the bridges' condition from Ms. Wanda Smith, the prospective purchaser whose refusal to complete the purchase of the lodge led to The Sweetwater's bid. Pl. Br. 16-17. The evidence does not support plaintiff's speculative assertion. As part of her due diligence in purchasing the lodge, Ms. Smith reasonably asked the special use permit administrators about the condition of the bridges, and was referred to Mr. Fischer. Tr. 779:9-17). Mr. Fischer did not provide her with the inspection reports, but told her on May 15, 1995 that "the bridges were not in good shape and there was a possibility [she would] have to use fords to access the lodge." Tr. 1414:14-15; DX 13/1. Thus, Mr. Fischer gave Ms. Smith the same information that Mr. Rossman conveyed to Mr. Mummery unbidden a month later at the June 12, 1995 meeting. Unlike Ms. Smith, Mr. Mummery never asked for information about the bridges from the Shoshone's engineering staff, as did the Sutherlands in 1997, who were provided the reports in response to their "extensive" questions about the bridges. Tr. 2030:17-23; cf. Hardeman-Monier-Hutcherson v. United States, 458 F.2d 1364, 198 Ct. Cl. 472 (1972) (ruling that Government breached contract by refusing to provide information requested by contractor).

Plaintiff has failed to prove the key element in its tortious breach of contract claim: that the Forest Service misrepresented that the bridges could be relied upon to operate the lodge. Detroit Housing Corp. v. United States, 55 Fed. Cl. 410, 415 (2003). Mr. Rossman testified that he told The Sweetwater's representatives before it closed its purchase of the lodge that the bridges were vulnerable to being washed out, and Mr. Mummery testified that he understood that risk. DPFF ¶¶ 73-75. Thus, the Court should reject plaintiff's tortious breach of contract claim, even if the Court determines that plaintiff has not waived this theory of recovery by failing to plead it. Southern Comfort Builders, Inc. v. United States, 67 Fed. Cl. 124, 153 (2005).

In its post-trial brief, plaintiff also belatedly seeks for the first time to assert a claim for failure to disclose superior knowledge based on the same allegations as its tortious breach of contract claim. Pl. Br. 19-21. The Court should dismiss this claim as untimely, too. Renda Marine, Inc. v. United States, 66 Fed. Cl. 639, 720 (2005) (citing Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003)).

In any event, the Court should reject plaintiff's superior knowledge claim, because plaintiff cannot meet at least two elements it must prove. "The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance." Giesler v United States, 232 F.3d 864, 876 (Fed. Cir. 2000) (emphasis added). Plaintiff cannot show that it was unaware that the bridges were vulnerable to being washed out, nor can it show that it was unable to obtain the bridge inspection reports, which the Forest Service provided to the Sutherlands. DPFF ¶ 138.

Likewise, there is nothing "novel" about inspecting the structural integrity of a bridge. Mr. Mummery observed in 1995 that the northern abutment of the lower Sweetwater bridge was in the same position as shown in a 1997 photograph that depicts it at a 45 degree angle. DPFF ¶ 56; JX 13/4 (lower photograph). It was readily apparent even to a casual observer that the abutments were vulnerable to erosion. Because The Sweetwater was well aware that it could not rely on the bridges to operate the lodge, the Court should deny plaintiff any recovery based upon its claims for misrepresentation, tortious breach of contract, and failure to disclose superior knowledge.

## III. The Forest Service Never Owed, And Never Breached, Any Implied Duties To Cooperate And Not Hinder Asserted By The Sweetwater

Plaintiff's claim that the Forest Service breached implied duties to cooperate and not hinder that allegedly arose from the permit fails for at least three reasons. First, the Forest Service never assumed any duty to seek funding to replace the bridges when it granted the permit to The Sweetwater in 1995. Second, no duty to seek funding arose in 1997 as a result of the Forest Service providing the bridge inspection reports to the Sutherlands, or as a result of Mr. Larson's February 27, 1997 letter to the Sutherlands. Third, the Forest Service did not violate the duties alleged by plaintiff, because the Forest Supervisor retained unfettered discretion to decline to commit funds to replace the Sweetwater bridges.

### A. The Forest Service Never Assumed Any Duty To Seek Funds To Replace The Bridges, And Warned The Sweetwater It Would Have To Use Fords

Plaintiff asserts that by granting the permit to The Sweetwater, the Forest Service undertook a contractual duty to seek funds to replace the Sweetwater bridges, because the bridges were allegedly "essential" for The Sweetwater to maintain and operate the lodge as a "public resort," as required by the permit. Pl. Br. 24-25, 29-30. Plaintiff also asserts that

Forest Service representatives made certain representations at the June 12, 1995 meeting that gave rise to an implied duty to seek funds. Id. 25-26.

The issuance of the permit to The Sweetwater did not in and of itself require the Forest Service to seek funds to replace the bridges. Mr. Rossman, who signed the permit, did not possess any authority to bind the Forest Service to a promise to replace the bridges, because he was not a contracting officer, nor was he authorized to set the terms of a 20-year term permit. Forest Service Manual ("FSM") 2704.34 (DX 32/22). In contrast, in S.A. Healey Co. v. United States, 216 Ct. Cl. 172, 576 F.2d 299, 301 (1978), it was the authorized representative of the contracting officer who approved specific amounts of expected earnings, which were then expressly stated in the contract. Likewise, in Son Broadcasting v. United States, 52 Fed. Cl. 815, 821 (2002), the Court only recognized that the plaintiff held a right that was expressly granted in the permit, and did not hold that the Forest Supervisor possessed the authority to bind the Government to an agreement requiring the disbursement of funds.

