**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC,<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | No. 02-1795C<br>(Judge Merow) |

**DEFENDANT'S RESPONSES TO**
**PLAINTIFF'S PROPOSED FINDING OF FACT**

Pursuant to the Court's Order dated January 27, 2006 order, defendant, the United States, respectfully files its responses to the proposed findings of fact ("PPFF") filed by plaintiff, The Sweetwater, A Wilderness Lodge LLC ("The Sweetwater").

*Location of the Sweetwater Lodge*

1. The Sweetwater Lodge is located on, and entirely surrounded by, Forest Service land within the Shoshone National Forest ("Shoshone"). *See* Joint Exhibit 1 at p. 16 [hereinafter cited to as "JX __"]; Defendant's Corrected Proposed Findings of Uncontroverted Facts at ¶ 1 (dated December 23, 2003)[hereinafter cited to as "Def. Facts ¶ __"].

**Defendant's Response To PPFF ¶ 1**

Defendant agrees.

2. The lodge assets are located in a canyon at the end of the Sweetwater Road (also referred to as FSR 423), which is a road approximately 3.5 miles in length. *The Sweetwater, A*

*Wilderness Lodge LLC v. The United States*, No. 02-1795c (slip opinion)(Dec. 30, 2004)(at 2)[hereinafter cited to as "*Sweetwater* at __"]; Tr. 809:16-812:21[1]; Declaration of Jeffrey C. Mummery at ¶¶ 4-5 (App. 213-214 in Appendix to Plaintiff's Memorandum in Support of its Cross-Motion for Summary Judgment As To Liability On Counts I and II and Opposition to Defendant's Motion to Dismiss Count II For Lack of Subject Matter Jurisdiction and Motion to Dismiss Counts I and II for Failure to State a Claim, or, In the Alternative, Motion for Summary Judgment on Counts I and II (Feb. 6, 2004)[hereinafter cited to as "Mummery Dec. at ¶ __ (App. __"].

**Defendant's Response To PPFF ¶ 2**

Defendant agrees.

3. Sweetwater Road, which is controlled and maintained by the Forest Service, provides the only vehicular access to the lodge and is part of the Forest Service's road system. JX 5 at p. 1 (Sweetwater Road "provides the only access for the permitted lodge owner and it's users"); *Sweetwater* at 2.

**Defendant's Response to PPFF ¶ 3**

Defendant agrees with the proposed finding, but disagrees with any implication that the Forest Service agreed that it would perform all maintenance on Sweetwater Road. Mr. Rossman's June 13, 1995 email states that "JEFF, HAVING AN INTEREST IN THE SAFETY OF HIS GUESTS, WILL MAINTAIN THE ROAD AS HE SEES FIT." DX 18. Forest Service

[1] "Tr." refers to the transcript of the hearing held in Cody, Wyoming on September 19-29, 2005 by page and line number.

maps and signs in 1995 clearly identified that Sweetwater Road was not maintained for passenger vehicles. DPFF[2] ¶¶ 6-12.

4. There are three bridges on Sweetwater Road, all of which are owned and controlled by the Forest Service. The first bridge is located approximately a quarter mile from the beginning of Sweetwater Road where it meets Yellowstone Highway. This bridge spans the North Fork of the Shoshone River and is hereinafter referred to as the "North Fork Bridge." There are two additional bridges on Sweetwater Road at distances of approximately 2.5 and 3 miles from the Yellowstone Highway, both of which span Sweetwater Creek. These two bridges are hereinafter referred to as the "Sweetwater bridges." *Sweetwater* at 1-2.

**Defendant's Response to PPFF ¶ 4**

Defendant agrees that the Forest Service owns and controls the three bridges on Sweetwater Road, but notes that it did not build the two Sweetwater bridges (DPFF ¶¶ 18-19), nor did it own them until sometime after 1995 when, pursuant to 36 C.F.R. § 251.60(h)(2)(i), ownership of the bridges passed by default to the Government because the Brannons failed to remove them after selling the lodge to The Sweetwater. Defendant agrees with the second, third, fourth, and fifth sentences of the proposed finding.

5. The creek which the Sweetwater bridges spanned is subject to flash flooding throughout the year during rainstorms, and most often during the spring during snowmelt, where the water level would suddenly increase dramatically and anyone trying to cross the creek, whether they

[2] "DPFF" refers to defendant's proposed findings of fact, filed December 23, 2005.

were on foot or in a vehicle, could be swept away and killed. Tr. 802:9-807:25; Tr. 910:13-911:6; Tr. 1695:17-1696:21.

**Defendant's response to PPFF ¶ 5**

Defendant agrees that Sweetwater Creek, like many other drainages in the Shoshone, is subject to flash flooding, which could result in serious injury or death to someone crossing the creek on foot or in a vehicle, but notes that the Forest Service takes steps to notify visitors that there are hazards that they may encounter. PX 40. Defendant also notes that Monte Barker, Shoshone National Forest Wildlife Biologist, testified that flash flooding of Sweetwater Creek was "most prevalent . . . during the spring and early summer," before the three months (July, August, and September) that Mr. Mummery designated as "high season" in the business plan that he did not create until 2005 to support his damages claim. Tr. 805:14-15; PX 41-1. Mr. Barker also testified that "[w]e have very few wet falls." Tr. 805:18-19.

6. The owner of the lodge assets would be unable to operate an ongoing resort business without vehicular access over the Sweetwater bridges. Tr. 2719:9-2723:15 (the Forest Service's expert witness concluded that accessing the lodge via fords using horses or vehicles was not feasible); Defendant's Exhibit 62 (at pages 67-69)[hereinafter cited to as "DX __"]; Mummery Dec. at ¶ 49 (App. 225); Tr. 823:10-16 (Mr. Barker, who is an experienced backcountry ranger, also concluded that accessing the lodge via horseback was not a viable option).

**Defendant's Response to PPFF ¶ 6**

Defendant disagrees. Vehicular access to the lodge does not require bridges, because fords offer a viable alternative means of vehicular access. Contrary to this proposed finding, defendant's appraisal expert, Mr. John Frome, testified that operating the lodge using fords would generate a small net income that would cover operating expenses if its peak season were June through August. Tr. 2723:6-14. This income would be substantially larger if, as Mr. Mummery now proposes, the peak season were June 28 through September 26 (PX 41, p. 1), because the lodge would only lose approximately two weeks of its peak season (the first half of July) rather than half of its peak season (June and first half of July). Acting Wapiti District Ranger Bob Rossman testified that he considered fords to be a safe means of reaching the lodge (Tr. 957:5-19), and Forest Supervisor Rebecca Aus also testified that fords are used routinely in the Shoshone and other National Forests. Tr. 1692:10-1693:6, 1786:7-1787:12. Realty Specialist Jennifer Watson testified that fords already existed on Sweetwater Road in 1995, and were used by the Brannons. Tr. 2099:5-2100:18; DX 16/2, 16/4.

Defendant agrees that Mr. Frome testified that he did not consider it to be feasible to operate The Sweetwater's lodge relying exclusively on horseback access. Tr. 2721:1-10. At trial, Mr. Barker testified that operating the lodge by horseback "may be possible, although I don't know how financially viable it is." Tr. 823:23-25. During his deposition, Mr. Barker testified that the lodge could be easily reached by horseback without crossing Sweetwater Creek, and stated, "I've seen people take lodges that we thought was totally unviable with the right types of marketing and individuals and so forth, they made them work." Def. Resp. to PFUF[3] ¶ 13.

[3] "Def. Resp. to PFUF" refers to defendant's responses to plaintiff's proposed findings of uncontroverted fact, filed March 29, 2004.

7. The absence of vehicular access would severely limit any operating season for the lodge, greatly increase operating and other overhead expenses for lodge operations, greatly increase the risk of injury or death to lodge patrons, and similarly increase liability to the lodge. Tr. 2722:4-15 (Forest Service's expert witness admitted that season would be cut in half using fords); Mummery Dec. ¶ 49 (App. 225).

**Defendant's Response to PPFF ¶ 7**

Defendant disagrees. The absence of bridges would only modestly limit the high season for the lodge now proposed by Mr. Mummery. PX 41. There is no evidence that operating the lodge using fords would "greatly increase operating and other overhead expenses." As Ms. Aus testified, Mr. Mummery owned a four-wheel-drive Suburban that he could use to ferry guests from the parking lot at Wapiti Campground to the lodge, which would also diminish the risk of injury or death to lodge patrons and any associated liability for The Sweetwater. Tr. 1695:7-16.

As noted in Defendant's Response to PPFF ¶ 6, The basis of Mr. Frome's cited testimony was his May 2005 report, which assumed that the season for operating the lodge was June, July, and August. DX 64/71. After Mr. Frome prepared this report, plaintiff served Mr. Mummery's business plan, which proposed a "high season" for operating the lodge of June 28-September 26, plus a "shoulder season" September 27-October 17. PX 41, p. 1. Snowmelt would not affect use of the fords in September and October, because it is usually gone by mid-July, and rainfall would be unlikely to interfere with the use of fords. Mr. Barker testified that "[w]e have very few wet falls." Tr. 805:18-19.

8. As one Forest Service employee familiar with the permit and lodge operations stated,

operating the lodge without vehicular access over the bridges would be a total change from what the Forest Service intended the operations to be at the time the permit was signed. Tr. 853:13-18 (testimony of Monte Barker).

**Defendant's Response to PPFF ¶ 8**

Defendant agrees that this proposed finding accurately represents the cited portion of Mr. Barker's testimony, but disagrees that Mr. Barker was authorized to express the intent of the Forest Service, and also disagrees that Mr. Barker ever told The Sweetwater's representatives that the Forest Service would ensure that The Sweetwater could operate the lodge using bridges. On the contrary, Mr. Barker testified that "what we agreed to is that if the bridges went out, fords would – would be there." Tr. 837:7-8.

9. A Forest Service report prepared in 1992 and revised in 1997 supporting replacement of the Sweetwater bridges concluded that "[s]hould the [Sweetwater] bridges fail and this access be lost, legal action resulting in considerable cost to the government will surely be forth coming from the lodge permittee *as well as the service to the public being lost.*" JX 10(page 5)(emphasis added). In addition, in a letter to the Forest Service dated 1986, the prior permittee stated that "a major catastrophe (*i.e.*, a bridge wash-out) would obviously wipe us out." Plaintiff's Exhibit 4 [hereinafter cited to as "PX __"].

**Defendant's Response to PPFF ¶ 9**

Defendant agrees that plaintiff has accurately quoted the cited passages, but notes that before Mr. Mummery bought the lodge, he understood that the Forest Service could not make any commitments to replace the bridges if they became impassable. DPFF ¶¶ 87-91.

10. The lodge contributes to about 20% of the use made by the public of the road. Tr. 105:2-8. Sweetwater Road also provides public recreational access to the Shoshone National Forest and is used by the Forest Service for administrative purposes related to monitoring and maintaining the Forest. Tr. 847:7-848:10; JX 5 (page 1); Tr.921:21-922:11. The Forest Service was encouraging more public use of the Sweetwater Road by equestrians hauling horse trailers up the road and had built a turn-around for those vehicles at the end of the road just before the permit area. Tr. 171:4-17 Tr. 849:18-851:25.

**Defendant's Response to PPFF ¶ 10**

Defendant disagrees that the lodge only contributes to 20 percent of the use made by the public of the road. In the testimony cited in the first sentence of this proposed finding, Mr. Mummery stated that he "would guess that the lodge is less than 20 percent of use of the road." Tr. 105:7-8 (emphasis added). Numerous Forest Service employees testified that Sweetwater Road carried little traffic other than lodge visitors outside hunting season. DPFF ¶ 15.

Defendant disagrees that the Forest Service has any significant need for Sweetwater Road for administrative purporses. Mr. Barker testified that "[w]e don't have any need for range management purposes as far as livestock grazing because we have none. We don't have any timber base up there." Tr. 815:18-21.

Defendant also disagrees that the Forest Service encouraged more public use of Sweetwater Road by building a turnaround at the end of the road. Mr. Barker testified that the turnaround was not created to encourage more visitors, but to accommodate Mr. Mummery, because users of the road were tearing down the fence that marked the permit area so that they could turn around. Tr. 850:1-8.

*Lodge facilities*

11. The facilities at The Sweetwater Lodge include an original lodge building with a dining room, lounge area with original river rock fireplace, office, additional room, cook's quarters, two bathrooms, large kitchen with butlers' pantry, and laundry room with additional storage. JX 1 (p. 1/16); PX 44 (Que Mangus appraisal).

**Defendant's Response to PPFF ¶ 11**

Defendant disagrees. Mr. Mangus's report simply states that the lodge has a "fireplace" and "a kitchen, dining room, lounge and storage area." PX 44, p. 9. There is no mention of a "cook's quarters." The fireplace is not described as "original river rock," nor is the kitchen described as "large."

12. The facilities also include a main cabin with living room, dining area, full kitchen, bathroom, Master bedroom, loft with walk out balcony, large enclosed front porch, full basement which has Sweetwater Spring and spring box therein, and attached maintenance shop, and another large cabin including living room with native rock fireplace and chimney, dining room, bedroom, bathroom, kitchen and attached covered porch. JX 1 (p. 1/16); PX 44 (Que Mangus appraisal).

**Defendant's Response to PPFF ¶ 12**

Defendant disagrees. Mr. Mangus's report only describes the "chalet" as having "living quarters . . . enclosed porch . . . outside wood deck. . . . upper level loft." PX 44, p. 9. The entirety of Mr. Mangus's description of the Absaroka Cabin is: "470 sq. ft. of floor space and a 132 sq. ft. porch." Id.

13. The facilities also include four additional cabins all of which include a sitting room/bedroom with native rock fireplace and chimney, dressing room, bathroom and covered porch with view of Sweetwater Creek. JX 1 (p.1/16); PX 44 (Que Mangus appraisal).

**Defendant's Response to PPFF ¶ 13**

Defendant disagrees. Mr. Mangus's report does not describe any of the other four cabins as having "native rock fireplace and chimneys" or a "dressing room." The report simply states that "each cabin contains around 355 sq. ft."

*Nature of Term SUPs*

14. In order to use the Sweetwater Lodge, the owner must obtain a Term Special Use Permit ("Term SUP") from the Forest Service. 36 C.F.R. § 251.50(a); Tr. 97:23-25.

**Defendant's Response to PPFF ¶ 14**

Defendant agrees that all uses of National Forest System lands are special uses, including ownership and use of The Sweetwater's lodge, and that before conducting a special use, the owner must submit a proposal and obtain authorization from an authorized Forest Service officer. 36 C.F.R. § 251.50(a).

15. If a Term SUP is abandoned, terminated, revoked or cancelled, the owner of the assets must remove them on its own expense from National Forest lands. 36 C.F.R. § 251.60(h)(2)(i).

**Defendant's Response to PPFF ¶ 15**

Defendant agrees that the cited regulation states, "Upon revocation or termination of a special use authorization, the holder must remove within a reasonable time the structures and improvements and shall restore the site to a condition satisfactory to the authorized officer,

unless the requirement to remove structures or improvements is otherwise waived in writing or in the authorization." 36 C.F.R. § 251.60(h)(2)(i).

16. One of the purposes of recreational Term SUPs is to serve, by regulation and by purpose, as a delivery system to provide public services. Tr. 1949:17-1950:16 (testimony of Gary Reynolds, the Recreation, Wilderness and Land Staff Officer for the Shoshone).

**Defendant's Response to PPFF ¶ 16**

Defendant agrees that plaintiff has accurately represented a portion of Mr. Reynolds' testimony, but Mr. Reynolds also testified that special use permits are not a way for the Government to obtain services, and he distinguished special use permits from concession contracts. Tr. 1975:20-1977:24. Defendant also notes that the purpose of special use permits is a legal issue, and Mr. Reynolds is not a lawyer, nor was he a Forest Service line officer.

17. The purpose of Term Special Use Permits is to provide "a service that the Forest Service is supposed to provide to the public and deem that a private entity could do—could do the job so the Forest Service wouldn't have to open up a lodge." Tr. 78:20-789:1 (testimony of Mike Bree); Tr. 801:18-802:8; *see* Tr. 857:20-25.

**Defendant's Response to PPFF ¶ 17**

Defendant agrees that plaintiff has accurately quoted the cited testimony, but notes that the purpose of special use permits is a legal issue, and Mr. Bree is not a lawyer, nor is he a line officer.

18. Mr. Monte Barker, who was a member of the Shoshone special use permit team, stated that "concessionaire permittees are part of the Forest Service who are permitted to provide a service that we want provided, it's not for convenience of the permittee. It's to meet a responsibility providing public service to the public, and so we allow the numbers and the locations in order to provide what we feel to meet the public need." Tr. 834:5-11. Mr. Barker further stated that he treated permittees as employees. Tr. 866:20-23.

**Defendant's Response to PPFF ¶ 18**

Defendant agrees that plaintiff has accurately quoted the cited testimony, but notes that the purpose of special use permits is a legal issue, and Mr. Barker is not a lawyer, nor is he a line officer.

19. By their own conditions, Term SUPs create an obligation against the United States by requiring the United States to pay equitable consideration for any improvement authorized by the permit which the Forest Service revokes, for reasons other than breach of the provisions, prior to the end of the term or by mutual consent with the permit holder. *Sweetwater* at 4-5; 36 C.F.R. §251.51 (Term permits provide compensable rights to permittees); JX 1 (at clause 15).

**Defendant's Response to PPFF ¶ 19**

Defendant agrees that clause 15 of the permit issued to The Sweetwater provides that if the Forest Service "shall determine that the public interest requires termination of this permit . . . the United States shall be obligated to pay an equitable consideration for the improvements." JX 1/3, ¶ 15 (emphasis added). However, clause 44 of the permit provides that the permit may be revoked or terminated to prevent confrontation or conflict with grizzly bears, and "the United States shall not be liable for any consequences from such suspension, revocation, or

termination." JX 1/11, ¶ 44.

**[Defendant notes that there are no PPFF ¶¶ 20-23]**

*The Forest Service's 1992 inspection of the Sweetwater bridges*

24. In the course of pursuing discovery in this case, The Sweetwater discovered for the first time that in 1992, three years before it purchased the lodge assets, the Shoshone requested bridge inspectors from the Wasatch-Cache National Forest to inspect the Sweetwater bridges. Tr. 1390:6-1391:20.

**Defendant's Response to PPFF ¶ 24**

Defendant agrees that the Shoshone's engineering staff requested bridge inspectors from the Wasatch-Cache National Forest to inspect the Sweetwater bridges in 1992, but is unable to confirm when plaintiff first learned this fact.

25. As of 1992, the Sweetwater bridges had not been load rated. Tr. 1885:7-22; Tr. 1891:12-1892:7. However, it was Forest Service policy to close bridges which had not been load rated. *Id*. The Forest Service engineer admitted that the Forest Service's failure to close the bridges absent a load rating was a violation of Forest Service policy. *Id*.

**Defendant's Response to PPFF ¶ 25**

Defendant disagrees. In the first sentence of the proposed finding, plaintiff has misstated the cited testimony of Shoshone civil engineer Tom Koenig. In both cited passages, plaintiff's counsel asked Mr. Koenig whether the Sweetwater bridges had been load rated when he carried out his inspection in 2000 (shortly after he arrived on the Shoshone), not in 1992, as stated in the

proposed finding. Tr. 1885:7-11, 1891:12-18. Mr. Koenig explained that there is no fixed schedule for bridges to be load rated each time they are inspected, and that the Forest Service only requires bridges to be load rated if their condition changes. Tr. 1928:25-1929:9, 1929:25-1930:9, 1930:24-1931-4. A Forest Service analysis in 1976 of the design that strengthened the Sweetwater bridges by adding the three I-beam stringers indicated a load rating of at least 17.3 tons. DX 3/6, 3/8; Tr. 1887:16-18.

The second and third sentences of the proposed finding also misstate Mr. Koenig's testimony. In the cited passages, Mr. Koenig did not admit that there was any "failure to close the bridges" that "violated Forest Service policy." Tr. 1885:7-11, 1891:12-18. Mr. Koenig testified that the Forest Service policy is that bridges have to have a minimum three-ton load rating to stay in operation. Tr. 1902:5-7. He explained that based upon his inspection, he believed that the bridges could be left open because "the three I beams that were added to the bridges sometime after 1974 if I remember right, to me, they gave considerable strength to the bridge. . . if the bridge was going to fail anytime in the near future, it was going to have been from the abutments undergoing more scour and having a substructure or abutment failure. . . . the [N]orth [F]ork bridge, the lower bridge, was only rated for five tons itself . . . there just couldn't be a load getting to the upper two bridges that would cause the bridge to fail." Tr. 1887:16-1888:2.

26. The Shoshone Forest Engineer, Mr. Jim Fischer, admitted that, after the bridge inspectors conducted a technical inspection of the Sweetwater bridges in 1992, they stated to the Shoshone that "you need to close those bridges immediately." Tr. 1392:5-1395:7; *Sweetwater* at 2. The Forest Service employees on the Shoshone argued that they could not close the bridges because

the Forest did not want to face the consequences of the impact of bridge closure on the lodge owner given the critical need for vehicular access to lodge operations. *Sweetwater* at 2; Tr. 1394:18-24. Mr. Fischer later described this inspection as "basically condemning" the bridges. JX 7 (page 1).

**<u>Defendant's Response to PPFF ¶ 26</u>**

Defendant agrees that Mr. Fischer testified that the Wasatch-Cache bridge inspectors did make the comment quote above, but explained "that was their initial reaction, but it was not their conclusion." Tr. 1397:7-8. The inspection forms, which were completed before this conversation, did not recommend closing the bridges. DPFF ¶ 22; DX 9/1-2, DX 10/1-2. In the passage cited in the second sentence of the proposed finding, Mr. Fischer did not testify that there was a "critical" need for vehicular access to lodge operations, nor did he testify that the bridges were critical to ensuring vehicular access to lodge operations. Tr. 1394:15-24. Defendant agrees that in a handwritten internal Forest Service note (JX 7/1), Mr. Fischer described the 1992 inspection as "basically condemning" the bridges because the inspectors recommended replacing both bridges, but he also testified that "[i]f they had recommended the final recommendation as the official inspectors to close the bridges, they would have given those bridges an overall appraisal, either a zero or one rating, and they would have written on those forms that the bridges had to be closed. That was not done." Tr. 1397:19-24.

27. The bridge inspectors, in response to the Shoshone employees reaction to their inspection results, purportedly agreed to the Shoshone placing a 3 ton weight limit sign by the bridges. *Sweetwater* at 2; Tr. 1394:24-1395:3. Mr. Fischer referred to this outcome as a "compromise"

that would "probably" be safe for motorists. *Sweetwater* at 2; Tr. 1394:25; Tr. 1396:17; Tr. 1582:8-1583:13.

**Defendant's Response to PPFF ¶ 27**

Defendant disagrees that the decision to post the three-tone weight limit signs was made only by Mr. Fischer. Mr. Fischer testified that as a result of his conversation with the Wasatch-Cache inspectors, it was "our joint professional opinions" that "[w]e felt that the bridges could safely carry" a three-ton load, such as a passenger car or pick up truck. Tr. 1402:23-1403:5. Defendant agrees that in the passage cited in the second sentence of the proposed finding, Mr. Fischer testified that "[c]ompromise, negotiation, reasonable solution, whichever you'd like to call it. It was – as I said here, it was our judgment that [the bridges] would probably be safe restricting it to pickup trucks and passenger cars." Tr. 1583:10-13.

28. However, the Forest Service bridge inspectors did not load rate the bridges before or after they put up the 3 ton weight limit sign. Tr. 1402:11-13; Tr. 1885:7-22; Tr. 1891:12-1892:7.

**Defendant's Response to PPFF ¶ 28**

Defendant agrees that this proposed finding accurately reflects the cited testimony of Mr. Fischer (Tr. 1402:11-13), but not the cited testimony of Mr. Koenig, who was only asked about his awareness of any load rating "at that point in time" when he performed the 2000 inspection (Tr. 1885:9-10, 1891:16).

29. Mr. Fischer testified that, pursuant to his office's standard operating procedure, Ms. Jennifer Watson would have been informed of this matter. Tr. 1409:24-1412:1. However, Ms. Watson denied having any knowledge. Tr. 2026:15-24.

**Defendant's Response to PPFF ¶ 29**

Defendant agrees that Mr. Fischer testified that "I can't recall if we specifically did it, but it was the standard operating procedure" to convey information about the 1992 bridge inspection to the Wapiti District Ranger office. Tr. 1411:18-20. Defendant agrees that Ms. Watson testified that she was unaware of the 1992 bridge inspection when The Sweetwater was considering purchasing the lodge.

*The Sweetwater's purchase of the lodge*

30. The Brannons had been operating the lodge assets since 1983 under a Term SUP issued by the Forest Service. JX 3.

**Defendant's Response to PPFF ¶ 30**

Defendant agrees, and notes that the permit issued to the Brannons was amended in 1985. JX 4.

31. At the time the Brannons operated the lodge, visitors to the lodge typically accessed it in passenger cars, including cars such as Cadillacs and other cars, and the Forest Service did not restrict that use with signs on the road or otherwise. Tr. 137:22-138:2; Tr. 797:14-798:1; Tr. 860:2-12; Tr. 1380:25-1381:5; Tr. 2268:11-2270:17.[4]

[4]The two Forest Service employees who together agreed to send the funding back which otherwise would have resulted in the Sweetwater bridges being repaired, Messrs. Larson and Fischer (*see* ¶¶ 151-153 *supra*), testified that they recalled a large sign located on the side of Sweetwater Road which stated that the road was not maintained for passenger cars. However, Mr. Barker of the Forest Service testified that no such signs were put up. Tr. 860:2-12. Nor did Mr. Koenig recall any signs as of 2000 when he arrived on the Forest. Tr. 1858:22-25. Mr. Bree also testified that the Forest Service had never restricted the type of cars which could use Sweetwater Road. Tr. 797:14-798:1. In addition, Ms. Watson had no recollection of any large

**Defendant's Response to PPFF ¶ 31**

Defendant agrees that visitors reached the lodge in passenger cars while it was operated by the Brannons. Forest Service employee Mike Bree testified that "Brannons bladed the road" (Tr. 797:19-20), and Shoshone Forest Engineer Jim Fischer testified that "I do know that [Mr. Brannon kept the road fairly smooth, when he had the lodge so that the passenger car vehicles could go up there." Tr. 1524:20-22.

