# In the United States Court of Federal Claims

No. 02-1795 C
(Filed August 25, 2006)

| | | |
|---|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC, Plaintiff, v. THE UNITED STATES, Defendant. | * | Term Special Use Permit; Equitable Consideration for Permit Termination; Contract Disputes Act; Taking. |

*Kevin R. Garden*, Alexandria, Virginia, for the plaintiff.

*John H. Williamson,* Department of Justice, Washington D.C., with whom were Assistant Attorney General *Peter D. Keisler*, *David M. Cohen*, Director, *Kathryn A. Bleecker*, Assistant Director, and *Kenneth S. Capps*, Attorney-Advisor, Office of General Counsel Mountain Region, U. S. Department of Agriculture, for defendant.

## OPINION

**Merow**, *Senior Judge*.

In this litigation plaintiff, The Sweetwater, A Wilderness Lodge, LLC, ("The Sweetwater") seeks to recover approximately $2,500,000 in damages stemming from actions and inactions of the Forest Service, United States Department of Agriculture, in connection with a Term Special Use Permit ("Term SUP") issued for plaintiff's operation of lodge and cabin facilities it acquired located in the Shoshone National Forest ("Shoshone") approaching the eastern entrance to Yellowstone National Park.

Evidence was received at a ten-day trial in Cody, Wyoming, at which testimony totaling 2,985 pages was presented from 17 witnesses and 114 exhibits, some lengthy,

were introduced. The following facts and conclusions are derived from the evidence received.

## FACTS

Wyoming State Highway 14/16/20, called the "Yellowstone Highway" or "North Fork Highway" runs west from Cody, Wyoming through the Shoshone National Forest to Yellowstone National Park. There are some twelve lodge facilities operated along the Yellowstone Highway under Forest Service Term Special Use Permits. Because of environmental restrictions resulting from agreements reached in connection with the reconstruction of this highway in the 1990s, it is unlikely that any additional such permits will be forthcoming. The lodges along Yellowstone Highway generate most of their income during the period of time the eastern entrance to Yellowstone National Park is open – generally from Mother's Day (second Sunday in May) to October 15th. After the eastern entrance to Yellowstone closes for the winter, the Yellowstone Highway becomes, in effect, a road to nowhere. Some of the lodges do remain open and have limited winter activities.

Highway 14/16/20 runs along the North Fork of the Shoshone River. The spring melting of the winter snow cover results in high water runoff in this river and its tributaries through the middle of July and serves to replenish the Buffalo Bill Reservoir created by the Buffalo Bill Dam across the Shoshone River. This extensive reservoir is the source of Cody, Wyoming's water supply.

Approximately 27 miles beyond Cody, Wyoming and 15 miles beyond the Buffalo Bill Reservoir traveling toward Yellowstone National Park is a turnoff on the Yellowstone Highway for the Wapiti Campground maintained by the Forest Service. Beyond the campground, the Forest Service maintains a bridge, Number 423-0.2, over the North Fork of the Shoshone River. In April of 1982, the Forest Service contracted for the removal of an old suspension bridge at this site and for the construction of two abutments and two piers and the placement of a government-furnished prefabricated bridge over the North Fork of the Shoshone River. The contract also provided for the installation of curbs and running planks on the bridge. The total contract price paid was $86,897.71 and the work was accepted on May 15, 1982. The bridge was designed for a 10,000 pound vehicle load – the design vehicle being a pickup truck. The narrow seven foot, nine inch inside curb restricts commercial vehicle access.

The road leading to Bridge 423-0.2 and beyond is Forest Service Road Number 423. On Forest Service maps at the relevant times, Road 423 is designated as a dirt or gravel road, Maintenance Level II, which indicates maintenance for high clearance vehicles. The road is 3.5 miles long terminating at The Sweetwater Lodge site. This lodge site is unique among the twelve lodges located along the Yellowstone Highway in that the others are all located within ¼ mile of the highway whereas The Sweetwater is 3.5 miles away from the highway approaching the designated wilderness area of the Shoshone National Forest.

The Shoshone National Forest has a goal to decommission excess Forest Service roads for environmental and wildlife conservation reasons and to conserve needed maintenance funds. The evidence in this litigation demonstrates that, while Road 423 is used to some degree by hunters and for access to more pristine forest areas, were it not for the presence of the lodge at its terminus, it would some time ago have been a strong candidate for decommissioning by the Forest Service.

Forest Service Road 423 runs along Sweetwater Creek which flows into the North Fork of the Shoshone River. Proceeding up Road 423 from Bridge 423-0.2 toward the lodge site two bridges cross Sweetwater Creek, Numbers 423-2.5 and 423-3.0. The Forest Service records indicate these bridges were probably built in the early 1960s or 1970s and were last load rated in 1974. This load rating would not remain valid for any time relevant to this litigation.

In March of 1992, the Shoshone National Forest submitted a request for $188,000 in appropriated funds, with no private contributions contemplated, for "replacing two bridges on the access road in Sweetwater Canyon on the Wapiti Ranger District . . . ." The request reported that "[d]eterioration of the substructure requires immediate attention in order to insure the safety of the users." It was also reported that:

> This project is needed to provide continued vehicular access in a safe manner. This road is one of the few on the Wapiti R.D. and as such provides for motorized recreational opportunities. The road also provides the only access for the permitted lodge owner and it's [sic] users. If the bridges are not replaced the government risks legal action should an accident occure [sic]. A second legal risk stems from the

probable loss of business by the lodge permittee, if access is lost or limited by the unsafe bridges.

(Jt. Ex. 5.)

In August of 1992, the Forest Service arranged for bridge inspectors from the Wasatch-Cache National Forest to travel to the Shoshone National Forest and inspect bridges including the two Sweetwater Creek bridges, Nos. 423-2.5 and 423-3.0. At the conclusion of the inspection, the inspectors reported to the Shoshone National Forest Engineer, James Fischer, their concerns about bridges Nos. 423-2.5 and 423-3.0. The inspectors stated that the bridges should be closed. A substantial discussion ensued with Mr. Fischer indicating that closure was not possible because of the need for public traffic to the lodge and a solution was reached to install "weight limit three tons" signs. No actual load rating of the bridges was done. The "three ton" limit was chosen because it covers a small vehicle roughly the size of a passenger car or a pickup truck. It was considered the bridges could safely carry that load. The 1992 Inspection Reports prepared by the inspectors and included in the Forest Service files, provided recommendations that Bridge 423-2.5 "BE REPLACED IN ENTIRETY" and for Bridge 423-3.0 "REPLACEMENT OF ABUTMENTS & SUPERSTRUCTURE." (Def.'s Ex. 9-10.)[1/]

The Forest Service records show that in 1993, there were plans to design the Sweetwater Bridges in 1994 and construct them in 1995, but in 1994 the project was indefinitely postponed. (Jt. Ex. 2.)

The facilities reached at the terminus of Forest Service Road 423 consist of a lodge, a chalet, and five cabins. The lodge was constructed in 1915. The original structure was a hand-hewn log cabin comprising about 960 sq. ft. It was remodeled in 1966 and an addition was built around 1980. The present structure encompasses 2,209 sq. ft. with porches of 40 sq. ft. and 140 sq. ft. The lodge includes a dining area, living area, two small storage rooms, full bath, half bath, pantry and kitchen. The living and dining areas have exposed beams with wood ceilings and walls. There is a native rock fireplace in the living room. Heat is provided by electric baseboard.

[1/] Defendant proposed a finding that the Forest Service also had posted a sign on Road 423 to the effect the road was not maintained for passenger cars. This finding is not made as creditable witnesses contradicted the testimony on which defendant relied for the proposed finding and in the numerous pictures of Road 423 introduced into evidence there is no evidence of such a posting. Rather, it appears that the only posted restrictions were the weight limit signs at each bridge.

There is an electric transmission line to the property under a permit issued to Pacific Power and Light Company. Mountain States Telephone and Telegraph Company (QWEST) holds a permit covering 3.445 miles of buried cable from the Wapiti Campground to the lodge site. Domestic water is from a shallow well with water piped to all structures. There are four septic systems servicing the seven habitable structures on the site.

The chalet was originally constructed in 1930 and has been remodeled since then. The structure has a second-story loft and an unfinished basement. The exterior walls are log siding. The main level contains living quarters, an enclosed porch and an outside wood deck. The loft area is used as a bedroom. The living quarters include a living room, kitchen and full bath. Heating is electric baseboard.

The five guest cabins, named Absaroka, Ptarmigan, Mt. Pleasant, Ishawooa, and Sweetwater, were all constructed around 1930 and have been remodeled. Absaroka Cabin has a kitchen/dining area, dressing room, bedroom and bath. The structure has a native rock fireplace. Heat is electric baseboard. The Absaroka Cabin structure measures approximately 470 sq. ft. plus a covered porch of some 124 sq. ft. The remaining four cabins are all replicas of each other, each containing around 355 sq. ft. These cabins comprise a sitting/bedroom with native stone fireplace, bathroom, and porch. Exterior walls are log siding. Heat is electric baseboard.

If one were to commence construction to reproduce new the above-described lodge, chalet, five cabins and site improvements, at 2005 costs, the evidence presented in this litigation demonstrated that the expense would total slightly in excess of $2,000,000, of which approximately $1,600,000 would be actual construction cost and the remainder indirect costs. Construction cost would be impacted by the remote location of the site which is rimmed by pristine wilderness.

