IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-1795C (Senior Judge Merow) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MOTION FOR RECONSIDERATION OF VARIOUS ISSUES RELATED TO DAMAGES AND REFERENCE TO FACTS NOT ADMITTED IN EVIDENCE**

Pursuant to RCFC 59, plaintiff The Sweetwater, A Wilderness Lodge LLC ("The Sweetwater") respectfully moves for reconsideration of certain specific determinations by the Court in its August 25, 2006 Opinion that pertain to the calculation of damages in the above-captioned matter, as well as the Court's reference to a document which was not admitted as evidence in this case.[1] Cognizant of the high standard applicable to motions for reconsideration, The Sweetwater is raising these issues because they are based on what The Sweetwater believes are mistakes of fact with respect to the evidence submitted in this matter.

In brief summary, The Sweetwater believes the evidence (specifically, Mr. Mangus' report which the Court largely accepted) shows that the Court used an incorrect "per unit value" for The Sweetwater lodge if in fact the lodge is deemed to be a five-unit lodge and not a six-unit lodge. In addition, certain expenditures which otherwise appear to fall within the Court's determination of qualifying expenses appear to have been omitted from the Court's calculation

[1] This motion, which is being submitted within 10 days of the Court's Opinion not including weekends and holidays, is timely.

and certain expenses which the Court intended to omit have been inadvertently included in the award.

Further, the evidence demonstrates as a factual matter that the parties would have been required to mutually arrive at an agreement for payment of "equitable consideration" under clause 15 of the Term Special Use Permit and the evidence supports the fact that The Sweetwater would not have allowed the Forest Service to make payment of a fixed amount for the lodge value whenever it determined to do so, but in fact would have included a provision that the Forest Service pay the appropriate fair market value as of the date of payment. Finally, the Court in its opinion quotes from a document allegedly included in The Sweetwater's permit application which was not admitted as evidence and which the parties had agreed was not part of that permit application. Importantly, this confusion appears to have caused the Court to arrive at its determination that lost profits were not appropriate between the period when lodge operations were closed (1997) and the bridges to the lodge were locked (2001).

As this Court has held, "[r]econsideration of the court's determination 'must be based 'upon manifest error of law, or mistake of fact, and is not intended to give an unhappy litigant an additional chance to sway the court.''" *Keeton Corrections, Inc. v. United States*, 60 Fed. Cl. 251, 253 (Fed. Cl. 2004); *see First Commerce Corp. v. United States*, 63 Fed. Cl. 627, 632 (Fed. Cl. 2005). The movant must demonstrate that the motion is necessary to prevent manifest injustice. *Keeton*, 60 Fed. Cl. at 253. The Sweetwater believes the issues it raises below justify reconsideration under the standard set forth above.

*A. Per Unit Value Used To Calculate Lodge Value*

The Sweetwater respectfully believes that the evidence which the Court accepted and relied

upon for its calculation of the lodge value conclusively shows that the Court inadvertently used an incorrect "per unit value" for the lodge when it determined that the lodge effectively had only five (5) units. While the Court found that the lodge was a five-unit lodge, the Court then used a "per unit value" (*i.e.*, $150,000) that was applicable to a six-unit lodge. Opinion at 33-34. The Court concluded that the appraisal analysis by The Sweetwater's expert, Mr. Mangus, was correct but for his consideration of The Sweetwater as having six (6) units, and the Court concluded that the appropriate number of units was five (5). *Id*. at 33. The Court then completed a calculation of the lodge value by using the "per unit value" multiplied by five (5) rather than six (6).

However, Mr. Mangus' report demonstrated that each of the remaining unit's per unit value should have been *increased* by $7,993.64 for each unit taken out of a lodge value calculation. In other words, the per unit value goes up when the number of units goes down, even though the total lodge value decreases. *See* Opinion at 33; PPFUF ¶ 223; Tr. 2841:5-2842:14; PX 63; Tr. 2847:5-2818:2; PX 64. Furthermore, as The Sweetwater noted in its proposed findings of fact at ¶ 223, the data used by the government's expert reflected this same trend when inapplicable sales were removed from his data. *See* Tr. 2841:5-2842:14; PX 63; Tr. 2847:5-2818:2; PX 64.

Therefore, because the Court has determined that The Sweetwater lodge has only five (5) units instead of six (6) units, the correct per unit value as of May 5, 2005 was $157,993.64, rather than the $150,000 value established solely for six (6) unit lodges and used by the Court in calculating the appropriate six (6) unit lodge value. Opinion at 34. Accepting the Mangus figure of $157,993.64 per unit, the May 5, 2005 value for the five (5) units equals $789,968.20. If the Court were to reduce this value by 4% per annum to April 3, 2001, it produces a value on the

date of the permit termination of $673,024.71.[2]

B *Date of appropriate fair market value to ensure "equitable consideration"*

The Sweetwater respectfully believes that, in light of the specific circumstances of this case, the Court's use of the fair market value of The Sweetwater lodge facilities as of April 3, 2001 as constituting the maximum amount of "equitable consideration" that should be paid was in error. While The Sweetwater does not object to the Court's determination that termination effectively occurred on April 3, 2001, The Sweetwater believes that the proper interpretation of clause 15 is that the payment made should reflect the fair market value *at the time of payment* in order to effectuate the parties' mutual contractual agreement that such payment be arrived at by mutual agreement and that it be equitable. Otherwise, by allowing the Forest Service to unilaterally determine the time of its payment of a *fixed* amount, the payment would not constitute "equitable consideration" and thus would not meet the clear agreement between the parties.

