IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE SWEETWATER, A WILDERNESS LODGE LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 02-1795C<br>(Senior Judge Merow) |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S REVISED APPLICATION FOR ATTORNEYS' FEES AND COSTS PURSUANT TO THE EQUAL ACCESS TO JUSTICE ACT**

Kevin R. Garden
THE GARDEN LAW FIRM P.C.
211 North Union Street, Suite 100
Alexandria, VA 22314
(703) 519-1286

Dated: January 7, 2007

Plaintiff The Sweetwater, A Wilderness Lodge LLC ("The Sweetwater") respectfully replies to the government's opposition to The Sweetwater's application for attorneys' fees and costs pursuant to the EAJA. In its opposition, the government admits that The Sweetwater was a prevailing party in this case. Opp. at 3 ("We agree that plaintiff is a 'prevailing party' under the statute"). Given this key admission, as a matter of law the government's defense against compensating The Sweetwater under the EAJA is narrowly limited to proving that, with respect to the plaintiff's claim *as a whole*, the government was substantially justified in its position both prior to as well as during this litigation. 28 U.S.C. § 2412(d)(1)(A); Opp. at 3 (the Court must consider the plaintiff's claim "as a whole"). The government's fundamental position in response to The Sweetwater's claim as a whole consisted of two points: (1) asserting that the permit at issue was not a contract and (2) asserting that the agency did not terminate the permit by precluding vehicular access to the lodge. Opp. at 5. While the government tries to characterize The Sweetwater's alternative bases for compensation in this case as somehow being wholly independent of each other, it is indisputable that each and every alternative basis for compensation was centered on these two core issues. As to these core issues, even the government admits that the Court rejected the government's position on them. Opp. at 5.[1] Because the government's position was contrary to existing case law as well as the testimony of the government's own employees and expert witness, it cannot be viewed as substantially justified.

---

[1] As the government admits at page 5 of its Opposition:

> The Court [found] that the Forest Service terminated The Sweetwater's permit by closing the bridges and not funding their replacement in April 2001. The Court also found that plaintiff's valuation of the lodge was in large part more accurate than that offered by defendant.

In addition, the government's assertion that The Sweetwater's EAJA costs are "excessive in view of the limited success actually achieved" (Opp. at 1) is wholly out of line with the reality of this case given that The Sweetwater was faced with a total loss of its assets as of 2001 and was required to endure over four years of litigation to force the agency to comply with its legal obligations under the permit. Before bringing this suit, The Sweetwater, which is a very small business engaged solely in operating the lodge facilities at issue, was faced with having to destroy all of those lodge facilities and being forced to remove the wreckage at its own cost and restore the area to its natural condition.[2] In other words, The Sweetwater would have lost its business as well as the assets associated with that business had the agency been allowed to prevail in ignoring its contractual obligations. In addition, the agency told The Sweetwater that the permit at issue was not even an actionable contract and that clause 15 of that contract was inapplicable unless the agency explicitly elected to use it. As a result of bringing this suit, The Sweetwater has obtained equitable consideration for its lodge facilities, as required by its contract, including its out of pocket costs since termination. In addition, The Sweetwater has not been forced to incur the substantial cost of removing those facilities and restoring the permit area to a natural condition. It is now (hopefully) clear to the agency that these permits are actionable contracts and that clause 15 applies when the facts in the case merit its application, not simply when the agency chooses to invoke that clause at its convenience.

Given these undeniable facts, the government's dismissive mischaracterization of The Sweetwater's success as "limited" (Opp. at 1) reveals a complete lack of understanding as to the devastating impact of the government's actions on The Sweetwater. In addition, the amount of

[2] As the Court noted, the lodge facilities could not be sold without vehicular access. Opinion at 26. Thus, since no operations could occur, The Sweetwater would have been required to destroy and remove those structures.

the fees and costs in The Sweetwater's application is wholly consistent with having to endure four years of vigorous litigation against the federal government during which the government brought numerous unsuccessful attacks on the contract itself as well as The Sweetwater's compliance with that contract. While the federal government may try to dismiss this very small business' success by characterizing it as 'no big deal,' what was at stake in this case was no less than The Sweetwater's entire investment in its business- which is a very big deal to The Sweetwater.

**1. The government's position both during this litigation, as well as its position which led to this litigation, was not substantially justified.**

As this Court held in *Keeton Corrections, Inc. v. United States*, 62 Fed. Cl. 134, 135 (2004), "[t]he government's position is substantially justified if it is 'justified in substance or in the main'- that is, justified to a degree that could satisfy a reasonable person." (*Quoting Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). This position includes both the government's posture taken in the litigation as well as its underlying actions which led to the litigation itself. *Keeton*, 62 Fed. Cl. at 136. "Thus, the proper focus of the court is to make a singular determination based on the entire civil action." *Id.* at 136.

While both parties raised various arguments as to the government's liability to The Sweetwater, the government's main position throughout this case was twofold. First, it insisted that the permit was not a contract. Second, it insisted that the agency did not terminate the permit and thus had no liability even though it precluded any vehicular access to the lodge. This position did not have a reasonable basis in law or fact.