Here, the Forest Service never agreed in the permit or elsewhere to seek a specific amount of funding to support its alleged contractual obligations to The Sweetwater. Moreover, the bridges were not essential to operate the lodge, because as discussed below, fords provided an alternative means of access.

Plaintiff asserts that the Forest Service representatives made certain representations during the June 12, 1995 meeting that, like the granting of the permit, gave rise to an implied duty to seek funds to replace the Sweetwater bridges. Pl. Br 25-26. This assertion founders on two crucial facts. First, the Forest Service representatives present at the meeting emphasized that they could not commit the agency to seek funds to replace the bridges,

because higher-level Forest Service officials would decide whether to allocate Capital Improvement Program ("CIP") funds or other funding sources to the project. DPFF ¶¶ 83-92. Messrs. Barker and Bree were not even line officers, and lacked any authority to bind the Forest Service. DPFF ¶ 62. Second, the Forest Service representatives told The Sweetwater's representatives that fords would provide an alternative means of vehicular access to operate the lodge if the Sweetwater bridges became impassable. DPFF ¶¶ 93-96.

The use of fords was a reasonable proposal, because at that time Sweetwater Road was designated both on maps and with signs as an improved dirt road that was intended for (though not restricted to) high-clearance vehicles. DPFF ¶¶ 2-12. It was Mr. Brannon, not the Forest Service, who kept the road smooth enough for passenger vehicles to use. DPFF ¶ 34. There were fords at each of the Sweetwater bridges that Mr. Brannon used for his tractor and heavier vehicles. Tr. 2099:5-2100:18; DX 16/2, 16/4. The Forest Service was not required to ensure that passenger cars had access to the lodge, just as it was not required to provide uninterrupted access at all times to the ski resort in Walter Dawgie Ski Corp. v. United States, 30 Fed Cl. 115, 131 (1993).

Plaintiff identified several representations that it claims gave rise to an implied duty to seek funds to replace the Sweetwater bridges. First, Mr. Mummery testified that Acting Wapiti District Ranger Bob Rossman stated at the meeting that "'it [is] our intent to keep the [Sweetwater] road open to the best of our ability.'" Pl. Br. 25 (emphasis added); Tr. 135:2-8. This alleged statement could not give rise to any duty to seek funds to replace the bridges. Bridges were not necessary to keep the road open, because fords could provide access for lodge visitors as well as hunters and other visitors in high-clearance vehicles.

Plaintiff also asserts that "the Forest Service," which can only speak through natural persons, also "stated" that "'it is our intent to support, to the degree that we [can], access to the lodge facility.'" Pl. Br. 26 (emphasis added). Mr. Barker agreed that it was the intent of the Forest Service at the time of the June 12, 1995 meeting to support access (Tr. 825:5-8), but also testified that "the only thing we agreed to is, hey, if they wash out, the only way we're going to access this is via some fords." Tr. 820:22-24. Mr. Rossman and Mr. Bree testified that the parties discussed that Mr. Mummery would use fords to operate the lodge if the bridges failed. DPFF ¶¶ 93-94. Even Mr. Mummery acknowledged that fords were discussed at the meeting as a "compromise" means of operating the lodge, though he contended that they would cut in half the operating season. DPFF ¶ 95.

Plaintiff also asserts that the Forest Service "agreed" that it had a commitment to "provide for the operation of the lodge to the extent that it could," and also "agreed" that installing fords "would not affect the Forest Service's efforts to obtain funding for the bridges." Pl. Br. 26 (emphasis added). No witness testified that either of these alleged agreements was expressed during the June 12, 1995 meeting, as plaintiff inaccurately implies. The first alleged agreement, like the preceding quotations regarding "supporting access" and "keeping the road open," was what Mr. Rossman testified in his deposition was his intent at the time of the June 12, 1995 meeting, but neither he nor any other witness testified at trial that he made this statement during the meeting. PPFUF ¶ 25; Tr. 131:20-132:13, 824:21-25, 925:2-12. Even if he did, the alleged agreement only purported to commit the Forest Service to assist "to the extent that it could." Pl. Br. 26.

Similarly, neither Mr. Rossman nor any other witness testified that he told The Sweetwater's representatives at the June 12, 1995 meeting that installing fords would have

no effect on efforts to obtain funding to replace the bridges, as plaintiff implies. Pl. Br. 26. At trial, he testified in response to questions from the Court that he did not intend that the installation of fords would result in canceling any request for CIP funds, but he also testified that he was unsure whether installation of fords would make replacing the bridges a higher priority for funds. Tr. 935:17-936:10.

Plaintiff disregards that all three Forest Service employees who participated in the June 12, 1995 meeting testified that they did not make any commitment on behalf of the Forest Service to seek funds to replace the Sweetwater bridges. Mr. Rossman, who was the ranking Forest Service representative and only line officer at the meeting, testified that during the meeting, "I know that we conveyed the information that if the bridges failed, that they would not be replaced. I'm not using the word 'never,' but for the foreseeable future, <u>there's no way that we would be funding that</u>." Tr. 956:15-19 (emphasis added).

Similarly, Mike Bree testified that "we advised [Mr. Mummery] that we – we – we <u>may look at trying to get money</u> to [replace the bridges], but it wasn't – nothing was guaranteed. I mean, we would put in for the capital improvement money <u>if the opportunity arose</u>, but we – we weren't going to guarantee that we were going to replace those bridges." Tr. 770:22-771:3 (emphasis added). Mr. Barker testified that the Forest Service representatives at the meeting agreed to apply for CIP funds for the bridges, but also testified that "we couldn't give him much hope that that kind of funding would come to fruition here when it compared against other accesses and bridges. . . . it was made very clear that this had been put in for CIP before, and I – <u>I didn't need to try again</u>." Tr. 838:6-9, 839:18-20 (emphasis added).