Defendant agrees that the Forest Service has not restricted use of Sweetwater Road by passenger vehicles, because they have never been prohibited, but disagrees that the Forest Service has not posted signs warning motorists against using passenger vehicles on the road. Both Mr. Fischer and Wapiti District Ranger Brent Larson testified that a large white sign with black letters posted by the Forest Service warned motorists just after they crossed the North Fork bridge that Sweetwater Road was "Not Maintained for Passenger Cars." DPFF ¶¶ 10-12. Mr. Barker did not testify that "no such signs were put up" to warn motorists, as plaintiff asserts, but merely agreed that "there's no signage restricting" what kind of vehicles could use the road (Tr. 860:9-11). Mr. Bree similarly testified that the Forest Service did not "restrict" passenger cars from using the road (Tr. 797:24-798:1), and like Mr. Barker, did not address whether any signs were posted to warn motorists that if they chose to drive passenger cars on Sweetwater

---

sign meeting the description provided by Mr. Larson. Tr. 2006:23-2009:18. Also, Mr. Wilkerson and Mr. Mummery, both of whom traveled the road frequently, testified unequivocally that no sign ever existed. Tr. 2920:15-2921:15; Tr. 2268:11-2270:2. Finally, the Forest Service did not produce any photographs or documentation showing that such a sign had been ordered or placed on the road. Moreover, it would be illogical to place a sign warning passenger cars to go back on the other side of the North Fork bridge, because once they got to that point there was no easy turnaround point. *See* Tr. 1221:24-1222:10 (Mr. Larson explained that gates had been placed on the North Fork bridge because there was no convenient space along the Sweetwater Road if a traveler needed to turn around). The fact is that no specific warning against the use of the road by passenger cars was ever present on Sweetwater Road.

Road, they did so at their own peril. Thus, the testimony of Mr. Barker and Mr. Bree does not conflict with the testimony of Mr. Fischer and Mr. Larson.

Ms. Watson, too, recalls a sign warning motorists that Sweetwater Road was a "steep, narrow road" (Tr. 2008:1-3), although she was unsure of the sign's dimensions, and estimated them as being smaller than did Mr. Larson and Mr. Fischer. Tr. 2007:12-15. Although Mr. Mummery did not recall the sign, he had initially contended in his declaration in support of plaintiff's cross-motion for summary judgment that "no warning signs of any type were ever posted on the road." DPFF ¶ 76. After the Government produced photographs in support of its opposition to plaintiff's cross-motion for summary judgment (DX 16/1, 16/3) that proved that the "WEIGHT LIMIT 3 TONS" signs (JX 13/3, 13/4, 14/1) had been present in 1995, Mr. Mummery's recollection changed. He testified at trial that he saw the signs before he signed the contract to buy the lodge, and relied upon them as indicating that the bridges were safe. Tr. 77:8-10, 78:14-16. The weight limit signs shown in those photographs have a white background with black lettering, just as Mr. Fischer and Mr. Larson testified about the other signs erected by the Forest Service. The photograph calls into question the accuracy of Mr. Wilkerson's recollection that he never saw the signs, because he testified that "I've never seen a sign in the forest put up by the Forest Service that was white with black letters." Tr. 2269:24-2270:1.

32. In 1995, the previous owner of the lodge, the Brannons, entered into discussions to sell the lodge to Wanda Smith, but Ms. Smith did not go through with the transaction after speaking to James Fischer, who was an engineer with the Forest Service. Def. Facts at ¶ 19; Tr. 763:5-764:2; Tr. 1412:19-1414:15. Afterwards, the Brannons were extremely angry at the Forest

Service for disclosing information to Ms. Smith about the bridges leading to the lodge and confronted Forest Service personnel about their comments. Tr. 765:15-766:13; Def. Facts ¶ 21.

**Defendant's Response to PPFF ¶ 32**

Defendant agrees.

33. When Mr. Bree spoke to Mr. Fischer, the Forest Engineer, about the safety of the Sweetwater bridges at this time, he "didn't really get a straight answer from him on the safety of the bridges and whether the public could use them or not." Tr. 783:2-4.

**Defendant's Response to PPFF ¶ 33**

Defendant agrees that plaintiff has accurately quoted one portion of Mr. Bree's testimony, but Mr. Bree also testified that when he asked Mr. Fischer about the safety of the bridges, Mr. Fischer "said they weren't going to close them, but they weren't – they weren't safe to where, you know, big trucks could go up and down them." Tr. 781:13-16.

34. Shortly after the Brannon's confrontation with the Forest Service, The Sweetwater became interested in purchasing the lodge facility. Tr. 74:14-75:22; Tr. 767:12-22.

**Defendant's Response to PPFF ¶ 34**

Defendant agrees, and notes that on Friday, May 19, 1995, only four days after Ms. Smith spoke to Mr. Fischer, Mr. Mummery learned that the closing on the Brannons' sale of the lodge to Ms. Smith had fallen through, and he could get a "good deal" on the lodge. DPFF ¶¶ 35, 39.

35. Mr. Mummery was told about the lodge being for sale by a friend of his who was the real

estate agent selling the lodge, and who told him that a prior sale of the lodge had not closed. Tr. 75:2-8. Mr. Mummery was informed that the prior sale had not gone through because the prospective buyer had been unable to finance the purchase. Tr. 106:20-107:4.

**Defendant's Response to PPFF ¶ 35**

Defendant agrees that Mr. Mummery testified that he learned about the lodge from his friend Buck Wilkerson, who represented the Brannons. Tr. 74:7-23. Defendant also agrees that Mr. Mummery testified that he did not know why the sale to the Brannons had collapsed: "my impression was that it was because the woman didn't come up with the money. Whether that's true or not I don't know." Tr. 75:4-6 (emphasis added).

36. Mr. Jeffrey Mummery, who has been the Managing Member of The Sweetwater since its inception in 1995 (Tr. 65:l-66:9), resides approximately 13-14 miles from the lodge facilities, which is a 20 minute drive from his house. Tr. 67:6-13, 23-24.

**Defendant's Response to PPFF ¶ 36**

Defendant agrees that plaintiff has accurately represented Mr. Mummery's testimony about how rapidly he can drive from his home to the lodge, but notes that the operators of other North Fork lodges are married couples who live on site. Tr. 176:16-21.

37. Prior to purchasing The Sweetwater, Mr. Mummery has experience working as a guide for an outfitter as well as operating a hotel/resort on the Yellowstone Highway between Cody and Yellowstone National Park. Tr. 73:1-20.

**Defendant's Response to PPFF ¶ 37**

Defendant agrees that Mr. Mummery testified that he worked as a guide for an outfitter,

and that he leased and operated the Yellowstone Valley Inn for a single year (Tr. 474:8-475:18), but notes that Mr. Mummery admitted that "I was never the manager or owner of a hotel or motel." Tr. 476:5-6.

38. Mr. Mummery first visited the lodge with Gary Fales, an experienced lodge owner who lives close to the lodge. Tr. 76:10-24; 82:11-16. After reviewing the lodge and area, Mr. Fales recommended to Mr. Mummery that he buy the lodge. Tr. 81:7-8.

**Defendant's Response to PPFF ¶ 38**

Defendant agrees that plaintiff has accurately represented the cited testimony.

39. At the time, the bridges had a standard official load rating sign before them indicating that they had a 3 ton weight limit (i.e., the bridges were safe for passage by vehicles weighing up to 3 tons), which Mr. Mummery understood to indicate that the bridges were safe for public use. Tr. 77:23-78:16; Tr. 128:22. Mr. Fischer testified that those signs had been placed by the bridges by the Forest Service with the intention that people would conclude that the bridges were safe for use by passenger cars and pick up trucks (Tr. 1402:3-1403:5), and Ms. Aus agreed that it would be reasonable for The Sweetwater to assume the bridges were safe given these signs. Tr. 1631:18-1632:22; Tr. 1673:22-24. These vehicles were the very types which were used by lodge guests. Tr. 137:22-138:2; Tr. 797:14-798:1; Tr. 1380:25-1381:5.

**Defendant's Response to PPFF ¶ 39**

Defendant agrees that in 1995, signs before the bridges warned "WEIGHT LIMIT 3 TONS," and agrees that Mr. Mummery testified that he understood that to mean that the bridges were safe for public use. JX 13/3, 14/1; Tr. 77:23-78:16. Defendant disagrees that Mr. Fischer

testified about what conclusions motorists might draw from the "WEIGHT LIMIT 3 TONS" signs, but simply testified that the signs were posted after he and the bridge inspectors concluded that "[w]e felt that the bridges could safely carry that load." Tr. 1402:3-1403:5. Defendant agrees that lodge guests used vehicles such as passenger cars and light trucks that weighed less than three tons.

40. When Messrs. Mummery and Fales visited with Mrs. Brannon, she was distraught because a sale of the lodge the Brannons had arranged had fallen through and indicated to Mr. Mummery that they very much wanted to sell the lodge, and quickly. Tr. 78:19; Tr. 80: 4-5; 81:1-5; Def. Facts ¶ 26. The Brannons had already packed up their belongings in anticipation of selling the lodge. Tr. 79:3-9. The Brannons had a contract to buy a boat which they were going to live on in Oregon which created a financial problem for them. Tr. 79: 7-9; 80:7-9; 100: 11-19; Def. Facts ¶ 25.

**Defendant's Response to PPFF ¶ 40**

Defendant agrees.

41. Dave Brannon in fact had recently found out that there was an out-of-statement judgment against him that was going to be filed against him and that he needed to sell his assets quickly to avoid losing them. Tr. 504:10-23; Tr. 2257:9-18.

**Defendant's Response to PPFF ¶ 41**

Defendant disagrees. The cited testimony is hearsay that cannot be used as evidence that "in fact" a judgment compelled Mr. Brannon to sell the lodge quickly, and can only be relied upon for purposes of proving the testifying witnesses' state of mind when they learned about this

alleged out-of-state judgment. Mr. Mummery testified that he "only recently learned," apparently from his friend Mr. Wilkerson, that the alleged out-of-state judgment "was being ready to be filed in Cody" (Tr. 504:13-14), whereas Mr. Wilkerson testified that Mr. Brannon allegedly "was afraid that if [the judgment] came to Wyoming that if he had anything here they'd be looking at it." Tr. 2257:17 (emphasis added). Both witnesses' testimony is contradicted by Mr. Mummery's testimony that Mr. Brannon had "transferred some previous time this asset to his wife because he had had a failed insurance business that had other problems." Tr. 504:15-17. If Mr. Brannon had already transferred ownership of the lodge to his wife, then the prospect that an out-of-state judgment might be filed against him in Wyoming would not have presented any threat that would have pressured his wife to sell the lodge quickly.

42. The Brannons had been asking $450,000-500,000 for the lodge. Tr. 81: 12-13; Def. Facts ¶ 24. Mrs. Brannon informed Mr. Mummery that they would sell the lodge for less than the price they had been asking. Tr. 81: 13-14.

**Defendant's Response to PPFF ¶ 42**

Defendant agrees that plaintiff has accurately represented the cited testimony.

43. Mr. Mummery then was shown around the lodge the next day by Mr. Brannon. Tr. 84:8-11. The Brannons were distressed and wanted out. Tr. 93:12-13; Tr. 1350:20-24; Tr. 1352:7-10 (Mr. Larson testified that Mr. Mummery had told him that The Sweetwater purchased the lodge at less than market value and the Brannons had pleaded with him to buy it or they would lose their assets); Tr. 2328:3-9 (Mr. Mangus, plaintiff's expert, was aware that the Brannon's had sold the lodge under distress).

**<u>Defendant's Response to PPFF ¶ 43</u>**

Defendant agrees that plaintiff has accurately represented the cited testimony, and notes that the Government's appraisal expert, Mr. Frome, adjusted his appraisal to account for Mr. Mummery getting a good deal on his purchase of the lodge. Tr. 2703:24-2704:4; DX 64/55 ("+" in "Conditions" column of chart shows favorable terms of sale).

44. After visiting and inspecting the lodge with Mr. Fales, and then again with Mr. Wilkerson, Mr. Mummery offered the Brannons $275,000 for the lodge facilities. Tr. 94:2; DX 17. Mr. Brannon was upset because the offer was low. Tr. 482:25-483:4. The Brannons counter-offered at $287,500 and Mr. Mummery accepted the offer. Tr. 96:15-97:5. The offer was explicitly "subject to the buyer approving issue of a new special use permit to buyer." DX 17, p. 3; Tr. 97: 15-20. Mr. Mummery had included that language to ensure that he would not have to buy the lodge if he could not obtain the permit which he wanted. Tr. 98:6-22.

**<u>Defendant's Response to PPFF ¶ 44</u>**

Defendant agrees with the first three sentences of this proposed finding, but defendant disagrees with the fourth and fifth sentences of this proposed finding. Mr. Mummery acknowledged on cross-examination that the language quoted above, which he drafted, did not place any conditions on what type of permit the Forest Service might issue to him. Tr. 494:21-495:7.

*Meetings between The Sweetwater and Forest Service*

45. Prior to The Sweetwater closing on the purchase of the lodge assets, representatives of The Sweetwater met with representatives of the Forest Service to discuss the issuance of a Term SUP to The Sweetwater for the purpose of operating the lodge facility. Tr. 101:19-102:14; Tr. 155:20-156:2.

**Defendant's Response to PPFF ¶ 45**

Defendant agrees.

46. One of these meetings occurred on or around June 12, 1995 at which representatives of The Sweetwater and the Forest Service discussed the issuance of a Term SUP. Tr. 108:23-110:3.

**Defendant's Response to PPFF ¶ 46**

Defendant agrees that a meeting occurred on or around June 12, 1995 at which representatives of The Sweetwater and the Forest Service discussed the issuance of a Term SUP. DX 18.

47. The Forest Service personnel at the June 12th meeting were "acting on behalf of" the Forest Supervisor. Tr. 813:19-23; Tr. 928:10-929:25. The current Forest Supervisor stated that The Sweetwater was entitled to rely upon the representations made by the Forest Service line officer at the meeting. Tr. 1744:23-1745:4; Tr. 1747:9-1748:15.

**Defendant's Response to PPFF ¶ 47**

Defendant agrees that Mr. Barker testified that "the forest personnel attending" the meeting were "acting on behalf" of the Forest Supervisor (Tr. 813:19-23), but disagrees that any of the Forest Service employees at the meeting besides Acting Wapiti District Ranger Bob Rossman had been delegated any authority by the Forest Supervisor. DPFF ¶ 62. The two

remaining Forest Service employees at the meeting, Mr. Barker and Mr. Bree, were not line officers, and thus could not be delegated any authority by the Forest Supervisor. Id. Mr. Rossman did not possess any authority to act as Forest Supervisor with respect to any decisions regarding replacement of the Sweetwater bridges. DPFF ¶64. Ms. Aus testified that she did not agree with plaintiff's premise that Mr. Rossman made any representations during the June 12, 1995 meeting that the Forest Service "would put in temporary fords until they could locate funds to replace the bridges." Tr. 1748:16-23.

48. The Forest Service stated to the representatives of The Sweetwater that the Term SUP was a "legally binding document" to which all parties were agreeing. Tr. 814:18-19.

**Defendant's Response to PPFF ¶ 48**

Defendant agrees that Mr. Barker, who was neither a lawyer nor a line officer, and who did not possess authority to enter an agreement on behalf of the Forest Service (DPFF ¶ 62), testified that the permit was a "legally binding document." Tr. 814:19. Defendant notes that Mr. Rossman testified that he was not negotiating the terms of the permit, and did not regard it be a contract. DPFF ¶ 68.

49. One of the purposes of the meeting was for the Forest Service to provide The Sweetwater with a full disclosure as to the condition of the bridges so that The Sweetwater could decide whether to go ahead with the purchase of the lodge. Def. Facts ¶ 50; Tr. 896:5-14; Tr. 914:19-915:21; Tr. 956:8-10. The Forest Service was aware that The Sweetwater was relying on the Forest Service's statements to determine whether or not it should purchase the lodge. Tr. 897:16-17.

**Defendant's Response to PPFF ¶ 49**

Defendant disagrees that the cited testimony supports the assertion that the purpose of the meeting was for "the Forest Service" to make a "full disclosure" regarding the condition of the bridges. Mr. Rossman agreed that the purpose of the meeting was to ensure that he communicated to Mr. Mummery all the information about the condition of the bridges of which Mr. Rossman was aware. Tr. 896:5-14 ("as best as you could convey"). Mr. Barker testified that the Forest Service representatives made clear that there were "no commitments" that the bridges would be replaced, and Mr. Mummery "was trying to make the final decision on what to do." Tr. 897:7, 897:16-17.

50. With respect to the Term SUP, the District Rangers on the Forest had been delegated authority to sign Term SUPs as the Forest Supervisor and make decisions related to the administration of those permits. Tr. 1271: 9-19; Tr. 1281:19-1282:10; Tr. 1316:1-9 (delegation never formally cancelled in writing); Tr. 1317:12-24 (Mr. Larson stated that the Forest Service Manual provided support for District Ranger's issuing Term Special Use Permits). At the time of the June 12, 1995 meeting, Mr. Rossman was authorized to make recommendations to the Forest as to obtaining funds to repair or replace the bridges, and it was the Forest Engineer who made the decisions on which particular bridges were to be repaired or replaced "because the money came down to him." Tr. 777:9-778:18.

**Defendant's Response to PPFF ¶ 50**

Defendant disagrees. Mr. Larson testified that former Forest Supervisor Barry Davis "went outside of" the Forest Service Manual and purported to delegate authority to District Rangers to issue long-term special use permits, even though the Forest Service Manual only

permits Forest Supervisors to delegate authority to District Rangers to issue special use permits for terms of less than five years, or for "standardized" permits on sites approved in the Forest plan. Tr. 1281:25-1282:10; DX 37 (FSM 2704.34). Mr. Larson testified that when Ms. Aus became Forest Supervisor in 1996, she canceled Mr. Davis's purported delegation orally rather than in writing: "she told all of us that we need to refer back to the manual delegations of authority for signature. And she did that in leadership team meetings." Tr. 1316:1-9.

The second sentence of this proposed finding inaccurately represents the cited testimony of Mike Bree. Mr. Bree testified that Mr. Fischer was not a line officer, and that he worked with the forest supervisor and district rangers to make budgeting decisions. Tr. 777:23-778:16.

51. Vehicular access on Sweetwater Road was critical to operating the lodge, but the Forest Service insisted on keeping the Sweetwater Road a public road because it did not want to allow the lodge owner to restrict the public's access to that road. Tr. 135:16-136:2; *see* Tr. 173:24-174:2; Tr. 587:3-7; Tr. 769:6-770:11; Tr. 784:7-10; Tr. 808:16-22; Tr. 817:9-14; PX 38.

**Defendant's Response to PPFF ¶ 51**

Defendant agrees that Mr. Bree and Mr. Barker testified that the Shoshone's policy in 1995 had been to keep Sweetwater Road open for public use (Tr. 769:23-24, 808:18-22), but disagrees that any of the cited testimony addresses, let alone supports, plaintiff's assertion that "vehicular access on Sweetwater Road was critical to operating the lodge."

52. The primary uses for Sweetwater Road are to provide access to the recreating public, which includes the lodge visitors, and to allow for Forest Service monitoring of soil and water

conditions in the area and along the full length of Sweetwater Road. Tr. 815:21- 816:4; Tr. 875:4-7; 875:18-876:4.

**Defendant's Response to PPFF ¶ 52**

Defendant agrees that the proposed finding accurately represents the cited testimony of Mr. Barker, but notes that Mr. Barker testified that because there is no livestock grazing or timber base in the Sweetwater drainage, Sweetwater Road is unnecessary for range or timber management. Tr. 815:17-25.

53. At the meeting, the Forest Service representatives stated to the representatives of The Sweetwater that "it [is] our intent to keep the [Sweetwater] road open to the best of our ability." Tr. 129:2-6; Tr. 129:17-130:24; Tr. 135:2-8; *see* Tr. 135:2-15. They further stated that it was the agency's intent to support, to the degree that it could, access to the lodge facility. Tr. 825:5-8. These were the kind of commitments which Mr. Simpson, who attended the meeting as The Sweetwater's counsel, had sought from the meeting. Tr. 1112:13-25. Based on his working history with the Forest Service and its employees, Mr. Simpson felt that these commitments were sufficient. Tr. 1114:14-1115:3; *see* PPFF ¶ 47 (Ms. Aus stated that The Sweetwater was entitled to rely upon the representations made by the Forest Service at this meeting).

**Defendant's Response to PPFF ¶ 53**

Defendant agrees that Mr. Rossman stated that it was the intent of the Forest Service to do what it could to keep open Sweetwater Road, and maintain access to the lodge, but disagrees that the Forest Service ever committed itself to keeping open the Sweetwater bridges to accomplish this intent. Mr. Rossman testified that what he said during the June 12, 1995 meeting was that if the bridges became impassable, it was unlikely that they would be replaced,

but that fords would provide an alternative means of vehicular access to the lodge. DPFF ¶¶ 83, 93.

Plaintiff has attributed to the Forest Service representatives statements that are not supported by the cited testimony. The quoted language in the first sentence of the proposed finding is what Mr. Mummery claims that Mr. Rossman stated during the June 12, 1995 meeting. Tr. 135:2-9. Mr. Rossman never testified that he made any statement to that effect during the meeting, but merely testified in his deposition that at the time of the June 12, 1995 meeting, "it would have been our intent to keep the road open to the best of our ability." PPUF[5] ¶ 24 (emphasis added). His statement was directed to the road, which could continue to provide access to the lodge without bridges if fords were used. Likewise, in the testimony cited in the second sentence of this proposed finding, Mr. Barker merely agreed that it was the intent of the Forest Service at the time of the meeting to support "access" to the lodge as best it could. Tr. 825:5-8. In the cited testimony, he did not address what statements were made at the meeting, nor did he stated that he or the other Forest Service representatives convey any intent to maintain the bridges as the means of access. Id.

Mr. Simpson testified that the commitment that he understood that Mr. Barker had made with Mr. Rossman's concurrence was to do would they could do personally to obtain funds to replace the bridges, but that they could not make any unconditional commitment to rebuild the bridges, and could only do what was within his power to try to get funding. DPFF ¶ 92.

[5] "PFUF" refers to plaintiff's proposed findings of uncontroverted facts, filed in support of its cross-motion for summary judgment.

54. The position taken by the Forest Service was that "we are responsible for working with the lodges and making sure that they operate because the purpose of that particular permit is—is a service that the Forest Service is supposed to provide to the public and deem that a private entity could do—could do the job so the Forest Service wouldn't have to open up a lodge." Tr. 788:20-789:1.

**Defendant's Response to PPFF ¶ 54**

Defendant agrees that the proposed finding accurately represents a portion of Mr. Bree's testimony, but disagrees that he is qualified or authorized to express the "position taken by the Forest Service," as plaintiff asserts above.

55. Because the Shoshone Forest Plan allocates the area around the lodge as being for the purpose of a lodge facility, the Forest Service agreed that it had a commitment to provide for the operation of the lodge to the extent it could. Tr. 824:14-25; Tr. 925:2-12; Tr. 1750:2-7. This commitment included the Forest Service keeping the road open to the best of its ability, as well as the Forest Service supporting vehicular access to the lodge facility. Tr. 132:14-133:8; Tr. 825:1-8; Tr. 926:24-927:3.

**Defendant's Response to PPFF ¶ 55**

Defendant agrees that the proposed finding accurately represents the cited testimony, but notes that Ms. Aus also testified (on the same page as one of the passages cited by plaintiff), in response to a question about whether the Forest Service had committed to provide vehicular access to the lodge, "I believe that we agreed to provide access via fords and I believe that you can access that lodge via fords." Tr. 1750:13-15.

56. The individual who executed the Term SUP as the Acting Forest Supervisor, who was present at the 1995 meeting, summarized his comments at the 1995 meeting as being based on the fact that "[t]he Forest Plan of the Shoshone National Forest allocates that area up there to a public lodge facility; therefore, there is a commitment on the part of the Forest to provide for that use to the extent it can. All Forest Plan implementation is subject to dollars available, but I think it's probably – no, it's not probably, it's standard practice and intent when one has allocated a use on the Forest *to do your best* to implement that." Tr. 131:7-132:13; Tr. 925:2-926:23.

**<u>Defendant's Response to PPFF ¶ 56</u>**

There is no support, in the cited testimony or elsewhere in the record, for plaintiff's assertion that Mr. Rossman "summarized his comments" at the June 12, 1995 meeting as being based upon the passage quoted above. At trial, Mr. Rossman merely agreed that he had made this statement in his deposition, and it was still accurate. Tr. 925:2-12.

57. The Term SUP entered into by the parties contained a clause which provided for the Forest Service to compensate the permittee if the Forest Service terminated lodge operations. JX 1 (clause 15). This clause was discussed at the June 12, 1995 meeting. Tr. 538:12-22; Tr. 788:6-789:1; Tr. 793:25-794:1.

**Defendant's Response to PPFF ¶ 57**

Defendant disagrees. Clause 15 does not state that the permittee will be compensated if "lodge operations" are terminated, but states that the Government will pay equitable consideration for "termination of the permit," meaning authorization to operate the lodge. JX 1/3, ¶ 15. Mr. Barker, Mr. Bree, and Mr. Rossman all testified that no commitment was made during the June 12, 1995 meeting that The Sweetwater would receive compensation if the Forest Service decided not to replace the Sweetwater bridges. DPFF ¶¶ 103-06. Mr. Simpson, too, recalled no discussion about clause 16 of the Brannon's permit, which is identical to clause 15 in the permit issued to The Sweetwater two months after the June 12, 1995 meeting. DPFF ¶¶101-02.

58. At the June 12th meeting, the Forest Service officials pointed out to The Sweetwater that, notwithstanding their commitment to making their best efforts to obtain funds to replace the bridges if it became necessary to allow contract performance, the funding was subject to approval by other employees in the Forest Service's Regional Office and Congress, and the Forest Service was legally precluded from guaranteeing that funding would be received because the agency could not legally commit to the expenditure of appropriated funds in future years. Tr. 770:12-771:10.

**<u>Defendant's Response to PPFF ¶ 59</u>**

The proposed finding tries to recharacterize and embellish the cited testimony of Mr. Bree, who made no mention of whether the Forest Service was legally precluded from guaranteeing the funding. Mr. Bree's testimony on this point makes clear that there was no promise to seek funds to replace the bridges:

> We talked to Mr. Mummery about replacing of the bridges, but at that particular time, we did not have the funding to replace those bridges, and we also did not anticipate funding coming down from the Regional Office to replace those bridges. And we advised him that we – we -- <u>we may look at trying to get money to do it</u>, but it wasn't – nothing was guaranteed. I mean, we would – we would put in for the capital improvement money <u>if the opportunity arose</u>, but we – we weren't going to guarantee that we were going to replace those bridges.

Tr. 770:17-771:3 (emphasis added).

59. In making this point, the Forest Service distinguished between actions and decision which were within their control, and those that were outside of it (such as decisions to be made at the Regional level). Tr. 897:16-22.

**<u>Defendant's Response to PPFF ¶ 59</u>**

Defendant disagrees. Plaintiff again seeks to wholly recharacterize a witness's testimony. In the cited passage, Mr. Barker made no reference to decisions made at the Regional level. Tr. 897:16-22. Mr. Bree testified that the Forest Supervisor would be involved in decisions about the bridges. Tr. 777:23-778:5.