In 1983, the Forest Service and H. David Brannon and Nancy Brannon, d/b/a Brannon's Wilderness Lodge executed a Term Special Use Permit, amended in 1985, covering the 15.4 acres at the terminus of Forest Service Road 423 for the purpose of "[m]aintaining and operating a public resort consisting of lodge, cabins, dormitories, corral, tack shed, horse rentals, satellite dish and antenna, water and sewage systems and utility lines. Performing cooperative maintenance responsibilities with the Forest Service on 3.5 miles of access road (FDR 423) in accordance with attached Exhibit B." (Jt. Ex. 3.)

The "Exhibit B" referenced comprised a Memorandum of Understanding for Cooperation in Road Maintenance ("MOU") between Brannon's Wilderness Lodge and the Forest Service wherein Brannons assumed road maintenance responsibility for their traffic (that generated from the use of lands involved in operating and maintaining the guest lodge) and the Forest Service assumed road maintenance responsibility for all National Forest traffic (that generated by the use of National Forest lands or road systems for recreation purposes other than lodge traffic) and for two bridges (FS No. 423-2.5 and FS No. 423-3.0 – the Sweetwater bridges) including abutments and approaches. The MOU included a special clause stating: "1. Nothing herein shall be construed as obligating the FOREST SERVICE to expend or as involving the United States in any contract or other obligations for the future payment of money in excess of appropriations authorized by law and administratively allocated for this work." (Jt. Ex. 4.)

The MOU contemplated that a yearly Joint Road Maintenance Plan would be developed. The 1985 Plan provided that Brannon's Wilderness Lodge would grade Road 423 approximately four times per year and the Forest Service would pay their proportionate cost, providing "that the Forest Service has available funds." For FY 86, the Forest Service agreed to "contribute no less than $1,000 toward their proportionate share of road maintenance in FY 86." The MOU also provided "4. New construction or reconstruction, such as bridge replacement, will be agreed to as part of the yearly Joint Maintenance plan." (Jt. Ex. 4/3, 4/5.)

H. David Brannon ("Dave Brannon") and Nancy Brannon operated Brannon's Wilderness Lodge as a destination resort. Guests were not obtained from traffic along Yellowstone Highway. Most guests made reservations in advance. The Brannons resided at the site. Mrs. Brannon was an excellent cook. On weekends the lodge would, for a fixed fee, approximately $250.00, arrange a gourmet feast which covered the "feast," lodging for one night and a champagne breakfast. People residing in the area who did not require overnight accommodations could also make reservations for a gourmet meal. The witnesses in this litigation, who resided in the local area during the Brannons' operation of the lodge, testified that a meal at the lodge was a most enjoyable experience.[2/] Although the Forest Service listed the road (No. 423) to the

---

[2/]It is noted, but not relied upon in the resolution of this matter, that the Bowker Biography listing for Nancy Brannon (http://www.bowkerbios.com/bowkerbios/nancy_brannon.htm) states that (continued...)

lodge as maintained for high clearance vehicles, many guests traveled the road in passenger cars. Dave Brannon drove a small Renault back and forth daily. The Brannons owned a tractor with a blade and used it to grade the road whenever it was needed to maintain clearance for all vehicular traffic to the lodge. More serious access problems were handled by the Forest Service. For instance, Forest Service employee, Michael ("Mike") Bree recalled an incident where a summer rainstorm caused high water that washed out a portion of Road 423 prompting a panic call from Dave Brannon that the lodge was stranded and he needed to get out. The Forest Service sent a bulldozer to open up the road. (Tr. 780.)

Forest Service records show that Brannon's Wilderness Lodge reported it received gross income of $83,287 for 1990, $82,548 for 1991, $78,291 for 1992, $73,104 for 1993, and $93,641 for 1994.

By 1995, the work of maintaining and operating the lodge was becoming too much of a burden for Dave Brannon and the Brannons reached a decision to move to Oregon where they contracted to purchase a boat and planned to operate it as a restaurant. The Brannons listed the Wilderness Lodge site improvements for sale with a broker at $495,000. Wanda Smith, who operated a lodge in the Jackson Hole, Wyoming area obtained financial backing and contracted to purchase the improvements from the Brannons for $450,000. The Term SUP which governed the Brannons' operation of the Wilderness Lodge as a public resort provided that "[i]f the

---

[2](...continued)
she is an author of four popular cookbooks and describes the Wilderness Lodge operation as follows:

> She and her husband Dave built an excellent reputation while they owned and operated 'Brannon's Wilderness Lodge' . . . a gourmet Italian feasting place in the Rocky Mountains outside Yellowstone National Park. During their nearly fourteen year stay there, they were featured in magazine and newspaper articles throughout the country, including Bon Appetite, Travel and Leisure, Family Circle, The Atlanta Journal and Constitution, The Miami Herald, The San Francisco Chronicle and others. The lodge featured an 8-course authentic Italian 'feast' that took 31/2 to 4 hours to complete. Nancy made everything from scratch including all the breads, soups, sauces, pastas, entrees and desserts ... buying nothing pre-prepared. During the intermissions, guests were invited to take their wine and wander down to the creek, or in by the fireplace, depending on the season. After a relaxing evening, guests would stroll up to their cabins for a peaceful night's sleep. The next morning, a sumptuous champagne brunch awaited them in the dining room. Truly a 'special occasion place', Brannon's Wilderness Lodge was the scene for many marriage proposals, birthday and anniversary celebrations, as well as wedding parties. They felt privileged to be able to say that they had served guests from all 50 United States and 28 foreign countries.

person to whom title to said improvements shall have been transferred in either manner above provided is qualified as a permittee, and is willing that his future occupancy of the premises shall be subject to such new conditions and stipulations as existing or prospective circumstances may warrant, his continued occupancy of the premises will be authorized by a permit to him, which may be for the unexpired term of this permit or for such new period as the circumstances justify." (Jt. Ex. 3/2.)

Before closing on the sale with the Brannons, Wanda Smith contacted the Forest Service to inquire with respect to the terms of a permit. Jennifer Watson was then the head of the Forest Service team responsible for the administration of Term SUPs. The team also included Mike Bree and Monte Barker. Ms. Smith was shown the MOU in effect with the Brannons' permit concerning road maintenance and discussed the Sweetwater bridge conditions with the Forest Engineer, James ("Jim") Fischer. Mr. Fischer informed Ms. Smith that the two bridges were not in good condition and it might be necessary to resort to fords over the Sweetwater Creek if a bridge washed out. On April 11, 1995, Mr. Fischer had sent an E-mail indicating that road maintenance funds set aside were not enough to replace the bridges and he intended to propose a project to take out the bridges. The remainder of the E-mail is missing (Jt. Ex. 6), but in testimony, Mr. Fischer confirmed that he contemplated then using fords. He did recall that the Sweetwater bridge replacement project was, at that point, not in the Forest's Capital Improvement Program, but he intended to reinstate it. (Tr. 1412-16.) Jennifer Watson and Mike Bree also accompanied Ms. Smith on a site visit to the Wilderness Lodge and while there took photographs and developed a list of items that required correction. During her contacts with the Forest Service, Ms. Smith expressed concern about road maintenance and indicated she did not contemplate operating a road grader. The bridge situation also caused concern. Ms. Smith did not show up for the closing of her contract to buy the lodge improvements from the Brannons and the deal collapsed.

Having signed contracts for their Oregon move, the collapse of the Smith deal left the Brannons in a difficult situation. Dave Brannon blamed the Forest Service for the collapse and made his frustration with the personnel involved clearly known. Mr. Brannon also contacted local real estate broker Ralph ("Buck") Wilkerson to find a substitute buyer. The listing price was dropped from $495,000 to $375,000 in hopes of obtaining a quick sale. Mr. Wilkerson attempted to contact persons who had expressed an interest previously in purchasing the lodge but was not successful. He then called Jeffrey ("Jeff") C. Mummery with whom he had previous business

relations and told him that he thought there was an opportunity to obtain the lodge at a very good price. Mr. Mummery is in the business of buying and selling real estate. Mr. Mummery's prior experience included working as a guide for an outfitter as well as operating a hotel/resort on the Yellowstone Highway between Cody and Yellowstone National Park.

The same day that Mr. Wilkerson informed him of the opportunity, Mr. Mummery visited the lodge with his friend, Gary Fales, who owns Rimrock Ranch, another North Fork lodge. On this visit they encountered Mrs. Brannon who was distraught that the sale to Ms. Smith had not closed. They had packed their belongings in anticipation of moving. Mr. Fales recommended that Mr. Mummery buy the lodge. Mr. Mummery returned to look at the lodge again on Saturday, May 20, 1995, and spoke to Dave Brannon. On Sunday morning, May 21, 1995, Mr. Mummery sent Mr. Brannon an offer to buy the improvements for $275,000. The Brannons faxed a counter-offer for $287,000, which Mr. Mummery accepted. Closing was set for June 21, 1995. On June 9, 1995, a certificate of organization for The Sweetwater was filed with the Wyoming Secretary of State. Mr. Mummery is the managing member of The Sweetwater, A Wilderness Lodge, LLC, a Wyoming corporation.