As the Court noted, clause 15 determines the method by which any payment to The Sweetwater will be established, and that clause supercedes any other otherwise applicable authorities such as Article 5 of the constitution. Opinion at 28. Notably, clause 15 of the Term Special Use Permit does not explicitly state that the equitable consideration value, such as fair market value, shall be set *as of the time of termination*. Opinion at 14. Instead, the clause explicitly states that the amount of "equitable consideration" will be subject to negotiations

[2] This value was determined by dividing the May 5, 2005 value of $789,968.20 by 1.04 to reflect the 4% annual adjustment in order to arrive at the value of the lodge as of May 5, 2004. This same formula was then used three more times to arrive at the value of the lodge as of May 5, 2001. This resulting value was then divided by 1.00333 to reflect the adjustment for the one month period April 3-May 5, 2001 (.04/12= 1.00333). The final figure is $673,024.71.

between the parties and must be arrived at by mutual agreement. *Id*. If the Forest Service had properly invoked clause 15 back on April 3, 2001 and stated, as part of the parties' explicitly required negotiations, that it would not actually make payment of the then fair market value until five and one-half (5 ½) years later, we believe the Court would agree given the evidence produced at trial and Mr. Mummery's testimony that it is unreasonable to conclude that The Sweetwater would have accepted those terms in the negotiations. (However, the Forest Service's failure to properly invoke clause 15 precluded these negotiations from actually occurring.)[3]

What the evidence produced in this matter shows is that The Sweetwater would have accepted that the Forest Service pay the fair market value *as of the date it made payment*, given the well-established rising market values of the lodges on the North Fork as agreed to by defendant's expert. For example (and as the overall evidence in this case supports), The Sweetwater likely would have agreed to payment of the April 3, 2001 fair market value, subject to a 4% annual increase in that value from 2001 until payment was made. This 4% annual increase was recognized by the Court as the appropriate level of change in the market place based on the testimony of Mr. Mangus, who is a highly regarded appraiser in the Cody area. Opinion at 34.[4]

For this reason, we respectfully believe the Court's opinion should have recognized that, in order to properly implement the term "equitable consideration" as used in the Term Special Use Permit and determine what the parties would have agreed to pursuant to the contract-

[3]We respectfully submit that no reasonable party would accept an arrangement by which it agreed to be paid a fixed amount at some point in the future to be determined by the paying party. Nor do we believe that such an arrangement has any basis in principles of equity, and thus is not consistent with the contractual obligation to provide "equitable consideration."

[4] The 4% figure in no way constitutes an interest rate. It is based on the actual change in the real estate market in the North Fork. It was also generally supported by the government's expert, whose data showed a 3.6% annual increase in those property values. Opinion at 38.

mandated negotiations, the fair market value of the lodge should be assessed in light of the rising market values for lodges in the area. Given the Court's other findings, it would be appropriate to do so by using the April 3, 2001 amended value of $673,204.71 with a 4% annual increase until payment was made to reflect the actual changes in the marketplace.

Pursuant to this argument, The Sweetwater is still entitled to its post-termination expenses which were incurred from April 3, 2001 to payment because those investments were directly caused by The Sweetwater having to hold and maintain the lodge, which the Forest Service will now acquire and will have the benefit of using (or selling) as it chooses. It is patently clear from the circumstances and evidence in this matter that, until the Court ruling of August 25, 2006, The Sweetwater had absolutely no choice other than to bear the costs, responsibilities, risks and associated liability for the permit area and improvements. Because the Forest Service was in total control of if or when it wanted to make payment until this Court's ruling, The Sweetwater's burden was solely caused by the Forest Service's failure to properly exercise clause 15 and furthermore disregard numerous requests by The Sweetwater to do so. The methodology set forth above ensures that such payment is truly "equitable consideration," as was agreed to and mandated by the clause in the agreement between the parties. Any other conclusion, especially in light of the *Forest Service's* failure to properly invoke clause 15 in a timely manner, would result in manifest injustice. As the Court held, the Forest Service failed to comply with its obligation to pay The Sweetwater under clause 15 as of the termination and had the Forest Service exercised clause 15 in a timely manner, The Sweetwater would have received the lodge value on April 3, 2001 and it would not have incurred any of its expenditures for the lodge thereafter. Thus, this compensation clearly consists of equitable consideration, and The

Sweetwater is clearly entitled to be compensated for these post-termination expenditures as well as for the market value as of the date of payment.

C. *The Court's calculation of The Sweetwater's post-termination expenditures for the years 2001, 2002 and 2004 appears to contain clerical errors which favor The Sweetwater in 2004 and the government in 2001 and 2002.*

Pursuant to its determination that The Sweetwater was entitled to certain post-termination expenditures, the Court calculated those expenditures based on The Sweetwater's total expenditure's set forth at PX 42 and its corporate records set forth at PX 43. Opinion at 34. The Court's stated intent was to include all eligible expenses except for litigation costs and expenditures for the purchase of liquor. *Id.* Applying this same standard to The Sweetwater's expenditures as set forth in PX 43 and as shown in further detail below, The Sweetwater respectfully believes that the Court's calculations incorrectly understated those reimbursable expenditures by a total of $15,222.75 for the years 2001 and $4,678.12 for the year 2002, while at the same time it *overstated* those compensable expenditures by $13,831.10 for the year 2004. The net result is an overall increase in The Sweetwater's reimbursable expenditures of $6,132.03.[5]

The Court determined that The Sweetwater's eligible expenditures for the period April 3-December 31, 2001 totaled $23,716.38. Opinion at 34. The Court appears to have calculated this amount by adding up the checks listed on The Sweetwater's 201 Transaction Listing which

[5] While this total difference is not of an overly large magnitude, we are noting it at this point because this correction is very significant to the accuracy of The Sweetwater's intended request for attorneys' fees pursuant to the Equal Access to Justice Act. As explained below, the Court inadvertently included $13,831.10 of litigation costs in The Sweetwater's 2004 expenditure calculation. This result was largely due to the fact that these expenditures were not clearly recognizable in The Sweetwater's financial ledgers as litigation costs. The Sweetwater is raising this issue as part of its continuing effort to be fully candid with the Court.

were drawn on The Sweetwater's account between April 4-December 31, 2001, except for two checks payable to the Wyoming Liquor Commission, which were for $220.32 and $1,245.59. PX 43 at TS 2159. This calculation leads to the exact amount set out in the Court's Opinion. However, this calculation omits several expenditures which were not paid by check, but which were listed in the Transaction Listing. These expenditures, which the Court included in its calculation of expenditures in 2002, 2003 and 2004, were annual costs for bank services, depreciation, amortization, loans fees, and management fees. PX 43 at TS 2158. Because these were annual fees, they admittedly should be prorated to reflect the April 4-December 31, 2001 period, which results in them being recoverable at 75% (*i.e.*, 9 out of 12 months). As shown on Attachment A (PX 43 at TS 2158), these costs included $90 for bank services, $8,980.50 for depreciation, $1,652.25 for amortization and loan fees, and $4,500 for management fees. These additional expenditures total $15,222.75. Thus, adding the additional expenditure of $15,222.75 to the total found by the Court of $23,176.38 brings the corrected total for 2001 expenditures to $38,939.13.