On the first point as to a contract, this Court had previously addressed the very same type of Forest Service permit in *Son Broadcasting v. United States*, 52 Fed. Cl. 815 (2002), and held that the very same government argument was wrong. The government made no effort to

distinguish the terms of the permit in that case with the permit in the instant litigation. Instead, the government cited (and cites once again) to certain language in that opinion which addressed an entirely different type of Forest Service permit (*i.e.*, a Forest Service grazing permit) than the permit which was at issue in that case. Opp. at 8. Both *Son Broadcasting* and this case involved Forest Service Term Special Use Permits, <u>not</u> grazing permits. The permits in *Son Broadcasting* and this case had the same terms and characteristics. Thus, the government's argument now, as before, is a futile effort to distinguish that case.

Moreover (and quite understandably), the government did not appeal either the *Son Broadcasting* decision or the present decision to the Federal Circuit. Ironically, the government states that its position is substantially justified because the Federal Circuit has not been presented with a case dealing with this issue. Opp. at 8. This fact is not surprising because the government obviously knows better than to appeal its losses in these decisions and has apparently chosen to avoid establishing binding precedent at the Federal Circuit. Furthermore, as the courts have made clear, the lack of precedent on an issue is simply no basis for concluding that a parties' position on the issue has merit. *Halverson v. Slater*, 206 F.3d 1205, 1210 (D.C. Cir. 2000)("the absence of contrary case law does not necessarily lead to the opposite conclusion, *i.e.*, that the [government's] position was substantially justified. There may be no contrary case law for reasons having nothing at all to do with whether the Department's position had merit").

In addition, rulings by other courts and tribunals held the same as this Court. *See Walter Dawgie Ski Corporation v. United States*, 30 Fed. Cl. 115, 123 n.3 (1993) ("This Court notes [] the general acceptance of these [Special Use] permits as contracts"); *Ness Investment Corp. v. United States*, 595 F.2d 585, 219 Ct. Cl. 440 (1979)(Court of Claims took jurisdiction over Forest Service special use permit as being a contract); *Meadow Green-Wildcat Corp. v.*

*Hathaway*, 936 F.2d 601, 604 (1st Cir. 1991)(these permits have all the indicia of contracts); *Cradle of Forestry in America Interpretative Association In Re: Special Use Permits Issued by the United States Department of Agriculture Forest Service*, ARB Case No. 99-035 (these permits are contracts covered by the Service Contract Act). In fact and when it suited its goals, even the government *itself* asserted that these Forest Service permits were contracts in the *Peckham* matter where it sought contract damages. *United States v. Thomas Peckham*, No. 98-1352 JM(AJB) (S.D. Cal. May 25, 2000); *see* Clerk's Docket Entry #62. The government's attempt to distinguish the position it took in the *Peckham* case is meritless. *See* Opp. at 8. As this Court noted in *Keeton*, 62 Fed. Cl. 137, where the government's position was contrary to other determinations as well as arguments made by the government itself in other cases, that supports the determination that the government's position is not substantially justified.

As to the government's fundamental position regarding whether the contract had been terminated, which was the *raison d'etre* of this case, the government's *own expert witness* informed the government that lodge operations were not viable without vehicular access, and thus it was apparent that the government had prevented contract performance by preventing vehicular access over those bridges. As the Court found, based on the testimony of Forest Service employees as well as the government's own expert witness:

> The evidence admitted in this litigation is ***clear*** that, while several Forest Service officials had the view that the lodge could be operated on a permanent basis with fords over Sweetwater Creek, in fact, ***The Sweetwater site could not be operated successfully if fords were installed in lieu of bridges over Sweetwater Creek.*** This is because high water up to the middle of July would preclude access over fords, even by high clearance vehicles, and this would eliminate a substantial portion of the operating season. ***Defendant's expert witness reported that, "[f]ords do not work***, there is no net operating income left, even prior to constructing fords." (Pl.'s Ex. 66.)

Opinion at 10 (emphasis added).[3] The agency had proceeded below based on its off-the-cuff view that the lodge could be operated as an on-going entity without vehicular access even though The Sweetwater and the two agency employees most familiar with the lodge, Messrs. Barker and Larson, disagreed. Tr. 818:1-819:22 (Mr. Barker testified "I don't see any way possible that you could operate this [lodge] on a sustained basis with fords because of the high water situation"); Opinion at 22 ("Larson said that if the road is not repaired to provide safe passage for customers, then it would be difficult for the Sweetwater Lodge to operate"). The agency individuals who casually made this critical but totally erroneous determination, which they never bothered to even verify, had no expertise in lodge operations whatsoever. As this Court held in *Keeton*, 62 Fed. Cl. at 137, because "the government's litigating position cannot overcome the unreasonableness of the underlying agency action, [] the government's overall conduct cannot be held substantially justified." However, *even when* the government was later told by its own expert in this litigation that the lodge operations were not viable without vehicular access, it chose to ignore this fact and stubbornly stuck to its initial position.

In its opposition, the government abandons the principle that its position must be judged "in the main" and instead selects seven narrow "facts" which it tries to focus this Court on in an effort to show that it was substantially justified. Notably, the government makes no effort to address its *overall* position in this case. The reason for that lack of effort is clear- the government's overall position lacked substantial justification. As to the seven specific "facts" which the government has picked out from this matter after culling over the voluminous filings in this case, each of them are addressed below. Opp. at 7. Not one of these seven "facts"

[3] The Court also found that "Ms. Aus, who had the erroneous view that The Sweetwater could operate the lodge without bridge access on a permanent basis, by using fords, and that Mr. Mummery had so agreed in 1995, placed a very low or non-existent priority on replacement of the Sweetwater bridges, at least for the term covered by The Sweetwater's permit." Opinion at 6.

demonstrates that the government was substantially justified.