Moreover, the Forest Service representatives made clear at the June 12, 1995 meeting that at most, all they could "try" to do, as Mr. Bree testified, was to submit an application for review by higher-level Forest Service officials. Tr. 783:17-23. The representatives at the meeting lacked any authority to bind these higher-level officials to seeking funds from Congress to replace the bridges. Mr. Rossman testified that he lacked authority to make any decision to fund the replacement of the bridges. Tr. 962:20-963:23. Cf. Son Broadcasting, 52 Fed. Cl. at 821 (contractual commitment found by Court did not require financial disbursement by Forest Supervisor). Mr. Barker testified that "I can't make and the ranger can't make financial obligations of that magnitude." Tr. 837:19-21 (emphasis added).

Mr. Mummery admitted that "I understood that the personnel [at the meeting] could not guarantee what the outcome" would be once higher-level Forest Service officials considered whether to replace the bridges. Tr. 537:16-18. None of the witnesses testified that at the June 12, 1995 meeting, "the Forest Service also pointed out that it could not guarantee that funding for the bridges could be obtained due to circumstances outside their control (such as the need for Congressional approval)," as plaintiff asserts. Pl. Br. 26. These employees were not authorized to undertake a commitment on behalf of the Forest Service that was only subject to Congress appropriating funds.

Because the Forest Service representatives at the June 12, 1995 meeting did not, and could not, bind the Forest Service to seek funds to replace the Sweetwater bridges, and told The Sweetwater it would have to use fords to operate the lodge if the bridges failed, no implied duty to seek funds to replace the bridges arose from the meeting, or from the Forest Service granting The Sweetwater a permit two months later.

### B. The Actions Of The Forest Service In 1997 Did Not Give Rise To Any Duty To Seek Funds To Replace The Bridges

Plaintiff asserts that two events in 1997 provided additional reasons that the Forest Service had an implied duty to seek funds to replace the bridges. Pl. Br. 26-29. First, plaintiff asserts that once The Forest Service provided the bridge inspection reports to the Sutherlands, The Sweetwater could no longer operate the lodge because of liability and safety concerns, which required the Forest Service to take steps to restore access by bridges. Pl. Br. 27 Second, plaintiff asserts that Mr. Larson's February 27, 1997 letter that was sent to Jeff Mummery to clarify the Forest Service's position regarding the Sweetwater bridges confirmed that the Forest Service was required to seek funds to replace the bridges. Both assertions are wrong.

The premise of the first assertion is mistaken. The Forest Service did not prevent The Sweetwater from operating the lodge. Mr. Mummery admitted that the Forest Service never told him that he could not use the bridges to operate the lodge, and he continued to use them himself. DPFF ¶ 147. The bridges were inspected by Jim Fischer in March 1997, and deemed to be sufficiently sound to be used by vehicles within the posted three-ton weight limit. DPFF ¶ 145. Mr. Mummery chose not to operate the lodge for reasons having nothing to do with the Forest Service providing the bridge inspection reports to the Sutherlands. Mr. Larson testified that in 1997 and subsequent years, the reason that Mr. Mummery gave for failing to operate the lodge was not any safety or liability concerns, but that he could not accept advance bookings, because the bridges might wash out before his guests arrived. Tr. 1025:12-1027:20.

Mr. Larson did not agree with Mr. Mummery that The Sweetwater was unable to operate the lodge (Tr. 1343:8-1344:7), as plaintiff asserts. Pl. Br. 27. Mr. Larson did not

require The Sweetwater to operate the lodge because there were 11 other lodges on the North Fork offering recreational opportunities to the public, and the reconstruction of the North Fork Highway, which began in 1995, made it difficult to start operating a lodge. Tr. 1170:17-1171:13, 1299:2-1300:2.

Mr. Larson's February 27, 1997 letter, too, did not give rise to any implied duty to seek funds to replace the bridges. Because he was a District Ranger rather than Forest Supervisor, Mr. Larson did not possess the authority to alter the terms of the permit, or to assume on behalf of the Forest Service any commitment to seek funds to replace the bridges. The Forest Service Manual ("FSM") 2704.34 (DX 37/22) limited his authority to permits whose term was less than five years. Contel of California, Inc. v. United States, 37 Fed. Cl. 68, 73 (1996) (no authority to contract when "agency's internal procedures specifically preclude its agent from exercising such authority"). Mr. Larson never even purported to act on behalf of the Forest Supervisor, who unlike a District Ranger, held the authority to issue and set the terms of 20-year term permits such as the one issued to The Sweetwater. FSM 2704.33 (DX 37/22).

Like the Forest Service officials in Pacific Gas & Elec. Co. v. United States, 3 Cl. Ct. 329 (1983), aff'd, 738 F.2d 452 (Fed. Cir. 1984), Mr. Larson was unable to commit the agency to seeking funds to replace the bridges. It is axiomatic that "[a]nyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government." Trauma Service Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). Mr. Mummery failed to confirm what authority Mr. Larson possessed, but instead, focused his energies on proposing language for Mr. Larson to include in the February 27, 1997 letter. DPFF ¶ 140.