60. As to actions within its control, the Forest Service did state that it would seek such funds should it become necessary for lodge operations. Tr. 771:7-10, Tr. 783:17-23 (Mr. Bree testified

that the "we emphasized that don't count on the bridges being replaced in the near future, that we would *try* and that was the key word is we would try to get funding for the bridges, but we weren't going to guarantee it"); Tr. 784:19-21 ("Mr. Rossman advised Mr. Mummery that he'd do it, and he could try to get money, but it was no guarantees"); Tr. 785:1-3 (Mr. Bree testified that "we came to an unwritten agreement that everybody would try to do what they could do to allow Mr. Mummery to operate"); Tr. 786:23-787:1 ("It was kind of like everything was thrown out, and the Forest Service said they would try to get money to replace the bridges, and that's kind of where everybody just walked away").

**Defendant's Response to PPFF ¶ 60**

Defendant agrees that plaintiff has accurately quoted a portion of Mr. Bree's testimony, but notes that Mr. Barker testified that during the June 12, 1995 meeting, "it was made very clear that this had been put in for CIP before, and I – I didn't need to try it again." Tr. 839:19-20. Mr. Rossman testified that he told Mr. Mummery that if the bridges became impassable, the Forest Service could not fund their replacement for the foreseeable future, and that fords would provide the means of access. DPFF ¶¶ 83, 93. At most, these employees could offer only a personal commitment to try to obtain funds to replace the bridges. They were not authorized to assume, on behalf of higher-level officials, any duty by the Forest Service to try to obtain funds. FSM 2704.33.

61. At that particular point in time, the Forest had no funds presently allocated in its budget for improving the existing condition of the bridges (which were open to public traffic) or for replacing them. Tr. 770:12-771:3.

**Defendant's Response to PPFF ¶ 61**

Defendant agrees that Mr. Bree testified that "we did not have the funding to replace those bridges," but disagrees that he addressed whether funds were available to improve the condition of the bridges. Tr. 770:19-20.

62. Subject to the two limitations of Regional Office approval and available appropriated funds from Congress, the Forest did commit to its best efforts to ensure the lodge operation could perform pursuant to the requirements of the permit. Tr. 771:7-10; Tr. 773:7-12 (Mr. Bree testified that the Forest Service gave The Sweetwater assurances in the June 12, 1995 meeting that The Sweetwater would have access to operate its lodge).

**Defendant's Response to PPFF ¶ 62**

Defendant disagrees. In the cited testimony, Mr. Bree testified that "we would put in for capital improvement money if the opportunity arose" (Tr. 770:25-771:1), but he did not state that he or any other Forest Service representatives made any commitment that bound the Shoshone or the Forest Service to use "best efforts" to seek funding to replace the bridges. He lacked the authority to bind the Forest Service. Mr. Bree testified that the Forest Service offered to provide access by fords: "if it was a worst case scenario, the Forest Service would put fords in so he could operate his – his – his business." Tr. 772:13-15.

63. At the June 12th meeting the parties also discussed that, in the event the bridges were to become impassable in the future, the Forest Service would construct fords to provide temporary access until funds could be obtained to repair the bridges or the loss of access could otherwise be addressed. Tr. 145:16-25; Tr. 772:3-773:6; Tr. 932:10-933:12; Tr. 935:17-937:6 (testimony of

Robert Rossman that providing fords in the event the bridge access was lost would not impact the Forest Service's effort in seeking funds to replace the bridges); *see* JX 12 (letter written to The Sweetwater by Ms. Watson and signed by Mr. Larson in 1997 describing agreed-upon use of fords as "temporary"); Tr. 2074:11-2076:20. This access was sought so that The Sweetwater would be able to maintain the lodge until bridge access could be restored. Mummery Dec. ¶ 17 (App. 217).

**Defendant's Response to PPFF ¶ 63**

Defendant disagrees. Mr. Rossman did not testify that the fords would only be temporary. He testified that "we made it clear that if the bridges went, they were gone. And if he wanted to access his lodge that – using vehicles, then he would need fords in order to do that," because "for the foreseeable future, there's no way that we would be funding that." Tr. 934:17-20, 956:18-19. Although Mr. Mummery claimed in his declaration that the fords were for the purpose of maintaining the lodge, at trial he testified that the purpose of the fords was to allow him to operate the lodge: "it was clear that were talking about if you had to deal with f[]ords it had to be a temporary issue because you really just automatically cut the business in half" because half of the operating season comes after the snowmelt high water subsides in mid-July. Tr. 130:13-16.

64. Mr. Barker, who attended the June 1995 meeting, was asked about the issue of the fords and stated as follows:

> [I]n knowing the area, there is little doubt in my opinion that [the use of fords] was temporary only because it wouldn't be feasible to have invitees thinking that they're going to come up this road [without bridge access]. And—and when we—when we have a special use permit, I think we have a higher obligation because we're inviting people to go up there. And I don't see any way possible

> that you could operate this [lodge] on a sustained basis with fords because of the high water situation.

Tr. 818:1-819:22; *see* Tr. 1232:17-1233:13; Tr. 1233:23-1234:22.[6] Mr. Barker further stated that "our [the Forest Service's] number one charge is public safety over all other things and that would not be- I don't feel that [it] would be appropriate to access a public service lodge with a ford that crosses a major bridge." Tr. 819:25-820:3.[7]

**<u>Defendant's Response to PPFF ¶ 64</u>**

Defendant agrees that plaintiff has accurately quoted portions of Mr. Barker's testimony, but notes that Mr. Barker also testified that "the only thing <u>we agreed to</u> is, hey, if [the bridges] wash out, the only way we're <u>going to access this is via some fords</u>. . . . the only access, motorized access, would be a ford. There's no other possibility." Tr. 820:22-24, 821:9-11 (emphasis added). Mr. Larson's testimony and Ms. Watson's notes regarding what Mr. Barker said regarding the temporary nature of the fords does not negate his trial testimony that the parties agreed to use fords as the means of access to the lodge if the bridges became impassable. Tr. 1234:23-1235:14; PX 38.

Defendant agrees that Mr. Rossman testified that the Forest Service does not close fords when it rains, but the Forest Service does take measures to alert the public to hazards that exist in the forest. PX 40.

---

[6] Mr. Larson subsequently reported back to Ms. Aus and Ms. Watson in 2001, before the non-compliance letter was written, that Mr. Barker had unequivocally stated that The Sweetwater had not agreed to the use of fords on a long term basis. Tr. 1234:23-1235:14. Mr. Barker also told Ms. Watson this fact as well in April 2002. PX 38.

[7] The Forest Service does not close fords during period when using the ford may be dangerous. Tr. 957:21-958:4.

65. The Sweetwater had previously informed the Forest Service that use of fords would not permit viable lodge operations due to the high water conditions that frequently occurred on Sweetwater Creek, and The Sweetwater continued to inform it of that fact after obtaining the permit. Tr. 138:7-139:9; Tr. 140:5-142:8; Tr. 821:23-822:11. As Mr. Barker stated, the fact that fords could not provide permanent access was so obvious, it was beyond having to be stated. Tr. 822:24-823:3.

**<u>Defendant's Response to PPFF ¶ 65</u>**

Defendant agrees that in the cited testimony, Mr. Barker agreed that Mr. Mummery had expressed his belief that the lodge would be "impossible to operate on a sustained basis without vehicular access." Tr. 822:6-7. However, Mr. Barker also testified that "the primary purpose of that meeting was to discuss that thing, and the Forest Service did not make any commitment that although that may be the case, we have no authority or jurisdiction to be able to resolve that issue," leaving it to Mr. Mummery to decide whether he wanted to close on his purchase of the lodge in those circumstances. Tr. 822:12-16.

66. Mr. Barker further agreed with Mr. William Simpson's characterization of the meeting in a letter dated May 2, 2001 (JX 17). Tr. 843:17-844:20. In that letter, Mr. Simpson stated:

> My recollection of the statements of Jeff Mummery at that meeting is that while Mr. Mummery was agreeable with the contingency of building and using fords through streams in the event any of the bridges failed along the Sweetwater Creek Road, the use of any such ford would be only temporary while bridges were being replaced or reconstructed. Mr. Mummery did not state that a ford would be a permanent substitute for any bridge which may need repairs and replacement.

JX 17.

**Defendant's Response to PPFF ¶ 66**

Mr. Barker's cited testimony did not address Mr. Simpson's characterization of the June 12, 1995 meeting. When asked if the letter was accurate, Mr. Barker stated "Yeah, to the degree that we talk about maintenance a little bit," and clarified that "there would be some minimal maintenance responsibility for the permittee." Tr. 844:11-14.

67. In the event access over the bridges was lost, Mr. Barker testified that, given the current ability of the lodge to use the bridges, the Forest Service stated that it "would do our best to get [the bridges] on the CIP list to look at the bridges and to upgrade the road." Tr. 820:14-16; *see* Tr. 22-25. As to the issue of what would occur if the access over the bridges was lost, Mr. Barker stated that the Forest Service would then install fords to provide emergency access to the lodge and "then what we would do in the Forest Service was to elevate this situation. We got a problem, folks, that we need to address, and we'll elevate it to the best of our ability at that time because it would be more of an emergency situation that would have to be dealt with." Tr. 821:12-22.

**Defendant's Response to PPFF ¶ 67**

Defendant disagrees that Mr. Barker testified that fords would provide "emergency access" to the lodge. Mr. Barker testified that "we couldn't provide him much hope that that kind of funding would come to fruition here when it compared against other accesses and bridges," and that "it was made very clear that this had been put in for CIP before, and I – I didn't need to try again." Tr. 838:6-9, 839:19-20.

68. Mr. Rossman stated that, if bridge access were subsequently lost, the Forest Service

"certainly wouldn't have [] pulled" its request for funds to repair or replace the bridges at that point. Tr. 937:4-5.[8] (Ms. Aus later admitted that she was unaware that Mr. Rossman had represented to The Sweetwater in the June 1995 meeting that the Forest Service had committed to do its best to provide vehicular access. Tr. 1749:7-16.)

**Defendant's Response to PPFF ¶ 68**

Defendant agrees that plaintiff has accurately quoted portions of Mr. Rossman's and Ms. Aus's testimony, but notes that Ms. Aus also testified that "I believe that we agreed to provide access via fords and I believe that you can access that lodge via fords." Tr. 1750:13-15.

69. It was never stated at the meeting or at any other point that, if the Forest Service decided not to replace the bridges, it would not resolve the access problem that was created by implementing otherwise applicable contract terms, or that The Sweetwater would have to operate permanently using some other method of access. Tr. 125:16-25; Mummery Dec. ¶ 23 (App. 219).

**Defendant's Response to PPFF ¶ 69**

Defendant disagrees. Mr. Rossman testified that at the June 12, 1995 meeting, "we made it clear that if the bridges went, they were gone. And if he wanted to access his lodge that – using vehicles, then he would need to have fords in order to do that." Tr. 934:17-20 (emphasis added). When asked "Mr. Mummery never stated that he was willing to use fords on a permanent basis, correct?" Mr. Rossman responded that Mr. Mummery "stated that he was willing to use fords, and that was to implement his permit." Tr. 933:18-22.

[8] As set forth in paragraph 154 below, this action is precisely what the Forest Service subsequently did when bridge access was lost.

70. During the June 12, 1995 meeting in which the Forest Service made it representations as to its efforts to obtain funds should bridge access be lost, the parties negotiated the terms and their respective obligations under the Term SUP, as demonstrated by the fact that they discussed whether or not to include an MOU as part of the permit (Tr. 965:8-9), and they deleted clause 44 which had been in the Brannons' permit. Tr. 123:3-124:18; Tr. 588:10-589:20; Tr. 927:10-928:9; JX 3 (at JX 3/12)(clause 44).

**<u>Defendant's Response to PPFF ¶ 70</u>**

Defendant agrees that the representatives of the Forest Service and The Sweetwater discussed during the June 12, 1995 meeting whether The Sweetwater would sign an MOU similar to the Brannons. Tr. 534:21-535:15. Defendant disagrees that any negotiation occurred. The permit was not issued until two months after the June 12, 1995 meeting, and Mr. Rossman testified that it was the decision of the Forest Service, not a joint decision of the parties, to exclude clause 44: "because <u>we</u> determined that there would no agreement relative to the permittee's responsibilities and <u>our</u> responsibilities via an MOU, that this clause [44] basically was judged to be inappropriate." Tr. 928:5-8.

71. Mr. Rossman also stated that "the authority to make a decision about whether the funds were there for replacement of the bridges" was a decision that "would have been handed off to the engineering shop" because "[i]t's an engineering function." Tr. 962:20-963:4.

**<u>Defendant's Response to PPFF ¶ 71</u>**

Defendant disagrees. Plaintiff has scrambled Mr. Rossman's testimony, distorting its

meaning. Mr. Rossman testified that as Acting District Ranger, he did not consider himself to possess authority to make a decision about whether funds were available for replacement of the bridges. Tr. 962:20-24. He explained that "I'm not a contract[ing] officer. That would have been handed off to the engineering shop." Tr. 963:3.

72. The e-mail drafted by Mr. Rossman on June 13, 1995 purporting to summarize the meeting of June 12, 1995 was never disclosed to The Sweetwater before 2001. Tr. 152:3-7; Tr. 938:16-18; JX 6.

**Defendant's Response to PPFF ¶ 72**

Defendant disagrees that the Forest Service did not "disclose" the email until 2001. Mr. Mummery did not see the printout of the internal Forest Service email until February 16, 2001, because that was the first time that he undertook any efforts to review the Forest Service files, which had been available for his inspection at any time since 1995. Tr. 152:3-7.

73. The Sweetwater did not enter into a formal road maintenance agreement similar to the one the prior permittee had held because doing so would make The Sweetwater liable for injuries to members of the general public related to the Sweetwater bridges or road. Tr. 111:10-20; Tr. 118:18-119:9; JX 4 (attached to Brannon's Term Special Use Permit).

**Defendant's Response to PPFF ¶ 73**

Defendant agrees that Mr. Mummery told the Forest Service that the reason he would not enter a memorandum of understanding ("MOU") that addressed financial responsibilities for the road and bridges was that he believed that the MOU would expose him to the risk of lawsuits brought by persons who suffered injuries on Sweetwater Road, and that he could not obtain

coverage for this risk. Tr. 118:1-119:9.

74. Because the Forest Service, as a condition in the permit and for the Forest Service's own benefit, required The Sweetwater to carry liability insurance and to indemnify the Forest Service for any liability arising from The Sweetwater's operations under the permit, The Sweetwater would not have been able to obtain insurance if it had accepted any responsibility for maintaining the road and bridges. Tr. 113:10-20; Tr. 115:10-20; JX 1 (at page 9, clauses 28, 29).

**Defendant's Response to PPFF ¶ 74**

Defendant agrees that the Forest Service requires a term special use permittee to carry liability insurance and to indemnify the Forest Service, but disagrees that "The Sweetwater would not have been able to obtain insurance if it had accepted any responsibility for maintaining the road and bridges." Defendant agrees that Mr. Mummery testified that his insurance agent and his lawyer told him that "[t]hey couldn't figure out how to cover me." Tr. 119:1-2. Defendant notes that clauses 27 and 28 of the permit issued to the Brannons also required the permittee to indemnify the Government and carry liability insurance (JX 3/8, 3/9), but that the Brannons nonetheless signed the MOU concerning road and bridge maintenance, indicating that the Brannons were able to obtain insurance.

75. The Forest Service did not state that The Sweetwater's decision not to sign the road maintenance agreement would in any way reduce the Forest Service's responsibilities towards the Sweetwater Road. Tr. 121: 13-20. In fact, the Forest Supervisor, Ms. Aus, later admitted that the road maintenance agreement was irrelevant to the issues related to the bridges.

Tr. 1737:16-1738:4.

**Defendant's Response to PPFF ¶ 75**

Defendant agrees that the first sentence of this proposed finding accurately states Mr. Mummery's cited testimony, but disagrees that the Forest Service did not tell The Sweetwater that it could not commit to any maintenance without the MOU. The work plan in the Brannons' MOU provided that the Forest Service would spend at least $1,000 year on maintenance in fiscal year 1986, whereas Mr. Rossman's email records that without the MOU, "WE ARE NOT LIKELY TO ALLOCATE DOLLARS" to maintenance of the road. JX 4/5; DX 18.

Defendant disagrees with the second sentence of the proposed finding. In response to plaintiff's question whether the Brannons' MOU was irrelevant, Ms. Aus testified that "I don't believe it's irrelevant . . . . it also helped me to arrive at a conclusion that I was not obligated to provide more to somebody I did not have an MOU with." Tr. 1739:1-8.

76. The Sweetwater nonetheless agreed informally to complete minor maintenance on the road and bridges at The Sweetwater's sole discretion. Tr. 785:9-15.

**Defendant's Response to PPFF ¶ 76**

Defendant agrees. DPFF ¶ 71.

77. The Forest Service agreed not to include in The Sweetwater's permit the language set forth in clause 44 of the Brannon's permit based on the understanding reached by the parties that the Forest Service had the sole responsibility to maintain the road which accessed the lodge. Tr. 123:3-124:18; Tr. 588:10-589:20; Tr. 927:10-928:9; JX 3 (at JX 3/12).

**Defendant's Response to PPFF ¶ 77**

Defendant disagrees. Mr. Rossman testified that the Forest Service made the decision that it was not appropriate to include clause 44 because "there would be no agreement relative to the permittee's responsibilities and our responsibilities via an MOU." Tr. 928:6-9.

78. At the meeting, the Forest Service emphasized the value of the road to them and the public in general. Tr. 126:1-128:1; Tr. 815:2-15.

**Defendant's Response to PPFF ¶ 78**

Defendant disagrees. Mr. Barker's testimony does not support plaintiff's assertion that the Forest Service "emphasized" the value of the road. Mr. Barker testified that "we very well may have talked about what those uses up there; why it was a public road." Tr. 815:14-15.

79. The Forest Service never referred to the internal classification level of Sweetwater Road at the June 12th meeting or thereafter until this dispute arose. Tr. 137:13-21. Nor was the designation of Sweetwater Road as a "Level 2" road set forth anywhere in the Term SUP. *See* JX 1. "Level 2" is a designation set forth in internal Forest Service documents and defined in its internal manual, which is not binding as a matter of law.

**Defendant's Response to PPFF ¶ 79**

Defendant agrees that the proposed finding accurately represents the cited testimony and exhibits, but notes that Forest Service maps clearly identified Sweetwater Road as an improved dirt road intended for use by "high-clearance vehicles," and Messrs. Larson and Fischer and Ms. Watson all testified that signs on the road warned that it was "Not Maintained For Use By Passenger Vehicles." DPFF ¶¶ 3, 6, 10-12.

80. Mr. Barker testified that the Sweetwater Road had, at some point previously, been listed as a Level 3 road. Tr. 859:25-860:8. In addition, Mr. Fischer testified that, while Level 2 roads are inspected every four years, Level 3 roads are inspected every two years. Tr. 1405:3-11. Mr. Fischer specifically noted in 1997 that the Sweetwater Road had not been inspected every two years because it had been "basically condemned" in 1992 (JX 7, p. 1), thus indicating that the normal inspection cycle for Sweetwater Road was every two years, which is the cycle for Level 3 roads (not Level 2 roads).

**Defendant's Response to PPFF ¶ 80**

Defendant disagrees. Mr. Barker did not testify that Sweetwater Road had ever been "listed" as a level three maintenance road, but simply said that he thought that the designation for the road had "varied over the years, I guess." Tr. 860:2-3. Mr. Barker was not a member of the Shoshone's engineering staff, and did not have any responsibility for designation of Sweetwater Road. DPFF ¶ 62. Mr. Barker testified that Sweetwater Road and the Sweetwater bridges looked "questionable . . . as far as what we call a maintenance-level-three road for passenger cars," and that "most forest maps have some way of distinguishing what the level of the road is." Tr. 859:16-18, 871:23-24. The map of the Shoshone that was in effect from 1990 until 2004 identifies Sweetwater Road as intended for "high clearance vehicles" (DX 72), which is consistent with Mr. Barker's observation of the road's condition as not being maintained for passenger cars.

Plaintiff has inaccurately recharacterized Mr. Fischer's testimony, which addressed the frequency of bridge inspections, not road inspections. Mr. Fischer testified that "I believe the Forest Service requirements for bridge inspections on level two roads, maintenance level two

roads, was that you would the inspection on them every 48 months." Tr. 1405:3-6 (emphasis added). Testimony of Mr. Fischer that was not cited by plaintiff expressly contradicts plaintiff's unfounded assertion in the final sentence of this proposed finding that "the normal inspection cycle for Sweetwater Road was every two years." Mr. Fischer testified specifically regarding the Sweetwater bridges: "I didn't feel it was a necessary expenditure to have a full technical inspection again in '94 and '96. We weren't required to do it in '94, '96 yes." Tr. 1407:3-6 (emphasis added). In response to the question "[w]as the policy to inspect the bridges every two years or every four years?" Mr. Fischer testified "[f]or this road, the Forest Service policy, I believe at that time, was every four years for a technical inspection." Tr. 1409:10-14 (emphasis added). Mr. Koenig, too, testified that Forest Service policy was to inspect bridges "every four years for a Level 2 bridge and every two yeas for a 3, 4 and 5 level bridge." Tr. 1865:12-14, 1939:17-18.

81. Mr. Koenig, an engineer with the Shoshone National Forest, testified that a Level 2 road may require bridges if they are needed for appropriate access along the road, which is determined based on the purposes for which the road is used. Tr. 1939:19-1940:21. Mr. Koenig also testified that the Forest Service usually assigns Level 3 to roads needed for a commercial business. Tr. 1940:14-16.

**Defendant's Response to PPFF ¶ 82**

Defendant agrees that the proposed finding accurately represents a portion of Mr. Koenig's testimony, but notes that Mr. Koenig was neither a staff officer or a line officer, and he did not participate in the June 12, 1995 meeting when the use of fords was agreed upon because he did not arrive on the Shoshone until 2000.

82. The Forest Service did not bring any bridge inspection reports or other documents to the June 12, 1995 meeting. Tr. 152:16-153:11; Tr. 922:12-16. Mr. Rossman testified that he was unaware of any 1992 bridge inspection report regarding the Sweetwater bridges. Tr. 917:23-918:11; Tr. 924:12-14. While the Forest Service had previously concluded in 1992 that "[d]eterioration of the substructures [of the Sweetwater] bridges requires immediate attention in order to insure that the safety of the users," the Forest Service did not disclose these findings to The Sweetwater. Tr. 919:15-920:4; JX 5. Nor did the Forest Service disclose that it had determined as of 1992 that the "current bridge condition is not safe." Tr. 919:15-920:4; JX 5 at p. 2.

**Defendant's Response to PPFF ¶ 82**

Defendant agrees that Mr. Rossman testified that he was not aware of the 1992 bridge inspection reports and did not provide them to The Sweetwater's representatives at the June 12, 1995 meeting. However, the "findings" that plaintiff quotes above are not taken from the August 1992 inspection reports prepared by the Wasatch-Cache inspectors, but from the proposal to replace the bridges that was prepared by the Shoshone's engineering staff in March 1992, five months earlier. Cf. JX 5 (March 1992 proposal), DX 9, 10 (August 1992 inspection reports). Mr. Fischer testified that "in these justification statements, we like to fire things up a little bit . . . you try your best to make a project look good and the need for it look higher. . . . there were risks, liability risks. But we have those on virtually every road and every bridge." Tr. 1389:10-17.

Mr. Rossman testified that he told Mr. Mummery during the June 12, 1995 meeting that the bridges were "vulnerable" to being washed out. Tr. 920:12.

83. While Mr. Rossman was aware that the Forest Service inspected bridges, he, like The Sweetwater, was not aware that it prepared bridge inspection reports. Tr. 918:12-23. Accordingly, Mr. Rossman did not indicate to The Sweetwater at the June 12th meeting that the Forest Service possessed bridge inspection reports. Tr. 918:24-919:2. Had Mr. Rossman been aware of these documents, including the report which stated that the bridges were "inadequate, should be closed," he testified that he "certainly would have shared that knowledge." Tr. 922:25-923:8; *see* Tr. 923:9-924:11.

**Defendant's Response to PPFF ¶ 83**

Defendant disagrees. Mr. Rossman did not testify that he was unaware that the Forest Service prepared bridge inspection reports. In response to a question about whether he was aware that the Forest Service had prepared inspection reports "with regard to the Sweetwater bridges," he testified that he was "aware generally that the forest engineer's office conducted periodic inspections of bridges." Tr. 918:12-23. Mr. Rossman testified that he did not recall indicating to The Sweetwater's representatives that "those kind of reports existed." Tr. 918:24-919:2.

Defendant disagrees that the Wasatch-Cache bridge inspectors stated on any of the August 1992 inspection reports that the bridges "inadequate, should be closed." DX 9, 10. That handwritten annotation was added by Mr. Fischer in February 1997 as a "very quick summary" of his interpretation of the code "2" assigned by the inspectors. Tr. 1433:7-1435:5; JX 7/2. It would have been impossible in for Mr. Rossman to share with representatives of The Sweetwater in 1995 Mr. Fischer's handwritten annotation, which was not recorded until 1997. Moreover, Mr. Fischer testified that if the inspectors had concluded that the Sweetwater bridges needed to

be closed, "they would have given those bridges an overall appraisal, either a zero or one rating, and they would have written on those forms that the bridges had to be closed. That was not done." Tr. 1397:21-24.

84. Ms. Watson, who did not attend the June 12, 1995 meeting, stated that, if The Sweetwater had shown more concern as to the condition of the bridges, she would have given it more information about the bridges. Tr. 2031:24-2032:9. However, the very purpose of the June 12, 1995 meeting was to discuss the access issue and the status of the bridges which the Forest Service held out as being safe.

**Defendant's Response to PPFF ¶ 84**

Defendant disagrees. The proposed finding does not accurately represent Ms. Watson's testimony. She testified that "relative to other lodge transactions, other lodge owners that have looked at buying properties have asked a lot more questions and we've had lots more time to deal with them relative to those things." Tr. 2031:19-23. Ms. Watson testified that she did not believe it was reasonable for The Sweetwater to assume that the Forest Service had no information about the condition of the bridges "because when you buy anything, when you enter into anything, you have a responsibility to try to find out what you need to know." Tr. 2033:15-25. Ms. Watson noted that "the Sutherlands asked extensive questions about the bridge, and when they asked the questions about the bridge, an effort was made to locate every document that there was, and the engineers had those documents and those documents were provided." Tr. 2030:18-23.

85. These documents, which were not disclosed, included the statement that the Sweetwater

bridges "presently do not meet any engineering standards and do not provide for public and administrative safety." JX 10; Tr. 1387:13-23.

**Defendant's Response to PPFF ¶ 85**

Defendant disagrees. The quoted passage is taken from the February 1997 revision to the proposal to replace the Sweetwater bridges, and was not present in the 1992 version. JX 10/5, JX 5. Like Mr. Fischer's handwritten annotation, it would not have been possible for the Forest Service to provide to The Sweetwater in 1995 a document that was not created until 1997, even if The Sweetwater had asked for any such documents.