Mr. Mummery on behalf of The Sweetwater had meetings with the Forest Service prior to the scheduled June 21, 1995 closing on the sale with the Brannons. On June 12, 1995, Mr. Mummery and his attorney, William ("Bill") Simpson, met with the Forest Service personnel, Mike Bree, Monte Barker, and Robert ("Bob") W. Rossman. Mr. Rossman was employed at the Shoshone National Forest from 1980 to 1999. He began as the Forest Hydrologist and from 1994 to 1996, served as the Acting District Ranger for the Wapiti District, which includes Road 423 and the lodge area. The Forest Supervisor, who was the top official in the Forest, had delegated authority to the Forest District Rangers to sign Term SUPs for the supervisor and to carry out the administration of the permits thereafter. Forest Service employees Bree and Barker were part of the team then in place to deal with Term Permits, under the supervision of the Acting District Ranger. Mr. Rossman was aware at the June 12, 1995 meeting that he would, on behalf of the Forest Supervisor, subsequently be executing the new Term Special Use Permit for the lodge site with The Sweetwater.

The June 12, 1995 meeting was scheduled to discuss the terms for The Sweetwater permit. At the meeting Mr. Mummery, acting for The Sweetwater, upon

advice of counsel, opposed a MOU covering road maintenance, such as existed for the Brannons, unless Road 423 could be privatized to permit only traffic to the lodge site. For liability and insurance reasons, Mr. Mummery did not want to be responsible for maintenance on a road open to the public beyond the permitted 15.4-acre site, which was to be The Sweetwater's responsibility to maintain and operate. The Term Permit proposed required The Sweetwater to obtain public liability insurance for property damage and death or injury to individuals, "rising out of the holder's activities under the permit . . . ," and to name the United States as a co-insured. The Sweetwater could not obtain this insurance if its activities covered road maintenance. It was agreed that no MOU would be executed.

Also, discussed at the meeting was the action the Forest Service would take if a Sweetwater bridge became unusable or was washed out. Mr. Mummery and The Sweetwater's counsel, Mr. Simpson, were aware that it did not make sense to buy the lodge if one couldn't get there and were seeking some commitment that in the event of a bridge washout, steps would be taken to get it back up where it was passable and The Sweetwater could conduct a business. The Forest Service personnel could not provide a guarantee that funds would be available in the future for bridge replacement, but did assure The Sweetwater that they would make their best effort to obtain replacement funds. These funds had to come from congressional appropriations through the Forest Region, located in Denver, Colorado, where they would be allocated to cover requests by the Shoshone National Forest. It was indicated that obtaining bridge replacement funds could take a substantial period of time, perhaps three years, and, while success could not be guaranteed, the Forest Service personnel would do their best to maintain access to the lodge site. In the event of a bridge washout it was represented that the Forest Service could construct a ford over Sweetwater Creek to preserve access to the lodge site, but this would be a temporary measure and would not interfere with attempting to obtain funds to replace the bridge.

The evidence admitted in this litigation is clear that, while several Forest Service officials had the view that the lodge could be operated on a permanent basis with fords over Sweetwater Creek, in fact, The Sweetwater site could not be operated successfully if fords were installed in lieu of bridges over Sweetwater Creek. This is because high water up to the middle of July would preclude access over fords, even by high clearance vehicles, and this would eliminate a substantial portion of the operating season. Defendant's expert witness reported that, "[f]ords do not work,

there is no net operating income left, even prior to constructing fords; . . ." (Pl.'s Ex. 66.) In the event of a washout, Mr. Mummery did agree to the use of fords on a temporary basis pending Forest Service action to obtain bridge replacement funds.

Consistent with the Forest Service's responsibility to maintain Road 423, Mr. Mummery objected to the inclusion in the forthcoming permit of a clause like clause 44 of the Brannon Permit. This clause could be read to indicate that no government agency would furnish road maintenance. It was agreed that this clause would not be included in the forthcoming permit.

At the June 12, 1995 meeting the existence of the 1992 Bridge Inspection Reports was not disclosed and Mr. Mummery was not aware of the recommendations that the bridges be replaced, or the actions of the Forest Service in requesting replacement funds in 1993 which action was indefinitely postponed in 1994. From observation he was aware that The Sweetwater bridges had a posted 3-ton weight limit and required attention. He was aware that Wanda Smith had not closed on her contract with the Brannons, but was not aware of her discussions with the Forest Service on road maintenance. Mr. Mummery attributed her failure to close on lack of financing.

On June 13, 1995, Mr. Rossman sent the following E-mail message (Def.'s Ex. 18) to James Fischer with copies to Mike Bree, Monte Barker, and Jennifer Watson:

> JIM, FYI – WE HAD A MEETING WITH JEFF MUMRY [sic] AND BILL SIMPSON YESTERDAY ON THE PENDING SWEETWATER DEAL. THE MAJOR TOPIC WAS, GUESS WHAT???, THE ROAD. HERE'S WHERE WE ENDED UP: JEFF DOESN'T HAVE A PROBLEM WITH GOING TO FORDS AS A CONTINGENCY FOR BRIDGE FAILURE OR UNSAFE BRIDGE CONDITION. WE ALSO AGREE NOT TO HAVE A ROAD M.T.C. AGREEMENT. JEFF IS CONCERNED ABOUT THE LIABILITY HE ASSUMES FOR GENERAL PUBLIC, AS OPPOSED TO GUESTS. OUR APPROACH IS TO MAINTAIN THE ROAD IN ACCORDANCE WITH OUR SYSTEM OF SETTING PRIORITIES ZONALLY, WHERE THE LIABILITY IS BASICALLY OURS ANYWAY. JEFF, HAVING AN INTEREST IN THE SAFETY OF HIS GUESTS, WILL MAINTAIN THE ROAD AS HE SEES FIT WHILE WE WILL COMMUNICATE

> AND MONITOR PROBLEM AREAS INFORMALLY (WITHOUT THE AGREEMENT). IT IS UNDERSTOOD THAT WE DO NOT HAVE A PRIORITY ON MAINTAINING THIS ROAD, AND ARE NOT LIKELY TO ALLOCATE DOLLARS TO IT. WE ARE LEANING TOWARD THE USE OF SOME GOOD SIGNING FOR PEOPLE WHO MAY ENTER THE AREA (NEED TO THINK ABOUT LIABILITY ASPECTS OF THAT, AS WELL). MIKE, MONTE, DOES THIS JIBE WITH YOUR RECOLLECTIONS?

On June 15, 1995, Mr. Mummery, as the Manager for The Sweetwater, A Wilderness Lodge, LLC, submitted to the Forest Service The Sweetwater's application (Def.'s Ex. 19) for a Term Permit to "Operate existing Lodge for Public Services (Food, Lodging, Trail Rides, Gift Shop & other appropriate services)." Included with the Application, under "Resort Improvements" was the following statement:

> 3. The Lodge is desirous of improvements to the two existing small bridges on the 3½ mile Sweetwater access road, and has requested the Forest Service to address this issue with the appropriate Forest Service personnel for approval of the same along with the indication of amount of financial participation by the Forest Service. The Lodge has referred the Forest Service to an independent contractor who has appraised the bridge situation and who will provide the appropriate professional recommendation for type of improvement. The intent is to strengthen the bridges for continued use by all public and Forest Service use, to contribute to their effective maintenance and to promote safe travel conditions for all individuals.

The closing on The Sweetwater's purchase contract with the Brannons occurred on June 21, 1995. Jennifer Watson attended the closing to assist in acquiring the papers needed to prepare a new Term Permit. The Term Permit was executed on August 21, 1995, Bob Rossman for the Forest Service, signing as "Acting Forest Supervisor," and by Jeffrey Mummery for The Sweetwater. The permit was for a term expiring December 31, 2014 and covered:

15.4 acres and is issued for the purpose of:

Maintaining and operating a public resort providing the following:

Facilities: Lodge building with dining room and lounge, 5 cabins, manager's residence, television satellite system, 2500 feet of TV cable and antenna, water and sewage systems, and utility lines.

Services: Rental of cabins, serving meals.

Day Use of Trail Rides 600 Service Days in areas accessible from lodge, excluding Wilderness portion of the Sweetwater drainage

Day Use Fishing 200 Service Days from lodge in Northfork Drainage.

Products: Sale of gift items

(Jt. Ex. 1.)

The length of the term provided in the permit is based on the investment involved. It is anticipated that the investment in improvements located on the Forest lands can be amortized out through the period of the permit, although the Forest Service policy was to renew Term Permits for public resort operations if the need for the activity remained and the permittee was in compliance with the permit terms.

The SUP obligated The Sweetwater to operate at least ninety-three days each year and to pay an annual flat fee of $1,400 to the Forest Service. The Sweetwater was required to insure its operations, name the United States as a co-insured, and indemnify the United States in the event any liability arose related to The Sweetwater's operations. No provision for maintenance of Road 423 or memorandum of understanding concerning road maintenance, such as were included in the Brannon[s'] SUP, were included in The Sweetwater's SUP.