As to the year 2002, the Court determined that The Sweetwater's total expenditures for 2002, including litigation expenses and liquor purchases, were $98,788. PX 42. By then using The Sweetwater's General Ledger (PX 43 at 200073-200077), the Court appears to have deducted from this total annual expenditures which the Court determined were expenses for litigation costs and liquor purchases. While The Sweetwater agrees with the Court's apparent deductions for litigation costs in 2002,[6] The Sweetwater believes that, in arriving at the total

[6] As shown at PX 43, p. 200075, these litigation expenses totaled $53,540.58. *See* Att. B hereto (marked up copy of PX 43). This total is comprised of separate entries for $23,780, $5,020, $13,578.33, $3,000, $706.80, and $7,455.45 paid to Saltman & Stevens. *Id*. at 200075.

amount of expenditures owed as compensation to The Sweetwater, the Court incorrectly counted two entries for $2,339.06 for liquor purchases. *See* Att. B (PX 43 at p. 200075, 20076.[7]

The incorrect deduction for liquor purchases was apparently due to the fact that, in calculating the total expenditures of $98,788 as represented in PX 42, the Court did not recognize that no liquor costs had been included in that total. PX 42 (attached hereto as Att. C). In making its deduction, the Court was reviewing a year-end income entry for liquor of $2,339.06 (PX 43 at 200075, entry dated 12/31/02 and marked as "Other Income") as well as another entry for the actual purchase of that same liquor on August 6, 2002. Att. B (PX 43 at 200076). However, the first entry reflects a payment by a charitable organization for liquor which The Sweetwater provided to it at the cost price of $2,339.06. Att. B (PX 43 at 200075). The second entry is for the $2,339.06 check which The Sweetwater wrote to pay for the liquor. Att. B (PX 43 at 200076). Because this expenditure was never included as part of The Sweetwater's costs as set forth in PX 42, it should not have been deducted at all from The Sweetwater's expenditures for that year. Thus, the result of these two incorrect deductions was to reduce The Sweetwater's expenditures for 2002 by $4,678.12 (2 x $2,339.06 = $4,678.12). When these corrections are made, the expenditures in 2002 are increased from $37,394.30 to $42,072.42.

As to the year 2004 and as part of its continuing candidness with the Court, The Sweetwater also believes that the Court incorrectly *credited* The Sweetwater with litigation costs as part of the expenditures it awarded to The Sweetwater for 2004. While The Sweetwater

---

[7] When the total amount of expenditures ($98,788)(PX 42) is reduced by the litigation costs of $53,540.58 as well as the double-counting of the liquor purchases ($2,339.06 + $2,339.06 = $4,678.12) and the deductions for liquor license fees ($3,175), the result is the exact figure reached by the Court in its Opinion, *i.e.*, $37,394.30.

intends to seek these costs in its EAJA application, it is of the belief that these litigation costs cannot properly be included as reimbursable expenditures under its contract claim. These costs totaled $13,831.10 and consisted of the following entries: a payment of $4,512.30 to Javernich & Stenstrom; a payment of $9,000 to Big Sky Reporting and another payment of $318.80 to Javernich & Stenstrom. PX 43 at 200019. (Attached hereto as Att. D). These payments were for deposition transcripts in the present litigation. When these costs are removed from the total expenditures awarded to The Sweetwater for 2004, that amount is reduced from $51,458 to $37,626.90.

Therefore, The Sweetwater believes that the correct total for reimbursable expenditures is as follows:

| | |
|---|---|
| Apr. 3, 2001- Dec. 31, 2001 | $ 38,939.13 |
| 2002 | $ 42,072.42 |
| 2003 | $ 29,977.00 |
| 2004 | $ 37,626.90 |
| **Total** | $ 148,615.45 |

Using the exact same methodology adopted by the Court for calculating the per month rate for continuing expenditures (Opinion at 34), The Sweetwater's expenditures for the 45 month period were $148,615.45 and therefore the appropriate per month rate for expenditures is $ 3,302.57 for each month after December 31, 2004.

D. *Due in part to a mistaken reference in the Court's opinion to a document as being part of The Sweetwater's permit application when the document was not admitted in evidence, the Court incorrectly denied The Sweetwater its lost profits from 1997-2001.*

In its Opinion, the Court set forth a lengthy entry from a document which states that "the Lodge" was interested in improving the two bridges leading to the lodge, and the Court identified

the document as part of The Sweetwater's permit application in 1995. Opinion at 12. The trial transcript shows that this determination was an error. The government had attempted to admit the document at issue as evidence in this case as Defendant's Exhibit 19. However, as the trial transcript demonstrates and the government conceded, the pages at issue were not part of The Sweetwater's permit application. Att. D (Trial Transcript at pp. 485-488). In fact, when counsel for The Sweetwater pointed this out at the trial, counsel for the government agreed that the pages should not have been attached to The Sweetwater's permit application and withdrew its request to admit the pages. At. D (Trial Transcript at p. 487). As a result, the pages were never admitted into evidence. *See* Att. D (Trial Transcript at 488).[8]

(To the extent relevant and if there is a need to reopen the record on this issue, The Sweetwater makes an offer of proof that, as Mr. Mummery testified in his deposition and as Ms. Jennifer Watson of the Forest Service confirmed, the pages at issue were prepared by the Forest Service and/or another lodge owner, and were not in any way prepared by or part of The Sweetwater's application, and should not have been attached to The Sweetwater's permit application.)