First, the government asserts that, because the permit did not include any language promising to replace the bridges or compensate the permittee for the lodge if the bridges were not replaced, the government was substantially justified in asserting that the government had not terminated the permit when it decided not to restore the only access to the lodge which allowed operations to occur. Opp. at 7. However, as the Court noted in the hearing, the *sine qua non* of the contract was to perform lodge operations. Those operations could not occur with vehicular access over the bridges. If the agency chose to block the bridges with a gate or refuse to repair these bridges which were the only means for operations to occur, it was preventing the very purpose of the contract's existence, *i.e.*, it was terminating the contract. Absence of explicit language in the permit requiring the government to replace the existing bridges if they no longer could provide access does not obviate in any way the fact that the government, by deciding that it would not restore that critical access, obviously was *permanently* terminating operations. Thus, the absence of a promise to replace the bridges is wholly irrelevant to whether the contract was terminated when lodge operations were precluded by the government's own actions.[4]

The second item raised is the government's allegation that Mr. Mummery agreed to the use of fords in order to access the lodge. Opp. at 7. As was made readily apparent by the testimony of the agency's own personnel, Mr. Mummery merely agreed to the temporary use of fords to access the lodge for maintenance purposes if bridge access was lost. *Mr. Mummery never agreed to the use of fords to operate the lodge*. In fact, agency employees who attended the June 1995 meeting where this conversation occurred verified this fact. As the Court found:

[4] Notwithstanding the absence of any explicit language in the permit itself as to the agency's commitment to try to replace the bridges, as the Court found, agency employees at the time of executing the permit "assure[d] The Sweetwater that they would make their best effort to obtain replacement funds." Opinion at 10.

> In the event of a bridge washout it was represented that the Forest Service could construct a ford over Sweetwater Creek to preserve access to the lodge site, but this would be a ***temporary*** measure and would not interfere with attempting to obtain funds to replace the bridges . . . In the event of a washout, Mr. Mummery did agree to the use of fords on a ***temporary*** basis pending Forest Service action to obtain bridge replacement funds.

Opinion at 10-11 (emphasis added); *see also* Joint Exhibit 12 (agency itself referred to "temporary fords" in 1997 letter). Mr. Mummery's agreement to use fords for this limited purpose in no way supported the government's position that he had agreed to use those fords to operate the lodge.

The government cites to an email prepared by an agency employee at the meeting. Opp. at 7 (referencing Joint Exhibit 6). This email was <u>silent</u> as to the issue of whether fords would be used on a *temporary* or *permanent* basis, thus this email does not support the government's position. In fact, the government's position was completely refuted by its own employees. As Mr. Barker stated, the fact that fords could not provide permanent access was so obvious, it was beyond having to be stated. Tr. 822:24-823:3; *see* Tr. 818:1-819:22; 1232:17-1233:13; Tr. 1233:23-1234:22 . Mr. Larson also reported to Ms. Aus and Ms. Watson in 2001 that Mr. Barker had unequivocally stated that The Sweetwater had not agreed to the use of fords on a long term basis. Tr. 1234:23-1235:14. Mr. Barker also told Ms. Watson this fact as well in April 2002. PX 38. The fact that the government chose to ignore the clear testimony of its own employees which directly rebutted its position only makes the government's position that much more unreasonable.

Third, the government refers to Mr. Mummery's understanding that the receipt of future funding for the bridges was uncertain. Opp. at 7. However, as the government fails to point out, even the Acting Forest Supervisor who executed the permit stated that the agency had *no intentions to stop trying to seek funding*, which is exactly what it subsequently did. Tr. 937:4-5

(Mr. Rossman stated that, if bridge access were subsequently lost, the Forest Service "certainly wouldn't have [] pulled" its request for funds to repair or replace the bridges at that point). While funding was not guaranteed, the agency nonetheless had made it clear that it would *seek* such funding. Opinion at 10 (the agency "assure[d] The Sweetwater that they would make their best effort to obtain replacement funds"). It then changed its mind and affirmatively and deliberately ceased those efforts, thus resulting in an indisputable permanent termination of lodge operations. Therefore, an understanding that funding was not guaranteed is irrelevant to the issue of termination because in no way can it support the government's argument that it did not essentially terminate the permit when it blocked the bridges and ceased any further funding efforts to restore them.

Fourth, the government cites to the purely legal argument it made that, unless it affirmatively revokes the permit through a formal document, the government's conduct can never constitute a termination of the permit no matter what actions it takes. Opp. at 7. This argument is nonsense. As the Court held, "[t]he circumstance that the termination of the permit for a public resort was accomplished by actions to eliminate needed access, rather than by a formal document, should have no bearing on a resulting obligation of the Forest Service to pay an equitable consideration for The Sweetwater's improvements." Opinion at 23.