Moreover, the letter did not state that the Forest Service was undertaking an irrevocable commitment to seek funds to replace the Sweetwater bridges. The letter stated that replacement bridges were "currently included" in the Shoshone's CIP program for Fiscal Year 1999, leaving open the possibility that the Forest Service might decide to exclude the project. JX 12. The letter did not represent that "funding for the bridges *would be sought* from Congress," or that "the only event that could prevent the funding from being used to replace the bridges was if Congress denied it," as plaintiff asserts. Pl. Br. 28. The letter merely warned that like any other project that was part of the Forest Service appropriation, "funding is subject to Congressional approval." JX 12. The letter did make clear that the Forest Service would not commit itself to replacing the bridges. The letter cautiously stated that if the bridges became impassable, "alternative solutions to provide access to the area . . . . could include the construction of temporary fords." JX 12 (emphasis added).

The Forest Service representatives who participated in the June 12, 1995 meeting had expressly declined to commit the Forest Service to seeking funds to replace the bridges. Giving the bridge inspection reports to the Sutherlands, and sending the February 27, 1997 letter to Mr. Mummery, did not give rise to any implied duty that the Forest Service had already declined to assume at the time the permit was granted in 1995.

### C. The Forest Service Did Not Breach Any Implied Duties To Cooperate And Not Hinder By Declining To Commit Funds To Replace The Bridges

Plaintiff asserts that in 1999, Congress approved funding to replace the Sweetwater bridges, but Messrs. Fischer and Larson decided to reject the funds because of the prospect that a conservation buyer might acquire the lodge. Pl. Br. 29-31, 34-36. Plaintiff asserts that the decision not to commit funds to replacing the bridges violated implied duties to cooperate and not hinder (Pl. Br. 32, 35), because "the Forest Service was not free to cease its efforts to

seek funds to replace the Sweetwater bridges." Id. 36. These assertions are meritless for several reasons.

First, Congress never approved funds specifically to replace the Sweetwater bridges. Mr. Fischer testified that "Congress approved a Forest Service appropriation. They didn't approve the Sweetwater bridges." Tr. 1500:11-12. Mr. Fischer explained that any funds that were potentially available to fund the replacement of the Sweetwater bridges were just a part of the proposed budget for the Forest Service. Tr. 1498:6-11.

Second, plaintiff's assertion that Mr. Larson pursued a conservation buyer as part of a strategy to remove the lodge is not supported by the evidence. Pl. Br. 34-36. Mr. Larson testified that a conservation buyer might have chosen to operate the lodge, and that he did not oppose that outcome: "[m]y goal was simply to get Jeff out of his investment up there. That was his desire." Tr. 1173:22-1174:5; DRPPFF[7] ¶¶ 142-44. Mr. Larson testified that he sensibly told Mr. Fischer that "[i]t probably wouldn't make good sense to spend money replacing bridges now" (Tr. 1306:11-13) because "we'd had some initial conversations in which there appeared to be some very good interest" by conservation buyers (Tr. 1306:22-24), some of whom might want to remove the lodge or "operate[] in a manner that did not require bridges and roads." Tr. 1176:9-11; DRPPFF ¶ 144. Although Mr. Larson believed that a conservation buyer offered benefits to the taxpayer as well as to Mr. Mummery, Mr. Larson's pursuit of a conservation buyer was premised on a voluntary transaction: "What I was hoping for was that Jeff would find a willing buyer and there would be a willing seller." Tr. 1173:5-7.

[7] "DRPPFF" refers to defendant's responses to plaintiff's proposed findings of fact, filed herewith.

Third, although Messrs. Fischer and Larson believed in approximately late 1999 that funds should not be used to replace the Sweetwater bridges, they did not make the final decision to decline to commit funds, nor did they possess the authority to do so. As the Shoshone's Forest Engineer, Mr. Fischer was a staff officer, not a line officer. DPFF ¶ 157. He testified that "in my job, I'm a recommender and probably decider and final decisions are made by the – were made by the line officer, which would either be the Forest supervisor or district ranger." Tr. 1506:2-5 (emphasis added). Mr. Larson was not a contracting officer, and did not possess authority to do anything with respect to The Sweetwater other than to conduct day-to-day administration of the permit. FSM 2704.33 (DX 37/22).

It was Rebecca Aus, the Forest Supervisor of the Shoshone, who made the final decision in approximately early 2000 not to commit funds to replacing the Sweetwater bridges. Mr. Fischer testified that before he took any action to decline funds for the Sweetwater bridges, he informed Ms. Aus of his and Mr. Larson's proposed plan, and understood that it was "approved by Ms. Aus," as plaintiff concedes. Pl. Br. 37. Mr. Fischer testified that "if she had not liked the idea, then she would have told us, no don't do it." Tr. 1503:17-18. It was only after Ms. Aus "approved" declining the funds that Mr. Fischer contacted the Regional Office, and told them that the Shoshone had decided not to commit the funds to replacing the Sweetwater bridges. Tr. 1503:21-23. The funds had not been earmarked by Congress, and the Shoshone retained the ability to decide whether to spend the funds that it was authorized by the Regional Office to spend. Tr. 1564:7-14.

Ms. Aus testified that the availability of CIP funds to replace the Sweetwater bridges and carry out other projects on the Shoshone prompted her to decide whether the bridges were the highest priority project:

> [W]e had a pot of CIP money that was coming to the Forest that we would be able to spend on CIP projects. . . . the Sweetwater bridges were on the CIP list at the time and I think that's what precipitated the conversation was okay, here's this money that's coming to us. What is our highest priority project . . . we have an enormous deferred maintenance backlog with very, very heavily used recreation facilities, very heavily used trails, administrative sites, all of which required deferred maintenance and why do we have a level two road – bridges on a level two road on this list?