86. Mr. Barker believed that, given clause 15 of the Term SUP, the three options the Forest had if the bridges became impassable were to bring the road up to applicable standards, privatize the road, or purchase the lodge from The Sweetwater. Tr. 825:23-827:6. Clause 15 was discussed by the parties at the June 1995 meeting. Tr. 836:24-25.

**Defendant's Response to PPFF ¶ 86**

Defendant disagrees. Mr. Barker did not testify that "my estimation" (Tr. 826:8) about the three options was based upon clause 15 of the permit, nor did he testify that he communicated his opinion about the three options to representatives of The Sweetwater. Tr. 825:25-827:6. He testified about clause 15 that "I assume it probably was discussed in a general manner" during the June 12, 1995 meeting. Tr. 836:24-25. However, he specifically disagreed with plaintiff's assertion that "if the Forest Service can't provide the necessary facilities to allow permit operations, that you'd compensate the permittee" (Tr. 827:7-14), and said that "we made very clear that although we understand the situation, we can make no commitments as far as financial or otherwise on this road or <u>what might happen if the permittee</u>

couldn't operate." Tr. 828:10-13 (emphasis added). Mr. Barker testified that "what we agreed to is that if the bridges went out, fords would – would be there." Tr. 837:7-8.

87. Mr. Barker, a Forest Service employee and member of the Shoshone special use permit team, further testified:

> Whether today or then, I feel that based on -- based on the idea that concessionaire permittees are part of the Forest Service who are permitted to provide a service that we want provided, it's not for convenience of the permittee, it's to meet a responsibility providing public service to the public, and so we allow the numbers and the locations in order to provide what we feel to meet the public need.
>
> With that said, then whether or not -- I guess that there is that implied responsibility, then, that you provide adequate ancillary facilities, access, opportunities to—opportunities to that concessionaire to-- to fulfill that obligation that we require.
>
> In order to fulfill that, then I would assume that you would have at least the essential facilities available to you to meet that obligation of the forest for public service, public safety, and in the public interest.
>
> So that I guess my thinking at that time is if we can't get the road where it's at least usable to meet the intent of bringing people up there, then we have a responsibility to, under the terms to the permit in other words-- I believe there is something there about for a higher and better interest. If we can't provide the interest that we had foreseen with issuance of that permit, then probably we would compensate that permittee and get out of there.
>
> It's a compensable permit, because if we can't do what it was intended to do, then I think we have a responsibility and obligation to meet our standard one way or the other. Either fix the road, purchase that term permit, that portion of it back, or allow -- give it to the permittee. That was the option I looked at that I told—that I told you.
>
> I mean, any of the one of the options is valid. If we either -- if it's a public road, keep it up. If it's a private road, they keep it up. Or if we do away with the road and do what's necessary as far as the compensation and the permit, they can't be successfully operated.

Tr. 834:3-835:22.

**Defendant's Response to PPFF ¶ 87**

Defendant agrees that the passage quoted above accurately reflects Mr. Barker's deposition testimony as read into the trial transcript by plaintiff's counsel. Tr. 834:3-835:16. However, when plaintiff's counsel then asked Mr. Barker whether that was "still your view today" (Tr. 835:2), Mr. Barker made clear that his statement reflected his own personal opinion, but did not reflect any representations made during the June 12, 1995 meeting: "That is my opinion, yes. That's not a – that's not a statement that, I guess, I would have made in any of those meetings . . . . I wish to state that this is my personal opinion, and it was never indicated to anybody that this was Forest Service policy. To me, it's my opinion." Tr. 835:22-24, 836:25-837:3 (emphasis added).

88. The Forest Service stated to The Sweetwater during the June 12th meeting that the Term SUP was renewable provided the permittee had complied with applicable laws. Tr. 153:22-155:3 Tr. 545:25-546:12; Tr. 547:20-548:2; *see* Tr. 861:18-25; Tr. 986:9-23.

**Defendant's Response to PPFF ¶ 88**

Defendant agrees that in the cited testimony, Mr. Mummery claimed that the subject of renewability of the permit was discussed, but Mr. Barker testified, "Boy, I don't recall" (Tr. 862:4), and Mr. Larson testified that "I do not know because I was not a part of the meeting." Tr. 986:21-22.

89. Prior to executing a Term SUP and pursuant to regulation, the Forest Service conducts a review of the potential permittee's ability to perform the requirements of the Term SUP, which

includes both its experience and its financial resources. The Forest Service does not enter into a Term SUP unless it determines that the other party has the necessary ability and is able to meet the permit's requirements. *See* 36 C.F.R. § 251.54(e)(5)(iv).

**<u>Defendant's Response to PPFF ¶ 89</u>**

Defendant agrees that the cited regulation provides that when conducting second-level screening of proposals for special use permits, the authorized officer shall reject any proposal if the officer determines that, among other reasons, "[t]he proponent does not or cannot demonstrate technical or economic feasibility of the proposed use or the financial or technical capability to undertake the use and to fully comply with the terms and conditions of the authorization." 36 C.F.R. § 251.54(e)(5)(iv).

90. In addition, as part of the process of entering into a Term SUP, the Forest Service made a determination that there is a need and a demand for the service to be provided under The Sweetwater's Term SUP, and that the operation would be financially viable. Tr. 1983:15-1984:6; Tr. 1987:25-1988:11.

**<u>Defendant's Response to PPFF ¶ 90</u>**

Defendant agrees that in the cited testimony, Mr. Reynolds testified that the officer who issued the permit to The Sweetwater made a judgment that there was a "need for this service on the public land." Tr. 1983:21-22. Mr. Reynolds also testified that in his opinion, "this operation has been marginal for some time" (Tr. 1984:12-13), but that "the Brannons had a history of successful operation of the lodge. They [i.e., The Sweetwater] came in and wanted to renew that. . . . if I was in the shoes of the person that was reissuing the permit, I would take that into consideration that it was probably a viable operation. Now, whether it's profitable or not, that's

between them and their accountant." (Tr. 1988:4-6, 1988:22-1989:2).

91. The Sweetwater closed on the lodge on June 21, 1995, at a meeting attended by a Forest Service representative. Tr. 483:12-484:1. At the meeting and upon the transfer of ownership, the Forest Service accepted the relinquished permit from the prior permittee and agreed to issuing a new permit to The Sweetwater. Tr. 483:19-25.

**Defendant's Response to PPFF ¶ 91**

Defendant disagrees that Ms. Watson, the Forest Service representative who attended the closing, "agreed to issuing a new permit to The Sweetwater." Ms. Watson was not a line officer who possessed any authority to issue a permit. She testified that the reason that she was at the closing was because "I find it works quite well to attend these sometimes to make sure that I get all the documents that are necessary in order to complete a transfer of the permit." Tr. 2004:12-15.

*Execution of the Term SUP*

92. On August 21, 1995, The Sweetwater and the Forest Service executed the Term SUP. JX 1; Tr. 2003:17-20. The Term SUP was executed on behalf of the Forest Service by Robert Rossman as the Acting Forest Supervisor. Tr. 910:8-9. It was "standard operating procedure" on the Forest that, even though the Forest Supervisor was present, the District Ranger would sign the Term SUP as Acting Forest Supervisor. Tr. 963:24-964:10.

**Defendant's Response to PPFF ¶ 92**

Defendant agrees, but reiterates its response to PPFF ¶ 50.

93. The bridges were not included within the designated permit area under The Sweetwater's subsequent permit. JX 1; Tr. 103:23.

**Defendant's Response to PPFF ¶ 93**

Defendant agrees that the permit issued to The Sweetwater, like the permit issued to the Brannons, stated "this permit cover 15.4 acres." JX 1, JX 3. Unlike the permit issued to the Brannons, the permit issued to The Sweetwater did not identify the Sweetwater bridges as part of the resort that the permittee was operating. JX 1, JX 3.

94. In the Term SUP, the Forest Service agreed to a process by which it would review and approve construction or development by The Sweetwater on the permit area. JX 1 (clause 3). In return, The Sweetwater agreed within the 15.4 acre area of the permit "to maintain the improvements and premises [*i.e.*, federal lands] to standards of repair, orderliness, neatness, sanitation, and safety acceptable to the forest officer in charge." JX 1 (clause 4). The Term SUP also obligated The Sweetwater to pay an annual fee of $1,400 to the Forest Service. JX 1 (clause 19).

**Defendant's Response to PPFF ¶ 94**

Defendant agrees that plaintiff has accurately paraphrased or quoted the cited portions of the permit issued to The Sweetwater, but disagrees that the parties "agreed" to the terms of the permit, which were unilaterally set by the Forest Service using its congressionally delegated authority to determine the conditions under which permittees may use National Forest system lands. 16 U.S.C. § 497.

95. The Term SUP required The Sweetwater to insure its operations, name the United States as a coinsured on the face of the insurance policy, and indemnify the United States in the event any liability arose related to The Sweetwater's operations. JX 1 (clause 28, 29). This indemnification requirement placed full liability on The Sweetwater for liability resulting from its operations, which would include any maintenance of the Sweetwater Road or bridges that was performed. *Id.;* Mummery Dec. ¶ 28 (App. 220).

**Defendant's Response to PPFF ¶ 95**

Defendant disagrees that the indemnification provision in the permit required The Sweetwater to assume all liability for "any maintenance of the Sweetwater Road or bridges that was performed." The MOU that the Government proposed The Sweetwater sign did not require The Sweetwater to perform any maintenance on the bridges. JX 4.

96. The Term SUP also contained clause 15, which states in pertinent part:

> If during the term of this permit or any extension thereof, the Secretary of Agriculture *or any official of the Forest Service acting by or under his authority shall determine that the public interest requires termination of this permit*, this permit shall terminate upon thirty days' written notice to the permittee of such determination, and the United States shall have the right thereupon to purchase the permittee's improvements, to remove them, or to require the permittee to remove them, at the option of the United States, *and the United States shall be obligated to pay an equitable consideration* for the improvements or for removal of the improvements and damages to the improvements resulting from their removal.

JX 1 (clause 15)(emphasis added).

**Defendant's Response to PPFF ¶ 96**

Defendant agrees that plaintiff has accurately quoted the first sentence of clause 15, but notes that equitable consideration is payable only if the Forest Service "determine[s] that the

public interest requires termination of the permit." JX 1/3 (emphasis added). Defendant also notes that clause 15 does not state that equitable consideration would be paid to The Sweetwater if the Sweetwater bridges were not replaced. Id.

97. The Forest Service consistently maintained that the Sweetwater Road had to be kept open to the public. Tr. 845:18-25.

**Defendant's Response to PPFF ¶ 97**

Defendant agrees that Mr. Barker testified that all four Shoshone Forest Supervisors he has worked for "have indicated that [Sweetwater Road] is to remain a road open to the public because it's one of the few areas on the North Fork where you can get off the highway." Tr. 808:18-22.

98. After executing the Term SUP, The Sweetwater spent the remainder of 1995 cleaning up the permit area, including areas the Forest Service had requested be improved. Tr. 157:16-159:7; Tr. 773:17-774:12; Pl. App. 221 (Mummery Dec. ¶ 31).

**Defendant's Response to PPFF ¶ 98**

Defendant agrees.

*1996 Operations*

99. The Sweetwater operated the lodge in 1996 consistent with the terms of its Term SUP and enjoyed a positive cash flow in the first year of operations. Tr. 407:1-8; JX 23 (at p. 23/7); Mummery Dec. ¶ 33 (App. 222).

**<u>Defendant's Response to PPFF ¶ 99</u>**

Defendant disagrees. The Sweetwater failed to open the lodge to the public in 1996, as required by the permit, but instead granted exclusive access to Mr. Carl Bixby, and Mr. Mummery failed to inform the Forest Service that The Sweetwater's owners had agreed to sell all their ownership interest in the lodge to Mr. Bixby. DPFF ¶¶ 126-30. Although Mr. Bixby paid Mr. Mummery $71,500 for the use of the lodge in 1996, the lodge did not turn a profit in 1996 once all its expenses are taken into account. DPFF ¶¶ 196-97.

100. The Sweetwater entered into an arrangement with Carl Bixby by which Mr. Bixby would be responsible for the costs associated with operating the lodge, seek guests for the lodge in the computer industry and The Sweetwater would operate the lodge. Tr. 159:18-163:10.

**<u>Defendant's Response to PPFF ¶ 100</u>**

Defendant disagrees. The permit issued to The Sweetwater required that it operate the lodge as a "public resort." JX 1/1. The permit was never amended to restrict its clientele to guests "in the computer industry." Clause 13 of the permit requires the permittee to obtain "express written permission of the Forest Supervisor" to sublease the lodge. JX 1/3. The permit did not allow The Sweetwater to absolve itself of all responsibility to ensure that the lodge was open to the public, and to shift this responsibility to Mr. Bixby.

Defendant notes that testimony of Mr. Mummery that is not cited by plaintiff contradicts plaintiff's assertion that Mr. Bixby bore all responsibility for obtaining guests for the lodge. Mr. Mummery testified that Mr. Bixby filed a lawsuit in which he alleged that either Mr. Mummery or The Sweetwater "did not fulfill an obligation to attempt to market to more people." Tr. 168:18-19.

101. The arrangement with Mr. Bixby involved a potential sale of stock in The Sweetwater, but would not have resulted in the change of ownership because The Sweetwater would still own the lodge facility. JX 8; Tr. 163:19-22. Because of financial problems, Mr. Bixby did not go through with the stock purchase. Tr. 164:10-167:1. In addition, while the lodge was open and ready for business, Mr. Bixby only brought in a few guests during the summer of 1996. 166:20-167:1. Mr. Bixby later accused The Sweetwater of having failed to properly market the lodge to the public pursuant to the agreement between him and The Sweetwater. Tr. 168:14-19.

**Defendant's Response to PPFF ¶ 101**

Defendant disagrees. What plaintiff euphemistically refers to as the "arrangement" with Mr. Bixby progressed well beyond a "potential" sale of stock to a signed sales agreement. On February 17, 1996, Mr. Mummery and Mr. Bixby signed a "Contract for Sale" in which the owners of The Sweetwater agreed to sell "[a]ll outstanding ownership interest" in The Sweetwater. JX 8/1, ¶ (a). The transfer in ownership of The Sweetwater necessarily involved a transfer in the ownership of the lodge itself. The sales contract specifically provided "[t]his sale includes all of the personal property and other assets owned by The Sweetwater." JX 8/3, ¶ 5. Thus, the sales contract provided for a transfer of the improvements, not just the stock of The Sweetwater. Ms. Watson testified that "the Bixby transfer would constitute a transfer of the permitted improvements" (Tr. 2050:2-4) that required The Sweetwater to give notice to the Forest Service pursuant to clause 51 of the permit. Tr. 2049:21-2050:16.

The Sweetwater never disclosed this agreed-upon change in ownership to the Forest Service, as required by clause 51, which states that the permittee "shall immediately notify the Forest Supervisor when a sale and transfer in ownership of the permitted improvements is

planned." JX 1/13. Mr. Mummery testified about his failure to disclose the sales contract, "I may very well have said Bixby is wanting to buy the lot. I don't know that I said he signed the sales contract." Tr. 624:17-19.

Mr. Mummery admitted that "[w]e were operating exclusively for [Mr. Bixby's] purposes" but contended that "[his] purposes were to go out and get customers to go to the lodge." Tr. 626:2-4. Even if Mr. Bixby were acting as a form of booking agent for The Sweetwater, this did not relieve The Sweetwater of its requirement in the permit to ensure that the lodge was a "public" resort. JX 1/1. However, Mr. Mummery testified that he did not do much to market the lodge in 1996, because "we were getting paid whether we marketed it or not." Tr. 628:3. As a result, no one else besides Mr. Bixby and his family and friends used the lodge during the 1996 season. Tr. 166:25-167:1.

102. While several Forest Service employees visited the lodge in 1996, none ever raised any concern that the lodge was operating in a manner inconsistent with the terms of the permit. Tr. 168:20-169:7; Tr. 866:4-7 (Mr. Barker visited the lodge "quite a few times in 1996").

**Defendant's Response to PPFF ¶ 102**

Defendant agrees that during visits by Forest Service employees to the lodge, they never voiced any concerns to Mr. Mummery that he was not complying with the permit, but disagrees that they had any reason to know of his non-compliance. Mr. Barker testified that the purpose of his visits, like those made by Mr. Bree, was to "to make sure what he said he was going to do to clean up and to change, he did." Tr. 866:6-7. In a note about Ms. Watson's visit to the lodge in September 1996, she recorded that a sheep hunter who was camping near the lodge stated that "he has not seen the public using this facility at any time." DX 74; Tr. 2037:21-2039:6,

2101:13-17. Ms. Watson testified that "[w]e don't give formal notification for noncompliance for every action that happens with a lodge. We don't have that kind of staffing, and so we do rely on the fact that we have effective communications with lodges, that they're dealing with us openly, honestly, and I operate on that premise." Tr. 2042:6-11.

103. The Sweetwater placed advertisements in the fall of 1996 to prepare for its 1997 season. Pl. App. 180 (Mummery 259:22-260:15).

**Defendant's Response to PPFF ¶ 103**

Defendant disagrees. At trial, Mr. Mummery agreed that in January 1997, when he had met the Sutherlands, he "had not yet made any preparations regarding the operations for the 1997 season." Tr. 638:4-8.

104. In the summer of 1996, Rebecca Aus became the new Forest Supervisor on the Shoshone National Forest (Tr. 1627:1-2), and in late 1996, Mr. Brent Larson took over as the new District Ranger. Tr. 982:4-19.

**Defendant's Response to PPFF ¶ 104**

Defendant agrees. Ms. Aus testified that "I had reported to the [Shoshone] Forest in August of '96." Tr. 1628:1-2. Mr. Larson testified that he became Wapiti District Ranger in October 1996. Tr. 1288:21-23.

105. Mr. Larson's personal feeling with respect to the lodge was that he did not want to see funding put into replacing the Sweetwater bridges and he thought the Forest would be better off if Sweetwater Lodge were removed. Tr. 1309:15.

**<u>Defendant's Response to PPFF ¶ 105</u>**

Defendant agrees that Mr. Larson testified that after the sale to the Sutherlands fell through in 1997, he told Mr. Mummery "personally I did not believe it was a good investment to replace those bridges." Tr. 1309:15-16. While defendant agrees that Mr. Larson testified that his personal preference was to find a conservation buyer who would remove the lodge, he made very clear that he did not exclude any buyers who wanted to operate the lodge. In response to the question "you didn't care whether it was by a conservation buyer buying it or by someone buying it to operate it?" Mr. Larson testified "That's correct and I would not have stopped any kind of sale to a private entity to operate that resort." Tr. 1173:25-1174:5. Mr. Larson also testified that "I had some personal preference, but I certainly did not -- you know, if Jeff would have walked in the door and said I've got Sutherland or I've got somebody like the Sutherlands that want to buy that, we would have gone through the process to sell the resort. . . . My goal was simply to get Jeff out of his investment up there. That was his desire." Tr. 1173:11-16, 1173:22-24. Mr. Larson said: "I wasn't being picky. I was looking for anybody that would come up with the cash." Tr. 1270:5-13.

Mr. Larson testified that he considered removing the lodge as a means of interesting a conservation buyer in purchasing it: "when I talked to Jeff about a conservation buyer, it was like, you know, <u>here's the tactic that we will use</u> and that is, or that I will use and I will try to sell to a conservation buyer. You can eliminate this lodge and perhaps road to help the wildlife resources out there." Tr. 1291:5-10 (emphasis added).

*Disclosure of 1992 Forest Service bridge inspection and effective "condemnation"*

106. In January 1997, The Sweetwater entered into an agreement to sell the lodge assets to Ray and Judi Sutherland for $595,000. Tr. 178: 23-24; JX 9.

**Defendant's Response to PPFF ¶ 106**

Defendant agrees that the proposed finding accurately represents the cited testimony and exhibit.

107. However, the Sutherlands were informed by the Forest Service as part of their discussions with the agency that the bridges over Sweetwater Creek had been "basically condemned" back in 1992. Tr. 1429:21-1430:1432:4; JX 7 (page 1); Tr. 2064:14-18. The Forest Service sent a document to the Sutherlands in February of 1997 that stated:

> We did not inspect the two upper bridges in '94 or '96 – they were basically condemned in '92.

JX 7.[9]

**Defendant's Response to PPFF ¶ 107**

Defendant agrees that Mr. Fischer's handwritten note to Ms. Watson (JX 7/1), which contains the language quoted above that he described as a "poor choice of words," was sent to the Sutherlands with the bridge inspection reports on February 19, 1997. JX 7; Tr. 1430:10-14, 2064:14-22. Defendant notes that a February 20, 1997 letter from Brent Larson to the Sutherlands states "[t]his letter is intended to clarify issues surrounding the inspection reports provided to you yesterday on the three bridges which provide access to the Sweetwater Wilderness lodge." JX 11 (emphasis added). The letter

[9] Mr. Rossman testified that, had he known of this conclusion at the time of the June 1995 meeting with The Sweetwater, he would have disclosed it. However, he was never informed about it. Tr. 948:20-949:20.

explained that the Sweetwater bridges were not condemned because certain elements had been assigned a rating of "2," and that if the bridges had been condemned, they would have been given a rating of "0." Id.

Defendant agrees that Mr. Rossman testified that if he had been aware of any conclusion that the Sweetwater bridges should be closed, he would have informed The Sweetwater's representatives of this information. Tr. 948:20-949:20.

108. The Forest Engineer added an additional note to the prior bridge inspection forms that stated, as to both bridges, "should be closed." Tr. 1432:16-1433:25; Tr. 1435:24-1436:13; *compare* JX 10 *to* JX 7.[10]

**Defendant's Response to PPFF ¶ 108**

Defendant agrees, but notes that Mr. Fischer testified that "I was trying to summarize what two [rating code] in the FHWA guidelines meant, where it says recommends closure, it should read not should be closed, but may be necessary to close." Tr. 1434:2-5. The code rating "2" for the condition ratings for items 58-62 on the bridge inspection reports means that "it may be necessary to close the bridge until corrective action is taken." DX 23/49 (emphasis added).

109. This prior determination was not set forth in the Forest Service file in 1995, but was added by the Forest Engineer in a note he sent to the Sutherlands in 1997. Tr. 1432:16-1433:25.

---

[10] In responding to questions on this issue in the trial, Mr. Fischer asserted that "when I made this statement [that the bridges should be closed], I had absolutely no intent of trying to tell somebody that the bridges should be closed." Tr. 1435:3-5. Mr. Fischer's attempts at denial are patently absurd.

No information related to the existence of an inspection by the Forest Service of the bridges in 1992 had previously been provided to The Sweetwater. Tr. 153:12-14.

**Defendant's Response to PPFF ¶ 109**

Defendant agrees that the proposed finding accurately represents the cited testimony, but notes that unlike the Sutherlands, The Sweetwater failed to ask the Forest Service if it could provide any information regarding the bridges. Tr. 2030:16-30.

110. While the Forest Service then attempted to withdraw its statement to the Sutherlands by asserting in a letter dated February 20, 1997 that no 'formal' condemnation had occurred (JX 11), the Sutherlands did not complete their purchase because of the bridges, and gave up a $5,000 deposit which they had put down towards their purchase contract. Tr. 191:13-23.

**Defendant's Response to PPFF ¶ 110**

Defendant disagrees. The February 20, 1997 letter did not assert that "no 'formal' condemnation had occurred." As discussed above, the letter explained that the bridges had not been condemned, and did not refer in any way to a "formal" condemnation. JX 11. Defendant agrees that the cited testimony supports the proposed finding that the Sutherlands did not complete their purchase of the lodge, and forfeited their $5,000 earnest money deposit. Tr. 191:13-23; JX 9/1.

111. The letter to the Sutherlands noted that the several components of the bridges had been rated as "2" in prior bridge inspection reports (which had not been provided to The Sweetwater). JX 11; Tr. 183:9-12. The letter further stated that a bridge which was condemned would be given a rating of "0" and would then be closed to all traffic. JX 11. This representation was

wrong because, as shown below, no components on a bridge could be rated with a "0" or "1" *until* the bridge had first been closed.

**Defendant's Response to PPFF ¶ 111**

Defendant agrees that the first two sentences of the proposed finding accurately represent the February 20, 1997 letter. Defendant also notes that the letter accurately represented that in 1992, the bridge inspectors had not condemned the bridges. JX 11. The inspection reports recommended that the bridges be replaced, but did not recommend that the bridges be closed. DX 9/1, 10/1.

Defendant disagrees that there is any support in the record for plaintiff's assertion that "no components on a bridge could be rated with a '0' or '1' until the bridge had first been closed." The Federal Highway Administration guide to coding bridges does not restrict the conditions in which an inspector may assign a "0" or "1" rating to the condition of items 58 through 62 (items shown on DX 9/1), but merely states that "[c]ondition rating are used to describe the existing, in-place bridge." DX 23/48. Inspectors are directed to rate the condition of the bridge without regard to whether it is open to traffic: "[c]ompleted bridges not yet opened to traffic, if rated, shall be coded as if open to traffic." Id. The rating that the inspectors assigned to the substructure and channel protection of the Sweetwater bridges (items 60 and 61 on DX 9/1 and 10/1) was "2," which according to the coding guide means "CRITICAL CONDITION . . . may be necessary to close the bridge." DX 23/49. Plaintiff's assertion that bridge inspectors would be unable to assign a bridge a rating of "0," which is for a bridge that is in "FAILED CONDITION - out of service - beyond corrective action" because it had not already been closed defies common sense, because it would prevent bridge inspectors from ever recommending the closure of failed bridges.

112. Mr. Fischer initially testified that, if the bridge inspectors had *recommended* closing the Sweetwater bridges, they would have given them a "0" or "1" rating. Tr. 1397:19-24. However, Mr. Fischer later admitted that bridge inspectors could not close a bridge. Tr. 1448:3-7; Tr. 1611:9-11 (bridge inspectors cannot close bridges, but only make recommendations that they be closed). Because codes "0" or "1" only apply to bridges that are *already* closed (Tr. 1613:25-1614:22; DX 23 at p. 23/51), and the bridge inspectors themselves could not close bridges, they could not give the Sweetwater bridges a rating of "0" or "1". Tr. 1615:3-13. Thus, a "2" rating which the bridge inspectors gave to components of the bridges was the lowest possible rating they could give. Tr. 1617:3-5; DX 23 at p. 23/51. In addition, the Forest Service inspectors did not complete an overall rating of the bridges in 1992. JX 7 at pp. 3 and 9 (while bridge inspectors gave the bridges' substructures the lowest possible rating given that the bridges were still open (see JX 7/2 and JX 7/8), they gave no rating given for overall Structural Evaluation for bridges)(see JX 7/3 and 7/9).

**<u>Defendant's Response to PPFF ¶ 112</u>**

Defendant agrees that the first two sentences of this proposed finding are consistent with the cited testimony. Defendant disagrees with the third sentence of this proposed finding. See Defendant's Response to PPFF ¶ 111.