The Sweetwater SUP includes a termination provision as follows:

> 15. If during the term of this permit or any extension thereof, the Secretary of Agriculture or any official of the Forest Service acting by or under his authority shall determine that the public interest requires termination of this permit, this permit shall terminate upon thirty days' written notice to the permittee of such determination, and the United States shall have the right thereupon to purchase the permittee's improvements, to remove them, or to require the permittee to remove them, at the option of the United States, and the United States shall be obligated to pay an equitable consideration for the improvements or for removal of the improvements and damages to the improvements resulting from their removal. The amount of the consideration shall be fixed by mutual agreement between the United States and the permittee and shall be accepted by the permittee in full satisfaction of all claims against the United States under this clause: Provided, That if mutual agreement is not reached, the Forest Service shall determine the amount and if the permittee is dissatisfied with the amount thus determined to be due him he may appeal the determination in accordance with the Appeal Regulation (35 C.F.R. 251 Subpart C) and the amount as determined on appeal shall be final and conclusive on the parties hereto; Provided further, That upon the payment to the permittee of 75% of the amount fixed by the Forest Service, the right of the United States to remove or require the removal of the improvements shall not be stayed pending final decision on appeal.

(Jt. Ex. 1/3.)

The Sweetwater devoted the remainder of the season in 1995, to site cleanup activity. A large amount of debris that had accumulated in the later years of the Brannons' operation was collected from the site and removed. Upon acquiring The Sweetwater Lodge from the Brannons, Mr. Mummery received requests to list the operation for sale. He authorized Sommers & Voerding Real Estate Brokerage to prepare a 5-page brochure offering Sweetwater Lodge "at a list price of $595,000.00." (Def.'s Ex. 34.) In November or December of 1995, Daren J. Singer and William

Bram Lassiter attempted to perfect a claim for spring water from a source on the site, that they wished to bottle and sell. In ensuing discussions with Mr. Mummery about the claim attempt they expressed an interest in buying the property. Mr. Mummery quoted a price of $600,000 to $650,000, which was not accepted.

During the clean-up operations, Mr. Mummery was visited by a friend who was a lawyer and who resided in Ann Arbor, Michigan. The friend had a client, Carl Bixby, who was a "big time fly fisherman" and Mr. Mummery's friend considered the lodge was a place Mr. Bixby would want to spend a week and go fishing. Several witnesses in this litigation confirmed that Sweetwater Creek presented excellent fishing opportunities. In November or December of 1995, Mr. Bixby contacted Mr. Mummery and discussed a visit but then inquired if the lodge was for sale. Mr. Bixby operated a computer company and with his connections considered he could market the lodge to persons in the computer industry as a place to vacation or for conferences.

On February 17, 1996, Carl Bixby, d/b/a Atlantis Three, a Michigan corporation and the owners of The Sweetwater (Western Wyoming Properties & Investment Corporation, a Wyoming corporation and Anglo-American Land Development Association, a Florida Partnership) entered into a contract to sell to Carl Bixby, d/b/a Atlantis Three all outstanding ownership interest in The Sweetwater – A Wilderness Lodge, LLC together with the stock in the company which held the liquor license issued by Park County, Wyoming permitting the sale and consumption of alcoholic beverages at The Sweetwater. The purchase price was $600,000. Closing was set for August 21, 1996.

An agreement was reached that pending the closing, Mr. Bixby would pay the operating costs of The Sweetwater and do the marketing for guests. A cook was hired and a manager, Monte Jackson, was retained. Mr. Bixby paid some $71,500 in operating expenses. However, Mr. Bixby encountered trouble with his business, lost focus on the lodge and did not provide guests other than himself and his family on several occasions. He failed to close on the sale contract in August of 1996 and forfeited his down payment. In September of 1996, Jennifer Watson traveled to The Sweetwater Lodge to check on the operation and encountered a big horn sheep hunter alongside the creek who noted that he was there on several occasions but did not see any public use of the facility. The Sweetwater Term Permit was for the operation of a "Public Resort" for at least 93 days each year. Ms. Watson drafted a note for the

Forest Service file concerning her contact with the sheep hunter, but did not contact Mr. Mummery or otherwise take any action to complain about The Sweetwater's operation or lack thereof.

True to the intention he expressed when discussing The Sweetwater bridges with Wanda Smith, Jim Fischer, the Shoshone Forest Official responsible for obtaining capital investment funds via the Regional Office in Denver, reinstated the Sweetwater bridges project into the Forest's Program in FY 1996. His records state that the bridges were proposed for design work in FY 1998 and for construction in FY 1999. (Jt. Ex. 2/4.) The 1992 submission for Sweetwater bridge replacement funds was amended to now seek $230,000, with no contribution by The Sweetwater contemplated. (Jt. Ex. 10.) In August of 1996, there was a change in the administration of the Shoshone National Forest with Rebecca Aus replacing Barry Davis as the Forest Supervisor. Also a new District Ranger for the Wapiti District, Brent Larson, replaced Bob Rossman effective October 1, 1996, with Mr. Rossman assuming a position as the Environmental Coordinator for the Shoshone Forest. Ms. Aus orally canceled the delegation authority Mr. Davis had previously granted lower level officials to act on Term Permit matters for the Supervisor. In late September or early October 1996, Mr. Rossman brought Mr. Larson to meet Mr. Mummery at The Sweetwater Lodge site. During the meeting Mr. Larson, as a result of his trip up Road 423, inquired if Mr. Mummery had plans to fix up the road and received Mr. Mummery's response that it was a Forest Service road not a Sweetwater Lodge road. Mr. Mummery again inquired whether traffic on Road 423 could be privatized and limited to Sweetwater Lodge activity so he could fix it up, and Mr. Larson indicated this was not possible.

As a result of The Sweetwater Lodge sale brochure prepared by Sommers & Voerding (Def.'s Ex. 34), in January of 1997, a couple from Florida, Raymond S. and Judi S. Sutherland expressed an interest in buying the facility. Mr. Sutherland was a retired executive and Mrs. Sutherland was interested in cooking. Mr. Mummery provided the couple a site visit and Mrs. Sutherland, upon inspection of the facilities, considered the lifestyle was what they wished for their retirement. On January 27, 1997, the Sutherlands and Mr. Mummery on behalf of The Sweetwater, A Wilderness Lodge, LLC, executed a contract providing for the Sutherlands to purchase the "[p]ersonal property consisting of buildings, equipment, fixtures, furniture, inventory, etc. situated on a U.S. Forest Service permit designated area." (Jt. Ex. 9.) The purchase price was $595,000, contingent upon the Sutherlands, "[r]eceiving

preliminary approval from the U.S. Forest Service concerning the issuance of a permit to operate the property." A $5,000 escrow was to be established from the purchase price at closing "to be released to Seller at such time as the US Forest Service access road to the property is repaired to permit single lane passenger automobile travel." In the event the road was not so repaired by May 1, 1997, the $5,000 could be used by the Sutherlands for this purpose. (*Id*.)

On January 27, 1997, the Sutherlands, Mr. Mummery, Mr. Sommers of Sommers & Voerding, and Monte Jackson, the Lodge Manager, met with Jennifer Watson, the Forest Service Permit Administrator. Ms. Watson prepared a hand written memorandum of the meeting for the file (Def.'s Ex. 36) noting that, at the meeting, the items required in order to transfer a resort permit were covered. The permit application checklist was discussed item by item. Ms. Watson provided all necessary forms. The meeting memo notes that the access roads and bridges were discussed and concludes "I explained that FS funds for bridge repair would not be available."

The Sutherlands retained a local lawyer, Scott Kath, to assist in the sale transaction. Jennifer Watson contacted the Forest Engineer, Jim Fischer, to inquire about the condition of Road 423 and The Sweetwater Creek bridges. On February 14, 1997, Mr. Fischer sent Ms. Watson copies of the 1992 Bridge Inspection Reports on which he added several explanatory notations. Mr. Fischer provided a hand-written cover note to Ms. Watson in which he stated "[w]e did not inspect the two upper bridges in 94 or 96 – they were basically condemned in 92." (Jt. Ex. 7.) Mr. Fischer placed 1997 notations on the 1992 Inspection Reports to explain the numerical code used. For example, a "2" code translated to "inadequate, should be closed." Both bridges had several "2" ratings. Ms. Watson provided Mr. Fischer's entire submission, cover note to her included, to the Sutherlands or their counsel, Mr. Kath. Mr. Kath telephoned Mr. Mummery and indicated that the recommendation to buy the lodge was in question because the bridges have been condemned. Mr. Mummery called Mr. Sommers and Brent Larson to ascertain what was occurring. Mr. Larson on February 20, 1997, wrote the Sutherlands a letter to clarify the situation. In relevant part the letter stated:

> This letter is intended to clarify issues surrounding the inspection reports provided to you yesterday on the three bridges which provide access to the Sweetwater Wilderness Lodge.

> The statement that the bridges crossing the Sweetwater Drainage are condemned is not correct. When the bridges were last inspected in 1992, several of the bridge components were given a rating code of "2". This code indicates a deficiency which may be dealt with through load limit restrictions. As a point of reference, a bridge which is condemned would have a code of "0", and would be immediately closed to all traffic.
>
> While the Shoshone Forest clearly desires to maintain access in the Sweetwater Drainage, that access would more likely become seasonal fords of the Sweetwater River should the condition of the bridges deteriorate to the point where they can no longer be used. As explained in previous discussions, this is because funding for replacement of these bridges is not currently available, and the liklihood [sic] of obtaining adequate funding to replace these bridges in the future is low.
>
> When Jeff Mummery purchased this lodge several years ago, the condition of the bridges was an issue at that time. He agreed that fords would be an acceptable alternative for access to the lodge should the bridges either fail or become unsafe. Whether this method of access will be adequate for you and your proposed business at the Sweetwater Lodge must figure into your business plans.