Due in part to the government's misleading exhibit, The Sweetwater respectfully believes that the Court erred in two directly related factual findings. This error led to a manifest injustice to The Sweetwater. The Court noted that "[t]he facts in the case demonstrate that when asked, the Forest Service provided full information to prospective purchasers of site improvements" and

---

[8] Ironically, The Sweetwater's counsel stated in making his objection at the trial that, given the government's misleading attachment of additional pages to the actual permit application, he "would hate to have the Court go back and look at this document and forget that in fact the attachments were not part of this application." Att. D (Trial Transcript at 488, l. 8-11). While this is what in fact subsequently occurred, The Sweetwater nonetheless fully understands the circumstances leading to this error given the voluminous record which was produced in this matter.

that "Mr. Mummery [] did not seek access to the Forest Service bridge records." Opinion at 30. However, the facts show that (1) the Forest Service provided full information to all potential permittees *except for* The Sweetwater, and that (2) the Acting Forest Supervisor admitted that he represented to Mr. Mummery that the Forest Service had produced all bridge records for Mr. Mummery's review. Thus, Mr. Mummery had *no reasonable basis* to seek further documents.

As The Sweetwater set forth in its proposed findings of fact, relying on the testimony of Mr. Rossman:

> 49. One of the purposes of the meeting was for the Forest Service to provide The Sweetwater with a full disclosure as to the condition of the bridges so that The Sweetwater could decide whether to go ahead with the purchase of the lodge. Def. Facts ¶ 50; Tr. 896:5-14; Tr. 914:19-915:21; Tr. 956:8-10. The Forest Service was aware that The Sweetwater was relying on the Forest Service's statements to determine whether or not it should purchase the lodge. Tr. 897:16-17.

In responding to this proposed fact, the government merely asserted that Mr. Rossman was only speaking for *himself* at the meeting. Government Response to PPFF ¶ 49. But as the Court has since found, Mr. Rossman had been delegated authority to sign the Term Special Use Permit as Acting Forest Supervisor and "Mr. Rossman was aware at the June 12, 1995 meeting that he would, on behalf of the Forest Supervisor, subsequently be executing the new Term Special Use Permit for the lodge site with The Sweetwater." Opinion at 9. As the Court also found, "[a]t the June 12, 1995 meeting the existence of the 1992 Bridge Inspection Reports was not disclosed." Opinion at 11 (emphasis added). In fact, Mr. Rossman stated that, if he had known of these bridge documents, he "certainly would have shared that knowledge." Tr. 922:25-923:8; *see* Tr. 923:9-924:11. PPFF ¶ 83 (the government agreed that Mr. Rossman made this statement).

Thus, the evidence clearly shows that the Forest Service intended for Mr. Mummery to believe that he had all relevant documents related to the bridges, and also that Mr. Mummery had no basis to disbelieve these Forest Service representations.[9]

Therefore, The Sweetwater believes that, contrary to the Court's statements in its Opinion, the evidence clearly shows that Mr. Mummery *did* seek access to the Forest Service bridge records, and was intentionally led to believe that all records related to the condition of the bridges had been produced- when in fact they admittedly had not been produced. With all due respect, we believe that it would be unreasonable and manifestly unjust for the Court to require Mr. Mummery not to believe the representations of the Acting Forest Supervisor that all such documents had been produced and inquire further in the face of these representations, when at the time Mr. Mummery had no reason to doubt the credibility of that individual's representations. However, the Court's finding places just such a requirement on Mr. Mummery.

As a direct result of this failure to disclose this information in 1995, The Sweetwater's operations were closed from 1997 (immediately upon this same information finally being released) until the Forest Service terminated the lodge permit in 2001. Opinion at 19. It would be patently unfair to conclude that The Sweetwater should or even could have reasonably operated at this time, given the incredible financial liability (not to mention *moral liability*) which it would have faced had any individuals or families been injured or killed when crossing the bridges. As the Court repeatedly noted in its Opinion, the Forest Service had repeatedly determined that the bridges were *unsafe* and *jeopardized the public safety* and *should be closed*

[9] Moreover, because the government's actions directly caused the lack of operations as of 1997, it is improper to excuse this conduct based on the fact that the parties recognized that, if the bridges became impassable, it may take three years to repair them. In this instance, the *Forest Service*, and not the flow of Sweetwater Creek or any other natural cause, led to the bridges not being usable for lodge operations as of 1997. Justice requires that the Forest Service bear liability for causing The Sweetwater to be placed in this situation.

in the documents which were not revealed to The Sweetwater until 1997. Opinion at 3, 4. Had The Sweetwater continued to invite guests over those bridges after obtaining this information and someone had been killed, it is quite plausible that Mr. Mummery would have been held criminally negligent. To thus hold (in hindsight knowing that the bridges did not physically fail) that Mr. Mummery should have or even could have stayed open after 1997 is simply an unfair determination made only with the benefit of this hindsight. Simply put, no reasonable or moral person would have continued operations in these circumstances. Furthermore, while the Forest Service (which assert that Mr. Mummery should have operated in this period) enjoys sovereign immunity in this area, Mr. Mummery does not.

Based on the foregoing, The Sweetwater believes that the facts clearly demonstrate that the Forest Service is liable for The Sweetwater's lost profits during this period based on its breach of contract due to this failure to disclose these government determinations while at the same time it was purporting to provide The Sweetwater with all relevant information. (And this conduct was only compounded by the entirely misleading 3-ton weight limit sign posted at the bridges). *Hardeman-Monier-Hutcherson v. United States*, 198 Ct. Cl. 472, 475, 458 F.2d 1364, 1372 (1972). The evidence in the case presented by The Sweetwater demonstrated that the annual lost profit amount based on The Sweetwater's operations in 1996 was $34,995 and was based on The Sweetwater's business records for 1996. JX 23; Tr. 405:11-13; PX 43 (TS 2055-TS 2059; TS 2095-TS 2107). Using this annual amount for the period February 1997-April 2001, the total lost profits would be $139,980. The evidence in the case presented by the defendant's own expert demonstrated that these profits would have been $ 37,456 for 2000. DX 62/63. Using this annual amount for the period February 1991-April 2001, the total lost profits

would be even higher! ($149,824). Therefore, depending upon which evidence the Court accepts, the total lost profits to which The Sweetwater is entitled are between $139,980-149,824.