Fifth, the government asserts that, because it never made any express finding that termination of the permit was in the public interest, it could not be deemed to have terminated the permit. Opp. at 7. This argument is also patently unreasonable. Moreover, the government omits mentioning that the Forest Supervisor initially engaged in an appraisal to buy out the lodge, but then cancelled that appraisal only when she was felt she was unable to fund the purchase. As the Court found, "[o]n August 16, 2001, after a conference with the Office of

General Counsel, Gary Reynolds, Ms. Watson's supervisor, sent a message to Mr. Sonderby stating, in part, 'please STOP working on this project as our Forest Supervisor has decided not to appraise. The main problem with appraisal is that we have no way to finance a purchase of the improvements.' (Pl.'s Ex. 34.)." Opinion at 23. By doing so, the Forest Supervisor clearly believed that, if she had sufficient funding, terminating the lodge would have been in the public interest. Thus, the government's highly technical argument that the lack of an explicit finding that termination was in the public interest is not only legally insufficient, it also ignores the vast amount of evidence which demonstrates that the agency in fact substantively concluded that termination was in the public interest.

This agency's initiation of an appraisal after closing the bridges in 2001 also shows that the agency recognized, based on the impact of closing the bridges, that it had an obligation to compensate The Sweetwater under the terms of the contract. The agency did not go through with this payment because of its view that it did not have sufficient available funds. Given that this payment was an explicit obligation under clause 15, the lack of available funds was not a justification for its failure to meet this obligation. *Wetsel-Oviatt Lumber Co. Inc. v. United States*, 38 Fed. Cl. 563, 569-570 (1997). However, that is the main reason the agency failed to meet its obligation at this time. *Id*. (the assessment of how much money was owed to The Sweetwater for the lodge under clause 15 was called off because the agency felt it could not fund that payment). At a minimum, the agency should have at least candidly admitted that this was its primary basis for not meeting its contract obligations, rather than trying to construct various reasons for why it was not liable for this payment and then forcing The Sweetwater to endure four years of litigation to prove a point the agency had previously agreed with.

Sixth, the government asserts that it was seeking a conservation buyer solely to help The Sweetwater because it believed The Sweetwater did not want to operate the lodge. Opp. at 7. This claim was entirely discredited in the trial. As the Court found, the agency was seeking a conservation buyer so that the agency could avoid being responsible for replacing the bridges or compensating The Sweetwater for its facilities. Opinion at 20 ("Upon receipt of information that the requested Sweetwater bridge replacement funds were available, the District Ranger, Mr. Larson, conferred with Mr. Fischer and they decided that the bridge replacement funds should be rejected pending resolution of the conservation buyer approach, ***which, if successful, would obviate bridge replacement***")(emphasis added). The government's assertion that it had sought a conservation buyer because it was being driven by a desire to assist The Sweetwater was shown to be a fallacious claim at the trial. As Mr. Larson admitted, while his goal in pursuing a conservation buyer would have benefited The Sweetwater if he found such a buyer, his true goal was not to benefit The Sweetwater, but to save his agency money. This reality was revealed when Mr. Larson was faced with a choice between solving The Sweetwater's problems, or taking a chance at saving his agency money. As Mr. Larson admitted, when the funding was available to replace the bridges and restore vehicular access to the lodge, Mr. Larson convinced Mr. Fischer not to apply the funds to the bridges even though doing so would have solved all of The Sweetwater's problems. Tr. 1211:5-1213:16 (Mr. Larson admitted that his efforts to prevent funding from being applied to the bridges was driven by his goals and was directly contrary to The Sweetwater's goals). Thus, the agency clearly sought a conservation buyer for the purpose of avoiding replacement of the bridges as well as avoiding any payment to The Sweetwater (which would theoretically come from the conservation buyer). As it turned out, the agency's

strategy of seeking a conservation buyer (which was Mr. Larson's idea) became the reason why this problem was not solved back in 2000.

Nonetheless, at most the government's current argument pertains to a particular motivation by the agency as to why it sought a conservation buyer, and in no way shows that the agency did not in fact *actually terminate* the permit by padlocking the main bridge and ceasing any efforts to replace the bridges. As a result, this argument cannot possibly show that the government was substantially justified in its position that it did not terminate the permit.

Seventh, the government asserts that the fact that the plaintiff did not operate the lodge from 1997 to the present somehow supports the government's position that it did not prevent lodge operations and thereby terminate the permit. Opp. at 7. In actuality, this fact is simply more evidence that the lack of vehicular access prohibited any lodge operations. Obviously, if the lodge could be operated without vehicular access, The Sweetwater would have done so. The fact that The Sweetwater did not operate further demonstrates that such operations were not feasible. The government's own expert witness later confirmed this fact.

Contrary to the government's claim, the above-mentioned seven specific items in no way constitute evidence that the government's position in this case was reasonable or otherwise substantially justified.