Tr. 1657:6-1658:4 (emphasis added). Ms. Aus testified that because Sweetwater Road was designated for use by high-clearance vehicles, "bridge replacement is questionable, because what we obligated to do there is provide access for high-clearance vehicle and I believe you can do that without bridges." Tr. 1648:19-1649:3.

Ms. Aus testified that the funds that the Shoshone might have used to replace the Sweetwater bridges was eventually redirected into work on the Wapiti campground, a popular campground on the North Fork highway at the foot of Sweetwater Road. Tr. 1670:1-6, 1675:13-1676:11. Contrary to what plaintiff asserts (Pl. Br. 37), Ms. Aus did not contradict Mr. Fischer, who merely testified that the Shoshone did not request an alternative project in that very same year because the budgetary request had already been made. Tr. 1493:11-14. Mr. Fischer did not testify that the CIP funds could not be redirected to the Wapiti campground. Mr. Fischer, who Mr. Larson deferred to as the "subject matter expert" on the budgets for roads and bridges (Tr. 995:18), testified that "road and bridge monies had to fund the roads and bridges that were associated with the recreation projects." Tr. 1427:8-10. Thus, there were no barriers to diverting funds from replacing the Sweetwater bridges to road work in the Wapiti campground. Tr. 1331:7-9.

Fourth, and most importantly, no contractual commitments prevented Ms. Aus from exercising her discretion to commit CIP funds to restoring the Wapiti campground rather

than to replacing the Sweetwater bridges. The issuance of a permit that required The Sweetwater to operate a public resort did not impose any duty on the Forest Service to seek funds to replace the bridges, because fords provided a suitable means of access for an improved dirt road that was designated for use by high-clearance vehicles. DPFF ¶¶ 2-12.

Even if the permit were a contract to operate the lodge, Ms. Aus's decision did not breach the alleged contract, because it was consistent with Mr. Rossman's warning before the permit was granted that The Sweetwater would have to use fords if the bridges failed. As Ms. Aus testified, "Why is it suddenly the government's responsibility to replace those bridges, when we explicitly said you're going to have to use fords if those bridges go out?" Tr. 1668:10-14. The Government could not violate an implied duty to replace the bridges that it had expressly declined to assume before the permit issued by offering fords as an alternative means of access. Both Ms. Aus and Mr. Rossman testified that fords provided an acceptable and safe means of access to the lodge, and were commonly used on the Shoshone and other National Forests. Tr. 957:5-19, 1692:10-1693:6, 1786:7-1787:12.

The Forest Service has consistently demonstrated its willingness to provide fords as an alternative means of vehicular access to the lodge. Ms. Aus's July 16, 2000 letter that responded to Mr. Mummery's proposed operating plan for 2002 stated that "the Forest Service will construct fords over the two Sweetwater Creek crossing" without requiring The Sweetwater to waive any claims for damages. DX 54/4. Ms. Aus testified that "had Mr. Mummery been willing to try the fords, we would have constructed the fords" (Tr. 1720:22-23), and Mr. Mummery has admitted that he has never requested that the Forest Service provide fords. Tr. 650:1-5.

Even if implied duties to cooperate and not hinder The Sweetwater in operating the lodge arose from the permit, providing fords would comply with any obligation that the Forest Service had to ensure vehicular access to the lodge. Operating the lodge using fords would still be commercially viable, even though fords would shorten the operating season of the lodge. Using fords, the lodge could be operated from the end of snowmelt around July 15 (Tr. 141:8-9, DX 64/71) into October, easily meeting the requirement in the permit of operating 93 days per year. JX 1/1; Tr. 1692:15-1693:6. This manner of operation corresponds closely to what Mr. Mummery has proposed as the "high season" for operating the lodge of "June 28-September 26," with a "shoulder season" through October 17, and weekends and holidays thereafter. PX 41/1. Thus using fords would only lose revenue during May and June, which Mr. Mummery does not consider high season.

The small profit projected by the Government's expert appraiser, Mr. John Frome, would be substantially larger, because Mr. Frome assumed that the "peak season" for the lodge would be June through August. DX 64/71. Mr. Frome prepared his report before The Sweetwater provided its business plan that proposes a "high season" that runs from late June through September, a month later than the peak season on which Mr. Frome's income projection is based.

Mr. Mummery testified that "[w]e are discovering our fastest growing season in the Cody economy is actually September because that's when the empty nesters vacation, and they have money." Tr. 422:18-21. Mr. Mummery claims that he would have capitalized on this phenomenon by operating the lodge for adults only. Tr. 690:5-10. Fords would not interfere with this operating schedule because, as Mr. Barker testified, "[w]e have very few wet falls" (Tr. 805:18-19). If Mr. Mummery wanted to avoid any risk of liability for lodge

guests that attempted to cross the fords during rainstorms, guests could park their cars at the Wapiti campground, and be ferried up to the lodge by Mr. Mummery using a high-clearance vehicle that could clear the fords. Tr. 1330:15-1332:2, 1695:7-16.