113. The Sweetwater strongly disagreed with the Forest Service's statement in its letter to the Sutherlands that The Sweetwater had ever agreed to the use of fords as a means to operate the lodge. Tr. 184:18-21; Tr. 185:12-22; *see* JX 11.

**<u>Defendant's Response to PPFF ¶ 113</u>**

Defendant disagrees. This proposed finding is contradicted by Mr. Mummery's testimony that at the time of the June 12, 1995 meeting, he understood that the Forest Service would provide fords so that he could operate the lodge for at least half of the normal season: "they would at least be able to put in temporary f[]ords so that that portion of the season which maybe less than 50 percent of what you'd consider the normal summer season comes after high water so that I would – you know, it was clear that we were talking about if you had to deal f[]ords it had to be a temporary issue because you really just automatically cut the business in half." Tr. 130:8-16.

*Forest Service representations of its effort to resolve the access problem*

114. By letter dated February 27, 1997 which was written "to clarify the Shoshone Forest's position in regards to the bridges across Sweetwater Creek on [Sweetwater Road]," the Forest Service stated to The Sweetwater that:

> Should the existing bridges crossing Sweetwater Creek deteriorate to the point where they can no longer be used before money is available for their replacement, alternative solutions to provide access to the area will be explored at that time. Alternatives could involve the construction of temporary fords to serve as access while pursuing any emergency funding sources available for more permanent solutions.

JX 12.

**<u>Defendant's Response to PPFF ¶ 114</u>**

Defendant agrees that plaintiff has accurately quoted a portion of the February 27, 1997 letter, whose language was proposed by Mr. Mummery. Tr. 186:19-24, 1019:12-16.

115. In the same letter, the Forest Service represented to The Sweetwater that the Forest Service had requested funds from Congress to install replacement bridges on Sweetwater Road. JX 12; Tr. 1024:6-11. The February 27, 1997 letter stated in pertinent part:

> This letter is to clarify the Shoshone National Forest's position in regards to the bridges across Sweetwater Creek on Forest Development Road Number 423. This road provides access to National Forest lands on the Sweetwater Drainage as well as the Sweetwater Wilderness Lodge.
>
> . . .
>
> Replacement bridges for these two bridges crossing Sweetwater Creek are currently included in the Forest's Capital Improvement Program for FY 1999. However, this funding is subject to Congressional approval and I cannot guarantee that it will be available at that time.
>
> . . .
>
> It is the Forest's intention to continue to provide access to National Forest lands in the Sweetwater drainage.

JX 12.

**<u>Defendant's Response to PPFF ¶ 115</u>**

Defendant disagrees. The letter does not state that the Forest Service had "requested funds from Congress to install replacement bridges on Sweetwater Road," but merely stated that funding for the Capital Improvement Program was "subject to Congressional approval." JX 12. Mr. Fischer explained that "Congress approved a Forest Service appropriation. They didn't approve the Sweetwater bridges." Tr. 1500:11-12.

116. The Forest Service put no further conditions or qualifications on its efforts to seek funds other than that the success of the funding effort was dependent upon Congress approving its funding. Tr. 1024:12-23; JX 12.

**<u>Defendant's Response to PPFF ¶ 116</u>**

Defendant disagrees. The February 27, 1997 letter did not state that the inclusion of the

Sweetwater bridges in the Shoshone's CIP program meant that Congress would appropriate sufficient funds to the Forest Service to fund all projects in the CIP program. Mr. Larson testified that "typically there were three times as many projects in CIP as there were funds for" (Tr. 1355:2-4) so he believed that it was accurate to state that the bridges were included in the CIP program because this did not necessarily mean that they would actually be funded. Tr. 1355:22-1356:1. Mr. Mummery testified that Mr. Larson explained to him the CIP program "within two or three days" after the letter was sent, and Mr. Mummery understood that "I would have to wait, and we may not get it the first time around." Tr. 189:5-21. During this same time period soon after the February 27, 1997 letter was sent, Mr. Larson told Mr. Mummery that replacing the Sweetwater bridges "was a low priority and probably the likelihood was not that great" to obtain Forest Service funds for the project. Tr. 1292:12-20, 1309:12-1310:9.

117. Mr. Larson explained to The Sweetwater at the time he wrote this letter that his reference to not being able to guarantee funding would be available "at that time" was a reference to the fact that the Forest Service budget process might delay the receipt of funds, and that if a delay occurred the parties could seek emergency funding. Tr. 188:16-190:1. This explanation was consistent with what the Forest Service stated at the June 1995 meeting. Tr. 190:2-11.

**Defendant's Response to PPFF ¶ 117**

Defendant disagrees. The plain language of the letter, whose language was proposed by Mr. Mummery, indicates the phrase "at that time" in the last sentence of the second paragraph refers to "FY 1999" in the preceding sentence. JX 12. The third paragraph states that "emergency funding" could be pursued only if the bridges "deteriorate[d] to the point where they can no longer be used before money is available for their replacement." Id.

118. This representation encouraged The Sweetwater to continue incurring expenses to maintain The Sweetwater without ongoing operations. Tr. 189:7-191:12; Tr. 211: 6-18; Mummery Dec. ¶¶ 56, 61, 65-66 (Pl. App. 226-228).

**<u>Defendant's Response to PPFF ¶ 118</u>**

Defendant disagrees, and notes that it is unclear what plaintiff refers to as "[t]his representation." In response to the question that "no one from the Forest Service said to you that the bridges could not be used and you couldn't operate the lodge?" Mr. Mummery testified that "they all said you go ahead. I said I can't." Tr. 647:15-19.

119. The Forest Service prioritized the projects it felt merited funding. Tr. 995:24-996:17. The Shoshone was also given an expected budget amount and made a request to the Regional Office for these projects which cost totaled this amount, starting at the top of the priority list and working down. Tr. 998:21-999:3. The decision of which projects the Shoshone would request funding for was a group decision made by the employees with knowledge of the particular projects. Tr. 998:14-19; Tr. 1421:22-1422:3.

**<u>Defendant's Response to PPFF ¶ 119</u>**

Defendant agrees with the first sentence of this proposed finding.

Defendant disagrees with the second sentence of this proposed finding, which is based upon the testimony of Mr. Larson, who stated that "Mr. Fischer is probably the subject matter expert" on the CIP budget process (Tr. 995:17-18), because he put together the list of CIP projects for the Shoshone. Tr. 997:18-21. Mr. Fischer's testimony contradicts the second sentence of the proposed finding. In response to the question whether "you were given some

sense of how much money you were potentially going t get and you were asked to come up with a priority list of projects that in your estimate would total about that amount of money?" Mr. Fischer testified "[n]ot when we're doing it three years out. . . . through the whole process, projects were just scrambled. If only a certain amount of money was left, you'd search clear way down in your bag of proposals and maybe find a less expensive project and bring it up." Tr. 1419:19-24, 1420:18-22.

Defendant agrees with the final sentence of this proposed finding.

*Cessation of operations in 1997*

120. Because of the safety and liability concerns over the bridges, The Sweetwater informed the Forest Service in late winter 1997 that it could not operate the lodge in the 1997 season and invite paying guests to the lodge due to the liability created by the Forest Service's bridge evaluations. Def. Facts ¶ 109; Tr. 185:1-9; 194:17-196:14; Tr. 1024:24-1025:7; Tr. 1034:24-1035:6; Tr. 1036:2-16.

**Defendant's Response to PPFF ¶ 120**

Defendant disagrees. In 1997, Mr. Mummery offered a different reason for not operating than the one he now asserts. Mr. Larson testified that in 1997, "the only reason that I ever heard [Mr. Mummery] say was that the bridges were in such as state that he could not depend on them being there after high water the next spring, and therefore, he wasn't going to operate. . . . his theory was that he couldn't – he couldn't do advanced bookings. If he did advanced bookings, then he'd have to refund money if the bridges were not there. That was his rationale or reasoning to me." Tr. 1025:13-17, 1026:16-20.

On cross-examination, Mr. Mummery admitted that the 1992 inspection reports did not say that bridges could not be used for passage of guests to the lodge. Tr. 649:19-25.

121. The Forest Service approved this decision and did not require The Sweetwater to operate or to submit an Operating Plan. Tr. 1025:8-11; Tr. 1025:22-1026:6; Tr. 1168:20-1169:10.

**Defendant's Response to PPFF ¶ 121**

Defendant disagrees. The cited testimony does not support plaintiff's assertion that the Forest Service "approved" the alleged decision made by Mr. Mummery that the lodge could not be operated, or that the Forest Service agreed with his stated reason: that the risk of liability supposedly created by the 1992 bridge inspections. Mr. Larson testified that there were several reasons that he allowed The Sweetwater not to operate its lodge, none of which involved the condition of the bridges. First, Mr. Larson testified that "there were 11 other lodges along the North Fork that provide that kind of opportunity to the recreating public. The lodge itself had not operated in a capacity other than a dinner resort for the previous umpteen years under the Brannons' ownership. So I didn't see, you know, when Jeff said he wasn't going to operate, I didn't see a compelling reason to make him operate his lodge, because it really hadn't operated as a lodge resort in the traditional sense for many, many years." Tr. 1299:2-12. Second, Mr. Larson also testified that because of the extensive construction on the North Fork Highway that began in 1995 and lasted until 2001, it was a difficult time to start a business, and "[i]t was going to cost him a lot of money, a lot of money, to get that thing up and running." Tr. 1299:25-1300:2, 1170:17-1171:13.

Although Mr. Larson acknowledged that he had allowed The Sweetwater not to operate the lodge (Tr. 1026:5-6, 1169:5-7), he testified that he did not possess the authority to relieve

The Sweetwater of the requirement in the permit to operate 93 days per year. Tr. 1361:9-1362:12. Mr. Larson testified that as part of his duties to administer the permit, "I never amended the permit. I just simply chose not to enforce that stipulation. . . . The requirement to operate always remained there." Tr. 1362:7-12.

The cited testimony does not support plaintiff's assertion that The Sweetwater was not required to submit an operating plan. Mr. Larson testified that during the period after the sale to the Sutherlands fell through, "there were many, many times, too numerous to count, over that course of time where Jeff would come into the office and just talk about I've got an idea of how I can make this lodge work. . . . we would say, Jeff, put your ideas down in writing, let's evaluate those ideas, let's evaluate a business plan. And if it makes sense, you know, we'll do it." Tr. 1192:2-6, 1192:25-1193:3.

122. The Sweetwater submitted annual reports to the Forest Service in 1999 and 2000 stating that The Sweetwater had been closed during the prior year due to the bridges, and no one in the Forest Service objected to its assertions. PX 21, 25; Tr. 199:7-201:7.

**Defendant's Response to PPFF ¶ 122**

Defendant agrees that the cited documents, which are for the years 1998 and 1999, not 1999 and 2000, were submitted at some point in time to the Forest Service. PX 21, 25. Defendant disagrees that "no one in the Forest Service objected" to The Sweetwater's contention that it could not operate the lodge without the bridges. Mr. Larson testified that "I think we discussed it that that was a condition, a term of his permit, that he needed to operate at least 90 days a year." Tr. 1029:22-24. Mr. Larson also testified that "I'm thinking that every one of

those years he was reminded of the requirement in his permit by Jennifer Watson of the need to operate." Tr. 1191:25-1192:2.

123. As a matter of Forest Service policy and law, the Forest Service is required to provide The Sweetwater written notice if the Forest Service believes there are grounds for permit revocation not requiring an immediate suspension, and must also provide The Sweetwater a reasonable time to cure any alleged non-compliance. 36 C.F.R. § 251.60(e); JX 21 )(p. 2).

**Defendant's Response to PPFF ¶ 123**

Defendant agrees that 36 C.F.R. § 251.60(e) states: "Except when immediate suspension pursuant to paragraph (f) of this section is indicated, the authorized officer shall give the holder written notice of the grounds for suspension or revocation under paragraph (a) of this section and reasonable time to cure any noncompliance, prior to suspension or revocation pursuant to paragraph (a) of this section."

124. In 1997 (and continuing up to 2001), the Forest Service did not dispute or otherwise contradict in any communications to The Sweetwater that the Sweetwater bridges were not in proper condition for safe vehicular passage. Tr. 206: 3-14; Mummery Dec. ¶ 60 (App. 227). Nor did the Forest Service demand or request that The Sweetwater conduct operations in 1997, 1998, 1999, 2000 or 2001. Tr. 1028:24-1030:4.

**Defendant's Response to PPFF ¶ 124**

Defendant disagrees that the Forest Service agreed that the Sweetwater bridges were in proper condition for safe vehicular passage. At trial, in response to the question that "no one from the Forest Service said to you that the bridges could not be used and you couldn't operate

the lodge?" Mr. Mummery testified that "they all said you go ahead. I said I can't." Tr. 647:15-19.

Defendant agrees that Mr. Larson allowed The Sweetwater not to operate, but notes that Mr. Larson testified that "I think we discussed it that that was a condition, a term of his permit, that he needed to operate at least 90 days a year." Tr. 1029:22-24. Mr. Larson also testified that during the period after the sale to the Sutherlands fell through, "there were many, many times, too numerous to count, over that course of time where Jeff would come into the office and just talk about I've got an idea of how I can make this lodge work. . . . we would say, Jeff, put your ideas down in writing, let's evaluate those ideas, let's evaluate a business plan. And if it makes sense, you know, we'll do it." Tr. 1192:2-6, 1192:25-1193:3.

125. After receiving the February 27, 1997 letter, The Sweetwater repeatedly inquired about the Forest Service's continuation of its efforts to fix the bridges and was informed that the Forest Service was continuing its efforts to obtain funds for this purpose. Tr. 204: 7-14; Tr. 1040:11-25; Mummery Dec. ¶ 57 (Pl. App. 226).

**<u>Defendant's Response to PPFF ¶ 125</u>**

Defendant agrees that Mr. Larson told Mr. Mummery that the Sweetwater bridges were still in the CIP program, but disagrees that Mr. Larson held out any realistic hope that the project would ever be funded. Mr. Larson testified that during the time period soon after the February 27, 1997 letter was sent, he told Mr. Mummery that replacing the Sweetwater bridges "was a low priority and probably the likelihood was not that great" to obtain Forest Service funds for the project. Tr. 1292:12-20, 1309:12-1310:9. Mr. Larson also testified that in 2000, he told Mr. Mummery that "I didn't think the bridges were going to get funded" (Tr. 1309:4-5), and said that

that was consistent with his explanation to Mr. Mummery in 1997 that the bridges were a low priority. Tr. 1307:24-1310:9.

126. Mr. Larson stated to The Sweetwater that the Forest Service would continue its efforts to rebuild the bridges or, if not, "find another solution" (Tr. 1038:23-1040:10), which Mr. Mummery understood to be the exercise of clause 15 of the contract. *See* JX 16. Mr. Larson also testified that The Sweetwater was justified in believing that the Forest Service was pursuing funding to replace the bridges. Tr. 1188:12-17.

**Defendant's Response to PPFF ¶ 126**

Defendant agrees that in the cited testimony, Mr. Larson testified that in 1998, he told Mr. Mummery words to the effect that he would work with Mr. Mummery until "[e]ither the bridges are rebuilt, or we find another solution to your problem" (Tr. 1039:22-1040:7), but disagrees that Mr. Larson stated that in 1998, either he or Mr. Mummery discussed clause 15 as offering "another solution." The letter cited by plaintiff as evidence of Mr. Mummery's supposed understanding about the meaning of Mr. Larson's comment in 1998 is dated April 2, 2001. JX 16. The letter does not refer to clause 15, let alone indicate that Mr. Mummery believed that the Forest Service was required to "exercise" clause 15, but states that "I am seriously interested in exploring the alternative which we have been loosely discussing since last fall, which is the idea of the Forest Service paying the limited liability company the replacement value of the Sweetwater Lodge assets." Id. (emphasis added).

*Forest Service decision to seek a "conservation buyer" and eliminate the lodge and bridges*

127. At some point after issuing the letter to The Sweetwater dated February 27, 1997 and

prior to 1999, Mr. Larson had decided that it was in the overall interest of the public and the lodge owner to have the lodge operations terminated, which would be achieved by locating a conservation buyer. Tr. 206:15-207:20; Tr. 1027:24-1028:21.

**Defendant's Response to PPFF ¶ 127**

Defendant disagrees. The cited testimony does not support the assertion that Mr. Larson decided that it was in the "interest of the public" to terminate the lodge operations by locating a conservation buyer. Mr. Larson testified that "it became very obvious to me that Jeff was not interested in operating this lodge, and I approached him with a way to what he called relieve him of his draining asset, in terms of trying to find – help him find a buyer for that." Tr. 1027:25-1028:4.

128. The District Ranger's idea actually was initiated by a local environmentalist and then pursued by Mr. Larson. Tr. 1045:6-23; *see* Tr. 1163:11-1164:12; PX 18.

**Defendant's Response to PPFF ¶ 128**

Defendant agrees that the proposed finding accurately represents the cited testimony and exhibit.

129. Mr. Larson testified:

> I have said several times, we would be better off trying to secure the lodge through a conservation buyer than- than continuing on with the permit up there; or, you know, do away with the permit and not have to deal with the road issues and the bridge issues.

Tr. 1200:7-21.

**Defendant's Response to PPFF ¶ 129**

Defendant agrees that the proposed finding accurately quotes a portion of Mr. Larson's testimony, but notes that Mr. Larson also testified that "[m]y goal was simply to get Jeff out of his investment up there. That was his desire." Tr. 1173:22-24. In response to the question "you didn't care whether it was by a conservation buyer buying it or by someone buying it to operate it?" Mr. Larson testified "That's correct and I would not have stopped any kind of sale to a private entity to operate that resort." Tr. 1173:25-1174:5.

130. A "conservation buyer" was a private individual or entity that would agree to purchase the lodge assets and then agree to waive the permit back to the Forest Service, remove the lodge and restore the area to its natural condition. Tr. 1046:2-12.

**Defendant's Response to PPFF ¶ 130**

Defendant disagrees. In the cited testimony, Mr. Larson did not attempt to define a conservation buyer, or limit it to someone who would remove the lodge. In the cited testimony, Mr. Larson responded to the question, "How would the mitigation aspect of it work?", which followed Mr. Larson's explanation that the conservation buyer idea was proposed by a local environmentalist interested in mitigating the effects on wildlife of the reconstruction of the North Fork highway. Tr. 1045:25-1046:1. Mr. Larson testified that "the way it was presented to me was have a conservation buyer buy the resort . . . and then you could remove the facilities, and you, therefore, would not need the road or bridges." Tr. 1046:2-9.

131. The effect of locating a "conservation buyer" was that the lodge would be removed and the area restored to its natural condition. Tr. 1045:24-1046:12.

**Defendant's Response to PPFF ¶ 131**

Defendant disagrees. In the cited testimony, Mr. Larson testified only about how the mitigation scheme proposed by Mr. Neal would work. In testimony not cited by plaintiff, Mr. Larson testified that "a conservation buyer may have said I want to retain what's up there, but I don't need a road or I need a road and here's what we're going to do. And there's any number of twists that could have occurred." Tr. 1269:9-13. Mr. Larson also testified: "if they would have walked in and said, you know, we're wanting to buy this but, you know, we don't really want to do away with the resort. We have an idea how we might use this in a public way. I'm sure we would have considered it." Tr. 1203:6-10.

132. The Forest Service determined that The Sweetwater lodge facilities were unique in that they were the only facilities anywhere in the area that penetrated deep into the forest and were well away from the main highway. JX 28 (page 26); Tr. 1160:22-1161:21.

**Defendant's Response to PPFF ¶ 132**

Defendant disagrees. In the cited testimony, Mr. Larson testified that his interpretation of the top paragraph on page 26 of the 2003 Shoshone "Roads Analysis Report" was that "it just says that Sweetwater is different in that, from a lodge perspective, it's three miles off the highway. That's what I read there." Tr. 1161:13-15. He agreed with the statement of plaintiff's counsel that "it's outside that corridor of activity along the North Fork." Tr. 1161:19-21. Neither Mr. Larson nor the report stated that The Sweetwater's lodge "penetrated deep into the forest" or presented any harmful environmental impact.

133. The lodge area was located near pristine forest land and was adjacent to designated sensitive Wilderness area. Tr. 809:16-810:10; Tr. 884:14-17. The area around and near the

lodge was considered crucial habitat for bighorn sheep as well as elk, and was also important habitat for grizzly bear. PX 28 (page 22); Tr. 1158:8-1160:21. Removing the lodge would enhance the area for purposes of grizzly bear habitat. Tr. 1052:1-17.

**Defendant's Response to PPFF ¶ 133**

Defendant disagrees. Mr. Barker, whose job title is Wildlife Biologist, testified that he had no concerns that the operation of The Sweetwater's lodge had any effect on wildlife in the Sweetwater drainage and or the adjoining wilderness area: "Any effects would have occurred years ago as far as what we call habitat effectiveness. . . . They've acclimated. There never was enough use, really, to cause – cause a lot of displacement." Tr. 885:13-25.

The exhibit that is the source of the testimony cited in support of the second and third sentences in the proposed finding (PX 28) was not prepared until late 2002 or early 2003, five years after plaintiff asserts that Mr. Larson made his alleged decision to remove the lodge. PX 28; Tr. 1156:8-24. Mr. Larson testified that "[w]herever we have a road that goes through crucial winter range, you know, it's pretty standard operating procedure to suggest that if we can we ought to close it during those crucial periods of time while they're actually calving, birthing, that sort of thing." Tr. 1159:14-19.

134. A local environmental group had raised concerns with Mr. Larson over the importance of the area used by the lodge to threatened and endangered wildlife species. Tr. 1052:21-1053:8.

**Defendant's Response to PPFF ¶ 134**

Defendant agrees that Mr. Larson testified that "the local conservation groups thought it was a pretty important habitat," but did not testify that the Forest Service shared this assessment. Tr. 1053:2-3.

135. Human activity in these types of areas was determined by Forest Service biologists to have a detrimental effect on these threatened and sensitive wildlife species. PX 28 (pages 22-23); Tr. 1156:8-1160:21.

**Defendant's Response to PPFF ¶ 135**

Defendant disagrees. See Defendant's Response to PPFF ¶ 133.

136. In addition, the road leading to the lodge was causing harmful impacts on Sweetwater Creek because it was contributing to sedimentation that was harming the trout fishery in that stream. Tr. 1053:9-21; Tr. 1054:1-1055:3; Tr. 1859:1-1860:20; PX 56.

**Defendant's Response to PPFF ¶ 136**

Defendant disagrees. In the cited testimony, Mr. Larson testified that Sweetwater Road might cause harm to Sweetwater Creek, not that it definitely was causing harm: "I don't know that it was ever stated as those are detrimental effects or harmful effects. Any amount of sediment on a tributary that's a spawning stream, it could have adverse effects on spawning fish." Tr. 1053:17-21.

137. If the road was to remain open, these problems had to be fixed. Tr. 1862:3-17. The cost of fixing this would have been substantial. Tr. 1861:6-20.

**Defendant's Response to PPFF ¶ 136**

Defendant disagrees. Mr. Koenig, one of the Shoshone's engineers, did not link fixing any problems with keeping the road open. He testified that "to meet Forest Service policy," it would be necessary to prevent sediment from Sweetwater Road from washing directly into

Sweetwater Creek. Tr. 1862:16-17. He testified that "to put in where the side drainages cross, putting in the concrete envelope as well as either concrete down the fill slope or large riprap or a combination of both in remote location to get the concrete there, yeah, it would have cost a considerable amount of money." Tr. 1861:10-15.

138. In a formal report, the Forest Service's biologists concluded that:

> The Sweetwater Road (FSR #423) is of concern relative to spring and winter use. The lower Sweetwater drainage is crucial winter range and crucial birthing area for both bighorn sheep and elk. The area is also important spring and fall habitat for the grizzly bear and receives high amounts of bear use during these periods even though it is not within the recovery area. . . . From a wildlife perspective, effective restriction of all classes and types of public motorized use during the winter and spring periods are recommended.

PX 28 (page 22)(Roads Analysis Report; Supplemental Document to the Upper/Middle Lower Fork Shoshone River Watershed Assessment Report (Shoshone National Forest).

**Defendant's Response to PPFF ¶ 138**

Defendant agrees that plaintiff has accurately quoted the cited document, but also refers the Court to Defendant's Response to PPFF ¶ 133.

139. In addition, the Shoshone also had a target as to a certain number of miles that it was to attempt to decommission annually and removing the lodge would allow for the FSR 423 to be decommissioned as part of this effort. Tr. 1164:25-1165:23; Tr. 1953:8-1954:2. In fact, a Forest Service employee felt that it could "easily justify decommissioning FSR 423 if given the opportunity. PX 30; Tr. 1955:7-1958:20.

**Defendant's Response to PPFF ¶ 139**

Defendant disagrees that the first sentence of the proposed finding accurately represents the entirety of the cited testimony. When asked whether decommissioning Sweetwater Road would count towards the Shoshone's target for decommissioning roads, Mr. Larson testified that "it certainly could. But I would say that it was never in the work plans to decommission that road and make it count towards the target. It was never considered a road that we would consider decommissioning, never." Tr. 1165:16-20. Mr. Larson testified that the subject of decommissioning only arose as a possibility if a conservation buyer were found for the lodge: "If that were to occur, yeah, certainly we would probably count those miles if were to decommission it. That was a what if." Tr. 1165:23-1166:1.

Defendant agrees that the second sentence of the proposed finding accurately represents the a portion of the testimony of Gary Reynolds.

140. Mr. Larson had also been told by environmentalists he was contacting about possibly purchasing the lodge as "conservation buyers" that the asking price for the lodge was too high. Tr. 209:4-15; Tr. 1181:6-1185:2.

**Defendant's Response to PPFF ¶ 140**

Defendant agrees that Mr. Larson testified that conservation buyers thought the price was too high, but notes that he also testified that their principal concern was that the price be set by appraisal: "their premise was we need to do an appraisal to determine an accurate price and I don't think they really wanted to talk dollar and cents until they had ever done, they'd done an appraisal and the could come up with an accurate price." Tr. 1184:15-19. Mr. Mummery testified that he told a prospective conservation buyer that he based the price on his past attempted sales, not on an appraisal: "look, I've sold it twice or almost sold it twice for

$600,000. I would take the $600,000 if you can pay me in cash and I can get out of here." Tr. 209:11-13.

141. In response to a question as to whether the access to the lodge would lower its value, Mr. Larson responded "in the appraisal world, if you don't have access, you don't have value." Tr. 1186:15-1187:2. Mr. Larson had been told this by one of the prospective environmental buyers. Tr. 210:20-25.

**Defendant's Response to PPFF ¶ 141**

Defendant agrees that although Mr. Larson made the statement quoted in the first sentence of the proposed finding, he also testified that he did not recall any of the prospective conservation buyers indicating that an appraisal of the lodge's value would treat it as having no access: "our discussions about the resort and about conservation buyers was prior to the 2001 closure. So the lodge had access prior to 2001. . . . I did not ever recall them talking about an appraiser, the appraisal based on a lodge with no access." Tr. 1301:17-23.