(Jt. Ex. 11.)

Further discussions between Mr. Mummery and the District Ranger, Mr. Larson resulted in Mr. Larson's letter, dated February 27, 1997, to Mr. Mummery stating:

> This letter is to clarify the Shoshone Forest's position in regards to the bridges across Sweetwater Creek on Forest Development Road Number 423. This road provides access to National Forest lands on the Sweetwater Drainage as well as the Sweetwater Wilderness Lodge.
>
> The most recent inspection of the two bridges across Sweetwater Creek found deficiencies and recommended replacement of these bridges in order to ensure long term access to the Forest in this area. Replacement bridges for these two bridges crossing Sweetwater Creek are currently

> included in the Forest's Capital Improvement Program for FY 1999. However, this funding is subject to Congressional approval and I cannot guarantee that it will be available at that time.
>
> It is the Forest's intention to continue to provide access to National Forest lands in the Sweetwater drainage. Should the existing bridges crossing Sweetwater Creek deteriorate to the point where they can no longer be used before money is available for their replacement, alternative solutions to provide access to the area will be explored at that time. Alternatives could involve the construction of temporary fords to serve as access while pursuing any emergency funding sources available for more permanent solutions. The need for adequate access to the Sweetwater Lodge which is permitted under the Term Permit Act of 1915 will be taken into consideration in all alternatives considered.

(Jt. Ex. 12.)

The clarifications by the Forest Service did not satisfy the Sutherlands and the $595,000 sale collapsed. Mr. Mummery was also not satisfied. He considered that the representations as to bridge conditions that had been disclosed to the public prevented him from operating the lodge until the two bridges were replaced or, otherwise, made safe, and so represented in writing by the Forest Service. The Shoshone National Forest was now seeking $230,000 in Capital Investment Funds for this bridge replacement project. Mr. Mummery's Reports to the Forest Service as to income from permit operations from 1998 and 1999 listed "0" income and stated the lodge was closed due to roads or due to inadequate road access. Forest Service personnel did not raise objections to Sweetwater's lack of operations. This was the period of time that the Yellowstone Highway was being reconstructed and the resulting traffic delays had negatively impacted business for the eleven lodges in the Shoshone National Forest located within ¼ mile of the construction on the highway. Mr. Larson and Ms. Watson were content to let Sweetwater Lodge remain closed while this work progressed. Mr. Mummery was persistent in his inquiries with Ms. Watson or Mr. Larson concerning the status of the funding request for bridge replacement.

Although the project to replace the Sweetwater bridges had been reinstated in the Forest's Capital Investment Program, Mr. Larson, the District Ranger, was not enamored of spending Forest Service money to improve Road 423 and the bridges.

Mr. Larson with the assistance of Chuck Neal, a "Terrestrial Ecologist" located in Cody, Wyoming proposed obtaining a "conservation buyer" to acquire The Sweetwater Lodge facilities. If a conservation buyer, such as The Greater Yellowstone Coalition, acquired The Sweetwater Lodge, the facilities could be removed and the Forest Service would no longer need to replace the bridges or incur road maintenance expense. Mr. Neal prepared "An Ecological Overview" to assist in locating a conservation buyer. The Overview (Pl.'s Ex. 18) explained its contents and purpose with the following opening description:

> This report is concerned primarily with the lower several miles of the Valley (that part outside the wilderness designation which surrounds it on three sides). The Sweetwater watershed is overwhelmingly roadless except for the approximately three miles of a periodically graded dirt road which leads to the Sweetwater Lodge consisting of a main lodge, managers house and five small cabins (22 person capacity, which is currently for sale). This road requires a bridge crossing over the North Fork of Shoshone River and two bridge crossings of the Sweetwater Creek. The road is a Forest Service (FS) road and the FS has reacted positively to a suggestion that the road, bridges and lodge be removed if funds could be acquired to buy the lodge; hence this brief report.

The Overview comments that Sweetwater Creek is an important spawning tributary and nursery stream for Snake River Cutthroat and Yellowstone Cutthroat, Rainbow Trout and Mountain Whitefish which would improve "without the sediment-producing road." The Overview concludes with the comment that "[t]here seems little doubt that there will be significantly greater use of this resource-rich Valley by the grizzly bear without the presence of the road, Lodge and accompanying vehicular traffic and general human presence."

The District Ranger, Mr. Larson, discussed the conservation buyer proposal with the Forest Supervisor, Ms. Aus, and received an encouraging response. Ms. Aus, who had the erroneous view that The Sweetwater could operate the lodge without bridge access on a permanent basis, by using fords, and that Mr. Mummery had so agreed in 1995, placed a very low or non-existent priority on replacement of the Sweetwater bridges, at least for the term covered by The Sweetwater's permit. Ms. Aus placed her spending priority on addressing the Forest's $24,000,000 general

maintenance backlog. During a trip to the Shoshone National Forest by the Regional Forester from Denver, Colorado, Mr. Larson discussed the conservation buyer approach with him and also received an encouraging response. Mr. Mummery had no objection to the purchase of Sweetwater Lodge at a market price by a conservation buyer, but was skeptical that such a buyer could be located. During the search for a conservation buyer the Forest's request for Sweetwater bridges replacement funds remained active. In 1999, Mr. Fischer, the Forest Service Official in charge of the Capital Investment Program, received information from the Region that funds to replace the two Sweetwater bridges were available in the approved FY 2000 budget.

Upon receipt of information that the requested Sweetwater bridge replacement funds were available, the District Ranger, Mr. Larson, conferred with Mr. Fischer and they decided that the bridge replacement funds should be rejected pending resolution of the conservation buyer approach, which, if successful, would obviate bridge replacement. Mr. Fischer informed the Region of this decision. Mr. Mummery, who continually inquired about the status of the Forest's funding request, was not informed that bridge replacement funds were available but had been rejected by the Forest. No conservation buyer was located.

In 2000, Mr. Mummery decided that Sweetwater would do some work on the two bridges in order to attempt to provide the access needed to operate the lodge. A meeting was scheduled at the site and the District Ranger requested Thomas Koenig to attend on behalf of the Forest Engineer. Mr. Koenig, a civil engineer, had recently reported to the Forest and the Forest Engineer had assigned him to inspect the Sweetwater bridges. At that time Mr. Koenig informed the Forest Engineer that Road 423 required substantial work to correct deficiencies causing washing of sediment into the creek and that if the bridges were to be replaced, the road work should also be accomplished. At the site meeting with Mr. Mummery, Mr. Koenig discussed the road deficiencies and the bridge conditions and suggested that Mr. Mummery hire a private engineer to inspect and load rate the bridges before he made any investment in trying to improve their condition. Mr. Mummery arranged for an engineer to inspect the bridges and the inspection occurred in January of 2001. On January 15, 2001, Russell R. Taylor, PE, submitted his conclusions which included the sentence, "[q]uite simply, the structures are past due for replacement and I can see no economical benefit in trying to reuse any of the structure in a rehabilitation effort." (Jt. Ex. 15.) Mr. Taylor stated that "I am unable to arrive at any rationale for arriving at any reasonable load capacity rating." (*Id.*) Mr. Fischer asked Mr. Koenig to write

a brief report which was accomplished by April of 2001. The three page report (Pl.'s Ex. 56) concluded:

> Cost to replace all three bridges on FDR 423 and make necessary structural improvements to the road could easily exceed $500,000. The limited public use and Forest Service administrative use of FDR 423 does not justify the high cost necessary to keep the road open. Without the Sweetwater Lodge at the end of the road, a significant portion of the FDR 423 would probably have been closed long ago.

When it was confirmed by Mr. Taylor that the bridges could not be load rated, Ms. Aus determined they should be closed as Forest Service policy required load rating for a bridge to be open to the public. The Sweetwater bridges had not been load rated since 1974 but had not previously been closed by the Forest Service. On April 3, 2001, the Forest issued the following Press Release (Pl.'s Ex. 31):

**Unsafe bridges force closure of Sweetwater Road**

> Due to the unsafe condition of two bridges, the Sweetwater Road that runs from Wapiti Campground on the North Fork of the Shoshone River up along Sweetwater Creek to Sweetwater Lodge will be closed to motor vehicle traffic effective April 5. The road will remain open to foot traffic by hikers and horseback riders.
>
> Forest Supervisor Becky Aus implemented a closure order after engineers inspected the two bridges on Sweetwater Road and found that the decks and abutments have deteriorated to the point that they can't safely carry motorized vehicles or horses.
>
> The bridge crossing the North Fork River at Wapiti Campground will be gated to vehicular traffic but will allow for the passage of foot and horse traffic, according to Wapiti District Ranger Brent Larson. However, Larson advises horseback riders to use caution and suggests that they ford the stream rather than use the bridges crossing Sweetwater Creek. 'There are some holes in the planking, which is in very bad shape.' he said.
>
> Larson said both the road and the bridges have been deteriorating for several years, but the cost or [sic] repairing them has been prohibitive.