**Conclusion**

For the reasons set forth above, The Sweetwater respectfully requests that the Court grant its motion for reconsideration, and modify its decision in the following manner:

1. The Sweetwater is entitled to payment of the fair market value of the lodge facilities as of April 3, 2001 ($673,042.71) subject to a 4% annual increase in that amount from that date until payment of final judgment herein, to be made in order to reflect the payment of equitable consideration for the lodge facilities;

2. The Sweetwater is entitled to $148,615.45 consisting of The Sweetwater's post-termination expenditures through December 31, 2004, as a portion of equitable consideration;

3. The Sweetwater is entitled to $3,302.57 per month for each month after December 31, 2004 until payment of final judgment herein, also part of equitable consideration; and

4. The Sweetwater is entitled to payment of $149,824 in lost profits between February, 1997 and April 3, 2001.

The Sweetwater further requests that the Court conduct an oral argument on any of the issues discussed above to the extent the Court believes such an argument would be helpful to the resolution of this motion.

Respectfully submitted,

s/Kevin R. Garden

Kevin R. Garden
THE GARDEN LAW FIRM P.C.
301 N. Pitt Street, Suite 325
Alexandria, VA 22314
(703) 535-5565

Dated: September 11, 2006

# The Sweetwater-A Wilderness Lodge LLC
## Transaction Listing

12/31/01

SWEETWATER
Page 1
09/18/03 11:28 AM

| Date | Reference | T | Account | Description | Amount | | Reference Total |
|---|---|---|---|---|---|---|---|
| 12/31/01 | 1 | | 105 | CHECKS WRITTEN | (28,051.89) | | |
| 12/31/01 | 1 | | 284 | CHECKS WRITTEN | (5,159.58) | | (33,211.47) |
| 12/31/01 | 2 | | 105 | DEPOSITS | 28,210.00 | | |
| 12/31/01 | 2 | | 284 | DEPOSITS | (13,750.00) | | |
| 12/31/01 | 2 | | 363 | DEPOSITS | (14,250.00) | | |
| 12/31/01 | 2 | | 716 | DEPOSITS | (210.00) | | |
| 12/31/01 | 3 | | 105 | BANK SERVICE CHARGES | (120.00) | | |
| 12/31/01 | 3 | * | 625 | BANK SERVICE CHARGES | 120.00 | 75% = $90 | |
| 12/31/01 | 4 | | 221 | DEPRECIATION | (5,206.00) | | |
| 12/31/01 | 4 | | 231 | DEPRECIATION | (446.00) | | |
| 12/31/01 | 4 | | 236 | DEPRECIATION | (5,747.00) | | |
| 12/31/01 | 4 | | 251 | DEPRECIATION | (575.00) | | |
| 12/31/01 | 4 | * | 645 | DEPRECIATION | 11,974.00 | 75% = $8,980.50 | |
| 12/31/01 | 5 | | 290 | AMORTIZATION | (1,833.00) | | |
| 12/31/01 | 5 | * | 615 | AMORTIZATION | 1,833.00 | 75% = $1,652.25 | |
| 12/31/01 | 6 | | 292 | LOAN FEES | (370.00) | | |
| 12/31/01 | 6 | * | 615 | LOAN FEES | 370.00 | | |
| 12/31/01 | 7 | | 284 | RECLASSIFY | 17,960.76 | | |
| 12/31/01 | 7 | | 363 | RECLASSIFY | (17,960.76) | | |
| 12/31/01 | 8 | | 362 | To adjust loan | 4.15 | | |
| 12/31/01 | 8 | | 700 | To adjust loan | (4.15) | | |
| 12/31/01 | 9 | | 339 | To adj current portion | (822.96) | | |
| 12/31/01 | 9 | | 369 | To adj current portion | 822.96 | | |
| 12/31/01 | 10 | | 284 | Management fee | (6,000.00) | | |
| 12/31/01 | 10 | * | 719 | Management fee | 6,000.00 | 75% = $4500 | |
| 12/31/01 | 11 | | 284 | Reclassify | 1,117.89 | | |
| 12/31/01 | 11 | | 364 | Reclassify | (1,117.89) | | |
| 12/31/01 | 12 | | 315 | To adj accrued interest | 34.26 | | |
| 12/31/01 | 12 | | 700 | To adj accrued interest | (34.26) | | |
| 01/08/01 | 1725 | | 820 | PPL | 324.39 | | 324.39 |
| 01/08/01 | 1726 | | 820 | KEELE SANITATION | 416.00 | | 416.00 |
| 01/08/01 | 1727 | | 735 | STROUPE PEST | 35.00 | | 35.00 |
| 01/08/01 | 1728 | | 820 | PEGASUS | 90.49 | | 90.49 |
| 01/08/01 | 1729 | | 800 | QWEST | 363.65 | | 363.65 |
| 01/08/01 | 1730 | | 800 | CELL ONE | 134.97 | | 134.97 |
| 01/08/01 | 1731 | | 284 | JCM | 1,500.00 | | 1,500.00 |
| 01/18/01 | 1732 | | 362 | PINNACLE BANK | 355.42 | | |
| 01/18/01 | 1732 | | 700 | PINNACLE BANK | 727.88 | | 1,083.30 |
| 02/08/01 | 1733 | | 800 | CELL ONE | 134.76 | | 134.76 |
| 02/08/01 | 1734 | | 820 | PPL | 316.83 | | 316.83 |
| 02/27/01 | 1735 | | 690 | SAFECO INSURANCE | 524.30 | | 524.30 |
| 02/08/01 | 1736 | | 800 | QWEST | 380.09 | | 380.09 |
| 02/08/01 | 1737 | | 820 | DIRECT TV | 179.18 | | 179.18 |
| 02/08/01 | 1738 | | 760 | RAYES PLUMBING | 63.47 | | 63.47 |
| 02/18/01 | 1739 | | 362 | PINNACLE BANK | 357.94 | | |
| 02/18/01 | 1739 | | 700 | PINNACLE BANK | 725.36 | | 1,083.30 |
| 02/18/01 | 1740 | | 820 | AVISTA COMM | 119.70 | | 119.70 |
| 03/19/01 | 1741 | | 362 | PINNACLE BANK | 360.47 | | |
| 03/19/01 | 1741 | | 700 | PINNACLE BANK | 722.83 | | 1,083.30 |
| 03/19/01 | 1742 | | 820 | PEGASUS | 52.74 | | 52.74 |