**2. The key to EAJA decisions is the significance of the relief obtained, not the specific quantum of damages.**

As the government did in *Keeton*, 62 Fed. Cl. at 138, it once again argues that, because the prevailing party did not obtain every aspect of the relief which was sought, it cannot recover EAJA fees and costs. *See* Opp. at 1 (arguing that plaintiff is not entitled to any EAJA award "because the Court rejected the majority of theories of liability urged by plaintiff"). As this Court held in *Keeton*, 62 Fed. Cl. at 138:

> [I]t is possible to achieve more than partial or limited success even where an applicant did not receive all of the relief requested. *See Naekel v. Dep't of Transp., FAA*, 884 F.2d 1378, 1379 (Fed. Cir. 1989). Instead, the court 'should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended in the litigation.' *Hensley* [*v. Eckerhart*,] 461 U.S. at 435, 103 S.Ct. 1933. In this regard, '[w]here a plaintiff has achieved excellent results, his attorney should recover a fully compensatory fee.' *Id*. There is no mathematical formula for making such a determination and it is within the court's discretion. *Id*. at 436-37, 103 S.Ct. 1933.

In the present case, the government focuses on a comparison of the total quantum of damages which the Court could have awarded as equitable consideration for the lodge improvements as compared to the amount it actually awarded. Opp. at 9-10. Notably, the government's argument does not pertain to its own underlying liability or the significance of the award to The Sweetwater. The Court rejected this type of argument in *Keeton*, and should reject it in this case for the same reasons. Furthermore, as the Court of Claims (Trial Division) held in *Kay Manufacturing Company v. United States*, 1982 WL 36736 (1982), where the government had denied certain charges by a contractor because the government claimed that they were excessive, and the contractor proved entitlement to those charges:

> It is noted, of course, that the mere size of the money claim of a plaintiff does not itself determine the necessity and wisdom of pursuing the claim. Indeed, [the government's] finding that earned profits- in any amount- were excessive may well have been intolerable to a contractor who had performed as well as did the plaintiff here in a difficult task and at a crucial time.

In the present case, the government had terminated The Sweetwater's business and claimed The Sweetwater was entitled to no money whatsoever for its facilities, which were rendered useless upon the termination. As a result, The Sweetwater had no choice to but seek equitable consideration. Given the discretion the agency had to terminate the permit, The Sweetwater could not reverse that decision and its remedy was the equitable consideration it was due, but had been denied. The Sweetwater achieved that remedy.

Obviously, The Sweetwater's recovery of more than $800,000 as equitable consideration for the lodge improvements was substantial, especially in light of the government's view that it owed The Sweetwater $0. While the government offered a highly-paid expert witness who asserted that the value of the lodge was in fact only $415,000, that witness was forced to admit that he included several improper sales in his calculations to arrive at that figure. As the Court found, the report of the government's expert was "grounded" on a distress sale, something which an appraiser should not properly include in his or her analysis. Opinion at 33. The government's characterization of this fact as being the report's "only weakness" is akin to characterizing a building constructed on a sinkhole as being the building's "only weakness." Opp. at 10. As the Court noted, "[a] close analysis of Mr. Frome's calculations demonstrates that the values reached equate to utilizing the $287,500 sale price for The Sweetwater in 1995, plus an annual market increase of 3.6%." Opinion at 33. The government paid an extensive amount of money to have its expert try to dress up what was really a simple mathematical calculation. We believe the Court dismissed his assessment for this reason, except with regard to the applicable number of lodge units. Given that the Court only agreed with one particular aspect of the government's experts very lengthy and expensive analyses, the government cannot properly argue that its use of this expert somehow shows that the government's overall position in this case was substantially justified, or that the Court should reduce the fees and costs to which The Sweetwater is otherwise entitled.

Furthermore, the government refers to The Sweetwater's claim for $350,000 as "massive." Opp. at 11. However, as this Court is well aware, the cost of litigating against the federal government for over four years is never nominal and in this case it involved 16 depositions at various locations, a review of 9,000 pages produced by the government, an

extensive motion to dismiss and summary judgment proceeding, a review of two huge appraisal reports by the government's expert witness, a ten day trial at which testimony totaling 2,985 pages was presented from 17 witnesses and 114 exhibits, and preparation of the voluminous filings both before and after the trial. The extensive amount of relevant facts in this case is shown by the Court's twenty-two pages of factual background in its opinion. Moreover, the vast bulk of this effort was focused on demonstrating that the agency had terminated the contract without compensating The Sweetwater and was therefore liable to The Sweetwater. A significant amount of this effort was also required to rebut the voluminous counter-allegations which the government hurled at The Sweetwater in an effort to discredit its case or have it dismissed (including the numerous allegations that The Sweetwater breached the contract), all of which were denied.

In fact, upon reflection we fully agree with the government's assertion that The Sweetwater was required to endure a "massive" obligation to take on the federal government and enforce it legal contract rights. However and most notably, the government never asserts that $350,000 is an *excessive* amount for the level required in this case.[5] Nor does the government identify any of the attorney hours of effort incurred as being unreasonable. This silence not only confirms that this amount was well in line with the level of effort required, it also constitutes a tacit admission that the government incurred at least that amount as well,
further validating this figure.[6]

[5] Indeed, if this case had been handled by a large law firm, this claim easily would have been twice as high.

[6] The Sweetwater has incurred an additional $10,194.22 in legal fees related to pursuing its EAJA application since its last submission and negotiating the terms for sale of the lodge facilities. These fees are documented on Exhibit X attached hereto.