Plaintiff contends that Ms. Aus lacked the discretion to apply available CIP funds to projects other than replacing the Sweetwater bridges, because "'an agency is *required* to reprogram [funds] if doing so is necessary to meet debts or obligations.'" Pl. Br. 38 (quoting Thompson v. Cherokee Nation of Okla., 334 F.3d 1075, 1086 (Fed. Cir. 2003), aff'd, 543 U.S. 631 (2005)). Thompson is inapposite, because the Government admitted that it had entered a binding contract that required it to pay the Cherokee indirect support costs to operate health clinics formerly operated by the Department of Health and Human Services. 125 S. Ct. at 1177. In contrast, the Forest Service did not owe The Sweetwater any obligation to replace the Sweetwater bridges, because "vehicular access over the Sweetwater bridges" was not essential for The Sweetwater to operate the lodge. If the Forest Service owed any duty, at most it was only required to provide fords as a means of vehicular access to the lodge.

There is no support of plaintiff's suggestion that the Forest Service engaged in any conduct "'tantamount to fraud.'" Pl. Br. 38-39 (quoting Centex Corp. v. United States, 49 Fed. Cl. 691, 709 (2001), aff'd, 395 F.3d 1283 (Fed. Cir. 2005)). The Forest Service representative told Mr. Mummery before the permit was granted that higher-level Forest Service officials might not approve funding to replace the bridges, and The Sweetwater might have to operate the lodge using fords.

In sum, no implied duty to replace the Sweetwater bridges ever arose from the granting of the permit or any representations made by Forest Service employees in 1995 and

1997. None of the employees whose alleged statements and actions plaintiff relies upon possessed sufficient authority to enter contracts that restricted the ability of higher-level Forest Service officials, such as Ms. Aus, from deciding in 2000 not to fund the replacement of the Sweetwater bridges. DPFF ¶¶ 62-64, 157-58; FSM 2704.34. By offering to install fords, the Forest Service fulfilled any implied duty it may have had to provide vehicular access to the lodge, because the lodge can be operated in a commercially viable manner using fords. In contrast, The Sweetwater has violated any implied duties to cooperate and not hinder that arise from the permit, because it failed to operate the lodge using bridges before 2001, and by never trying to operate the lodge using fords. DPFF ¶ 154; Cedar Lumber v. United States, 5 Cl. Ct. 539, 459 (1984) ("there is an implied obligation on both parties to cooperate and not to hinder the performance of the other party") (emphasis added).

**IV. The Forest Service Has Not Terminated The Lodge's Operations, And Does Not Owe The Sweetwater "Equitable Consideration" Pursuant To Clause 15**

Plaintiff asserts that by deciding not to commit funds to replace the Sweetwater bridges, the Forest Service terminated "lodge operations." Pl. Br. 40. Plaintiff also asserts that by not replacing the bridges, the Forest Service triggered clause 15 of the permit, which plaintiff contends "obligates the Forest Service to compensate The Sweetwater when the Forest Service terminates lodge operations." Id. 41 (emphasis added) Both assertions are incorrect.

First, as shown above (pp. 14-15), the Forest Service did not "terminate operations" of the lodge by not replacing the Sweetwater bridges. Mr. Mummery chose to cease operating the lodge in 1997 for reasons that have shifted over time. DPFF ¶ 144; Tr. 194:17-195:7. The bridges were inspected in March 1997 by Forest Engineer Jim Fischer, and remained open to vehicular traffic until April 2001. DPFF ¶¶ 145, 172. Since April 2001,

the Forest Service has offered to provide fords to allow The Sweetwater to operate the lodge. DX 54/4; Tr. 1720:22-23. The Forest Service has never prohibited The Sweetwater from operating the lodge, but instead has directed it to operate, as required by the permit. JX 21.

Second, clause 15 does not "address[] situations where the Forest Service has terminated lodge operations," as plaintiff contends. Pl. Br. 40 (emphasis added). Plaintiff tries to rewrite the terms of clause 15, which states that the Forest Service will pay the permittee equitable consideration only if a duly authorized Forest Service official determines that "the public interest requires termination of this permit," not lodge operations. JX 1 (emphasis added). The requirement to compensate the permittee only arises if the Forest Service revokes authorization to conduct the activities allowed by the permit, and is not triggered by cessation of the lodge's operations. Forest Service regulations define both "termination" and "revocation" as "the cessation of a special use authorization." 36 C.F.R. § 251.51. The Notice of Non-Compliance that the Forest Service served on The Sweetwater in December 2001 "provide[d] notice of facts that may warrant revocation of your permit," but the Forest Service has never proceeded to terminate or revoke the permit, despite The Sweetwater's subsequent failure to submit an acceptable operating plan. JX 21/2; DPFF ¶ 178. Plaintiff has failed to prove that there was any "termination of this permit" within the meaning of clause 15.

The evidence does not support plaintiff's assertion that Mr. Larson as well as Ms. Aus and the Regional Forester, Lyle Laverty, shared a desire to remove The Sweetwater's lodge "to put the land area where the lodge operations occurred to a better public use." Pl. Br. 42. Mr. Larson testified that Mr. Laverty did not say "not to ever build the bridges, but to pursue and exhaust all avenues to go an alternative route." Tr. 1179:24-25. Mr. Larson

testified that this strategy would not necessarily result in terminating the operation of the lodge, but might only result in the lodge being "operated in a manner that did not require bridges and roads." Tr. 1176:9-10. Neither Mr. Larson nor Ms. Aus ever concluded that the public interest "requires" termination of the permit. DPFF ¶ 155.