The second sentence of the proposed finding is not supported by the cited testimony, in which Mr. Mummery claimed that Steve Thomas, a prospective conservation buyer, stated that there would be "a reduced price because of the access issue." Tr. 210:22-23. Both Mr. Mummery and Mr. Larson testified that Mr. Larson brought Mr. Thomas up to the lodge for the meeting. Tr. 209:19-22, 1302:25-1303:3. Mr. Larson testified that the prospective conservation buyers regarded the lodge as having access: "I mean there was a road up there and people were driving up and down it." Tr. 1302:18-23. Mr. Larson also testified that he did not recall Mr. Mummery ever telling any of the prospective conservation buyers that the lodge had no access

(Tr. 1302:5-8), presumably because this would diminish Mr. Mummery's chances of obtaining the highest possible price for the lodge.

142. Mr. Larson stated that he also took this action to terminate lodge operations in order to eliminate the Forest Service's continuing road and bridge obligations caused by the presence of the lodge and thereby save the government money. *See* JX 22 (discussing costs to Forest Service of maintaining road); Tr. 942:15-943:11 (same); Tr. 1047:4-20; Tr. 1202:7-1203:24.

**Defendant's Response to PPFF ¶ 142**

Defendant disagrees. Mr. Larson never took any action to terminate the lodge's operations, nor did he testify that he had done so. He testified that he believed there would be benefits if the lodge were removed: "if the presence of the lodge required us to spend $500,000 as a figure that came out later of the taxpayers' money to improve roads and bridges to Mr. Mummery's lodge or to a lodge, then, you know, I would say it would be in the benefit of the taxpayer not to spend that money, as a taxpayer." However, he stated that even though he saw the potential benefits to removing the lodge, neither he nor anyone else in the Forest Service believed that the public interest required termination of the lodge's operations: "I did not think that the permit needed to be, it was required to be terminated in the public interest." Tr. 1297:9-19. Mr. Larson's pursuit of a conservation buyer was premised on a voluntary sale by Mr. Mummery, not an involuntary termination: "What I was hoping for was that Jeff would find a willing buyer and there would be a willing seller." Tr. 1173:5-7.

143. Mr. Larson admitted that pursuing a conservation buyer was more advantageous to the Forest Service than The Sweetwater selling the lodge to another operator. Tr. 1049:5-10; Tr. 1173:20-24; Tr. 1201:21-1202:6.

**Defendant's Response to PPFF ¶ 143**

Defendant agrees that Mr. Larson admitted the acquisition of the lodge by a conservation buyer who removed the lodge could bring the additional benefits of reducing potential road and bridge maintenance expenses. However, Mr. Larson testified that he did not exclude any buyers who had other ideas: "I wasn't being picky. I was looking for anybody that would come up with the cash." Tr. 1270:5-13. Mr. Larson testified that "[m]y goal was simply to get Jeff out of his investment up there. That was his desire." Tr. 1173:22-24. In response to the question from plaintiff's counsel "you didn't care whether it was by a conservation buyer buying it or by someone buying it to operate it?" Mr. Larson testified "That's correct and I would not have stopped any kind of sale to a private entity to operate that resort." Tr. 1173:25-1174:5.

144. Mr. Larson spoke to the Regional Forester as well as the Forest Supervisor about his strategy as well as others in the Forest Service, and was given the "green light" to proceed. Tr. 1047:21-1048:13; Tr. 1055:4-1056:21; Tr. 1174:6-1180:13. The Regional Forester (Mr. Laverty), Forest Supervisor (Ms. Aus) and Forest budget specialist (Mr. Fischer) all told him "Go for it. If you can make it happen, yeah, do it." Tr. 1048:3-4; Tr. 1180:9-13; *see* 1203:20-1204:14.

**Defendant's Response to PPFF ¶ 144**

Defendant agrees that the Regional Forester and Forest Supervisor were receptive to Mr. Larson's "strategy" of searching for a conservation buyer for the lodge as an alternative to

building new bridges. However, Mr. Larson testified that Lyle Laverty, the Regional Forester, did not tell Mr. Larson "not to ever build the bridges, but to pursue and exhaust all avenues to go an alternative route." Tr. 1179:24-25. Mr. Larson testified that this strategy would not necessarily result in terminating the operation of the lodge, but might only result in the lodge being "operated in a manner that did not require bridges and roads, you know. That decision would be subsequent to anything, acquisition." Tr. 1176:9-11.

Defendant disagrees that Mr. Larson pursued a "strategy" of terminating lodge operations. Mr. Larson testified that "a conservation buyer may have said I want to retain what's up there, but I don't need a road or I need a road and here's what we're going to do. And there's any number of twists that could have occurred." Tr. 1269:9-13. Mr. Larson also testified: "if they would have walked in and said, you know, we're wanting to buy this but, you know, we don't really want to do away with the resort. We have an idea how we might use this in a public way. I'm sure we would have considered it." Tr. 1203:6-10.

145. Mr. Larson informed The Sweetwater of his efforts to locate a conservation buyer. Tr. 1044:1-2; Mummery Dec. ¶ 62 (App. 227). However, The Sweetwater informed him that it was skeptical of pursuing a conservation buyer and did not think such efforts were worthwhile because a conservation buyer would not likely pay a fair value for the lodge. *Id.* at ¶ 63; Tr. 1044:7-22; Tr. 1291:19-24. Provided that it would result in a payment of fair market value, The Sweetwater did not oppose the strategy of the Forest Service to seek an alternative way to ensure that The Sweetwater would be compensated for its assets. JX 20 (letter to Brent Larson from Jeff Mummery dated July 12, 2001 stating that "[i]n lieu of obtaining funds through the

federal government, I have no objection to the Forest Service pursuing the possible purchase of Sweetwater Lodge's assets by the Nature Conservancy or similar organizations").

**Defendant's Response to PPFF ¶ 145**

Defendant agrees with the first sentence of the proposed finding.

Defendant disagrees with the second sentence of the proposed finding. The cited trial testimony and exhibit do not support plaintiff's assertion that Mr. Mummery was skeptical that a conservation buyer would not pay fair market value. Mr. Larson testified that conservation buyers wanted to rely upon an appraisal to determine the fair market value of the lodge, whereas Mr. Mummery was set on obtaining the $600,000 figure that he had been offered previously. See Defendant's Response to PPFF ¶ 140.

146. Mr. Larson had called Mr. Jim Fischer, who was the Forest Service employee on the Shoshone responsible for obtaining and appropriating the funding for bridge replacement projects, and shared this strategy with him. Tr. 1180:14-1181:5; Tr. 1204:15-1205:2; Tr. 1416:16-22.

**<u>Defendant's Response to PPFF ¶ 146</u>**

Defendant agrees that Mr. Larson shared with Mr. Fischer his strategy to locate a conservation buyer for the lodge. Defendant disagrees that the cited testimony supports any finding that Mr. Larson shared any other strategy with Mr. Fischer, nor does it support the assertion that Mr. Fischer was "the" Shoshone employee "responsible for obtaining and appropriating the funding" to replace the Sweetwater bridges. That assertion contradicts the final sentence of PPFF ¶ 120, which states: "The decision of which projects the Shoshone would request funding for was a group decision made by the employees with knowledge of the particular projects."

147. Mr. Larson admitted that the reason he was contacting Mr. Fischer was to engage in a strategy of getting Mr. Fischer to slow down the process of obtaining funds to replace the Sweetwater bridges which would give the Forest Service more time to locate a conservation buyer. Tr. 1205:3-1206:7; *see* Tr. 1206:8-1207:17; Tr. 1305:16-1306:24; Tr. 1492:19-23.

**<u>Defendant's Response to PPFF ¶ 147</u>**

Defendant disagrees that Mr. Larson sought to "slow down the process of obtaining funds." Mr. Larson testified that he told Mr. Fischer "[i]t probably wouldn't make good sense to spend money replacing bridges now" because "we'd had some initial conversations in which there appeared to be some very good interest in this prospect." Tr. 1306:11-13, 1306:22-24. There is no evidence in the cited testimony or elsewhere in the record that Mr. Larson's discussions with Mr. Fischer had any effect on obtaining funds to replace the Sweetwater bridges anytime before fiscal year 2000, when the project was indefinitely postponed only after Rebecca Aus, Forest Supervisor, approved removal of the project from the CIP program. JX 2/6.

148. As a result of that conversation, Mr. Fischer admitted that he started "dragging his feet" as to moving forward with replacing the bridges. Tr. 1501:24-1502:15; *see* Tr. 1492:16-18; Tr. 1596:3-7.

**Defendant's Response to PPFF ¶ 148**

Defendant disagrees that Mr. Fischer engaged in any "foot dragging" that delayed replacement of the bridges. In the cited testimony, Mr. Fischer disagreed that he had tried to slow down the funding process: "No. I hadn't been dragging my feet to slow down the funding. I was dragging my feet on going in to final design of the bridges." Tr. 1502:2-7. When asked "when did you start dragging your feet?" Mr. Fischer testified "I believe I said at least an 80 percent sure that we would have the funds for construction in fiscal year 2000. Okay. There was no dragging the feet prior to that. No way – no reason to drag feet." Tr. 1596:8-17 (emphasis added). Mr. Fischer testified that "in fiscal '99, there wasn't enough money to do the bridges and . . . there was in fiscal 2000, it appeared." Tr. 1500:18-21. Thus, any delay by Mr. Fischer in beginning the design work on the bridges in 1998 or 1999 did not delay their replacement, because no funding was available until fiscal year 2000.

149. In late 1999, while Mr. Larson was still seeking a conservation buyer in order to terminate lodge operations and despite Mr. Fischer's foot-dragging, the funding that was necessary to initiate the replacement of the Sweetwater bridges was approved by the Regional Office and Congress and sent to the Forest Service. Tr. 1492:24-1497:3; Tr. 1494:8-10. As defendant has admitted, "**during Fiscal Year 2000, funds became available from the Forest**

**Service's regional office to replace the Sweetwater bridges**." Defendant's Corrected Proposed Findings of Uncontroverted Facts ¶ 92 (emphasis added).

**<u>Defendant's Response to PPFF ¶ 149</u>**

Defendant disagrees that Mr. Fischer engaged in any "foot dragging" regarding obtaining funding to replace the bridges. Defendant agrees that Mr. Fischer testified that during fiscal year 2000, "it appeared that there was going to be enough money to fund the construction of the Sweetwater bridges" (Tr. 1563:2-14) within the funds appropriated by Congress for the entire National Forest budget. Tr. 1498:6-11. However, Mr. Fischer also testified that the Shoshone retained the ability "to decide whether to actually spend those funds that it was authorized by the region to spend." Tr. 1564:8-11.

Rebecca Aus, Forest Supervisor, testified about her review of the proposal to replace the Sweetwater bridges: "we had a pot of CIP money that was coming to the Forest that we would be able to spend on CIP projects. . . . the Sweetwater bridges were on the CIP list at the time and I think that's what precipitated the conversation was okay, here's this money that's coming to us. What is our highest priority project . . . we have an enormous deferred maintenance backlog with very, very heavily used recreation facilities, very heavily used trails, administrative sites, all of which required deferred maintenance and why do we have a level two road – bridges on a level two road on this list?" Tr. 1657:6-1658:4.

Defendant agrees that plaintiff has correctly quoted defendant's corrected proposed finding of uncontroverted facts.

150. Mr. Fischer, who received notification of the funding, then spoke to Mr. Larson. Tr. 1492:24-1494:17. Mr. Fischer was led to believe that there was "a really good possibility" that the Forest Service would locate a conservation buyer to purchase the lodge. Tr. 1493:6-10.

**Defendant's Response to PPFF ¶ 150**

Defendant agrees that the proposed finding accurately represents the cited testimony.

151. As a result of this conversation, Messrs. Larson and Fischer decided that Mr. Fischer should *return the money* because replacement of the bridges was inconsistent with this goal of obtaining a conservation buyer. Tr. 1494:14-17. Mr. Fischer testified:

> It was pretty much between Brent and myself of- of let's – you know – let's pull the bridges from the program until we know for sure what's going to happen with these [conservation buyer] proposals.

Tr. 1494:14-17.

**Defendant's Response to PPFF ¶ 151**

Defendant agrees that Mr. Fischer testified that he and Mr. Larson made a decision to pull the Sweetwater bridges from the CIP program, but defendant disagrees that Mr. Fischer testified that he possessed authority to make the final decision regarding whether the bridges should not receive CIP funds. Mr. Fischer testified that "in my job, I'm a recommender and probably decider and final decisions are made by the – were made by the line officer, which would either be the Forest supervisor or district ranger." Tr. 1506:2-5 (emphasis added). Mr. Fischer also testified that before he took any action to decline funding for the Sweetwater bridges, he informed Forest Supervisor Rebecca Aus of his and Mr. Larson's proposed plan to pull the bridges from the program, and understood that she approved this action:

> At some point, after Brent and I decided that we ought to take the bridges from the CIP program, she was informed and I – what I can't remember is if I did it in a staff meeting or if Brent did it with her in meetings with her over the phone, but she was informed of that and <u>if she had not liked the idea, then she would have told us, no don't do it</u>, but we never head no, don't do it and we never really heard yes, go ahead and do it. We just assumed that or at least I did that it was okay and some time later in the year is when I contacted the regional office.

Tr. 1503:12-23 (emphasis added). It was only after Ms. Aus approved the action that Mr. Fischer contacted the regional office. Tr. 1503:21-23.

Ms. Aus testified that "I do know that our discussion was when we talked about it, what is the highest priority for these dollars and we had campgrounds on that list. We had water systems that we had to shut down because of health and safety purposes. We – they didn't meet health and safety code standards. We don't meet ADA standards. We have a lot of stuff that needs to be fixed and it's high priority, high public use types of facilities and that was the conversation that we had when the bridges were removed from the CIP list." Tr. 1660:19-1661:5.

There is also no support in the record for plaintiff's assertion that Mr. Fischer "*return[ed] the money*." Mr. Fischer testified that "there was money available in – the regional office accounts. The money itself never came to the Forest." Tr. 1563:17-19.

152. Mr. Fischer then testified that he or Mr. Larson informed Ms. Aus of decision to prevent the bridges from being funded, and she did not express an opinion one way or the other. Tr. 1503:12-20; Def. Facts ¶ 92.

**<u>Defendant's Response to PPFF ¶ 152</u>**

Defendant agrees that Mr. Fischer sought and received Ms. Aus's approval to pull the bridges from the CIP program: "if she had not liked the idea, then she would have told us, no,

don't do it." Tr. 1503:17-19. Ms. Aus testified that "what I default to is to what the Forest Service is responsible for under how it has that road listed and that road is designated as a level two maintenance road, which means that it's responsible for high-clearance vehicles, not passenger vehicles. And so in my view, bridge replacement at all is questionable, because what we are obligated to do there is provide access for high-clearance vehicles and I believe you can do that without bridges." Tr. 1648:19-1649:3.

153. Mr. Fischer then testified that he called the regional office to reject the funds, telling them:

> Hey, you know, our decision is we're not going to build this bridge this year because of the conservation – because of what appeared at the time as a really good possibility that the conservation organizations would – you know, were going to be able to buy the lodge.

Tr. 1493:6-10.

**<u>Defendant's Response to PPFF ¶ 153</u>**

Defendant agrees that after Ms. Aus approved pulling the Sweetwater bridges from the CIP program, Mr. Fischer communicated to the regional office the Shoshone's decision that it would not use CIP funds to replace the Sweetwater bridges. Defendant disagrees that Mr. Fischer "rejected" the funds for all uses by the Shoshone. Ms. Aus testified that the funds were redirected into work on the Wapiti campground, a popular campground on the North Fork Highway at the foot of Sweetwater Road. Tr. 1670:1-6, 1675:13-1676:11. Ms. Aus testified that Mr. Mummery "was told by Mr. Rossman that if the bridges failed, he would have to use fords. Why is it suddenly the government's responsibility to replace those bridges, when we explicitly said you're going to have to use fords if those bridges go out?" Tr. 1668:10-14.

154. By doing so, the bridges were no longer eligible for any funding. Tr. 1507:21-23; Tr. 1509:15-18. However, the funding would likely have been received if the Forest requested it in the future. Tr. 1508:10-12.

**Defendant's Response to PPFF ¶ 154**

Defendant agrees that the proposed finding accurately represents the cited testimony.

155. The Shoshone did not request that the funds be applied to any other Forest projects. Tr. 1493:11-21.

**Defendant's Response to PPFF ¶ 155**

Defendant agrees that Mr. Fischer testified that the Shoshone "did not offer an alternative project." Tr. 1493:11-12.

156. Mr. Larson subsequently admitted that, when he spoke to Mr. Fischer, he did not have any conservation buyers lined up, much less any letters of intent, draft contracts or any indication of interest, but he was "hopeful." Tr. 1209:9-1210:4.

**Defendant's Response to PPFF ¶ 156**

Defendant disagrees. The proposed finding presents an incomplete portrayal of Mr. Larson's testimony. Mr. Larson testified that in 1999 or 2000, he did not have a conservation buyer "lined up" to buy the lodge, but he did have "folks looking." Tr. 1209:9-15. Steve Thomas from the Greater Yellowstone Coalition told Mr. Larson that he would help line up persons and organizations such as Paul Allen of Microsoft and the Turner Foundation. Tr. 1210:11-14.

157. If Mr. Larson and Mr. Fischer had not taken steps to block funding for use in replacing the Sweetwater bridges, the bridges would have been built. As Mr. Fischer stated:

> [Question] So but for the conversation with Brent Larson and the decision about the conservation buyer, the bridges would have been built?
>
> [Mr. Fischer] They would.

Tr. 1495:12-14; *see* Tr. 1495:3-15 (Mr. Fischer stated that "if those manipulations hadn't been done, we would have designed and built the bridges").

**Defendant's Response to PPFF ¶ 157**

Defendant agrees that the proposed finding accurately quotes the cited testimony of Mr. Fischer, but disagrees that it was Mr. Larson and Mr. Fischer who made the final decision in 2000 not to use CIP funds to replace the Sweetwater bridges. Defendant notes that in a portion of the cited testimony, Mr. Fischer testified that "I think Becky Aus, the Forest Supervisor, was involved in some of these discussions." Tr. 1495:14-16.

158. As Mr. Fischer further stated, "it appeared the money was in the bank and so we were – it

was still this thing of do we or don't we build them? What's going to happen you know with the status of the lodge? Is it going to be purchased by somebody that's going to let the permit lapse and then as a permittee have to remove the facilities?" Tr. 1496:22-1497:3.

**Defendant's Response to PPFF ¶ 158**

Defendant agrees that the proposed finding accurately quotes the cited testimony.

159. At this point in time, the Shoshone National Forest had no further obstacles to its using the funds on the replacement of the Sweetwater bridges. Tr. 1564:8-11.

**Defendant's Response to PPFF ¶ 159**

Defendant disagrees. As Ms. Aus testified, "[w]e had higher priority projects that had higher public use that needed to come before we funded the Sweetwater bridges." Tr. 1663:3-5.

160. While the Sweetwater bridges were not identified explicitly in any funding request sent to Congress, the funding request sent to Congress had included the money for the Sweetwater bridges, and Congress approved that funding. Tr. 1497:24-1498:11.

**Defendant's Response to PPFF ¶ 160**

Defendant agrees that in the cited testimony, Mr. Fischer testified that "Congress appropriated the entire National Forest budget and the funding for the bridges if it was in there was a pretty small part of that, but I think it was in there somewhere." Tr. 1498:6-11. Defendant disagrees that the cited testimony supports any assertion that Congress approved funding to replace the Sweetwater bridges.

161. As to the impact on the decision not to fund the bridges on The Sweetwater's operations,

Ms. Aus testified as follows:

> [T]he fact that he was not operating obviously was not something that I was aware of. I clearly did not associate not replacing the bridges with his ability to operate. I believe that Mr. Mummery, the level two maintenance, the high-clearance—the level two maintenance standard that we set for that road, we would be able to maintain and that he could continue to operate his lodge using that standard. So I don't see how the decision related to the bridges negatively affects his ability to operate.

Tr. 1689:19-1690:4.

**<u>Defendant's Response to PPFF ¶ 161</u>**

Defendant agrees that the proposed finding accurately quotes a portion of Ms. Aus's testimony, but notes that Ms. Aus also testified that Mr. Mummery had agreed to use fords to operate the lodge if the bridges became impassable, and that she regarded this as a viable means of operating the lodge:

> [F]ords are not an uncommon transportation practice. Fords generally are low water crossings. You could not operate in the spring. I – that's clear, but July, August, September, which gets you close to 93 days and as we heard Mr. Mummery on Monday talking about the expanding the season in September, I think that – you know I believe that fords are adequate access or they're not the preferred access, but I do believe that they are not uncommon transportation tools and that I n this neck of the woods where the geography is very, very challenging, we use fords on roads. The six National Forests that I have worked on have used fords. The dozens of National Forests that I'm familiar with have used fords as a common transportation tool. So I think that it is possible to provide access to that lodge using fords.

Tr. 1692:15-1693:6.

162. Ms. Aus also stated that her view was affected by the fact that she had been told by Mr. Rossman that The Sweetwater had agreed to use fords on a permanent basis to operate its lodge

if bridge access was lost. Tr. 1690:5-23.[11] In addition, Ms. Aus had never been told by anyone, even as of the trial, that her own agency's expert had agreed that the lodge could not be operated using fords. Tr. 1694:1-4; *see* ¶ 6, supra (Forest Service expert agreed that the lodge could not be operated using fords as the method of access).

**Defendant's Response to PPFF ¶ 162**

Defendant agrees that the first sentence of this proposed finding is supported by the cited testimony. Defendant disagrees with the assertions in footnote 11 to the first sentence because The Sweetwater did agree to use fords to operate the lodge, as demonstrated in Defendant's Responses to PPFF ¶¶ 63-67. Defendant disagrees that Mr. Frome, its appraisal expert, concluded that the lodge "could not be operated using fords." Even if the normal season of the lodge were June through August, Mr. Frome concluded that the lodge would turn a small profit using fords to gain access after high water in July. DX 64/71. After Mr. Frome prepared his report, Mr. Mummery provided his new business plan, which proposes a high season lasting through September, which would increase the profit that the lodge could make using fords.

163. While the Forest Service employees have asserted that their actions were driven by a benevolent desire to assist The Sweetwater (*see*, *e.g.*, Tr. 1173:22-1174:5), no one in the Forest Service ever informed The Sweetwater that the Forest Service's efforts to locate a conservation buyer would result in it discontinuing its efforts to obtain funding to replace the bridges. Tr. 1166:2-1167:8. In addition, Mr. Larson admitted that his efforts to prevent funding from

[11] As demonstrated previously the Forest Service employees who attended the June 12, 1995 meeting did not state that The Sweetwater had agreed to the use of fords as a permanent method to operate the lodge. Nor did Mr. Rossman's e-mail which he drafted the next day state the fords would be used as a permanent means to operate the lodge. *See* JX 6.

being applied to the bridges (which was kept secret from The Sweetwater) was contrary to The Sweetwater's goals, and was pursued because it was directly consistent with the Forest Service goal of having the lodge removed at no cost to the Forest Service. Tr. 1211:5-1213:16.

**<u>Defendant's Response to PPFF ¶ 163</u>**

Defendant disagrees. The first sentence of the proposed finding is not supported by the cited testimony. In response to questioning about whether the Forest Service was pursuing both a conservation buyer and CIP funding to replace the Sweetwater bridges, Mr. Larson testified that "[b]oth were worked on." Tr. 1167:5. Mr. Fischer testified that efforts to obtain funding to replace the Sweetwater bridges were not discontinued or even delayed anytime before 2000. Tr. 1596:14-17.

The testimony cited in the second sentence of the proposed finding does not support plaintiff's assertions that Mr. Larson admitted that his efforts were contrary to The Sweetwater's goals, or that he pursued the conservation buyer to achieve an alleged Forest Service goal of removing the lodge. Mr. Larson testified that his conversations with Mr. Fischer "probably did influence" Mr. Fischer not to move forward with replacing the bridges. Tr. 1213:15. However, Mr. Fischer testified that he did not delay the project. Tr. 1596:14-17.

164. Nor did anyone in the Forest Service ever inform The Sweetwater in 1999, 2000 or any point thereafter that funding to initiate replacement of the bridges had actually been obtained, but was rejected because the Forest Service was pursuing a conservation buyer. Tr. 248:18-20; Mummery Dec. ¶ 67 (App. 228); JX 16 (Mr. Mummery stated to the Forest Service by letter

dated April 2, 2001 that he "was hopeful that [Mr. Larson's] efforts to secure funding would have been successful by now"); Tr. 230:3-20.

**Defendant's Response to PPFF ¶ 164**

Defendant disagrees. Mr. Larson testified that in 2000, he told Mr. Mummery that the bridges "were not going to be funded." Tr. 1309:3-6.

165. Had the Forest Service informed The Sweetwater in 1999 or 2000 that funding had been obtained for the purpose of replacing the bridges, The Sweetwater would have insisted that such funding be applied to the bridges rather than rejected while further efforts were made towards locating a conservation buyer. Mummery Dec. ¶ 68 (App. 229).

**Defendant's Response to PPFF ¶ 165**

Defendant disagrees. There is no support in the evidence adduced at trial for this speculative assertion. In the numerous letters that Mr. Mummery wrote to Mr. Larson during 2001, Mr. Mummery never asserted that it regarded the permit to be a contract that granted The Sweetwater the right to have the bridges replaced at taxpayer expense. JX 16, 18, 20.

166. In reliance on the Forest Service's previous written statements in 1997 and continuing oral assertions that it was trying to locate funding to replace the bridges, The Sweetwater continued to maintain the lodge, and kept it in excellent condition so that it was ready for operations. Mummery Dec. ¶ 61(App. 227).

**Defendant's Response to PPFF ¶ 166**

Defendant disagrees. This proposed finding is contradicted by Mr. Mummery's trial

testimony that between 1997 and 2000, "[o]ne of the things that I hadn't been doing is as much maintenance." Tr. 214:13-14.

167. As its inability to operate the lodge continued, The Sweetwater regularly inquired of the Forest Service as to the progress of the Forest Service's efforts to seek funds to repair the bridges, and was repeatedly told by the Forest Service that efforts were continuing. Tr. 215:22-216:1.

**Defendant's Response to PPFF ¶ 167**

Defendant disagrees. Mr. Larson testified that in 2000, he told Mr. Mummery that the bridges "were not going to be funded." Tr. 1309:3-6.

168. Mr. Larson felt that, if "push came to shove" and he was unable to locate a conservation buyer and The Sweetwater was unable to continue without operating, the Forest Service would then replace the Sweetwater bridges. Tr. 1260:21-1261:3; Tr. 1303:9-1304:4. .

**Defendant's Response to PPFF ¶ 168**

Defendant disagrees. This proposed finding does not accurately represent the cited testimony. Mr. Larson testified that it was "kind of my scheme in my mind" that the Forest Service would replace the Sweetwater bridges if he could not locate a conservation buyer. Tr. 1261:7-8. However, Mr. Larson testified that "I did not have the authority to say we're going to do this." Tr. 1303:20-21.