> 'We've looked at replacing the bridges and upgrading the road, but we simply haven't had the money,' he said. 'It's conservatively estimated it would cost more than $500,000 to bring the road and bridges up to standard. It is difficult to justify spending that kind of taxpayer money on a 3.5-mile road that provides access to a lodge.
>
> 'We're looking at several options. These include repairing the road ourselves, turning the road over to the lodge owner or possibly abandoning the road.'
>
> Larson said that if the road is not repaired to provide safe passage for customers, then it would be difficult for the Sweetwater Lodge to operate.

Expert testimony presented at the trial of this case from a local bridge builder with an excellent reputation for quality work, Wayne B. Baker, Tin Cup Enterprises, LLC, established that the cost in 2005 to construct two replacement bridges over Sweetwater Creek, including preparing their approaches, would be $101,348.00. The cost in 2000 was estimated to be $85,000. (Pl.'s Ex. 68; Tr. 2888-2918.)

Following the closure of Forest Service Road 423 in April of 2001, Mr. Mummery had a number of discussions about the situation with the District Ranger, Mr. Larson. Mr. Mummery also contacted the Wyoming Congressional Delegation in an attempt to reach a solution. The Shoshone National Forest officials, including Ms. Aus and Mr. Larson met with field representatives of the congressional delegation. The discussions covered several possibilities such as the revocation of Sweetwater's permit in the public interest, a conservation buyer, and voluntary relinquishment of the permit. The Forest Service agreed to pursue an appraisal of the property. Also discussed between Mr. Larson and Mr. Mummery was the possibility of changing the lodge to a wilderness lodge experience where access would be by horseback. Mr. Mummery promptly rejected this possibility after obtaining a message from his bank, that without access to the lodge by vehicle, including emergency vehicles, the assets (buildings and improvements) would be uninsurable and valueless as collateral. (Pl.'s Ex. 32.) Mr. Mummery also stated he had no intention of relinquishing The Sweetwater permit except upon the payment of compensation and, in this regard, was in favor of a termination of the permit in the public interest.

Jennifer Watson was assigned the task of arranging for an appraisal of The Sweetwater Lodge property and contacted Mark S. Sonderby, ARA, SRA, Forest Service Review Appraiser, for this work. The appraisal was to provide information to be used in an evaluation of permit termination compensation or, perhaps, to obtain the sum needed for any special appropriation which might be proposed for action by the congressional delegation.

On August 16, 2001, after a conference with the Office of General Counsel, Gary Reynolds, Ms. Watson's supervisor, sent a message to Mr. Sonderby stating, in part, "please STOP working on this project as our Forest Supervisor has decided not to appraise. The main problem with appraisal is that we have no way to finance a purchase of the improvements." (Pl.'s Ex. 34.) No appraisal was accomplished.

In October of 2001, the Forest Service Regional Office in Denver, Colorado requested a status or action plan on the structurally deficient bridges in the Shoshone National Forest, including the two Sweetwater bridges. The Region stated that it wished to include one or more per year of the Shoshone deficient bridges in a program of work over the next five years. Thomas Koenig promptly responded that none of the Sweetwater bridges should be programmed for replacement with Forest Service Funds. Mr. Koenig's response (Pl.'s Ex. 35) stated (in relevant part):

> All three Sweetwater bridges are currently closed to vehicle traffic. We want to convert 423-1-0.2 to a trail bridge and remove bridges 423-1-2.5 and 423-1-3.0. Legal issues remain to be settled with the Sweetwater lodge permit holder before the bridges are removed and the road closed. Bridge 423-1-0.2 is in very good shape. The reason that it rates out so low is that it is a trail bridge that was installed on a road (I have no idea why).

On December 21, 2001, the Forest Supervisor, Ms. Aus, sent a Notice of Non-Compliance and Opportunity to Cure to The Sweetwater. Ms. Aus noted that the Term Permit under which The Sweetwater operates, requires its operation as a public resort for a minimum of 93 days each year. Ms. Aus noted that except for 1995 and 1996, "the lodge has not provided any public services." (Jt. Ex. 21.) Ms. Aus stated that ". . . the Forest Service has not accepted the responsibility to provide access. Access remains your responsibility." (*Id.*)

The Sweetwater was warned that revocation of its permit was possible and to preclude this, a plan of operation of the lodge as a public resort with adequate access for at least 93 days per year was requested. On May 1, 2002, The Sweetwater submitted an operating plan which proposed a significant expansion of the permitted area and activities. By letter, dated May 28, 2002, The Sweetwater submitted to Rebecca Aus a claim for over $2,500,000, under the provisions of the Contract Disputes Act, 41 U.S.C. § 601 *et seq*., comprising out-of-pocket costs and lost profits related to the 1997 operating season and thereafter and including the replacement cost of the lodge assets. By letter, dated July 16, 2002, a Forest Service official, signing for Ms. Aus, responded to The Sweetwater's proposed expanded operating plan by noting that it would require proceedings under the National Environmental Policy Act ("NEPA"). The response addressed crossing Sweetwater Creek with the two proposed options. The first option was the construction of fords in fiscal year 2003. The second option was funding bridges under the Capital Investment Program under which the Forest Service would agree to insure that the reconstruction would be at the top of the Forest's request for funds. Both options were conditioned on The Sweetwater waiving all current, and future, claims for damages. By letter, dated July 22, 2002, Ms. Aus responded to The Sweetwater's Contract Disputes Act claim denying that the permit governing The Sweetwater's operations is a contract, and asserting that no obligation to pay money damages in connection with disputes exists. This litigation then ensued.

## DISCUSSION

Were it not for the existence of clause 15 in the 20-year Term Permit executed by the Acting Forest Supervisor and The Sweetwater on August 21, 1995, the facts established in this litigation would support a conclusion that authorized Forest Service actions resulted in a taking of The Sweetwater's improvements, located on the 15.4-acre site at the terminus of Forest Service Road 423, which would require the payment of just compensation by the United States.

The Sweetwater Term Permit restricted activity on the site it covers to the operation of a "public resort." The evidence submitted in this litigation established that a public resort could only be viably operated on the site covered by the permit if there was access to the site by vehicles driven by the public. For the required crossings of Sweetwater Creek, bridges were needed and utilized by the public for access to the site covered by the permit. In the event of a bridge washout, fords could

be used on a temporary basis to gain access to the site pending bridge repair or replacement, but a public resort could not be viably operated on the site using fords to cross Sweetwater Creek on a permanent basis. At the time the Term Permit for the site was executed by The Sweetwater and the Forest Service, thereby superseding the Brannons' permit, all parties were aware that bridge access for the public over Sweetwater Creek had been the mode of operation for this public resort. Even under the Brannons' operation of the site, when there was a Memorandum of Understanding as to road maintenance in effect between the Brannons and the Forest Service, the Forest Service assumed responsibility for the Sweetwater bridges. In 1992, before the Brannons' permit for the site was superseded by The Sweetwater's, the Forest sought appropriated funds to replace the two Sweetwater bridges with no contribution from the Brannons contemplated. After The Sweetwater held the permit, the Forest continued to seek and actually obtained, but then rejected, appropriated funds sufficient to replace the two Sweetwater bridges, with no contribution from The Sweetwater contemplated.

Accordingly, the Forest Service determination in April of 2001 to close the Sweetwater bridges, coupled with the determination not to fund their replacement and most likely, instead, to remove the bridges, and turn Road 423 into a trail, effectively stranded The Sweetwater's investment in the permit site improvements. There existed no feasible way that The Sweetwater could thereafter recover its investment by the operation of a public resort on the permit site during the remainder of its 20-year term – the only activity allowed and required by the permit. The Wanda Smith and Sutherland truncated sales attempts demonstrated that the assets on the site were simply not salable without adequate access to them by vehicle.

The buildings and site improvements in which The Sweetwater invested cannot be removed from the site and at the end of the permit term would remain and become Forest Service property. If the buildings are then destroyed and the site restored, this may well occur at plaintiff's expense, as provided by clauses 11 and 39 of the permit.

In resolving whether, absent clause 15 considerations, the Forest Service actions to close the Sweetwater bridges and not fund their replacement would result in a taking of The Sweetwater's assets on the permit site, the inability of The Sweetwater thereafter to recoup its investment, or better, is relevant. *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1363 (Fed. Cir. 2001). As the permit allows only the operation of a public resort and the elimination of the bridges to the site

precludes a viable operation of a public resort, The Sweetwater has no means to recover its investment or, in fact, to recover its daily expenses, or the expenses it may incur to demolish the improvements and restore the site. This consequence of Forest Service bridge elimination action points to a taking.

Also, as stated in *Armijo v. United States*, 229 Ct. Cl. 34, 37, 663 F.2d 90, 93 (1981), "[t]here are two well recognized situations where the government will be held to take without any formal expropriation or physical invasion. One is the actual cutting off of access." *See White Sands Ranchers of New Mexico v. United States*, 14 Cl. Ct. 559 (1988). The Forest Service decisions to close the bridges and not to fund their replacement cut off all access to the permit site that was required to operate a public resort, the only activity allowed and required. This action points to the existence of a taking. *See Bydlon v. United States*, 146 Ct. Cl. 764, 175 F. Supp. 891 (1959) (banning access by air, a way of necessity, to remote resort); *Drakes Bay Land Co. v. United States*, 191 Ct. Cl. 389, 424 F.2d 574 (1970) (acquisition of land across only feasible access route); *Pete v. United States*, 209 Ct. Cl. 270, 531 F.2d 1018 (1976) (taking of land necessary to the operation of cabin barges on land-locked lake); *Laney v. United States*, 228 Ct. Cl. 519, 525, 661 F.2d 145, 149 (1981) (blocking access to an island).