PX 43

Att. A

TS 2158

| Date | Reference | T | Description | Beginning Balance | Current Amount | YTD Balance |
|---|---|---|---|---|---|---|
| | 364 Note payable - Mummery (cont.) | | | | | |
| 12/31/02 | 10 | | JCM | | 26,305.47 | |
| 12/31/02 | 11 | | EXPENSES PAID BY JCM | | (1,250.77) | |
| | | | | | (11,273.19) | (12,391.08) |
| | 369 Less current portion - LTD | | | 5,258.12 | | |
| 12/31/02 | 12 | | ADJ CURRENT PORTION | | 310.90 | |
| | | | | | 310.90 | 5,569.02 |
| | 371 Members' equity | | | 43,893.94 | | |
| 12/31/02 | 2 | | ANGLO | | (24,925.00) | |
| 12/31/02 | 10 | | ANGLO | | 25,000.00 | |
| | | | | | 75.00 | 43,968.94 |
| | 485 Other income | | | 0.00 | | |
| 12/31/02 | 2 | | LIQUOR | | (2,339.06) | |
| | | | | * | (2,339.06) | (2,339.06) |
| | 605 Accounting & Legal | | | 0.00 | | |
| 12/31/02 | 3 | | SALTMAN | | 23,780.00 | |
| 12/31/02 | 3 | | SALTMAN | | 5,020.00 | |
| 12/31/02 | 3 | | SALTMAN | | 13,578.33 | |
| 12/31/02 | 11 | | EXPENSES PAID BY JCM | | 225.84 | |
| 12/31/02 | 11 | | EXPENSES PAID BY JCM | | 511.75 | |
| 1/02 | 1804 | | SALTMAN | | 3,000.00 | |
| 01/18/02 | 1811 | | FRANBY ESQ | | 892.92 | |
| 04/10/02 | 1816 | | SIMPSON BERG | | 1,500.00 | |
| 07/01/02 | 1832 | | DAN FRANK ESQ | | 1,000.00 | |
| 09/24/02 | 1851 | | CYNTHIA RANKIN | | 175.00 | |
| 09/24/02 | 1855 | | SALTMAN | | 706.80 | |
| 11/05/02 | 1860 | | CYNTHIA RANKIN | | 100.00 | |
| 12/16/02 | 1865 | | CYNTHIA RANKIN | | 100.00 | |
| 12/24/02 | 1868 | | SALTMAN | | 7,455.45 | |
| | | | | | 58,046.09 | 58,046.09 |
| | 606 Advertising | | | 0.00 | | |
| 05/03/02 | 1826 | | CODY ENTERPRISE | | 161.50 | |
| | | | | | 161.50 | 161.50 |
| | 615 Amortization | | | 0.00 | | |
| 12/31/02 | 7 | | AMORTIZATION | | 1,833.00 | |
| 12/31/02 | 8 | | LOAN FEES | | 62.00 | |
| | | | | | 1,895.00 | 1,895.00 |
| | 625 Bank charges | | | 0.00 | | |
| 12/31/02 | 3 | | LOAN FEE | | 125.00 | |
| 12/31/02 | 4 | | BSC | | 140.00 | |
| 12/31/02 | 9 | | PINNACLE BANK | | 35.00 | |
| | | | | | 300.00 | 300.00 |
| | 630 Business promotion | | | 0.00 | | |

| Date | Reference T | Description | Beginning Balance | Current Amount | YTD Balance |
|---|---|---|---|---|---|
| | **630 Business promotion (cont.)** | | | | |
| 04/27/02 | 1818 | CODY STAMPEDE | | 488.00 | |
| | | | | 488.00 | 488.00 |
| | **645 Depreciation** | | 0.00 | | |
| 12/31/02 | 6 | DEPRECIATION | | 8,871.00 | |
| | | | | 8,871.00 | 8,871.00 |
| | **665 Fees** | | 0.00 | | |
| 12/31/02 | 5 | MANAGEMENT FEE | | 1,930.00 | |
| | | | | 1,930.00 | 1,930.00 |
| | **690 Insurance** | | 0.00 | | |
| 12/31/02 | 11 | EXPENSES PAID BY JCM | | 176.69 | |
| 01/18/02 | 1807 | PREMIUM INS | | 176.69 | |
| 02/04/02 | 1815 | PREMUIM FINANCE | | 176.69 | |
| 07/01/02 | 1836 | MEEKER INS | | 549.75 | |
| 07/18/02 | 1838 | PREMIUM FINANCING | | 199.05 | |
| 08/12/02 | 1842 | PREMIUM FINANCE | | 199.05 | |
| 09/17/02 | 1849 | PREMIUM FINANCE | | 199.05 | |
| 09/24/02 | 1856 | PREMIUM FINANCE | | 199.05 | |
| 11/05/02 | 1861 | PREMIUM FINANCE | | 398.10 | |
| | | | | 2,274.12 | 2,274.12 |
| | **700 Interest** | | 0.00 | | |
| [illegible]/31/02 | 9 | PINNACLE BANK | | 7,158.38 | |
| 12/31/02 | 13 | ADJ ACC INT | | 33.96 | |
| | | | | 7,192.34 | 7,192.34 |
| | **714 Liquor** | | 0.00 | | |
| 08/06/02 | 1839 | WY LIQUOR | | 828.86 | |
| 08/06/02 | 1840 | WY LIQUOR DIV | | 1,510.20 | |
| | | | * | 2,339.06 | 2,339.06 |
| | **719 Management fee** | | 0.00 | | |
| 12/31/02 | 5 | MANAGEMENT FEE | | 6,000.00 | |
| | | | | 6,000.00 | 6,000.00 |
| | **727 Outside services** | | 0.00 | | |
| 09/10/02 | 1847 | HOLM BLOUGH | | 1,252.21 | |
| | | | | 1,252.21 | 1,252.21 |
| | **735 Pest Control** | | 0.00 | | |
| 02/04/02 | 1813 | STROUPE | | 35.00 | |
| 04/27/02 | 1817 | STROUPE PEST | | 70.00 | |
| 07/01/02 | 1833 | STROUPE PEST | | 114.00 | |
| 09/17/02 | 1848 | STROUPE PEST | | 76.00 | |
| 10/02/02 | 1857 | STROUPE | | 38.00 | |
| [illegible]5/02 | 1862 | STROUPE | | 38.00 | |
| | | | | 371.00 | 371.00 |

Att. B

# *Sweetwater Lodge*

## Operating Expenditures*

## 1995 - 2004

*Does not include 2005 estimate, nor interest on Old Johansson loans of $350K or Mummery loan of $60K