**3. Where a party has prevailed on one of several alternative theories of recovery that seek to redress the same injury, the party has still been successful and no reduction is merited.**

As part of its attempt to evade its statutory liability under EAJA, the government lists the various alternative theories set forth by The Sweetwater (such as its breach of contract claim, claim under the contract and takings claim), and then asserts that because The Sweetwater only prevailed on one theory of liability, The Sweetwater had only a limited degree of success. Opp. at 1 ("the Court rejected the majority of the theories of liability urged by plaintiff"); Opp. at 2 (listing various alternative theories of liability). However, under the government's argument, whenever a party raises two or more alternative theories of recovery arising under the same core facts (such as a contract based theory and a takings theory), that party can never be more than 50% successful since it can only prevail on one of its two theories. This reasoning has been rejected by the courts. As the Supreme Court has held:

> Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised.

*Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S.Ct. 1933 (1983)(emphasis added).

Courts have specifically noted that this principle applies equally to alternative theories of recovery which are based on the same core factual issues. As the Court of Appeals for the District of Columbia held in *Copeland v. Marshall*, 641 F.2d 880, 892 n.18 (D.C. Cir. 1980):

> [I]t sometimes will be the case that a lawsuit will seek recovery under a variety of legal theories complaining of essentially the same injury. A district judge must take care not to reduce a fee award arbitrarily simply because a plaintiff did not prevail under one or more of these legal theories. No reduction in fee is appropriate where the "issue was all part and parcel of one matter," *Lamphere v. Brown Univ.*, 610 F.2d 46, 47 (1st Cir. 1979), but only when the claims asserted "are truly fractionable." *id.*

*See also Clarke v. Ford Motor Co.***,** 2006 WL 752902 (E.D.Wis. 2006)("However, all of

plaintiff's claims arose out of a common core of facts--Ford's refusal to pay retroactive benefits to Pickard. Plaintiff's unsuccessful claims were alternative theories of recovery. A court should not discount the lodestar merely because alternative legal theories are rejected"). As one District Court has held:

> A computation of the hours reasonably expended should not include time spent on "discrete and unsuccessful" claims, *Duckworth v. Whisenant,* 97 F.3d 1393, 1397 (11th Cir.1996), but should include time spent on all claims that arise out of the same course of conduct and share a "common core of fact," even if a specific individual claim did not succeed. *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Davis v. Locke,* 936 F.2d 1208, 1214 (11th Cir.1991); *Jean v. Nelson*, 863 F.2d 759, 771 (11th Cir.1988); *Popham v. City of Kennesaw,* 820 F.2d 1570, 1578 (11th Cir.1987); *Military Circle Pet Ctr. No. 94 v. Cobb County,* 734 F.Supp. 502, 504 (N.D.Ga.1990).

*Webster Greenthumb Co. v. Fulton County, Georgia*, 112 F.Supp.2d 1339, 1351 (N.D. Ga. 2000). As another District Court held in a case against the Forest Service:

> Plaintiffs' second and third claims were simply asserting additional ways in which the agency allegedly violated NEPA by not conducting new or supplemental NEPA analyses, and claim two is pleaded in the alternative to claim one. Plaintiffs may get attorneys' fees for "unsuccessful claims" if they involved a common core of facts as the successful claims. *Hensley v. Eckerhart,* 461 U.S. 424, 434-35 (1983); *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1499 (9th Cir.1995) (noting that "the test is whether relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury upon which the relief granted is premised"). I conclude that plaintiffs are entitled to the full fee award, and I find that the hours expended and hourly rates are reasonable.

*Oregon Natural Resources Council Action v. U.S. Forest Service*, 2004 WL 1118304 (D. Or. 2004). Based on this principle of law, any effort to assert that The Sweetwater was not successful in this case (or that its award should be reduced) because it prevailed on only one theory of recovery where it had raised several alternative theories based on the same facts, is meritless.[7] Because The Sweetwater was compensated for the value of its

[7] As to The Sweetwater's claim for a tortious breach of contract which is noted by the government (Opp. at 2), this theory of recovery was raised to ensure that the agency was liable

lodge in light of the government's position that no compensation was due, The Sweetwater clearly was successful in this litigation.[8]

**4. No *pro rata* reduction of The Sweetwater's overall EAJA award is appropriate in this matter.**

The government asserts in its opposition that The Sweetwater is "not entitled" to any EAJA award. *See* Opp. at 1. Significantly, a review of the government's opposition demonstrates that, while the government objects to certain specific items, at no point does the government assert that if in fact The Sweetwater is entitled to an EAJA award, the Court should engage in a *pro rata* reduction of that award. The Sweetwater agrees that, upon a determination that The Sweetwater is entitled to an EAJA award, no *pro rata* reduction is appropriate.

The vast, vast bulk of the time and effort throughout this case was devoted to developing the shared facts which pertained to all of bases for compensation set forth in this case, as well as the numerous defenses raised by the government as part of its vigorous counter-attack on The Sweetwater (all of which were defeated). These included the facts related to whether the permittees or the agency bore responsibility from 1992 to the present for the bridges including the main bridge over the North Fork of the Shoshone, the actual condition of those bridges from 1992 to the present including the technical inspections which had been occurred, the specific

---

for The Sweetwater's current inability to operate the lodge due the lack of vehicular access (*i.e.*, the effective termination). The claim was based on the same facts as were related to the other claims, such as the condition of the bridges as of 1995, the parties' knowledge and obligations as to those bridges, and whether The Sweetwater could operate the lodge without vehicular access over those bridges.