Mr. Larson's goal was not, as plaintiff asserts, "terminating lodge operations," but finding a purchaser who would offer a price acceptable to Mr. Mummery, so as to relieve Mr. Mummery of his obligation to operate the lodge. DPFF ¶ 155. Mr. Larson testified that "I wasn't being picky. I was looking for anybody that would come up with the cash." Tr. 1270:5-13. In response to the question from plaintiff's counsel "you didn't care whether it was by a conservation buyer buying it or by someone buying it to operate it?" Mr. Larson testified, "That's correct and I would not have stopped any kind of sale to private entity to operate that resort." Tr. 1173:25-1174:5. Mr. Larson testified that even "a conservation buyer may have said I want to retain what's up there, but I don't need a road or I need a road and here's what we're going to do." Tr. 1269:9-12. Mr. Larson testified that if a conservation buyer "would have walked in and said, you know, we're wanting to buy this, but you know, we don't really want to do away with the resort. We have an idea how we might use this in a public way. I'm sure we would have considered it." Tr. 1203:6-10.

In support of its assertion that defendant has violated clause 15, plaintiff relies upon a single decision of this Court, Wetsel-Oviatt Lumber Co., Inc. v. United States, 38 Fed. Cl. 563, 565 (1997). Pl. Br. 42-43. As explained in our post-trial brief (pp. 29-30), in Wetsel-Oviatt, the Government conceded that it had terminated the timber contracts at issue as the result of an environmental assessment. Id. at 570. In contrast, the Forest Service never conducted any environmental assessment that concluded that The Sweetwater's lodge caused

any harmful effects, nor does the Government concede that it has terminated the permit that authorizes The Sweetwater to operate its lodge. DPFF ¶ 156. Plaintiff also relies upon Davidson Indus., Inc., AGBCA No. 95-166-1, 96-2 BCA ¶ 28,299 (1996)), in which there also was no dispute that the Forest Service had suspended a portion of a timber sale contract until completion of a consultation process with the United States Fish and Wildlife Service about concerns over the effect on the spotted owl and marbled murrelet. 96-2 BCA ¶ 28,299.

Mr. Mummery testified that the Forest Service representatives told him that clause 15 would require the agency to buy the lodge if the bridges were not replaced. Tr. 546:8-12, 564:5-10. It is noteworthy that this testimony is cited nowhere in plaintiff's post-trial brief or proposed findings of fact. Plaintiff only asserts that clause 15 was "discussed" at the June 12, 1995 meeting. PPFF ¶ 57. Plaintiff's silence speaks volumes about the veracity of Mr. Mummery's testimony, which was contradicted by all three Forest Service witnesses and even The Sweetwater's own lawyer. DPFF ¶¶ 99-106.

Plaintiff has failed to prove that the Forest Service violated clause 15 of the permit. The Forest Service did not terminate the lodge's operations, but rather, Mr. Mummery chose not to operate the lodge. The Forest Service has never terminated the permit that authorizes The Sweetwater to operate its lodge, and thus does not owe The Sweetwater any "equitable consideration" pursuant to clause 15.

## V. Plaintiff Has Failed To Prove Any Breach Of Contract Damages

In our post-trial brief (pp. 42-66), we have comprehensively addressed the reasons that plaintiff is not entitled to recover any of the three categories of damages that it seeks for its breach of contract claims: out-of-pocket expenses, lost profits, and value of the lodge facilities. Rather than belaboring those reasons, we have addressed below only those

assertions in section "V." of plaintiff's post-trial brief that are not addressed in our post-trial brief, incorporating by reference the assertions in our earlier brief in response to plaintiff's other arguments.

**A. Out-Of-Pocket Expenses**

First, plaintiff claims that it seeks $459,201 for out-of-pocket expenses it allegedly has incurred to maintain the lodge from 1997 through 2004. Pl. Br. 46. This amount appears to be derived by subtracting the amounts for 1995 and 1996 from the $520,126 figure on the far right-hand side of the "TOTAL COSTS PER YEAR" line of the "Sweetwater Lodge Operating Expenditures" spreadsheet. Tr. 461:11-462:14; PX 42. We challenge these expenses for the reasons explained in our post-trial brief (pp. 43-47).

Plaintiff also seeks $60,800 for its estimated out-of-pocket expenses for January 2005 through March 2006. Pl. Br. 46; PPFF ¶ 202. During Mr. Mummery's trial testimony, he failed to explain any methodology that he used to develop the estimate upon which this figure is based, which was $40,000 for the period January through September 2005. Tr. 462:15-24. Even if plaintiff were entitled to recover any out-of-pocket expenses, it has not carried its burden to prove its damages after 2004 with "'reasonable certainty.'" Southern Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1334 (Fed. Cir. 2005) (quoting Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001)).

**B. Lost Profits**

The Sweetwater's lost profits claim is based in part on the business plan that Mr. Mummery developed in 2005 to support plaintiff's damages claim by projecting the revenues that the lodge would have generated beginning in 1997. PX 41. Mr. Mummery testified about the newly created business plan "I probably have to, in all full disclosure, have to

admit I have the advantage. It's seven or eight years later, so I'm creating this with a lot more knowledge than maybe I had in the summer of 1997." Tr. 410:22-25. Mr. Mummery's admission casts further doubt on whether the profits that plaintiff now seeks were contemplated by The Sweetwater or the Forest Service in 1995, or could have been attained. LaVan v. United States, 382 F.3d 1340, 1351 (Fed. Cir. 2004); see also our post-trial brief (pp. 47-57).

Plaintiff asserts that based upon the 2005 business plan, it projected $830,000 in lost profits for the period 1997 through March 2006. Pl. Br. 47.[8] This figure appears to be derived from the 2005 business plan, which projects profits for the period 1997 through 2004 as $830,518. PX 41, p. 10. Plaintiff also asserts that applying a 6 percent increase and an undisclosed interest rate to its alleged 1996 profits of $34,995 for the nine years 1997-2005 yields a figure of $492,500. However, plaintiff has not identified any evidence that explains what interest rate it used to arrive at this figure, either in the exhibits or trial transcript, nor has it shown any calculations behind the "methodology" to which it refers. PPFF ¶ 205.