*Forest Service formal closing of Sweetwater bridges and FSR 423*

169. The Sweetwater began to push the Forest Service in1999-2000 for a solution to the current issue related to its bridges over Sweetwater Creek. Tr. 213:19-25; Tr. 1217:18-24.

**<u>Defendant's Response to PPFF ¶ 169</u>**

Defendant agrees that Mr. Larson testified that after Mr. Larson told Mr. Mummery in 2000 that replacements for the Sweetwater bridges "were not going to be funded" (Tr. 1309:3-6), "Jeff had basically said I just need to kind of fix those bridges up to cosmetically make them look better and I would be willing to do that." Tr. 1218:17-20. Mr. Koenig testified that when he met with Mr. Mummery, "I remember him talking about wanting to put log railing on the bridges and other things." Tr. 1883:14-15.

Defendant disagrees that The Sweetwater began to "push" for a "solution" in 1999-2000. Mr. Larson testified that as long as he was pursuing a conservation buyer for the lodge, "I never got a sense from Jeff that, by gosh, you've got to do something for me here ASAP. . . . I really heard it loud and clear in 2001." Tr. 1341:6-16. Defendant also disagrees that The Sweetwater ever pushed for any solution other than replacing the bridges, such as installing fords.

170. The Sweetwater made repairs in 2000 in anticipation of potentially reopening the lodge upon being able to restore access over the bridges. Tr. 215:8-21; Tr. 220:2-221:8.

**<u>Defendant's Response to PPFF ¶ 170</u>**

Defendant agrees that Mr. Mummery testified that he made repairs to the lodge facilities in 2000, but disagrees that The Sweetwater made the repairs in reliance upon any indication from the Forest Service that the bridges would be replaced. Mr. Mummery testified that the reason that he performed the repairs was that "[o]ne of the things that I hadn't been doing is as much

maintenance" (Tr. 214:13-14) during the four years since Mr. Bixby had used the lodge, and that some of cabins' roofs had been damaged by falling trees and storms. Tr. 214:8-215:9.

171. When The Sweetwater began to explore other possible solutions in late 2000 that might enable it to operate, which included its possibly undertaking efforts to repair the bridges in exchange for improved permit terms that would allow it to justify the expense, the Forest Service suggested having a meeting at the bridges and then recommended that The Sweetwater hire a structural engineer to determine if the bridge could be "load rated" (*i.e.*, assigned a maximum weight load). Def. Facts ¶ 99; Tr. 224: 4-15; Tr. 1883:9-1884:4; Tr. 1894:17-1897:6; Tr. 1218:15-24.

**Defendant's Response to PPFF ¶ 171**

Defendant agrees that after Mr. Mummery proposed making cosmetic fixes to the Sweetwater bridges, Mr. Larson recommended "let's get our hydrologist out there. Let's get Tom Koenig, our engineer, out there and let's kind of take a look at what we would envision in terms of what would need to be done on the roads and bridges." Tr. 1212:21-24. Defendant also agrees that Mr. Koenig suggested to Mr. Mummery that he hire a professional engineer to load rate the bridges "just making sure that they would rate out and that there would be some life left, that, you know, the investment he was putting in the bridges would pay off." Tr. 1883:20-23.

172. The bridges at that point in time had no load rating, which was contrary to Forest Service policy. Tr. 1885:7-22; Tr. 1891:12-1892:7. The condition of the bridges in 2000 was the same as their condition in 1997 and 1992. Tr. 1872: 6-11 (Mr. Koenig testified that the bridge

condition in 2000 was the same as it was in 1997); *compare* JX 7 (1992 inspection) *with* JX 13 (page 5)(1997 inspection) *and* JX 14 (page 5)(1997 inspection); Tr. 1777:19-1780:25.

**Defendant's Response to PPFF ¶ 172**

Defendant agrees that Mr. Koenig testified that the Sweetwater bridges did not have a load rating in 2000, which was contrary to Forest Service policy, which Mr. Koenig testified was that "bridges have to have a minimum three-ton load rating to stay in operation." Tr. 1902:5-7.

Defendant also agrees that Mr. Koenig testified that the condition of the bridges when he inspected them in 2000 (PX 26, 27) appeared to be the same as the conditions recorded in the photographs of the March 1997 inspections performed by Mr. Fischer (JX 13/5, 14/3). Tr. 1872:6-11. Defendant also agrees that the numerical ratings of the bridges' condition recorded by the bridges inspectors in 1992 were not substantially different from the ratings recorded by Mr. Fischer in March 1997. JX 7, 13, 14.

173. The structural engineer concluded that he could not load rate the bridges, and the Forest Service then used this conclusion to formally close the bridges in April 2001. Tr. 226: 10-22; JX 15.[12]

**Defendant's Response to PPFF ¶ 173**

Defendant agrees that Russell Taylor, the professional engineer who inspected the Sweetwater bridges in January 2001, concluded that "I am unable to arrive at any rationale for

[12]The Forest Service's own inspector admitted that, the prior summer, he inspected the bridges and was aware of the same physical conditions that led to the private inspector concluding that the bridge could not be load rated and that, had the Forest Service attempted to load rate the bridges in 2000, it would have come to the same conclusion. Tr. 1902:19-1903:18. Instead of arranging to have the bridge load rated by the Forest Service, he encouraged The Sweetwater to do so. Tr. 224: 4-15; Tr. 1883:9-1884:4; Tr. 1894:17-1897:6; Tr. 1218:15-24.

arriving at any reasonable load capacity rating. . . . I can see no economical benefit in trying to reuse any of the structure in a rehabilitation effort." JX 15. Defendant agrees that in April 2001, three months after Mr. Taylor inspected the bridges, the Forest Service closed the bridges to vehicular access by the public. PX 31. Defendant disagrees that the Forest Service planned to "use" Mr. Taylor's inspection to close the bridges. Mr. Koenig testified that he considered it to be a "borderline call" whether to close the bridges when he inspected them in August 2000, and that once he received Mr. Taylor's report, he believed that a Forest Service inspector who was similarly qualified would also probably conclude that the bridges could not be load rated. Tr. 1903:7-18. Mr. Koenig explained that he did not think it made sense for the Forest Service to load rate the bridges because he understood that they were listed for replacement in the CIP program. Tr. 1897:4-17, 1863:23-1864:4.

174. However, the condition of the bridges in 2001 which the Forest Service used as a reason to close them was the same as it had been in 1992, but the Forest Service had not closed the bridges at that point. Tr. 1872: 6-11 (Mr. Koenig testified that the bridge condition in 2000 was the same as it was in 1997); *compare* JX 7 (1992 inspection) *with* JX 13 (page 5)(1997 inspection) *and* JX 14 (page 5)(1997 inspection); Tr. 1777:19-1780:25

**Defendant's Response to PPFF ¶ 174**

Defendant agrees that the condition of the bridges in 2001 was substantially the same as in 1992, but notes that Mr. Koenig testified that when he inspected the bridges in 2000, he did not close them because "I just looked at the past inspections, seeing that the bridges were 'hanging in there.' I thought they needed to be inspected more often, but they could still continue. . . . I thought they were still safe to operate that pickup size load over the bridges." Tr. 1891:25-1892:3, 1892:22-24. The reasons that Mr. Koenig recommended closing the bridges are set forth in Defendant's Response to PPFF ¶ 172.

175. When the Forest Service prepared a press release to announce its decision to close the road, it specifically mentioned that it would cost more than $500,000 to make the road safe for use in an effort to quell any public discontent with its decision. Tr. 1224:18-1225:10; PX 31.

**Defendant's Response to PPFF ¶ 175**

Defendant agrees that Mr. Larson included in the press release the statement that "it would cost more than $500,000 to bring the road and bridges up to standard" (JX 31, p. 2), but disagrees that Mr. Larson included the $500,000 figure to "quell any public discontent with its decision." Mr. Larson testified that "I know I specifically asked Gordon Warren, hey, throw these options out there as kind of a scoping, a sensing of the community of what folks are thinking about this road." Tr. 1224:14-17.

Defendant disagrees with plaintiff's implication that Mr. Larson provided an inflated estimate to blunt criticism of closing the road. Mr. Larson testified that "I assume that that was the best figure I had available to me at that point in time based on information I had gotten from my engineers," who Mr. Larson identified as Mr. Koenig. Tr. 1225:7-10, 1225:25-1226:2. Both

Mr. Koenig and Mr. Larson testified that the $500,000 estimate covered work on Sweetwater Road and all three bridges on it, including the North Fork bridge. Tr. 1226:6-7, 1922:20-1923:1, 1926:12-1927:25; PX 56.

176. To prevent any public or lodge visitors from using the bridges, the Forest Service placed a padlocked gate on the bridge over the North Fork of the Shoshone River at the beginning of the road to the lodge. Tr. 1221:20-23; Mummery Dec. ¶ 73 (App. 229); PX 31.

**<u>Defendant's Response to PPFF ¶ 176</u>**

Defendant agrees that in April 2001, the Forest Service placed a padlocked gate on the south end of the North Fork bridge to prevent vehicular use of the Sweetwater bridges by the public. Tr. 1221:20-23. Defendant notes that the Forest Service provided a key to Mr. Mummery. Dec. 30, 2004 Order, p. 7.

177. After the bridges were closed, The Sweetwater reiterated the fact that it could not operate without vehicular access. Tr. 1244:12-20.

**<u>Defendant's Response to PPFF ¶ 177</u>**

Defendant agrees that Mr. Larson testified that after Sweetwater Road was closed to vehicular access, "there was a proposal or suggestion made to Jeff that you could operate this lodge in any number of different way without <u>motor vehicle access</u> and his response was, you know, I can do lots of things, but, you know, I can't make pigs fly." Tr. 1244:16-20 (emphasis added). Defendant notes that Mr. Mummery's comment was directed at proposals involving alternatives to motor vehicle access, but that fords provided a form of motor vehicle access.

178. In the summer of 2001, the Forest Service initiated an appraisal of the lodge value for the purpose of potentially purchasing the lodge assets. Tr. 245:24-248:13; Tr. 250:1-19: Tr. 1237:25-1238:8; Tr. 2081:16-22.

**<u>Defendant's Response to PPFF ¶ 178</u>**

Defendant agrees that in 2001, the Forest Service initiated a process to obtain an appraisal of the lodge, but disagrees that the only purpose of the appraisal was to purchase the lodge. Ms. Aus testified that the options that the Forest Service was considering were Mr. Larson's pursuit of a conservation buyer, and whether the public interest required termination of the permit in the public interest pursuant to clause 15, and that "the appraisal would have been useful for both of those." Tr. 1707:1-11. Mr. Larson testified that "I think the appraisal was started based on this idea that we would need a special appropriation from Congress in order to acquire the lodge. Now whether that's under Clause 15 or whether it would be under just, here's the money, you know, acquire the resort." Tr. 1250:11-16.

179. At this point, the Forest Service discussed the idea of applying funds that would otherwise go into restoring the bridges to the purchase of the lodge itself, but concluded that it would not be able to use funds for this purpose. Tr. 1237:11-24; Tr. 1242:7-1243:12; Tr. 1248:24-1249:20; Tr. 2081:23-2082:24.

**<u>Defendant's Response to PPFF ¶ 179</u>**

Defendant agrees that Mr. Larson testified that he and Ms. Aus discussed that "it would make more sense to put the money that would be going in to the construction of bridges and roads into the acquisition of the resort," but that funds for construction could not be used to purchase existing structures. Tr. 1237:17-24. Mr. Larson also testified that Ms. Aus "said there is no special appropriation out there. And so the only funds that would be available would be our normal appropriation. And there is no way we can make that kind of expenditure with our normal appropriation." Tr. 1242:18-23. Mr. Larson also testified that the Shoshone lacked the funds or the authority to buy the lodge. Tr. 1251:2-8.

Ms. Watson testified that after it initiated the process of obtaining an appraisal, the Forest Service determined that even if it did decide to terminate the permit, it did not have funds available to compensate the permittee. Tr. 2081:23-2082:4. However, Ms. Aus disagreed that the appraisal was canceled because the Shoshone did not have funds to buy the lodge. Tr. 1709:12-16

180. In an internal e-mail from Mr. Gary Reynolds, Staff Officer, Recreation, Wilderness, Lands for the Shoshone, marked "URGENT – Sweetwater appraisal," Mr. Reynolds stated that the appraisal process had ended and "[t]he main problem with the appraisal is that we have no way to finance a purchase of the improvements." PX 34; Tr. 1962:18-1965:6.

**<u>Defendant's Response to PPFF ¶ 180</u>**

Defendant agrees that plaintiff has accurately quoted a portion of the cited exhibit, but notes that when Ms. Aus was asked to explain the statement in Mr. Reynolds' email, she testified

that "my way of thinking is that if you can't justify the termination in the public interest, then you can't justify the expense." 1710:10-12.

181. At some point in or around 2001, the Forest Service determined that there was no possibility that lodge operators could be terminated through a conservation buyer purchasing the lodge. Tr. 1236:19-1237:10.

**Defendant's Response to PPFF ¶ 181**

Defendant agrees that Mr. Larson testified that before the December 2001 notice of non-compliance letter was sent to The Sweetwater, it appeared obvious that the conservation buyer strategy was not going to work. Tr. 1236:14-23.

182. Mr. Larson stated that he had never affirmatively recommended terminating a Term SUP (which would trigger clause 15) "because there are other ways to get out" of the situation. Tr. 1275:20-1276:7.

**Defendant's Response to PPFF ¶ 182**

Defendant disagrees. The proposed finding distorts Mr. Larson's testimony that he would be "very reluctant" to recommend the termination of a term special use permit because "I would always be searching for a solution to avoid a termination if at all possible. I'd be looking for something that would resolve the concern and/or like in this case, help Jeff get out from under his, what did he call it, his stranded asset." Tr. 1275:18-1276:10.

*Forest Service's issuance of noncompliance letter*

183. The next action the Forest Service took towards The Sweetwater was to issue a letter to it in December 2001 stating that it was not in compliance with its permit because it was not open to the public "at least 93 days each year." Tr. 1713:5-9; Tr. 1253:5-1254:3; JX 21. In that letter, the Forest Service asserted that it was considering revoking The Sweetwater's Term SUP for lack of compliance with its terms. *Id.*

**Defendant's Response to PPFF ¶ 183**

Defendant agrees that the Forest Service sent The Sweetwater a December 21, 2001 letter titled "Notice of Non-Compliance and Opportunity to Cure" that informed The Sweetwater that it had not complied with clauses 1 and 54 of its permit. JX 21/1. Defendant disagrees that the letter indicated that the Forest Service might revoke the permit without providing The Sweetwater an opportunity to cure its non-compliance. The letter stated "[t]his letter provides notice of facts that may warrant revocation of your permit and allows the opportunity to achieve compliance with the terms of the permit." JX 21/2 (emphasis added).

184. As a result of this alleged non-compliance, the Forest Service had the authority to order The Sweetwater to tear down its lodge, remove all remnants of its facilities and return the area to its natural state, all at The Sweetwater's expense. JX 1 (clause 11 of Term SUP); 36 C.F.R. § 251.60(h)(2)(i); Tr. 1256:24-1257:22. As a result, the Forest Service would no longer need the road and it could be removed. Tr. 1268:9-1269:5.

**Defendant's Response to PPFF ¶ 184**

Defendant agrees that the cited regulation states that

"[u]pon revocation or termination of a special use authorization, the

> holder must remove within a reasonable time the structures and improvements and shall restore the site to a condition satisfactory to the authorized officer, unless the requirement to remove structures or improvements is otherwise waived in writing or in the authorization. If the holder fails to remove the structures or improvements within a reasonable period, as determined by the authorized officer, they shall become the property of the United States, but holder shall remain liable for the costs of removal and site restoration.

36 C.F.R. § 251.60(h)(2)(i).

Defendant disagrees that when it sent the "Notice of Non-Compliance on December 21, 2001, the Forest Service could "tear down the lodge, remove all remnants of its facilities and return the area to its natural state, all at The Sweetwater's expense." The regulation requires the Forest Service to give notice of the grounds for revocation and allow the permittee a reasonable opportunity to cure its non-compliance before revoking the permit and proceeding to remove the property: "Except when immediate suspension pursuant to paragraph (f) of this section is indicated, the authorized officer shall give the holder written notice of the grounds for suspension or revocation under paragraph (a) of this section and reasonable time to cure any noncompliance, prior to suspension or revocation pursuant to paragraph (a) of this section." 36 C.F.R. § 251.60(e).

185. While the Forest Service alleged in the noncompliance letter that The Sweetwater had not operated since 1997, it was merely making a "point of record" because the Forest Service had allowed The Sweetwater not to operate. Tr. 1030:15-23; Tr. 1265:21-25.

**Defendant's Response to PPFF ¶ 185**

Defendant agrees that Mr. Larson described the December 21, 2001 Notice of Non-Compliance as a "point of record," and that Mr. Larson allowed The Sweetwater not to operate,

but notes that Mr. Larson testified that "[Mr. Mummery] chose not to operate." Tr. 1265:17-18. Defendant disagrees that the intent of the "Notice of Non-Compliance" letter was "merely making a 'point of record.'" The letter was expressly intended to provide The Sweetwater an opportunity to cure its non-compliance by beginning to operate the lodge.

186. Mr. Larson felt that the Forest Service's accusation that The Sweetwater had breached its contract by not operating and should be forced to try to operate without bridges was "a radical change of direction" from how he had been managing the matter. Tr. 1267:2-16.

**Defendant's Response to PPFF ¶ 186**

Defendant agrees that Mr. Larson testified that "I would not say it was a radical change of direction for the Forest Service. It was a radical change of direction from where I had been going, personally, in managing this. The agency is pretty clear on direction." Tr. 1267:9-13.

187. While The Sweetwater did not believe it had violated any terms of its Term SUP, it submitted an Operating Plan for operations. DX 54; Mummery Dec. ¶ 78 (App. 230).

**Defendant's Response to PPFF ¶ 187**

Defendant agrees that in 2002 The Sweetwater submitted its first operating plan since 1996. DX 54. Defendant is unable to verify whether The Sweetwater believed it had not violated any terms of the permit.

188. In response to that proposed Operating Plan, the Forest Supervisor offered to "insure that the bridge reconstruction on Sweetwater [] be at the top of the Shoshone National Forest request for funds," but *only if* The Sweetwater waived all present *and future* monetary claims against the

Forest Service. DX 54 (page 4); Tr. 1770:7-1772:17; *Sweetwater* at 10.

**Defendant's Response to PPFF ¶ 185**

Defendant agrees, but notes that in the same letter, the Forest Supervisor offered to construct fords to provide a means of access to the lodge, and did not condition this offer on any waiver of claims. DX 54/4.

*Submission of a CDA Claim*

189. The Sweetwater submitted a claim to the Forest Service dated May 28, 2002 pursuant to the Contract Disputes Act ("CDA") for breach of contract in order to recoup these substantial damages. JX 23. Those specific damages are outlined in that claim letter and include lost profits, operating expenses and the replacement value of the lodge assets. JX 23

**Defendant's Response to PPFF ¶ 189**

Defendant agrees that The Sweetwater submitted what it purported to be a CDA claim for breach of contract, which seeks damages including lost profits, operating expenses and the replacement value of the lodge. JX 23.

190. In response to that claim, the Forest Supervisor asserted that the Term SUP was not a contract, therefore, there could be no cognizable claim pursuant to the CDA. DX 55.

**Defendant's Response to PPFF ¶ 190**

Defendant agrees that the Forest Supervisor stated that the permit was not a contract, and that neither the Administrative Procedures Act nor the permit "provide[d] for payment of money damages." DX 55.

191. The Sweetwater bridges are currently blocked by padlocked gates on each end of each bridge. Tr. 1221:7-23. These gates make crossing the bridges absolutely impossible by any type of typical vehicle, even high clearance vehicles. Tr. 846:1-5.

**<u>Defendant's Response to PPFF ¶ 191</u>**

Defendant agrees that padlocked gates have been erected at either end of each Sweetwater bridge that block any vehicles, even high-clearance vehicles, from driving over the bridges. However, defendant notes that Mr. Mummery possesses a key to the padlocks, and drove his Jeep over the bridges when the Government's expert appraiser conducted a site visit. DX 64/40, ¶ 4.

192. The Forest Service is currently making no efforts to seek any funding to replace the Sweetwater bridges. Tr. 1908:10-23; Tr. 1912:5-18; PX 35.

**<u>Defendant's Response to PPFF ¶ 192</u>**

Defendant agrees that in the cited October 2001 email, Mr. Koenig told Regional Office engineers that the North Fork and Sweetwater bridges should not be programmed for replacement with Forest Service funds, and that "[l]egal issues remain to be settled with the Sweetwater lodge permit holder before the bridges are removed and the road closed." PX 35. Defendant notes, however, that Mr. Koenig testified that it was only after the bridges were closed to traffic in April 2001 that "there were discussions on forest about possibly removing the bridges to make sure that there was no traffic across them after they couldn't be load rated." Tr. 1937:22-1938:8.

193. The Forest Service is currently planning on removing the two Sweetwater bridges as

soon as the present litigation concludes, and establishing the bridge over the North Fork as a "trail bridge," which means high clearance vehicles will not be allowed to cross over it, and thus will not be able to access the lodge. Tr. 1906:5-1914:14; PX 35.

**Defendant's Response to PPFF ¶ 193**

Defendant disagrees. The cited testimony and exhibit address only Mr. Koenig's personal "understanding of the forest policy [] on the Sweetwater bridges" in October 2001. There is no evidence that it is the present intent of the Forest Service to remove the Sweetwater bridges at the conclusion of this lawsuit. Defendant also disagrees that the Forest Service intends to "establish" the North Fork bridge as a "trail bridge," because it already is one. As demonstrated in Mr. Koenig's testimony and in the cited exhibit, the current North Fork bridge is a trail bridge, and is only rated to carry vehicles weighing up to 10,000 pounds. Tr. 1927:15-1928:24.

*Damages*

194. The Sweetwater submitted a claim letter to the Forest Service dated May 28, 2002. JX 23. Its damages were broken out into three categories: operating expenses, lost profits and the value of the lodge. *Id.*

**Defendant's Response to PPFF ¶ 194**

Defendant agrees.

195. The Sweetwater subsequently revised its damage calculations. PX 41, 42.

**Defendant's Response to PPFF ¶ 195**

Defendant agrees.

196. The lodge was only able to operate in 1996, and at the time a sale of the stock in The Sweetwater was pending. Tr. 362:10-13.

**Defendant's Response to PPFF ¶ 196**

Defendant agrees that a sale of all interest that The Sweetwater owned in the lodge was pending during 1996. Defendant disagrees that the Sweetwater ever operated as a public resort. DPFF ¶ 146. In 1996, The Sweetwater operated the lodge exclusively for the benefit of Mr. Bixby. DPFF ¶¶ 127-28. The Sweetwater chose not to operate the lodge using the bridges during the 1997, 1998, 1999, and 2000 seasons. Tr. 1265:17-18. The Sweetwater has never requested that the Forest Service install fords so that it could operate the lodge with an alternative means of vehicular access from 2001 through the present. DPFF ¶ 154.

*Operating Expenses*

197. The Sweetwater expended significant operating expenses in maintaining the lodge operations from 1997 through 2005. PX 42; PX 43; Tr. 365:8-17; Tr. 376:14-25.

**Defendant's Response to PPFF ¶ 197**

Defendant agrees that the cited exhibits and testimony appear to support that The Sweetwater incurred expenses to maintain its lodge, but defendant disagrees that any of the

expenses claimed should be paid by the Government, for the reasons set forth in defendant's post-trial brief (pp. 43-47).

198. The Sweetwater's operating expenses are based on its annual financial statements and ledgers, which were prepared by its accountant. Tr. 365:13-19 (PX 42 is a summary of the expenses set forth in The Sweetwater's annual financial statements and ledgers for 1997-2005); Tr. 373:15-18)(JX 42 is the most accurate summary of The Sweetwater's expenses); Tr. 37813-24; Tr. 381:8-21; PX 52 (copies of The Sweetwater's legal bills). The expenditures incurred by The Sweetwater during 1997-2005 are set forth in PX 42. Tr. 265:13-14.

**Defendant's Response to PPFF ¶ 198**

Defendant agrees only that the cited testimony and exhibits state plaintiff's claim for operating expenses.

199. The Sweetwater's general ledgers were prepared by its accountant based on The Sweetwater's cancelled checks and bank statements. Tr. 369:2-8; PX 43.

**Defendant's Response to PPFF ¶ 199**

Defendant agrees only that the cited testimony and exhibit support the proposed finding.

200. The Sweetwater deducted appropriate items from its costs that are not properly charged to the government as damages in this matter. Tr. 365:23-366:7.

**Defendant's Response to PPFF ¶ 200**

Defendant agrees that Mr. Mummery testified that the items in the "Depleted" [sic] column on the statement of The Sweetwater's operating expenditures "are items that I knew off

the top of my head for one reason another should not be expensed. . . . One of them I think is a charitable contribution. One of them was for liquor." Tr. 365:23-366:9. Defendant disagrees that any of its claimed costs are properly charged to the Government.

201. The Sweetwater's operating expenses include costs incurred for the following items: Accounting and legal costs; advertising; amortization; bank charges; business promotion; contract labor; depreciation; donations; dues and subscriptions; fees, gas, oil and tires; insurance; interest expense; legal; liquor; miscellaneous; management fee; office expense; outside services; pest control; postage; rent; repairs and maintenance; supplies; taxes and licenses; telephone; travel and entertainment; utilities; and vehicle expenses. PX 42.

**Defendant's Response to PPFF ¶ 201**

Defendant agrees that plaintiff seeks to recover the expenses listed above, but disagrees that plaintiff is entitled to recover any of these expenses from the Government.

202. In addition, because The Sweetwater's operating expenditures ends at 2004, The Sweetwater estimated that its operating expenses in 2005 up to September would be an additional $40,000. Tr. 462:9-24. Using this same methodology, The Sweetwater's operating expenses from January 2005 through March 2006 (the time period since the period used in its claims letter) would be $60,800. This estimate would bring The Sweetwater's total claim for operating expenses to $520,000.

**Defendant's Response to PPFF ¶ 202**

Defendant agrees that The Sweetwater has estimated that its operating expenses for January 2005 through March 2006 would be $60,800, but disagrees that Mr. Mummery explained how he estimated that the expenses for January through September 2005 would be $40,000. Tr. 462:9-24. Defendant agrees that because The Sweetwater claims that the expenses that it incurred from 1997 through 2004 are $459,201, that its total claim for operating expenses is approximately $520,000. Defendant disagrees that plaintiff is entitled to recover any of this amount.

203. The total of these operating expenses from 1997-March 2006 is $520,000.

**Defendant's Response to PPFF ¶ 203**

Defendant agrees that the total operating expenses claimed by plaintiff is $520,000, but disagrees that plaintiff is entitled to recover any of this amount from the Government.