Citing cases such as *American Pelagic Fishing Co. L.P. v. United States*, 379 F.3d 1363 (Fed. Cir. 2004) defendant asserts that plaintiff possessed no property interest in either the permit or, the operation of lodge and improvements on Forest land, and as a result no taking could occur from Forest Service actions. The situation involved with The Sweetwater is not similar to that of American Pelagic. In *American Pelagic*, it was held that by acquiring title to the Atlantic Star, a fishing vessel, American Pelagic did not acquire the right to fish for Atlantic mackerel in the Exclusive Economic Zone and thus did not possess the property right that it asserted formed the basis for its taking claim. In The Sweetwater situation there is no question that The Sweetwater possesses a property right in the improvements on the 15.4-acre, government-owned site covered by the permit. Clause 12 of the permit expressly permits a sale of the site improvements and the action to be taken with respect to a permit upon a transfer of ownership. Clause 15 requires that compensation be paid if the Forest Service terminates the permit in the public interest. Clause 14 of the permit conditions revocation of the permit "upon breach of any of the conditions herein." Under clause 11 of the permit the improvements, if not demolished, eventually become the property of the United States and the site must be restored. In

*American Pelagic* and similar cases, there is no assertion that the government caused inability to carry out a viable operation under the permit involved can result in ownership by the United States of the assets involved, together with a financial obligation to pay for their destruction. *American Pelagic* does not address the situation faced by The Sweetwater and does not support the government's argument that no taking is possible.

However, in the circumstance where a factual situation can arguably support a taking claim, but is also covered by a provision in a document agreed to by the parties, it is generally held that the parties' agreement forms the basis for the claim. *Castle v. United States*, 301 F.3d 1328, 1342 (Fed. Cir. 2002); *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001); *Sun Oil Co. v. United States*, 215 Ct. Cl. 716, 770, 572 F.2d 786, 818 (1978). The same situation controls when the parties enter into an agreement which substitutes a compensation provision for a circumstance which would, otherwise, give rise to a breach of contract claim. *See Gen. Builders Supply Co., Inc. v. United States*, 187 Ct. Cl. 477, 409 F. 2d 246 (1969); *G. C. Casebolt Co. v. United States*, 190 Ct. Cl. 783, 786, 421 F.2d 710, 712 (1970).

Clause 15 of the Sweetwater permit provides that if, during its term, the Forest Service terminates the permit in the public interest, "the United States shall be obligated to pay an equitable consideration for the improvements. . . ." The clause provides for the amount of the consideration to be fixed by mutual agreement and if agreement cannot be reached for the Forest Service to determine the amount, subject to an appeal by The Sweetwater if it is dissatisfied with the amount determined. While the Forest Service at no time issued a formal determination of permit termination, the actions taken by authorized officials, including the Forest Supervisor, to eliminate the Sweetwater bridges, in the public interest, thereby precluding the viable operation of a public resort on the site, had the same effect as a formal termination determination. The circumstance that the termination of the permit for a public resort was accomplished by actions to eliminate needed access, rather than by a formal document, should have no bearing on a resulting obligation of Forest Service to pay an equitable consideration for The Sweetwater's improvements. *See Wetsel-Oviatt Lumber Co., Inc. v. United States*, 38 Fed. Cl. 563, 569 (1997); *Best Foam Fabricators Inc. v. United States,* 38 Fed. Cl. 627, 638 (1997). This termination remedy was agreed to by the parties when the permit was executed in 1995 and, thus, supersedes any remedy The Sweetwater may otherwise have for

denial of needed access on a taking theory. While the Forest Service took initial steps to obtain an appraisal of the site improvements which could be used for clause 15 purposes; the appraisal work was stopped after consultation with counsel and no determination of an equitable consideration amount was made. The action of the Forest Service in deciding not to determine an amount for clause 15 compensation which The Sweetwater could then accept or appeal, if not satisfied, served to eliminate any possibility for an administrative resolution of the controversy and judicial review thereof.

In arguing against any compensation, the government asserts the Forest Service had a right to revoke The Sweetwater permit because prior to the bridge closings, particularly in 1996, The Sweetwater did not operate the site as a public resort and also failed to notify the Forest Service of the transactions with Carl Bixby. The Sweetwater blames the absence of public use in 1996 on the failure of Mr. Bixby to market the resort, although it was open to the public for guests. As for notice to the Forest Service, clause 51 of the permit requires notification, "when a sale and transfer in ownership of the permitted improvements is planned." The Sweetwater-Bixby transaction was for a sale of the ownership of The Sweetwater. The Sweetwater would continue to own the improvements. Clause 52 requires notification of change in The Sweetwater's ownership, but "within fifteen (15) days of the . . . changes." The Bixby deal never closed. Undoubtedly it would be better practice to keep the Forest Service informed as to all contemplated transactions, but the permit did not require a notice concerning the Bixby transactions, and the failure to notify the Forest Service does not provide a valid basis upon which to revoke the permit and deny termination compensation. Moreover, Forest Service Regulations, 36 C.F.R. § 251.60(e), require prior notice to the permittee and an opportunity to cure prior to revocation action. During this period of time, the Forest Service, because of Yellowstone Highway construction, did not require The Sweetwater to operate and did not provide any notice of proposed revocation of the permit for failure to operate.

Having determined that The Sweetwater permit was terminated by Forest Service actions, effective in April of 2001, and that no valid grounds existed for prior revocation of the permit, the next task is to determine the equitable consideration amount due The Sweetwater.

In the unpublished order denying summary judgment motions in this matter, filed December 30, 2004, it was stated at *slip op.* at 11, that "[a]dopting the analysis

set forth in *Son Broadcasting, Inc. v. United States*, 52 Fed. Cl. 815 (2002), it is concluded that the August 21, 1995 SUP is sufficiently contractual in nature to support jurisdiction in this court, pursuant to 28 U.S.C. § 1491, over monetary claims based on its terms." Plaintiff has set forth "breach of contract" claims based on asserted Forest Service misrepresentations, superior knowledge, and hindrance of contract performance. A claim is also made for Permit Clause 15 compensation. The misrepresentations and superior knowledge assertions are based mainly on the Forest Service's knowledge of, and limited representations concerning, the condition of the Sweetwater bridges in 1995, as compared with the expanded disclosures made to the Sutherlands in 1997. When the government has superior knowledge it cannot remain silent with impunity. *Hardeman-Monier-Hutcherson v. United States*, 198 Ct. Cl. 472, 475, 458 F.2d 1364, 1372 (1972).

The facts in the instant case demonstrate that, when asked, the Forest Service provided full information to prospective purchasers of site improvements. This occurred with Wanda Smith and with the Sutherlands. Mr. Mummery was sufficiently aware of bridge conditions to discuss the access issue at his pre-permit meeting with the Forest Service in June of 1995, but did not then seek access to the Forest Service bridge records. There is every reason to assume that had access to these records been requested they would have been made available, unlike the situation in *Hardeman-Monier-Hutcherson*. Also, at the 1995 meeting Mr. Mummery agreed that fords could be used on a temporary basis, until replacement funds could be obtained, if the Sweetwater bridges failed. The time needed by the Forest to gain funds was estimated to approach 3 years. The Forest Service did proceed to seek bridge replacement funds in 1996 and obtained them in 2000. The change of Forest administration in 1996 brought forward active opposition to the use of funds for Sweetwater bridge replacement which resulted in the rejection of available funds in 2000 and the bridge closure in 2001. Thus, until the funds were rejected and the bridges closed there was no active Forest Service hindrance with The Sweetwater's performance. The Sweetwater's decision not to operate after 1996 was not opposed until December of 2001.

Accordingly, if it is concluded that The Sweetwater's permit comprises a contract on which a cause of action for its breach can be grounded, The Sweetwater has not established that the permit was breached prior to the Forest Service actions resulting in permit termination.

In resolving the amount of compensation due for the permit termination an initial issue is whether the Contract Disputes Act, 41 U.S.C. § 601, *et seq*., is applicable to plaintiff's compensation claim. If the claim was correctly brought under this Act, the recovery would include interest , measured from the receipt of the claim by the contracting officer. 41 U.S.C. § 611. The Contract Disputes Act applies to any executive agency express or implied contract for the procurement of services. 41 U.S.C. § 602(a)(2). The question then is whether The Sweetwater Permit is executed for the procurement of services by the Forest Service. A respectable argument can be made that the Forest Service is, by the permit executed by the parties, procuring services from The Sweetwater to provide recreation activity to the public on federal lands. However, the Federal Circuit has expounded a limited application of the term, indicating that the procurement must be for the "direct benefit or use of the Federal Government." *New Era Constr. v. United States*, 890 F.2d 1152, 1157 (Fed. Cir. 1989). If the federal government owned the improvements and the permit involved was for The Sweetwater to operate and maintain them for the government, the Contract Disputes Act would cover The Sweetwater's claim. *Oroville-Tonasket Irrigation Dist. v. United States*, 33 Fed. Cl. 14 (1995). In the present situation, The Sweetwater owns the improvements and the permit requires The Sweetwater to operate a public resort, not to operate the improvements for the direct use of the federal government. Thus, The Sweetwater's claim is not covered by the Contract Disputes Act. This, of course, has no impact on this court's jurisdiction over the claim as the Tucker Act, 28 U.S.C. § 1491, unlike the Contract Disputes Act, is not limited in its contract coverage to only "procurement" contracts. *Wesleyan Co., Inc. v. Francis J. Harvey, Secretary of the Army*, 454 F.3d 1375 (Fed. Cir. 2006).