### Expenses to be Included in Damage Claim Against United States Forest Service (Department of Agriculture): 1995 - 2004

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | TOTALS All Years | Depleted From Expense Acct. | NET TOTAL EXPENSED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accounting & Legal | $791 | $850 | $2,113 | $380 | $1,751 | $1,665 | $3,330 | $58,046 | $25,669 | $149,947 | $244,541 | ($164,884) | $79,657 |
| Advertising | $0 | $0 | $0 | $0 | $0 | $108 | $145 | $162 | $0 | $65 | $480 | $0 | $480 |
| Amortization | $1,333 | $2,286 | $2,286 | $2,286 | $2,286 | $2,390 | $2,203 | $1,833 | $1,833 | $1,833 | $20,569 | $0 | $20,569 |
| Bank Charges | $29 | $137 | $66 | $137 | $125 | $117 | $120 | $300 | $121 | $144 | $1,295 | $0 | $1,295 |
| Business Promotion | $0 | $801 | $564 | $0 | $0 | $367 | $0 | $488 | $309 | $185 | $2,714 | ($488) | $2,226 |
| Contract Labor | $0 | $0 | $0 | $0 | $0 | $3,560 | $0 | $0 | $0 | $0 | $3,560 | $0 | $3,560 |
| Depreciation | $8,461 | $26,309 | $23,226 | $16,874 | $13,769 | $13,885 | $11,974 | $8,871 | $6,084 | $5,734 | $135,187 | $0 | $135,187 |
| Ddonations | $0 | $0 | $30 | $0 | $50 | $0 | $0 | $0 | $0 | $0 | $80 | $0 | $80 |
| Dues & Subscriptions | $188 | $415 | $600 | $0 | $241 | $185 | $370 | $0 | $0 | $185 | $2,184 | $0 | $2,184 |
| Fees | $0 | $0 | $0 | $0 | $0 | $1,400 | $1,700 | $1,930 | $0 | $0 | $5,030 | $0 | $5,030 |
| Gas, Oil & Tires | $65 | $35 | $0 | $88 | $0 | $0 | $0 | $0 | $0 | $0 | $188 | $0 | $188 |
| Insurance | $2,651 | $4,862 | $3,439 | $4,149 | $3,656 | $4,555 | $2,186 | $2,274 | $1,572 | $704 | $30,047 | $0 | $30,047 |
| Interest Expense | $8,316 | $15,376 | $12,949 | $10,098 | $10,441 | $7,823 | $8,526 | $7,192 | $5,633 | $5,414 | $91,768 | $0 | $91,768 |
| Legal | $0 | $1,280 | $0 | $0 | $1,588 | $0 | $0 | $0 | $0 | $0 | $2,867 | $0 | $2,867 |
| Liquor | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Miscellaneous | $0 | $0 | $0 | $0 | $0 | ($78) | ($17) | $0 | $0 | $0 | ($95) | $0 | ($95) |
| Management Fee | $0 | $14,000 | $0 | $0 | $13,850 | $0 | $6,000 | $6,000 | $6,000 | $6,000 | $51,850 | $0 | $51,850 |
| Office Expense | $108 | $131 | $0 | $49 | $21 | $44 | $190 | $0 | $0 | $0 | $542 | $0 | $542 |
| Outside Services | $258 | $0 | $0 | $0 | $0 | $0 | $0 | $1,252 | $0 | $0 | $1,510 | $0 | $1,510 |
| Pest Control | $0 | $520 | $700 | $620 | $485 | $590 | $370 | $371 | $0 | $0 | $3,656 | $0 | $3,656 |
| Postage | $0 | $24 | $0 | $36 | $0 | $0 | $0 | $136 | $284 | $493 | $973 | $0 | $973 |
| Rent | $0 | $0 | $36 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $36 | $0 | $36 |
| Repairs & Maintenance | $10,194 | $8,313 | $3,475 | $15,767 | $3,119 | $17,149 | $63 | $1,045 | $0 | $0 | $59,125 | $0 | $59,125 |
| Supplies | $1,063 | $5,076 | $30 | $197 | $629 | $3,585 | $510 | $0 | $0 | $0 | $11,090 | $0 | $11,090 |
| Taxes & Licenses | $2,798 | $4,414 | $3,464 | $3,648 | $5,298 | $6,647 | $2,866 | $7,726 | $8,462 | $11,298 | $56,622 | ($13,500) | $43,122 |
| Telephone | $1,021 | $3,148 | $2,281 | $3,256 | $3,107 | $1,032 | $2,591 | $487 | $859 | $1,095 | $18,877 | $0 | $18,877 |
| Travel & Entertainment | $0 | $1,114 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,114 | $0 | $1,114 |
| Utilities | $673 | $2,851 | $2,801 | $3,131 | $3,324 | $2,875 | $2,198 | $675 | $328 | $170 | $19,025 | $0 | $19,025 |
| Vehicle Expense | $0 | $2,556 | $634 | $1,819 | $0 | $672 | $0 | $0 | $0 | $0 | $5,682 | $0 | $5,682 |
| | $37,949 | $94,496 | $58,694 | $62,535 | $63,740 | $68,570 | $45,325 | $98,788 | $57,154 | $183,267 | $770,518 | ($178,872) | $591,646 |
| (Income) | $0 | ($71,520) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | ($71,520) | $0 | ($71,520) |
| TOTAL COSTS PER YEAR | $37,949 | $22,976 | $58,694 | $62,535 | $63,740 | $68,570 | $45,325 | $98,788 | $57,154 | $183,267 | $698,998 | ($178,872) | $520,126 |