[8] The government also briefly refers to The Sweetwater's argument that the Contract Disputes Act (CDA) applied to its contract as showing a lack of success. Opp. at 2. However, as even the Court acknowledged, The Sweetwater did not need to prevail on this procedural issue in order to obtain the Court's jurisdiction. Opinion at 31. Moreover, while the CDA would have allowed interest on The Sweetwater's claim, that statute is purely procedural and did not create any different theory of recovery. Finally, the government does not even attempt to quantify the level of effort which was expended on this issue, which is understandable given that such effort clearly was negligible in the overall scope of this case.

understanding of each of the parties related to the terms of and obligations arising under the permit, what was stated in the June 1995 meeting when the permit was issued, the agency's commitment and efforts to seek funding to replace the bridges and the specific reasons for the agency's decision to cease funding efforts for those bridges.

In addition, the agency raised a vast multitude of specific factual counter-allegations in an effort to support its position that it had not terminated the permit or that, conversely, The Sweetwater had not met its contractual obligations. These counter-allegations included, but certainly were not limited to, various alleged prior agreements and understanding of The Sweetwater as to agreeing to operate without bridges, allegations as to The Sweetwater's relationship with Mr. Bixby in 1996, as well as claims that the agency individuals involved had no authority to act under the permit. The Sweetwater was required to commit extensive efforts to address these allegations and their significance, and all of them were proved either wrong or irrelevant. For these reasons, The Sweetwater believes that no *pro rata* reduction is appropriate.[9]

**5. There are no special circumstances rendering an award unjust.**

The government states at one point that The Sweetwater's so-called "limited" success constitutes "special circumstances" which render unjust any award to The Sweetwater. Opp. at 11. Not only is the government's assertion completely wrong as demonstrated above, but under the circumstances of this case, justice will not occur unless The Sweetwater is granted its requested award.

As this Court's Opinion makes clear, the agency should have paid The Sweetwater the full value of its lodge back in 2001. Not only did the agency fail to do so and thus deny The

[9] In the event that the Court disagrees with the above discussion, The Sweetwater respectfully submits that the record in this case does not justify any reduction of its EAJA claim in excess of 5% given the extensive overlapping of the facts which were related to the various alternative bases for compensation set forth by The Sweetwater.

Sweetwater interest on this amount for five years (and retain that interest for itself, a value of in excess of $222,000), but it also required The Sweetwater, during the period it was unable to operate an ongoing business and receive any revenue, to incur huge legal expenses *simply to obtain what was rightfully owed to it*.[10] Even upon an award of 100% of The Sweetwater's EAJA claim, The Sweetwater will still have been forced to incur substantial additional management time and expenses *just to get what was rightfully owed to it*. While it never will admit it, the government is obviously aware that this type of result creates a significant disincentive, if not outright barrier, for small businesses to assert their rights against the government. The EAJA was intended to, as much as possible, rectify this type of injustice.

**6. The Sweetwater is entitled to the costs related to its motion for reconsideration.**

Even though the government admits that The Sweetwater is a prevailing party in this case, it singles out a particular motion in its opposition, namely The Sweetwater's motion for reconsideration. However, the government completely ignores the fact that in its motion for reconsideration, The Sweetwater pointed out, among other issues, that the Court had *incorrectly granted The Sweetwater* $13,381.10 in costs which were related to litigating this case, and that the Court had incorrectly denied The Sweetwater costs related to its maintenance of the facilities at issue. The Court agreed with both of these corrections. The Sweetwater also sought an

[10] The government notes that The Sweetwater was unable to timely pay some of the debts it incurred to its attorneys in order to proceed with this case for over four years. Opp. at 13, n. 5. While these debts were in fact incurred and thus are eligible legal costs, the government is correct that timely payments were not always made. These delays were due to the fact that The Sweetwater's sole business had been terminated by the government over five years ago with no compensation, and The Sweetwater had to borrow substantial funds and go into debt simply to persevere in obtaining what was rightfully owed to it (unfortunately, the substantial cost of these borrowings are not recoverable). The government's passing assertion that this delay due to the financial hardship imposed by the government's illegal conduct is somehow a basis to "doubt" Mr. Mummery's credibility is outrageous and something for which government counsel should be ashamed. Moreover, it is simply one more example of the government's spiteful strategy to malign Mr. Mummery rather than address the facts in this case.

important correction in the Court's Opinion related to its knowledge at the time of executing the permit which was necessary because the government may have chosen to appeal the case and then cite to this incorrect fact. The Court also agreed with this correction.[11] While the government also moved (albeit out of time) for reconsideration *on different grounds* in its response, and this motion (not The Sweetwater's motion) resulted in the reduction of The Sweetwater's claim on these different grounds, *this separate and unopposed motion was totally unrelated to The Sweetwater's motion*. Therefore, even if the Court chooses to single out one motion in this extensive litigation, the record shows that The Sweetwater's motion, which resulted in corrections to the Court's Opinion, was justified.