Plaintiff offers no rationale for averaging the $830,000 and $492,500 figures to arrive at its lost profits claim of $661,250. Pl. Br. 47.[9] The average effective gross income generated by the lodge during the Brannons' last five years of operations was approximately $80,000 per year. DX 64/58, DX 73. Mr. Mummery himself projected in 1995 that the lodge would only generate gross sales of $152,000 by its fourth and fifth years of operations, and pretax profits of $32,514. His 2005 business plan, which projects gross sales of

---

[8] Plaintiff's reference to $880,000 elsewhere in its brief appears to be a typographical error. Pl. Br. 44 (last line).

[9] Plaintiff's counsel appears to have adopted his comment that "on average" a person with one foot in boiling water and one foot in ice cold water is pretty comfortable. Tr. 1539:5-8.

$586,865 and profits of $104,047 in 2005, is five times the revenues that the Brannons generated, and four times the revenues that Mr. Mummery himself projected, for a lodge that has only five cabins.

Finally, plaintiff has not proven why it is entitled to recover future lost profits for the period 2005-14, when Mr. Mummery's past efforts to sell the lodge predict that he would have sold it long before the term of the permit had run.

### C. Value Of Lodge

Plaintiff asserts that it is entitled to recover the reproduction cost of its lodge minus physical depreciation as "equitable consideration" pursuant to clause 15 of the permit. Pl. Br. 48. Plaintiff asserts that because the National Park Service, a "sister agency," has used this same method "in very comparable situations" to value concession buildings in Yellowstone National Park, this "demonstrates that it constitutes a reasonable method by which to assess 'equitable consideration.'" Pl. Br. 49. The Park Service is required by statute to value concessions using this method. 16 U.S.C. § 5954(a)(3). No similar statute requires the Forest Service to use this same method in setting "equitable consideration."

Plaintiff again offers no rationale for averaging the reproduction value and the market value to reach its interest-adjusted average of $1,227,500. Pl. Br. 49. Plaintiff tries to shore up this number by asserting that the value of the lodge is $1,230,000 with a "projected income valuation approach." Id. This third approach is flawed in numerous respects.

First, it is based upon the wildly optimistic profit projections reflected in Mr. Mummery's 2005 "business plan." Tr. 465:16-466:12. Second, this income valuation approach is not based upon the testimony of either of plaintiff's experts. Mr. Mangus, plaintiff's appraiser, was asked not to use an income approach in developing his value, and

commented in his appraisal report that "[t]he appraiser feels that it may be inappropriate to use other lodges in the immediate area to project cash flows and expenses for a different type of guest lodge operation." PX 44, p. 2. The income approach plaintiff tries to rely upon was developed by Mr. Mummery, whose testimony reveals that it is based upon exactly what Mr. Mangus rejected – dissimilar properties:

> I talked to a couple of people that are in the hotel and motel business, and I was using standard sort of motels, which may not be totally applicable to a little old lodge, but it was the best I could come up with to come up with something that I can use as a comparable. And they felt that a standard motel, sort of an average, will sell for two and a half to three times gross revenue, or approximately 15 times pretax earnings. So I did that. I took the average of my two methodologies, which is 82,000 bucks. I multiplied 15 times earnings, which gave me – I would get a bigger number, by the way, if I used gross revenues, but gave me 1,230,000. I kinda put all three of those together, You Honor, and I said I think 1.2 million sounds about right.

Tr. 465:21-466:12 (emphasis added). Even if plaintiff were entitled to recover the value of the lodge, the wildly varying results of the different valuation methods plaintiff prevent it from proving that its damages with "reasonable certainty." Bluebonnet, 266 F.3d at 1355.

## VI. Plaintiff Is Unable To State A Claim For A Fifth Amendment Taking

Plaintiff appears to assert its taking claim as an alternative to its breach of contract claims: "[i]n the event that the Court were to determine that the Forest Service has not breached its contract with The Sweetwater as demonstrated above, the Forest Service's actions would then constitute a taking of The Sweetwater's property without just compensation." Pl. Br. 50. However, plaintiff asserts that it is entitled to recover not only the value of the lodge, but also the value of "the contract," meaning the permit, whose value is "the lost profits which would have been received under it." As demonstrated in our post-

trial brief (pp. 39-42), the Federal Circuit has rejected taking claims asserting that a property interest exists in a permit and in personal property used pursuant to the permit. See, e.g., American Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1374-83 (Fed. Cir. 2004), cert. denied, ____ U.S. ____, 125 S. Ct. 2963 (2005). Plaintiff cannot recover any lost profits for the taking of the permit, even if plaintiff were awarded the value of the lodge under a taking theory.

**CONCLUSION**

For the foregoing reasons, the Government respectfully request that this Court deny plaintiff all relief it seeks in its first amended complaint, and grant us such other relief as the Court may see fit.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

OF COUNSEL:

KENNETH S. CAPPS
Attorney-Advisor
Office of the General Counsel
Mountain Region
U.S. Department of Agriculture
P.O. Box 25005
Denver, CO 80225-0005

s/ John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
1100 L St. N.W., 8th floor
Washington, D.C. 20530
Tel: (202) 307-0277
Fax: (202) 307-0972

February 1, 2006

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 1st day of February, 2006, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John H. Williamson