*Lost profits*

204. In its claim letter dated May 28, 2002, The Sweetwater set forth a claim for lost profits based on its actual operations in 1996. PX 23; Tr. 403:4-405:16.

**Defendant's Response to PPFF ¶ 204**

Defendant agrees that in its claim letter dated May 28, 2002, The Sweetwater set forth a claim for lost profits based on what it claimed were its operations in 1996. PX 23. Defendant disagrees that plaintiff is entitled to recover any of this amount from the Government

205. The annual lost profit amount based on The Sweetwater's operations in 1996 was

$34,995 and was based on The Sweetwater's business records for 1996. JX 23; Tr. 405:11-13; PX 43 (TS 2055-TS 2059; TS 2095-TS 2107). The claims letter calculation for estimated lost profits through December 2002 totals $312,256. JX 23. Using this same methodology, the current total of lost profits up to mid-September of 2005 would be at least $492,500, and $960,000 for the entire period 1997-2014 discounted back to 2005 value.

**Defendant's Response to PPFF ¶ 205**

Defendant agrees that The Sweetwater claims that the annual lost profit amount based upon The Sweetwater's operations in 1996 was $34,995 based on The Sweetwater's business records for 1996. JX 23. Defendant disagrees that The Sweetwater made any profit in 1996 once all expenses are considered, as explained in defendant's post-trial brief (pp. 50-51).

Defendant agrees that The Sweetwater's May 28, 2002 claim letter asserted that its lost profits for six seasons (from 1997 through 2002) totaled $312,256. JX 23. Defendant disagrees that plaintiff has shown its calculations to arrive at this total, but merely stated that "[t]hese profits are then adjusted to reflect subsequent operating years by using a 6% overall increase in revenues to reflect the higher rates which would be charged in subsequent years as well as the cost of money due to the delay in receiving those profits" without identifying what interest rate it has used for the "cost of money." JX 23.

Defendant also disagrees that "using this same methodology, the current total of lost profits up to mid-September of 2005 would be at least $492,500, and $960,000 for the entire period 1997-2014 discounted back to 2005 value," because plaintiff has not shown the calculations that reveal what interest rate it has used to arrive at these totals.

Defendant disagrees that plaintiff has proved that it is entitled to recover any lost profits from the Government.

206. Because The Sweetwater had not yet operated the lodge with its own long-term business plan prior to being forced to close operations in 1997, for purposes of calculating the profits it would have obtained from 1997-2005, it determined what its revenues would likely have been had it operated in 1997 through 2005 under a long-term business plan. Tr. 407:16-411:21; Tr. 363:6-11; PX 41.

**Defendant's Response to PPFF ¶ 206**

Defendant agrees that The Sweetwater has never operated its lodge using any form of business plan, but disagrees that The Sweetwater was "forced" to close the lodge in 1997, because The Sweetwater chose not to operate. Tr. 1265:17-18; DPFF ¶ 154.

Defendant agrees that plaintiff's alternative lost profits claim are based upon a "business plan" that it only created in 2005 specifically for purposes of this lawsuit. PX 41. Defendant notes that Mr. Mummery testified that "I probably have to, in all full disclosure, have to admit I have the advantage. It's seven or eight years later, so I'm creating this with a lot more knowledge than maybe I had in the summer of 1997." Tr. 410:22-25.

207. The lost profit calculation only includes activities currently authorized under the Term SUP. Tr. 414:4-7.

**Defendant's Response to PPFF ¶ 207**

Defendant agrees that plaintiff seeks lost profits for activities currently authorized by the permit, with the exception of The Sweetwater's proposal to rent cars, which is not an activity identified on the face of the permit. PX 41, p. 5; JX 1/1. Defendant disagrees that plaintiff is entitled to recover any lost profits from the Government.

208. The lost profit calculation is based on a detailed operating calendar. PX 41 (at p. 1); Tr. 418:2-423:22. The calculation also includes a breakdown of the revenue for the lodge from the various income streams, including cabin rental (PX 41 at page 3; Tr. 429:23-435:9), food and beverage revenue (PX 41 at page 4; Tr. 435:11-439:5), and revenue from other sources such as guided fishing trips (PX 41 at page 5; Tr. 439:10-442:13). These revenue sources, exclusive of the cost of goods sold, total $477,901 for calendar year 2005 only. PX 41 at page 6; Tr. 444:9-446:2.

**Defendant's Response to PPFF ¶ 208**

Defendant agrees only that plaintiff's most recent lost profit calculation is set forth in PX 41.

209. Deducting personnel costs of $174,304 (PX 41 at page 7; Tr. 446:2-449:16), and operating expenses of $199,550 (PX 41 at page 8; Tr. 449:23-450:12), the total profit for 2005, but for the breach, would have been $104,047. PX 41 at page 9; Tr. 450:13-451:5.

**Defendant's Response to PPFF ¶ 209**

Defendant agrees that in its latest lost profit calculation, plaintiff claims that its lost profit for 2005 would have been $104,047, but defendant disagrees that plaintiff is entitled to recover any lost profits based upon its "business plan" for the reasons set forth in defendant's post-trial brief (pp. 52-56).

210. By calculating reasonable rates of growth using The Sweetwater's business plan model, the total lost profits for The Sweetwater from 1997-2005 total $830,000 and $1,667,007 for the

entire period 1997-2014, discounted back to 2005 value. PX 41 at 10; Tr. 451:6-455:4.

**Defendant's Response to PPFF ¶ 210**

Defendant agrees that plaintiff seeks lost profits that total $830,000 for the period 1997-2005, and $1,667,007 for the entire period 1997-2014, discounted back to 2005 value. Defendant disagrees that plaintiff is entitled to recover any lost profits based upon its "business plan" for the reasons set forth in defendant's post-trial brief (pp. 52-56).

*Value of the lodge facilities*

211. Mr. Que Mangus conducted an appraisal of the value of the lodge facilities as of May 4, 2005. PX 44. Mr. Mangus lived in the Cody area all his life and has been appraising properties since 1983, and has been licensed appraiser for the past twelve years. Tr. 2294:6-2295:16.

**Defendant's Response to PPFF ¶ 211**

Defendant agrees, but notes that Mr. Mangus is not a Member of the Appraisal Institute (Tr. 2391:10-15), unlike the Government's appraisal expert, Mr. John Frome, who holds the MAI designation. Tr. 2665:21-2666:7.

212. Mr. Mangus' experience focuses on properties in Park County, which is were Cody is located. Tr. 2294:24-25; Tr. 2302:12-16. Since 1983, he has appraised almost all if not all of the lodges located on the Shoshone National Forest between Cody, Wyoming and Yellowstone National Park. Tr. 2299:4-24. Mr. Mangus' appraisals have been within +/- 5% of the final sale price agreed upon by the parties. Tr. 2301:14-18.

**Defendant's Response to PPFF ¶ 212**

Defendant agrees, but notes that Mr. Mangus testified that a significant part of his

business is preparing appraisals for lending institutions to confirm a price that has already been agreed upon by a buyer and seller before the appraisal is prepared. Tr. 2393:12-25.

213. The National Forest lodges on the Shoshone National Forest exist in a unique market situation. Tr. 2302:17-2303:1. As Mr. Mangus noted, the supply of such lodges is limited but the demand is high. Tr. 2315:2-6.

**Defendant's Response to PPFF ¶ 213**

Defendant agrees that Mr. Mangus testified that "the lodges that are on the North Fork, the Shoshone in the forest I'd say are total ecosystem of their own, and it's a very unique market situation" (Tr. 2302:23-2303:1), and that Mr. Mangus also testified "the supply is quite limited, and the demand for these particular properties is quite abundant." Tr. 2315:5-6.

214. Mr. Mangus' analysis was conducted to determine a market value of the lodge facilities as of May 4, 2005 with access, which is the value which would be paid by a willing buyer to a willing seller. Tr. 2303:17-23045:16.

**Defendant's Response to PPFF ¶ 214**

Defendant disagrees that the proposed finding accurately reflects the cited testimony and exhibit. Mr. Mangus did not state that the lodge only had value if there were access over the bridges. Mr. Mangus prepared a limited summary appraisal with an effective date of May 4, 2005, which stated that at The Sweetwater's request, applied the hypothetical condition that Sweetwater Road was open to traffic. PX 44, p.1. The engagement letter in the front of the appraisal stated that it was prepared in response to The Sweetwater's request for a "'Willing Seller to Willing Buyer' sales comparison 'Fair Market Evaluation Appraisal.'" Id. Mr. Mangus

testified that the phrase "willing seller to willing buyer" meant "we're trying to establish a market value deemed on what a willing seller will sell to a knowledgeable buyer." Tr. 2304:15-17.

215. Mr. Mangus used a sales comparison approach in determining the market value of the lodge given that his experience has shown that buyers of lodges on the North Fork in the Shoshone National Forest are not concerned with the revenue produced by the lodge or the condition of the facilities, but largely purchase the lodges as a lifestyle choice. Tr. 2307:12-2308:6; Tr. 2361:9-2362:8.

**Defendant's Response to PPFF ¶ 215**

Defendant agrees that the proposed finding accurately reflects a portion of Mr. Mangus's testimony, but notes that Mr. Mangus also testified that at the request of The Sweetwater, he prepared a limited summary appraisal that does not use the cost or income approaches to value the lodge. Tr. 2306:8-2307:9, 2405:19-24. Mr. Mangus admitted that the appraisals that he has performed on other North Fork lodges have not been limited summary appraisals, and some have used the cost and income approaches. Tr. 2406:3-9.

216. To conduct his valuation, Mr. Mangus reviewed records from sales of other lodges, public records at the Courthouse, discussed the lodge with realtors and investigated other markets outside of the Cody area. Tr. 2311:20-2312:20.

**Defendant's Response to PPFF ¶ 216**

Defendant agrees, and notes that Mr. Mangus testified that he also "relied on my professional knowledge of this area and my history and expertise related to appraising these

lodges," including the sales and income in the reports that he had prepared on different North Fork lodges. Tr. 2312:4-7, 2396:15-2397:3.

217. Mr. Mangus concluded that the Sweetwater Lodge's location well off the highway provided it seclusion that benefited its sales price. This seclusion is unique among all the lodges within the Shoshone National Forest. Tr. 2315:21-2316:19.

**Defendant's Response to PPFF ¶ 217**

Defendant agrees that Mr. Mangus testified that "I would say that definitely the Sweetwater has the most privacy and seclusion just because of the location three miles off the highway." Tr. 2416:21-24. Defendant disagrees that Mr. Mangus concluded that this seclusion benefited its sales price. Mr. Mangus testified that when he used the sales comparison approach in his appraisal, he did not make any adjustments to the sales price of the other North Fork lodges. Tr. 2416:12-2417:3.

218. In locating comparable market sales, Mr. Mangus focused on sales which were of the most similar properties in the area close to the May 2005 time frame. Tr. 2333:3-24. He then was required to make adjustments because of the fact that no two properties are the same. Tr. 2333:14-16.

**Defendant's Response to PPFF ¶ 218**

Defendant agrees that Mr. Mangus selected for his sales comparison approach the three sales of North Fork lodges that occurred closest in time to May 2005, and then made substantial adjustments to the prices of the properties, principally based on the number of guest units. PX 44, pp. 18, 23-24.

219. As Mr. Mangus stated, with respect to collecting information about other property sales, the maxim "the more, the better" does not apply because the key is the unique similarities of the other properties that must be used in a comparative analysis. Tr. 2333:25-2334:16.

**Defendant's Response to PPFF ¶ 219**

Defendant agrees that Mr. Mangus testified that when selecting other property sales, "you could action [sic] confuse the issue with too much data" (Tr. 2334:13-14), but disagrees that Mr. Mangus testified in the cited passage that he had applied the principle that "the key is the unique similarities of the other properties" used in the sales comparison approach. Tr. 2333:25-2334:16. Mr. Mangus testified that he believed that "the most recent sales are your best," and the three comparison properties in his appraisal -- UXU Lodge, Bill Cody's Inn, and Absaroka Lodge – were the three most recent sales of North Fork lodges at the time of his appraisal. There is no evidence that these three properties had "unique similarities" to The Sweetwater's lodge. Mr. Mangus agreed that the other North Fork lodges were "very good comparables" for the sales comparison approach because they are on all on the same highway. Tr. 2413:3-10.

If the "unique similarities" of UXU Lodge, Bill Cody's Inn, and Absaroka Lodge were the most important fact in Mr. Mangus's analysis, then he should have considered past sales of these three lodges. Mr. Mangus testified that sales from the last five years would be reliable for purposes of the sales comparison approach. Tr. 2438:21-24. However, he did not consider in his appraisal the December 2000 sale of Absaroka Lodge. PX 44, p. 18.

220. Mr. Mangus determined that the sales of the Absaroka Lodge, Bill Cody Inn and UXU Lodge between July 2004 and May 2005 were the most similar and most comparable sales. *See*

PX 44 (page 16-18). Mr. Mangus has personal knowledge of each of these lodges. Tr. 2348:21-2346:6.

**Defendant's Response to PPFF ¶ 220**

Defendant disagrees that these three sales were "the most similar and most comparable" for the reasons stated in Defendant's Response to PPFF ¶ 219, and Mr. Mangus's report does not contain this assertion. Defendant agrees that Mr. Mangus testified that he has "personal" knowledge of each of these lodges, but notes that Mr. Mangus did not testify that he had made recent visits to any of the three comparisons, unlike the Government's appraisal expert, John Frome, who visited all three lodges as well as The Sweetwater's lodge plus Blackwater Lodge and Crossed Sabres Ranch to prepare his appraisal. DX 65/31, 66/6-9.

221. To correlate the sales price of these three lodges to The Sweetwater, Mr. Mangus determined the per unit price for each lodge and then made a time adjustment based on a 4% annual rate to calculate the sale prices as of May 2005. PX 44 (page 18); Tr. 2337:14-2338:2; Tr. 4342:4-2343:16.

**Defendant's Response to PPFF ¶ 221**

Defendant agrees that for the limited purposes of adjusting for time, Mr. Mangus considered prior sales of the three comparable properties he had selected, and calculated the amount of increase in sales of each property over time. Based upon a range of 2.5 to 6 percent, he chose 4 percent as the annual rate of increase to adjust the price per unit for each property in comparison with The Sweetwater's lodge. PX 44, p. 23.

222. Because each lodge has a different number of units, Mr. Mangus then had to make an

adjustment to account for the different sizes of the lodges. Tr. 2350:24-2353:7. Because the sale history of the lodges revealed that buyers would pay on overall lower price for a lodge with fewer units, but nonetheless pay more per unit where there were fewer units, Mr. Mangus calculated what the increased per unit price is for lodges with fewer units. Tr. 2351:6-2353:7. Because of this trend, it is inappropriate to make a straight mathematical calculation by dividing the total sales price by the number of units. Tr. 2358:7-25.

**<u>Defendant's Response to PPFF ¶ 222</u>**

Defendant disagrees that Mr. Mangus "had" to make an adjustment to account for the different number of guest units at each lodge. Mr. Mangus did not make any adjustment for the number of units when, during the preceding year, he prepared appraisals of the very same North Fork lodges that he used as comparable properties in preparing his appraisal of The Sweetwater's lodge: UXU Lodge (May 2005), Absaroka Lodge (September 2004), and Bill Cody Inn (June 2004). DX 75, 76, 77.

Defendant agrees that Mr. Mangus extrapolated from actual sales data what he contended would be the price per unit for a six-unit lodge, but disagrees that "the sale history of the lodges revealed that buyers would pay on overall lower price for a lodge with fewer units" for the reasons stated in pp. 59-61 of our post-trial brief. For those same reasons, defendant disagrees that "it is inappropriate to make a straight mathematical calculation by dividing the total sales price by the number of units."

223. In order to calculate the appropriate adjustment to make, Mr. Mangus used the data from the three most comparable sales and established a "best fit" line. PX 44 (page 24); Tr. 2353:8-2356:6. The data from these sales demonstrated that the fewer the number of units in a lodge,

the higher the per unit price for the lodge. PX 44 (page 24). This increase was approximately $7,993.64 in unit price for each unit reduction that occurred. *Id*. In fact, the data used by the government's expert reflected this same trend when inapplicable sales were removed from his data. Tr. 2841:5-2842:14; PX 63; Tr. 2847:5-2818:2; PX 64.

**Defendant's Response to PPFF ¶ 223**

Defendant disagrees with the first three sentences of this proposed finding for the reasons stated in pp. 59-61 of our post-trial brief.

Defendant also disagrees with the final sentence of this proposed finding. When plaintiff's counsel asked Mr. Frome, the Government's appraisal expert, whether he saw any pattern in the data once the allegedly "inapplicable" sales were disregarded, Mr. Frome testified, "We start out at $110,000. We jump up to $135,000, down to $84,000, up to $95,000, down to $84,000, up to $87,000, down to $82,000, down to $79,000. That's the pattern, I see sir. . . . it jumps all over the boat." Tr. 2840:7-10, 2840:19-20 (emphasis added). Mr. Frome gave this testimony while looking at the unvarnished data in PX 62.

In contrast, in the testimony cited above by plaintiff, Mr. Frome was looking at demonstrative exhibits prepared by plaintiff's counsel, PX 63 and PX 64, that imposed trend lines on the actual data. Tr. 2841:5-2842:14, 2847:5-2818:2. Mr. Frome agreed that like Mr. Mangus's "best fit" line, the trend lines prepared by plaintiff's counsel showed that the price per unit "tend[ed] to trend down as units increase." Tr. 2842:13-14. However, Mr. Frome made clear that he did not agree that there was any correlation between price per unit and number of units among sales of North Fork lodges. Tr. 2827:21-2828:25. In his appraisal, he concluded based upon a regression analysis of all sales of North Fork lodges during the past ten years that "there is no correlation to size of property in units and selling price per unit." DX 65/14.

224. After the additional adjustments were made to each of the per unit prices for the Absaroka Lodge, Bill Cody Inn and UXU Ranch for criteria such as site improvements and nonrealty assets (*see, e.g.*, Tr. 2363:21-2366:15)(adjustments to Absaroka Lodge price), Mr. Mangus calculated the adjusted per unit price for The Sweetwater based on each of the three sale prices for the Absaroka Lodge, Bill Cody Inn and UXU Ranch. DX 18.

**<u>Defendant's Response to PPFF ¶ 224</u>**

Defendant agrees that the proposed finding accurately represents the Mr. Mangus's adjustments, but for the reasons explained in our post-trial brief (pp. 59-62), disagrees that the $150,000 "adjusted" per unit price for The Sweetwater's lodge is accurate.

225. Mr. Mangus then concluded that, because The Sweetwater was most comparable to the UXU Ranch, which had an adjusted sale price of $151,346 per unit, the appropriate unit sale price for The Sweetwater was $150,000. Tr. 2381:15-2382:13; PX 44 (page 28). Even though The Sweetwater had fewer units than UXU Ranch, Mr. Mangus did not adjust The Sweetwater's per unit price higher than UXU Ranch's to stay within the range established by UXU Ranch. Tr. 14-2383:11. This result ended up with The Sweetwater's per unit price being conservative given the established trend of per unit prices increasing as the total number of units in a lodge decreased. *See* PX 44 (page 24).

**<u>Defendant's Response to PPFF ¶ 225</u>**

Defendant agrees that Mr. Mangus concluded that the appropriate unit sale price for The Sweetwater was $150,000 because he believed it was most comparable to UXU Lodge, but defendant disagrees with this conclusion for the reasons explained in our post-trial brief (pp. 59-

62). Defendant agrees that “Mr. Mangus did not adjust The Sweetwater’s per unit price higher than UXU Ranch’s” adjusted price of $151,346, but notes that UXU’s time-adjusted price per unit was only $135,000 before Mr. Mangus made an 18.11 percent adjustment for the supposed correlation between price per unit and price. PX 44, p. 18. Defendant disagrees with the final sentence of this proposed finding, particularly the assertion that the $150,000 price per unit was “conservative,” because, as explained in greater detail in our post-trial brief (pp. 59-62), the adjustment that Mr. Mangus made for number of units was inconsistent with his other appraisals of North Fork lodges, and was not supported by the sales data once all sales were considered.

226. The sales price established for May 2005 could also be adjusted using the 4% annual rate to apply it to different years, up to 5 years. Tr. 2380:18-2381:14.

**Defendant’s Response to PPFF ¶ 226**

Defendant agrees that Mr. Mangus testified that he was confident that the four percent time-adjustment figure that he developed could be used “to adjust either forward or backward for maybe five years” his $900,000 valuation of the lodge in 2005. Tr. 2381:4-7.

227. In addition to the appraisal by Mr. Mangus, Mr. John Pucetas also calculated the cost of reproducing the Sweetwater Lodge, less the actual physical depreciation which currently exists at the lodge facilities based on their current condition. DX 45; Tr. 2503:2-2504:18.

**Defendant’s Response to PPFF ¶ 227**

Defendant agrees.

228. Mr. Pucetas has extensive experience in assessing the same value for resort facilities

located in neighboring National Parks, such as Yellowstone National Park. Tr. 2497:18-2501:12. This value is done pursuant to the formula set forth in the contracts which the lodge operators have with the National Park Service. Tr. 2505:5-2507:1.

**<u>Defendant's Response to PPFF ¶ 228</u>**

Defendant agrees that Mr. Pucetas testified that he has prepared similar estimates of the reproduction cost less physical depreciation for concession facilities in National Parks, such as Yellowstone. Tr. 2498:11-2500:6. Defendant agrees that Mr. Pucetas testified that "the Park Service contracts have a very specific formula for calculating what they refer to as sound value. Sound value is reproduction costs new less physical depreciation, but not to exceed fair market value." Tr. 2505:11-15. Defendant notes that the valuation method used by Mr. Pucetas is mandated by law for properties in National Parks. By statute, each National Park Service concessioner possesses a "leasehold surrender interest" in each capital improvement it constructs that is "equal to the initial value (construction cost of the capital improvement) . . . less depreciation." 16 U.S.C. § 5954(a)(3). There is no similar statutory provision regarding properties in National Forests.

229. To conduct his analysis, Mr. Pucetas visited the lodge and took extensive photographs of the facilities and determined the relevant floor dimensions needed for calculating the costs of reproduction. Tr. 2515:15-2516:14.

**<u>Defendant's Response to PPFF ¶ 229</u>**

Defendant agrees that to conduct his analysis, Mr. Pucetas visited the lodge, took photographs, and drew sketches recording floor dimensions to calculate the costs of reproduction. PX 45.

230. Mr. Pucetas then calculated the cost of reproduction on an elemental level for each structure, breaking the buildings down to the costs for their foundations, superstructure, plumbing, etc. PX 45 (pages 2.3-2.19). The costs used by Mr. Pucetas came from construction cost data sources as well as local contractors. Tr. 2521:3-24.

**Defendant's Response to PPFF ¶ 230**

Defendant agrees that Mr. Pucetas calculated the cost of reproduction on an elemental level for each structure, and that he used costs from construction cost data sources as well as quotes from utility companies and rates from his work at Hamilton Stores in Yellowstone. Tr. 2521:6-18. Defendant agrees that the rates were adjusted from a national cost basis to Cody, Wyoming, but disagrees that Mr. Pucetas testified that he obtained costs from local contractors, nor does his report state that he obtained costs from local contractors. Tr. 2521:19-24.

231. Mr. Pucetas also accounted for improvements needed at the site to prepare for constructing the buildings (PX 45)(page 2.19) as well as an adjustment based on the remote location of the buildings. PX 45 (page 2.20).

**Defendant's Response to PPFF ¶ 231**

Defendant agrees.

232. Based on the current physical condition of each aspect of the buildings, Mr. Pucetas then depreciated the buildings. PX 45 (pages 1.1-1.9).

**Defendant's Response to PPFF ¶ 232**

Defendant agrees that Mr. Pucetas depreciated the buildings, but disagrees that the

depreciation is based upon an accurate assessment of the current physical condition of each building for the reasons described in our post-trial brief (pp. 65-66). Defendant notes that Mr. Mangus testified that he was uncomfortable with calculating the depreciation for the lodge, because most of the buildings were built in 1930, and have been remodeled at least once. DPFF ¶ 211. Mr. Pucetas agreed with Mr. Mangus that making assessments of the effective age of buildings is "fairly subjective." DPFF ¶ 222.

233. Using the same methodology as employed under National Park Service contracts, Mr. Pucetas calculated that the reproduction cost of the Sweetwater Lodge along with the associated and necessary costs is $2,117,834. PX 45 (page 1.1). When the physical depreciation of 30.3% is applied to reduce this figure, the total depreciated cost of reproduction is $1,475,600.

**Defendant's Response to PPFF ¶ 233**

Defendant agrees that using the same methodology as mandated by 16 U.S.C. § 5954(a)(3) to value a leasehold surrender interest of a National Park Service concession facility, Mr. Pucetas calculated that the reproduction cost of the Sweetwater Lodge along with the associated and necessary costs is $2,117,834, and then he applied a physical depreciation rate of 30.3% to arrive at a total depreciated cost of reproduction of $1,475,600. PX 45. Defendant disagrees that this figure accurately reflects the value of the lodge, which the Government's expert valued at $415,000 based on the same sales comparison approached used by Mr. Mangus. DX 65/4.

234. Mr. Pucetas testified that the value which was assessed for concessioner structures in Yellowstone National Park was not limited by a market value cap because the properties, due to

their location on federal lands, were found not to have a comparable market. Tr. 2505:5-2507:1.

**Defendant's Response to PPFF ¶ 234**

Defendant agrees that Mr. Pucetas testified that an arbitration panel agreed that "there wasn't a market in Yellowstone National Park," but notes that this testimony was contradicted by Mr. Mangus's testimony that there is an active market in the sale of lodges along the North Fork Highway in the Shoshone National Forest, "[t]here is an abundance of public land with Forest Service permits issued for guest ranches or lodges . . . . This is considered to be a highly marketable, recreational and commercial portion of the market area for permits on the Forest Service land." Tr. 2314:21-2315:1.

235. The Sweetwater Lodge is unique among the lodges located on the Shoshone National Forest given its location 3.5 miles into the Forest as well as the unique aspects of its structure. Tr. 2487:18-2488:2; Tr. 2507:8-2510:1.

**Defendant's Response to PPFF ¶ 235**

Defendant agrees that Mr. Pucetas testified that the location of The Sweetwater's lodge is unique, but disagrees that The Sweetwater holds any compensable interest in the location of the lodge, because it only owns the improvements in the permitted site, not the land on which they sit. Defendant disagrees that there are unique aspects of the structures for the reasons stated at p. 64 of out post-trial brief.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Kathryn A. Bleecker

KATHRYN A. BLEECKER
Assistant Director

s/ John H. Williamson

JOHN H. WILLIAMSON
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
ATTN: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel.: (202) 307-0277
Fax: (202) 307-0972

February 1, 2006

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 1st day of February, 2006, a copy of the foregoing "DEFENDANT'S REPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ John H. Williamson