In resolving the amount of equitable consideration due The Sweetwater, since the termination clause of the permit supersedes a taking claim the sums involved in the two approaches should be somewhat equivalent. For example, compensation under a termination for convenience of the government contract clause is equivalent to the breach of contract claim it supersedes, with the exception of unearned anticipated profit. *John Reiner & Co. v. United States*, 163 Ct. Cl. 381, 393, 325 F.2d 438, 444 (1963). The Sweetwater permit has no express provision for the recovery of interest for a termination. Therefore, interest cannot be added to the amount found to be equitable consideration. *Library of Congress v. Shaw*, 478 U.S. 310 (1986); *California Fed. Bank v. United States*, 395 F.3d 1263, 1273 (Fed. Cir. 2005). The equitable consideration can not be fully equivalent to just compensation awarded on a taking claim, which includes interest for delay in payment, but can comprise the fair

market value of the improvements as of the termination. See *Kirby Forest Indus. v. United States*, 467 U.S. 1, 10 (1984).

At the trial of this case, to assist the court in determining the value of the Sweetwater improvements, each party presented a highly qualified expert witness who had thoroughly investigated the market for the twelve North Fork lodges during the relevant period of time. Plaintiff presented Mr. Que Mangus, a State of Wyoming Certified Real Estate Appraiser, located in Cody, Wyoming with extensive experience appraising North Fork lodges for local financial institutions. Defendant presented John Frome, MAI, ARA, a Wyoming Certified General Appraiser, located in Afton, Wyoming. Both expert witnesses testified that a sales comparison approach presented the best indication of value. This approach involved gathering information on sales of North Fork area lodges operated as public resorts on federal land, comparing those sales to The Sweetwater property, adjusting for differences, and reaching a resulting opinion of value.

In developing his opinion of The Sweetwater's value, Mr. Mangus relied upon three sales for comparison:

(1) Absaroka Lodge, located along the Yellowstone Highway, having seventeen guest cabins, with a sale date of October, 2004 and a sale price of $1,325,000;

(2) Bill Cody Inn, located along the Yellowstone Highway, having a main lodge, eleven guest cabins and a chalet (fourteen units), with a sale date of July, 2004, and a sale price of $1,300,000;

(3) UXU Lodge, located along the Yellowstone Highway, having ten guest cabins, with a sale date of May, 2005, and a sale price of $1,350,000.

In developing his opinion of The Sweetwater value, Mr. Frome used the same Absaroka Lodge and Bill Cody Inn sales but also listed nine other sales including a prior 1996 sale of The Bill Cody Inn for $850,000 and prior Absaroka Lodge sales in 1997 for $1,100,000 and in 2000 for $1,200,000. Mr. Frome also listed The Sweetwater sale in 1995 for $287,500 (five units) and a prior UXU Lodge sale in 1996 for $800,000.

In reaching his opinion that The Sweetwater had a value of $900,000 as of May 4, 2004, subject to a 4% annual downward adjustment to reach a value for an earlier date, Mr. Mangus adjusted the three sale prices he utilized to reflect the different number of housing units in each facility with a view toward obviating the price decrease that occurs for sales having more units. The result of his adjustments produced a range of value between $110,953 to $151,346 per unit. Mr. Mangus placed most weight on the UXU Lodge sale at an adjusted $151,346 per unit but lowered his choice for The Sweetwater to $150,000 per unit, "[b]ecause of the indication from the other two sales. (Pl.'s Ex. 44 at 28.) Mr. Mangus considered The Sweetwater comprised six units by including the chalet and the five cabins.

Mr. Frome did not adjust the per unit sales prices for the differing number of units, but on a time adjusted basis developed a range for comparison of $27,290 to $89,290 per unit. For The Sweetwater value as of January 1, 2000, Mr. Frome's opinion was $67,000 per unit. Mr. Frome considered that there was only five units and this produced an opinion that the value was $335,000, subject to approximately a 3.6% annual adjustment for an earlier or a later value date. Mr. Frome did not originally include the 2005 UXU Lodge sale for $1,350,000 in his calculations, but submitted an updated calculation for a value of The Sweetwater as of June 27, 2005, which did include this sale. Mr. Frome's June 27, 2005 value was $415,000. A close analysis of Mr. Frome's calculations demonstrates that the values reached equate to utilizing the $287,500 sale price for The Sweetwater in 1995, plus an annual market increase of 3.6%.

It is concluded that the approach utilized by Mr. Mangus offers a clearer view of The Sweetwater value. The 1995 sale on which Mr. Frome's calculations appear to be grounded was a distress sale due to the failure of the prior sale to Wanda Smith for $450,000 on which the Brannons had relied to their detriment. The Sweetwater obtained a below market price sale in 1995. However, it is concluded that Mr. Frome did utilize the correct number of units for The Sweetwater in his calculations. For the operation of a public resort in this remote location there is a need for manager's quarters such as the chalet. The chalet is listed as a "manager's residence" in The Sweetwater permit. Thus, The Sweetwater has five guest units, not six. While Mr. Mangus selected the high unit value of $150,000 per unit, based on a comparable UXU Lodge sale, this is compensated for to a degree by a correction in The Sweetwater units he utilized from six to five. According to the approach used by Mr. Mangus, this would support a higher per unit price for The Sweetwater, because of

the decrease in the number of units. Thus, accepting the Mangus figure of $150,000 per unit, the May 5, 2005 value for the five units equals $750,000. Reducing this amount by 4% per annum to 2001, produces a value on the date of permit termination of $637,010.

The determination that The Sweetwater permit was terminated upon the closure of the bridges and their effective elimination by the Forest produces the logical conclusion that The Sweetwater, thereafter, was no longer responsible for maintenance and upkeep on the improvements which cannot be removed and for which the Forest Service must pay equitable consideration. The record evidence shows the expenditures made by The Sweetwater after April 3, 2001. Mr. Mummery testified that legal expenses for this litigation should be eliminated as well as expenses for liquor required to be purchased in order for The Sweetwater to retain its license to serve alcoholic beverages. Mr. Mummery indicated that he retains possession of this supply. (Tr. 366, 393.)

Accordingly, the chart below sets forth the amounts expended by The Sweetwater from April 3, 2001 through December 31, 2004, as shown by the evidence of record.

| | |
|---|---|
| Apr. 3, 2001 - Dec. 31, 2001 | $ 23,716.38 |
| 2002 | $ 37,394.30 |
| 2003 | $ 29,977.00 |
| 2004 | $ 51,458.00 |
| **Total** | $ 142,545.68 |

For the 45-month period involved, The Sweetwater's expenditures averaged $3,167.68 per month. The 45-month period for which records were available, and admitted as evidence, is considered to comprise a sufficient period of time to establish a reasonable expenditure pattern. Thus, in addition to $637,010 for the permit termination as of April 3, 2001, The Sweetwater is entitled to recover, as a part of the equitable consideration, its post-termination expenditures of $142,545.68 from April 3, 2001 to December 31, 2004, plus $3,167.68 each month thereafter until date of judgment. Plaintiff's claims to recover its expenditures prior to April 3, 2001, is

rejected. The Sweetwater's decision not to operate then was not contested by the Forest, but it was not mandated by Forest Service actions. Moreover, the time involved did not exceed the temporary period that Mr. Mummery was informed might be needed to acquire bridge replacement funds, and during which he had agreed to use fords, if bridges were not available. Thus, The Sweetwater's determination not to operate after 1996, may well have been a rational business decision, but not one for which the Forest Service has financial responsibility. Of course, with its permit terminated as of April 3, 2001, The Sweetwater could not be entitled to lost profits thereafter.

## CONCLUSION

For the foregoing reasons it is **ORDERED** that final judgment be **ENTERED** against defendant and in favor of plaintiff for the following amounts and that the judgment be paid under the following conditions:

(a) **$637,010.00**, consisting of equitable consideration for the value of plaintiff's improvements located on the site covered by the permit, executed August 21, 1995, by the Forest Service and The Sweetwater and terminated by the Forest Service, effective April 3, 2001;

(b) **$142,545.68**, consisting of plaintiff's post-termination expenditures through December 31, 2004, also a portion of equitable consideration;

(c) **$3,167.68 per month** for each month after December 31, 2004, until payment of final judgment herein, also a part of equitable consideration consisting of plaintiff's continuing post-termination expenditures; and

(d) that plaintiff may obtain payment of this judgment only upon tender of a deed or other appropriate document, in such form as the Attorney General, or his authorized representative, may deem necessary to assure that the defendant acquires valid ownership

of The Sweetwater's improvements located on the 15.4-acre site covered by the permit. *See Drakes Bay Land Co. v. United States*, 198 Ct. Cl. 506, 509, 542, 459 F.2d 504, 505 (1972).

s/ James F. Merow
James F. Merow
Senior Judge