Att. C

DX 42

| ate | Reference T | Description | Beginning Balance | Current Amount | YTD Balance |
|---|---|---|---|---|---|
| | **364 Note payable - Mummery (cont.)** | | | | |
| 12/31/04 | 2 | JCM DEPOSITS | | (19,114.52) | |
| 12/31/04 | 3 | TRANSFER TO JCM | | 2,260.85 | |
| 12/31/04 | 5 | BILLS PAID BY JCM | | (1,669.85) | |
| 12/31/04 | 6 | 2004 MNG FEE | | (6,000.00) | |
| | | | | (24,523.52) | (48,520.31) |
| | **369 Less current portion - LTD** | | 6,876.32 | | |
| 12/31/04 | 12 | CURRENT PORTION ADJ | | (561.27) | |
| | | | | (561.27) | 6,315.05 |
| | **371 Members' equity** | | 199,973.44 | | |
| | | | | 0.00 | 199,973.44 |
| | **605 Accounting & Legal** | | 0.00 | | |
| 12/31/04 | 5 | BILLS PAID BY JCM | | 300.00 | |
| 12/31/04 | 7 | SIMPSON 2004 | | 3,207.00 | |
| 12/31/04 | 7 | SALTMAN & STEVENS 2004 | | 78,531.97 | |
| 03/15/04 | 1926 | CYNTHIA RANKIN | | 500.00 | |
| 07/02/04 | 1940 | JAVERNICH & STENSTROM | | 4,512.30 | |
| 07/02/04 | 1941 | BIG SKY REPORTING | | 9,000.00 | |
| 07/02/04 | 1942 | SALTMAN & STEVENS | | 51,130.63 | |
| 07/06/04 | 1945 | BILL SIMPSON | | 1,361.00 | |
| 07/06/04 | 1946 | CYNTHIA RANKIN, CPA | | 490.00 | |
| '6/04 | 1951 | JAVERNICH & STENSTROM | | 318.80 | |
| 26/04 | 1962 | BILL SIMPSON ESQ | | 595.00 | |
| | | | | 149,946.70 | 149,946.70 |
| | **606 Advertising** | | 0.00 | | |
| 12/31/04 | 5 | BILLS PAID BY JCM | | 65.00 | |
| | | | | 65.00 | 65.00 |
| | **615 Amortization** | | 0.00 | | |
| 12/31/04 | 10 | AMORTIZATION | | 1,833.00 | |
| | | | | 1,833.00 | 1,833.00 |
| | **625 Bank charges** | | 0.00 | | |
| 12/31/04 | 4 | BSC | | 144.00 | |
| | | | | 144.00 | 144.00 |
| | **630 Business promotion** | | 0.00 | | |
| 07/06/04 | 1944 | CODY CHAMBER OF COMMERCE | | 185.00 | |
| | | | | 185.00 | 185.00 |
| | **645 Depreciation** | | 0.00 | | |
| 12/31/04 | 9 | DEPRECIATION | | 5,734.00 | |
| | | | | 5,734.00 | 5,734.00 |
| | **660 Dues & subscriptions** | | 0.00 | | |
| 12/31/04 | 7 | CHAMBER DUES 2004 | | 185.00 | |

Att. D

other licenses?

A No, she's involved in that portion of it that has to do with the Sweetwater permit. Now how that documentation works, I'm not quite sure, but I know that relinquished their permit, and all of the Sweetwater granted to -- or excuse me, the Forest Service granted to Sweetwater a permit.

But I think that if we failed to make our payments, our permit could have automatically been kind of canceled by Brannon. I don't say canceled on behalf of the Forest Service, but he would have the documentation to go to the Forest Service and say Mr. Mummery hasn't paid me, you've got to cancel his permit, and give me my permit back. So he wouldn't get back, you know, a pig-in-a-poke so to speak.

MR. WILLIAMSON: Your Honor, I would like to move for the admission of Defendant's Exhibit 19, the application for a special use permit.

THE COURT: Any objection?

MR. GARDEN: Your Honor, what I would request is that we go through the whole document. I believe there is attachments here and I want to confirm that in fact Mr. Mummery agrees that these attachments were submitted with his application, because I think there is an issue in the deposition as



Att. E

to what attachments were actually his, and what were prepared by other people.

MR. WILLIAMSON: And, Your Honor, let me clarify. Let me restrict my motion of admission to only the first four pages of Defendant's Exhibit 19, which I think are the application that Mr. Mummery was testifying about, and perhaps, if I may, just clarify that with Mr. Mummery.

BY MR. WILLIAMSON:

Q Mr. Mummery, is that in fact accurate, those first four pages of Defendant's Exhibit 19 is the application as you recall?

A As I recall, it certainly is.

Q Okay.

A You know, I --

Q All right, and then --

A I don't recall it very well. I don't look at it very often.

MR. WILLIAMSON: Okay, then we will not move for the admission of the pages that follow those first four pages, Your Honor.

THE COURT: Your motion goes through --

MR. WILLIAMSON: To be clear for the record, Defendant's Exhibit 19, pages 1, 2, 3 and 4.

THE COURT: All right.

MR. WILLIAMSON: Mr. Mummery did testify about during his deposition regarding the draft resort operating plan that begins at page 5 of Defendant's Exhibit 19, and it concludes at page 9 of Defendant's Exhibit 19, and that document was something that was prepared at a different time, and we probably shouldn't have included it in here. I didn't need to complicate matters.

This was all marked as a deposition exhibit and we put it in wholesale, so we should have taken off the first four pages.

THE COURT: Any objection to the first four pages?

MR. GARDEN: No objection, Your Honor.

THE COURT: Defendant's Exhibit 19 is admitted, that is, the first four pages was a four-page document, the first four pages being the pages.

MR. WILLIAMSON: And I think they are each clearly labeled.

THE COURT: Right.

(The document referred to, previously identified as Defendant's Exhibit No. 19, pages 1 through 4 were received in evidence.)



Att. E

MR. GARDEN: We just want the record to reflect, Your Honor, that it's our understanding, and I'm certain we are going to have testimony on this, just because this document is -- all of it's here, that the remaining pages were not in fact part of this application.

THE COURT: Very well.

MR. GARDEN: You know, we're not testifying, but I would hate to have the Court go back and look at this document and forget that in fact the attachments were not part of this application.

THE COURT: Actually there are page numbers at the bottom right-hand corner, and I think that encompasses, if I'm right, 04684 and 04685 and 04686 and 04687.

MR. WILLIAMSON: Yes, that's correct, Your Honor.

THE COURT: Those four pages are the ones that are admitted into evidence as Defendant's Exhibit 19.

BY MR. WILLIAMSON:

Q Mr. Mummery, in that same binder could you please, sir, turn to Defendant's Exhibit 17, which is the sales contract between you and Brannon's Resort, is that correct?



Att. E