**7. The Sweetwater is entitled to the costs of its expert Mr. John Pucetas.**

The government asserts that The Sweetwater is not entitled to recover its costs incurred by Mr. John Pucetas of SiteTek, who was admitted as an expert witness by the Court. Opp. at 14. Mr. Pucetas assessed the reconstruction value of the lodge, and as the Court noted in its opinion, that reconstruction cost was properly shown to be $2,000,000. Opinion at 5. The government's assertion is based on the fact that the Court did not ultimately incorporate Mr. Pucetas' reconstruction cost assessment in its final determination of the lodge value. However, as was noted by Mr. Mangus, an appraisal typically includes three different assessments- a sales comparison approach, an income approach and a construction cost approach. PX 44 at 15. Mr. Mangus was not experienced in completing the reproduction cost approach of the lodge facilities given their age, and this approach was completed by Mr. Pucetas, who was eminently skilled in this area. Thus, this effort and expense were necessary to provide a thorough appraisal. While

---

[11] In addition, the fees for the eleven hours related to The Sweetwater's preparation of a reply to its motion for reconsideration were correctly included in its EAJA claim. Opp. at 13, n. 4. That reply was not filed because the Court ruled very promptly after receiving the government's opposition to The Sweetwater's motion, thus mooting any further submissions.

the Court ultimately did not incorporate Mr. Pucetas' value in its final determination of the appropriate lodge value and used Mr. Mangus' sales comparison approach, the Court did note in the hearing that Mr. Pucetas' valuation was entirely consistent with the term "equitable consideration" as set forth in the contract based on comparable government contract principles. Thus, the government has not shown any basis, given this Court's review of the case "as a whole," to single out and exclude the costs for this work related to the appraisal of the property which clearly was incurred as part of a proper and thorough presentation to the Court in this case.

**8. Legal fees and costs incurred in 2002.**

The government asserts that The Sweetwater is not entitled to recover out of pocket costs for legal fees and costs totaling $47,000 incurred in 2002 because they preceded the filing of its Complaint. Opp. at 11-12. However, the Complaint was filed in December 2002, and 41.3 hours were incurred in 2002 after that filing as well as in preparing that Complaint. *See* Exhibit E (pages 36-39). They are therefore recoverable. *See Oliveria v. United States*, 827 F.2d 735, 744 (Fed. Cir 1987)(pre-complaint costs incurred "in preparation for trial" are recoverable); *Levernier Constr., Inc. v. United States*, 947 F.2d 497, 501 (Fed. Cir. 1997); *California Marine Cleaning, Inc. v. Unites States*, 43 Fed. Cl. 724, 731 (1999). At the unopposed EAJA rate of $152.38, these hours total $6,293.29.

As to the remaining fees and costs claimed for 2002 (which total $41,135.68 as reduced by EAJA rates), it is undisputed that these were out of pocket costs incurred because of The Sweetwater's continued obligations under the permit. The Court held in its Opinion that The Sweetwater is entitled to these out of pocket costs which were incurred in 2002. Therefore, The Sweetwater requests that, if the Court concludes that these costs cannot be recovered under the EAJA, the Court issue a separate Order directing that the government pay these costs as part of

the equitable consideration owed pursuant to the terms of the permit, and at the full amount they were incurred which was $56,376.22 for the months January 2002-October 2002. *See* Exhibit E to Revised EAJA Application.[12]

**9. The Sweetwater is entitled to the costs set forth in Exhibits S and V because those charges were incurred by or at the direction of its attorneys for purposes of pursuing this litigation.**

The government challenges the costs set forth on Exhibits S and V attached to The Sweetwater's revised EAJA Application because they "lack any explanation" as to why they are recoverable under the EAJA. Opp at 14. However, $3,626.70 of these costs were incurred by or at the direction of The Sweetwater's counsel for purposes of this litigation. *See* Exhibit Y attached hereto. In these particular instances, Mr. Mummery was present when these costs were incurred for the purposes of pursuing this litigation, or was directed by his counsel to incur them on behalf of counsel. Rather than going through the formality of paying for them and then billing The Sweetwater for them later, his attorney directed Mr. Mummery to pay for them at that point in time. Thus, these costs clearly are recoverable under the EAJA as expenses of The Sweetwater's attorneys incurred in the course of pursuing this litigation. *See Oliveria,* 827 F.2d at 744 (Fed. Cir 1987)(trial judge has discretion to decide which costs were incurred in preparing for litigation). The net reduction in The Sweetwater's claim for these out of pocket costs is therefore $2,280.16.

**10. Conclusion**

For the reasons set forth above and in its prior submissions, The Sweetwater respectfully

[12] Because of the fact that The Sweetwater is not receiving interest on its October 12, 2006 judgment in this case, if the Court is unable to compensate The Sweetwater for this additional $56,376.22 without extending the appeal period which applies to the amounts The Sweetwater received in that prior judgment, The Sweetwater respectfully withdraws this request for these additional out of pocket expenses.

requests that the Court award it $358,206.60 in fees and costs pursuant to the EAJA incurred as of the filing of this submission.[13]

Respectfully submitted,

s/Kevin R. Garden

Kevin R. Garden
THE GARDEN LAW FIRM P.C.
211 North Union Street, Suite 100
Alexandria, VA 22314
(703) 519-1286

Dated: January 7, 2007

[13] The Sweetwater will likely incur additional legal costs in resolving the issues related to the bill of sale sought by the government before the government will comply with the Court's judgment in this case and reserves the right to submit these costs to the Court as part of this application.